Cheryl A. Williams (Cal. Bar No. 193532)
Kevin M. Cochrane (Cal. Bar No. 255266)
caw@williamscochrane.com
kmc@williamscochrane.com
WILLIAMS & COCHRANE, LLP
525 B Street, Suite 1500
San Diego, CA 92101
Telephone: (619) 793-4809

Attorneys for Plaintiffs
WILLIAMS & COCHRANE, LLP, *et al.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **WILLIAMS & COCHRANE, LLP**; *and* **FRANCISCO AGUILAR, MILO BARLEY, GLORIA COSTA, GEORGE DECORSE, SALLY DECORSE**, *et al., on behalf of themselves and all those similarly situated*; <br><br> *(All 28 Individuals Listed in ¶ 13)* <br><br> Plaintiffs, <br><br> vs. <br><br> **QUECHAN TRIBE OF THE FORT YUMA INDIAN RESERVATION**, *a federally-recognized Indian tribe;* **ROBERT ROSETTE; ROSETTE & ASSOCIATES, PC; ROSETTE, LLP; RICHARD ARMSTRONG; KEENY ESCALANTI, SR.; MARK WILLIAM WHITE II**, *a/k/a/ WILLIE WHITE; and* **DOES 1 THROUGH 100**; <br><br> Defendants. | Case No.: 17-CV-01436 GPC MDD <br><br> **FIRST AMENDED COMPLAINT** <br><br> <u>**CLASS ACTION COMPONENT**</u> <br><br> <u>**JURY TRIAL DEMANDED**</u> <br><br> **[ACTION FILED JULY 17, 2017]** |

## INTRODUCTION

1. This case concerns the tortious interference of a contract by an individual who has now done or attempted to do the same with three different clients of the plaintiff over the span of the past seven years. Last year, the firm of Williams & Cochrane concluded a gaming compact-based lawsuit in this district against the State of California on behalf of the Pauma Band of Mission Indians that led to the payment of a $36.3 million judgment in September 2016. *See Pauma Band of Luiseno Mission Indians v. California,* No. 09-01955 (S.D. Cal. 2016) ("*Pauma*"). A case involving so much money naturally draws a lot of undesired attention, and, in an unusual turn of events, an attorney by the name of Robert Rosette tried to settle the case with the State of California even though he did not represent the plaintiff tribe in the suit and even admitted as much in his covert communications with the Office of the Governor.[1] Lacking these e-mails, the presiding judge in the prior case – Judge Cathy Ann Bencivengo – naturally took issue with the actions of Robert Rosette, but, ultimately refrained from doing anything about his questionable conduct since he was not formally involved in the proceeding.

2. At the time various media outlets around Southern California were reporting on the State paying this once-in-a-generation judgment to Pauma, another tribe situated in this district known as the Quechan Tribe of the Fort Yuma Indian Reservation reached out to Williams & Cochrane and asked if the firm could solve a similar but more complicated dispute that the tribe had with the State of California concerning approximately $40 million in overpayments under an allegedly void compact.[2] After an in-person meeting,

---

[1] A true and correct copy of a series of July 2011 e-mails between Robert Rosette and the State of California's then-compact negotiator Jacob Appelsmith is attached hereto as **Exhibit 1**.

[2] Williams & Cochrane has carefully reviewed the ethical rules related to disclosing confidential information in a dispute with a former client, and the consensus seems to be that an attorney can disclose what he or she "reasonably believes necessary… to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client." Model Rules of Prof'l Conduct R. 1.6(b)(5) (2016); *accord* Restatement (Third) of the Law Governing Lawyers § 65 (2000); The Bar Association of

1

numerous phone calls, and weeks of discussion and negotiation, Williams & Cochrane and Quechan ultimately executed an Attorney-Client Fee Agreement that incorporated a discounted 15% contingency fee in the event the firm was able to find an expedient way to recover the $40 million in overpayments (or the value thereof) through either negotiation or litigation.[3] Along with signing the contract, the Quechan Tribal Council also executed a tribal resolution indicating that it had voted "5 for," "0 against" on the issue of whether to accept the terms of the Attorney-Client Fee Agreement.[4]

3. With that, Williams & Cochrane got down to work and over the course of the next nine months, from October 2016 to June 2017, was able to convince the Office of the Governor to provide Quechan with a replacement compact that would eliminate over $120 million in revenue sharing fees during the next 28 years and provide the tribe with the ability to generate another $660 million in additional revenue as a result of new gaming rights. ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████. And yet, on June 27, 2017, just three days before the parties were supposed to execute the compact and the 15% contingency fee would definitively attach without the aid of the premature termination section of the Attorney-Client Fee Agreement, the putative President of Quechan Keeny Escalanti transmitted a

San Francisco Formal Op. 2014-01 (2014) (citing Cal. Evid. Code § 958). Thus, along with citing to information that is in the public realm and obtained outside of the attorney-client relationship, Williams & Cochrane will include evidence-based allegations herein pertaining to the terms of the contract, the tribe's entitlement to a reduction in revenue sharing from the State, the value of the services rendered, the results obtained, and the time and labor required to achieve those results since this information may bear on the damages resulting from Quechan's decision to repudiate the Attorney-Client Fee Agreement. After all, the putative President for Quechan Keeny Escalanti, Sr. has already indicated that Williams & Cochrane should take nothing under the Attorney-Client Fee Agreement after evaluating such considerations. *See* ¶¶ 3 & 112-16; Ex. 4.

[3] A true and correct copy of the September 29, 2016 "Attorney-Client Fee Agreement" between Williams & Cochrane and Quechan is attached hereto as **Exhibit 2**.

[4] A true and correct copy of the September 29, 2016 Quechan Resolution No. "R-195-16" is attached hereto as **Exhibit 3**.

letter to Williams & Cochrane, via an e-mail on which no other Tribal Councilmembers were carbon copied, indicating that the tribe was terminating the firm effective immediately and would not pay either the contingency fee or a reasonable fee in lieu thereof based upon the value of the services the tribe had received.[5] In an apparent effort to convince Williams & Cochrane to simply walk away from the contract, putative Quechan President Keeny Escalanti included an extortive threat at the end of the letter that stated, "[w]e strongly advise you against pressing your luck any further out of concern for the reputation of your firm in Indian Country and in the State of California" – language that is reminiscent of what putative Quechan President Keeny Escalanti included in a separate "Demand for Cease and Desist" three days later.[6] After conveying the original threat, putative Quechan President Keeny Escalanti then ended the June 27th letter by explaining that Williams & Cochrane could not tell anyone else in the tribe about the message they had just received (*i.e.*, other Tribal Councilmembers, the General Manager of the casino, tribal members, etc.), and simply instructed the firm to turn over all their work product to one Robert Rosette – including the latest draft of the compact that Quechan and the State of California were days away from executing.

4. The bizarreness of the situation was not lost on the attorney general representing the State of California in the compact negotiations, who called one of the partners of Williams & Cochrane named Cheryl Williams after receiving a similar letter three days before the conclusion of the negotiations and exclaimed "This has never happened before [in my twenty-plus years of representing the Office of the Governor in tribal compact matters] and we don't know what to do." Unfortunately, Williams & Cochrane did know what to do – and that was to turn over its incalculably valuable work product and simply step away from the situation. While it does not know the full extent of the fraud in this

---

[5] A true and correct copy of a June 26, 2017 letter from putative Quechan President Keeny Escalanti to Williams & Cochrane is attached hereto as **Exhibit 4**.

[6] A true and correct copy of a June 30, 2017 letter from putative Quechan President Keeny Escalanti to Williams & Cochrane is attached hereto as **Exhibit 5**.

matter, what Williams & Cochrane does know is that Robert Rosette actually advertises on his website that he was responsible for litigating the *Pauma* case that resulted in the $36.3 judgment, and he presumably solicited Quechan with similar misrepresentations about his role in the case and then told the tribe to fire Williams & Cochrane once a compact in principle had been reached so he could swoop in and take credit for the outcome.[7][8] This is the only logical telling of the basics of a story that involves a person who either has or has tried to interfere with significant contracts between Williams & Cochrane and third parties on at least four separate occasions this decade. Unfortunately, the only forum for resolving this issue is in federal court because Robert Rosette has a long and well-documented history of coming in to tribes through dubious means – like by representing singular persons or "factions" and then claiming he represents the tribe as a whole – and then doing whatever it takes to assume control and advance his agenda, even if it means the divided tribal members turn against each other and resort to mass armed violence. *See* Section II(A), *infra.*

5. Thus, in order to rectify a situation with no extra-judicial remedy, Williams & Cochrane has filed the instant complaint alleging various contract-related claims against Quechan in order to obtain the remaining $6,209,916.10 due on the Attorney-Client Fee Agreement that both the tribal government and membership led the firm to believe they would honor. In addition, this complaint also advances a number of claims under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* to obtain treble damages or a punitive analog of the aforementioned amount from the duplicitous individuals associated with Rosette, LLP who tortuously and fraudulently interfered with Williams & Cochrane's contract rights.

6. On the compact front, it is worth bringing to the Court's attention the fact that

---

[7] A true and correct copy of a June 28, 2017 screen capture of the website biography for Robert Rosette is attached hereto as **Exhibit 6**.

[8] A true and correct copy of an August 25, 2014 screen capture of the website biography for Robert Rosette from the Internet Archive (*see* https://archive.org/web/) is attached hereto as **Exhibit 7**.

Quechan has now received the full benefit of the bargain it struck under the Attorney-Client Fee Agreement. As to that, on September 5, 2017, Robert Rosette issued a press release that he contemporaneously uploaded to his website announcing that "Governor Edmund G. Brown and the Fort Yuma Quechan Indian Tribe… have signed a new Tribal-State Gaming Compact" that will "reduce the Tribe's revenue sharing obligations by approximately four million ($4,000,000) per year, and simultaneously increase the Tribe's ability to generate revenues through its gaming operations." The following day, the Office of the Governor posted the compact executed by Quechan and the State of California on its own website, with the terms therein revealing that the agreement in all positive material respects is the one Williams & Cochrane had negotiated for Quechan – from eliminating all non-regulatory revenue sharing fees on Quechan's preexisting allotment of 1,100 machines, to allowing for the operation of 500 additional machines, to increasing the number of gaming facilities the tribe can run from one to three. Even language as insignificant as the Recitals at the outset of the compact is virtually indistinguishable from what Williams & Cochrane authored and included in its final draft compact that it sent to the State of California. Thus, the best Robert Rosette did during his two-month involvement in this situation was to try and "hold the line" and oversee the execution of the compact negotiated by Williams & Cochrane. Lest there be any doubt about the value of the concessions that Williams & Cochrane negotiated on Quechan's behalf, both the press release (as indicated above) and the compact memorialize that the reduction in revenue sharing obtained by Williams & Cochrane will save the tribe around $4,000,000 per year for the entire course of the twenty-eight year agreement, with the latter document stating in material part:

> This Compact reduces the Tribe's revenue sharing obligations by approximately four million dollars ($4,000,000) per year, and simultaneously increases the Tribe's ability to generate revenues through its Gaming Operation by providing the right to operate additional Gaming Facilities and Gaming Devices.

Thus, with the benefits of the Attorney-Client Fee Agreement in hand, the only thing left

for Quechan to do is to pay the remaining $6,209,916.10 that is due under its contract with Williams & Cochrane. The damages owed by Robert Rosette and the others who schemed to interfere with the Attorney-Client Fee Agreement are a whole different matter, however. To show the entitlement to these damages, the first two acts of the narrative that follows first focuses on Williams & Cochrane's contractual relationship with Quechan before shifting gears to detail Robert Rosette's seven-year quest to put Williams & Cochrane out of business – a pursuit that ultimately concludes with him emerging at Quechan and inducing a total repudiation of a contract just days before Williams & Cochrane was set to settle an immense and highly-delicate dispute between the tribe and the State of California. These final allegations and those in the two acts of the narrative thereafter go to show the harms suffered by the general membership of Quechan ("General Council"), as Robert Rosette negligently interfered in the California compact negotiations and then defiantly sought to retain his position in the tribe afterwards for untold and seemingly untoward reason. After all, the contract interference that is at the heart of this suit appears to have less to do with insatiable spite than it does with something much more basic.

7. Speaking of which, vindictiveness is a powerful emotion, but perhaps not strong enough to compel an individual to take over an unfamiliar, high-stakes representation at the last moment for supposedly $10,000 a month when the interference will likely require him to spend one-hundred times as much retaining a powerhouse law firm like O'Melveny & Myers to try and justify his conduct before a state or federal court. The compulsive force in this case, though, has less to do with vindictiveness than it does with lust for power and avarice. In reality, the tortious interference with the Attorney-Client Fee Agreement is just one piece of a much larger picture, and one that can be seen at tribe after tribe at this point. What Robert Rosette has a documented history of doing is finding some covert side door into a tribe so he can implement a get-rich-quick scheme, the most recent incarnation of which is the online payday lending business that he sells to tribes. A common playbook exists for carrying out this particular scheme, with Robert Rosette first

offering to have his twenty-plus-attorney firm take on some substantial form of work for a remarkably insubstantial rate, then displacing all legal oversight, and then setting up an illicit enterprise for which 97% of the money goes to shadow entities – like himself and his select Tribal Council allies – while the general membership of the tribe remains bliss-fully ignorant of what is taking place behind the scenes, at least initially. This pattern of subversiveness is plainly evident in the course of events at Quechan, as Robert Rosette somehow convinced his Tribal Council allies to disregard the directive of the General Council and fire Williams & Cochrane at the last moment, then found a way to displace the tribe's long-standing general counsel, and then protected his Tribal Council allies from recall when the Quechan general membership voted them out of office shortly after the service of the complaint in this case. All the while, Robert Rosette has ensured that all of the basic legal documents pertaining to his representation of Quechan remained hidden until the filing of the initial responsive motions in this case so the General Council could not invalidate his contract and oust him from the tribe. As has been the case with count-less other tribes where Robert Rosette has put the interests of the few above the whole, internal strife is now boiling over, with the harms befalling Quechan being both final and concrete (*i.e.*, the damages caused by interfering with the California compact work) and continuing and mounting, as communal governmental processes have broken down in the individual pursuit for obtaining discreet payday loan profits. This course of events shows why the interference with the Attorney Client Fee Agreement was just a single harm of a much larger fraudulent scheme, and also why a number of Quechan General Council-members have sought to advance professional malpractice claims against Robert Rosette, on behalf of themselves and their absent tribal members, for mishandling the conclusion of the California compact negotiations and costing the tribe many millions of dollars in the process.

## JURISDICTION

8. The district court has jurisdiction over this matter pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. ("RICO"); the Lan-

ham Act, 15 U.S.C. § 1051 *et seq*.; the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq*. ("IGRA") (*see, e.g., Cabazon Band of Mission Indians v. Wilson,* 124 F.3d 1050, 1056 (9th Cir. 1997)); 28 U.S.C. § 1331 ("Federal Question Jurisdiction"); and 28 U.S.C. § 1367 ("Supplemental Jurisdiction").

9. Venue is proper in this district under Section 1965(a) of RICO since Robert Rosette represents a number of tribes in and around San Diego County and Imperial County – presumably including Quechan – and thus "transacts his affairs" in the district for purposes of the statute. *See* 18 U.S.C. § 1965(a) (explaining a RICO action may be instituted against a person in any district in which "such person resides, is found, has an agent, or transacts his affairs"); *see also Yavapai-Apache Nation v. La Posta Band of Diegueno Mission Indians,* 2017 Cal. App. Unpub. LEXIS 4430 (4th Dist. June 28, 2017) (indicating Rosette represents the Southern District-based La Posta tribe in a more than four-year-old breach of contract action in which the San Diego Superior Court entered a final judgment against La Posta in the amount of $48,893,407.97); *Yavapai-Apache Nation v. Iipay Nation of Santa Ysabel,* 201 Cal. App. 4th 190 (4th Dist. 2011) (indicating Rosette has defended the Southern District-based Santa Ysabel tribe in a nearly identical breach of contract action involving $30+ million in damages). Furthermore, jurisdiction is also proper under the general venue statute since a substantial part of the events giving rise to this suit occurred in this district – including the execution of the Attorney-Client Fee Agreement, the termination of said agreement, and a multitude of acts comprising the long-running series of wire and mail fraud in this case. *See* 28 U.S.C. § 1391(b)(2) (explaining "[a] civil action may be brought in… a jurisdiction district in which a substantial part of the events or omissions giving rise to the claim occurred…"). It is also worth noting for venue purposes that this district is uniquely situated to hear this case since three of its judges dealt with the issues discussed herein while presiding over the prior action entitled *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* No. 09-01955 CAB MDD (S.D. Cal. 2016).

10. Quechan has waived its sovereign immunity to suit in federal court pursuant to

Section 13 of the Attorney-Client Fee Agreement between Quechan and Williams & Cochrane. *See* Ex. 2, § 13. This waiver would also extend to the two putative Quechan Tribal Councilmembers who are named defendants in this case if they ultimately acted in their official capacities rather than the *ultra vires* manner that is alleged.

11. This action presents an actual and live controversy as to whether Quechan repudiated the Attorney-Client Fee Agreement at the direction of and with the assistance of Robert Rosette, an attorney that has used the mail and wires to perpetuate an ongoing series of fraud against Williams & Cochrane for the past seven years in large part to personally enrich himself at the expense of Williams & Cochrane's tribal clients. This action also presents an actual and live controversy as to whether Robert Rosette mishandled the conclusion of the California compact negotiations to the considerable detriment of the general membership of Quechan. The district court has the power to remedy the dispute in accordance with the Prayer for Relief, *infra*.

## PARTIES

12. Williams & Cochrane, LLP is a partnership registered in the State of California to provide legal services, with offices in both San Diego and Temecula, California.

13. Francisco Aguilar, Milo Barley, Gloria Costa, George DeCorse, Sally DeCorse, Charles Denard, Gailla Golding, Jessica Golding, Tracey Hartt, Michael Jack, James Jackovich, Tashena Johns, Leon Machada, Kenneth Meeden, Melissa Mills, Cecil Palone, Dwayne Porter, Lamuel Porter, Louis Rosevelt, Priscilla San Miguel, Daniel Sestiaga, James Slaughter, Kyle Slaughter, Kara Slaughter, Franklin Smith, Pascha Stoit, Ray Valenzuela, and Frank White are individuals and enrolled members of the Quechan Tribe of the Fort Yuma Indian Reservation.

14. The Quechan Tribe of the Fort Yuma Indian Reservation is a federally-recognized Indian tribe identified in the January 17, 2017 Federal Register as the "Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona." *See* 82 Fed. Reg. 4918 (Jan. 17, 2017), *available at* https://www.gpo.gov/fdsys/pkg/FR-2017-01-17/pdf/2017-00912.pdf (last visited June 30, 2017). According to its website, the address

for Quechan's tribal administration building that houses "the offices of the President, Vice-President, and the Tribal Council Members" is 350 Picacho Road, Winterhaven, California 92283. *See* Fort Yuma Quechan Indian Tribe, *Departments – Administration, available at* https://www.quechantribe.com/departments-administration.html (last visited July 2, 2017).

15. Robert Rosette is an individual and attorney licensed to practice law in the States of Arizona and California and a number of federal courts, including the United States District Court for the Southern District of California. Rosette has a California Bar number of 224437. *See* The State Bar of California, *Attorney Search Results for Robert A. Rosette, available at* http://members.calbar.ca.gov/fal/Member/Detail/224437 (last visited July 1, 2017). Rosette is the President and Director of Rosette & Associates, PC, which is in turn a general partner of a parent entity named Rosette, LLP, and is identified as working out of the firm's principal office at 565 West Chandler Boulevard, Suite 212, Chandler, Arizona 85225. *See* Rosette, LLP, *Biography of Robert A. Rosette, available at* https://www.rosettelaw.com/professionals/robert-rosette/ (last visited July 10, 2017).

16. Rosette & Associates, PC is a corporation organized in the State of Arizona to provide legal services. *See* Arizona Corporation Commission, *File Detail for Rosette & Associates P.C., available at* http://ecorp.azcc.gov/Details/Corp?corpId=11084750 (last visited June 30, 2017). Its principal office is at 565 West Chandler Boulevard, Suite 212, Chandler, Arizona 85225.

17. Rosette LLP is also an entity registered in the State of Arizona to provide legal services. *See* Arizona Secretary of State, *Result Detail for Rosette, LLP, available at* https://apps.azsos.gov/apps/tntp/r/2LP/4003535 (last visited June 30, 2017). It has five offices – one apiece in California, Arizona, Oklahoma, Michigan, and Washington, D.C. – and employs at least twenty attorneys. *See, e.g.*, Rosette, LLP, *Professionals, available at* https://www.rosettelaw.com/professionals/ (last visited Mar. 2, 2018). Like Rosette & Associates, PC, the principal office for Rosette, LLP is at 565 West Chandler Boulevard, Suite 212, Chandler, Arizona 85225.

18. Richard Armstrong is an individual and attorney licensed to practice law in the States of Arizona and California and a number of federal courts, including the United States District Court for the Southern District of California. Armstrong has a California Bar number of 225191. *See* The State Bar of California, *Attorney Search Results for Richard J. Armstrong, available at* http://members.calbar.ca.gov/fal/Member/Detail/ 225191 (last visited July 1, 2017). Armstrong is a senior of counsel with Rosette, LLP who has been with the firm since before 2009 and presently oversees the firm's Sacramento office at 193 Blue Ravine Road, Suite 255, Folsom, California 95630. *See* Rosette, LLP, *Biography of Richard J. Armstrong, available at* https://www.rosettelaw.com/ professionals/ (last visited July 10, 2017).

19. Keeny Escalanti, Sr., is an individual and the putative Tribal Chairman of Quechan.

20. Mark William White II, a/k/a Willie White, is an individual and a putative Tribal Councilmember of Quechan. White is also a self-styled entrepreneur with apparent connections to the marijuana industry, which he is either actively involved in or attempted to get into through a corporate entity entitled Sovereign Hempire. *See* Arizona Corporation Commission*, File Detail for Sovereign Hempire LLC*, *available at* http://ecorp. azcc.gov/Details/Corp?corpid=N21086999 (last visited July 10, 2017).

21. Does 1 through 100 are other individuals or entities associated with Robert Rosette (and his law firm) or Quechan who partook in the fraudulent conduct in this case, including precipitating the breach of the Attorney-Client Fee Agreement and conspiring to set up a sham online payday lending entity at Quechan that, on information and belief, is intended for the personal enrichment of a select few individuals. The "Doe" designations represent fictitious names, with Williams & Cochrane ignorant of the true names on account of the material evidence revealing the identities of the implicated parties being in the exclusive possession of those parties or the presently-named defendants in this action.

///

///

# GENERAL ALLEGATIONS

## I.   THE CONTRACT BETWEEN QUECHAN AND WILLIAMS & COCHRANE

### A. Background on Indian Gaming

22. Indian gaming in the State of California began to take off during the 1980s when a number of tribes with reservations near urban centers started operating bingo facilities and card rooms on their reservations. *See, e.g., California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 205 (1986) ("*Cabazon*").

23. The State of California soon became disgruntled with the emergence of these tribal bingo operations and began to demand that the operating tribes comply with State laws, which at the time had special rules related to the type of entities that could offer such gaming, the handling of gaming revenues, and the amount of prizes that could be awarded to the participants. *See Cabazon,* 480 U.S. at 205.

24. However, the Supreme Court of the United States held that the State of California could not use its "criminal jurisdiction over offenses committed by or against Indians within all Indian Country within the State" that it obtained pursuant to Public Law 280, 18 U.S.C. § 1162, to civilly regulate tribal activities that were not outright proscribed as a matter of State law. *See* Cabazon 480 U.S. at 212. According to the Supreme Court, the State of California did "not prohibit all forms of gambling… and daily encourages its citizens to participate in this state-run gambling." *Id.* at 210. Since "California regulates rather than prohibits gambling in general and bingo in particular," the Supreme Court held that the State of California could not enforce its regulatory bingo law at Penal Code § 326.5 against the two tribal parties in the case. *Id.* at 212.

25. The decision by the Supreme Court in *Cabazon* led Congress to pass IGRA the following year to define the rules that would apply for any federally-recognized Indian tribe interested in engaging in gaming.

26. IGRA divides the potential forms of gaming into three separate categories that require differing amounts of regulation depending on the type (and potential profitability) of the game at issue. Class I encompasses "social games solely for prizes of minimal

value or traditional forms of Indian gaming" (*see* 25 U.S.C. § 2703(6)), and falls under the "exclusive jurisdiction of the Indian tribes." 25 U.S.C. § 2710(a)(1). Class II includes bingo and non-banked card games (*see* 25 U.S.C. § 2703(7)(A)), and is subject to both tribal regulation and federal regulation in accordance with the provisions of IGRA. 25 U.S.C. § 2710(a)(2). And Class III is a catch-all category that includes "all forms of gaming that are not class I gaming or class II gaming" (*see* 25 U.S.C. § 2703(8)), such as banked card games and slot machines, and comes under a tripartite regulatory scheme that requires involvement from the tribe, the state, and the federal government. *See, e.g.,* 25 U.S.C. § 2710(d).

27. Since a state typically does not have a role in the regulation of tribal activities that occur on reservation lands, IGRA creates a role for the states by devising a compacting mechanism that allows a state to negotiate for certain types of regulations that it would like to apply to the gaming facility at issue. *See, e.g.,* 25 U.S.C. § 2710(d)(3)(C).

28. IGRA also includes a requirement that the State negotiate for a compact in good faith. Thus, amongst other requirements, if a tribe requests to commence compact negotiations for a class III game that the state has permitted any other person, organization, or entity to conduct (*see* 25 U.S.C. § 2710(d)(1)(B)), then the "State shall negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A).

29. To breathe life into this good faith requirement, Congress included a provision in IGRA that waives the States' Eleventh Amendment immunity to suit in federal court for "any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact… or to conduct such negotiations in good faith." 25 U.S.C. § 2710(d)(7)(A)(i).

30. A federal district court holding that a state negotiated in bad faith for a class III gaming compact with a tribe would trigger a tripartite remedial scheme whereby a tribe can obtain a compact or a compact-like mechanism through, in succession, renewed negotiations with the state, baseball-style arbitration before a "mediator," or consultations

with the Secretary of Interior during which the federal official would proscribe regulatory "procedures… under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction." 25 U.S.C. § 2710(d)(7)(B)(iv)-(vii).

31. The Supreme Court soon thereafter frustrated the compacting scheme in IGRA by holding that Congress did not act pursuant to a "valid exercise of power" in abrogating the States' Eleventh Amendment immunity from suits brought by tribes alleging that the surrounding states had either refused or failed to negotiate in good faith for a class III gaming compact. *See Seminole Tribe of Fla. v. Florida,* 517 U.S. 44 (1996).

