Christopher T. Casamassima (SBN 211280)
chris.casamassima@wilmerhale.com
Rebecca A. Girolamo (SBN 293422)
becky.girolamo@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Attorneys for Defendants*
*Quechan Tribe of the Fort Yuma Indian*
*Reservation, Keeny Escalanti, Sr., and*
*Mark William White II*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAMS & COCHRANE, LLP; and FRANCISCO AGUILAR, MILO BARLEY, GLORIA COSTA, GEORGE DECORSE, SALLY DECORSE, et al., on behalf of themselves and all those similarly situated;<br><br>(All 28 Individuals Listed in ¶ 13)<br><br>Plaintiffs,<br><br>v.<br><br>QUECHAN TRIBE OF THE FORT YUMA INDIAN RESERVATION, a federally-recognized Indian tribe; ROBERT ROSETTE; ROSETTE & ASSOCIATES, PC; ROSETTE, LLP; RICHARD ARMSTRONG; KEENY ESCALANTI, SR.; MARK WILLIAM WHITE II a/k/a WILLIE WHITE; and DOES 1 THROUGH 10,<br><br>Defendants. | CASE NO.: 17-cv-01436-GPC-MDD<br><br>**MEMORANDUM IN SUPPORT OF QUECHAN DEFENDANTS' MOTIONS TO DISMISS PURSUANT TO FRCP 12(b)(1) AND 12(b)(6)**<br><br>Judge:  Hon. Gonzalo P. Curiel<br>Courtroom: 2D<br>Date: April 27, 2018<br>Time: 1:30 p.m. |

# <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

SUMMARY OF ALLEGATIONS AGAINST QUECHAN DEFENDANTS .........4

ARGUMENT...........................................................................................6

I.     THE TRIBE'S LIMITED WAIVER OF SOVEREIGN IMMUNITY
ONLY ALLOWS W&C TO BRING A SPECIFIC CONTRACT
CLAIM AGAINST THE TRIBE ONLY, IN FEDERAL COURT ...............6

        A.    The Quechan Tribe of the Fort Yuma Indian Reservation Is a
Federally-Recognized Tribe ...............................................7

        B.    The Tribe's Limited Waiver of Sovereign Immunity is Confined
to Fee A Dispute Under the Terms of the Fee Agreement .................7

        C.    The Tribe's Sovereign Immunity Extends To President Escalanti
and Councilman White ......................................................9

II.    W&C'S BREACH OF CONTRACT CLAIM FOR A
CONTINGENCY FEE IS BARRED UNDER THE TERMS OF THE
FEE AGREEMENT...........................................................12

III.   PLAINTIFF'S CLAIM FOR IMPLIED BREACH OF GOOD FAITH
AND FAIR DEALING MUST BE DISMISSED BECAUSE IT IS
DUPLICATIVE OF ITS BREACH OF CONTRACT CLAIM ................13

IV.   W&C CANNOT PLEAD A PROMISSORY ESTOPPEL CLAIM............15

V.    W&C DOES NOT PLEAD A RICO CONSPIRACY CLAIM ..................17

CONCLUSION ................................................................23

# **TABLE OF AUTHORITIES**

**Page(s)**

## CASES

*Allen v. Smith*, No. 12cv1668-WQH-KSC, 2013 WL 950735 (S.D. Cal. Mar. 11, 2013) ................................................................ 9

*Alves v. Players Edge, Inc.*, No. 05CV1654WQH(CAB), 2007 WL 6004919 (S.D. Cal. Aug. 8, 2007) ........................................ 23

*Avalos v. Baca,* 596 F.3d 583 (9th Cir. 2010) .............................. 23

*Big Valley Band of Pomo Indians v. Super. Ct.*, 35 Cal. Rptr. 3d 357 (2005) ................................................................ 8

*Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011 (9th Cir. 2016) ................................................................ 8

*C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411 (2001) ................................................... 7

*Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008) ......................... 21

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371 (1990) ................................................................ 13

*Carpenter v. Thrifty Auto Sales,* No. EDCV09-02233 DMG, 2010 WL 11595928 (C.D. Cal. July 30, 2010) ................................ 22

*Comenout v. Whitener*, No. C15-5054 BHS, 2015 WL 917631 (W.D. Wash. Mar. 3, 2015), *appeal aff'd in part, dismissed in part,* 692 F. App'x 474 (9th Cir. 2017) ........................................ 8

*Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132 (E.D. Cal. 2017) ...........................17, 18, 20

*Cook v. AVI Enters., Inc.*, 548 F.3d 718 (9th Cir. 2008) ............... 9

*Cty. of Marin v. Deloitte Consulting LLP*, 836 F. Supp. 2d 1030 (N.D. Cal. 2011) ................................................................ 19

*De Los Angeles Gomez v. Bank of Am., N.A.*, 642 F. App'x 670 (9th Cir. 2016) ................................................................ 23

*Demontiney v. United States*, 255 F.3d 801 (9th Cir. 2001) ........................................ 7

*Doan v. Singh*, 617 F. App'x 684 (9th Cir. 2015) ......................................................... 18

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990 (9th
   Cir. 2014) ................................................................................................................. 18

*Gold River, LLC v. La Jolla Band of Luiseno Mission Indians*, No.
   11cv1750 JM(BGS), 2011 WL 6152291 (S.D. Cal. Dec. 9, 2011) ................... 6

*Hardin v. White Mountain Apache Tribe*, 779 F.2d 476 (9th Cir. 1985) ................... 7

*Howard v. Am. Online, Inc.*, 208 F.3d 741 (9th Cir. 2000) ........................... 17, 21, 22

*Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269
   (9th Cir. 1991) ........................................................................................................... 9

*JMP Secs. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029
   (N.D. Cal. 2012) ...................................................................................................... 16

*Kennar v. Kelly*, No. 10CV2105-AJB WVG, 2011 WL 2116997 (S.D.
   Cal. May 27, 2011), *aff'd sub nom. Kenner v. Kelly*, 529 F. App'x
   870 (9th Cir. 2013) ................................................................................................. 22

*Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751 (1998) ................................. 7

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994) ......................................... 6

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397 (9th
   Cir. 1991) ................................................................................................................. 20

*Lewis v. Norton*, 424 F.3d 959 (9th Cir. 2005) ............................................................. 6

*Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531 (9th Cir. 1989) ....................... 20

*Muller v. Morongo Casino, Resort, & Spa*, No. EDCV 14-02308-VAP,
   2015 WL 3824160 (C.D. Cal. June 17, 2015) ........................................ 6, 7, 8, 9

*Munning v. The Gap, Inc.*, No. 16-cv-03894-TEH, 2016 WL 6393550
   (N.D. Cal. Oct. 28, 2016) ...................................................................................... 13

*Myers v. Seneca Niagara Casino*, 488 F. Supp. 2d 166 (N.D.N.Y. 2006) ................ 8

*Natomas Gardens Inv. Grp., LLC v. Sinadinos*, 710 F. Supp. 2d 1008
   (E.D. Cal. 2010) ................................................................................................ 22, 23

