UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAMS & COCHRANE, LLP; and FRANCISCO AGUILAR, MILO BARLEY, GLORIA COSTA, GEORGE DECORSE, SALLY DECORSE, et al., on behalf of themselves and all others similarly situated,<br><br>                                        Plaintiffs,<br><br>v.<br><br>QUECHAN TRIBE OF THE FORT YUMA INDIAN RESERVATION; ROBERT ROSETTE; ROSETTE & ASSOCIATES, PC; ROSETTE, LLP; RICHARD ARMSTRONG; KEENY ESCALANTI, SR.; MARK WILLIAM WHITE II, a/k/a WILLIE WHITE; and DOES 1 THROUGH 100,<br><br>                                        Defendants. | Case No.:  3:17-cv-01436-GPC-MDD<br><br>(publicly filed redacted version)<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS [ECF No. 50];**<br><br>**(2) DENYING MOTION TO DISQUALIFY [ECF No. 51];**<br><br>**(3) DENYING AS MOOT MOTION TO STRIKE [ECF No. 52];**<br><br>**(4) GRANTING MOTION TO DISMISS [ECF No. 53]; and**<br><br>**(5) DENYING AS MOOT EX PARTE MOTION TO EXCLUDE AND CONTINUE [ECF No. 62]** |

Before the Court are several motions.  Defendants Quechan Tribe of the Fort

Yuma Indian Reservation ("Quechan," or the "Tribe"), Escalanti, and White

(collectively, the "Quechan Defendants") have filed a motion to dismiss the operative First Amended Complaint ("FAC") and a motion to disqualify Williams & Cochrane as counsel for Plaintiffs other than itself. (ECF Nos. 50, 51.) Defendants Armstrong, Rosette, Rosette & Associates, and Rosette, LLP (collectively, the "Rosette Defendants") have filed an anti-SLAPP motion to strike one of the claims in the FAC and a motion to dismiss the FAC. (ECF Nos. 52, 53.) In response, Plaintiffs have filed a motion seeking to exclude certain evidence offered in support of Defendants' motions or, alternatively, to withhold consideration of Defendants' motions to permit additional discovery. (ECF No. 62.) For the reasons stated below, the Court GRANTS in part and DENIES in part the Quechan Defendants' motion to dismiss, DENIES the motion to disqualify, DENIES as moot the motion to strike, GRANTS the Rosette Defendants' motion to dismiss, and DENIES as moot the motion to exclude or continue.

## I.    Background

Plaintiffs' First Amended Complaint alleges the following relevant facts.[1]  Plaintiff Williams & Cochrane, LLP ("W&C"), is a California legal services partnership formed in 2010 by Cheryl Williams and Kevin Cochrane after they left their positions at the law firm of Rosette & Associates, PC. (FAC, ECF No. 39, ¶¶ 12, 46, 50.) All other Plaintiffs in this case (the "Member Plaintiffs") are enrolled members of Quechan, which is a federally-recognized Indian tribe. (*Id.* ¶¶ 13, 14.) Defendant Robert Rosette serves as the President and Director of Defendant Rosette & Associates, which is a general partner of Defendant Rosette, LLP. (*Id.* ¶¶ 15–17.) According to Plaintiffs, Rosette is an Indian

---

[1] Contrary to Rule 8(a)'s clear instruction, the FAC is neither "short" nor "plain." Fed. R. Civ. P. 8(a). It spans 122 pages and contains pages-long discussions of topics wholly irrelevant to the claims in this case. "Ultimately, such pleading is self-defeating for plaintiffs, as it merely slows down the litigation from reaching the merits of plaintiffs' claims." *In re Clearly Canadian Secs. Litig.*, 875 F. Supp. 1410, 1420 (N.D. Cal. 1995). Plaintiffs are hereby warned that should they choose to file an amended complaint in an attempt to cure the deficiencies discussed in this ruling, their pleadings shall be short and plain. If such an amended complaint fails to adhere to Rule 8(a)'s requirements, the Court will consider dismissing the complaint *sua sponte*.

law attorney who "has a history of representing individual persons or factions within tribes while purporting to represent the tribe itself." (*Id.* ¶ 126.) Defendant Richard Armstrong serves as senior of counsel at Rosette, LLP. (*Id.* ¶ 18.) Defendant Keeny Escalanti is a member of the Quechan Tribe who became Tribal Chairman in 2017. (*Id.* ¶ 19.) Defendant Mark William White II is a member of the Quechan Tribe who has served as a member of the Tribe's council. (*Id.* ¶ 20.)

## A. The Pauma Litigation

In 1999, the State of California entered into a compact with 60-some Indian tribes permitting the tribes to operate a threshold number of slot machines and creating a licensing system for the tribes to seek permission to operate additional machines. (*Id.* ¶¶ 32–36.) Disagreements over the maximum number of total licenses permitted under the compact led to a 2004 compact amendment (the "2004 Amendment") that altered the tribe's allocation of machines. (*Id.* ¶¶ 37–40, 135.) Under this amendment, however, certain tribes—including the Pauma Band of Mission Indians ("Pauma")—"ended up paying approximately twenty-four times as much revenue sharing each year in order to operate machines that should have been available under its original compact." (*Id.* ¶ 40.) Pauma was also responsible, under the 2004 Amendment, for entering into "MOUs" with San Diego County to compensate the county for services relating to Pauma's gaming operations. (*Id.* ¶ 135.) Pauma retained Rosette to execute its MOU with San Diego County, which he completed in 2007. (*Id.* ¶ 136.)

In 2009, Pauma—represented by Rosette & Associates—filed suit in this court against California seeking rescission of the 2004 Amendment and restitution for the additional fees paid thereunder. (*Id.* ¶¶ 41–42.) Two attorneys at Rosette & Associates were exclusively responsible for litigating Pauma's case: Cheryl Williams and Kevin Cochrane. (*Id.* ¶¶ 42–43, 139.) A month after obtaining a preliminary injunction against California, Williams and Cochrane left Rosette & Associates and created their own firm, W&C. (*Id.* ¶¶ 45–46, 140.) California appealed the preliminary injunction to the Ninth Circuit and sought a stay pending appeal. (*Id.* ¶ 48.) Williams offered to assist Rosette

& Associates in preparing an opposition to California's stay motion, but Rosette & Associates rejected Williams's offer. (*Id.*) The Ninth Circuit granted the stay. (*Id.* ¶ 49.) Soon after, Pauma terminated Rosette & Associates and hired W&C. (*Id.* ¶¶ 50, 144.) W&C successfully moved for reconsideration of the Ninth Circuit's stay order, and it later obtained a favorable disposition of the appeal. (*Id.* ¶¶ 51, 146–47.)

While Rosette was representing Pauma he wrote an "opinion letter" in which he explained that the savings Pauma obtained as a result of the injunction could be distributed to the tribal government. (*Id.* ¶¶ 150–51.) According to Plaintiffs, this opinion was meant to "get the injunction savings freed up for [Rosette's] own personal gain, not for the benefit of the Pauma General Council." (*Id.* ¶ 151.)

After Pauma retained W&C, Rosette told then-Chairman Christobal Devers "to withhold payment of [W&C's] invoices" to "devastate" W&C and permit Rosette to take over Pauma's representation. (*Id.* ¶ 152.) W&C received its first paycheck from Pauma almost four months after beginning its representation of Pauma. (*Id.* ¶ 153.) Before W&C received that payment, Devers told Williams and Cochrane that Pauma would "never" pay W&C, and he suggested that W&C walk away from the job before he "ruin[ed W&C's] reputation in Indian Country." (*Id.* ¶ 154.)

### B. Relationship with La Pena Law

In July 2010, Cochrane met with Michelle La Pena, a Sacramento attorney who represented several gaming tribes. (*Id.* ¶¶ 157–59.) La Pena agreed to take W&C on as "of counsel" in her law firm, La Pena Law. (*Id.* ¶ 160.) On August 11, 2010, Cochrane presented La Pena with a litigation memorandum with which La Pena was "rather impressed." (*Id.* ¶¶ 161–62.) La Pena suggested to Cochrane that she was interested in absorbing or merging with W&C. (*Id.* ¶ 162.)

At some point in the following days, however, Rosette told La Pena that W&C had stolen his clients and suggested they would steal La Pena's in the future. (*Id.* ¶ 163.) On August 15, La Pena informed Cochrane that despite the fact that W&C produced "quite stellar" work, she was terminating the of counsel relationship because of "confidentiality

and conflict" issues.  (*Id.* ¶ 164.)