32. The people of the State of California fixed the statutory hole created by the Supreme Court in *Seminole* for resident tribes in 1998 with the passage of Proposition 5, a measure containing a model compact that included a waiver of sovereign immunity for actions related to the State's refusal to execute that particular gaming compact with any interested tribe or to conduct negotiations for *any other* gaming compact in good faith. *See* Cal. Gov't Code § 98005.

**B. The 1999 Compacts and the ensuing License Pool Dispute**

33. With the good faith negotiation requirement back in effect for gaming compact negotiations in the State of California, Governor Gray Davis commenced mass negotiations the ensuing years with upwards of sixty tribes to devise a model compact for class III gaming rights, including slot machines.

34. The resultant agreement ("1999 Compact") contains a uniform system for determining the number of slot machines that each signatory tribe could operate.[9]

35. For starters, each signatory tribe would start with a baseline entitlement of slot machines equivalent to the greater of the number of machines the tribe operated illegally before the compact went into effect or 350. *See* Ex. 8 at § 4.3.1.

36. From there, each one of the sixty-plus signatory tribes could submit an appli-

---

[9] A true and correct copy of excerpts of the "Tribal-State Compact between the State of California and the Quechan Indian Nation" (*i.e.*, one of the many substantively-identical 1999 Compacts) is attached hereto as **Exhibit 8**.

cation to obtain machine-specific licenses to increase its device count up to a maximum of 2,000. *See* Ex. 8 at § 4.3.2.2(a).

37. The only catch was that the 1999 Compact did not expressly state the total number of licenses that were available to the signatory tribes, with that figure instead being the output of the following opaque formula in Section 4.3.2.2(a)(1) of the agreement:

> (1). The maximum number of machines that all Compact Tribes in the aggregate may license pursuant to this Section shall be a sum equal to 350 multiplied by the number of Non-Compact tribes as of September 1, 1999, plus the difference between 350 and the lesser number authorized under Section 4.3.1.

*See* Ex. 8 at § 4.3.2.2(a)(1).

38. During the summer of 2002, approximately two-and-a-half years into the performance of the agreements, the California Gambling Control Commission ("CGCC") unilaterally determined that the "license pool" formula in Section 4.3.2.2(a)(1) of the 1999 Compacts provided for 32,151 licenses, and applied this number when reviewing future tribal applications for slot machine licenses. *See, e.g., Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California,* 618 F.3d 1066, 1071 (9th Cir. 2010).

39. Yet, on April 22, 2009, the United States District Court for the Eastern District of California held that the license pool actually contains upwards of 10,549 more licenses than the CGCC had determined some seven years prior, and directed the Commission to make these additional licenses available to the signatory tribes. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California,* 629 F. Supp. 2d 1091 (E.D. Cal. 2009) ("*Colusa*").

### C. The Pauma Band and its Compact Suit against the State of California

40. The Pauma Band of Mission Indians ("Pauma") was one of the sixty-plus original tribal signatories to the 1999 Compact – an agreement they amended in 2004 ("2004 Amendment") to obtain the ability to operate 2,000 slot machines after the CGCC had determined they could not obtain the necessary licenses under the 1999 Compact given its restrictive interpretation of the license pool formula. *See Pauma Band of Luise-*

*no Mission Indians of Pauma & Yuima Reservation v. California,* 813 F.3d 1155, 1161-1162 (9th Cir. 2015) ("*Pauma*"). The result of the amendment was that Pauma ended up paying approximately twenty-four times as much revenue sharing each year in order to operate machines that should have been available under its original compact. *Id.* at 1162.

41. After learning about the ruling by the Eastern District of California in *Colusa*, Pauma filed a complaint in the Southern District of California on September 4, 2009 requesting rescission of the 2004 Amendment and restitution of the heightened fees paid thereunder on the basis of any one of seven claims: unilateral and mutual mistake of fact, unilateral and mutual mistake of law, frustration of purpose/failure of consideration, and two types of revenue-sharing-based violations under IGRA. *See Pauma,* No. 09-01955, Dkt. No. 1, pp. 19-26 (S.D. Cal. Sept. 4, 2009).

42. At the time, Pauma was represented in the lawsuit by a law firm named Rosette & Associates. The two attorneys who were exclusively responsible for preparing and filing the complaint in the case were Cheryl A. Williams and Kevin M. Cochrane.

43. In fact, Cheryl Williams and Kevin Cochrane performed all the litigation work in the case – from drafting the pleadings/motions to appearing at in-person hearings or telephonic conferences with the district court – from the outset of the proceeding until their eventual departure from the firm the ensuing year. This allegation is verified by Robert Rosette's October 26, 2010 deposition testimony in the antecedent case of *Pauma Band of Luiseno Mission Indians of the Pauma Yuima Reservation, Cal. v. Harrah's Operating Co.*, No. GIC847406 (San Diego County Sup. Ct. 2012). After suggesting that he was the lead strategist for the case, Robert Rosette responded as follows when asked about his specific involvement in the compact litigation by the deposing attorney for Harrah's:

> Q. Now, in terms of the [compact] litigation, the drafting and filing of the complaint and the arguing, did you do all that yourself up to the time you were removed from the case?
>
> A. No, I – I have employees that work for me that conduct research, draft, make court appearances, so on and so forth.

Q. All right. So outside of being sort of the lead strategist, did you make any appearances or become an attorney of record at all?

A. I was an attorney of record. There was only one appearance that was actually showing up, the oral argument for the preliminary injunction. And I had a conflict that day.

Q. Who argued that case from your firm?

A. Cheryl Williams.

44. Shortly after the filing of its complaint, Pauma moved for a preliminary injunction to reduce the revenue sharing fees of the 2004 Amendment to the prior rates of the 1999 Compact.

45. The initial district judge assigned to the action – Judge Larry Alan Burns – granted Pauma's motion for preliminary injunction in an order that indicated that "Pauma has made a strong showing of likelihood of success on the merits." *Pauma,* No. 09-01955, Dkt. No. 44, p. 2 (S.D. Cal. Apr. 12, 2010). On the basis of this "strong" showing and a "satisfactory" showing on the other three factors under *Winter v. NRDC,* 555 U.S. 7 (2008), Judge Burns ordered that "Pauma shall pay only those payments required under the terms of the original compact between the parties[.]" *Id.*

46. Approximately one month after Judge Burns' issued his injunction order, on or about May 15, 2010, both Cheryl Williams and Kevin Cochrane departed Rosette & Associates, leaving the case in the care of their prior firm.

47. As the two attorneys were departing, the State of California filed a notice of appeal of the injunction order on May 4, 2010 (*see Pauma*, No. 09-01955, Dkt. No. 50 (S.D. Cal. May 4, 2010)), and then followed this up with a motion to stay the injunction order pending appeal in the United States Court of Appeals for the Ninth Circuit. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* No. 10-55713, Dkt. No. 7 (9th Cir. May 21, 2010).

48. Though having left the firm, Cheryl Williams nevertheless offered to assist Rosette & Associates in preparing the opposition to the State's motion to stay in the Ninth Circuit so Pauma's interests would not be harmed. However, this request was quickly re-

buffed and the replacement attorneys with Rosette & Associates filed Pauma's opposition to the State's motion to stay the injunction pending appeal on June 11, 2010. *See Pauma,* No. 10-55713, Dkt. No. 15 (9th Cir. June 11, 2010).

49. On July 28, 2010, the motions panel of the Ninth Circuit granted the State's request to stay the injunction in a one paragraph order that simply stated that "Appellants' motion to stay the district court's April 12, 2010 order pending appeal is granted," along with citing to two cases entitled *Hilton v. Braunskill,* 481 U.S. 770, 776 (1987); and *California Pharmacists Association v. Maxwell-Jolly,* 563 F.3d 847, 849-850 (9th Cir. 2009). *See Pauma,* 10-55713, Dkt. No. 39 (9th Cir. July 28, 2010).

50. Just two days after Rosette & Associates filed its ineffective opposition brief, on or about Sunday June 13, 2010, the Pauma General Council held a meeting and voted to terminate Rosette & Associates from the compact litigation and replace the firm with Cheryl Williams and Kevin Cochrane, who had just previously formed their own law firm named Williams & Cochrane, LLP. This allegation that Rosette & Associates was removed from the case is again verified by Robert Rosette's October 26, 2010 deposition testimony in the antecedent *Pauma v. Harrah's* case. When the deposing attorney for Harrah's asked him to generally describe the status of the compact litigation as of that date (*i.e.*, just four months after his termination), Robert Rosette explained that he did not know because he was removed from the case in an exchange that went as follows:

Q. And then what is the current status of that case?

A. I don't know. I'm not – I was removed.

[…]

Q. And why were you terminated from representing Pauma?

A. They chose different legal counsel. Specifically, Cheryl Williams had left my firm and started her own firm and took the case with her.

Q. Is she a solo practitioner now?

A. She's got a law partner, but I don't – I don't know how they're formed or structured or anything. I don't – I don't care.

Q. And so she left your firm and simultaneously the matter transferred with

her; is that right?

A. No, I had the matter for probably over a month. I actually filed the initial – I took it over myself for a while, just because I was the main attorney. I just handled it myself for about 45 days and actually filed the preliminary answers in federal court, and then I was told shortly thereafter that I was being removed.

Q. And who told you that?

A. The chair – I was actually at – you know, my father had just passed away. I was at his funeral in Montana. That's why I couldn't go to the general council meeting. And the chairman had called me on – I think their general council meetings are the first Sunday of every month. He called me on Monday, when I was at home at Rocky Boy, Montana, and told me that the general council made a decision to remove me.

Q. Was there any claim that you had some conflict in going ahead with this case or any other reason other than simply going ahead with Cheryl?

[…]

A. I told you earlier that I respect tribal decisions, don't question them, don't pry. I told them thank you for letting me know and that I would transfer the files and I didn't ask any other – and, you know, like I said, I don't care. I got other things I could do.

51. After resuming their role as counsel of record in the case, Cheryl Williams and Kevin Cochrane were able to convince the Ninth Circuit to vacate its stay order and re-instate the preliminary injunction. *See Pauma,* No. 10-55713, Dkt. No. 62 (9th Cir. Aug. 23, 2010).

52. The Ninth Circuit then followed this order up with another one disposing of the interlocutory appeal entirely that kept the injunction in place pending any further consid-eration by the district court. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* 410 F. App'x 20 (9th Cir. Nov. 30, 2010).

53. The procedural handling of the case following remand involved multiple trans-fers as magistrates were promoted to district judgeships, with the case first going from Judge Burns to Judge Battaglia (*see Pauma,* No. 09-01955, Dkt. No. 104 (S.D. Cal. Mar. 22, 2011)), and then again from Judge Battaglia to Judge Bencivengo. *See Pauma,* No.

1  09-01955, Dkt. No. 176 (S.D. Cal. Mar. 6, 2012)).

2    54. In the midst of these transfers, Williams & Cochrane filed a First Amended

3  Complaint on Pauma's behalf with Judge Battaglia on September 9, 2011. *See Pauma,*

4  No. 09-10955, Dkt. No. 130 (S.D. Cal. Sept. 9, 2011). Along with adding a wealth of new

5  allegations, the amended pleading also included a new claim for relief based on misrepre-

6  sentation under federal contract law as embodied in the Restatement (Second) of Con-

7  tracts and other general principles. *See id.* at pp. 55-56.

8    55. When the case finally ended up before Judge Bencivengo, the court decided the

9  case on cross-motions for summary judgment, resolving the case in Pauma's favor on the

10  basis of the misrepresentation claim that Williams & Cochrane had added in September

11  2011. *See Pauma,* No. 09-01955, Dkt. No. 227 (Mar. 18, 2013). As a result of obtaining

12  summary judgment on the basis of the misrepresentation claim, Pauma was immediately

13  "entitled to rescission of the 2004 Amendment" and also subsequently received an order

14  allowing it to recoup the approximately $36.3 million in overpayments the tribe made to

15  the State under the amendment as a form of specific performance of the original 1999

16  Compact. *See Pauma,* No. 09-01955, Dkt. Nos. 238 & 245 (S.D. Cal. June 11, 2013 &

17  Dec. 2, 2013).

18    56. Along with that, the initial summary judgment order from Judge Bencivengo

19  also contained a *sua sponte* statute of limitations analysis that the State of California

20  failed to argue, presumably to stave off any copycat suits from arising in the years

21  following entry of judgment. *See Pauma,* No. 09-01955, Dkt. No. 227, pp. 17-18 (S.D.

22  Cal. Mar. 18, 2013).

23    57. However, before the district court would calculate and award the specific

24  performance remedy, Judge Bencivengo ordered Pauma and the State of California to

25  participate in a settlement conference with Magistrate Judge Mitchell Dembin to see if

26  the dispute could be resolved without the need for an appeal. *See Pauma,* No. 09-01955,

27  Dkt. No. 227, p. 31 (S.D. Cal. Mar. 18, 2013) (indicating the parties were to contact

28  Magistrate Judge Dembin to schedule a settlement conference before the district court

would consider the issue of "the heightened revenue sharing payments under the 2004 Amendment").

58. The Pauma General Council met in advance of the settlement conference and voted to try and negotiate an extension on the term of the largely-revenue-sharing-free 1999 Compact with the State of California, using the $36.3 million it was about to receive as a bargaining chip. *See Pauma,* No. 09-01955, Dkt. No. 256-1, ¶ 4 (S.D. Cal. Jan. 30, 2014).

59. The parties met for settlement conferences with Magistrate Judge Dembin twice between May 9, 2013 and May 20, 2013, but unfortunately "[n]o settlement was reached." *Pauma,* No. 09-01955, Dkt. Nos. 234 & 235 (S.D. Cal. May 9, 2013 & May 20, 2013).

60. On appeal, the Ninth Circuit affirmed the summary judgment orders of the district court, reclassifying the $36.3 million award as a form of restitution rather than specific performance in the process. *See Pauma,* 813 F.3d 1155.

61. The State of California subsequently chose to petition the Supreme Court for a writ of certiorari, but the Court ultimately declined to hear the petition after Williams & Cochrane filed a competing one on Pauma's behalf in the hopes of defusing the State's petition. *Compare California v. Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation,* __ U.S. __, 136 S. Ct. 2511 (2016) *with Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* __ U.S. __, 136 S. Ct. 2512 (2016).

62. Following the termination of the appeal process, the State of California satisfied the judgment in full during September 2016.

63. This $36.3 million payment marked the first time that the State of California has paid a monetary remedy to a tribe as part of a compact dispute since the late 1990s, and even then the amount of funds at issue was a small fraction of those involved in Pauma's case. *See Cabazon v. Wilson,* 124 F.3d at 1053-55 (explaining that the State had to return license fees for simulcast wagering facilities).

64. When all was said and done, the Pauma case involved more than three-hundred docket entries in the district court, two motions to dismiss, four summary judgement processes, two appeals, and competing petitions for writs of certiorari to the Supreme Court during the seven-plus-year history of the case.

65. At the culmination of the suit, Williams & Cochrane turned its attention to litigating other complex and novel questions on behalf of Pauma that touch on weighty issues of federal Indian law and federal labor law, some of which are at the heart of two additional suits against the State of California. *See, e.g., Casino Pauma v. NLRB,* No. 16-70397, Dkt. No. 23-1 (9th Cir. Oct. 31, 2016) (initial opening brief questioning, in part, whether the NLRB can exert authority over Indian-owned entities based on Congressional silence); *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. UNITE HERE Int'l Union et al.,* No. 16-02660, Dkt. No. 1 (9th Cir. Oct. 27, 2016) (initial complaint questioning, in part, whether a union is bound to follow an arbitration process for unfair labor practice charges that it negotiated for the State of California as part of a class III gaming compact).

66. Thus, Williams & Cochrane went back to work, whereas Robert Rosette was busy championing the Pauma victory, advertising on his website that he "successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California against then Governor Schwarzenegger." *See* Exs. 6 & 7.

### D. The Quechan Tribe Hires Williams & Cochrane in the Wake of *Pauma* Becoming Final

67. The decision by the Supreme Court to deny the State's petition for a writ of certiorari in *Pauma* garnered a significant amount of media attention, as it was picked up by the Associated Press and also independently reported by a number of other news and law-related outlets around California. *See, e.g., California pays tribe $36 million to settle years-old fight,* SAN DIEGO UNION-TRIBUNE, Sept. 9, 2016, *available at* http://www.san diegouniontribune.com/sdut-california-pays-tribe-36-million-to-settle-years-2016sep09-

story.html (last visited July 2, 2017); *A Schwarzenegger-era casino deal will cost state* *$36.3 million,* SACRAMENTO BEE, Aug. 23, 2016, *available at* http://www.sacbee.com/ news/politics-government/capitol-alert/article97452877.html (last visited July 2, 2017); *Calif. Gov. Signs Off On $36M to Tribe for Slots Repayment,* Law360, Sept. 9, 2016, *available* *at* https://www.law360.com/articles/838630/calif-gov-signs-off-on-36m-to-tribe-for-slots-repayment (last visited July 2, 2017).

68. Shortly after these news articles became public, the President of Quechan Mike Jackson contacted Cheryl Williams to find out whether Williams & Cochrane was interested in representing his tribe to solve a similar compact dispute with the State of California, and invited her and her partner Kevin Cochrane to come out to the tribe's reservation near Yuma, Arizona to discuss the situation with the Tribal Council.

69. Quechan has a long history of political infighting. *See, e.g., Quechan Tribe* *awaits results of Monday's elections,* YUMA SUN, June 16, 2015, *available at* https:// www.pressreader.com/usa/yuma-sun/20150616/281565174391817 (last visited July 2, 2017); *Elders call for probe of Quechan Nation election,* YUMA SUN, June 29, 2007, *available at* https://indianz.com/News/2007/003686.asp (last visited July 2, 2017).

70. However, the one constant and stabilizing force for Quechan through the years has been President Mike Jackson, a military veteran and son and grandson of tribal leaders who, aside from a single four-year hiatus, occupied the office of President continuously from 1995 through 2016. President Jackson, who was profiled by the New York Times in 2007 as he sought to protect Quechan's sacred sites from the potential harms of a $4 billion oil refinery (*see Far from the Reservation, but Still Sacred?,* NEW YORK TIMES, Aug. 12, 2007, *available at* http://www.nytimes.com/2007/08/12/business/ yourmoney/12tribe.html (last visited July 2, 2017)), is the signatory for both the tribe's original and amended compacts with the State of California and held the position of President when the tribe opened its original casino in California, the permanent resort facility that replaced it, its casino in Arizona, and also when the tribe broke ground on a

health clinic that is designed to serve all the tribes in the Yuma-area.[10] *See* Ex. 8; *Ground finally broken on clinic for local tribes,* YUMA SUN, Jan. 28, 2016, *available at* https://www.pressreader.com/usa/yuma-sun/20160128/281479275438281 (last visited July 2, 2017).

71.   As mentioned above, Quechan has an amended compact with the State of California that was approved by the Bureau of Indian affairs on January 4, 2007 ("2007 Amendment"), or roughly two-and-a-half years after Pauma's amendment and four-and-a-half years after the CGCC restricted the size of the license pool under the 1999 Compacts. *See* 72 Fed. Reg. 2007-08 (Jan. 17, 2007), *available at* https://www.gpo.gov/fdsys/pkg/FR-2007-01-17/pdf/E7-514.pdf (last visited July 2, 2017). The 2007 Amendment allows Quechan to operate up to 1,100 slot machines inside of one reservation-based gaming facility until December 31, 2025 in exchange for a base revenue sharing fee of 10% of the first $50 million in net win the tribe generates each year. *See* Ex. 9 at § 4.3.3(a). For all intents and purposes, the practical effect of this revenue sharing structure is that Quechan pays 10% of its net win to the State of California off of the ██████ ██████ in revenues the tribe typically generates each year at its California casino.

72. Williams & Cochrane initially met with Quechan about its issues with its 2007 Amendment on or about September 14, 2016. Along with the partners for Williams & Cochrane, the individuals present at the meeting included President Jackson, four of the five Tribal Councilmembers, the Tribal Council Secretary Regina Escalanti, the General Manager of the Quechan Casino Resort Charles Montague (who is himself a Quechan tribal member), and the Chief Financial Officer for the Quechan Casino Resort Phil Simons.

73. ███████████████████████████████████████████████████████████████████████████████

---

[10] A true and correct copy of excerpts of the "Amendment to Tribal-State Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation" is attached hereto as **Exhibit 9**.

74. The cessation of revenue sharing payments is extremely dangerous under the 2007 Amendment, as the agreement states that the "[f]ailure to make timely payment shall be deemed a material breach of the Amended Compact," which enables the State of California to bring suit in federal court to terminate the tribe's compact rights. *See* Ex. 9 at § 4.3.3(e). Even if the State refrained from taking such extreme action, the 2007 Amendment requires Quechan to essentially shut down the gaming floor of its casino until it becomes current on its revenue sharing obligations if it is behind in making a payment by more than sixty days from the due date. *See* Ex. 9 at § 4.3.3(f). This requirement becomes even more punitive if Quechan's revenue sharing payments are "overdue… on more than two occasions," in which case the prohibition on operating slot machines would continue for "an additional 30 days after full payment of all outstanding amounts has been made." *See* Ex. 9 at § 4.3.3(f). For a tribe like Quechan, the enforcement of this provision could result in the deprivation of at least ▮▮▮▮▮ in gaming revenue, and that assumes the tribe made immediate payment after the State of California shuttered the casino's slot floor. The pertinent part of the subsection of the 2007 Amendment detailing the State's rights in the event of non-payment by Quechan is set forth below:

> (f) Notwithstanding anything to the contrary in Section 9.0, if any portion of the payments referenced in subdivision (a) pursuant to subdivisions (b) and (d), is overdue after the State Gaming Agency has provided written notice to the Tribe of the overdue amount with an opportunity to cure for at least 15 business days, and if more than 60 days has passed from the due date, then the Tribe shall cease operating all Gaming Devices until full payment is made; provided further than if any portion of the payments is overdue as specified above on more than two occasions, the Tribe shall be required to cease operating all Gaming Devices for an additional 30 days after full payment of all outstanding amounts has been made.

*See* Ex. 9 at § 4.3.3(f).

75. ▮▮▮▮▮▮▮▮▮▮

1  ███████████████████████████████████████████████████████

2  ███████████████████████████████████████████████████████

3  ███████████████████████████████████████████████████████

4  █████████████████████[11]███████████████████████████████

5  ███████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████████

8  ███████████████████████████████████████████████████████

9  ███████████████████████████████████████████████████████

10  █████████████████████.

11  76.  █████████████████████████████████████████████████

12  ███████████████████████████████████████████████████████

13  ███████████████████████████████████████████████████████

14  ███████████████████████████████████████████████████████

15  ███████████████████████████████████████████████████████

16  ███████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████

18  ███████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████

21  ███████████████████████████████████████████████████████

22  ███████████████████████████████████████████████████████

23  ████████████████████

24  Sec. 12.1. The terms and conditions of this Gaming Compact may be amend-
25  ed at any time by the mutual and written agreement of both parties.

26  _____

27  [11]  A  true  and  correct  copy  of  a  ████████████████████████

28  ██████████████████████████████████, is attached hereto as **Exhibit 10**.

Case No.: 17-CV-01436 GPC MDD
FIRST AMENDED COMPLAINT

Ex. 8 at § 12.1.

77. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

78. As for the terms of the fee agreement between the parties, the Quechan Tribal Council explained that they were exceedingly familiar with the costs of matters that had a high likelihood of spiraling into federal litigation (*see, e.g., Quechan Tribe of Fort Yuma Indian Reservation v. U.S. DOI,* 2012 U.S. Dist. LEXIS 71248 (S.D. Cal. 2012); *Quechan Indian Tribe v. United States,* 535 F. Supp. 2d 1072 (S.D. Cal. 2008)), and preferred to create a hybrid structure whereby the tribe would pay a discounted rate going forward and then combine that with a contingency fee that was less than the normal 30 to 35% that a firm would normally command. In response, Cheryl Williams explained that she would provide the Quechan Tribal Council with two different proposals by the end of the week, and the parties could then negotiate the final terms of a services agreement once the Quechan Tribal Council selected the proposal with the general structure it preferred.

79. On September 16, 2016, Cheryl Williams sent an e-mail to the Quechan Tribal Secretary Regina Escalanti and President Jackson to convey two different hybrid fee proposals. As explained by Cheryl Williams, the fee structures were meant to be "a fair middle ground choice on the spectrum of fee arrangements that range from purely hourly on one end (*i.e.*, $475-$500 per hour) to purely contingency on the other (*i.e.*, 33%-35% of net recovery)." Further, they were also designed taking into account (1) the potential liability for the firm given the millions of dollars at issue, and (2) the massive amount of work that a representation of this nature would likely require given Williams & Cochrane's experience representing Pauma in negotiations and litigation during its seven-year dispute with the State of California. As for the terms of the proposals, both contained a progressive contingency fee structure that started at 5% of any recovered value of the

excess revenue sharing payments Quechan made under the 2007 Amendment "if the matter is resolved before the filing of a lawsuit or within 12 months thereof" and gradually increased to 15% "[i]f the matter is resolved after 36 months of filing a lawsuit." Along with this contingency fee, one of the fee proposals was based on a discounted hourly rate of $350 per hour while the other incorporated a monthly flat fee of $50,000 in lieu of the hourly rate.

80. On the ensuing Wednesday, September 21, 2016, President Jackson called Cheryl Williams and explained that the Quechan Tribal Council had discussed the terms of the proposal fee agreements amongst themselves and an independent attorney and decided that they wanted to go with the proposal containing the flat monthly fee arrangement. However, since Quechan wanted to fix the situation as quickly as possible, President Jackson stated that the Tribal Council desired to modify the contingency fee structure to provide Williams & Cochrane with the 15% contingency fee if the firm was somehow able to resolve the matter expediently through negotiations. Upon hearing this comment, Cheryl Williams double checked whether President Jackson and the Quechan Tribal Council wanted this change (they did), inquired whether they wanted to negotiate any other provisions of the proposed agreement (they did not), and then explained that she would get them a revised and final version of the Attorney-Client Fee Agreement to re-review the ensuing week.

81. On Monday, September 26, 2016, Cheryl Williams e-mailed a copy of the final version of the Attorney-Client Fee Agreement to Tribal Secretary Regina Escalanti, an Executive Secretary named Linda Cruz, and President Jackson.

82. As previously mentioned, the Attorney-Client Fee Agreement contains a "Monthly Flat Fee" in Section 4, which explains that the "Client agrees to pay a flat fee of $50,000 per month for Firm's services under this Agreement." *See* Ex. 2 at § 4.