*Patriot Sci. Corp. v. Korodi*, 504 F. Supp. 2d 952 (S.D. Cal. 2007) ...................15, 16

*Ramey Const. Co., Inc. v. Apache Tribe of Mescalero Reservation*, 673
    F.2d 315 (10th Cir. 1982)..................................................................... 7

*Randol v. Harrah's Rincon Resort & Casino*, No. 08-CV-0642................................. 8

*Rich v. Shrader*, No. 09-CV-0652-MMA, 2010 WL 3717373 (S.D. Cal.
    Sept. 17, 2010).......................................................................... 20

*Richards Indus. Park LP v. FDIC*, No. 11cv2059-LAB (DHB), 2015
    WL 12570945 (S.D. Cal. Aug. 19, 2015) ....................................... 13

*Sanford v. MemberWorks, Inc.*, 625 F.3d 550 (9th Cir. 2010) .......................17, 20, 21

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978) ................................................ 7

*Sedima, S.P.R.L. v. Imrex Co.*, Inc., 473 U.S. 479, 496 (1985)................................. 17

*Soghomonian v. United States*, 82 F. Supp. 2d 1134 (E.D. Cal. 1999) ...................... 7

*Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008)................. 21

*Turner v. Cook*, 362 F.3d 1219 (9th Cir. 2004) ........................................................ 17

*U.S. v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) .................................................... 22

*US Ecology, Inc. v. State of Cal.*, 28 Cal. Rptr. 3d 894 (Cal. Ct. App.
    2005) ........................................................................ 15

*Valvoline Instant Oil Change Franchising, Inc. v. RFG Oil, Inc.*, No. 12-
    cv-2079-GPC-KSC, 2013 WL 4027858 (S.D. Cal. Aug. 5, 2013).......13, 14, 15

*Walker v. Gates*, No. CV 01-10904 GAF, 2002 U.S. Dist. LEXIS 27443
    (C.D. Cal. May 22, 2002).............................................................. 21

*Walker v. KFC Corp.*, 728 F.2d 1215 (9th Cir. 1984) ............................................ 15

*Wasco Products v. Southwell Technologies*, 435 F. 3d 989 (9th Cir.
    2006), *cert. denied*, 549 U.S. 817, 127 S.Ct. 83 (2006) .................................. 22

*Youngman v. Nevada Irrigation Dist.*, 70 Cal. 2d 240 (1969) .................................. 15

## STATUTES, RULES, AND REGULATIONS

80 Fed. Reg. 1942, 1945 (Jan.14, 2015) ................................................................ 7

18 U.S.C. § 1961(4) ................................................................................................ 18

18 U.S.C. § 1962(c) ..........................................................................................17, 21

California Civil Code Section 47 ............................................................................ 3

Racketeer Influenced and Corrupt Organizations Act ("RICO")  2, 3, 9, 17, 18, 19, 21, 22, 23

Federal Rule of Civil Procedure 8 ....................................................................12, 19

Federal Rule of Civil Procedure 9 ................................................. 17, 18, 19, 20, 22

Federal Rule of Civil Procedure 12(b)(1) ............................................................. 6

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

2      Williams & Cochrane, LLP ("W&C"), now on its third try to allege a viable

3 claim, alleges that the Quechan Tribe of the Fort Yuma Reservation ("Tribe") owes it

4 $6.2 million for partially negotiating a gaming compact between the Tribe and the

5 State.  This enormous windfall would be in addition to the $400,000 that the Tribe

6 already paid W&C for the minimal work it performed.  At the same time, among

7 other claims, W&C is attempting to bring a baseless malpractice claim against the

8 lawyers that completed the compact negotiations for the Tribe, Rosette, LLP

9 ("Rosette") on behalf of individual Tribe members ("Individual Plaintiffs") who have

10 no standing to bring the claim.  By doing so, however, W&C is using the Tribe's

11 confidential information and representing successive clients in substantially related

12 matters in violation of the California Rules of Professional Conduct.  That is the

13 subject of the Tribe's motion to disqualify W&C, filed concurrently with this motion.

14      As it relates to the Tribe, the crux of W&C's First Amended Complaint

15 ("FAC") is that W&C alleges that the "Contingency Fee" provision, or the alternative

16 "reasonable fee" provision, in its Fee Agreement requires the Tribe to pay it an

17 additional $6.2 million, over and above the $50,000/month the Tribe already paid

18 W&C.  It is an outrageous request.  W&C engaged in stop-and-start discussions with

19 the State over eight months, using the standard gaming compact terms proposed by

20 the State.  The Tribe ultimately paid W&C $400,000, which was already exorbitant

21 for the amount and level of difficulty of the work W&C performed.  After the Tribe

22 finally terminated W&C, Rosette finished the compact negotiations at a fraction of

23 what the Tribe would have paid W&C in the monthly fixed fees alone.

24      W&C's prior complaints asserted a wide array of tort claims against the Tribe,

25 the President of the Tribe ("President Escalanti") and another Tribal Councilmember

26 ("Councilman White") (collectively with the Tribe, the "Quechan Defendants").

27 Rather than defend those claims against motions to dismiss and strike, W&C

28 abandoned its tort claims.  What remains in the FAC against the Quechan Defendants

are an overly-broad contract claim, a duplicative breach of covenant of good faith and fair dealing claim, an improper promissory estoppel claim, and a completely baseless RICO conspiracy claim against President Escalanti and Councilman White.

The other claims remaining in the FAC—and indeed, the vast majority of the FAC's allegations—pertain to what appears to be a long-running grudge W&C has with Rosette. This dispute goes back years and allegedly springs from a completely different matter involving the Pauma tribe that began when the partners at W&C were working for Rob Rosette at Rosette, LLP. None of these allegations have anything to do with the Quechan Defendants.

W&C's entitlement to an additional amount of fees under the Fee Agreement is a straightforward matter of contract law, and the Tribe partially waived its sovereign immunity for contractual fee disputes under the Fee Agreement. Accordingly, while it will prevail on the merits prior to trial, the Tribe is not moving to dismiss the portion of W&C's breach of contract claim based on W&C's purported entitlement to an additional "reasonable fee" under the "Discharge and Withdrawal" section of the Fee Agreement (Section 11). That is the one and only claim that can proceed.

The Quechan Defendants move to dismiss W&C's remaining claims on multiple bases:

***First***, the "Limited Waiver of Client's Sovereign Immunity" in the Fee Agreement, (FAC Ex. 2, § 13(a)), extends only to claims W&C "may bring seeking payment under the terms of this agreement." The breach of the covenant of good faith and fair dealing and promissory estoppel claims exceed this limited waiver. In addition, nothing in the Fee Agreement extends the waiver of sovereign immunity to claims against Tribal Councilmembers. As a result, the RICO conspiracy claim against President Escalanti and Councilman White is likewise barred.