### C. Rosette Attempts to Insert His Firm Into Pauma's Negotiations

On August 4, 2011, California's counsel of record in the Pauma case informed W&C that Rosette and his firm had separately set up a meeting to settle the matter on behalf of Pauma.  (*Id.* ¶ 167.)  The meeting was set up by Armstrong, who had emailed California compact negotiator Jacob Appelsmith and stated that Pauma's Tribal Council wanted to sit down with California's negotiators "without their attorneys present."  (*Id.* ¶ 169–71.)  Rosette followed-up Armstrong's email with another stating that Rosette's firm was not "engaged as legal counsel on the litigation," but that Pauma wanted to settle the case.  (*Id.* ¶ 172.)  After W&C moved for a protective order to prevent Rosette from interfering with the case, however, Appelsmith postponed the negotiations and Rosette sent an email to all members of the Tribal Council except for the Chairman asking them to sign two prepared letters that stated Pauma's Tribal Council had engaged Rosette's firm for negotiation purposes.  (*Id.* ¶¶ 173–76.)  Pauma's Tribal Council refused to sign the letters, even after Rosette pressured the council's chairman for the next twenty days.  (*Id.* ¶ 177.)  Rosette made another unsuccessful attempt to get Pauma to hire him to renegotiate its compact with California in November 2016, and he continues to do so today.  (*Id.* ¶¶ 183–84.)

W&C continued to represent Pauma throughout the remainder of the litigation, which resulted in rescission of the 2004 Amendment and Pauma obtaining $36.3 million.  (*Id.* ¶¶ 55–65.)  Despite W&C's handling of almost the entirety of Pauma's case, Rosette has published on his firms' websites a statement that he "successfully litigated a case saving the Pauma . . . over $100 Million in Compact payments allegedly owed to the State of California against then Governor Schwarzenegger."  (*Id.* ¶¶ 66, 147; ECF Nos. 39-6, 39-7.)  The same assertion was also made in a profile of Rosette titled "25 People to Watch in the Gaming industry.  (*Id.* ¶ 148.)  According to Plaintiffs, Rosette makes the same assertions in other advertising and marketing materials.  (*Id.* ¶ 149.)

//

### D. Quechan Retains Williams & Cochrane

Soon after the conclusion of Pauma's litigation, Quechan President Mike Jackson asked W&C to represent Quechan in a dispute over its own compact amendment that was signed with California in 2007.  (FAC ¶¶ 68, 71.)  The Quechan Constitution empowers the Tribal Council with the responsibility of choosing Quechan's counsel.  (*Id.* ¶ 186.)

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████  (*Id.* ¶ 73.)

Failing to make timely revenue-sharing payments was "extremely dangerous under the 2007 Amendment" because it could have resulted in Quechan breaching the compact and California halting all of Quechan's gaming operations, ████████████████████

██████████  (*Id.* ¶ 74.)  ██████████████████████████

█████████████████████████████████████████████

██████████████████  (*Id.* ¶ 75.)  ██████████████████

███████████████████  (*Id.*)  ████████████████████

██████████████████████████████████████  (*Id.* ¶¶ 76–77.)

Quechan and W&C negotiated and executed a fee agreement that included (1) a flat monthly fee of $50,000 and (2) a contingency fee of any "revenue sharing discount Quechan receives under a negotiated successor compact."  (*Id.* ¶¶ 78–86; *see* ECF No. 39-2.)  Section 5 of the fee agreement, which governs the contingency fee, states that the contingency fee "recognizes the unique experiences of Firm in providing the monetary recovery requested by Client and the extraordinary effort involved in such negotiation and/or litigation, as well as the discounted monthly flat rate."  (ECF No. 39-2 at 002.[2])  The contingency fee is a percentage of Quechan's "net recovery," which is defined in

---

[2] Citations to specific pages in the exhibits attached to the FAC refer to the Bates Stamp numbers located at the bottom right corner of each page.

3:17-cv-01436-GPC-MDD

relevant part as "any credit, offset or other reduction in future compact payments to the State in a successor compact (whether new or amended) as a result of the excess payments made under Client's tribal/State compact amended in 2006 in lieu of or in addition to a monetary 'net recovery.'" (*Id.*) Section 5(a) sets the contingency fee rate at 15% "[i]f the matter is resolved before the filing of a lawsuit or within 12 months thereof." (*Id.* at 003.) For purposes of Section 5(a), "the matter is resolved at the point in time that the Client signs a successor compact (whether new or amended), which subsequently obtains the requisite State and federal approvals and takes effect under the Indian Gaming Regulatory Act." (*Id.*) It also explains that the 15% rate "is higher than the formative rates for resolving the case through court action . . . based upon the Client's express request after consultation and stated need to resolve the situation in as effective and expeditious a manner as possible." (*Id.*) In other words, by setting a higher contingency fee rate for a non-litigation disposition, the fee arrangement puts a premium on W&C obtaining an amended compact for Quechan without resorting to litigation.

Section 11 of the fee agreement discusses "Discharge and Withdrawal." (*Id.* at 004.) Section 11 states that "Client may discharge Firm at any time." (*Id.*) It goes on to explain that if Quechan discharges W&C "before Client otherwise becomes entitled to any other monetary constituting the 'net recovery' as described" in Section 5, "Client agrees that Firm will be entitled to be paid by Client a reasonable fee for the legal services provided in lieu of the contingency fee set forth" in Section 5. (*Id.* at 005.) The amount of such an alternate fee is based on ten factors set forth in the agreement. (*Id.*) After setting forth those factors, Section 11 states that "[i]n the event of Firm's discharge after . . . Client otherwise becomes entitled to any other monetary amount constituting the 'net recovery' as described" in Section 5, "the Client will pay the contingency fee set forth" in Section 5 "upon receipt of the 'net recovery' amount." (*Id.*)

Section 13 of the fee agreement includes a "limited waiver" of Quechan's sovereign immunity. (*Id.* at 006.) In relevant part, Section 13(a) states that Quechan "expressly and irrevocably waives its sovereign immunity (and any defense based

7

thereon) from any suit, action or proceeding or from any legal process with respect to any claims the Firm may bring seeking payment under the terms of this agreement." (*Id.*) Section 13(c) states that W&C "shall have and be entitled to all available legal and equitable remedies, including the right to restitution, specific performance, money damages and injunctive and declaratory relief. The waiver with respect to any monetary remedies shall only entitle the Firm to obtain any payments due to the Firm as set forth in paragraphs 4 and 5 of this Agreement." (*Id.*)

### E. Williams & Cochrane Negotiates On Behalf of Quechan

On October 17, 2016, California sent W&C a letter agreeing to enter into negotiations with Quechan. (FAC ¶ 88.) The parties held their first negotiation session on November 9, 2016. (*Id.* ¶ 89.) ███████████████████ ████████████████████████████ ██████████ (*Id.*) ████████████ ████████████████ (*Id.* ¶ 90.) █████ ████████████████████████████ ██████████████ (*Id.*) Normally, in addition to SDF payments, California demands revenue sharing of at least six percent of "net win" on machines beyond the tribe's first 350 machines. (*Id.* ¶ 91.) ████ ████████████████████████ ████████ (*Id.* ¶ 90.) ██████████████████ ████████████████████████ ████████████████████ (*Id.*) The draft compact was also offered to Quechan remarkably quickly: compact negotiations for other tribes are expected to take almost five years. (*Id.* ¶ 92.) ████████████████ ██████████████████████ ██████████████████████



(*Id.* ¶¶ 93, 102.)  Seeking to obtain additional favorable terms, W&C scheduled a negotiating meeting with the Office of the Governor for January 31, 2016.  (*Id.* ¶ 94.)

(*Id.* ¶ 97.)

(*Id.*)

(*Id.*)  In March 2017, four "challenger" candidates were seated on the five-member Tribal Council, and Escalanti replaced Jackson as President.  (*Id.* ¶¶ 95–96.)

(*Id.* ¶¶ 98–101.)

(*Id.* ¶ 104.)

(*Id.* ¶ 105.)

(*Id.* ¶ 106.)

(*Id.* ¶ 107.)

(*Id.*)

9

[redacted] (*Id.* ¶ 108.) [redacted]

(*Id.* ¶ 109.) [redacted]

[redacted]

(*Id.*)  Williams sent a final "set of redlines" to the California negotiators in the early morning of June 21.  (*Id.* ¶ 110.)

### F.  Rosette's Efforts to Interfere with W&C's Representation of Quechan

According to the FAC, in the past few years Rosette has been visiting several tribes and soliciting their business "by promising he could get them involved in the payday lending and medical marijuana fields."  (*Id.* ¶ 190.)  In the spring of 2017, Rosette reconnected with Defendant White, who has an interest in "getting involved" in the marijuana industry.  (*Id.* ¶ 191.)  Rosette convinced White, and later then-President Escalanti, that Quechan should hire Rosette to perform its compact negotiations.  (*Id.* ¶ 192.)  Rosette suggested that Quechan could hire Rosette for a discounted fee, after which Rosette would sell Quechan a payday lending business, and if that plan succeeded, Rosette would give White and Escalanti a portion of his payday lending revenues "under the table."  (*Id.*)  Rosette also "instructed" White and Escalanti to breach Quechan's fee agreement with W&C, which led to Quechan withholding several months of payments.  (*Id.* ¶¶ 193–94.)