83. In addition, Section 5 of the Attorney-Client Fee Agreement contains a contingency fee provision that explains Quechan will pay Williams & Cochrane a 15% contingency fee on any revenue sharing discount Quechan receives under a negotiated

successor compact as a result of the heightened payments the tribe made under the 2007 Amendment, and that such fee attaches the moment the tribe signs the new agreement. *See* Ex. 2 at § 5. The pertinent part of Section 5 of the Attorney-Client Fee Agreement states:

> Firm's contingency fee will be calculated as follows if the representation matter is resolved through settlement or negotiation:
>
> (a)  If the matter is resolved before the filing of a lawsuit or within 12 months thereof, then Firm's contingency fee will be fifteen percent of the net recovery.
>
> [...]
>
> (b)  For purposes of subsection (a) alone, the matter is resolved at the point in time that the Client signs a successor compact (whether new or amended), which subsequently obtains the requisite State and federal approvals and takes effect under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*
>
> (c)  The contingency fee above is higher than the formative rates for resolving the case through court action set forth in the ensuing subsections below based upon the Client's express request after consultation and stated need to resolve the situation in as effective and expeditious a manner as possible.

*See* Ex. 2 at § 4.

84. To address opportunistic early termination, the Attorney-Client Fee Agreement also contains a Section 11 that explains that in the event Williams & Cochrane is discharged before the contingency fee normally attaches, Quechan would still have to pay this fee if it had become "entitled" to any amounts constituting the "net recovery" for contingency fee purposes. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 758 (2002) (defining "entitle" as "furnish with proper grounds for seeking or claiming something"); *accord* MERRIAM-WEBSTER, *Definition of Entitle, available at* https://www.merriam-webster.com/dictionary/entitle (last visited July 15, 2017) (defining "entitle" the same, as "to furnish with proper grounds for seeking or claiming something"). For other situations, Section 11 states that "Client agrees that Firm will be… paid by Client a reasonable fee for the legal services provided in lieu of the contingency fee set forth in

paragraph 5 of this Agreement," the amount of which "will be determined by considering" a list of factors that predominantly turns upon the value of the services performed for the tribe:

(1) The amount of the fee in proportion to the value of the services performed;

(2) The relative sophistication of the Firm and the Client;

(3) The novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly;

(4) The likelihood, if apparent to the Client, that the acceptance of the particular employment will preclude other employment by the Firm;

(5) The amount involved and the results obtained;

(6) The time limitations imposed by the Client or by the circumstances;

(7) The nature and length of the professional relationship with the Client;

(8) The experience, reputation, and ability of the Attorney;

(9) The time and labor required;

(10) The informed consent of the Client to the fee.

*See* Ex. 2 at § 11.

85. Finally, in order to enforce the financial obligations of the proposed contract, the Attorney-Client Fee Agreement also contains a waiver of sovereign immunity that provides in relevant part that the "Client hereby expressly and irrevocably waives its sovereign immunity (and any defense based thereon) from any suit, action, or proceeding or from any legal process with respect to any claims the Firm may bring seeking payment under the terms of this Agreement." *See* Ex. 2 at § 13(a).

86. As for the execution of the Attorney-Client Fee Agreement, on the same date Cheryl Williams transmitted the document to Quechan (*i.e.*, Monday, September 26, 2016), President Jackson signed the document at a Special Tribal Council Meeting, during which the Tribal Council passed a resolution by a vote of "5 for" and "0 against" to "approve the attorney-client fee agreement between the Quechan Indian Tribe and Williams & Cochrane." *See* Ex. 3. The attorneys for Williams & Cochrane countersigned

and thereby executed the Attorney-Client Fee Agreement on September 29, 2016, providing Quechan with a copy of the fully-executed contract afterwards.

**E. Williams & Cochrane gets Quechan a Compact Offer that Excises $120 Million in Revenue Sharing Payments and Enables the Generation of around $660 Million in New Gaming Revenues**

87. With the Attorney-Client Fee Agreement executed, Williams & Cochrane began preparing a notice of dispute for the Office of the Governor that would hopefully convince it to sit down with Quechan and negotiate a replacement compact for the 2007 Amendment. Ultimately, Williams & Cochrane sent out this letter on October 12, 2016.

88. On October 17, 2016, just five days later and approximately one month after the State paid $36.3 million to Pauma, the Office of the Governor agreed to "enter into negotiations for a new tribal state gaming compact between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation," in a letter signed by the Office of the Governor's Senior Advisor for Tribal Negotiations Joginder ("Joe") Dhillon.[12]

89. As a result of this letter, the parties held their first negotiation session on November 9, 2016 at the State Capitol. Appearing on behalf of the Office of the Governor was Senior Advisor Joe Dhillon, Senior Assistant Attorney General Sara Drake, and Deputy Attorney General Jennifer Henderson. For Quechan, all seven members of the Tribal Council were present as well as Cheryl Williams and Kevin Cochrane from Williams & Cochrane. ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████.

90. ████████████████████████████████████████

████████████████████████████████████████████.[13] ████████

---

[12] A true and correct copy of an October 17, 2016 letter from the Office of the Governor's Senior Advisor for Tribal Negotiations Joe Dhillon to Cheryl A. Williams is attached hereto as **Exhibit 11**.

[13] A true and correct copy of the December 6, 2016 draft "Tribal-State Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation" is attached hereto as **Exhibit 12**.

1

2

3

4

5

6

7

8

9 ▪ [14]

10

11

12 [15]

13

14

15

16

17

18

19

20

21

22

23

24

[14] A true and correct copy of the sample "Regulatory Cost Reimbursement Invoice" that accompanied the December 6th draft compact is attached hereto as **Exhibit 13**.

[15] A true and correct copy of a December 6, 2016 letter from the Office of the Governor's Senior Advisor for Tribal Negotiations Joe Dhillon to Quechan President Mike Jackson is attached hereto as **Exhibit 14**.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████.

91. From a substantive perspective, the revenue sharing terms of the December 7th initial draft compact were quite a victory to Williams & Cochrane because the State's general practice is to demand a revenue sharing fee that totals at least six percent of net win on all machines over 350 *in addition to the basic SDF payment that was included in Quechan's draft proposal. See, e.g.,* California Gambling Control Commission, *Tribal-State Compact between the State of California and the Pala Band of Mission Indians* § 5.2(a) (May 6, 2016) (imposing a 6% revenue sharing fee on all machines above 350 into the Revenue Sharing Trust Fund, *available at* http://www.cgcc.ca.gov/documents/compacts/amended_compacts/Pala_Compact_2016.pdf (last visited July 2, 2017). And this basic arrangement of requiring a large revenue sharing fee does not even account for the intergovernmental agreements that tribes are required to execute with the local communities to cover the cost of public services – something that hardly effects Quechan since its location (at least on the California side of the border) is far removed from other municipalities. *See id.* at § 4.4.

92. From a procedural standpoint, the December 7th initial draft compact came about much quicker than any tribe should expect. For instance, a coalition of dozens of tribes called the 1999 Compact Tribes Steering Committee has been negotiating new compacts with the Office of the Governor since the spring of 2013 and, based on information and belief, these tribes are, at best, expected to execute compacts towards the end of the 2018 legislative session. Quite simply, compact negotiations around the Nation are traditionally rather time-consuming processes, a fact Congress realized when it inserted a clause into IGRA stating that a tribe could not bring a "bad faith" negotiation suit against the state across the bargaining table until at least one hundred and eighty (180) days passed from "the date on which the Indian tribe requested the State to enter into negotiations." 25 U.S.C. § 2710(d)(7)(B)(i). In fact, the factual backgrounds of successful bad faith suits

are littered with indications that failed rounds of negotiations went on for years. *See, e.g., Big Lagoon Rancheria v. California,* 759 F. Supp. 2d 1149, 1154-56 (N.D. Cal. 2010) (revealing the last round of compact negotiations took place from "September 18, 2007… [to] April 3, 2009, [when] the Tribe filed its complaint, alleging that the State failed to negotiate in good faith, in violation of IGRA"); *North Fork Rancheria of Mono Indians v. California,* 2015 U.S. Dist. LEXIS 154729, *5-*6 (E.D. Cal. 2015) (indicating the first round of compact negotiations went on from "July of 2004… [to] April of 2008[,] when Governor Schwarzenegger and the Tribe executed a gaming compact"); *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger,* 2008 WL 6136699, *3 & *7 (S.D. Cal. 2008) (revealing the unfinished compact negotiations under review took place from February 26, 2004 to "November 3, 2006, [when] Rincon informed the State by detailed letter that it could not accept its October 31, 2006 proposal").

93. On or about December 28, 2016, Williams & Cochrane met with the Quechan Tribal Council, ███████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

94. With their marching orders in hand, Williams & Cochrane scheduled a follow-up meeting with the Office of the Governor on January 31, 2016 at the State Capitol to go through the December 7th initial draft compact and find out what the State was willing to negotiate above and beyond the base offer it provided.

95. However, before this meeting could take place, election chaos erupted at Quechan. President Jackson and Vice President Michael Jack were in the midst of four-year terms and not up for reelection during the midterm election that took place in December 2016. However, all five biannual Councilmember seats were up for vote, and one existing Councilmember (*i.e.*, Juliana Comet) had decided to retire rather than seek reelection. The initial election results reportedly indicated that challengers or aspirants won four of the five Council seats that were on the ballot. A recount of the vote was soon ordered and Quechan spent the next two months mired in intractable infighting. *See Quechan Tribe to re-do vote,* YUMA SUN, Feb. 9, 2017, *available at* https://www.pressreader.com/usa/yuma-sun/20170209/281509340930239 (last visited June 30, 2017).

96. Ultimately, the four new challengers were sworn into office on or about March 3, 2017. *See New Quechan Tribe Council Members sworn in nearly two months after election,* KYMA-TV, Mar. 3, 2017, *available at* http://www.kyma.com/news/new-quechan-tribe-council-members-sworn-in-nearly-two-months-after-election/372997144 (last visited June 30, 2017). In succession, President Jackson resigned from his position almost instantaneously with the swearing in of the new councilmembers and then Vice President Jack stepped down in the ensuing months.

97. As the political turmoil at Quechan raged on, Cheryl Williams and Kevin Cochrane met with the Office of the Governor at the planned January 31, 2016 negotiation session to see if any further progress could be made on the draft compact. ███

98. After the election turmoil at Quechan died down, Cheryl Williams and Kevin Cochrane travelled out to the reservation to meet with the reconstituted Tribal Council on March 24, 2017. ███████████████████████████████

99. ████████████████████████████████████

[16] [17]

---

[16] A true and correct copy of a March 9, 2017 letter from CGCC Executive Director Stacy Luna Baxter to President Jackson is attached hereto as **Exhibit 15**.

36                    Case No.: 17-CV-01436 GPC MDD

FIRST AMENDED COMPLAINT

1  ███████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ████████████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████

12 100. █████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████.

17 101. █████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████.

22 102. █████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26

27 [17] A true and correct copy of an April 12, 2017 letter from CGCC Executive
Director Stacy Lunda Baxter to the "Honorable Keeny Escalanti Sr., President Quechan
28 Indian Nation" is attached hereto as **Exhibit 16**.

103. ███████████████████████████████

104. ████████████████████████████████

[18]

105. ████████████████████████████████

.[19] After relaying the compact, Senior Assistant

---

[18] A true and correct copy of excerpts of the May 12, 2017 draft "Tribal State Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation" is attached hereto as **Exhibit 17**.

[19] A true and correct copy of the May 19, 2017 draft "Tribal State Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation" is attached hereto as **Exhibit 18**.

FIRST AMENDED COMPLAINT

Attorney General Sara Drake set up another negotiation session between the attorneys for the parties on June 14, 2017 at the Office of the Attorney General in Sacramento, California.

106. ████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████.

107. ████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

FIRST AMENDED COMPLAINT

Thus, the State of California had not only offered an agreement that would eliminate at least $112 million in revenue sharing payments over the next 28 years, but one that could generate another $661,000,000 in new gaming revenue.

108.

FIRST AMENDED COMPLAINT

█████████████████████████████████████████████████████████████.

**F. The Putative President of Quechan Keeny Escalanti Terminates Williams & Cochrane Three Days before the Conclusion of Compact Negotiations to Avoid Paying the Contingency Fee under the Attorney-Client Fee Agreement, Demanding that the Firm Turn Over its Work Product to Robert Rosette by Using Threats to its Reputation and Professional Standing**

109. ████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████ *See* Capitol Weekly, *Capitol Weekly's Top 100*, *available at* http://capitolweekly.net/capitol-weeklys-top-100/ (last visited July 5, 2017) (listing Quintana and Sloat as numbers 55 and 62 on the list of assorted Sacramento power players, respectively).

110. In keeping with the schedule agreed upon by the attorneys during the June

14th negotiation session, Cheryl Williams transmitted the final set of redlines to the State of California at 1:12 a.m. in the morning of Wednesday, June 21, 2017.[20]

111. However, the next conversation between Cheryl Williams and Senior Assistant Attorney General Sara Drake did not begin with a discussion about finalizing the Quechan compact. Rather, on Tuesday, June 27, 2016, Ms. Drake – who has been one of (if not) the principal attorney representing the State of California in tribal matters since the mid to late 1990s (*see Cabazon Band of Mission Indians v. Wilson,* No. 90-01118, Dkt. Nos. 159 & 177 (E.D. Cal. Feb. 12, 1999 & Mar. 23 1999)) – began the conversation by stating, "This has never happened before and we don't know what to do." With that, Ms. Drake then informed Cheryl Williams that the State had just received a letter indicating that Williams & Cochrane had been terminated from the compact negotiations, just three days before the negotiations were set to conclude, and replaced by Robert Rosette.

112. That same day Cheryl Williams received a similar letter. The letter was sent by e-mail from the Quechan Executive Secretary Linda Cruz to Cheryl Williams with no other individuals carbon copied on the message. The June 26, 2017 letter enclosed therein was entitled "Termination of Attorney-Client Relationship" and signed by the putative Quechan President Keeny Escalanti, Sr., who had purportedly assumed the seat left vacant following President Jackson's departure. *See* Ex. 4.  The June 26th letter began by explaining "[t]he Fort Yuma Quechan Indian Tribe… is terminating the services of Williams & Cochrane… effective immediately upon your receipt of this letter." *See id.*

113. Around the same time as the Quechan Executive Secretary had transmitted this letter, Quechan had also sent four paychecks to Williams & Cochrane to cover the base monthly fees for February 2017 to May 2017 that the tribe was behind in paying. With that, the June 26th letter went on to explain that the tribe intended to pay a "pro-

---

[20] A true and correct copy of the June 21, 2017 draft "Tribal State Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation" is attached hereto as **Exhibit 19**.

rated [portion of the monthly flat] fee for your services" for the month of June (which it never did), but that it would "not pay any contingency fee or 'reasonable fee for the legal services provided in lieu' thereof." *See* Ex. 4.

114. As for the reasons for repudiating the Attorney-Client Fee Agreement at the eleventh hour, the June 26th letter stated that Williams & Cochrane had already been "grossly overcompensated" given its failure to "produce better-than-boilerplate terms in your negotiations so far with the State." As such, the June 26th letter explained that the payment of fees to date was "more than fair" and then warned, "***We strongly advise you against pressing your luck further out of concern for the reputation of your firm in Indian Country and in the State of California.***" *See* Ex. 4.

115. After conveying this threat, the June 26th letter that was signed only by putative Quechan President Keeny Escalanti explained that Williams & Cochrane could not relay the message conveyed by this letter (or any other information obtained during their representation, like the draft compacts) to anyone else within the tribe:

> Finally, I remind you of the… confidentiality provisions which govern attorney-client relations and that you not disclose to any employee, officer, or official of the Tribe or any subdivision, agency, or enterprise of the Tribe regarding any matter that was the subject of your engagement.

*See* Ex. 4.

116. Nevertheless, the June 26th letter then concludes by explaining that Williams & Cochrane should "direct all communications regarding this matter to Robert A. Rosette" and promptly provide him with a copy of Quechan's entire case file – the very "confidential" materials that no one else within the tribe was supposedly permitted to see. *See* Ex. 4.

117. Though signed by putative Quechan President Keeny Escalanti, Williams & Cochrane is informed and believes that the June 26th letter was actually drafted by Robert Rosette or one of the attorneys in his employ at Rosette, LLP.

118. Unlike the execution of the Attorney-Client Fee Agreement, the June 26th letter was not accompanied by a resolution indicating how the Quechan Tribal Council

members voted on the issue – or if the other Councilmembers even knew about putative Quechan President Keeny Escalanti's actions at all.

119. The lack of any corroborating tribal resolution led Cheryl Williams to ask Senior Assistant Attorney General Sara Drake whether she had received a resolution removing Williams & Cochrane from the matter. In response, Ms. Drake indicated that she had not but she planned on asking Mr. Rosette to provide one before the negotiations would go forward. Further, before the call ended, Ms. Drake explained that she thought the compact negotiation materials in the State's possession were protected by the work product privilege, and suggested Cheryl Williams carefully review the applicable case law and ethical rules to determine whether she could lawfully disclose the compact negotiation materials in this highly unusual situation given her duties to her actual client and, supposedly, the State of California.

120. Following this call, on June 27, 2017, a second-year associate attorney with Rosette, LLP who works under the supervision of Richard Armstrong in the Folsom, California office sent Cheryl Williams an e-mail demanding that she immediately turn over a copy of the June 21st draft compact:

> Ms. Williams,
>
> As you know, our firm has been retained to represent the Fort Yuma Quechan Indian Tribe in their compact negotiations with the State. While there is a formal file request forthcoming, it is imperative that we receive, immediately, the last compact, with any redlines, that was transmitted to the State during your negotiations. Please provide said compact as soon as possible. I am available to discuss any questions or concerns.
>
> Thank you,
>
> Cecilia Guevara Zamora
> Rosette, LLP
> Attorneys at Law
> 193 Blue Ravine Road, Suite 255
> Folsom, California, 85630
> [...]

121. While Cheryl Williams was considering the propriety of this request, Wil-

liams & Cochrane is informed and believe that on either June 28, 2017 or June 29, 2017, Senior Assistant Attorney General Sara Drake spoke with Robert Rosette (or one of his attorneys at Rosette, LLP) and asked him to provide an authenticating tribal resolution for his involvement in the compact negotiations, explaining that she would not turn over the most recent redlined draft of the compact until she received one.

122. Shortly thereafter, on June 30, 2017, Cheryl Williams received a second email from the Quechan Executive Secretary, this time containing a "Demand for Cease and Desist" letter that was signed by putative President Keeny Escalanti and again written by Robert Rosette or an attorney in his employ at Rosette, LLP. *See* Ex. 5.

123. Since Robert Rosette was seemingly unable to obtain any of the negotiation materials in his conversation with Senior Assistant Attorney General Sara Drake, the June 30th letter demanded under threat of legal action that Williams & Cochrane refrain from speaking with anyone from the State and "immediately furnish all work-product belonging to the tribe, including, but not limited to, the most recent redlined changes to the draft State-Tribal Compact, including any comments incorporated therein" *See* Ex. 5. Though the previous June 26th letter purportedly terminated Williams & Cochrane on the basis that it did not "produce better-than-boilerplate terms in your negotiations so far with the State," the June 30th letter reversed course and indicated that the failure to produce the most recent redlines and comments would "result in irreparable harm to the Tribe, particularly given the California legislative deadlines associated with timely consider-ation of the Tribe's Gaming Compact." *See* Ex. 5.

124. Much like the prior June 26th letter, this second June 30th letter was not with-out its own threats based on misrepresentations (*i.e.*, "Should you continue your obstruc-tion of the Tribe's interests, the Tribe will be left with no other choice than to pursue the legal remedies available to it. We trust that the Firm will see the wisdom in promptly complying with these demands.") and hyperbolic if not slanderous accusations ("Through its decades of dealings with numerous attorneys and law firms across the country, the Tribe has not witnessed these types of outlandish actions or this level of unprofessional-

1    ism as it has from your Firm.").

2    125. After spending the ensuing July 4th weekend reviewing the ethical rules per-

3    taining to "Termination of Employment" under California Rule of Professional Conduct

4    3-700(A)(2) and Robert Rosette's well-documented history of exacerbating intra-tribal

5    strife when his position is threatened (*see* Section II(A), *infra*), the attorneys at Williams

6    & Cochrane decided that the best way to "avoid reasonably foreseeable prejudice" to the

7    rights and interests of Quechan was to provide Rosette, LLP and the tribe (principally

8    through its Executive Secretary Linda Cruz) with a copy of the June 21st draft compact in

9    the hopes that they could still convince the State of California to execute a compact based

10   on those terms before the end of the legislative session, and to simply step away from the

11   matter entirely.

12   **II.    THE TORTS BY ROBERT ROSETTE AGAINST WILLIAMS & COCHRANE**

13       **A. Background on Robert Rosette**

14   126. Robert Rosette is an Indian law attorney who, according to public records, has

15   a history of representing individual persons or factions within tribes while purporting to

16   represent the tribe itself, particularly when a tribe is mired in internal fighting regarding

17   the control of sometimes massive amounts of gaming revenues that may soon spill over

18   into membership disputes or worse. For example, Robert Rosette and his firm Rosette,

19   LLP represented and possibly still represents some "faction" of the Alturas tribe, who has

20   over $2 million in Revenue Sharing Trust Funds ("RSTF") frozen on account of a

21   leadership dispute that has spanned more than seven years and frayed government-to-

22   government relations with the United States. *See Alturas Indian Rancheria v. Calif.*

23   *Gambling Control Comm'n,* No. 11-02070, Dkt. No. 9 (E.D. Cal. Aug. 9, 2011); *see also*

24   *Alturas Indian Rancheria v. Salazar,* 2010 U.S. Dist. LEXIS 113083 (E.D. Cal. Oct. 18,

25   2010) (detailing the background of the intra-tribal dispute). Similarly, according to

26   numerous adverse federal court opinions, Robert Rosette and his firm have represented a

27   four-person faction of a supposedly five-member tribe known as the California Valley

28   Miwok Tribe, the quartet of which has tried to disenroll the other member and block the

enrollment of upwards of two hundred and fifty other Indians as they fight to get the CGCC to release $15.0 million in frozen RSTF funds to themselves alone. *See, e.g., Calif. Valley Miwok Tribe v. Jewell,* 5 F. Supp. 3d 86 (D.D.C. 2013); *see also* California Gambling Control Commission, *Revenue Sharing Trust Fund Report (RSTF) of Distribution of Funds to Eligible Recipient Indian Tribes for the Quarter Ended December 31, 2017* at p. 12, *available at* http://www.cgcc.ca.gov/documents/rstfi/2017/14_RSTF_Distrib_65th_CommStaffReport.pdf (last visited Jan. 26, 2018) (detailing the total amount of frozen RSTF funds and interest held by the CGCC on behalf of the California Valley Miwok Tribe).

127. These intra-tribal battles over accessing withheld revenue sharing allocations pale in comparison to the fights that have erupted at tribes with immensely profitable casino operations that have Robert Rosette lurking around in some capacity. As to that, a Fresno Bee article from 2012 indicates that Robert Rosette represented some part of the Tribal Council for the Picayune Rancheria of Chukchansi Indians – the tribe that operates the 1,800-machine Chukchansi Gold Resort & Casino that is situated between Fresno and Yosemite. *See Chukchansi fight partly over disenrollments,* Fresno Bee, Feb. 26, 2012. According to the Fresno Bee article, after the Tribal Council represented by Robert Rosette lost a majority of seats at a December 2011 election, it held on to power by disqualifying one of the election winners and then disenrolling large numbers of tribal members, which one of the challengers vying for a seat on the Tribal Council thought would taint the vote of any re-election since "[t]hey no longer have the same people who voted in December." *Id.* Other news reports from the region indicate that at least some tribal members were concerned that the Tribal Council represented by Robert Rosette was misappropriating casino revenues and failing to file audits with the National Indian Gaming Commission (who threatened to shut down the casino because of this), and this led a group of twenty tribal members armed with bullet-proof vests and guns to storm the casino in an attempt to take over the facility. *See, e.g., Gunmen storm Chukchansi Gold Resort & Casino in Madera County,* KFSN-TV, Oct. 9, 2014, *available at* http://abc7.

com/news/gunmen-storm-chukchansi-casino-in-madera-county/344900/ (last visited July 3, 2017); *Chukchansi Gold Casino remains closed following armed confrontation,* KFSN-TV, Oct. 10, 2014, *available at* http://abc30.com/news/chukchansi-gold-casino-remains-closed-following-armed-confrontation/345334/ (last visited July 3, 2017). Ultimately, the State of California sought and obtained injunctive relief in federal court to shut down the Chukchansi Gold Resort & Casino in a suit in which Robert Rosette and a slew of other attorneys purported to represent the tribe. *See California v. Picayune Rancheria of Chukchansi Indians of Cal.,* 2014 U.S. Dist. LEXIS 153737 (E.D. Cal. 2014). As a result, the tribe's casino was shuttered from approximately October 10, 2014 to December 31, 2015. *See Chukchansi resort and casino holds grand opening ceremony Friday,* FRESNO BEE, Jan. 14, 2016, *available at* http://www.fresnobee.com/news/local/article54783505.html (last visited July 3, 2016). An attorney employed by Rosette, LLP who still appears on the firm website indicated to the Fresno Bee shortly after the district judge issued its initial temporary restraining order that the Chukchansi Gold Resort & Casino generated more than $100,000,000 a year in net win (*see Chukchansi casino hearing one for the history books,* FRESNO BEE, Oct. 15, 2014, *available at* http://www.fresnobee.com/news/local/news-columns-blogs/city-beat/article19526154.html (last visited July 3, 2016)), meaning that the nearly fifteen-month closure likely cost the tribe at least $120,000,000 in gaming revenues. Nevertheless, the disenrollments reignited just months after Picayune was able to convince the federal and state regulatory authorities to allow the casino to reopen. *See Chukchansi starting disenrollment for some founding families' members,* FRESNO BEE, July 30, 2016, *available at* http://www.fresnobee.com/news/local/article92839572.html (last visited July 3, 2016).