***Second***, the Fee Agreement itself establishes that W&C cannot be entitled to the contingency fee described in Section 5 of the Fee Agreement. The Fee

Agreement explicitly states that the Tribe "may discharge [W&C] at any time." It did in late June 2017, and Section 11 of the Fee Agreement explicitly governs the availability of any additional extra fee to which W&C may be entitled where it was terminated before earning a contingency fee. Consequently, the factors laid out in Section 11 of the Fee Agreement control whether W&C is entitled to any additional money from the Tribe, and W&C's claim for a contingency fee under Section 5 of the Fee Agreement fails.

*Third*, the claim for breach of the covenant of good faith and fair dealing is wholly duplicative of the breach of contract claim. It adds no additional or alternative theory of liability or damage, and should be dismissed.

*Fourth*, the promissory estoppel claim fails because there was no detrimental reliance by W&C. It was being paid $50,000/month for its services and W&C alleges that it was doing its job during this time pursuant to the Fee Agreement. W&C did nothing beyond what it should have been doing as the Tribe's purportedly competent and diligent counsel.

*Fifth*, W&C attempts to allege a baseless RICO conspiracy claim against President Escalanti and Councilman White. It must be dismissed. W&C fails to allege a RICO violation, does not explain how the purported underlying RICO activity caused it harm, and comes nowhere close to alleging that President Escalanti and Councilman White knowingly agreed to enter into any conspiracy, let alone a RICO conspiracy targeted at W&C.

In addition to these arguments, the Quechan Defendants hereby incorporate by reference and move for dismissal based on Section A (*Noerr-Pennington* and California Civil Code Section 47) of the Rosette Defendants' memorandum in support of their motion to dismiss. Both arguments apply to claims asserted against Quechan Defendants to the extent the claims are based on protected communications concerning the Tribe's legal representation, but for the sake of efficiency, the Quechan Defendants will not repeat them here.

* * *

This is W&C's third attempt to allege claims against the Quechan Defendants, who spent considerable time and resources in preparing the last round of motions to dismiss and strike. In response, after considering those motions, W&C chose to amend its complaint. Three times is enough. The Quechan Defendants are eager to move forward with whatever remains of this case after these motions to dismiss and put this litigation behind them as quickly as possible. As a result, the Quechan Defendants respectfully request that the Court grant Defendants' motions with prejudice.

## SUMMARY OF ALLEGATIONS AGAINST QUECHAN DEFENDANTS

W&C's one hundred twenty-one page FAC mostly describes an apparent grudge W&C's two partners have with Rosette, dating back many years to when they worked for Rosette as associates at Rosette & Associates. FAC ¶¶ 40-43. Their gripe originates from a different matter for a different tribe involving different legal and factual issues. *Id.* ¶¶ 40-66, 126-184. It has nothing to do with any of the Quechan Defendants. W&C's allegations against the Quechan Defendants are, by contrast, relatively straightforward and limited:

The Tribe, acting through its governing body, the "Tribal Council," retained W&C to negotiate a compact with the State of California ("State"), and represent it in potential related litigation. *Id.* ¶ 2. W&C worked for the Tribe for approximately eight months, and was not able to obtain a finally-approved executed compact. Pursuant to the "Fee Agreement" between W&C and the Tribe, W&C was paid $50,000/month in a "Flat Fee" arrangement, regardless of the amount W&C worked. FAC Ex. 2, § 4. In addition to the Flat Fee, W&C added a 15% "Contingency Fee" clause to the Fee Agreement based on amounts the Tribe was to be paid or credited by the State for overpayments under the Tribe's prior gaming compact with the State. *Id.*, § 5. If, however, the Tribe terminated W&C before it was entitled to the Contingency Fee, W&C could be entitled to what it labeled a "reasonable fee"—

referred to from this point forward, more aptly, as the "Alternative Extra Fee."  *Id.* §
11.  The Alternative Extra Fee was to be based on a multi-factor test based on the
difficulty of the project, the quality of the result, and the time spent by W&C, among
other factors.  *Id.*

W&C alleges that it performed substantial work at the beginning of the
representation, performed little to no work for several months while the Tribe was
purportedly sorting out a governance dispute, and then picked back up the pace of its
work during the late spring/early summer of 2017.  FAC ¶¶ 87-98, 104-110.  W&C
does not allege that it provided the Tribe with any accounting of the time it spent on
the matter.  Indeed, W&C refuses to provide its time entries—if any exist—to the
Tribe despite requests to do so.  FAC ¶¶ 245-246.  W&C further alleges that by the
latter part of June, the status of negotiations with the State were very advanced and
that one or more Tribal Council members told W&C that it would execute the
compact on or about July 1, 2017.  *Id.* ¶¶ 109, 268.  W&C also alleges, however, that
it asked the Tribe to retain lobbyists to get the gaming compact through its final
hurdles.  *Id.* ¶ 109.  According to W&C, it continued to work on the compact into late
June 2017.  *Id.*

After waiting for more than eight months to arrive at what are fairly standard
terms offered for gaming compacts after 2013,[1] and with W&C conceding they still
needed outside help from a lobbyist to get the job done, the Tribe terminated W&C's
representation pursuant to the Fee Agreement on June 26, 2017.  *Id.* ¶ 112.  The Tribe

---

[1]     Although not necessary for a determination of the pending motion, the
reality—which Defendants will prove with ample evidence—is that the draft gaming
compact W&C claims it worked so hard to achieve is derived from the standard terms
that California tribes now routinely get from the State, (*see* Dhillon Decl. ¶ 8), and
does not require eight months of work.  These terms result from an administrative
remedy negotiated between the State and the Rincon Band of Luiseno Mission
Indians after ten years of litigation.  The Pauma tribe, still represented by W&C, does
not have a compact with similar terms or a permanent gaming facility.

paid W&C outstanding amounts under the monthly flat fee, but did not pay W&C a contingency fee or the Alternative Extra Fee.  *Id.* ¶¶ 113-114.

W&C also alleges in the FAC that Rosette sets up pay-day lending services for his other clients.  *Id.* ¶ 190.  And W&C alleges (falsely) that Councilman White and President Escalanti expressed to Rosette an interest in establishing a payday lending business.  *Id.* ¶ 192.

Approximately two months after terminating W&C and retaining Rosette, on August 28, 2017, the Tribe executed a new gaming compact with the State.  *Id.* ¶ 201.  Governor Brown signed the compact on August 31, 2017.  *Id.*

## ARGUMENT

## I.    THE TRIBE'S LIMITED WAIVER OF SOVEREIGN IMMUNITY ONLY ALLOWS W&C TO BRING A SPECIFIC CONTRACT CLAIM AGAINST THE TRIBE ONLY, IN FEDERAL COURT

A motion to dismiss on tribal sovereign immunity grounds is generally brought under Rule 12(b)(1).  *Lewis v. Norton*, 424 F.3d 959, 961 (9th Cir. 2005).  Under Rule 12(b)(1), the party asserting federal jurisdiction has the burden to demonstrate its existence.  *Gold River, LLC v. La Jolla Band of Luiseno Mission Indians*, No. 11cv1750 JM(BGS), 2011 WL 6152291, at *1 (S.D. Cal. Dec. 9, 2011) (citing *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)).