### G.  Quechan Fires Williams & Cochrane and Hires Rosette

On June 27, prior to Quechan signing any compact with California, Williams received an email from Quechan Executive Secretary Linda Cruz containing a letter dated June 26 and signed by Escalanti.  (*Id.* ¶ 112; ECF No. 39-4.)  The letter was titled "Termination of Attorney-Client Relationship," and stated that Quechan was "terminating the services of Williams & Cochrane . . . effective immediately upon your receipt of this letter."  (*Id.*)  The letter stated that the "Tribe will consider all its obligations to the Firm

satisfied upon payment of a pro-rated fee for your services" in June, and that the "Tribe will not pay any contingency fee or 'reasonable fee for the legal services provided in lieu' thereof, regardless of the outcome of its current dispute with the State of California." (ECF No. 39-4 at 012.)  It further explained that W&C was not entitled to any fee under Section 5 of the fee agreement because of (1) the amount of the $500,000 monthly fee was "exorbitant" and that W&C failed "to produce better-than-boilerplate terms in your negotiations," (2) "the Tribe was not represented by independent counsel in negotiating the agreement," (3) the work W&C performed was not "particularly difficult," (4) W&C's work did not preclude it from other employment, (5) the Tribe could have obtained the results of W&C's work on its own because the concessions that W&C had obtained were the "result of changes in the policy and economic condition of the State as well as extensive compact litigation such as the *Pauma*" case, and (9) W&C's invoices suggested that the it had not performed the amount of work to justify the $50,000 monthly fee, "let alone a contingency or other fee." (*Id.* at 013.)  Next, the letter stated: "We strongly advise you against pressing your luck further out of concern for the reputation of your firm in Indian Country and in the State of California." (*Id.*)  The letter concluded by asking W&C to return to Quechan its case file and reminding W&C of confidentiality requirements, noting that W&C must not "disclose to any employee, officer, or official of the Tribe or any subdivision, agency, or enterprise of the Tribe regarding any matter that was the subject of your engagement." (*Id.*)  Last, the letter instructed W&C to "direct all communications regarding this matter to Robert A. Rosette." (*Id.*)  Because the letter's language was similar to Christobal Dever's threat against W&C (*see id.* ¶ 154–55), Plaintiffs allege that Rosette drafted the letter terminating W&C as Quechan's counsel. (*Id.* ¶¶ 117, 154.)

The termination letter was not accompanied by any record of a Tribal Council vote, and California representatives—who had also received notice of W&C's discharge—were not provided such proof either. (*Id.* ¶¶ 118–19.)  On June 27, a Rosette, LLP associate sent Williams an email stating that it was imperative that she receive "the

last compact, with any redlines, that was transmitted to the State during your negotiations." (*Id.* ¶ 120.)  On June 30, Williams received a cease-and-desist letter signed by Escalanti—and according to Plaintiffs, drafted by Rosette—demanding that Williams not speak to California officials about Quechan's negotiations and requesting that W&C send over its most recent draft compact.  (*Id.* ¶ 123.)  The letter also threatened legal action if W&C did not comply with Quechan's demands, and accused W&C of unprofessional conduct.  (ECF No. 39-5.)  Soon after receiving the letter, W&C sent to Quechan the copy of the latest draft compact.  (FAC ¶ 125.)

After Quechan hired Rosette, California "changed its negotiation position" and demanded that Quechan pay back all of the revenue sharing payments it had been withholding.  (*Id.* ¶ 205.)  At the end of August 2017, Quechan—represented by Rosette—signed a deal with California that reduced Quechan's revenue sharing obligations by $4 million and increased Quechan's machine limit.  (*Id.* ¶¶ 200–01.)  The contents of this agreement are the same as the compact negotiated by W&C, but it does not include any of the "new concessions" that California offered to W&C during the earlier negotiations ███████████████████████████████████████████

█████████████████████████████████████████ (*Id.* ¶ 202.)  The compact also requires Quechan to pay California half of the withheld revenue sharing payments.  (*Id.* ¶ 206.)

Once the Quechan membership became aware of the Tribal Council's actions, the Tribe held recall elections that resulted in the removal of several council members including White and Escalanti.  (*Id.* ¶ 235.)  Nonetheless, the recalled officeholders have refused to step down.  (*Id.*)  Meanwhile, the Tribal Council has stopped making per capita payments to the Tribe's general membership as a result of what the Tribal Council explains is a sudden unprofitable turn in Quechan's casinos in California and Arizona. (*Id.* ¶ 236.)

### H. Other General Allegations Against Rosette

According to Plaintiffs, Rosette's business strategy consists of charging clients

"bargain-basement of even nominal sums to perform legal tasks," but making up for the lost revenue by convincing tribes to engage in additional business transactions such as "internet-based payday lending schemes." (*Id.* ¶¶ 212–15.) Rosette's strategy often includes "remov[ing] any legal oversight that may try to curb the operations of the forthcoming payday loan business," such as removing tribal officeholders, firing the tribe's counsel, and setting up an ineffective regulatory and oversight framework. (*Id.* ¶¶ 215–18.) One instance of this strategy led to accusations that one of Rosette's tribal clients was misusing federal grant funds. (*Id.* ¶ 219.) Rosette has set up more than thirty payday loan enterprises at more than a dozen tribes. (*Id.* ¶ 222.) Plaintiffs allege that a significant portion of the revenue from these enterprises goes to Rosette and "to a lesser extent, his allies on the Tribal Council." (*Id.* ¶ 228.) In performing these schemes, Rosette also convinces tribal councils to hide any legal "pertinent legal actions" from the general membership. (*Id.* ¶ 234.)

### I. Plaintiffs' Claims

As a result of the allegations above, Plaintiffs assert the following claims: (1) breach of contract, by W&C against Quechan; (2) breach of the implied covenant of good faith and fair dealing, by W&C against Quechan; (3) promissory estoppel, by W&C against Quechan; (4) two violations of the Lanham Act, by W&C against the Rosette Defendants; (5) violation of RICO, by W&C against the Rosette Defendants; (6) conspiracy to violate RICO, by W&C against the Rosette Defendants, Escalanti, and White; and (7) negligence/breach of fiduciary duty, by the Member Plaintiffs against the Rosette Defendants.

### II. Discussion

#### A. Legal Standard

Defendants move to dismiss Plaintiffs' claims under Rules 12(b)(1) and 12(b)(6). A motion under Rule 12(b)(1) challenges the Court's subject-matter jurisdiction to adjudicate a particular claim. Here, Quechan asserts that its tribal sovereign immunity bars the Court from exercising subject-matter jurisdiction over some of W&C's claims.

Under such circumstances, "the party asserting subject matter jurisdiction has the burden of proving its existence, i.e. that immunity does not bar the suit." *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015) (internal quotation marks omitted). The Court does not presume that the jurisdictional allegations are true, but rather "may hear evidence regarding jurisdiction and resolve factual disputes where necessary." *Id.* (internal quotation marks omitted).

By contrast, a Rule 12(b)(6) motion attacks the complaint as not containing sufficient factual allegations to state a claim for relief. "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "detailed factual allegations" are unnecessary, the complaint must allege more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

## B. Breach of Contract Claim (Count One)

The Quechan Defendants move to dismiss W&C's breach of contract claim to the extent that W&C seeks payment under Section 5 of the fee agreement. They contend that Section 11, not Section 5, governs what payment is owed to W&C in light of Quechan having discharged W&C prior to the conclusion of the compact negotiations. (ECF No. 50 at 12–13.) Because the FAC alleges that Quechan did not pay W&C any "reasonable fee" based on the ten factors set forth in Section 11 of the plea agreement, the Quechan Defendants concede that W&C has sufficiently pled a breach claim with respect to Section 11. (*Id.* at 12 ("W&C's allegation that it is eligible for an Alternative Extra Fee under Section 11 of the Fee Agreement is sufficiently pled under Rule 8.").) "But the plain language of the Fee Agreement," they argue, "excludes the possibility that W&C is

14

1    entitled to the contingency fee under Section 5 of the Fee Agreement." (*Id.* at 12–13.)

2    W&C argues that it is entitled to the contingency fee envisioned in Section 5 of the

3 fee agreement. It points to the provision in Section 11 that states: "In the event of Firm's

4 discharge after . . . Client otherwise becomes entitled to any other monetary amount

5 constituting 'net recovery' . . . the Client will pay the contingency fee set forth" in

6 Section 5. (ECF No. 39-2 at 005.) W&C argues that Quechan is liable to W&C for the

7 Section 5 contingency fee because prior to Quechan discharging W&C as counsel,

8 Quechan was "entitled" to the net recovery it obtained as a result of its negotiated

9 compact with California.

10    The Court cannot agree with W&C that at the time Quechan discharged W&C,

11 Quechan was "entitled"—under any understanding of that term—to any of the net

12 recovery it obtained as a result of the compact it signed with California. To be entitled to

13 something is to hold a legal right it. *See* Black's Law Dictionary (10th ed. 2014)

14 (defining entitle as "[t]o grant a legal right to or qualify for"); Oxford English Dictionary

15 (3d ed. 2014) (defining entitled as "has a legal right or just claim to do, receive, or

16 possess something"). Under the allegations in the FAC, there is no question that, at the

17 time Quechan discharged W&C as its counsel, Quechan had no legal right to any of the

18 benefits that California had offered during the negotiations with W&C.