128. A situation like the one at Picayune should be unique in the annals of Indian gaming, but a similar event happened almost contemporaneously at another tribe that Robert Rosette claimed to represent. According to a special agent with the California Bureau of Narcotic Enforcement named Eric Linch, two factions were vying for control of the Paskenta Band of Nomlaki Indians, the tribe who operates the 840-machine

Rolling Hills casino that is located just off Interstate 5 due west of Chico, California. *See California v. Paskenta Band of Nomlaki Indians,* No. 14-01449, Dkt. No. 3-4, ¶ 4 (E.D. Cal. June 17, 2014) ("*Paskenta*"). According to Special Agent Linch, a "significant number of Paskenta tribal members recently were disenrolled from the Tribe, including a majority of the Paskenta tribal council." *Id.* As a result of the action, "there was a new majority on the tribal council, the new majority was in charge of operating the Casino, and the disenrolled members of the tribal council were escorted off tribal property." *Id.* at ¶ 5. The attorney for the "faction" responsible for allegedly wresting control of the Tribal Council and instituting these disenrollments was none other than Robert Rosette, who defiantly explained to the San Jose Mercury News that the "tribe followed proper proced-ure when removing the members." *Northern California tribe in tense dispute over roll removal, casino,* SAN JOSE MERCURY NEWS, June 11, 2014, *available at* http://www.mercurynews.com/2014/06/11/northern-california-tribe-in-tense-dispute-over-roll-removal-casino/ (last visited July 3, 2017). Nevertheless, the disenrollments spurred those affected to "plan to conduct a hostile takeover of the Casino" using at least "two helicopters" before fifty members of this group ultimately settled upon engaging in a "hand gun[], pepper spray, and baton[]"-laden armed standoff outside the casino with an equal number of agents for the other faction. *Id.* at ¶¶ 7-14. While the State of California refrained from shutting down the casino in this instance, it did have to obtain injunctive relief in federal court to prevent tribal members or armed personnel in their employ from bringing fire-arms within one hundred yards of the Rolling Hills Casino. *See Paskenta,* No. 14-01449, Dkt Nos. 18 & 30 (E.D. Cal. Jun. 18, 2014 & July 7, 2014) (orders granting the State a temporary restraining order and a preliminary injunction, respectively).

129. The questionable ways in which Robert Rosette seemingly tries to obtain tribal clients has caused him trouble in the past. For instance, the Twenty-Nine Palms Band of Mission Indians brought a civil action against a number of individuals including Robert Rosette, claiming the tribe's general counsel Gary Kovall had an arrangement with Robert Rosette whereby he would refer work to him in exchange for a kickback that

Mr. Rosette would pay from an artificially-inflated fee that he would charge the tribe.[21] The allegations in the complaint ultimately led the United States Attorney's Office to obtain a grand jury indictment for Mr. Kovall, who in turn pled guilty to conspiracy to commit federal programs bribery under 18 U.S.C. § 371. *See United States v. Kovall,* 857 F.3d 1060, 1063 (9th Cir. 2017). Approximately eight months after the grand jury indict-ed Mr. Kovall, Robert Rosette entered into a settlement with Twenty-Nine Palms, the terms of which are apparently confidential.[22] [23]

130. Claims of improper billing practices by Robert Rosette continued after the Twenty-Nine Palms incident. For example, on April 21, 2011, the Havasupai Tribal Council sent a letter to Robert Rosette to inform him that his firm had "submitted invoices without supporting documents" and "the Tribal Council ha[d] passed a motion to initiate an investigation of your firm's business with us."[24] The Havasupai Tribal Council indicated that Robert Rosette's firm at the time – Rosette & Associates, PC – was "instructed not to conduct any more work or act on our behalf" and to expect "no further payment" until "the investigation [was] completed."

131. Representational questions aside, issues of improper conduct also affect the

---

[21] A true and correct copy of the February 3, 2010 "First Amended Complaint" in *Twenty-Nine Palms Band of Mission Indians of Cal. v. Edwards, Kovall, Rosette, et al.,* No. 30-2009 00311045 (Orange County Sup. Ct. Feb. 3, 2010) is attached hereto as **Exhibit 20**.

[22] A true and correct copy of the March 24, 2012 "Order Granting Rosette Defendants' Motion for Determination of Good Faith Settlement" in *Twenty-Nine Palms Band of Mission Indians of Cal. v. Edwards, Kovall, Rosette, et al.,* No. 30-2009 00311045 (Orange County Sup. Ct. Feb. 3, 2010) is attached hereto as **Exhibit 21**.

[23] A true and correct copy of the March 24, 2012 "Order Granting Motion of the Rosette Defendants to Permanently Seal Confidential Portions of their Motion for Determination of Good Faith Settlement" in *Twenty-Nine Palms Band of Mission Indians of Cal. v. Edwards, Kovall, Rosette, et al.,* No. 30-2009 00311045 (Orange County Sup. Ct. Feb. 3, 2010) is attached hereto as **Exhibit 22**.

[24] A true and correct copy of the April 21, 2011 letter from Edmond Tilousi, the Tribal Vice-Chairman for the Havasupai Tribal Council, to Robert Rosette is attached hereto as **Exhibit 23**.

decision-making of some of the tribes Robert Rosette is known to represent. For instance, Robert Rosette and his firm have represented the Habematolel Pomo of Upper Lake ("Upper Lake") since before 2010 – a tribe whose subordinate pay day lending businesses were recently sued by the Consumer Financial Protection Bureau in federal court for deceiving customers by "offer[ing] loans with annual percentage rates of between approximately 440% and 950%," but "not disclos[ing] the annual percentage rate of the loans in advertising or when customer service representatives answer questions over the phone." *Consumer Fin. Prot. Bureau v. Golden Valley Lending, Inc., et al.,* No. 17-3155, Dkt. No. 1, ¶ 49 & p. 9 (N.D. Ill. Apr. 27, 2017) ("*Golden Valley*").

132. Not only that, but Robert Rosette also represents multiple tribal clients who have entered into significant commercial contracts that they subsequently breached without making any meaningful payments. As an example of this, the fifteen-member La Posta Band of Diegueno Mission Indians secured a $23 million loan from third-party lenders that was ultimately bought by the Arizona-based Yavapai-Apache Nation in order to construct a gaming facility on its reservation, which is right alongside Interstate 8 about sixty miles east of downtown San Diego. *See Yavapai-Apache Nation v. La Posta Band of Diegueno Mission Indians*, 2017 Cal. App. Unpub. LEXIS 4430 (4th Dist. June 28, 2017). Not only did La Posta default on the loan, but it "never made *any* payments under the Loan Agreement." *Id.* at *8. The Yavapai-Apache Nation ultimately sued La Posta in San Diego Superior Court and the California Court of Appeal just recently affirmed the trial court's judgment awarding Yavapai-Apache $48,893,407.97 in damages on its breach of contract claim. *Id.* at *2. The attorney representing La Posta in this litigation is Robert Rosette (*see id.* at *1), who, on information and belief, was also the attorney advising the tribe when it elected to completely default on its contractual obligations.

133. The fact pattern in *Yavapai-Apache* closely mirrors that in another case involving Robert Rosette, wherein he defended another San Diego area tribe known as the Iipay Nation of Santa Ysabel in a suit by the Yavapai-Apache to recover "$36 million-

plus" that Santa Ysabel had allegedly failed to pay under a loan agreement that enabled the tribe to construct its gaming facility. *See Yavapai-Apache Nation v. Iipay Nation of Santa Ysabel,* 201 Cal. App. 4th 190, 203 (4th Dist. 2011). Based on information and belief, Williams & Cochrane also believes that Robert Rosette advised San Pasqual when it elected to default on its contractual obligations, just as he seemingly did with La Posta.

### B. Robert Rosette's Beginning and End at Pauma

134. Despite these allegations of questionable representations and dubious contracts, Robert Rosette actually started out providing legal representation to Pauma in a forthright manner. Like many tribes in Southern California, the political structure of Pauma resembles a true democracy in which the governing body of the tribe is the General Council, or "all adult members [of the Tribe] twenty-one (21) years of age or older."[25] The General Council is in charge of making decision, which a four-member Tribal Council then has the administrative power to carry out. *See* Ex. 24 at § 3. Among the many enumerated powers reserved for the General Council is the "power[ ] and responsibilit[y]" to "employ legal counsel." *See id.* at § 6(A)(1).

135. As is well documented in the court filings in its prior compact suit with the State of California, Pauma executed an amendment to its original compact with the State of California in 2004. *See, e.g., Pauma,* 813 F.3d at 1161. One requirement of the now rescinded 2004 Amendment was that Pauma commence negotiations with San Diego County for an intergovernmental agreement ("MOU") before beginning construction on any gaming-related project that the tribe intended to conduct under the 2004 Amendment. *See* California Gambling Control Commission, *Amendment to Tribal-State Compact between the State of California and the Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation* § 10.8.8, *available at* http://www.cgcc.ca.gov/documents/ compacts/amended_compacts/paumascanned.pdf (last visited July 4, 2017). To offset any potential harms of the gaming project in the local area, the ultimate MOU was supposed

---

[25] A true and correct copy of the June 28, 1968 "Articles of Association of the Pauma Band of Mission Indians" is attached hereto as **Exhibit 24**.

to include provisions "relating to compensation for[:] law enforcement, fire protection, emergency medical services and any other public services to be provided by the County to the Tribe for the purposes of the Tribe's Gaming Operation as a consequence of the Project," a gambling addiction program, and the general mitigation of any adverse "effect on public safety attributable to the Project." *Id.*

136. On or about May 15, 2007, Robert Rosette executed a contract with Pauma to "assist in negotiating an MOU with the County of San Diego" after the General Council of the tribe had voted to hire him for that specific purpose.[26]  A year-and-a-half later, on or about August 6, 2008, Pauma executed a MOU with San Diego County that Robert Rosette negotiated, which, as explained in the prior compact suit, required the tribe to make annual payments of $400,000 for sheriff's protection, $200,000 for a gambling addiction program, $40,000 for the prosecution of casino related crimes, and some of the upwards of $38 million in road improvement expenditures the tribe committed itself to under the intergovernmental agreement. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* No. 14-56104, Dkt. No. 29-1, p.89 (9th Cir. Apr. 13, 2015). What's more, these expenditures were in addition to the $7,750,000 in annual revenue sharing that Pauma was already bound to pay the State of California for the right to operate 1,050 machines under the 2004 Amendment. *See Pauma,* 813 F.3d at 1162.

137. Despite being burdened with a very costly MOU, during the ensuing year the Pauma General Council voted to retain Rosette & Associates again in order to resolve the tribe's dispute with the State of California regarding the legality and enforceability of the 2004 Amendment. The attorney who presented the idea of Rosette & Associates doing the compact litigation work to the General Council was Cheryl Williams.

138. Approximately three to four months before this presentation, during February and March 2010, Robert Rosette hired two attorneys by the names of Cheryl Williams

---

[26] A true and correct copy of the May 24, 2007 "Attorney Services Agreement" between Pauma and Rosette & Associates, PC is attached hereto as **Exhibit 25**.

and Kevin Cochrane in anticipation of litigating the *Pauma* case against the State of California – with Ms. Williams coming from the class action law firm of Milberg LLP (f/k/a Milberg Weiss LLP and Milberg Weiss Bershad & Schulman LLP) and Mr. Cochrane having a background working for an inter-tribal circuit-style court that served upwards of twenty tribes in the Southern California area, including Pauma.  As to that, Robert Rosette had testified during his October 26, 2010 deposition in the *Pauma v. Harrah's* case about his lack of litigation experience (both federal or state) and conse-quent habit of simply delegating this work wholesale to subordinate attorneys whether he had to hire them or they were already onboard at his firm:

> Q. All right. And during that period of time [when you were a partner at a different firm before starting your own firm], were you actively in litigation also as a –
>
> A. From time to time I either assigned litigation to attorneys who have a knack for doing that. You know, very rarely I'll make the court appearances or head the litigation. I try to stay out of court. I like to – I like the business transactions and I like to try to keep my clients out of litigation, but, you know, sometimes you can't avoid it.
>
> Q. The silver lining in every cloud. Some people have to be involved in it. So did you have any major litigation, what you would describe as major litigation, in which you were actually functioning as a litigator during your… years [at the prior firm]?
>
> A. Yeah, there were a few cases, I guess, I was involved in. I can't really remember the captions or the names. I can remember the issues and the tribes.
>
> Q. Just generally, what were the tribes?
>
> A. Well, Santa Rosa Rancheria, I was involved in the – CD Architects sued the tribe. And that was an arbitration, actually. I was involved in that piece. At the La Posta tribe here I was the lead attorney against the County of San Diego with regard to mitigation of off-reservation impacts.
>
> Q. Who is that on behalf of?
>
> A. The La Posta Band of Mission Indians. It was a good result for the tribe, bad result for San Diego County.
>
> Q. What year was that?

A. That was in 2005. I was involved with an election issue, the application of state law with regard to contributions. That was with the Santa Rosa Rancheria. But like I said, I tried to avoid litigation mostly and would just – you know, I've always hired litigators that I could delegate and assign work to.

139. In keeping with this, although Robert Rosette claims to have developed "the strategy [and] ideas behind the litigation," Cheryl Williams and Kevin Cochrane were responsible for doing all of the litigation work for Rosette & Associates during the formative stages of the *Pauma* case – from drafting the initial complaint to appearing on the district court conference calls in the aftermath of the issuance of the preliminary injunction order. Again, the deposition testimony by Robert Rosette in the *Pauma v. Harrah's* case confirms as much at multiple points, as he even acknowledges that he had employees do the actual legal work on Pauma's compact litigation, like Cheryl Williams:

Q. Now, in terms of the litigation, the drafting and filing of the complaint and the arguing, did you do all that yourself up to the time you were removed from the case?

A. No, I – I have employees that work for me that conduct research, draft, make court appearances, so on and so forth.

Q. All right. So outside of being sort of the lead strategist, did you may any appearances or become an attorney or record at all?

A. I was an attorney of record. There was only one appearance that was actually showing up, the oral argument for the preliminary injunction. And I had a conflict that day.

Q. Who argued that case from your firm?

A. Cheryl Williams.

140. Concerns about the ethical practices at Rosette & Associates led Cheryl Williams and Kevin Cochrane to leave Rosette & Associates during the month after the issuance of the injunction order in the *Pauma* case – merely fourteen or so months after they both had joined the firm. *See Pauma,* No. 09-01955, Dkt. No. 44 (S.D. Cal. Apr. 12, 2010). The civil action brought by Twenty-Nine Palms against Robert Rosette had been pending for the better part of a year with rumors of federal indictments forthcoming (*see*

*Twenty-Nine Palms Band of Mission Indians of Cal. v. Edwards, Kovall, Rosette, et al.,* No. 30-2009 00311045, Dkt. No. 1 (Orange County Sup. Ct. Oct. 13, 2009)), and Mr. Rosette had also begun taking a position with another one of his clients that Cheryl Williams and Kevin Cochrane felt was irreconcilable with his representation of Pauma. As to that, Robert Rosette had negotiated a compact for Upper Lake with the State of California in 2009 that required the tribe to pay 15% of its net win in order to operate 750 machines.[27] And yet, at the same time this partially-executed compact was awaiting state and federal approvals and Robert Rosette was positing that the revenue sharing fees were legal, Cheryl Williams and Kevin Cochrane were conversely arguing in the *Pauma* case while working for Rosette & Associates that a 10-15% revenue sharing fee constituted an illegal tax that necessarily required the voidance of a compact. Nevertheless, before leaving, Cheryl Williams and Kevin Cochrane tried to sidestep the ethical and representational issues by proposing, on or about April 28, 2010, to remain affiliated with Rosette & Associates through a separate litigation-oriented "of counsel" entity that would be far removed from the day-to-day entanglements in which the firm found itself mired – a proposal that Robert Rosette quickly rejected. 141. As for the Upper Lake compact, after the Assistant Secretary for Indian Af-fairs refused to approve the agreement on account of it "impos[ing] a tax, fee, charge, or other assessment on a tribally-owned gaming facility in violation of IGRA,"[28] Robert Rosette rushed to meet with the newly-elected Governor Brown and negotiated a replace-ment compact for Upper Lake that once again included a 15% revenue sharing fee for 750 devices, only this time the fee escalated up to that point.[29]

---

[27] A true and correct copy of excerpts of the 2009 "Tribal State Compact between the State of California and the Habematolel Pomo of Upper Lake" is attached hereto as **Exhibit 26**.

[28] A true and correct copy of the August 17, 2010 letter from Assistant Secretary – Indian Affairs Larry Echo Hawk to Upper Lake Chairperson Sherry Treppa is attached hereto as **Exhibit 27**.

[29] A true and correct copy of excerpts of the March 17, 2011 "Tribal State Compact

142. This second Upper Lake compact was roundly denounced by gaming tribes throughout California, who felt that Governor Brown took advantage of a tribe that was willing to "cut… a quick deal" and now had a template that his office could and would impose in all subsequent compact negotiations. When the attorney who litigated the seminal *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger,* 602 F.3d 1019 (9th Cir. 2010) (concluding that "[t]he State's demand for 10-15% of… net win… is simply an impermissible demand for the payment of a tax by the tribe."), sent out a scathing mass e-mail that claimed the revenue sharing structure of the new Upper Lake compact was nothing more than "a tax… a tax… a tax," Robert Rosette fired back, explaining that "[i]t is completely unreasonable to expect Indian Tribes to pay little or nothing in exchange for compacts."[30]

143. Meanwhile in the *Pauma* suit, the departure of Cheryl Williams and Kevin Cochrane from Rosette & Associates meant that Robert Rosette and his firm were first tasked with opposing a motion for stay by the State of California that asked the Ninth Circuit to halt the injunction order for the duration of the interlocutory appeal – a motion that the Ninth Circuit would soon thereafter grant. *See Pauma,* No. 10-55713, Dkt. Nos. 15 & 39 (9th Cir. June 11, 2010 & July 28, 2010).

144. Just two days after Rosette & Associates filed its opposition brief, on Sunday, June 13, 2010, the Pauma General Council convened for a meeting and voted to terminate Rosette & Associate's contract and to replace the firm with Williams & Cochrane.

## C. Robert Rosette's Tortious Interference with Williams & Cochrane's Contract with Pauma (Part One)

145. After assuming the representation, Williams & Cochrane was able to get the injunction order back into effect after the State of California made overtures threatening to terminate Pauma's compact rights altogether. *See Pauma*, No. 10-55713, Dkt. No. 55

---

between the State of California and the Habematolel Pomo of Upper Lake" is attached hereto as **Exhibit 28**.

[30] A true and correct copy of a March 24, 2011 e-mail from Robert Rosette to Scott Crowell is attached hereto as **Exhibit 29**.

(9th Cir. Aug. 23, 2010) (order granting Pauma's emergency motion and reinstating the injunction).

146. From thereon, Williams & Cochrane litigated the *Pauma* case on their own for the next six-plus years, ultimately convincing Judge Bencivengo to rescind the 2004 Amendment and restitute the $36.2 million in heightened revenue sharing paid under the agreement on account of a misrepresentation claim that Williams & Cochrane added to the complaint on September 9, 2011 – a full fifteen months *after* Robert Rosette was terminated from the case. *See Pauma,* No. 09-01955, Dkt. No. 130, pp. 54-58 (S.D. Cal. Sept. 9, 2011).

147. An utter lack of involvement in the case has, nevertheless, not stopped Robert Rosette for taking credit for the outcome in the *Pauma* litigation for three years now, as his website (and presumably numerous other promotional materials) advertises that "Mr. Rosette also successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California against then Governor Schwarzenegger." *See* Exs. 6, 7.

148. This claim that he had litigated the case has even been repeated in a profile of Robert Rosette that was disseminated in both print and electronic form as part of a "25 People to Watch in the Gaming Industry" piece by the Global Gaming Business Magazine. As to that, this profile for Robert Rosette ends by stating that:

> Rosette's litigation experience includes Indian tribal cases involving public interest and civil rights. … Rosette also successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 million in compact payments allegedly owed to the State of California against then-Governor Arnold Schwarzenegger.[31] [32]

149. Williams & Cochrane is informed and believes that Robert Rosette has been making similar claims about his supposed involvement in litigating the *Pauma* suit in

---

[31] A true and correct copy a December 19, 2012 Global Gaming Business Magazine article entitled "Legal Eagle: Rob Rosette" is attached hereto as **Exhibit 30**.

[32] A true and correct copy of the home page of the Global Gaming Business Magazine website as it appeared on January 5, 2013 is attached hereto as **Exhibit 31**.

other advertisements, promotional materials, and in both oral and written solicitations that have been transmitted or otherwise done across State lines, including to Quechan (*see* Section II(G), *infra*).

150. The termination of Robert Rosette from the compact litigation by the Pauma General Council should have marked the end of his interaction with Williams & Cochrane, but the lure of the monies saved by the injunction order brought him back around. To explain, in an act of prudence, the monies Pauma saved under the injunction order issued by Judge Burns were placed into a special, set aside account so the tribe would not find itself in a financial bind if this preliminary remedy (which the Ninth Circuit had already stayed for a brief period of time) was overturned and then vacated *en toto*.

151. Before his termination, on April 29, 2010, Robert Rosette wrote an opinion letter that was not shared with any other attorneys in his firm working on Pauma's compact litigation in which he opined that the injunction savings "could… be distributed to Pauma's Tribal Government" even though the General Council had made no such directive.[33] Following his removal, Robert Rosette transmitted a June 23, 2010 letter to Pauma's then-Chairman Christobal Devers in which he acknowledged his termination from the compact litigation, suggested that Williams & Cochrane attorneys were "seek[ing] to have their selfish concerns take precedent [sic] over the best interests of the Tribe" by urging caution with the injunction savings in light of the substandard quality of the opposition brief Mr. Rosette filed before his termination, and stated that "[p]erhaps their issuance of a Legal Opinion allowing the tribe to distribute [the reserved] funds to the General Council will demonstrate the contrary." Based on information and belief, Williams & Cochrane believes that Robert Rosette was trying to get the injunction savings freed up for his own personal gain, not for the benefit of the Pauma General Council.

152. What followed next was a five-month quest to tap into the injunction savings by removing Williams & Cochrane from the picture. At the time, Robert Rosette still had

---

[33] A true and correct copy of the June 23, 2010 letter from Robert Rosette to Christobal Devers, then-Chairman of Pauma, is attached hereto as **Exhibit 32**.

a powerful ally on the Pauma Tribal Council – then-Chairman Christobal Devers – and Williams & Cochrane is informed and believes that Mr. Rosette advised Chairman Devers both in writing and telephonically to withhold payment of the firm's invoices in the hopes that the action would financially devastate the new business and enable Rosette & Associates to take over the work.

153. As such, even though Williams & Cochrane began working for Pauma almost immediately after the General Council vote on June 13, 2010, it nevertheless did not receive its first payment until the morning of October 3, 2010 – just moments before Williams & Cochrane was set to present to the General Council for the first time on the status of the compact litigation.

154. However, before this happened, both Cheryl Williams and Kevin Cochrane met with the Pauma Tribal Council on Friday, August 6, 2010 during which then-Chairman Devers indicated that he would never pay Williams & Cochrane under their contract and suggested that the two attorneys walk away from the representation altogether or he would "ruin [their] reputation in Indian Country" – an abnormal statement that is practically verbatim to the one contained within the June 26th letter from putative Quechan President Keeny Escalanti that was actually written by Robert Rosette or an attorney in his employ.

155. Based on information and belief, Williams & Cochrane believes that Robert Rosette instructed Pauma's then-Chairman Christobal Devers both telephonically and electronically in the days leading up to the August 6th meeting to threaten the attorneys from Williams & Cochrane in the hopes that it would get them to abandon their client, allow Mr. Rosette to take over the representation, and precipitate the freeing up of the millions of dollars in injunction savings.

### D. Robert Rosette's Tortious Interference with Williams & Cochrane's Contract with La Pena Law

156. The aforementioned efforts by Robert Rosette to sever Williams & Cochrane's contractual relationship with Pauma coincided with attempts to accomplish the

1    same elsewhere.

2    157. In 2010, one of the more successful Indian law attorneys in the State of
3    California was an individual named Michelle La Pena, who ran a small law firm in her
4    own name that was located near downtown Sacramento at 2311 Capitol Ave., Sacramen-
5    to, California 95816. *See* La Pena Law Corporation, *Homepage, available at* http://lapena
6    law.com/ (last visited July 4, 2017). At the time, Michelle La Pena represented a number
7    of the largest gaming tribes in the State of California, including the Yocha Dehe Wintun
8    Nation – a tribe that operated the 2,000-machine Cache Creek Casino approximately
9    thirty miles west of Davis and Woodland, California – and the Shingle Springs Ranch-
10   eria, which about a year-and-a-half earlier opened the 2,000-machine Red Hawk Casino
11   directly off of Interstate 80 about fifteen miles east of Folsom, California.

12   158. The Shingle Springs Rancheria is a tribe that experienced a somewhat similar
13   compact fate as Pauma, in that it sought to obtain gaming device licenses under its origin-
14   al compact, but was told by the CGCC that it would have to execute an amendment in
15   order to increase its device count. Shingle Springs did this and entered into an amend-
16   ment with the State of California on June 30, 2008 that allowed it to increase its machine
17   count in exchange for a staggering General Fund fee of 20% on the first $200 million in
18   net win each year plus another $4,600,000 in annual fees that went into the RSTF. *See*
19   California Gambling Control Commission, *Amendment to the Tribal-State Gaming*
20   *Compact between the State of California and the Shingle Springs Band of Miwok Indians*
21   §§ 4.3.1 & 4.3.2.2, *available at* http://www.cgcc.ca.gov/documents/compacts/amended_
22   compacts/Shingle_Springs_Compact.pdf (last visited July 4, 2017).

23   159. Knowing that Michelle La Pena served in a general-counsel-like capacity for
24   these tribes and was not an experienced litigator, Kevin Cochrane met with Ms. La Pena
25   at her offices during the second half of July 2010 to discuss whether their firms could
26   work together to solve Shingle Springs' compact issue.

27   160. The initial meeting was productive, as Williams & Cochrane entered into an
28   of counsel relationship with La Pena Law and was immediately tasked with preparing a

presentation that Michelle La Pena could pitch to the Shingle Springs Tribal Council in order to see if it had any interest in fixing the tribe's amended compact.

161. On or about Wednesday, August 4, 2010, Kevin Cochrane provided Michelle La Pena with the desired litigation memorandum and supporting materials, which in turn led her to ask Mr. Cochrane to meet her at her office on the ensuing Wednesday, August 11, 2010.

162. During the August 11th meeting, Michelle La Pena stated that she was rather impressed with the quality of the Shingle Springs litigation memorandum and asked Kevin Cochrane to prepare a number of last minute documents for a temporary restraining order hearing that she had to appear at the following morning. After Mr. Cochrane agreed to do this last-minute work, Michelle La Pena explained that she thought the of-counsel arrangement was not enough, and wanted to either absorb or merge with Williams & Cochrane. Michelle La Pena told Kevin Cochrane to take some time to think over the proposal and then provided him with a copy of a litigation memorandum Robert Rosette had recently sent her "explor[ing] the possibility of compact litigation for… Shingle Springs… based on its similarities to the Pauma Band of Mission Indians," to alert him to the fact that Robert Rosette, who at this point had been terminated from the Pauma compact litigation for almost two months, was representing that he was responsible for litigating the Pauma case and was trying to drum up work with Shingle Springs through her on that basis.[34]

163. Based on information and belief, Williams & Cochrane believes that Michelle La Pena spoke with Robert Rosette while vetting Kevin Cochrane and Williams & Cochrane at some point between Thursday, August 12, 2010 and the morning of Sunday, August 15, 2010, and was told by Mr. Rosette that the attorneys of Williams & Cochrane had "stole" his client and would invariably "steal" her clients as well. Williams & Cochrane is further informed and believes that these comments were made by Robert Rosette as

---

[34] A true and correct copy of an August 2, 2010 memorandum from Rosette & Associates, PC to La Pena Law Corporation is attached hereto as **Exhibit 33**.

part of a strategy to put Williams & Cochrane out of business, months into its existence, and secure more work and opportunities (like accessing the Pauma injunction savings) for his own firm.