When a district court is presented with a challenge to its subject-matter jurisdiction, no presumption of truthfulness attaches to a plaintiff's allegations, and the court may hear evidence regarding jurisdiction and resolve factual disputes where necessary.  *See Muller v. Morongo Casino, Resort, & Spa*, No. EDCV 14-02308-VAP (KKx), 2015 WL 3824160, at *4 (C.D. Cal. June 17, 2015).

Sovereign immunity applies here to bar all claims against the Quechan Defendants except for the first cause of action for breach of contract because (1) the Tribe executed a limited waiver of sovereign immunity only as to fee disputes under

the Fee Agreement; and (2) the Tribe's sovereign immunity extends to Defendants Escalanti and White.

## A. The Quechan Tribe of the Fort Yuma Indian Reservation Is a Federally-Recognized Tribe

"Inclusion of a tribe on the Federal Register list of recognized tribes is generally sufficient to establish entitlement to sovereign immunity." *Muller*, 2015 WL 3824160, at *4 (citing cases). The Federal Register recognizes the "Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona." *See* Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 80 Fed. Reg. 1942, 1945 (Jan.14, 2015). And W&C alleges that Quechan is an "Indian Tribe." FAC ¶ 14. There is no question that the Tribe is entitled to sovereign immunity.

## B. The Tribe's Limited Waiver of Sovereign Immunity is Confined to A Fee Dispute Under the Terms of the Fee Agreement

Suits against Indian tribes are barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation. *See Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998); *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 59 (1978); *Hardin v. White Mountain Apache Tribe*, 779 F.2d 476, 478 (9th Cir. 1985). Further, "[t]here is a strong presumption against waiver of tribal sovereign immunity." *Demontiney v. United States*, 255 F.3d 801, 811 (9th Cir. 2001). A tribe's waiver of sovereign immunity therefore must be "clear" and "unequivocally express[ed]." *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418 (2001).

Accordingly, waivers of sovereign immunity must be "construed narrowly and in favor of the sovereign." *Soghomonian v. United States*, 82 F. Supp. 2d 1134, 1140 (E.D. Cal. 1999); *see also Ramey Const. Co., Inc. v. Apache Tribe of Mescalero Reservation*, 673 F.2d 315, 319-20 (10th Cir. 1982) ("Indian Tribes' sovereign immunity is co-extensive with that of the United States," which may consent to suit

and waive its sovereign immunity).  It is thus impermissible to "infer a waiver of immunity as to certain types of claims based on a separate, unrelated waiver of different categories of claims."  *Muller*, 2015 WL 3824160, at *6 (finding that a tribe's sovereign immunity waiver did not extend to employment-related claims even where tribe agreed to waive its right to sovereign immunity in connection with any claim related to operation of the tribe's Casino); *see also Myers v. Seneca Niagara Casino*, 488 F. Supp. 2d 166, 171 (N.D.N.Y. 2006) (holding it would be error to find that "because immunity was waived as to gaming activities in a Compact . . . that immunity was also waived for unrelated employment claims under the FMLA."); *cf. Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011 (9th Cir. 2016) (waiver does not automatically waive tribal sovereign immunity even as to related matters arising from the same set of underlying facts) (internal citations omitted).

This remains true even when the waiver is not explicitly self-limiting.  *See Big Valley Band of Pomo Indians v. Super. Ct.*, 35 Cal. Rptr. 3d 357, 364 (2005) (arbitration clauses did not effect a general waiver of the Tribe's sovereign immunity even though the clauses were not explicitly self-limiting); *see also Randol v. Harrah's Rincon Resort & Casino*, No. 08-CV-0642 W (BLM), 2008 WL 11337253, at *4 (S.D. Cal. May 19, 2008) (sovereign immunity not waived where the tribe's waiver permitted tribal remedies for tort claims); *Comenout v. Whitener*, No. C15-5054 BHS, 2015 WL 917631, at *3 (W.D. Wash. Mar. 3, 2015), *appeal aff'd in part, dismissed in part,* 692 F. App'x 474 (9th Cir. 2017) (sovereign immunity not waived where lease provision specified arbitration of claims).

W&C acknowledges that the Tribe partially waived sovereign immunity pursuant to a "Limited Waiver of Client's Sovereign Immunity" in the parties' Fee Agreement.  FAC Ex. 2, § 13.  But this waiver is explicitly limited to "any claims the firm may bring ***seeking payment under the terms of this agreement***."  *Id.* (emphasis added).

Construing the waiver narrowly and in favor of the Tribe—as required—

W&C's breach of the covenant of good faith and fair dealing and promissory estoppel claims do not merely "seek[] payment under the terms of the [Fee Agreement]." Rather, they are alternative claims that purport *not* to be based simply on breach of a specific fee provision of the Fee agreement. And W&C's RICO conspiracy claim is far from being a contract claim. Beyond invoking conspiracy and federal RICO law, W&C seeks $18.6 million in damages from President Escalanti and Councilman White—treble the amount W&C's seeks in "contract damages" from the Tribe. *See* FAC, Prayer for Relief, ¶ 6 (praying for $18.6 million for "treble damages under RICO").

If W&C's promissory estoppel and breach of the covenant of good faith and fair dealing claims are distinct from its contract claim for payment under the Fee Agreement, then they are barred from proceeding in this Court because the Tribe's limited waiver of sovereign immunity does not apply to those claims. S*ee Muller*, 2015 WL 3824160, at *6. On the other hand, if W&C's other claims are not distinct from its contract claims, they should be dismissed on the merits, as discussed *infra* in Sections III and IV. Either way, these claims fail—as does W&C's new RICO conspiracy claim.

### C. The Tribe's Sovereign Immunity Extends To President Escalanti and Councilman White

Tribal sovereign immunity extends to tribal officials acting in their official capacities and within the scope of their authority. *See Muller*, 2015 WL 3824160, at *3, *7-8 (dismissing claims against tribal employees for lack of jurisdiction where plaintiff failed to allege facts showing the employees acted outside the scope of their authority); *Allen v. Smith*, No. 12cv1668-WQH-KSC, 2013 WL 950735, at *10 (S.D. Cal. Mar. 11, 2013) (citing *Cook v. AVI Enters., Inc.*, 548 F.3d 718, 727 (9th Cir. 2008); *see also Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269, 1271-72 (9th Cir. 1991) (affirming dismissal where sovereign immunity extended to tribal officials who acted within their authority by closing a road in trust

land to plaintiffs).

Here, the Tribe's sovereign immunity extends to President Escalanti and Councilman White.  Councilman White was first elected to the Tribal Council on December 2, 2016.  White Decl. ¶ 2.[2]  The Tribal Council as currently constituted was seated on March 3, 2017.  *See id.*  Shortly thereafter, current President Escalanti replaced former President Jackson following the latter's resignation.  Escalanti Decl. ¶ 2.