19    W&C's only argument to the contrary is a citation to the Webster's Third

20 definition of "entitled," which is "to furnish with proper grounds for seeking or claiming

21 something." (ECF No. 73 at 16.) W&C fails to explain why this definition supports its

22 position. Quechan's negotiations with California were just that—negotiations. While

23 Quechan and California sought an expedited resolution of their negotiations, Quechan

24 was never "furnished" with any "grounds" for seeking or claiming the benefits that

25 California had offered up to the moment at which Quechan discharged W&C.

26    Because Quechan was not "entitled" to any of the concessions California had

27 offered during the negotiations, Quechan's failure to pay W&C the contingency fee

28 envisioned in Section 5 of the fee agreement was not a breach of contract. To the extent

that Count One is premised on a violation of Section 5, that claim is dismissed with prejudice.

### C. Sovereign Immunity—Claims Against the Tribe (Counts Two and Three)

The Quechan Defendants argue that this Court lacks subject-matter jurisdiction over Counts Two and Three, which assert a breach of the implied covenant of good faith and fair dealing and promissory estoppel. Quechan argues it has not waived its sovereign immunity to allow such claims. "Tribal sovereign immunity protects Indian tribes from suit absent express authorization by Congress or clear waiver by the tribe." *Pistor*, 791 F.3d at 1110 (quoting *Cook v. AVI Casino Enters., Inc.*, 548 F.3d 718, 725 (9th Cir. 2008)). Because there is a "strong presumption against [its] waiver," any waiver must be clear and unequivocally expressed. *Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011, 1016–17 (9th Cir. 2016).

Section 13 of the fee agreement between Quechan and W&C states: "Client hereby expressly and irrevocably waives its sovereign immunity (and any defense based thereon) from any suit, action or proceeding or from any legal process with respect to any claims the Firm may bring seeking payment under the terms of this agreement." (ECF No. 39-2 at 006.) Quechan argues that while this waiver permits the breach of contract claim, it does not permit the implied covenant or promissory estoppel claims because those are not "claims . . . seeking payment under the terms" of the fee agreement. (ECF No. 50-1 at 8–9.) Rather, the Quechan Defendants argue, those two claims are "alternative claims that purport not to be based simply on breach of a specific fee provision of the Fee [A]greement." (*Id.* at 9.)

Contrary to the Quechan Defendants' assertion, Quechan waived its sovereign immunity with respect to W&C's claim that Quechan breached the implied covenant of good faith and fair dealing. The waiver permits the Court to exercise jurisdiction over claims seeking payment under the "terms" of the fee agreement. The implied covenant of good faith and fair dealing is an implied "term in every contract." *Chodos v. West Publ'g*

*Co.*, 292 F.3d 992, 996 (9th Cir. 2002). Because Quechan clearly waived its immunity as to claims for payment under the "terms" of the fee agreement, and the implied covenant of good faith and fair dealing is a term of the fee agreement, the Court may exercise subject-matter jurisdiction over W&C's claim of breach of that term.

The promissory estoppel claim similarly falls within the confines of Section 13's sovereign immunity waiver. In the section of the FAC setting forth the factual predicate for W&C's promissory estoppel claim, Plaintiffs allege that as a result of certain statements made to W&C by Quechan officials, W&C "work[ed] to wrap up the negotiations" with California. (FAC ¶ 269.) That work falls within the terms of the fee agreement, which states that Quechan will pay W&C for legal work in the pursuit of "reducing Client's payments under its tribal/State gaming compact with the State of California," which included "obtaining a successor tribal/State gaming compact with the State of California." (ECF No. 39-2 at 001.) Because terms of the fee agreement include a promise to pay W&C for such work, W&C's promissory estoppel claim—which asserts that W&C has incurred uncompensated costs as a result of performing this work—is a claim for payment under the terms of the fee agreement. Whether that claim has any legal merit, however, is a separate question, which the Court addresses further below.

### D. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Two)

The Quechan Defendants argue that even if Quechan waived its sovereign immunity on the claim of breach of the implied covenant of good faith and fair dealing, the FAC fails to state such a claim because it is duplicative of W&C's breach of contract claim. "When the allegations of a claim for breach of the implied covenant 'do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.'" *Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 725 (N.D. Cal. 2014) (quoting *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 272 Cal. Rptr. 387, 400 (Ct. App. 1990)).

In light of the Court's ruling that the FAC does not state a claim for relief that W&C is entitled to the contingency fee in Section 5 of the fee agreement (Section II.B, *supra*), W&C's breach of the implied covenant of good faith and fair dealing claim does not "seek the same damages or other relief already claimed" as W&C's breach of contract claim. The breach of contract claim, if successful, entitles W&C to a "reasonable fee" under Section 11 of the fee agreement, which is determined by the interaction of 10 enumerated factors. (ECF No. 39-2 at 005.) By contrast, by asserting a breach of the implied covenant, W&C seeks to put itself in the position it would have been had Quechan never discharged W&C. That is, rather than seeking what it should be paid under Section 11 of the fee agreement, in this claim W&C seeks what it would have been paid under Section 5 had Quechan never discharged W&C in bad faith.

In other words, these two claims differ in two ways: (1) they focus on different moments in the dealings between W&C and Quechan and (2) they seek different remedies. As to the former, whereas the breach of implied covenant claim focuses on Quechan's allegedly wrongful discharge of W&C, the breach of contract claim focuses on Quechan's refusal to pay W&C a reasonable fee under Section 11 after that discharge. As to the latter, whereas the breach of contract claim seeks recovery under the factors set forth in Section 11 of the fee agreement, the breach of the implied covenant claim seeks the full contingency fee under Section 5 of the fee agreement that W&C would have received had it not been discharged.

The Quechan Defendants' only argument in support of their motion to dismiss the implied covenant claim is that it is duplicative of the breach of contract claim. They do not offer any argument that the *merits* of the implied covenant claim fail. Because the Court concludes that the implied covenant claim is not duplicative of the breach of contract claim, the Quechan Defendants have offered no persuasive argument in support of dismissing the implied covenant claim.

### E. Promissory Estoppel (Count Three)

The Quechan Defendants argue that W&C's promissory estoppel claim fails

because all relevant promises discussed in the FAC were the result of bargained compromise.  (ECF No. 50-1 at 15–17.)  The Court agrees.

To succeed in a promissory estoppel claim under California law, one must show: (1) "a promise clear and unambiguous in its terms," (2) "reliance by the party to whom the promise is made," (3) the "reliance [was] both reasonable and foreseeable," and (4) "the party asserting the estoppel [was] injured by his reliance."  *Granadino v. Wells Fargo Bank, N.A.*, 186 Cal. Rptr. 3d 408, 416 (Ct. App. 2015) (internal quotation marks omitted).  A plaintiff may not prevail on a promissory estoppel claim based solely on promises made in a contract.  *See, e.g.*, *JMP Secs. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1041 (N.D. Cal. 2012) ("Under California law, the same allegations that give rise to a breach of contract claim cannot also give rise to a claim for promissory estoppel, as the former [is] predicated on a promise involving bargained-for consideration, while the latter is predicated on a promise predicated on reliance in lieu of such consideration." (internal quotations omitted)).  This is because the purpose of a promissory estoppel claim "is to make a promise that lacks consideration (in the usual sense of something bargained for and given in exchange) binding under certain circumstances."  *Boon Rawd Trading Int'l Co., Ltd. v. Paleewong Trading Co., Inc.*, 688 F. Supp. 2d 940, 953 (N.D. Cal. 2010).  Thus, the "doctrine of promissory estoppel is only applicable when an alleged promise *lacks* adequate consideration."  *Id.* (emphasis added).  "In other words, where the promisee's reliance was bargained for, the law of consideration applies; and it is only where the reliance was unbargained for that there is room for application of the doctrine of promissory estoppel."  *Healy v. Brewster*, 380 P.2d 817, 822 (Cal. 1963).  California courts have described contract and promissory estoppel claims as "not only [] distinct or alternative theories of recovery but also as mutually exclusive."  *Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.*, 149 Cal. Rptr. 3d 440, 450 (Ct. App. 2012).