164. At 11:25 a.m. on the morning of Sunday, August 15, 2010, just four days after suggesting that Williams & Cochrane merge with or be acquired by her firm, Michelle La Pena e-mailed Kevin Cochrane and explained that she was ending the of counsel arrangement altogether, and "apologize[d]" if the decision "comes as a surprise, as I really like you and think you have a great career ahead of you."[35] Though stating that the quality of work prepared by Williams & Cochrane was "quite stellar," Michelle La Pena went on to explain for the first time that "[t]here are issues with confidentiality and conflicts that I do not believe we can overcome with your firm."

165. With that, Michelle La Pena terminated all communication with Williams & Cochrane. In other words, the August 15th e-mail from Michelle La Pena to Kevin Cochrane marks the last communication that Ms. La Pena has *ever* had – whether electronically, telephonically, or in person – with either Mr. Cochrane or Cheryl Williams.

### E. Robert Rosette's Tortious Interference with Williams & Cochrane's Contract with Pauma (Part Two)

166. After the La Pena incident, Cheryl Williams and Kevin Cochrane long feared that Robert Rosette had become emboldened and would try to interfere with their other contracts, especially with respect to Pauma's compact litigation since the amount of set-aside monies saved by the injunction order grew as time went on.

167. Unfortunately, this situation came to pass during the summer of 2011. On August 4, 2011, the counsel of record for the State of California in the compact litigation – Deputy Attorney General T. Michelle Laird – called Cheryl Williams and in a rather audibly uncomfortable manner explained that, after she "thought about it for a few days," she felt her ethical duties required her to disclose that Robert Rosette and his firm had set

---

[35] A true and correct copy of an August 15, 2010 e-mail from Michelle La Pena to Kevin Cochrane is attached hereto as **Exhibit 34**.

up a meeting with the Office of the Governor's then-compact negotiator (*i.e.*, Jacob Appelsmith) for August 18, 2011, with the intention of settling "the federal [compact] case." *See, e.g., Pauma,* No. 09-01955, Dkt. Nos. 118-2, 123-1 (S.D. Cal. Aug. 22, 2011).

168. At the time, Williams & Cochrane had no idea how this meeting was set up, and the State of California was neither willing to disclose that information nor cancel the August 18th settlement meeting. In light of this situation, Williams & Cochrane filed a motion for protective order on August 15, 2011, asking the district court to direct the State's negotiator (who was a private attorney and not a public official) to communicate through proper channels when dealing with matters related to Pauma's compact or the pending litigation. *See Pauma,* No. 09-01955, Dkt. No. 118 (S.D. Cal. Aug. 15, 2011).

169. The actual communications between Rosette, LLP and the State's negotiator were not before the district court as part of Pauma's motion for protective order, but have been included as an exhibit to this complaint. *See* Ex. 1. The exchange started with Richard Armstrong – a senior of-counsel attorney at Rosette, LLP who is typically deeply involved in Robert Rosette's schemes and appears to be an active participant in the Quechan situation (*see* ¶ 120) – sending an e-mail to Mr. Appelsmith on July 26, 2011 explaining that the Pauma "Tribal Council respectfully requests a meeting with the Governor's office at your earliest convenience to discuss compact related matters." *See* Ex. 1. As is the case with every communication between Rosette, LLP and the State's negotiator detailed below, not a single person affiliated with Pauma – including all four of the Tribal Councilmembers – was carbon copied or otherwise included on this e-mail.

170. The following morning, Jacob Appelsmith replied to Richard Armstrong and asked whether the desired meeting would involve "settlement discussion in the lawsuit" or instead "seek[ ] to amend or renegotiate the compact." See Ex. 1. After presenting these two options, Jacob Appelsmith suggested that "[i]t would seem to make more sense to have a settlement discussion since the lawsuit is about the compact, but I leave that up to you." *See id.*

171. Richard Armstrong responded by e-mail at 2:00 p.m. that afternoon, stating

"[t]he tribe indeed wants to meet *without their attorneys present* in order to establish a better government to government relationship with the goal of settling the pending lawsuit with a new compact." *See* Ex. 1.

172. A mere ten minutes later, and before Jacob Appelsmith could respond, Robert Rosette sent a follow-up e-mail to Mr. Appelsmith, explaining that his firm was "not engaged as legal counsel on the litigation," Pauma had not hired him to do the work, but he nevertheless wanted to set up a settlement process that would not involve the tribe's attorneys of record but would involve him and his firm after an initial meeting between the parties:

> Jacob,
>
> I believe only the first meeting is without lawyers. Obviously thereafter we will need to be involved. The good news is that the Tribe wants to pull us in, and as you know, we are not engaged as legal counsel on the litigation. The Tribe expressed to me a desire to settle the lawsuit through compact negotiations. I think they want to meet with you to understand this process first.
>
> Thanks,
>
> - Rob.

*See* Ex. 1.

173. In response to hearing that an attorney who admittedly had not been hired by a tribe was nevertheless interested in settling a federal lawsuit behind the backs of the tribe's counsel of record, Jacob Appelsmith replied that he wanted to go forward with the settlement negotiation and to do so without other attorneys present:

> I would like to meet with the Tribe and to do so as a settlement negotiation, and I assume there will be no lawyers present (except myself, which I can't avoid).

*See* Ex. 1.

174. Yet, the filing of the motion for protective order caused all those involved to try and cover their tracks. Jacob Appelsmith transmitted a letter to Pauma postponing the planned August 18, 2011 settlement negotiation (*see Pauma,* No. 09-01955, Dkt. No.

123-2, p. 6 (S.D. Cal. Aug. 22, 2011)), and Robert Rosette began to send e-mails to select members of the Pauma Tribal Council in the hopes of absolving himself of any wrong-doing.

175. As to that, on August 23, 2011, Robert Rosette sent an e-mail that was addressed to the Pauma Tribal Council as a whole but excluded the tribe's then-Chairman Randall Majel from the recipient list.[36] The purpose of the e-mail was to transmit two pre-prepared letters that Robert Rosette wanted one of the Pauma Tribal Councilmembers to sign at a meeting later in the day. The first letter was one prepared for the signature of Pauma's then-Secretary/Treasurer by Robert Rosette explaining that Mr. Rosette's actions were appropriately authorized and that the tribe would "not hold [Mr. Rosette's] firm liable for any unauthorized actions with the State of California, because no such actions were taken."[37] In pertinent part, this letter drafted by Robert Rosette for the benefit of Robert Rosette states:

> This letter is to make clear that your firm's action with respect to scheduling a meeting with the Governor's Office, and any communications related thereto, were all done at the express directive of the Tribal Council. You notified every Tribal Council member of your actions and your communications with the Governor's Office at every stage during this process. We do not and will not hold your firm liable for any unauthorized actions with the State of California, because no such actions were taken. It is not the intention of the Tribal Council that any recently filed briefs may have indicated the contrary.

*See* Ex. 36.

176. The second letter attached to Robert Rosette's August 23rd e-mail was a similar one intended for the signature of Pauma's Secretary/Treasurer that was instead addres-

---

[36] A true and correct copy of an August 23, 2011 e-mail from Robert Rosette to various members of the Pauma Tribal Council is attached hereto as **Exhibit 35**.

[37] A true and correct copy of the draft August 23, 2011 letter purportedly from Pauma's then-Secretary/Treasurer Bennae Calac to Robert Rosette, which was prepared by Robert Rosette and attached to the aforementioned August 23rd e-mail, is attached hereto as **Exhibit 36**.

sed to the State's negotiator Jacob Appelsmith.[38] As with the first one, this letter again contains a disclaimer that the actions taken by Robert Rosette were done at the "express directive of the Tribal Council" and that "Rosette, LLP notified every Tribal Council member of his actions and his communications with the Governor's Office at every stage during this process."

177. Based on information and belief, Williams & Cochrane believes that Pauma's then-Secretary/Treasurer would not sign the two letters prepared by Robert Rosette that sought to absolve Mr. Rosette of any wrongdoing, which in turn led Mr. Rosette to pressure Pauma's then-Chairman Randall Majel (whom he had omitted from the earlier communications) telephonically *over the course of the next twenty days* to sign a watered-down version of the initial letter.

178. When the motion for protective order finally came on for hearing in the *Pauma* case on May 18, 2012, Judge Bencivengo took issue with Robert Rosette even though she did not have the benefit of any of the e-mails discussed above. In pertinent part, Judge Bencivengo stated:

> Well, I have a different issue with Mr. Rosette, who is not here today I believe[,] as to whether or not he should be out purporting that he represents your client when it's not clear to me that he actually has that authority based on some of the declarations that were provided.

*See Pauma,* No. 09-01955, Dkt. No. 182, 19:1-5 (S.D. Cal. May 23, 2012).

179. Ultimately, Judge Bencivengo directed the State of California to interact with Pauma's counsel of record and to agree upon "protocol to control settlement discussions in this matter" (*see Pauma,* No. 09-01955, Dkt. No. 183 (S.D. Cal. May 23, 2012)), though she refrained from doing anything about Mr. Rosette since, as was mentioned above, he was not formally part of the proceeding.

---

[38] A true and correct copy of the draft August 23, 2011 letter purportedly from Pauma's then-Secretary/Treasurer Bennae Calac to Jacob Appelsmith, which was prepared by Robert Rosette and attached to the aforementioned August 23rd e-mail, is attached hereto as **Exhibit 37**.

**F. Robert Rosette's Tortious Interference with Williams & Cochrane's Contract with Pauma (Part Three)**

180. The motion for protective order process put an end to any direct interference from Robert Rosette in the compact litigation, but the conclusion of the suit in September 2016 led him to resurface.

181. As mentioned earlier, the final remedies in Pauma's compact litigation were rescission of the 2004 Amendment and restitution of roughly $36.3 million in overpayments that the tribe made to the State of California while operating under the agreement. The rescission remedy meant that Pauma went back to the 1999 Compact – an agreement that has a quickly-approaching initial expiration date of December 31, 2020.

182. After acquiring the aforementioned remedies in its compact litigation, the Pauma General Council tasked Williams & Cochrane with wrapping up its dispute with the State of California by negotiating or litigating for a successor agreement to the 1999 Compact.

183. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[39] Based on information and belief, Williams & Cochrane believes that Robert Rosette was intending to propose taking over all the legal work done by Williams & Cochrane – both compact and otherwise – for a nominal sum in the hopes of convincing some segment of the Pauma Tribal Council to set up an online payday lending enterprise along the lines of the ones he started for the Picayune Rancheria of Chukchansi Indians a few years earlier. *See* Section IV, *infra*.

184. What is worse, with that overture going nowhere, Williams & Cochrane is informed and believes that Robert Rosette is now attempting to sneak back into Pauma without either the Tribal Council or General Council's consent or even awareness by

---

[39] A true and correct copy of a █████████████████████████████████████ is attached hereto as **Exhibit 38**.

surreptitiously working for the new general manager of the tribe's subordinate gaming facility (*i.e.*, Michael Olujic) with whom Mr. Rosette has a preexisting relationship. *See* Facebook, *Profile for Michael Olujic, available at* https://www.facebook.com/profile. php?id=100011493673519 (last visited July 5, 2017) (listing Robert Rosette as one of Michael Olujic's "friends"). Such an arrangement is extremely dangerous for Pauma since it may provide Robert Rosette with access to the funds that remain from the provisional and final remedies the tribe obtained in its prior compact suit against the State of California.

## G. Robert Rosette's Tortious Interference with Williams & Cochrane's Contract with Quechan

185. Though Robert Rosette resurfaced at Pauma in November 2016, Williams & Cochrane is informed and believes that he did not appear at Quechan until the first few months of this year – long after the execution of the Attorney-Client Fee Agreement.

186. Quechan's government is similar in structure to most other tribes in Southern California, in that it has a Tribal Council that is responsive to a General Council with whom it meets on regular intervals.[40] With that said, Quechan does vest some additional authority in its Tribal Council on account of its larger-than-average membership. Whereas Pauma and most Southern California tribes leave decisions regarding the retention of legal counsel up to the General Council, Quechan gives the Tribal Council a say in the process so long as it "protect[s] and advance[s]… the rights of the Tribe and its members." *See* Ex. 39 at § 6(d). The relevant section of the Quechan Constitution states in pertinent part:

Section 6. The Tribal Council shall have the power:

(d)   To employ legal counsel for the protection and advancement of the rights of the Tribe and its members[.]

*See* Ex. 39 at § 6(d).

---

[40] A true and correct copy of the November 18, 1974 "Constitution and By-Laws of the Quechan Tribe of the Fort Yuma Reservation California" is attached hereto as **Exhibit 39**. *See* Art. III of the Bylaws.

187. Pursuant to this grant of authority, the Quechan Tribal Council hired Williams & Cochrane to solve its compact dispute with the State of California, and also tasked the primary attorney with its longstanding general counsel (*i.e.*, Thane Sommerville with the Seattle-based firm of Morisset, Schlosser, Jozwiak & Somerville) to handle negotiations with Governor Doug Ducey's office for a compact that would govern class III gaming on the small portion of the reservation that falls within the geographical boundaries of the State of Arizona. *See, e.g., Quechan Indian Tribe v. United States*, No. 02-01096 JAH MDD (S.D. Cal. filed on June 7, 2002) (listing the Morisset firm as counsel of record for Quechan); *see also* Section IV, *infra*.

188. Over the past year, Governor Ducey's office has engaged in joint negotiations with the tribes in the State of Arizona in the hopes of creating a model compact that all the tribes would accept.

189. Robert Rosette has been involved in these discussions on behalf of the Tonto Apache tribe (a/k/a the Tonto Apache Tribe of Arizona in the Federal Register), a small tribe in Payson, Arizona, whom he recently convinced to start a payday lending business similar to the one he started at Upper Lake that was sued in federal court by the Consumer Financial Protection Bureau for deceiving customers.

190. Though Governor Ducey has taken a very strong stance against payday lending, on information and belief, Robert Rosette decided to drum up extra compact work by visiting many of the rural tribes in the State of Arizona and soliciting their business (whether represented by legal counsel or not) by promising he could get them involved in the payday lending and medical marijuana fields if they retained him.

191. In the course of these solicitations, Williams & Cochrane is informed and believes that Robert Rosette met with a putative Councilmember of Quechan named Mark William "Willie" White II (who himself is ether involved, or interested in getting involved, in the marijuana industry through a company called Sovereign Hempire) at one of the joint negotiation meetings that took place during the spring of 2017. With that said, the relationship between Robert Rosette and putative Councilmember Willie White ex-

tends back further in time; as to that, while politicking for one of the Councilmember positions in advance of Quechan's general election of 2016, Mr. White informed the General Council in or around December 2016 that he had an attorney "friend" who could get the tribe involved in the online payday lending industry if he were elected to office.

192. Based on further information and belief, Williams & Cochrane also believes that, at or around the time of this meeting, putative Quechan Councilmember Willie White told Robert Rosette about Williams & Cochrane's representation of his tribe in California compact negotiations and Mr. Rosette in a series of oral, written, and telephonic communications informed putative Councilmember Willie White and subsequently putative President Keeny Escalanti that, as advertised on his website, he was actually responsible for litigating the *Pauma* case and should take over the tribe's representation in the negotiations from Williams & Cochrane. Williams & Cochrane is further informed and believes that Robert Rosette offered to replace Williams & Cochrane at a significantly discounted rate, which he was able to do by positioning himself to take a large percentage of the revenues from the payday lending business that he is trying to sell to the tribe in a deal on which he is the attorney for both of the participants in the transaction. Moreover, Williams & Cochrane is further informed and believes that Robert Rosette was able to persuade the putative Councilmembers to go along with his plan in part by offering to give them a portion of the revenues he would receive from the payday lending enterprise under the table *a la* Mr. Rosette's alleged arrangement with Mr. Kovall at 29 Palms.

193. Based on further information and belief, Williams & Cochrane also believes that, at or around the time this meeting, Robert Rosette instructed putative Councilmember Willie White and putative President Keeny Escalanti to breach the Attorney-Client Fee Agreement by withholding payment under the contract – the exact same thing that Mr. Rosette had previously advised Pauma's then-Chairman Christobal Devers to do in 2011. Based on further information and belief, Williams & Cochrane also believes the putative Quechan Councilmembers who were involved with Robert Rosette followed his

directive and withheld payment to Williams & Cochrane for approximately three-and-a-half months – finally only remitting the overdue payments contemporaneous with the transmission of the supposed June 26th termination letter from putative Quechan President Keeny Esclanti to Williams & Cochrane.

194. However, Williams & Cochrane is further informed and believes that, unlike his interference at Pauma in 2011 where he sought to cause an immediate severing of the tribe's contractual relationship with the firm, Robert Rosette realized that the complex and delicate negotiations between Quechan and the Office of the Governor were outside of his competence, despite this public attestations to the contrary, so he simply instructed putative President Keeny Escalanti to use Williams & Cochrane up until the terms of a final compact had been agreed upon in principle, at which point putative President Keeny Escalanti would terminate the firm to try and avoid paying the contingency fee (whether or not he was empowered to do so, and whether or not the other Tribal Councilmembers even knew about this action) and then hand the representation to Mr. Rosette so he could take the credit for the work. Not only that, but Williams & Cochrane is further informed and believes that Robert Rosette plans to pitch the Quechan compact that "he" supposedly negotiated to his general manager friend at Pauma's gaming facility with the intent of interfering yet again with Williams & Cochrane's contractual relations with the tribe, in large part so he can try and set-up a self-serving, sham payday lending business at that tribe as well.

195. Yet, as Quechan or some contingent of its government had this plan in place, the tribe was nevertheless acting like it was carrying out the terms of the Attorney-Client Fee Agreement by, amongst other things, ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

1

2

3

4

5

6

7

8

196. Nevertheless, as previously mentioned, putative Quechan President Keeny Escalanti sent Williams & Cochrane a Rosette-drafted termination letter on June 26, 2017 that contained an unusual and nearly identical threat to the one Robert Rosette instructed Pauma's then-Chairman Christobal Devers to make in 2011 – "We strongly advise you against pressing your luck further out of concern for the reputation of your firm in Indian County and in the State of California."

197. If not for Robert Rosette's interference in the matter, Quechan would have signed the compact Williams & Cochrane had negotiated with the State of California on or about June 30, 2017 – approximately three days after the transmission of putative Quechan President Keeny Escalanti's June 26th termination letter.

198. The State legislature would have then ratified the agreement on or about September 15, 2017 (as it has never rejected a Governor Brown negotiated compact), and the Secretary of the Interior would have approved the compact roughly forty-five days later when it published its notice of approval in the Federal Register. *See, e.g.,* 25 U.S.C. § 2710(d)(8)(C) (explaining the Assistant Secretary shall make a decision on the legality of the compact no later than "45 days after the date on which the compact is submitted").

199. Thus, if not for Robert Rosette's fraudulent and otherwise tortious interference in this matter, Williams & Cochrane would have received monthly flat fees of $50,000 for at least June, July, August, September, and October 2017, and a contingency fee of approximately $5,959,916.10,

███████████████████████████████████████████████

████ Given this, the amount of actual contract damages caused by Robert Rosette interfering in this matter is equal to approximately $6,209,916.10.

**III.  THE CULMINATION OF THE BREACH AND TORTIOUS INTERFERENCE WITH THE ATTORNEY-CLIENT FEE AGREEMENT: QUECHAN USES ROBERT ROSETTE TO EXECUTE THE COMPACT WILLIAMS & COCHRANE NEGOTIATED**

200. With the 2017 legislative session nearing a close, Robert Rosette issued a press release on September 5, 2017 – which he contemporaneously uploaded to his firm's website – to announce that "Governor Edmund G. Brown and the Fort Yuma Quechan Indian Tribe… have signed a new Tribal-State Gaming Compact" that will "reduce the Tribe's revenue sharing obligations by approximately four million dollars ($4,000,000) per year, and simultaneously increase the Tribe's ability to generate revenues through its gaming operations by providing the right to operate additional gaming facilities and gaming devices."[41] After reciting the benefits of the new compact, the press release, as it appears both on and off the Rosette, LLP website, directs those hoping to obtain "more information [about the compact to] contact: Robert Rosette" at either "(480) 889-8990" or "rosette@ rosettelaw.com."

201. The following day, on September 6, 2017, the Office of the Governor posted the executed compact on its website, which reveals that putative Quechan President Keeny Escalanti signed the agreement over a week earlier on Monday, August 28, 2017, and Governor Edmund G. Brown, Jr., countersigned the compact three days later on August 31, 2017.[42]

---

[41] True and correct copies of both the generally-disseminated September 5, 2017 press release entitled "Governor Brown and The Fort Yuma Quechan Indian Tribe Sign New Tribal-State Gaming Compact" and the substantively-identical September 1, 2017 "press release" that was placed on the Rosette, LLP website are attached hereto as one combined **Exhibit 40**.

[42] A true and correct copy of the August 31, 2017 "Tribal-State Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation" is attached hereto as **Exhibit 41**.

202. The core material terms of this executed compact are one and the same with those negotiated by Williams & Cochrane up through the draft compact it sent to the State of California on June 21, 2017. For instance, the executed compact still eliminates all non-regulatory revenue sharing on Quechan's preexisting 1,100 machines, turning what was a General Fund fee of ten percent of net win that typically ranged from $4.4 million to $5.2 million per year into an annual SDF payment of roughly $435,707.40. *See* Ex. 41 at § 4.3. In addition, the final compact also contains the new gaming rights Williams & Cochrane negotiated for Quechan, from the increase in the machine limit from 1,100 to 1,600, to the right to operate three Gaming Facilities instead of one. *See* Ex. 41 at §§ 4.1(a), 4.2.

203. Moreover, the terms of the executed compact do not shy away from disclosing the massive amount of money that Quechan will save every year as a result of the agreement Williams & Cochrane negotiated, with both the Recitals and Section 4.8 containing language along the lines of:

> This Compact reduces the Tribe's revenue sharing obligations by approximately four million dollars ($4,000,000) per year, and simultaneously increases the Tribe's ability to generate revenues through its Gaming Operation by providing the right to operate additional Gaming Facilities and Gaming Devices.

*See* Ex. 41 at Recitals & § 4.8.

204. What the terms of the executed compact further show is that the State of California did not give Quechan any new concessions as a result of Robert Rosette finishing the tribe's representation, and in fact actually clawed back on some of the ancillary benefits it had previously agreed to when negotiating with Williams & Cochrane, ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ This is not the end of

the "claw backs" by the State, however.

205. The reason Quechan did not immediately execute the compact after putative President Keeny Escalanti removed Williams & Cochrane from the representation seems to be that the Office of the Governor changed its negotiation position following the firm switch, suddenly demanding that Quechan pay back all the revenue sharing payments that the tribe missed under the 2007 Amendment.

206. After two months of eleventh-hour negotiations on this issue, the State of California apparently relented somewhat and agreed to execute the compact with Quechan so long as the tribe paid back roughly half of the amount it had failed to pay under the 2007 Amendment from July 2016 onward (*i.e.*, $2 million), which the State memorialized by inserting the following new section into the compact:

**Sec. 4.8. Revenue Sharing Obligations Owing Under the 2006 Amendment.**

This Compact reduces the Tribe's revenue sharing obligations by approximately four million dollars ($4,000,000) per year, and simultaneously increases the Tribe's ability to generate revenues through its Gaming Operation by providing the right to operate additional Gaming Facilities and Gaming Devices. In consideration of these immediate and lasting benefits, the Tribe agrees to satisfy its outstanding payment obligations to the State under the 2006 Amendment, which obligations are ongoing and total approximately four million dollars ($4,000,000), exclusive of interest, as of the execution date of this Compact, by making a reduced total payment of two million dollars ($2,000,000) to the State. The Tribe shall remit the payment required by this section over a period not to exceed six years by paying four (4) equal quarterly installments in accordance with the provisions of section 5.2, subdivision (b). Any failure to remit any portion of the payments due under this section is subject to the provisions of section 4.6, subdivisions (e) and (f). The parties agree that the reduction in the Tribe's outstanding payment obligations under the 2006 Amendment constitutes a meaningful concession by the State in good faith and that payment in full of the reduced amount by the Tribe in accordance with this section shall satisfy any past, present, or future claim the parties may have as to each other arising from the 2006 Amendment.

207. As previously mentioned, repayment of past-due fees under the 2007 Amend-

ment was simply a non-issue for the Office of the Governor at the end of June 2017 when Mr. Dhillon and Ms. Drake were working with Williams & Cochrane on finalizing the terms of a compact that Quechan could sign just days later. Thus, allowing Williams & Cochrane to finish the compact work would have provided Quechan with $2,000,000 in immediate savings (which the tribe could have used to pay some of its legal bills) along with a slew of additional long-lasting benefits of even greater financial value, ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

208. Despite these losses, putative Quechan President Keeny Escalanti was eager to tout the benefits of the compact when he subsequently testified before the Senate Committee on Indian Affairs on October 4, 2017 about the tribe's experience gaming under IGRA. *See* United States Senate Committee on Indian Affairs, *Testimony of Keeny Escalanti, Sr. for the Oversight Hearing on "Doubling Down on Indian Gaming: Examining New Issues and Opportunities for Success in the Next 30 Years"* (Oct. 4, 2017), *available at* https://www.indian.senate.gov/sites/default/files/10.04.17   Keeny   Escalanti Testimony.pdf (last visited Feb. 26, 2018).

209. The remarks by putative Quechan President Keeny Escalanti actually touched upon the negotiations for both the California and Arizona compacts, the latter of which the tribe had started nearly a year prior in November 2016. *See, e.g.,* Dan Nowicki, *Gov. Ducey strikes deal to reopen Arizona tribal gaming compacts,* ARIZONA REPUBLIC, Nov. 21, 2016, *available at* https://www.azcentral.com/story/news/politics/arizona/2016/11/21/ gov-doug-ducey-strikes-deal-reopen-arizona-tribal-gaming-compacts/94228690/   (last visited Feb. 26, 2018). Though acknowledging that Quechan had not finished negotiating the Arizona compact as of that date – something it still has not done as of the filing date for this First Amended Complaint – putative President Keeny Escalanti nevertheless ruefully expressed hope that a compact would get done at some point in the future, stating

"[t]he tribe [was] currently in the process of negotiating a new compact with State [sic] of Arizona, and is hopeful that Arizona will continue to recognize and appreciate the beneficial impact gaming revenues have on local rural communities."