The Tribe's Constitution provides that the Tribal Council is responsible for representing the Tribe in "all affairs," which includes employing legal counsel on behalf of the Tribe.  *See* FAC Ex. 39, Article I, Article III, Section 6; *see also* White Decl. ¶ 3.  Despite W&C's baseless and inflammatory rhetoric, that is all that happened here.  And this explains why the Individual Plaintiffs have no right or standing to bring claims against the Tribe's current counsel, Rosette, LLP.

Pursuant to his constitutional authority, Councilman White solicited proposals from other attorneys in April 2017.  White Decl. ¶¶ 6-7.  President Escalanti and Councilman White later met Rob Rosette at an Arizona Tribal Leaders' meeting.  While at the meetings, Calvin Johnson of Tonto Apache contacted them about gaming issues affecting the more rural Arizona tribes, and suggested they meet with Tonto Apache's attorney—Rob Rosette.  *Id*. ¶¶ 8-9.  The next morning, President Escalanti and Councilman White met with Rob Rosette to discuss gaming issues in Arizona.  *Id*. ¶¶ 9-10.  And only after discussing those Arizona gaming issues did President Escalanti ask Rob Rosette about his experience with compact negotiations in California and his availability to work for the Tribe.  Escalanti Decl. ¶ 11.  Ultimately, President Escalanti and Councilman White relayed to the Tribal Council

---

[2]     The Declarations of President Escalanti and Councilman White were filed in support of the Quechan Defendants first motion to dismiss.  Rather than refile the same declarations, which are equally applicable here, the Quechan Defendants direct the court to Docket Nos. 29-2 and 29-3.

what transpired at the meeting with Rob Rosette.[3]  *Id.* ¶¶ 11, 13.

Because the Tribal Council was dissatisfied with W&C's exorbitant fees and lackluster performance, it invited Rob Rosette to present to the Council about the possibility of Rosette, LLP representing the Tribe in both Arizona and California compact negotiations.  *Id.* ¶ 13.  Following this presentation, the Tribal Council voted 6-0 to hire Rosette, LLP.  Escalanti Decl. Ex. A; White Decl. ¶¶ 16-17.  At no point during the meeting at Talking Stick Resort, the Tribal Council presentation, or any other time did Mr. Rosette propose providing President Escalanti, Councilman White, or anyone else with any remuneration or personal incentive in exchange for retaining Rosette, LLP.  Escalanti Decl. ¶ 12; White Decl. ¶ 12.

Rosette then proceeded to conduct negotiations on behalf of the Tribe with the State—as described in the Declaration of Joginder Dhillon, Senior Advisor for Tribal Negotiations.  *See* Dhillon Decl. ¶¶ 2-3, 20.  Rosette quickly and successfully concluded those negotiations, obtaining significant benefits for the Tribe, beyond what W&C had been able to achieve.  *See* Dhillon Decl. ¶¶ 20-24.  There were no personal benefits requested or obtained by President Escalanti or Councilman White. *See id.*; Escalanti Decl. ¶ 12; White Decl. ¶ 12.

Nor have President Escalanti or Councilman White ever sought to benefit from a payday lending business.  In fact, neither of them have ever discussed payday lending with any of the Rosette Defendants.  *See* Supp. Escalanti Decl. ¶ 2; Supp. Escalanti Decl. ¶ 2.  They have no plans to start a payday lending business with the help of Rosette, or anyone else.  *Id.*

President Escalanti and Councilman White acted in their official capacities and within the scope of their authority in connection with their investigation of counsel to

---

[3]     Additional details of the meeting among President Escalanti, Councilman White, and Rob Rosette, and meetings and communications with the State can be found in the Declarations of Joginder Dhillon, President Escalanti and Councilman White.

replace W&C and the termination of W&C.  The Tribe's sovereign immunity therefore extends to President Escalanti and Councilman White, and was not waived. As a result, this Court lacks jurisdiction and must dismiss the claims against them.

## II.   W&C'S BREACH OF CONTRACT CLAIM FOR A CONTINGENCY FEE IS BARRED UNDER THE TERMS OF THE FEE AGREEMENT

The Fee Agreement provides that the Tribe "may discharge the firm at any time," and W&C alleges that the Tribe did so on June 26, 2017.  FAC Ex 2, § 11; FAC ¶ 112.  The compact was not executed until two months later.[4]  FAC ¶ 201 (alleging compact was executed by the Tribe on August 28 and by the Governor on August 31).  Until the compact was signed there was no new agreement with the State, and the Tribe was not entitled to any of the benefits the 2017 gaming compact provided.

Accounting for the scenario that played out here—where W&C was terminated before being entitled to a contingency fee—W&C included a provision in the Fee Agreement to potentially receive an Alternative Extra Fee in the event that it was "discharge[d] . . . prior to the issuance of a Court order granting a monetary award in Client's favor or before Client otherwise becomes entitled to another monetary amount constituting a 'net recovery' as described in paragraph 5 [the contingency fee provision] of this Agreement . . . ."  FAC Ex 2, § 11.  This language is part of the "Discharge and Withdrawal" Section that provides the Tribe can discharge W&C "at any time."  *Id.*  The 15% contingency fee is defined in a different section of the Fee Agreement that describes all of the litigation and pre-litigation scenarios under which W&C—as the Tribe's counsel—would be entitled to the contingency fee.  *Id.* § 5.

Consequently, although it is not entitled to another penny from the Tribe, W&C's allegation that it is eligible for an Alternative Extra Fee under Section 11 of the Fee Agreement is sufficiently pled under Rule 8.  But the plain language of the

---

[4]      This was, at least in part, due to the fact that the State was not prepared to sign the compact when the Tribe terminated W&C.  (See Dhillon Decl. ¶¶ 18-19).

Fee Agreement excludes the possibility that W&C is entitled to the contingency fee under Section 5 of the Fee Agreement, and any claim for payment of the contingency fee should be dismissed.  Because amendment would be futile—an amended pleading cannot change the Fee Agreement—the dismissal should be with prejudice.

## III.  PLAINTIFF'S CLAIM FOR IMPLIED BREACH OF GOOD FAITH AND FAIR DEALING MUST BE DISMISSED BECAUSE IT IS DUPLICATIVE OF ITS BREACH OF CONTRACT CLAIM

Under California law, a claim for breach of the implied covenant of good faith and fair dealing should be dismissed as superfluous if the "allegations . . . do not go beyond the statement of a mere contract breach," and the claim relies on the same alleged facts and seeks the same damages as in a companion breach of contract claim. *See, e.g., Richards Indus. Park LP v. FDIC*, No. 11cv2059-LAB (DHB), 2015 WL 12570945, at *2 (S.D. Cal. Aug. 19, 2015) (citing *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990)); *Valvoline Instant Oil Change Franchising, Inc. v. RFG Oil, Inc.*, No. 12-cv-2079-GPC-KSC, 2013 WL 4027858 (S.D. Cal. Aug. 5, 2013); *see also Munning v. The Gap, Inc.*, No. 16-cv-03894-TEH, 2016 WL 6393550, at *7 (N.D. Cal. Oct. 28, 2016) (dismissing breach of implied covenant claim as "duplicative" where it "relies on the same facts as [the] breach of contract claim.").