Here, it is clear that the work W&C performed on behalf of Quechan was done in exchange for Quechan's promise to pay W&C under the terms of the fee agreement.  In

other words, "[t]he only thing at issue here is under which provision of the contract [W&C] will be paid for its services, not whether there was a contract for services at all or whether the promises contained in the contract were supported by consideration." *JMP Secs.*, 880 F. Supp. 2d at 1041. In the section of the FAC setting forth W&C's promissory estoppel claim, it identifies the following pertinent "promises" made to W&C: (1) Quechan's informing W&C that the Tribal Council had voted to resolve the dispute with California via negotiations, (2) the General Council directed the Tribal Council to "execute whatever compact W&C negotiated with the State of California during the remainder of the month," and (3) members of the Tribal Council and Casino Resort told W&C that the Tribal Council intended to execute whatever compact W&C was able to negotiate with California within that month. (FAC ¶ 268.) To the extent that these are "promises" at all, they are clearly covered by the fee agreement, in which Quechan promised to pay W&C for its work in negotiating a resolution to Quechan's dispute with California. (ECF No. 39-2 at 001 (explaining that Quechan was hiring W&C for legal services including "representation related to tribal/State compact such as . . . obtaining a successor tribal/State gaming compact").) If W&C worked any harder at negotiating Quechan's compact with California as a result of those statements, it will be compensated through the bargained-for provision of Section 11.

Even if those promises could be viewed as separate from those made in the fee agreement, the FAC does not allege the necessary detrimental reliance. To demonstrate reliance, W&C must show that it "changed [its] position in any way because of what [it] had been promised." *Smith v. City & Cty. of San Francisco*, 275 Cal. Rptr. 17, 23 (Ct. App. 1990); *see also Hammes Co. Healthcare, LLC v. Tri-City Healthcare Dist.*, 801 F. Supp. 2d 1023, 1043 (S.D. Cal. 2011) (rejecting promissory estoppel claim because it "failed to identify a substantial change of position in reliance" on the alleged promise). Here, W&C offers no reason to believe that had these "promises" not been made, W&C would have acted any differently.

Contrary to W&C's assertion (*see* ECF No. 73 at 19–20), *Moncado v. West Coast*

*Quartz Corp.*, 164 Cal. Rptr. 3d 601 (Ct. App. 2013), does not support the viability of its promissory estoppel claim. There, after it was announced that a company was going to be sold, managers repeatedly told employees that if they stayed at the company until the company was sold—which the employees had no obligation to do—the company would pay them a bonus. *Id.* at 604–05. At least one employee turned down other employment opportunities because he wanted to collect the bonus, and another forewent the opportunity to move to another city. *Id.* at 605. When the employees found out that the company had been sold and that they had not received any bonus, they sued. *Id.* at 605–06. The trial court dismissed the plaintiffs' promissory estoppel claim (among others). *Id.* at 606. The Court of Appeal reversed. *Id.* at 610. The court explained that the allegations were sufficient to state a claim for promissory estoppel because "defendants promised to pay [plaintiffs] an amount sufficient to retire upon the sale of [the company] if they remained employed. . . . Plaintiffs relied on this promise to their detriment by remaining employed at [the company], and forgoing other employment and residential opportunities." *Id.*

The facts here are not analogous to those in *Moncada*. There, the promise at issue exceeded the scope of the contract: whereas the employment contract governed payments to the employees for their work on behalf the company, the bonus offer was in exchange for the employees' loyalty, which was not a bargained-for term of the employment agreement. Here, there is no separation between the employment contract and the "promises" discussed above. The promises cited in the FAC were merely requests for W&C to do the work that was covered by the fee agreement. Moreover, whereas the plaintiffs in *Moncada* forewent other opportunities as a result of the promises made, W&C does not allege that it passed up any other opportunity while performing its work for Quechan.

In sum, the fee agreement between Quechan and W&C determines the money W&C is entitled to as a result of its work negotiating Quechan's compact with California. As stated above, W&C has pled a claim that Quechan breached that contract by failing to

pay W&C the "reasonable fee" envisioned in Section 11 of the fee agreement. That breach of contract claim covers all of the conduct at issue in W&C's promissory estoppel claim. Any action W&C took in response to the promises alleged in the FAC were the result of the bargain memorialized in the fee agreement. W&C therefore fails to state a claim for promissory estoppel.

### F. Lanham Act Claims (Counts Four and Five)

The Rosette Defendants argue that W&C's Lanham Act claims should be dismissed because (1) the statements at issue are not actionable, and (2) the FAC does not allege any injury incurred by W&C that was caused by those statements. (ECF No. 53-1 at 18–23.)

The relevant portion of the Lanham Act states:

> Any person who, on or in connection with any goods or services, . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B). To establish a violation of this provision, W&C must prove (1) the Rosette Defendants "made a false statement" about its own service, (2) "the statement was made in commercial advertisement or promotion," (3) "the statement actually deceived or had the tendency to deceive a substantial segment of its audience," (4) "the deception is material," (5) the Rosette Defendants "caused its false statement to enter interstate commerce," and (6) W&C "has been or is likely to be injured as a result of the false statement, either by direct diversion of" clients away from W&C and towards the Rosette Defendants. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1052 (9th Cir. 2008) (quoting *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002)).

W&C's Lanham Act claims focus on two statements allegedly made by the Rosette Defendants. For the reasons below, the Court finds the statement at issue in Count Four

3:17-cv-01436-GPC-MDD

actionable under the Lanham Act, but concludes that the statement at issue in Count Five is not.

### i. Statement About the Pauma Litigation (Count Four)

At issue in Count Four is the statement on Rosette's websites that asserts he "successfully litigated a case saving [Pauma] over $100 Million in Compact payments allegedly owed to the State of California." (FAC ¶ 274.) The FAC states that this statement is false because Williams and Cochrane were counsel of record for Pauma between June 2010 and the conclusion of the case, and they were responsible for upholding the preliminary injunction. (*Id.*) The FAC points to statements made by Rosette indicating that his only contribution to the Pauma litigation was filing "one substantive brief that resulted in the Ninth Circuit overturning the preliminary injunction," and that he "did not even know what was happening in the *Pauma* case" as of four months after Pauma discharged Rosette's firm and hired W&C. (*Id.* at ¶¶ 138–39, 274.)

The Rosette Defendants argue that this statement is not actionable because it is not false. They point to the FAC's allegations that Rosette's firm represented Pauma in the pre-injunction portion of the litigation and that Rosette was responsible for the "strategy and ideas" behind the litigation. (*Id.* ¶¶ 41–42, 139.) The Rosette Defendants argue that because Rosette was the lead partner in the Pauma litigation prior to being discharged, it is not false for him to claim that he "litigated" that case, especially when the statement at issue does not deny the role played by Williams or Cochrane. (ECF No. 53-1 at 20 ("Lead partners are ultimately responsible for the success or failure of litigation, even though clients and courts understand that associates and other law firm client personnel often play important roles.").) They also emphasize that the statement about the Pauma litigation does not take "credit for the subsequent developments in the Pauma Litigation after [W&C] took over," as it does not reference the "$36.3 million award of restitution for past overpayments," which was obtained by W&C. (*Id.*)

The Court agrees with the Rosette Defendants that the statement that Rosette was

involved with, or even "litigated," the Pauma case is not actionable. However, the statements that Rosette's litigation efforts were "successful" and that they resulted in $100 million in savings for Pauma is sufficiently misleading to plead a violation of the Lanham Act. The statement that Rosette's efforts were "successful" could be misleading: according to the FAC, at the time Rosette was discharged as Pauma's counsel, Rosette had unsuccessfully opposed a motion to stay the injunction pending appeal. The assertion that Rosette's efforts saved Pauma "$100 Million" also could be misleading: Pauma had not saved anywhere near that amount of money by the time it discharged Rosette as its counsel.

In this sense, the Count Four claim is analogous to the statement held to be actionable in *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919 (9th Cir. 2010). Irwin, a former employee of PhotoMedex—a company that produced and sold "lasers for use in dermatological treatments"—claimed in promotional materials that he had "invented" one of PhotoMedex's products known as XTRAC. *Id.* at 922–23. The district court entered summary judgment for the defendants on this claim, concluding that the claim that Irwin invented XTRAC was "opinion and not misleading." *Id.* at 923. The Ninth Circuit reversed. *Id.* at 932–33. The panel explained that despite Irwin's having been "intimately involved in the development of the XTRAC system" and having invented "particular components of the XTRAC in patents," the statement was "actionable to the extent it misled consumers into believing that Irwin was the sole inventor or made more than his actual share of inventive contributions." *Id.* at 932. Here, it is similarly likely that a consumer reading Rosette's statement about his work in the Pauma case would be misled into believing that Rosette was solely responsible for Pauma's $100 million savings, when in reality he was discharged as Pauma's counsel long before that outcome was reached.

The Rosette Defendants also argue that the FAC fails to allege causation between this statement and W&C's harm. (ECF No. 53-1 at 22–23.) The Court disagrees. The FAC plausibly alleges that Rosette's false statement about his role in the Pauma litigation

led to Quechan's decision to discharge W&C as its counsel in the compact negotiations with California. The FAC states that Pauma's success in its compact litigation was the motivation behind Quechan hiring W&C. (FAC ¶¶ 67–68.) It is thus plausible that if Quechan officials were misled by Rosette's statement discussed above, they came to believe that it was Rosette, not Williams or Cochrane, who would give them the best chance at success at their negotiations with California.