210. What little putative Quechan President Keeny Escalanti had to say about the status of the slow-going Arizona compact negotiations contrasted with his in-depth testimony about the tribe's rocky history of gaming in California and the benefits conferred by the new agreement that "Governor Brown's administration worked tirelessly" to create that sought to turn the page on this turbulent past:

> To alleviate the financial hardship that we experienced under the 2006 Amendment, our Tribe recently negotiated a new Tribal-State Compact with Governor Edmund G. Brown ("2017 Compact"). Governor Brown's administration worked tirelessly to finalize our new compact, allowing the parties to reach an agreement in August 2017, in time for the California Legislature to ratify the compact before the end of the year's legislative session. The Tribe commends and is grateful for the hard work exhibited by Governor Brown and his administration. We are pleased with the terms of our new compact, as it allows for an expansion of gaming devices while offering up more favorable revenue-sharing provisions for the Tribe that will allow it to improve its financial status and augment services that we can provide its membership.

## IV. DETAILS CONCERNING ROBERT ROSETTE'S ONLINE PAYDAY LOAN EMPIRE AND THE EVENTS AT QUECHAN SUBSEQUENT TO THE FILING OF THIS ACTION

211. The law firm owned by Robert Rosette – Rosette, LLP – is one of the largest in the federal Indian law field from a size perspective, with five offices, twenty-plus attorneys, and many millions of dollars in basic operational expenses.

212. Despite this, the law firm has a tendency to charge bargain-basement or even nominal sums to perform legal tasks, even if they are time-intensive and require the work of multiple attorneys. As an example of this, the declaration filed on behalf of putative Quechan President Keeny Escalanti earlier in this case alleges that Robert Rosette agreed to take over Quechan's negotiations for both the California and Arizona compacts for a flat fee of $10,000 a month. *See* Dkt. No. 29-2, ¶ 11.

213. The imbalance between this revenue stream and the multi-millions in annual

built-in overhead should raise legitimate questions about the business model for Rosette, LLP and the continued viability of the law firm. However, the reason Robert Rosette is able to charge these reduced sums is because actual legal work is often simply a means to an end, enabling Mr. Rosette to get into a tribe and make his real money through usually-discreet business transactions, like the internet-based payday lending schemes that he tries to sell to tribes.[43]

214. Even with respect to these operations, what Robert Rosette will typically do is superficially charge a tribe a nominal fee in order to get the business up and running from a legal perspective. For instance, the contract Robert Rosette seemingly executed with the Lac Courte Oreilles Band of Ojibwe Indians ("LCO") contained a remuneration provision requiring the tribe to pay $50,000 up front and then $10,000 – once again – for each of the first "twenty (20) months beginning from the first month of the on-line lending oper-ation launch to the public."[44]

215. In order to get these operations off the ground once he has successfully come in to a tribe either directly (by agreeing to start a payday loan business) or indirectly (by

_____

[43] Much of the substance for the allegations in this section derives from informa-tion publicly-disclosed by members of tribes for whom Robert Rosette started online payday lending operations (*see, e.g.,* LCO Today: A news and editorial blog covering the Lac Courte Oreilles Band of Ojibwe Indians in Hayward, Wisconsin, *available at* http://lcotoday.blogspot.com/ (last visited Feb. 21, 2018)), or from allegations in one of the many lawsuits filed against such entities, including the action by the Consumer Financial Protection Bureau against the numerous payday loan businesses Mr. Rosette started for the Upper Lake tribe. *See Golden Valley,* No. 17-03155, Dkt. No. 1 (N.D. Ill. filed on Apr. 27, 2017); *see also Williams v. Big Picture Loans,* No. 17-00461, Dkt. No. 1 (E.D. Va. filed on June 22, 2017); *Pennachietti v. Mansfield,* No. 17-02582, Dkt. No. 1 (E.D. Pa. filed on June 8, 2017); *Finn v. Great Plains Lending, LLC,* No. 16-00415, Dkt. No. 1 (W.D. Okla. filed on Apr. 26, 2016); *Decker v. RS Financial Services, LLC,* No. 14-00242, Dkt. No. 1 (W.D. Okla. Mar. 13, 2014). Thus, the traditional allegation-based disclaimer of "based on information and belief" will yield in this section to direct cita-tions to the foregoing materials when appropriate.

[44] A true and correct copy of an image from the LCO Today website that claims to be an excerpt of the attorney-client fee agreement between Rosette LLP and LCO is attached hereto as **Exhibit 42**.

performing some other legal task), one of the first things that Robert Rosette will seek to do is remove any legal oversight that may try and curb the operations of the forthcoming payday loan business. For instance, this happened at the Tonto Apache tribe, where the emergence of Mr. Rosette and his law firm coincided with the termination of at least one tribal judge and the sudden departure of the tribe's longstanding general counsel Glenn Feldman – the same Glenn Feldman who argued and won the landmark *Cabazon* case before the Supreme Court. *See Cabazon,* 480 U.S. at 204 (indicating "Glenn M. Feldman argued the cause for appellees," the Cabazon and Morongo Bands of Mission Indians).

216. The jettisoning of outside attorneys then provides the necessary breathing room so Robert Rosette can create the legal infrastructure for a tribe to begin offering payday lending. For instance, Mr. Rosette did this for the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD") by drafting its "Tribal Consumer Financial Services Regulatory Code," an allegation proven true, in part, by the fact that the document properties for the PDF of the regulatory code on the tribal website identifies the author of the document as a Rosette, LLP partner by the name of Karrie S. Wichtman.[45] [46] This regulatory code explains that the LVD Tribal Council is thereby creating a "Tribal Financial Services Regulatory Authority" that is responsible for "implementation of the Code and regulations of the Tribe relating to consumer financial services activities and associated requirements." In lieu of creating a truly independent regulatory body along the lines of what has arisen under IGRA with tribal gaming commissions, the regulatory code instead suggests that the LVD Tribal Council has virtually total control over this entity, even going so far as to provide it with the power to hire and fire the manager who

---

[45] A true and correct copy of excerpts of the Lake Vieux Desert Band of Lake Superior Chippewa Indians' "Tribal Consumer Financial Services Regulatory Code" is attached hereto as **Exhibit 43**. *See* Lake Vieux Desert Band of Lake Superior Chippewa Indians, *Tribal Consumer Financial Services Regulatory Code, available at* http://www.lvdtribal.com/pdf/2014-10-31-Tribal-Consumer-Financial-Services-Regulatory-Code.pdf (last visited Feb. 21, 2018).

[46] A true and correct copy of the document properties for the PDF of the foregoing "Tribal Consumer Financial Services Regulatory Code" is attached hereto as **Exhibit 44**.

1    oversees the day-to-day operations of the Authority.

2    217. An equal amount of tribal-council control exists on the operational side of the

3    business as well. With the regulatory infrastructure in place, Robert Rosette then turns his

4    attention to creating a structural hierarchy through which the tribe can engage in payday

5    lending. At the top of this structure is typically a shell company that acts as a parent to a

6    number of subordinate corporate entities that perform some particularized task, one of

7    which being offering "payday" loans (or "installment" loans or whatever the *en vogue*

8    term is for usurious, short-term loans) over the internet. As was the case with the regula-

9    tory side, the basic operational agreement for the specific tribal corporation that engages

10   in online payday lending explains that a manager who serves at the whim of a board of

11   directors shall run the day-to-day operations of the entity.[47] The chain of command has

12   the manager responding to a board of directors which is in turn responsive to the Tribal

13   Council – this governing body, after all, retains the power to appoint such board members

14   by choosing from either enrolled members of the tribe (*i.e.*, a Tribal Councilmember or

15   someone affiliated with him) or outsiders with "substantial business, financial or industry

16   experience" (*i.e.*, a Rosette, LLP attorney or someone affiliated with him).

17   218. Consolidating control over the regulatory and operational components of the

18   payday lending businesses at the Tribal Council level then allows Robert Rosette to cre-

19   ate a wall of separation between the entities and the tribe at large so the inner workings of

20   these enterprises are shrouded in mystery. In fact, the information disclosed by the tribal-

21   member reporter behind the LCO Today website details how the persons running the

22   online payday lending venture at LCO insisted on using an accounting firm separate and

23   a apart from the one relied upon by the tribe, and also refused to disclose basic financial

24   information about the entity to inquisitive tribal members, claiming such information is

25   "proprietary" in nature.

26

27   [47] A true and copy of images from the LCO Today website that claim to be
     excerpts of the "Operating Agreement of Lac Courte Oreilles Financial Services, LLC" is
28   attached hereto as **Exhibit 45**.

219.   Shortly after creating this business structure whereby the online payday lending business is responsive to the Tribal Council but not the tribe at large, allegations began to swirl around LCO that the payday lending entity had not been conducting audits and, furthermore, the Tribal Council had also been misusing monies, including roughly $800,000 in federal grant funds that was earmarked for the remediation of fifty-plus mold-infested homes on the reservation. *See Duffy alleges gross mismanagement of funds for tribe,* BARRON NEWS-SHIELD, June 21, 2017, *available at* http://www.news-shield.com/news/free_news/article_a1616b1c-5681-11e7-9b03-3778827028c0.html  (last visited Feb. 21, 2017). Ultimately, one-hundred and thirteen (113) members of the tribe petitioned their local United States House representative Sean Duffy to issue a formal request that the Department of the Interior – in connection with other responsible federal agencies – conduct an "independent forensic audit of all accounts, department and agencies of or related to tribal activities."[48] After touring the reservation and seeing the contaminated homes firsthand, Representative Duffy issued the public request on October 6, 2016, though he explained nearly a year later, on June 21, 2017, that the LCO Tribal Council had failed to comply with the audit ultimately requested by the federal govern-ment or even "provide[] [him] with a single document showing that the [federal grant funds] were expended properly."

220. The cloud of secrecy nevertheless enables Robert Rosette to set up the online payday lending enterprise via a transaction he brokers in which the tribe essentially buys a non-branded franchise from a company that sells a prepackaged payday loan business.

221. The resultant business operates along the lines of one of the ones created for LCO – Blue Trust Loans – where an individual can log on to a website and obtain a payday or "installment" loan of up to a set dollar amount which he then repays in regular intervals over a certain and often convoluted period of time. One of the reasons discern-

---

[48] A true and correct copy of an October 6, 2016 letter from Representative Sean P. Duffy to then-U.S. Department of the Interior Secretary Sally Jewel, amongst others, is attached hereto as **Exhibit 46**.

ing the life of the loan is difficult is because the information available on the website to a prospective borrow only identifies the "fee [the borrower will pay] per $100 borrowed per pay period," not the amount of principle and interest-based fees that Blue Trust Loans will deduct per each pay period or the effective annual percentage rate ("APR") for the arrangement. *See* Blue Trust Loans, *FAQ – What Will my Loan Cost?, available at* https://www.bluetrustloans.com/faq.aspx (last visited Feb. 21, 2018). In reality, omitting this straightforward financial information from the website enables Blue Trust Loans to avoid disclosing to prospective borrowers that the ultimate APR on an obtained loan could be in the realm of 800% or higher.

222. To date, Robert Rosette has, on information and belief, created well in excess of thirty distinct payday loan enterprises at more than a dozen tribes, including the following:

    a.   Golden Valley Lending (Habematolel Pomo of Upper Lake)

    b.   Mountain Summit Financial (Habematolel Pomo of Upper Lake)

    c.   Silver Cloud Financial (Habematolel Pomo of Upper Lake)

    d.   Arrow One Lending (Iipay Nation of Santa Ysabel)

    e.   Sierra Lending (Iipay Nation of Santa Ysabel)

    f.   Tall Grass Finance (Iipay Nation of Santa Ysabel)

    g.   123 Wages (Kashia Band of Pomo Indians of the Stewarts Point Rancheria)

    h.   ABC Wages (Kashia Band of Pomo Indians of the Stewarts Point Rancheria)

    i.   Geyser Lending (Kashia Band of Pomo Indians of the Stewarts Point Rancheria)

    j.   InboxLoan (Kashia Band of Pomo Indians of the Stewarts Point Rancheria)

    k.   netPDL (Kashia Band of Pomo Indians of the Stewarts Point Rancheria)

    l.   Oxford Funding (Kashia Band of Pomo Indians of the Stewarts Point Rancheria)

    m.   PDLNow (Kashia Band of Pomo Indians of the Stewarts Point Rancheria)

    n.   PDY Services (Kashia Band of Pomo Indians of the Stewarts Point Rancheria)

o.   QXL Online (Kashia Band of Pomo Indians of the Stewarts Point Rancheria)

p.   ReadySetGo Finance (Kashia Band of Pomo Indians of the Stewarts Point Rancheria)

q.   Harvest Moon Loans (La Posta Band of Diegueno Mission Indians)

r.   Blue Trust Loans (Lac Court Oreilles Band of Ojibwe Indians)

s.   Ladder Credit (Lac Court Oreilles Band of Ojibwe Indians)

t.   ChoiceLease (Lac Court Oreilles Band of Ojibwe Indians)

u.   Bright Star Cash (Lac du Flambeau Band of Lake Superior Chippewa Indians)

v.   Lend Green (Lac du Flambeau Band of Lake Superior Chippewa Indians)

w.   Radiant Cash (Lac du Flambeau Band of Lake Superior Chippewa Indians)

x.   Sky Trail Cash (Lac du Flambeau Band of Lake Superior Chippewa Indians)

y.   Big Picture Loans (Lac Vieux Desert Band of Lake Superior Chippewa Indians)

z.   American Web Loan (Otoe-Missouria Tribe of Indians)

aa.  Great Plains Lending (Otoe-Missouria Tribe of Indians)

bb.  Blue King Loans (Picayune Rancheria of Chukchansi Indians)

cc.  Advance Me Today (Rosebud Sioux Tribe)

dd.  First Pay Loans (Rosebud Sioux Tribe)

ee.  MyQuickWallet (Rosebud Sioux Tribe)

ff.  Q Credit (Rosebud Sioux Tribe)

gg.  ZocaLoans (Rosebud Sioux Tribe)

hh.  Blue Pine Lending (Sokaogon Chippewa Community of Mole Lake)

ii.  Green Pine Lending (Sokaogon Chippewa Community of Mole Lake)

jj.  Red Pine Lending (Sokaogon Chippewa Community of Mole Lake)

kk.  White Pine Lending (Sokaogon Chippewa Community of Mole Lake)

ll.  MaxLend (Three Affiliated Tribes of the Fort Berthold Reservation)

mm. MaxLendLoan (Three Affiliated Tribes of the Fort Berthold Reservation)

nn.  Comet Loans (Tonto Apache Tribe)

84                    Case No.: 17-CV-01436 GPC MDD

FIRST AMENDED COMPLAINT

223. Though the Consumer Financial Protection Bureau and a spate of plaintiff's attorneys have brought suit against these payday lending entities, the threat of any result-ant enforcement actions or adverse judgments, respectively, does not serve as an effective deterrent to the practices of these entities because Robert Rosette can simply replicate the existing entity under a different name at the same tribe or at one of the five-hundred-plus other federally-recognized Indian tribes in the United States that he does not yet repre-sent.

224.  As for the method of creation for these lending enterprises, the information on the LCO Today website indicates that LCO entered into a transaction with a company headquartered in the United States Virgin Islands called Cane Bay Partners – who in turn has business affiliates in extraterritorial locales like Belize – whereby Cane Bay offered to sell the tribe an ownership interest in the lending operation it planned to create. The size of the stake turned upon the amount of money LCO planned on investing, with $1,000,000 buying a 2% interest in the business and $3,000,000 buying 5%. Ultimately, the option chosen by LCO, according to LCO Today, was to invest $1,000,000 for a 2% stake in the payday lending operation.

225. At least in the gaming context, the United States Congress tried to ensure that the operating tribe would be the primary beneficiary of any gaming facility by capping the fee demanded by a management company at 30%, and the special rate of 40% only in the event "the Chairman [of the National Indian Gaming Commission] is satisfied that the capital investment required, and income projections, for such tribal gaming activity require the additional fee requested by the [manager under the contract submitted by the] Indian tribe." *See* 25 U.S.C. § 2711(c)(1) & (2).

226. Yet, one can get an idea about the practical effect of the 98%/2% revenue split in the LCO-Cane Bay partnership by looking at the financial performance of other pay-day lending entities set up by Robert Rosette. As to that, the original complaint filed by the Consumer Financial Protection Bureau against the payday lending entities operated by Upper Lake indicates that between "August and December 2013… Golden Valley and

Silver Cloud [*i.e.*, Upper Lake's lending entities] paid [its business partners] approximately $35.8 million" while they "distributed approximately $536,000 to accounts held by the Habematolel Pomo Tribe." *Golden Valley,* Dkt. No. 1, ¶¶ 91-92 (N.D. Ill. Apr. 27, 2017). Put in layman's terms, these figures mean that for every $70 that went to the outside business partners in the payday-lending arrangement, the tribe received just $1.

227. This sort of inordinate disparity in profits from presumably "tribal" enterprises has become a lightning rod in the federal court system and quite the talking point for Robert Rosette. As to that, at a recent conference entitled "Wiring the Rez: Innovative Strategies for Business Development Via E-Commerce" that took place in Phoenix, Arizona on February 1st and 2nd of this year, Robert Rosette made a presentation on the first day of the conference in which he effectively acknowledged that the payday lending enterprises he set up were not true arms of the tribe under federal law, but pointed blame for this shortcoming at the test used by the federal judiciary rather than the structure of the created businesses. *See, e.g., White v. Univ. of Cal.,* 765 F.3d 1010, 1025 (9th Cir. 2014) (citing *Break-through Mgmt. Group., Inc. v. Chukchansi Gold Casino and Resort,* 629 F.3d 1173, 1187 (10th Cir. 2010)). To help make this point, one slide of the presentation questioned the fifth and final prong of the arm-of-the-tribe test that looks at "the financial relationship between the tribe and the entities [at issue]" by positing the question of whether a financial arrangement that resulted in the tribe getting 3% of gross profits was really such a bad thing.[49] The answer to this question first came from a general perspective, with Robert Rosette explaining the entire notion that money generated by tribal business entities should flow back to the tribal government for use in providing services to members was fundamentally flawed:

> The next thing you hear is, well, not all the money made by these businesses go back to the tribal government. And that's a big problem because what company does not allow for reinvestment back into the company, research and development, capital expenditures, you know. All of these companies

---

[49] A true and correct copy of an excerpt from a February 1, 2018 presentation by Robert Rosette at the "Wiring the Rez" conference is attached hereto as **Exhibit 47**.

should not be expected to put every penny that they make – whether it's e-commerce or patents or anything else – back to the tribal treasury so they can be spent for government purposes. That is a great concept – it is what we do – but it is unreasonable to now hold tribes to this new standard that every penny it makes has to go to some form of government purpose.

After that, the specific question of the tribe receiving only 3% of gross profits was addressed, with Robert Rosette assuming dual roles in a mock dialogue, first posing comments by a judge lampooning the idea that an enterprise could be truly tribal in nature if the overwhelming majority of the revenues go elsewhere, and then providing his response:

The tribes are only making 3% gross approximately, [shifting to talk from his perspective] because they like to use gross numbers when talking about Indians in business. [Shifting back] They're making approximately 3% of gross profit. That's awful. Who is making the other 97%? And how much do your third parties make? …

[Shifting again to talk from his perspective] Since when did these questions become the litmus test for determining whether you are the arm of a tribe? …

It has never been about how much a tribe makes nor should it be. If a tribe starts a business or pursues an opportunity in this new economy, and they're good at it and make money, you don't look at how much they make versus everyone else, you look at the decision making of the tribe that put them in the position to make that profit. …

[I know a lot of casinos in rural areas where] [e]veryone is making money *but* the tribe. [Why is that not a rent-a-tribe scheme?] Why, because we have always been able to articulate this test that it doesn't come down to these notions of who's making what and how much and this is suspicious. Okay. So we shouldn't allow judges or anybody to go down that road today.

228. On information and belief, one of the reasons Robert Rosette does not want a federal judge looking into the financial arrangements involving his online payday loan enterprises is because a significant portion of the 97% gross that ostensibly goes to outside partners in reality goes back to Mr. Rosette (on top of the superficial $10,000 a month fee he charges the tribe on the front end for the legal work) and, to a lesser extent, his allies on the Tribal Council.

229. An additional issue Robert Rosette made sure to discuss during his presenta-tion was differentiating his payday lending model from the one used by Scott Tucker, an individual who, along with his attorney, was sentenced to nearly seventeen years in pris-on a month earlier for repeatedly violating RICO by, in part, forming sham relationships with Indian tribes through which he could run personal payday loan businesses that tried to evade state usury laws and even the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*. *See United States v. Tucker, et al.,* No. 16-00091, Dkt. No. 322 (S.D.N.Y. Jan. 5, 2018) (criminal judgment against Tucker listing fourteen counts of conviction). As articulated by Robert Rosette, the primary difference seemed to be that the Rosette model involves *the tribe* making the loans pursuant to its own laws, presumably using the seed money it pays to its partner in order to buy into the venture.

230. This business model that thrives on furtiveness and the personal enrichment of a select few versus the whole has exacerbated if not outright caused internal problems at some of the operating tribes. Along with LCO, an example of this is the aforementioned Picayune Rancheria of Chukchansi Indians, one of the first tribes to commence operating a Rosette payday lending enterprise and one that, on information and belief, also sub-sequently bought back the shell of the business from Robert Rosette for $2,000,000 as his allies on the Tribal Council were about to lose their seats in the wake of the federal gov-ernment shutting down the tribe's immensely-profitable casino for fifteen months.

231. A number of telltale signs of trouble that typically accompany the formation of a Rosette payday lending businesses have become evident at Quechan over the course of the past year.

232. *Offering artificially and unsustainably low billing rates.* As mentioned, tribes that become targets for payday lending often receive proposals from Robert Rosette that include some nominal charge that likely will not even cover the payroll expenses involved in performing the work. This was the case at LCO where Robert Rosette offered to set up a payday lending business for $50,000 up front plus $10,000 a month for the first twenty months the business was operational. This same seemingly-arbitrary figure of

$10,000 per month is purportedly also at the heart of his Quechan contract, with putative Quechan President Keeny Escalanti and putative Councilmember Willie White acknowl-edging that Robert Rosette took over the work (or whatever work remained, if any) on both the California and Arizona compact negotiations for a flat fee of $10,000 per month. *See*, *e.g.,* Dkt. No. 29-2, ¶ 15 (S.D. Cal. Feb. 9, 2018).

233. *Displacing the existing legal counsel.* The declarations filed earlier in this suit by putative Quechan President Keeny Escalanti and putative Councilmember Willie White both acknowledge that they were so satisfied with Robert Rosette's work in getting the State to sign the California compact following the termination of Williams & Coch-rane (*i.e.*, having to suddenly pay $2,000,000 to the State, losing the mandatory renego-tiation provision, losing the four-year deferral on the State's minimum wage law, etc.) that they then had his firm "Rosette LLP [take] over the general counsel job [the] Morisset [law firm] had been doing in providing general legal services for Quechan on an hourly fee basis." *See, e.g.,* Dkt. No. 29-2, ¶ 20 (S.D. Cal. Feb. 9, 2018). Like the situation with Glenn Feldman at the Tonto Apache Tribe, the law firm of Morisset, Schlosser, Jozwiak & Somerville – and in particular the attorney Thane Somerville – had been acting as the general counsel for the tribe for a considerable number of years if not decades. *See Quechan Indian Tribe v. United States,* No. 02-01096 JAH MDD (S.D. Cal. filed on June 7, 2002) (listing the Morisset firm as counsel of record for Quechan); *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior,* No. 10-02241 LAB BGS (S.D. Cal. filed on Oct. 29, 2010) (same); *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior,* No. 12-01167 GPC PCL (S.D. Cal. filed on May 14, 2012) (same).

234. *Hiding pertinent legal actions.* All of the material actions related to the hiring of Robert Rosette were hidden from the Quechan General Council. For instance, the general membership of the tribe had no idea about the circumstances of Williams & Cochrane's departure or the existence of the present lawsuit until, on information and belief, various case filings were leaked in late 2017 and word spread around the tribe. In

response to the dissemination of this information, some or all of the Quechan Tribal Council posted a notice on the door of the tribal administrative office late in the afternoon of Friday, December 29, 2017 informing the tribe about the pending lawsuit and how the Tribal Council "retained the law firm WilmerHale LLP to represent the Tribe in the matter" and "[was] evaluating whether it has claims [of its own it can raise] against the law firm [of Williams & Cochrane]." On top of which, the first time the Quechan Tribal Council publicly disclosed to its membership either the termination of its longstanding general counsel Morisset or the resolution hiring Robert Rosette to do the California and Arizona compact negotiations was in the declarations putative Quechan President Keeny Escalanti and putative Councilmember Willie White filed in this Court on February 9, 2018. *See, e.g.,* Dkt. No. 29-2, ¶ 20 & Ex. A (S.D. Cal. Feb. 9, 2018). This latter resolution that putative Quechan President Keeny Escalanti purports to have signed at a special meeting on June 26, 2017 is the same one that – on information and belief – Robert Rosette was unable to provide to Senior Assistant Attorney General Sara Drake when she requested to see it during a phone conversation just a few days later on either June 28, 2017 or June 29, 2017. Along with these long-withheld documents, on information and belief, the Quechan Tribal Council is also refusing to provide the general membership with the other relevant legal documents involved in the factual background of this matter– *i.e.*, the resolution terminating Morisset, the resolution hiring Rosette, LLP for general counsel work, the resolution hiring WilmerHale, and all the corresponding contracts – at least as of the filing date of this amended complaint.

235. *Tightening the Tribal Council's grip on power.* As information about the pending lawsuit became public, the general membership of Quechan initiated a two-tiered recall process to try and remove six of the seven persons serving on the Tribal Council from office. The first recall election occurred on Friday, December 29, 2017 and involved putative Councilmember Willie White and one other officer.[50] The second recall election

---

[50] A true and correct copy of a January 12, 2018 Yuma Sun article inaptly entitled "Quechan council members survive recall effort" is attached hereto as **Exhibit 48**.

took place on Wednesday, January 17, 2018, and focused upon putative President Keeny Escalanti and three other officers.[51] The results of the recall saw an overwhelming majority of Quechan voters elect to remove both putative President Keeny Escalanti and putative Councilmember Willie White from office, with the final vote tallies being 147-80 and 209-102, respectively. For comparison sake, the two-hundred and nine votes to remove putative Councilmember Willie White is more than the total votes *any* candidate received during the Quechan general election of 2015. Not to mention, the one-hundred and forty-seven votes in favor of removing putative Quechan President Keeny Escalanti is more than the total votes he received during the same general election that saw him come in a distant second to President Mike Jackson. Nevertheless, the impacted Quechan Tribal Councilmembers devised a plan to remain in office with the assistance of Robert Rosette, ultimately refusing to step down on the basis that the votes were invalid because "the total number of voters did not meet the minimum set by the tribe's constitution."