In *Valvoline*, for example, a franchisee filed counterclaims against the plaintiff-franchisor, alleging, *inter alia*, breach of contract and breach of the implied covenant of good faith and fair dealing based on the possible acquisition of certain of franchisee's locations by a third party and related transactions.  2013 WL 4027858, at *9-10.  The franchisee alleged that the franchisor breached the implied covenant, in particular, "[b]y virtue of its bad faith conduct" but otherwise relied on the same facts underlying its breach of contract claim.  Citing *Careau & Co.*, this Court dismissed the implied covenant claim as "superfluous" because the franchisee's allegations "did not go beyond the statement of a mere contract breach" and sought the "exact same

damages" as in its breach of contract claim.  *Id.*

Here, on their face, W&C allegations with respect to its first claim for relief (breach of contract) and its second claim for relief (breach of the implied covenant of good faith and fair dealing) likewise rely on the same underlying facts and seek the same relief.  W&C's breach of contract claim incorporates the factual allegations set forth in the FAC and further alleges that:

- the parties executed a Fee Agreement in September 2016, pursuant to which W&C would provide legal services related to the Tribe's 2017 compact negotiations, (FAC ¶ 255);

- W&C performed from the execution date of the Fee Agreement through June 2017, (FAC ¶ 256);

- in June 2017, the Tribe terminated W&C before Compact negotiations were completed, and purportedly did not agree to pay a contingency fee or "reasonable fee for legal services" pursuant to the Fee Agreement (FAC ¶¶ 255, 257); and

- the alleged breach of the Fee Agreement caused W&C to suffer "contract damages and injuries totaling at least $6,209, 916.10…," (FAC ¶ 259).

The claim for breach of the implied covenant of good faith and fair dealing contains substantively identical allegations.  In it, W&C alleges the following:

- the parties executed a Fee Agreement in September 2016, pursuant to which W&C would provide legal services related to the Tribe's 2017 compact negotiations, (FAC ¶ 262) ("Quechan and Williams & Cochrane executed the…Fee Agreement *as is discussed in the First Claim for Relief*") (emphasis added);

- in June 2017, the Tribe terminated W&C before compact negotiations were completed, and purportedly did not agree to pay a related contingency fee or "reasonable fee for legal services" pursuant to the Fee Agreement (FAC ¶¶ 263, 264); and

- the alleged breach of the Fee Agreement caused W&C to suffer "contract damages and injuries totaling at least $6,209, 916.10…," (FAC ¶ 265).

In its breach of the implied covenant of good faith and fair dealing claim, W&C also offers the conclusory statement that, through its conduct, the Tribe sought to "evade the spirit of the bargain . . . ." FAC ¶ 261. But, as in *Valvoline*, that does not differentiate the breach of the implied covenant of good faith and fair dealing claim from W&C's breach of contract claim, and the relief that W&C seeks for both claims is identical. Because W&C's claim for breach of the covenant is completely duplicative of W&C's first breach of contract claim, it is superfluous and should be dismissed with prejudice. *See Valvoline*, 2013 WL 4027858, at *10.

## IV.   W&C CANNOT PLEAD A PROMISSORY ESTOPPEL CLAIM

In California, to establish a claim for promissory estoppel, a plaintiff must show: "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *US Ecology, Inc. v. State of Cal.*, 28 Cal. Rptr. 3d 894, 905 (Cal. Ct. App. 2005) (citation omitted). The purpose of the promissory estoppel doctrine "is to make a promise binding, under certain circumstances, ***without consideration*** in the usual sense of something bargained for and given in exchange." *Patriot Sci. Corp. v. Korodi*, 504 F. Supp. 2d 952, 968 (S.D. Cal. 2007) (quoting *Youngman v. Nevada Irrigation Dist.,* 70 Cal. 2d 240, 249-51 (1969)) (holding that plaintiff could not have relied on written promise after entering into, and performing under, a consulting contract with defendant) (emphasis added).

Accordingly, promissory estoppel is inapplicable where a plaintiff's only reliance is the performance of an act previously bargained for—*e.g.,* pursuant to a contract. *See Walker v. KFC Corp.,* 728 F.2d 1215, 1220 (9th Cir. 1984) ("Promissory estoppel is not a doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove a breach of

contract.")); *Patriot Sci. Corp.*, 504 F. Supp. 2d at 968; *JMP Secs. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1041-42 (N.D. Cal. 2012) (dismissing promissory estoppel claim as barred by its breach of contract claim).

Here, W&C alleges the parties had a contractual relationship in which the Tribe was to pay W&C to provide legal services related to the Tribe's California compact negotiations. *See* FAC ¶¶ 68, 76-86; *id.* FAC Ex. 2, § 2 ("Client hires Firm to provide legal services … for the purposes of reducing Client's payments under its tribal/State gaming compact with the State of California …."). W&C, however, bases its promissory estoppel claim on purported "promises" made in June 2017 that the Tribe would sign the gaming compact that W&C was allegedly negotiating with the State. FAC ¶ 268. These promises allegedly caused W&C to "work to wrap up the [Compact] negotiations." FAC ¶ 269. But these negotiations were ***the same services W&C was hired to perform*** under the Fee Agreement. W&C did not rely on any purported "promises" to do anything other than the work it was hired to do. Under well-settled law, the promissory estoppel doctrine is therefore inapplicable and the claim must be dismissed. *See Patriot Sci. Corp.*, 504 F. Supp. 2d at 968.

*JMP Securities* is instructive. There, a financial advisor sued its client, alleging breach of contract, promissory estoppel, and other claims relating to a financial services agreement. *JMP Secs.*, 880 F. Supp. 2d at 1032-33. The Court held that plaintiff's promissory estoppel claim was barred because "[t]he only thing at issue here is under which provision of the contract JMP will be paid for its services, not whether there was a contract for services at all or whether the promises contained in the contract were supported by consideration." *Id.* at 1041-42.

Like the parties in *JMP Securities*, the parties here do not dispute the Fee Agreement existed during the time W&C purportedly provided services to the Tribe. The alleged "promises" W&C now invents do not change the fact that "working to wrap up the negotiations" was what W&C was hired to do under the Fee Agreement. *See, e.g.*, FAC Ex. 2, §§ 2, 4; *see also JMP Secs.*, 880 F. Supp. 2d at 1041-42. The

- 16 -

dispute is over the amount of W&C's fees.  Promissory estoppel is therefore inapplicable and the claim should be dismissed with prejudice.