### ii. Statements About the Quechan Litigation (Count Five)

In Count Five, the FAC points to a press release that was uploaded to Rosette, LLP's website soon after Quechan reached its agreement with California. The press release states: "Governor Edmund G. Brown and [Quechan] have signed a new Tribal-State Gaming Compact [] between the Tribe and the State of California. . . . The terms of the new compact reduce the Tribe's revenue sharing obligations by approximately four millions dollars [] per year, and simultaneously increase the Tribe's ability to generate revenues through its gaming operations by providing the right to operate additional gaming facilities and gaming devices." (ECF No. 39-40 at 651.) The bottom of the press release states: "For more information, contact: Robert Rosette (480) 889-8990 rosette@rosettelaw.com." (*Id.*)

These allegations do not state a claim of violation of the Lanham Act. Based on the facts alleged in the FAC, nothing about the statements above are false or misleading. There is no dispute that Quechan and California agreed to a new compact that saved Quechan that amount of money and increased Quechan's amount of permitted devices. In their opposition memorandum, W&C's only argument to the contrary is that the "contact information" at the bottom of the press release "necessarily convey[s] the false message that [Rosette] single-handedly represented the Tribe in connection with the compact." (ECF No. 74 at 16.) The Court cannot agree. The contact information statement suggests nothing more than Rosette is Quechan's counsel, which is true.

Because Count Five does not allege a false or misleading statement, it fails to state a violation of the Lanham Act.

### G. RICO Claim (Count Six)

The Rosette Defendants contend that Count Six—which asserts a RICO violation by the Rosette Defendants through a series of violations of the mail and/or wire fraud statutes—fails because the FAC does not allege: (1) a RICO enterprise, (2) a sufficient pattern of racketeering activity, or (3) causation. (ECF No. 53-1 at 10–16; ECF No. 50-1 at 17–22.) The Court agrees with Defendants that the FAC fails to allege a sufficient racketeering activity; as a result, the Court need not address the other bases for Defendants' challenge.

"The RICO statute sets out four elements: a defendant must participate in (1) the conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity or collection of unlawful debt." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (citing 18 U.S.C. § 1962(c)). "Racketeering activity, the fourth element, requires predicate acts." *Id.* In Count Six, W&C alleges that the Rosette Defendants have engaged in racketeering activity by engaging in conduct that constitutes mail or wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. (FAC ¶ 286.) To establish a "pattern," W&C must allege at least two acts constituting mail or wire fraud. 18 U.S.C. § 1961(5). To allege a violation of mail or wire fraud under 18 U.S.C. §§ 1341 or 1343, respectively, a plaintiff must show: (1) there was a scheme to defraud; (2) the defendants used the mail (or wire, radio, or television) in furtherance of the scheme; and (3) the defendants acted with the specific intent to deceive or defraud. *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 620 (9th Cir. 2004).

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To plead fraud with particularity, the pleader must state the time, place, and specific content of the false representations. *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007). The allegations "must set forth more than neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about the statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal

quotation marks omitted).  The Rule 9(b) requirement allows a defendant to prepare an adequate answer to the allegations of fraud.  *Odom*, 486 F.3d at 553.  Moreover, where multiple defendants allegedly engaged in fraudulent activity, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).  Instead, a plaintiff must identify each defendant's role in the alleged scheme.  *Id.* at 765.

W&C alleges thirteen instances of conduct that it alleges constitutes a violation of the wire and/or mail fraud statutes:

(1) interfering with W&C's contract with Pauma "by suggesting the tribe's then-Chairman demand that the firm write a legal opinion freeing up the monies saved by the injunction in Pauma's suit against the State of California";

(2) interfering with W&C's contract with Pauma "by instructing the tribe's then-Chairman to not pay any of the firm's invoices and to communicate to the firm that he would 'ruin [its] reputation in Indian Count[r]y' if it simply did not walk away";

(3) interfering with W&C's contract with La Pena Law by telling La Pena that W&C stole Rosette's clients and "would invariably 'steal' her clients as well";

(4) Armstrong's attempting to interfere with W&C's contract with Pauma "by trying to covertly settle the tribe's litigation with the State of California through the State's negotiator Jacob Appelsmith";

(5) pressuring Pauma Councilmembers "into signing pre-prepared letters absolving Robert Rosette of any wrongdoing in trying to settle the tribe's compact litigation";

(6) interfering with W&C's contract with Pauma by telling Devers "to relay a message to the current Tribal Council that [Rosette] could re-do their compact and would like to discuss the matter with them free of charge";

(7) interfering with W&C's contract with Quechan by telling councilmembers that Rosette "was responsible for litigating the Pauma suit upon which the tribe's dispute with the State of California was in part based";

(8) interfering with W&C's contract with Quechan by telling councilmembers that W&C "had failed to 'produce better-than-boilerplate terms in your negotiations'";

(9) interfering with W&C's contract with Quechan by telling councilmembers "to withhold payment of the monthly flat fee from" W&C;

(10) interfering with W&C's contract with Quechan by telling councilmembers "to fire

[W&C] at the conclusion of the negotiations, right before the tribe signed the resultant compact";

(11) interfering with W&C's contract with Quechan "by preparing and transmitting the June 26, 2017 termination letter" indicating that Quechan would not comply with the fee agreement and threatening W&C not to push its luck "out of concern for the reputation of your firm in Indian Country and in the State of California";

(12) demanding W&C to "turn over work product of incalculable value so the Rosette defendants could use the firm's intellectual property for their own benefit to finish up the Quechan work they had fraudulently taken away";

(13) interfering with W&C's contract with Quechan by preparing and transmitting the June 30, 2017 cease-and-desist letter that again threatened "legal action against" W&C.

(FAC ¶ 287.)

These allegations fail to state with particularity the circumstances constituting the fraud and fail to provide the specific content of the false representations. In addition, the allegations merely lump the named defendants together and fail to identify each defendant's role. At best, only one of these allegations suggests that the lumped-together Rosette Defendants have violated the federal wire or mail fraud statutes.

The allegations above can be separated into substantive groups. The first group consists of allegations regarding Rosette's "suggesting" that another party to engage in, or "instructing" another party to engage in, certain conduct (Allegations 1, 2, 6, 9, and 10). But none of the conduct that Rosette Defendants sought to produce in those allegations was fraudulent. Or, put in terms of the mail and wire fraud statutes, none of these actions detail any "scheme to defraud." For example, while Rosette's instruction to the Quechan councilmembers to breach their contract with W&C (Allegation 9) might constitute interference with W&C's contract, it in no way could be considered an attempt at deceit. "It is long settled that, absent any element of deception, allegations of threats and abusive conduct simply do not constitute 'a scheme to defraud.'" *A. Terzi Prods., Inc. v. Theatrical Protective Union*, 2 F. Supp. 2d 485, 500 (S.D.N.Y. 1998) (quoting *Fasulo v. United States*, 272 U.S. 620 (1926)); *see also McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir. 1990) ("[N]ot every use of the mails or

3:17-cv-01436-GPC-MDD

wires in furtherance of an unlawful scheme to deprive another of property constitutes mail or wire fraud.").

The next group of allegations consists of those in which Rosette engaged in conduct on behalf of another (Allegations 4, 5, 11, 12, and 13). These actions also fail to suggest a scheme to defraud. Perhaps the closest allegation is Armstrong's attempt to interfere with W&C's contract with Pauma by trying to "covertly" settle that litigation and then asking the Pauma Councilmembers to sign a letter stating that they had authorized that action. But there is no allegation suggesting that Armstrong did so through deceit. As for the allegations that Rosette drafted letters to W&C on behalf of Quechan—*i.e.*, the termination letter, the letter demanding W&C hand over the relevant work, and the cease-and-desist letter—these allegations do not set forth what is false about the statements or suggest that Rosette was anything but forthright about the current state of Quechan's legal representation or the likely consequences of W&C continuing to withhold the requested documents.

Two of the allegations above suggest that Rosette made certain assertions about W&C: a statement to La Pena that W&C had "stolen" Rosette's client (Allegation 3), and a statement to Quechan that W&C had not been able to produce, through its negotiations with California, anything better than "boilerplate" terms (Allegation 8). Neither of these statements are fraudulent; rather, they are vague statements of opinion asserted in the midst of hard-nosed business tactics. *Cf. United States v. Goodman*, 984 F.2d 235, 240 (8th Cir. 1993) ("Without some objective evidence demonstrate a scheme to defraud, all promotional schemes to make money, even if 'sleazy' or 'shrewd,' would be subject to prosecution on the mere whim of the prosecutor.").

Last, the Court is left with the statement found actionable under the Lanham Act above—that is, Rosette's misleading statement that he successfully litigated the Pauma litigation and saved that tribe $100 million. Even assuming that this statement is actionable as wire fraud, none of the other allegations suggest a violation of the wire or mail fraud statutes. Count Six therefore fails to allege a sufficient pattern of racketeering

activity, and fails to state a claim that the Rosette Defendants violated RICO. Supplementation and clarification of this count, however, may lead to an actionable claim. As a result, the claim is dismissed without prejudice.