236. *Newly emerging financial issues.* This entrenchment in power has come on the heels of the Quechan Tribal Council stopping per capita payments to the general membership of the tribe, claiming that the California and Arizona casinos together are not making a profit which thereby eliminates any obligation to make such payments under the "Revenue Allocation Plan" approved by the National Indian Gaming Commission. It is worth noting that this argument that the two casinos currently operated by Quechan are suddenly unprofitable is being made despite the fact that the net income for the facilities over the last eighteen months includes an additional $6-plus million – according to the rate reduction memorialized in the terms of the new compact – that the tribe would have normally paid the State of California as revenue sharing under its 2007 Amendment. On information and belief, the cessation of per capita payments during a time of peak income has raised concerns amongst the Quechan general membership that the Tribal Council may be misusing the tribe's funds.

---

[51] A true and correct copy of a January 26, 2018 Yuma Sun article entitled "Results of Quechan Tribe's recall vote thrown out" is attached hereto as **Exhibit 49**.

# V. THE TANGLED, PRE-EXISTING RELATIONSHIP BETWEEN ROSETTE, LLP AND WILMERHALE

237. Following the service of the complaint in this case, the two general groups of defendants hired separate law firms, giving off the appearance that each is represented by independent counsel. On the one hand, the Rosette defendants retained O'Melveny & Myers while, on the other, Quechan and the putative Councilmembers went with Wilmer-Hale.

238. Yet, the putative Quechan Councilmembers' choice of law firms may not be as innocuous as it first seems. Every year the publication U.S. News & World Report releases "best of" lists for various service industries. One such list covers the best lawyers and law firms in the United States. WilmerHale was one of the law firms considered for inclusion in the list for the current year 2017-18, and ultimately ended up ranking as the law firm of the year in intellectual property litigation and also placing in the top three tiers in a number of other practice areas. The detailed information about the firm that is part of WilmerHale's profile on the U.S. News website includes "client comments," one of which was submitted by a "Rob Rosette" of "Rosette, LLP" and discloses

> I worked as co-counsel with WilmerHale. This law firm consists of true professionals. They provided excellent advice with regard to every project I had the pleasure of working on with them, and they work well with co-counsel.

*See* U.S. NEWS & WORLD REPORT, *Best Law Firms Rankings: Wilmer Cutler Pickering Hale and Dorr LLP – Client Comments, available at* https://bestlawfirms.usnews.com/profile/wilmer-cutler-pickering-hale-and-dorr-llp/client-comments/20955 (last visited Feb. 25, 2018).

239. This statement about Rosette, LLP and WilmerHale being co-counsel in the past is accurate, as the two firms have so far unsuccessfully represented the Eastern Shoshone Tribe in a suit in which the United States Court of Appeals for the Tenth Circuit held that the U.S. Congress diminished the size of the tribe's Wind River Reservation. *See Wyoming v. U.S. EPA,* 875 F.3d 505 (10th Cir. 2017); *see also* Pet. for Writ of Cert.,

1  *Eastern Shoshone Tribe v. Wyoming,* Nos. 17-1164, 17-1159 (U.S. Feb. 16, 2018) (listing

2  Rosette, LLP and WilmerHale as co-counsel), *available at h*ttps://www.supremecourt.

3  gov/search.aspx?filename=/docket/docketfiles/html/public/17-1164.html (last visited Feb.

4  23, 2018).

5      240. The *Eastern Shoshone* lawsuit is but one project on which Rosette, LLP and

6  WilmerHale have teamed up as co-counsel. As mentioned earlier, Robert Rosette has a

7  longstanding involvement in the internal dispute affecting the California Valley Miwok

8  Tribe, representing a four-person faction of the five-person tribe as he seeks to get the

9  CGCC to release some $15 million in frozen RSTF funding to his faction alone while si-

10  multaneously blocking the enrollment of hundreds of displaced Indians. *See, e.g.,* Califor-

11  nia Valley Miwok Tribe, *Homepage, available at* http://californiavalleymiwok.us/ (last

12  visited Feb. 25, 2018) (presenting the Homepage for this particular four-person faction of

13  the California Valley Miwok Tribe).

14      241. The $1.1 million in annual RSTF funding that the CGCC cut off more than a

15  decade ago was the principal means of support for the "tribe" (*i.e.*, the four-person fac-

16  tion now represented by Robert Rosette), as is evidenced by the fact that the four-person

17  faction faced recurrent eviction proceedings from 2009 to 2103 at their Stockton, Califor-

18  nia mansion that was masquerading as a tribal administrative office because they simply

19  lacked the funds to make the mortgage payment without the influx of RSTF monies. *See*

20  California Valley Miwok Tribe, *No Sale at Auction Tribe Fears Future Eviction* (Oct. 22,

21  2013), *available at* http://californiavalleymiwok.us/index.php/no-sale-at-auction-tribe-

22  fears-future-eviction/ (last visited Feb. 25, 2018). In light of this and other information,

23  Williams & Cochrane believes that Robert Rosette has a contingency fee arrangement

24  with the four-person faction he represents that involves receiving a significant percentage

25  (*i.e.*, 30-40%) of the frozen RSTF funds once the CGCC releases those monies.

26      242. The distribution of those RSTF monies largely turns upon whether the tribe is

27  organized and has a recognized governing body – questions that have split the various

28  and usually exceedingly-deferential Assistant Secretaries of Indian Affairs over the years.

The most recent decision on the issue was released by the final Assistant Secretary appointed by President Barack Obama – Kevin Washburn – on December 30, 2015, and concludes the "that the Tribe's membership is more than five people," and the Indians long denied membership by Rosette's four-person faction "must be given opportunity to take part in the reorganization of CVMT." *See Cal. Valley Miwok Tribe v. Jewel,* No. 16-01345, Dkt. No. 33-1, Ex. 19 at pp. 160-66 (E.D. Cal. Sept. 9, 2016).

243. Concluding the December 30, 2015 decision letter is a distribution list that details the physical addresses for the attorneys representing each side in the faction dispute. *See Cal. Valley Miwok Tribe,* Dkt. No. 33-1, p. 167 (E.D. Cal. Sept. 9, 2016). The firms listed under the heading of "Representing Silvia Burley" (*i.e.*, the leader of the four-person faction that has blocked the reorganization of the tribe) are "Rosette, LLP" and "Wilmer Cutler Pickering Hale and Dorr." *Id.* Although this decision letter came out at the end of 2015, WilmerHale appears to have continued its representation of the four-person faction since that time, as the "department and services" page on the faction's website lists "WilmerHale" beneath "Rosette, LLP" in the section identifying the faction's current "Legal Representation." *See* California Valley Miwok Tribe, *Departments & Services, available at* http://californiavalleymiwok.us/index.php/ departments/ (last visited Feb. 25, 2018).

244. Returning to the financial issue, the inability of the four-person Burley faction to pay its property bill let alone Rosette, LLP means that, on information and belief, WilmerHale's compensation for its work on these matters comes from Robert Rosette either in the form of rolling payments as the work was performed, a share of his contingency fee if and when the RSTF monies are released, or promises of future money and/or work should the Burley faction manage to stay in power if and when these interminable issues finally resolve.

245. The true relationship between Rosette, LLP and WilmerHale is a subject the attorneys with Williams & Cochrane tried to comprehend during recent conversations with opposing counsel. On January 20, 2018, the lead attorney in this suit for Wilmer-

Hale Christopher Casamassima sent the attorneys for Williams & Cochrane a letter questioning their past compliance with the California Rules of Professional Conduct and demanding that they promptly turn over Quechan's entire case file even though the compact project officially concluded some six weeks prior when the Principal Deputy Assistant Secretary for Indian Affairs approved the compact and transmitted notice of his approval to the Federal Register. *See* Indian Gaming; Tribal-State Class III Gaming Compacts Taking Effect in the State of California, 83 Fed. Reg. 3015-16 (Jan. 22, 2018) (indicating the compact was approved on December 15, 2017). This "entire case file" request did not simply request those materials reasonably related to the representation, but instead asked for "all time sheets or time records," "all… computer records," and "all correspondence," amongst other things.

246. This request came on the heels of the Yuma Sun publishing the two articles attached hereto as Exhibits 48 and 49 that explain five of seven putative Quechan Tribal Councilmembers were recalled from office during December 2017 and January 2018, including the two personally represented by WilmerHale in this suit. This political upheaval led Cheryl Williams to respond to Mr. Casamassima by explaining that she was willing to discuss the client-file issue, but she first needed something "confirming your representation of the Quechan tribe" and not just Mssrs. Escalanti and White, "such as a fee agreement between your firm and the Tribe."

247. The reply letter Mr. Casamassima sent on January 29, 2018 dodged the request to prove up WilmerHale's representation of Quechan by simply contending that "[n]o Tribal Council members have been recalled and there are no legitimate questions as to their authority to act on the Tribe's behalf."

248. The inability of WilmerHale to produce any evidence substantiating its representation of Quechan raised serious doubts in the minds of Cheryl Williams and Kevin Cochrane about the actual arrangement for this international law firm both financially and otherwise, especially in light of the fact that Quechan had supposedly hired a law firm that could easily charge in excess of $6 million to try and avoid a $6 million contractual

liability.

249. As to that, a cursory search of the federal dockets reveals that WilmerHale has litigated at least a handful of federal civil cases since the turn of the century in which accrued attorneys' fees were in excess of $6 million, including one in this district known as *Qualcomm v. Broadcom* that saw WilmerHale seek $6,054,609.50 in attorneys' fees after two years of litigation. *See Qualcomm Inc. v. Broadcom Corp.,* No. 05-01958 B BLM, Dkt. No. 617-1, p. 18 (S.D. Cal. Aug. 31, 2017); *see also, e.g., Rosie D. v. Patrick,* No. 01-30199, Dkt. No. 383-2, p. 2 (D. Mass. Dec. 18, 2007) (indicating WilmerHale generated $6,182,353.50 in billables).

250. The motion for attorneys' fees in *Qualcomm v. Broadcom* was based upon a 2005 fee schedule that had the senior partners assigned to the case charging between $435 and $790 per hour, and associates $310 per hour. *See Qualcomm Inc. v. Broadcom Corp.,* Dkt. No. 617-2, p. 22 (S.D. Cal. Aug. 31, 2007). However, a declaration that WilmerHale filed in connection with a motion for attorneys' fees in a federal bankruptcy action just two-and-a-half years ago shows that the hourly rates of its attorneys have increased substantially since the *Qualcomm* era. *See In re Corporate Resources Services,* No. 15-11546, Dkt. No. 70-1 (Bankr. D. Del. July 31, 2015). As to that, the average hourly rate for a partner assigned to the recent *In re Corporate Resources Services* matter increased from the $435-$790 range in *Qualcomm* to $780-$1,510. *Id.* Likewise, associates that billed out at $310 per hour ten years earlier were now coming in between $450 and $805 an hour. *Id.*

251. Even during the era of the lower hourly rates, the fees WilmerHale charged during litigation produced total bills that soared past $6 million. As an example, Wilmer-Hale was responsible for defending the former Chief Financial Officer of McAfee in "a single defendant criminal action without parallel civil litigation and its attendant discovery fees and expenses," a task that – according to a subsequent fraud suit filed by McAfee – seemingly required the involvement of "16 partners, 34 associate attorneys, 10 legal assistants and 49 staff personnel." *McAfee v. Wilmer, Cutler, Pickering, Hale and Dorr,*

*L.L.P.,* No. 08-00160, Dkt. No. 19, ¶¶ 6-7 (E.D. Tex. June 26, 2008). The ultimate outcome of this rather zealous representation was a criminal conviction for the client and an alleged billing "bonanza" for WillmerHale that involved more than $12 million in fees and $200,000 "in expenses for luxury hotel rooms, limousines and charges for room service and bar tabs." *Id.* at ¶¶ 5-6, 8.

252.  The sort of fee totals seen in cases like *McAfee, Qualcomm,* and others when combined with the preexisting relationship with Rosette, LLP logically suggest that WilmerHale is, in fact, being paid by Robert Rosette so this latter individual can try and control the entire defense of the present lawsuit for his own benefit.

## FIRST CLAIM FOR RELIEF

### [Breach of Contract]

### [By Williams & Cochrane and Against Quechan Tribe of the Fort Yuma Indian Reservation]

253. Williams & Cochrane incorporates by reference the preceding general allegations as if set forth in full.

254. A claim for a breach of contract requires the existence of an enforceable contract, the plaintiff's performance under the contract, the defendant's breach of the agreement, and damages to the plaintiff resulting from the breach. *See, e.g., Hickcox-Huffman v. US Airways, Inc.,* 855 F.3d 1057, 1062 (9th Cir. 2017) (citing, *e.g.*, *Reichert v. Gen. Ins. Co. of Am.,* 68 Cal. 2d 822 (1968) (*en banc*)). Under California law, the terms of a contract may contain an implied in fact agreement that limits the ability of one contracting party to fire the other for good cause or for another reason based upon the conduct of the parties, with the terms of such implied agreement standing on "equal footing with express terms." *See, e.g., Foley v. Interactive Data Corp.,* 47 Cal. 3d 654, 677-678 (1988) (citing, *e.g.*, Restatement (Second) of Contracts §§ 4, 19 (1981)).

255. Quechan and Williams & Cochrane executed the Attorney-Client Fee Agreement on September 29, 2016 after arms-length negotiation and the tribe consulted with an independent attorney. The terms of the contract state that Williams & Cochrane

would provide legal services to Quechan pertaining to "reducing [the tribe's] payments under its tribal/State gaming compact with the State of California and seeking return of payments made under such agreement." In return for these services, Quechan agreed to pay Williams & Cochrane a monthly flat fee of $50,000 and a 15% contingency fee on the roughly $39,732,774 in heightened revenue sharing that Quechan paid to the State of California under its 2007 Amendment if the firm was able to obtain a "credit, offset, or other reduction in future compact payments to the State in a successor compact (whether new of amended) as a result of" said past payments. The Attorney-Client Fee Agreement also explains that if Quechan discharges Williams & Cochrane before the contingency fee attaches, the tribe will still have to pay the full contingency fee if it has become "entitled" to the aforementioned "credit, offset, or other reduction in future compact payments" that serves as the basis for the fee. *See* Merriam-Webster, *Definition of Entitle*, *available at* *https://www.merriam-webster.com/dictionary/entitle* (last visited July 15, 2017) (defining "entitle" as "to furnish with proper grounds for seeking or claiming something"). Even if this is not the case, the Attorney-Client Fee Agreement still requires Quechan to pay the firm a "reasonable fee for the legal services provided in lieu of the contingency fee" that will be determined on the basis of a list of factors that first looks at "[t]he amount of the fee in proportion to the value of the services performed."

256. Williams & Cochrane performed under the Attorney-Client Fee Agreement from the execution date of the contract to June 27, 2017, by which point it had reached an agreement in principle with the State of California and was finalizing the terms of a twenty-five year gaming compact that would eliminate at least $112 million in revenue sharing fees vis-à-vis the 2007 Amendment and provide Quechan with ability to generate another $660 million in additional gaming revenue as a result of new machine rights.

257. Yet, just three days before Quechan was tentatively set to sign the final compact, putative President Keeny Escalanti caused a letter to be e-mailed to Williams & Cochrane in which he stated that the firm had been terminated and the tribe would "not pay any contingency fee or 'reasonable fee for the legal services provided in lieu'

thereof" as required by the terms of the Attorney-Client Fee Agreement. Between this and a second letter dated June 30, 2017, putative Quechan President Keeny Escalanti directed Williams & Cochrane to turn over the final draft of the compact to an attorney by the name of Robert Rosette so he could wind up the negotiations and have the tribe sign the compact Williams & Cochrane had negotiated without delay. To make it abundantly clear that Quechan would not pay any contingency or substitute fee under the Attorney-Client Fee Agreement, putative Quechan President included a threat in his June 26th termination letter, telling Williams & Cochrane that he "strongly advise[s] you against pressing your luck further out of concern for the reputation of your firm in Indian Country and in the State of California."

258. In addition to violating the express terms of the Attorney-Client Fee Agreement, putative Quechan President Keeny Escalanti also breached an implied in fact agreement that stands on "equal footing" with the express terms of the agreement, which ensured that the tribe would not terminate the firm during the conclusion of the time-sensitive negotiations. This implied in fact agreement is evidenced, in part, by the course of conduct between the parties, as the point persons for both the Tribal Council and the Quechan Casino Resort told Cheryl Williams in the weeks leading up to the transmission of putative President Keeny Escalanti's June 26th termination letter ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

259. Quechan's breach of both the express and implied terms of the Attorney-Client Fee Agreement has caused Williams & Cochrane to suffer contract damages and injuries totaling at least $6,209,916.10, which the district judge or a jury can resolve in accordance with the Prayer for Relief, *infra*.

///

### SECOND CLAIM FOR RELIEF

### [Breach of the Implied Covenant of Good Faith and Fair Dealing]

### [By Williams & Cochrane and Against Quechan Tribe of the Fort Yuma Indian Reservation]

260. Williams & Cochrane incorporates by reference the preceding general allegations as if set forth in full.

261. The implied covenant of good faith and fair dealing imposes basic duties that inhere in all contracts. *See, e.g., Talden Inv. Co. v. Comerica Mortg. Corp.,* 1990 U.S. Dist. LEXIS 19951, *47 (N.D. Cal. 1990) (citing Restatement (Second) of Contracts § 205 (1981)). The duty of good faith and fair dealing requires that a party to a contract not act in an opportunistic or bad faith way that will deprive the other party of the benefits of the agreement. *See, e.g., Mitchell v. Exhibition Food, Inc.,* 184 Cal. App. 3d 1033, 1043 (1986); 23 Richard A. Lord, *Williston on Contracts* § 63:22 (4th ed. 2002). The term "bad faith" is what courts consider an "excluder phrase" that is "without general meaning (or meanings) of its own and serves to exclude a wide range of heterogeneous forms of bad faith," or conduct that generally involves unfair dealing. *Price v. Wells Fargo Bank,* 213 Cal. App. 3d 465, 479 (1st Dist. 1989) (citing *Foley,* 47 Cal. 3d at 697). While "a complete catalogue of types of bad faith is impossible" (*see* Restatement (Second) of Contracts § 205 cmt. d (1981)), judicial decisions have long recognized that conduct that seeks to evade the spirit of the bargain is a basic form of bad faith. *See id.* This principle means, amongst other things, that "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." *Okun v. Morton,* 203 Cal. App. 3d 805, 820 (2d Dist. 1988) (quoting *Cal. Lettuce Growers v. Union Sugar Co.,* 45 Cal. 2d 474, 484 (1955)).

262. Quechan and Williams & Cochrane executed the Attorney-Client Fee Agreement as is discussed in the First Claim for Relief, *supra.*

263. The Attorney-Client Fee Agreement explains that Quechan "may discharge

[Williams & Cochrane] at any time," but it will still have to pay the contingency fee if the tribe has become "entitled" to a "credit, offset, or other reduction in future compact payments to the State in a successor compact (whether new of amended) as a result of" its past, excess payments under the 2007 Amendment. *See* Merriam-Webster, *Definition of Entitle*, *available at https://www.merriam-webster.com/dictionary/entitle* (last visited July 15, 2017) (defining "entitle" as "to furnish with proper grounds for seeking or claiming something"). Even if this is not the case, the Attorney-Client Fee Agreement still requires Quechan to pay the firm a "reasonable fee for the legal services provided in lieu of the contingency fee" that will be determined on the basis of a list of factors that first looks at "[t]he amount of the fee in proportion to the value of the services performed."

264. However, in this case, putative Quechan President Keeny Escalanti caused to be transmitted to Williams & Cochrane a letter on July 27, 2017 that terminated the firm just three days before the end of the negotiations and the planned execution date for the resultant compact, explaining that the tribe would "not pay any contingency fee or 'reasonable fee for the legal services provided in lieu' thereof." Despite this, putative Quechan President demanded that Williams & Cochrane turn over the latest draft compact to Robert Rosette using threats of legal action so this substitute attorney could simply step in as the attorney of record and have the tribe sign the compact that Williams & Cochrane negotiated. This course of conduct is a blatant evasion of the spirit of the bargain, especially when a court takes into account that the point persons for both the Tribal Council and Quechan Casino Resort had informed Cheryl Williams in the weeks leading up to the transmission of the June 26th termination letter that the General Council had directed the Tribal Council to sign whatever compact Williams & Cochrane negotiated with the State of California by the end of the month so the agreement would obtain the necessary State approvals during the current legislative session (and also end the specter of the CGCC taking adverse action against the tribe), and the Tribal Council intended to honor this directive.

265. Quechan's breach of the implied covenant of good faith and fair dealing that inheres in the Attorney-Client Fee Agreement has caused Williams & Cochrane to suffer contract damages and injuries totaling at least $6,209,916.10, which the district judge or a jury can resolve in accordance with the Prayer for Relief, *infra*.

## THIRD CLAIM FOR RELIEF

### [Promissory Estoppel]

### [By Williams & Cochrane and Against the Quechan Tribe of the Fort Yuma Indian Reservation]

266. Williams & Cochrane incorporates by reference the preceding general allegations as if set forth in full.

267. The doctrine of promissory estoppel explains that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promise or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Sheppard v. Morgan Keegan & Co.,* 218 Cal. App. 3d 61, 67 (1st Dist. 1990) (citing, *e.g.*, Restatement (Second) of Contracts § 90(1) (1981)). A claim for promissory estoppel under California law generally requires that a plaintiff show "(1) a clear and unambiguous promise; (2) reliance by the party to whom the promise is made; (3) reliance that is reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his or her reliance." *Temple v. Bank of Am., N.A.,* 2015 U.S. Dist. LEXIS 77207, *10 (N.D. Cal. 2015) (citing *Boon Rawd Trading, Int'l Co. v. Paleewong Trading Co.,* 688 F. Supp. 2d 940, 953 (N.D. Cal. 2010)). The California courts explain that promissory estoppel can apply in the contract context, with the promise being one that is either independent of the contract or implicit in the terms of the agreement whether through the implied covenant of good faith and fair dealing or otherwise. *See, e.g., Morgan Keegan & Co.,* 218 Cal. App. 3d at 67.

268. During the spring of 2017, Quechan made a series of promises to Williams & Cochrane after the firm caused the CGCC to stand down from bringing an enforcement

action against the tribe that could have resulted in the termination of the tribe's compact rights or the loss of millions (if not tens of millions) of dollars in gaming revenues, thus buying a window of time during which the tribe could execute a compact with the State of California before the delinquent payments once again became an issue for the Commission. First, shortly after Williams & Cochrane transmitted its final response letter to the CGCC on April 21, 2017, the General Manager for Quechan Casino Resort Charles Montague called Cheryl Williams and explained that the Tribal Council had re-voted on how to handle the compact dispute and once again decided to resolve it via negotiations using her firm. Subsequent to this, on or about June 6, 2017, the Quechan General Council met for its monthly tribal meeting and directed the Tribal Council to execute whatever compact Williams & Cochrane negotiated with the State of California during the remainder of the month so it would obtain the necessary State approvals during the current legislative session and thereby end the specter of the CGCC taking adverse action against the tribe. Then, in the wake of this meeting, the point persons for both the Quechan Tribal Council (*i.e.*, putative Vice President Virgil Smith) and Quechan Casino Resort (*i.e.*, General Manager Charles Montague) spoke with Cheryl Williams and informed her that the Tribal Council intended to execute the compact Williams & Cochrane negotiated with the State of California during the month in accordance with the directive of the General Council. Yet, despite these promises, putative Quechan President Keeny Escalanti caused to be sent to Williams & Cochrane a termination letter on June 27, 2017, just three days before the Tribal Council was scheduled to sign the compact, so the tribe could obtain the compact the firm had negotiated without having to pay for it in accordance with the terms of the Attorney-Client Fee Agreement.

269. Williams & Cochrane relied on the promises made by Quechan through putative Vice President Virgil Smith and Quechan Casino Resort General Manager Charles Montague by working to wrap up the negotiations up until the point the putative President Keeny Escalanti's June 26th termination letter was transmitted to this firm.

270. Williams & Cochrane's reliance on these promises was both reasonable and

foreseeable because each party to a contract has an inherent duty to carry out the terms of the agreement in good faith. Not to mention, through these promises, Quechan conveyed that the tribe was unified about how to resolve the dispute and planned to do so in accordance with the original plan as decided by the Tribal Council in December 2016. Williams & Cochrane's reliance should have also been foreseeable to Quechan given the firm's zealous advocacy of the tribe since the outset of the representation, and its determination to provide the Tribal Council with a compact to sign by or about June 30, 2017 so the agreement would obtain the necessary State approvals during the current legislative session and thereby end the specter of the CGCC taking adverse action against the tribe.

271. Quechan's failure to honor the aforementioned promises has caused Williams & Cochrane to suffer contract damages and injuries totaling at least $6,209,916.10, which the district judge or a jury can resolve in accordance with the Prayer for Relief, *infra*.

## FOURTH CLAIM FOR RELIEF

### [False Advertising in Violation of the Lanham Act – Robert Rosette's Litigation of the *Pauma* Suit (15 U.S.C. § 1051 *et seq*.)]

### [By Williams & Cochrane and Against Robert Rosette; Rosette & Associates, PC; and Rosette, LLP]

272. Williams & Cochrane incorporates by reference the preceding general allegations as if set forth in full.

273. The Lanham Act provides in relevant part that:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any… false or misleading description of fact, or false or misleading representation of fact, which –

[…]

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a). Thus, a claim for false advertising under the Lanham Act requires a

plaintiff to show five things akin to: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." *Skydive Ariz., Inc. v. Quattrocchi,* 673 F.3d 1105, 1110 (9th Cir. 2012).