## V.    W&C DOES NOT PLEAD A RICO CONSPIRACY CLAIM

W&C asserts a claim for conspiracy to violate RICO against President Escalanti and Councilman White.  That claim must be dismissed because W&C fails to allege the requisite elements of a RICO claim, and because W&C does not adequately allege a conspiracy.  *See Howard v. Am. Online, Inc*., 208 F.3d 741, 751 (9th Cir. 2000) ("Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO."); *Turner v. Cook*, 362 F.3d 1219, 1231 n. 17 (9th Cir. 2004) (finding that RICO conspiracy claim fails because appellants failed to allege the requisite elements of a RICO claim).[5]

### A. W&C Fails to Allege a RICO Claim

To state a RICO claim under § 1962(c), a plaintiff must allege: (i) conduct (ii) of an enterprise (ii) through a pattern (iv) of racketeering activity, and (v) injury in the plaintiffs' business or property by the conduct constituting the violation.  *Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp*., 235 F. Supp. 3d 1132, 1172 (E.D. Cal. 2017) (citing *Sedima, S.P.R.L. v. Imrex Co*., Inc., 473 U.S. 479, 496 (1985)).  W&C alleges that Councilman White, President Escalanti, and the Rosette Defendants, "are associated in fact and have either conspired to participate in or conduct an enterprise aimed at creating a sham online payday lending business" by engaging in two or more acts of mail or wire fraud as predicate acts.  FAC ¶ 293.  But W&C fails to properly allege an enterprise, racketeering activity, or injury to its business or property.  Moreover, W&C's mail and wire fraud allegations are not pled with particularity as required by Rule 9.  *See Sanford v. MemberWorks, Inc*., 625

---

[5]    President Escalanti and Councilman White hereby join in Section III.B. of the Rosette Defendants' memorandum in support of its motion to dismiss, which discusses the inadequacies of W&C's RICO allegations.

F.3d 550, 557–58 (9th Cir. 2010) (finding that failure to identify specific mailings or misrepresentations does not satisfy Rule 9's pleading requirements).

### 1. W&C fails to allege an enterprise.

An "enterprise" includes any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  To show an association-in-fact enterprise, plaintiffs must plead a common purpose, a structure or organization, and longevity necessary to accomplish the purpose.  *See Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).  W&C does not and cannot plead these elements.

***First***, W&C asserts that the RICO enterprise was "aimed at creating a sham online payday lending business at the tribe," but alleges only conversations among certain Defendants without explaining how the defendants associated together to create an online payday lending business.  FAC ¶ 293.  This is insufficient.  *See Doan v. Singh*, 617 F. App'x 684, 686 (9th Cir. 2015) ("Plaintiffs have not sufficiently pleaded the existence of an enterprise because the complaint does not allege how Defendants associated together for a common purpose.").

***Second***, beyond these isolated conversations between certain defendants, W&C fails to allege an organizational structure—formal or informal—among the named defendants, or how each defendant coordinated their activities as a continuing unit.  This is, again, insufficient to allege a RICO enterprise.  *See Comm. to Protect Our Agric. Water*, 235 F. Supp. 3d at 1175-76 (finding that conclusory allegations involving "secret meetings" and "isolated incidents each involving some but not all of the named defendants" were insufficient to establish the structure of the alleged enterprise).

W&C provides no description of the structure of the purported payday lending RICO enterprise, nor can it.  It was never discussed with Rosette,[6] and indeed, W&C acknowledges it never existed.  *See* FAC ¶ 222 (listing alleged Rosette-related payday lending businesses).  The most W&C can do is make the conclusory allegation that "Rosette and Quechan-related defendants are individuals and business entities that are associated in fact and have either conspired to participate in or conduct an enterprise aimed at creating a sham online payday lending business at the tribe in an environment that will avoid detection by the tribe at large."  *See* FAC ¶ 293.  That is not a description of the structure of a cognizable RICO enterprise in this or any other case; it is merely a legal definition of what a RICO enterprise is generally in the context of a RICO conspiracy claim.

**Finally**, W&C does not even plead that any such Quechan payday lending business, if it existed, would actually be fraudulent or illegal.  Instead, it insinuates the impropriety of payday lending generally and references litigation over other payday lending businesses allegedly conducted by other Tribes.  Those payday lending business have nothing to do with any of the Quechan Defendants.  Accordingly, these unrelated allegations are insufficient to allow an inference of fraudulent or illegal enterprise activity under Rule 8, let alone under the heightened standard of Rule 9.

### 2.  W&C does not allege RICO predicate acts.

W&C alleges that the RICO predicate acts are wire and mail fraud.  FAC ¶ 294.  The elements of wire or mail fraud are: "(1) formation of a scheme or artifice to defraud; (2) use of the United States mails or wires, or causing such a use, in

---

[6]     Given the prior and pending motion practice, and the Quechan Defendants' desire to move the litigation along as swiftly as possible, rather than bring an additional motion at this time based on W&C's lack of a reasonable factual basis for these allegations, they reserve all rights to pursue at a later time any and all appropriate sanctions and claims for relief for having to defend against this frivolous claim.

furtherance of the scheme; and (3) specific intent to deceive or defraud." *Cty. of Marin v. Deloitte Consulting LLP*, 836 F. Supp. 2d 1030, 1038 (N.D. Cal. 2011) (citing *Sanford v. MemberWorks*, *Inc.*, 625 F.3d 550, 557 (9th Cir. 2010)). Racketeering activity based on mail or wire fraud must be pled with particularity under Rule 9.  *See Sanford*, 625 F.3d at 557–58.  W&C, however, does not allege with any sort of particularity what the fraudulent activity or misrepresentations were, or how Councilman White or President Escalanti used the mails or wires to perpetuate any fraud.  *See id.* (finding that plaintiff's failure to identify which defendants made certain telephone calls and were parties to the alleged misrepresentations, and allege any specific mailings does not satisfy Rule 9's pleading requirements); *Comm. to Protect Our Agric. Water*, 235 F. Supp. 3d at 1179–80 (determining that plaintiff's claims of mail or wire fraud failed where the FAC did not explaining how defendants' communications involved a misrepresentation or "how any innocuous communications were an essential part of a scheme to defraud").

Rather, W&C vaguely alleges that Councilman White, President Escalanti, and Mr. Rosette "communicated," had "meetings," and "strategized," using the "mail and/or wires" within ambiguous time frames such as "the spring of 2017."  FAC ¶ 294(a)-(c), (g); *see Rich v. Shrader*, No. 09-CV-0652-MMA (WMc), 2010 WL 3717373, at *11 (S.D. Cal. Sept. 17, 2010) ("'Rule 9(b) does not allow a complaint merely to lump multiple defendants together but requires plaintiffs to differentiate their allegations . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.'") (quoting *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991)); *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 541 (9th Cir. 1989) (finding that plaintiffs had failed to allege mail fraud with particularity under Rule 9(b) because they "[did] not attribute specific conduct to individual defendants," or "specify either the time or the place of the alleged wrongful conduct").  Completely absent from the FAC are

allegations of what was purportedly fraudulent about these communications, meetings, mails, or wires.  It is not enough to say those things happened—W&C must explain why they are fraudulent.  W&C must allege the "specific intent to deceive or defraud."  *Sanford,* 625 F.3d at 557.  W&C does no such thing.[7]

### 3.  W&C Does Not Allege Harm To Its Business Or Property

To plead a RICO claim, the alleged RICO activity must cause actual harm to the business or property of the RICO plaintiff.  18 U.S.C. § 1962(c); *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1146-47 (9th Cir. 2008) ("RICO provides a private right of action for '[a]ny person injured in his business or property' by a RICO violation.") (citing 18 U.S.C. § 1962(c)); *see also Walker v. Gates*, No. CV 01-10904 GAF (PJWx), 2002 U.S. Dist. LEXIS 27443, at *23 (C.D. Cal. May 22, 2002).  These injuries must be "tangible" and "concrete."  *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008).  There is no allegation or any plausible inference that purported discussions about a potential payday lending business between any of the Quechan Defendants and Rosette caused any harm to W&C.  It therefore cannot allege a RICO claim.