## H. RICO Conspiracy Claim (Count Seven)

Defendants next challenge the RICO conspiracy claim in Count Seven. This conspiracy claim is asserted against the Rosette Defendants, Escalanti, and White, and is supported by allegations of conduct that differ from those listed in Count Six.

### i. Sovereign Immunity

Before considering the merits of this claim, the Court must address Escalanti and White's assertion that they are protected by Quechan's sovereign immunity in this suit. (*See* ECF No. 50-1 at 9–12.) Escalanti and White argue that because they were acting in their official capacities when engaging in the conduct discussed in this claim, the Tribe's sovereign immunity extends to them. The Court disagrees.

In *Lewis v. Clarke*, 137 S. Ct. 1285 (2017), the Supreme Court rejected this same argument. There, the defendant—a member of the Mohegan Tribe of Indians of Connecticut—asserted that the tribe's sovereign immunity protected him against a suit arising from a car accident he caused while acting in the scope of his employment as a driver for Mohegan's casino. *Id.* at 1289. The Supreme Court of Connecticut held that because the defendant was acting within the scope of his employment during the accident, he was protected in the suit by the Tribe's sovereign immunity. *Id.* at 1290. The United States Supreme Court reversed, holding that the relevant analysis is not whether the defendant was acting in his official capacity during the incident at issue, but rather whether the real party in interest in the suit was the Tribe. *Id.* at 1290–92. The Court explained that in determining the real-party-in-interest defendant in a case, a court "may not simply rely on the characterization of the parties in the complaint, but rather must determine in the first instance whether the remedy sought is truly against the sovereign." *Id.* at 1290. A case in which the real party in interest is the sovereign is one where "the relief sought is only nominally against the official and in fact is against the

official's office and thus the sovereign itself." *Id.* at 1291; *see also id.* ("That is why, when officials sued in their official capacities leave office, their successors automatically assume their role in the litigation."). By contrast, a suit against an officer in his personal capacity is one that seeks "to impose *individual* liability upon [that] government officer for actions taken under color of state law." *Id.* (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). Under the facts of that case, the Court held that the Tribe was not the real party in interest because the suit was against the defendant "to recover for his personal actions, which 'will not require action by the sovereign or disturb the sovereign's property.'" *Id.* (quoting *Larson v. Domestic & Foreign Comm. Corp.*, 337 U.S. 682, 687 (1949)).

Here, W&C's RICO conspiracy claim against Escalanti and White, discussed in greater detail below, is clearly a personal-capacity suit. It alleges that Escalanti and White have joined forces with the Rosette Defendants to create a fraudulent payday lending scheme. If Escalanti and White are found liable, *they* will have to pay damages to W&C, not Quechan. In other words, a finding of liability against Escalanti and White on this count "will not require action by [Quechan] or disturb [Quechan's] property."[3] *Id.*

### ii. Sufficiency of the Allegations

Having concluded that Escalanti and White do not enjoy the protections of Quechan's sovereign immunity under the facts of this claim, the Court considers whether the allegations supporting this claim are sufficient. They are not.

A RICO conspiracy can be proven in two ways: "Plaintiffs must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000). W&C alleges the following conduct as predicate acts:

---

[3] In support of this argument, the Quechan Defendants offer declarations by those Escalanti and White. (ECF Nos. 50-2, 50-3.) Because it is clear that this is a personal-capacity suit, the Court need not consider the contents of those declarations. As a result, the Court need not address Plaintiffs' motion to exclude those declarations. (ECF No. 62.) That aspect of Plaintiffs' motion is DENIED as moot.

(1) White communicated to the Quechan General Council "that he had an attorney 'friend' who could get the tribe involved in the online payday lending industry if he were elected to office";

(2) White and Rosette met in Arizona "to discuss the online payday lending scheme";

(3) On another occasion, White, Escalanti, and Rosette met to discuss the same scheme;

(4) Defendants caused Quechan to terminate W&C using the "pretense" that W&C failed to produce "better-than-boilerplate terms" when negotiating with California and "had been 'grossly overcompensated'";

(5) Defendants caused Quechan to terminate its "longstanding general counsel, the Morisset law firm" and hire Rosette;

(6) Defendants arranged to "hide the contract and authorizing resolution for Robert Rosette and his firm so the General Council of the tribe could not veto the agreement";

(7) Defendants strategized how to keep Escalanti and White in power after their recall elections;

(8) Defendants discontinued per capita payments to Quechan's general membership "on the basis that California and Arizona casinos operated by Quechan [were] not making a profit," and instead using such funds "as seed money for a payday lending scheme"; and

(9) Taking "additional actions over the course of the past year to set up a[] payday lending enterprise, covertly using, amongst others, the revenue sharing money Quechan has saved during that time that . . . has neither gone to the general membership in the form of per capita payments nor even been publicly accounted for."

(FAC ¶ 294.) W&C alleges in a conclusory fashion that defendants "either conspired to participate in or conduct an enterprise aimed at creating a sham online payday lending business at the tribe in an environment that avoid detection by the tribe at large." (FAC ¶ 293) The FAC further states that these actions constitute a RICO conspiracy because in engaging these actions, the relevant defendants sought to "set up a sham payday lending business that would personally enrich those in power rather than the tribe generally." (*Id.* ¶ 295.)

Plaintiffs fail to sufficiently allege that defendants agreed to violate the substantive provisions of RICO or agreed to commit, or participated in, a violation of two predicate

offenses. As an initial matter, W&C's RICO conspiracy claim suffers a vital flaw: nowhere in the FAC is there an allegation that these payday lending schemes are fraudulent or constitute mail or wire fraud. The FAC alleges that the Consumer Financial Protection Bureau and "a spate of plaintiff's attorneys" have sued over these payday lending practices (FAC ¶ 223), but it does not suggest that such litigation has resulted in findings or judgments suggesting the schemes are fraudulent. And while the FAC offers allegations that the loans at issue are predatory (*see id.* ¶ 221 (describing how a loan in such a scheme might involve 800% interest)), it does not state—and W&C offers no argument suggesting—that these loans involve any aspect of deceit. As a result, the "objective" of the agreement described in Count Seven was not one to violate RICO's substantive provisions.

Having concluded that the objective of the agreement alleged in Count Seven was not one to violate RICO, the Court must ask whether Count Seven alleges that the relevant defendants "agreed to commit, or participated in, a violation of two predicate offenses." *Howard*, 208 F.3d at 751. The FAC asserts that the actions above constitute agreements "to engage in at least two acts of mail or wire fraud." (FAC ¶ 294.) The only allegation above that suggests any fraudulent activity, however, is Allegation 8, which asserts that Defendants withheld per capita payments from Quechan membership using the allegedly false pretense that Quechan's casinos were not profitable. While Allegation 9 also suggests deceitful activity, it is much too vague: Plaintiffs' assertion that some of the relevant defendants took "additional steps" towards the scheme does not identify any particular conduct. In the absence of another viable allegation suggesting that the relevant defendants in Count Seven agreed to commit or participated in wire or mail fraud, the RICO conspiracy claim fails.[4]

_____

[4] It may be—though it is far from clear—that the alleged conspiracy that Plaintiffs are targeting is one in which the relevant defendants have agreed to keep for themselves funds that have been earned through Tribe-sponsored payday lending and to which the members are entitled. If *that* is the conspiracy at issue here—again, the verbosity of the FAC makes it impossible to tell—the Court has concerns that such a

3:17-cv-01436-GPC-MDD

It may be the case that the payday lending scheme alleged by Plaintiffs constitutes an agreement to violate RICO because the scheme is based on fraud. It also may be the case that the relevant defendants have agreed to commit wire or mail fraud on two different occasions. But either the FAC fails to demonstrate such illegality, or the relevant allegations are so buried beneath the other 120-some pages of allegations that the Court cannot reasonably detect them. Because a clarifying amendment to the FAC might be able to cure this deficiency, Count Seven is dismissed without prejudice.

## I. Negligence/Breach of Fiduciary Duty (Count Eight)

Count Eight of the FAC asserts a putative class action legal malpractice claim by the Member Plaintiffs against the Rosette Defendants, stemming from Rosette's completion of Quechan's negotiations with California. (FAC ¶¶ 297–303.)

### i. The Member Plaintiffs' Ability to Sue

The Rosette Defendants contend first that this claim must be dismissed because the Member Plaintiffs were never clients of the Rosette Defendants.[5] (ECF No. 53-1 at 23–24.) In moving to dismiss this claim, the Rosette Defendants ask the Court to take judicial notice of the Attorney Services Contract between Rosette LLP and Quechan, which states:

> [T]he Tribe should be aware that Firm's representation is with the Tribe and not with its individual members, officers, executives, shareholders, directors, partners, or persons in similar positions, or with its agencies, parent, subsidiaries, or other affiliates. In those cases, the Firm's professional

---

conspiracy has not caused any harm to W&C. If Plaintiffs choose to amend their complaint, they must be clear as to how this alleged abuse of power affected, or will affect, W&C itself.