274. Robert Rosette has a literally false representation of fact on the website for his firm Rosette, LLP (of which Rosette & Associates, PC is a general partner), which advertises to the general public and all potential clients in the Indian law field that "Mr. Rosette… successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California against then Governor Schwarzenegger." This statement is unequivocally false, though, given that the attorneys for Williams & Cochrane (*i.e.*, Cheryl Williams and Kevin Cochrane) were counsel of record in that matter from June 2010 till the conclusion of the case in September 2016, and responsible for upholding the preliminary injunction, rescinding the tribe's 2004 Amendment on the basis of a claim they added to the complaint in September 2011, and obtaining $36.3 million as restitution for the excess payments the tribe made to the State of California under its amendment. In fact, according to his own deposition testimony, Robert Rosette admits that he only had the case for forty-five days, during which time he filed one substantive brief that resulted in the Ninth Circuit overturning the preliminary injunction Cheryl Williams and Kevin Cochrane had obtained the tribe, thus leaving the tribe with no interim or final remedies as a result of his short-lived representation in the case. Not only that, but Robert Rosette's deposition testimony also reveals that Mr. Rosette did not even know what was happening in the *Pauma* case as of October 2010 – a mere four months after his termination, eleven months before Williams & Cochrane added the claim to the

complaint on which Pauma would ultimately prevail, and almost six years before the case would finally conclude.

275. This website advertisement by Robert Rosette (and assuredly other similar statements transmitted via e-mail or the regular mail) about his involvement in the Pauma litigation appears to have actually deceived Quechan President Keeny Escalanti and putative Councilmember Willie White, as they concocted a scheme to have Mr. Rosette (*i.e.,* the one other attorney who was supposedly responsible for litigating the case on which their dispute was, in part, based) replace Williams & Cochrane right on the cusp of the negotiations concluding. Moreover, this advertisement would also deceive most other tribal leaders not affiliated with Pauma in the normal course because the attorney information for the *Pauma* suit is largely hidden behind the paywalls for the federal government-run PACER pay site, and Robert Rosette is capable of producing early court filings to substantiate his supposed claim given that his firm represented Pauma during an approximately nine month period at the outset of the case, from the filing of the complaint on September 4, 2009 to approximately June 13, 2010.

276. Robert Rosette also caused this literally false statement of fact to enter interstate commerce by putting it on his website and keeping it there for three years now.

277. The abovenamed Rosette defendants' violation of the Lanham Act has caused Williams & Cochrane to suffer contract damages and injuries totaling at least $6,209,916.10, which the district judge or a jury can resolve in accordance with the Prayer for Relief, *infra*.

**FIFTH CLAIM FOR RELIEF**

**[False Advertising in Violation of the Lanham Act – Robert Rosette's Negotiation of the Quechan Compact (15 U.S.C. § 1051 *et seq.*)]**

**[By Williams & Cochrane and Against Robert Rosette; Rosette & Associates, PC; and Rosette, LLP]**

278. Williams & Cochrane incorporates by reference the preceding general allegations as if set forth in full.

279. The Lanham Act provides in relevant part that:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any… false or misleading description of fact, or false or misleading representation of fact, which –

[…]

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a). Thus, a claim for false advertising under the Lanham Act requires a plaintiff to show five things akin to: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." *Skydive Ariz., Inc.* 673 F.3d at 1110. When looking at the commerciality of the statement in the first prong of the test, "[t]he form of the statement is not dispositive, and courts find statements to be commercial speech even when promulgated outside the traditional advertising campaign." *NTP Marble, Inc. v. AAA Hellenie Marble, Inc.,* 2012 U.S. Dist. LEXIS 24671, *15-*16 (E.D. Pa. 2012) (quoting *Accenture Global Servs. GMBH v. Guidewire Software, Inc.,* 582 F. Supp. 2d 654, 667 (D. Del. 2008)). Given this, statements in press releases can and often do serve as the basis for false advertising claims under the Lanham Act. *See, e.g., NTP Marble, Inc. v. AAA Hellenic Marble, Inc.,* 799 F. Supp. 2d 446, 451 (E.D. Pa. 2011); *Mimedx Group, Inc. v. Osiris Therapeutics, Inc.,* 2017 U.S. Dist. LEXIS 114105, *12-*18 (S.D.N.Y. 2017); *Taser Int'l, Inc. v. Stinger Sys.,* 2012 U.S. Dist. LEXIS 108737, *31-*34 (D. Nev. 2012).

280. Robert Rosette has a misleading if not a literally false representation of fact

on the website for his firm Rosette, LLP (of which Rosette & Associates, PC is a general partner), which advertises to the general public and all potential clients in the Indian law field through a so-called "press release" that Mr. Rosette is responsible for negotiating the compact between the State of California and Quechan. This website-based press release that came out at or around the time that the notice of the execution of the Quechan compact became public similarly announces the compact, touts the benefits of the agreement (like "reduc[ing] the Tribe's revenue sharing obligations by approximately four million dollars… per year, and simultaneously increase[ing] the Tribe's ability to generate revenues though its gaming operations by providing the right to operate additional gaming facilities and gaming devices), and then ends by suggesting those wanting more information contact "Robert Rosette" at "(480) 889-8990" or "rosette@rosettelaw.com." This final statement implies that Robert Rosette is responsible for negotiating the Quechan compact, which is both literally false and misleading.

281. The inclusion of Robert Rosette's name and professional contact information at the end of the website-based press release would tend to deceive a substantial segment of the audience into believing that the Quechan compact is his work product.

282. This false statement of fact is also material in that it is likely to persuade a tribe in need of compact assistance to seek out the services of Robert Rosette, the individual identified on the press release, rather than the professionals actually responsible for creating the compact and all the attendant benefits that are touted in the press release.

283. Robert Rosette also caused this literally misleading statement of fact to enter interstate commerce by generally disseminating the press release through public relations firms and putting it on his website at or around the time that notice of the execution of the Quechan compact became public, and keeping it there from that point until, at least, the filing date of this First Amended Complaint.

284. The abovenamed Rosette defendants' violation of the Lanham Act has caused Williams & Cochrane to suffer damages and injuries in an amount to be proven at trial, which the district judge or a jury can resolve in accordance with the Prayer for Relief,

*infra.*

## SIXTH CLAIM FOR RELIEF

**[Conducting or Participating in an Enterprise's Affairs through Racketeering Activity in Violation of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 *et seq.*)]**

**[By Williams & Cochrane and Against Robert Rosette; Rick Armstrong; Rosette & Associates, PC; Rosette, LLP;  and Does 1 through 100]**

285. Williams & Cochrane incorporates by reference the preceding general allegations as if set forth in full.

286. A *prima facie* RICO case requires that the plaintiff show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Avalos v. Baca,* 596 F.3d 583, 592 (9th Cir. 2010) (citing *Miller v. Yokohama Tire Corp.,* 358 F.3d 616, 620 (9th Cir. 2004)). A "pattern" of racketeering activity requires proof of "at least two [predicate] acts of racketeering activity" within ten years of each other. *See* 18 U.S.C. § 1961(5). A predicate act of racketeering activity is defined as any act indictable under specified provisions of Title 18 of the United States Code, "and includes the predicate acts of mail [and] wire fraud." *Cochran Firm P.C. v. McMurray,* 2014 U.S. Dist. LEXIS 194663, *17 (C.D. Cal. 2014) (quoting *Turner v. Cook,* 362 F.3d 1219, 1229 (9th Cir. 2004)). To allege a violation of mail or wire fraud under 18 U.S.C. §§ 1341 or 1343, a plaintiff must show "(1) there was a scheme to defraud; (2) the defendants used the mail (or wire, radio, or television), in furtherance of the scheme; and (3) the defendants acted with the specific intent to deceive or defraud." *Cochran Firm P.C.,* 2014 U.S. Dist. LEXIS 194663 at *18-*19 (citing *Yokohama Tire Corp.,* 358 F.3d at 620). In passing RICO, Congress mandated that "the provisions of this title shall be liberally construed to effectuate its remedial purposes." *See* Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 904(a), 84 Stat. 947 (1970).

287. The abovenamed Rosette defendants are individuals and business entities that are associated in fact and have either participated in or conducted an enterprise that has sought to interfere with the contracts of Williams & Cochrane for its own financial gain

using a pattern of fraudulent conduct done through the mail and the wires.

288. As to this, each of the abovenamed Rosette defendants has engaged in at least two acts of mail or wire fraud during the last ten-year period, which are detailed in the General Allegations, *supra*, and include amongst other things:

(a) using the mail and/or wires on at least one occasion on or around June 23, 2010 to interfere with Williams & Cochrane's contract with Pauma by suggesting the tribe's then-Chairman demand that the firm write a legal opinion freeing up the monies saved by the injunction in *Pauma's* suit against the State of California for Mr. Rosette and other persons' benefit;

(b) using the mail and/or wires on at least one occasion on or before August 6, 2010 to interfere with Williams & Cochrane's contract with Pauma by instructing the tribe's then-Chairman to not pay any of the firm's invoices and to communicate to the firm that he would "ruin [its] reputation in Indian County" if it simply did not walk away from the contract;

(c) using the mail and/or wires on at least one occasion between August 12, 2010 and August 15, 2010 to interfere with Williams & Cochrane's contract with La Pena Law Corporation by telling Michelle La Pena that the attorneys for the firm had "stole" his clients and would invariably "steal" her clients as well;

(d) using the mail and/or wires on at least four occasions between July 26, 2011 and July 28, 2011 to interfere with Williams & Cochrane's contract with Pauma by trying to covertly settle the tribe's litigation with the State of California through the State's negotiator Jacob Appelsmith;

(e) using the mail and/or wires on at least two occasions between August 23, 2011 and September 12, 2011 in connection with the above to pressure various Pauma Tribal Councilmembers into signing pre-prepared letters absolving Robert Rosette of any wrongdoing in trying to settle the tribe's compact litigation with the State of California;

(f) using the mail and/or wires at least once on or about November 17, 2016 to interfere with Williams & Cochrane's contract with Pauma by telling the tribe's former Chairman Christobal Devers to relay a message to the current Tribal Council that he could re-do their compact and would like to discuss the matter with them free of charge;

(g) using the mail and/or wires at least once during the spring of 2017 to interfere with Williams & Cochrane's contract with Quechan by telling the tribe and/or certain putative Quechan Councilmembers that Robert Rosette was responsible for litigating the Pauma suit upon which the tribe's dispute with the State of California was in part based;

(h) using the mail and/or wires at least once during the spring of 2017 to interfere with Williams & Cochrane's contract with Quechan by telling the tribe and/or certain putative Quechan Councilmembers that the firm had failed to "produce better-than-boilerplate terms in your negotiations so far with the State;"

(i) Using the mail and/or wires at least once during the spring of 2017 to interfere with Williams & Cochrane's contract with Quechan by telling the tribe and/or certain putative Quechan Councilmembers to withhold payment of the monthly flat fee from the firm;

(j) Using the mail and/or wires at least once during the spring of 2017 to interfere with Williams & Cochrane's contract with Quechan by telling the tribe and/or certain putative Quechan Councilmembers to scheme to fire the firm at the conclusion of the negotiations, right before the tribe signed the resultant compact;

(k) Using the mail and/or wires at least once before June 26, 2017 to interfere with Williams & Cochrane's contract with Quechan by preparing and transmitting the June 26, 2017 termination letter signed by putative Quechan President Keeny Escalanti that informed the firm that the tribe would not comply with the Attorney-Client Fee Agreement and tried to dissuade the firm from taking legal

action to protect its rights by threatening, "We strongly advise you against pressing your luck further out of concern for the reputation of your firm in Indian Country and in the State of California;"

(l) Using the mail and/or wires at least once on or about June 27, 2017 in connection with the above to demand that Williams & Cochrane turn over work product of incalculable value so the Rosette defendants could use the firm's intellectual property for their own benefit to finish up the Quechan work they had fraudulently taken away;

(m) Using the mail and/or wires at least once on or about June 30, 2017 to interfere with Williams & Cochrane's contract with Quechan by preparing and transmitting the June 30, 2017 "demand for cease and desist" that again threatened legal action against the firm, and indicated that such action would be taken if the firm did not turn over its incalculably value work product to Robert Rosette and his firm.

289. The aforementioned predicate acts and others evidence a seven-year scheme to defraud Williams & Cochrane – while also trying to defraud the tribes the firm represents – that those involved with Rosette, LLP had the specific intent to carry out, and did carry out.

290. The abovenamed Rosette defendants' violations of the Racketeer Influenced and Corrupt Organizations Act have caused Williams & Cochrane to suffer contract damages and injuries totaling at least $6,209,916.10, which the district judge or a jury can resolve in accordance with the Prayer for Relief, *infra*.

## SEVENTH CLAIM FOR RELIEF

**[Conspiring to Conduct or Participate in an Enterprise's Affairs through Racketeering Activity in Violation of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 *et seq*.)]**

**[By Williams & Cochrane and Against Robert Rosette; Rick Armstrong; Rosette & Associates, PC; Rosette, LLP; Keeny Escalanti, Sr.; Mark William White II; and Does 1 through 100]**

291. Williams & Cochrane incorporates by reference the preceding general allegations as if set forth in full.

292. A RICO conspiracy claim "is governed by traditional concepts of conspiracy law, and 'should not require anything beyond that required for a conspiracy to violate any other crimes.'" *NOW v. Scheidler,* 897 F. Supp. 1047, 1075 (N.D. Ill. 1995) (quoting *United States v. Neapolitan,* 791 F.2d 489, 497 (7th Cir. 1986)). Thus, the target of the conspiracy provision in the statute "is the agreement to violate RICO's substantive provisions, not the actual violations themselves." *Id.* (quoting *Schiffels v. Kemper Fin. Servs., Inc.,* 978 F.2d 344, 348 (7th Cir. 1992)). In other words, a conspiracy to violate RICO "may be established by proof of an agreement to commit a substantive violation of RICO." *Rockshore Invs., LLC v. 1 World Found. Ltd.,* 2016 U.S. Dist. LEXIS 46828, *7 (C.D. Cal. 2016) (quoting *Oki Semiconductors Co. v. Wells Fargo Bank,* 298 F.3d 768, 774-75 (9th Cir. 2002)). "It is the mere agreement to violate RICO that [the statute] forbids; it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy," *Oki Semiconductors,* 298 F.3d at 774-75 (citing *Aetna Cas. Sur. Co. v. P&B Autobody,* 43 F.3d 1546, 1562 (1st Cir. 1994)). The illegal agreement need not be express "so long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Id.* at 775. Proving a RICO conspiracy means that "[a]ll conspirators are liable for the acts of their co-conspirators." *Id.*

293. The abovenamed Rosette and Quechan-related defendants are individuals and business entities that are associated in fact and have either conspired to participate in or conduct an enterprise aimed at creating a sham online payday lending business at the tribe in an environment that will avoid detection by the tribe at large.

294. As to this, each of the abovenamed defendants has agreed to engage in at least two acts of mail or wire fraud during the last ten-year period, which are detailed in the General Allegations, *supra*, and include amongst other things:

(a) using the mail and/or wires at least once during December 2017 in connection with Willie White communicating to the Quechan General Council that he had

an attorney "friend" who could get the tribe involved in the online payday len-
ding industry if he were elected to office;

(b) using the mail and/or wires at least once during the spring of 2017 in connect-
ion with putative Quechan Councilmember Willie White meeting with Robert
Rosette at one of the Arizona joint compact negotiation sessions to discuss the
online payday lending scheme;

(c) using the mail and/or wires at least once during the spring of 2017 in connect-
ion with putative Quechan Councilmember Willie White and, this time, putative
President Keeny Escalanti meeting with Robert Rosette to discuss the online
payday lending scheme;

(d) using the mail and/or wires at least once on or about June 27, 2017 to terminate
Williams & Cochrane from the California compact negotiations using the
pretense that the firm had "fail[ed] to produce better-than-boilerplate terms in
[the] negotiations" and had been "grossly overcompensated [while it] achieved
results the Tribe Could have obtained for itself by asking the State for a draft
compact;"

(e) using the mail and/or wires at least once sometimes after June 27, 2017 to ter-
minate Quechan's longstanding general counsel, the Morisset law firm and hire
Robert Rosette and his firm for the position;

(f) using the mail and/or wires at least once sometime after June 27, 2017 to ar-
range to hide the contract and authorizing resolution for Robert Rosette and his
firm so the General Council of the tribe could not veto the agreement;

(g) using the mail and/or wires at least once during December 2017 and January
2018 to  strategize how to keep Quechan's putative President Keeny Escalanti
and putative Councilmember White in power after the General Council recalled
the individuals in the aftermath of the service of the complaint in this case;

(h) using the mail and/or wires at least once to discontinue per capita payments to
the general membership of the tribe upon the basis that California and Arizona

casinos operated by Quechan are not making a profit, when on information and belief, those monies and others are instead being used as seed money for a payday lending scheme; and

(i) using the mail and/or wires to take additional actions over the course of the past year to set up an payday lending enterprise, covertly using, amongst others, the revenue sharing money Quechan has saved during that time that, on information and belief, has neither gone to the general membership in the form of per capita payments nor even been publicly accounted for.

295. The aforementioned predicate acts and others evidence a year-long conspiracy by the named defendants to take the necessary actions to set up a sham payday lending business that would personally enrich those in power rather than the tribe generally;

296. The abovenamed Rosette and Quechan-related defendants' conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act has caused Williams & Cochrane to suffer contract damages and injuries totaling at least $6,209,916.10, which the district judge or a jury can resolve in accordance with the Prayer for Relief, *infra*.

## EIGHTH CLAIM FOR RELIEF

### [Negligence/Breach of Fiduciary Duty]

**[By Named Quechan General Councilmembers on Behalf of Themselves and All Others Similarly Situated Against Robert Rosette; Rick Armstrong; Rosette & Associates, PC; Rosette, LLP; and Does 1 through 100]**

297. Williams & Cochrane incorporates by reference the preceding general allegations as if set forth in full.

298. Pursuant to Federal Rule of Civil Procedure 23, the named Quechan General Councilmembers bring this claim on behalf of themselves and all those similarly situated, who together form a class that is initially defined as follows:

**Malpractice Class:** All persons who are enrolled members of the Quechan Tribe of the Fort Yuma Indian Reservation and who neither served on the Tribal Council during June 2017 nor as a director or member of any actual or potential online payday lending business from March 2017 onward.

299. Sufficient justification exists for allowing the Quechan General Councilmembers to proceed as a class, including the following showings under the Federal Rules of Civil Procedure:

(a) **Numerosity (FED. R. CIV. P. 23(a)(1)).** On information and belief, the Quechan tribe is comprised of more than 3,200 members, which makes the class members so numerous that joinder is impractical;

(b) **Predominance of Common Questions of Law and Fact (FED. R. CIV. P. 23(a)(2)).** The entire fact pattern at issue involves one common set of actions that affected all the members of the Quechan General Council in the same manner, which means that common questions of fact and law should not only predominate but control;

(c) **Typicality (FED. R. CIV. P. 23(a)(3)).** The claims of the named Quechan General Councilmembers are typical of those of the entire class since each was a member of the entity that Rosette, without authority, represented;

(d) **Adequacy of Representation (FED. R. CIV. P. 23(a)(4)).** Williams & Cochrane is not just adequate, but the best representation for the proposed class since it can effectively identify the ancillary concessions that were altered or removed from the draft compact following its termination from the representation. With, substantial experience in the niche field of compact negotiation and litigation, Williams & Cochrane is also able to effective argue whether Robert Rosette met the appropriate standard of care in finishing the negotiations, and to also deal with side issues that may come up during discovery of these matters. Plus, in addition to being competent to handle the representation, Williams & Cochrane intends to prosecute the action vigorously and has interests that align with, and are not antagonistic to the class. To that end, Williams & Cochrane is even amenable to structuring the case in such a manner to protect the class' interests if any actual or perceived conflict exists; and

(e) **Superiority (FED. R. CIV. P. 23(b)(3)).** A class action is the superior method

Case No.: 17-CV-01436 GPC MDD

for handling claims of this nature for a multitude of reasons, including the sheer number of members in the tribe, the cost and difficulty of pursuing individual actions, and the fact that the Tribal Council is unable to press these issues on the General Council's behalf since, at a minimum, the President originally acted in an *ultra vires* manner, has an alleged financial conflict of interest, and currently lacks the authority to act since he was recalled in January 2018 but has since then refused to step down. Further, many class members may be hesitant to serve as named plaintiffs for fear that Tribal Councilmembers acting in concert with the Rosette defendants may retaliate against them in connection with the provision of tribal government – such as housing, employment, health care, and education– or even the enjoyment of tribal membership status itself.

300. Under California law, an attorney has a duty to "protect his [or her] client in every possible way." *FDIC v. O'Melveny & Myers,* 969 F.2d 744, 748 (9th Cir. 1992) (citing, e.g., *Day v. Rosenthal,* 170 Cal. App. 3d 1125, 1143 (1985)). The breach of this fiduciary duty amounts to negligence, and "is not limited to [an attorney's] failure to use the skill required of lawyers. Rather is a wider obligation to exercise due care to protect a client's best interests in all ethical ways and in all circumstances." *T & R Foods, Inc. v. Rose,* 47 Cal. App. 4th Supp. 1, 8 (Cal. Super. 1996). However, from a basic care perspective, an attorney can only "fulfil this duty by performing the legal services for which [he] ha[s] been engaged with 'such skill, prudence, and diligence as lawyers or ordinary skill and capacity commonly possess.'" *FDIC,* 969 F.2d at 748 (quoting *Lucas v. Hamm,* 56 Cal. 2d 583, 591 (1961)). Despite this, an attorney who "specializes within the profession… must meet the standards of knowledge and skill of such specialists." *Id.* (quoting *Neel v. Magana, Olney, Levy, Cathcart & Gelfand,* 6 Cal. 3d 176, 188 (1971)).

301. By his own admission, Robert Rosette is an attorney with extensive experience in Indian law – "having represented over three dozen tribes in connection with various legal disputes at the state and federal level" – and the compact negotiation sub-niche in particular. *See, e.g.,* Dkt. No. 31-2, ¶¶ 5, 7. This First Amended Complaint discusses

Robert Rosette's experience negotiating compacts in California with Governor Brown via the Upper Lake Tribe (*see* ¶¶ 140-142, *supra*), and the declaration he filed in support of his first responsive motion in this case makes no qualms about his negotiation experience in California and in Arizona, the latter through a coalition of tribes that includes the Tonto Apache Tribe. *See* Dkt. No. 31-2, ¶¶ 7-9, 24. Most casual observers, and most certainly Robert Rosette himself, would consider Mr. Rosette to be an expert in representing tribes in gaming issues under IGRA.

302. And yet, despite all of these experiences, Robert Rosette has painted a picture in his previously-filed declaration wherein he "was not familiar with the Quechan Tribe's legal issues in California, including Quechan's compact negotiations with California or California's threatened claims against Quechan" on June 16, 2017, a mere two weeks before the negotiations were set to conclude and just nine days before Mr. Rosette decided to interfere with them. *See* Dkt. No. 31-2, ¶ 20. Yet, interfere he did, and the entire tenor of the negotiations changed. Suddenly, the issues unbeknownst to Robert Rosette came to life, as the State hoped to back away from the deal it had agreed to, and may have if Williams & Cochrane did not turn over the latest draft compact so the State would have to adhere to the central terms of its deal. Nevertheless, compact negotiations that were days away from concluding ended up reopening, with the State demanding that Quechan cure the revenue sharing payments it declined to pay over the last year. Thus, rather than having a concluded compact through Williams & Cochrane, Quechan instead ended up with a $2,000,000 liability, the eleventh-hour loss of a slew of ancillary concessions under the compact (*i.e.*, the deferral on the State's minimum wage law, the reduced fee structure on the additional machines, etc.), and the costs and liabilities that will accompany defending a largescale federal lawsuit. These are many millions of dollars in loses that excuses like "[I take a] practical 'big picture' businesslike view [in compact negotiations]" cannot justify. *See* Dkt. No. 31-2, ¶ 23.

303. The abovenamed Rosette defendants' negligence and breach of fiduciary duty has caused the Quechan General Council to suffer damages and injuries in an amount to

be proven at trial, which the district judge or a jury can resolve in accordance with the Prayer for Relief, *infra*.

## PRAYER FOR RELIEF

**WHEREFORE**, Williams & Cochrane prays as follows:

1. That the Court, via the district judge or a jury as the case may be, award contract damages against the Quechan Tribe of the Fort Yuma Indian Reservation in an amount of at least **$6,209,916.10**;

2. That the Court award any other non-monetary remedies (whether equitable or legal in nature) against Quechan on the contract-based Claims numbered 1 through 3 in order to ensure that Williams & Cochrane is made whole by the tribe's breach of the Attorney-Client Fee Agreement;

3. That the Court award treble damages under the Lanham Act in an amount of at least **$18,629,748.30** against the indicated Rosette defendants for the false advertisement(s) about the *Pauma* lawsuit, as well as require the disgorgement of any of the direct or indirect profits that they may have obtained as a result of such advertisement(s);

4. That the Court award treble damages under the Lanham Act in an amount to be proven at trial against the indicated Rosette defendants for the false advertisement(s) about the *Quechan* compact, as well as require the disgorgement of any of the direct or indirect profits that they may have been obtained as a result of such advertisement(s);

5. That the Court award injunctive relief under the Lanham Act against the indicated Rosette defendants to ensure that Robert Rosette and his firm no longer advertise in any medium that they are responsible for litigating the *Pauma* suit or negotiating the Quechan compact;

6. That the Court award treble damages under RICO in an amount of at least **$18,629,748.30** against the indicated Rosette and putative-Quechan-Councilmember defendants;

7. That the Court award pre- and post-judgment interest on any monetary awards at the maximum rate or rates permitted under State law;

8. That the Court award reasonable attorney fees under RICO, the Lanham Act, or as otherwise allowed by law or equity;

9. That the Court award Williams & Cochrane its costs of suit under RICO, the Lanham Act, or as otherwise allowed by law or equity; and

10. That the Court award such other and further legal or equitable relief as it deems appropriate, as justice requires, or as the law allows.

**WHEREFORE**, the named Quechan General Councilmembers pray as follows:

11. That the Court certify their claim(s) to proceed as a class action;

12. That the Court, via the district judge or a jury as the case may be, award damages in an amount to be proven at trial against the indicated Rosette defendants for negligently handling the conclusion of Quechan's California compact negotiations;

13. That the Court award pre- and post-judgment interest on any monetary awards at the maximum rate or rates permitted under State law;

14. That the Court award reasonable attorney fees as allowed by law or equity;

15. That the Court award the named Quechan General Councilmembers, as representatives of a class or individually as the case may be, costs of suit as allowed by law or equity; and

17. That the Court award such other and further legal or equitable relief as it deems appropriate, as justice requires, or as the law allows.


RESPECTFULLY SUBMITTED this 2nd day of March, 2018


WILLIAMS & COCHRANE, LLP

By: */s/ Kevin M. Cochrane*
Cheryl A. Williams
Kevin M. Cochrane
caw@williamscochrane.com
kmc@williamscochrane.com
WILLIAMS & COCHRANE, LLP
525 B Street, Suite 1500

Case No.: 17-CV-01436 GPC MDD
FIRST AMENDED COMPLAINT

San Diego, CA 92101
Telephone: (619) 793-4809

FIRST AMENDED COMPLAINT