* * *

For these reasons and those explained in the Rosette Defendants' motion to dismiss, W&C has not pled a RICO claim.  As a result, the Court must dismiss

---

[7]      In reality, what W&C has done in the FAC is transform the same vaguely alleged communications and meetings that were the basis of its intentional interference with contract claim in its prior complaint into the communications and meetings that form the basis of a payday lending conspiracy.  *Compare* Compl. ¶ 253 (alleging communications between Robert Rosette, President Escalanti, and Councilman White "during the spring 2017 to devise a scheme whereby Quechan would breach the contract ....")  *with* FAC ¶ 294(c) (alleging communications between Robert Rosette, President Escalanti, and Councilman White "during the spring of 2017 ... to discuss the online payday lending scheme").  This transparent effort to cobble together a non-SLAPPable federal claim from the interaction between Rosette and the Tribe that led to Rosette's retention falls well short the requirements for alleging RICO predicate acts.

- 21 -

W&C's RICO conspiracy claim. *Howard*, 208 F.3d at 751 ("[T]he failure to allege substantive violations precludes their claim that there was a conspiracy to violate RICO."); *Kennar v. Kelly*, No. 10CV2105-AJB WVG, 2011 WL 2116997, at *7 (S.D. Cal. May 27, 2011), *aff'd sub nom. Kenner v. Kelly*, 529 F. App'x 870 (9th Cir. 2013) (dismissing the RICO conspiracy claim because plaintiffs failed to state an underlying RICO claim).

### B.  W&C Does Not Allege A Conspiracy

Not only does W&C fail to allege a RICO claim, but W&C also does not allege a conspiracy to violate RICO.  In the Ninth Circuit, a defendant may be held liable for conspiracy to violate RICO if he "'knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise.'" *Natomas Gardens Inv. Grp., LLC v. Sinadinos*, 710 F. Supp. 2d 1008, 1020 (E.D. Cal. 2010) (quoting *U.S. v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004)).  And to plead a RICO conspiracy, a plaintiff "must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses."  *Howard*, 208 F.3d at 751. Additionally, the defendant must be "aware of the essential nature and scope of the enterprise and intend[ ] to participate in it."  *Id.*  Further, a conspiracy involving a fraud must be pleaded with the particularity as required by Rule 9.  *See Carpenter v. Thrifty Auto Sales,* No. EDCV09-02233 DMG (DTBx), 2010 WL 11595928, at *5 (C.D. Cal. July 30, 2010) (citing *Wasco Products v. Southwell Technologies*, 435 F. 3d 989, 991 (9th Cir. 2006), *cert. denied*, 549 U.S. 817, 127 S.Ct. 83 (2006)) ("When the object of a conspiracy is fraudulent, a pleading must meet the heightened standard under Federal Rule of Civil Procedure 9(b).").

The FAC is devoid of any factual allegations from which the Court can infer Councilman White's or President Escalanti's knowing agreement to do anything more than terminate W&C and hire Rosette.  That is not a RICO conspiracy; that is

1  exercising the responsibility invested in the Tribal Council by the Tribe's

2  Constitution.  *See* FAC Ex. 39, Article I, Article III, Section 6.

3       Even taking it as true for purposes of this motion that Councilman White or

4  President Escalanti had conversations with Rosette about potentially setting up a

5  payday lending service (*see* FAC ¶ 294), that comes nowhere close to an "agreement"

6  to participate in the RICO scheme, which is required for W&C's conspiracy claim.

7  *Avalos v. Baca,* 596 F.3d 583, 593 (9th Cir. 2010) (affirming dismissal of RICO

8  conspiracy claims where plaintiff did not presented evidence of a "conspiracy" or

9  "agreement" among defendants); *Alves v. Players Edge, Inc.*, No.

10  05CV1654WQH(CAB), 2007 WL 6004919, at *12-13 (S.D. Cal. Aug. 8, 2007)

11  (holding that a RICO conspiracy claim fails where plaintiffs did not sufficiently

12  allege an agreement between defendants to further the enterprise and noting that

13  "mere association" with an enterprise does not constitute a RICO conspiracy); *De Los*

14  *Angeles Gomez v. Bank of Am., N.A.*, 642 F. App'x 670, 676 (9th Cir. 2016) (finding

15  that although plaintiffs pled that the defendants were involved and had general

16  knowledge of the enterprise, the allegations were insufficient to show that defendants

17  knew of the scheme or its scope, or that they agreed and intended to participate in it);

18  *Natomas Gardens Inv. Grp., LLC*, 710 F. Supp. 2d at 1020–21 (dismissing plaintiff's

19  RICO conspiracy claim where plaintiff failed to show how defendant was aware of

20  the essential nature and scope of alleged RICO enterprise or that defendants intended

21  to participate in it).

22       Because W&C fails to allege the requirements of a conspiracy, its RICO

23  conspiracy claim must be dismissed.

24                              **<u>CONCLUSION</u>**

25       W&C's attempt to squeeze an additional $6.2 million out of its former client,

26  after it had been paid $400,000 for a minimal amount of work, is unconscionable.

27  W&C's previously-alleged tort claims, which only compounded the impropriety of

28  this case, were barred for numerous reasons.  W&C's abandonment of those claims,

however, is not sufficient to cure the problems with the remaining claims, and the addition of a RICO conspiracy claim against President Escalanti and Councilman White is baseless.  W&C has had sufficient opportunity to allege a claim against the Quechan Defendants.  But outside of the narrow fee dispute under the Fee Agreement's Discharge and Withdrawal clause, it cannot do so.  Amendment would be futile.  The Court should therefore dismiss all other claims against the Quechan Defendants with prejudice.


Dated:  April 6, 2018                          Respectfully submitted,

                                               */s/ Christopher T. Casamassima*
                                               Christopher T. Casamassima
                                               Rebecca A. Girolamo

                                               WILMER CUTLER PICKERING
                                                  HALE AND DORR LLP

                                               *Attorneys for Quechan Defendants*
                                               *Quechan Tribe of the Fort Yuma Indian*
                                               *Reservation, Keeny Escalanti, Sr., and*
                                               *Mark William White II*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2018, I electronically filed the foregoing with the clerk of the court using the CM/ECF system which will send notification of such filing to the e-mail address denoted on the electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 6, 2018, at Los Angeles, California.


*/s/ Christopher T. Casamassima*
Christopher T. Casamassima

- 1 -

Case No. 17-cv-01436-GPC-MDD                                          CERTIFICATE OF SERVICE