[5] The Court DENIES the Quechan Defendant's motion to disqualify W&C as counsel for the Member Plaintiffs on this claim. (ECF No. 51.) The Quechan Defendants argue that by representing the Member Plaintiffs, W&C is representing "parties with adverse interests to the Tribe." (ECF No. 51-1 at 4.) They explain that because W&C previously represented the Tribe, it cannot now represent the Tribe's members because those parties are adverse in this litigation. The Member Plaintiffs, however, are not adverse to the Tribe in this litigation. The Members Plaintiffs are not suing the Tribe; rather, they are suing the Rosette Defendants. And there is no reason to believe that, if the Member Plaintiffs succeed in their malpractice claim, the Tribe would be harmed in any way. The only consequence of a successful malpractice claim by the Member Plaintiffs would be that the Rosette Defendants will pay damages to the Member Plaintiffs.

responsibilities are owed only to that entity, alone . . . . Of course, Firm can also represent individual members, . . . but any such representation will be the subject of a separate engagement letter.

(ECF No. 54-2 at 26.[6])  This document makes clear that the Rosette Defendants did not represent the Tribe's individual members.  The Member Plaintiffs respond by arguing that even if the contract between Quechan and the Rosette Defendants excluded the individual Quechan members as recipients of those legal services, the Rosette Defendants held a duty to protect the Quechan membership because it was foreseeable that any negligence by the Rosette Defendants would harm Quechan's membership.  The Court agrees.

Even assuming the attorney services agreement between Rosette LLP and Quechan is judicially noticeable, the fact of that agreement does not preclude the Member Plaintiffs from pursuing a malpractice claim.  Under California law, an individual may pursue a legal malpractice claim against an attorney even if the plaintiff and attorney were never previously in privity.  In *Lucas v. Hamm* the Supreme Court of California rejected the proposition that beneficiaries of a will could not sue an attorney for negligently preparing the will on the ground that the beneficiaries and the attorney were never in privity.  364 P.2d 685 (Cal. 1961).  In explaining this doctrine, the court noted:

[T]he determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury, and the policy of preventing future harm.

*Id.* at 687.  The predominant inquiry in this analysis "is whether the principal purpose of the attorney's retention is to provide legal services for the benefit of the plaintiff." *Goldberg v. Frye*, 266 Cal. Rptr. 483, 489 (Ct. App. 1990).

---

[6] The cited pagination of Defendants' exhibits refer to the pagination provided by the CM/ECF system.

3:17-cv-01436-GPC-MDD

Considering the facts alleged in the FAC, the policy considerations discussed above lead to the conclusion that the Member Plaintiffs may pursue a malpractice claim against the Rosette Defendants. The purpose of the transaction for which the Rosette Defendants were responsible—the compact negotiations with California—was to increase Quechan's wealth, which is distributed to its members in the form of per capita payments. (*See* FAC ¶ 236.) As a result, Quechan's efforts in renegotiating its compact with California were motivated by, at least in substantial part, an intention to benefit its members. If the Rosette Defendants' malpractice resulted in higher costs and lower revenues to the Tribe, it is reasonably foreseeable that the members would be harmed in the form of lower per capita payments. Such loss to the members is both certain and closely connected: if the Tribe holds fewer funds, the distributions to members will be lower. Because Quechan is nothing if not a collection of its members, the principal purpose of Quechan retaining the Rosette Defendants to obtain a favorable outcome of the compact negotiations was to benefit the financial lives of Quechan's members.

### ii. Sufficiency of the Allegations

Having concluded that the Member Plaintiffs may pursue a malpractice claim against the Rosette Defendants, the Court must next consider whether they have sufficiently stated such a claim. The Court agrees with the Rosette Defendants that the FAC's allegations of malpractice are insufficient.

The FAC does not point to any conduct by the Rosette Defendants suggesting their representation fell below the appropriate standard of care. Rather, the FAC focuses only on the consequences of the Rosette Defendants' representation. It points to the fact that Quechan ended up with a compact that was less favorable for Quechan than W&C's last draft compact. In this sense, the Member Plaintiffs' theory resembles one of *res ipsa loquitor*: because the outcome of the Rosette Defendants's negotiations differed significantly from what California offered W&C, they argue, one can infer negligence on the part of the Rosette Defendants.

It may be the case that these allegations would normally suffice to raise an

inference of negligence. But here, the FAC includes a wrinkle fatal to the Member
Plaintiffs' theory. According to the FAC, California's bargaining stance changed
dramatically after Quechan switched its representation from W&C to Rosette. (FAC ¶
205 ("The reason Quechan did not immediately execute the compact after putative
President Keeny Escalanti removed [W&C] from the representation seems to be that the
Office of the Governor changed its negotiation position following the firm switch,
suddenly demanding that Quechan pay back all the revenue sharing payments that the
tribe missed under the 2007 Amendment.").) In light of this fact, the differences between
Quechan's final compact and W&C's draft are not stark enough to draw a reasonable
inference of negligence by the Rosette Defendants.

As the FAC states, "the core material terms" of Quechan's finalized compact "are
*one and the same* with those negotiated by [W&C] up through the draft compact it sent to
the State of California on June 21, 2017." (FAC ¶ 202 (emphasis added).) The largest
difference between W&C's draft and the finalized compact is that Quechan was required
to repay half what it had withheld from California under the 2007 Amendment. (*Id.* ¶
206.) But as the FAC concedes, this was the result of California's negotiators "suddenly"
changing their position and demanding that Quechan pay back *all* of what Quechan
owed. (*Id.* ¶ 205.) The FAC explains that the Rosette Defendants were able to negotiate
that demand down to Quechan paying only half of what it previously owed. (*Id.* ¶ 206.)
The remaining differences between W&C's draft compact and the final compact—which
the FAC itself calls "ancillary" (FAC ¶ 204)—are not significant enough to suggest that
the Rosette Defendants negligently concluded the compact negotiations.

It is *possible* that the Rosette Defendants were negligent in negotiating on behalf of
Quechan, and that this negligence resulted in a compact less favorable to Quechan. But
the Member Plaintiffs' failure to allege any unreasonable conduct by the Rosette
Defendants leaves their negligence theory short of plausible. By failing to allege facts
pertaining to the Rosette Defendants' actual conduct during the Quechan negotiations, the
Member Plaintiffs rely solely on the differences between W&C's draft compact and the

final compact signed by Quechan. The difference between the two compacts, however, is not so severe to raise the inference of negligence the Member Plaintiffs suggest. As a result, the Member Plaintiffs' allegations are insufficient to state a claim of legal malpractice.[7]

Further amendment, however, may nudge this claim "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). As a result, the Court dismisses this claim without prejudice.

### III. Conclusion

For the reasons explained above, the Court issues the following rulings:

1. The Quechan Defendants' motion to dismiss (ECF No. 50) is **GRANTED in part and DENIED in part**.

2. The Quechan Defendants' motion to disqualify W&C as counsel for the Member Plaintiffs (ECF No. 51) is **DENIED**.

3. The Rosette Defendants' motion to dismiss (ECF No. 53) is **GRANTED**.

4. The Rosette Defendants' motion to strike Count Eight (ECF No. 52) is **DENIED as moot**.

5. Plaintiffs' *ex parte* motion to exclude declarations and continue consideration of the above motions (ECF No. 62) is **DENIED as moot**.

The Court dismisses Counts Three, Five, Six, Seven, and Eight. Because this is the first time the Court has addressed these deficiencies in Plaintiffs' pleadings, and for the additional reasons listed above, the Court dismisses these claims without prejudice. However, because the fee agreement between W&C and Quechan makes clear that W&C is not entitled to a "contingency fee" under Section 5, any amendment in an effort to save that aspect of the breach of contract claim would be futile. The Court therefore dismisses

---

[7] In light of the Court's dismissal of Count Eight, the Rosette Defendants' motion to strike that count (ECF No. 52) is DENIED as moot. Moreover, in reaching its conclusions as to Counts Six, Seven, and Eight, the Court did not rely on the declarations found at ECF Nos. 50-4, 52-2, or 52-3. As a result, the remaining portion of Plaintiffs' motion to exclude (ECF No. 62) is also DENIED as moot.

with prejudice Count One to the extent that it alleges a breach of Section 5 of the fee agreement.

The Court notes that a motion by Plaintiffs seeking leave to file a supplemental complaint is currently pending in this case. (ECF No. 71.) A hearing for that motion is currently scheduled for July 6, 2018, and the deadline for responsive memoranda has not yet passed. In light of the pendency of that motion, the Court orders the following. If Plaintiffs wish to file an amended complaint responding to the deficiencies discussed in this ruling, they may wait to do so until the Court rules on their motion for leave to file a supplemental complaint, after which they may file one comprehensive operative complaint. Once the Court rules on the motion to file supplemental pleadings, the Court will set a deadline for Plaintiffs to file an amended complaint.

**IT IS SO ORDERED.**

Dated: June 7, 2018

Hon. Gonzalo P. Curiel
United States District Judge