UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAMS & COCHRANE, LLP, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>QUECHAN TRIBE OF THE FORT YUMA INDIAN RESERVATION, et al.,<br><br>Defendants. | Case No.: 3:17-cv-01436-GPC-MDD<br><br>**ORDER:**<br><br>**(1) DENYING MOTION TO STRIKE [ECF No. 95]; and**<br><br>**(2) DENYING MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT [ECF No. 105]** |

On June 7, 2018, the Court granted in part and denied in part motions to dismiss the First Amended Complaint ("FAC") in this case. (ECF No. 89.) The Court granted Plaintiffs leave to amend. (*Id.* at 38.) Before Plaintiffs filed a second amended complaint, Defendant Quechan Tribe of the Fort Yuma Indian Reservation filed an answer to the FAC with counterclaims against Plaintiff Williams & Cochrane. (ECF No. 94.) Williams & Cochrane has moved to strike that answer. (ECF No. 95.) Plaintiffs have also since filed a Second Amended Complaint ("SAC") (ECF No. 100), and a motion for leave to file a third amended complaint (ECF No. 105-1). For the reasons set forth below, the Court denies both of Plaintiffs' motions.

//

## I. Background

In its previous ruling on Defendants' motions to dismiss the FAC, the Court detailed the wide-ranging allegations in this case. (ECF No. 89 at 2–13.) The Court will not repeat that level of detail here.

This lawsuit involves two categories of claims. The first category contains claims by Plaintiff Williams & Cochrane ("W&C") against (1) its former client Quechan Tribe of the Fort Yuma Indian Reservation ("Quechan," or the "Quechan Tribe"), members of Quechan's leadership Keeny Escalanti, Sr., and Mark William White (collectively, with Quechan, the "Quechan Defendants"), and (3) attorneys Robert Rosette and Richard Armstrong and their law firm organizations (collectively, the "Rosette Defendants"). According to the allegations, Rosette represented the Pauma Band of Mission Indians ("Pauma") in litigation against the State of California over a gaming compact. At the time, the attorneys that now make up W&C, Cheryl Williams and Kevin Cochrane, worked for Rosette, and they handled the vast majority of Pauma's litigation. After Williams and Cochrane left Rosette's firm to create W&C, Pauma chose to hire W&C to complete their litigation, which ended in Pauma's favor. Despite Williams and Cochrane's performing the vast majority of the work in Pauma's case, Rosette advertises that he is responsible for Pauma's litigation success.

After hearing about Pauma's success, Quechan hired W&C to resolve a similar dispute with the State of California. W&C and Quechan signed a fee agreement containing two relevant provisions. First, in Section 5 of the agreement, Quechan agreed to pay W&C a contingency fee based on a proportion of Quechan's "net recovery" after the conclusion of its dispute with California. Second, in Section 11 of the agreement, the parties agreed that while Quechan could fire W&C at any time, if it did so prior to Quechan becoming "entitled to" any of the net recovery envisioned in Section 5, Quechan was obligated to pay W&C a reasonable fee based on various factors. After the parties signed this agreement, W&C engaged in negotiations with the State on Quechan's behalf. Just days before Quechan was set to sign a new compact with California,

however, Quechan sent W&C a letter firing W&C as its counsel. In the letter, Quechan indicated that it would not pay W&C *any* fee, even the fee envisioned in Section 11. The letter stated that Quechan would now be represented by Rosette's firm.

A few months later, Quechan—represented by Rosette—finalized a compact with California that, according to Plaintiffs, was significantly less advantageous for Quechan than the agreement W&C had reached prior to being fired. Based on the allegations just described, W&C asserts claims of (1) breach of contract and the implied covenant of good faith and fair dealing against the Quechan Defendants, and (2) Lanham Act and RICO violations against the Rosette Defendants, Escalanti, and White.

The second category of claims (or claim, really) in this suit is an allegation of malpractice by a putative class of members of the Quechan Tribe against the Rosette Defendants. They allege that the Rosette Defendants negligently handled Quechan's negotiations with California.

The Proposed Third Amended Complaint ("PTAC") seeks to add a claim of "intentional interference with contract/prospective economic advantage" by W&C against the Rosette Defendants and new proposed defendants Christopher Casamassima—who represents the Quechan Defendants in this case—and Casamassima's law firm Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"). (ECF No. 105-2 at 81–84.[1]) The PTAC alleges that these defendants have intentionally interfered with W&C's relationships with Quechan and Pauma. With respect to Quechan, the PTAC alleges that (1) during a June 16, 2017 meeting with Escalanti and White, Rosette learned that W&C was representing Quechan; (2) Rosette then "solicited taking over the California compact negotiation work using representations and promotional materials he maintains in the ordinary course of business that erroneously claim he is responsible for successfully litigating the *Pauma* lawsuit on which the Quechan work was in part based"; and (3) this

---

[1] References to specific pages in the record correspond with the pagination provided by the CM/ECF system.

caused Quechan to repudiate its fee agreement days before Quechan was set to complete their compact negotiation with California. (*Id.* at 82–83 ¶ 245.)

With respect to W&C's relationship with Pauma, the PTAC alleges that Rosette and "the attorneys with WilmerHale" have been "targeting" Pauma. (*Id.* at 83 ¶ 246.) These efforts include "undo[ing] the sealing orders in this case" by (1) filing a declaration by California negotiator Joe Dhillon in which he disclosed "all of the confidential negotiation materials [W&C] transmitted to the State during the course of the negotiations," and (2) "disseminating" an unredacted version of the otherwise sealed operative complaint in this case "to at least two individuals affiliated with Pauma." (*Id.*) The PTAC also claims that these defendants filed a "premature" answer to the FAC—which, as discussed above, was filed after the Court's ruling on the motions to dismiss the FAC, but before Plaintiffs filed the SAC—that contains "a slew of punitive cross claims, which [the defendants] then relayed, or caused to be relayed, to Pauma tribal members with the message that such claims are definitive proof that [W&C] acted in an unethical manner in connection with its representation of Quechan." (*Id.*; *see also id.* at 55–58 ¶¶ 169–78.) These actions have "resulted in Pauma scheduling an imminent meeting to discuss [W&C]'s employment future with" Pauma. (*Id.* at 83 ¶ 246.) According to Plaintiffs, "[e]ven if this special meeting does not result in termination, the actions by Robert Rosette and WilmerHale have so tainted the waters at Pauma that [W&C]'s relationship with the tribe is likely irreparably damaged, and one that is now unlikely to continue long term." (*Id.* at 57–58 ¶ 178.)

## II. Motion to Amend

### A. Legal Standard

Federal Rule of Civil Procedure 15(a)(2) provides that after a party has amended its pleading as a matter of course, the party may only amend its pleading "with the opposing party's written consent or the court's leave." When the Court is asked for leave to amend a complaint, the Court "should freely give leave when justice so requires." *Id.* Courts in this circuit must apply "extreme liberality" to requests for leave to amend a

complaint. *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014). The Court nonetheless must consider five factors "to assess the propriety of a motion for lave to amend: bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint." *Id.* (quoting *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004)). With respect to futility, while courts ordinarily do not engage in a full application of the Rule 12(b)(6) standard to determine whether the proposed amendment states a plausible claim for relief, *e.g.*, *TV Ears, Inc. v. SYK Grp., LLC*, No. 16-cv-867-GPC-WVG, 2016 WL 7336623, at *2 (S.D. Cal. Dec. 19, 2016), "the validity of the proposed amended pleading is at the heart of the futility analysis," *Gaitan v. Mortg. Elec. Registration Sys.*, No. EDCV 09-10009 VAP (MANx), 2009 WL 3244729, *4 (C.D. Cal. Oct. 5, 2009).

**B. Discussion**

Defendants' arguments against the motion to amend sound mainly in futility and prejudice. Because the Court agrees that the proposed amendment in the PTAC is futile, it need not consider Defendants' prejudice arguments.

To state a claim for tortious interference of contract, a plaintiff must plead (1) "a valid contract between plaintiff and a third party"; (2) "defendant's knowledge of this contract"; (3) "defendant's intentional acts designed to induce a breach or disruption of the contractual relationship"; (4) "actual breach or disruption of the contractual relationship"; and (5) "resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 589–90 (Cal. 1990). "The tort of interference with prospective economic advantage protects the same interest in stable economic relationships as does the tort of interference with contract, though interference with prospective advantage does not require proof of a legally binding contract." *Id.* at 590. To state a claim for tortious interference with prospective economic advantage, a plaintiff must plead (1) "an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff"; (2) "the defendant's knowledge of the relationship"; (3) "intentional acts on the part of the defendant designed to disrupt the

relationship"; (4) "actual disruption of the relationship"; and (5) "economic harm to the plaintiff proximately caused by the acts of the defendant." *Id.* at 590 n.2.

### i. W&C's Relationship with Pauma

As an initial matter, it is clear that adding W&C's intentional interference claim with respect to alleged interference with W&C's relationship with Pauma, as proposed, would be futile. The only allegations in the PTAC that suggest any harm to that relationship are that (1) Pauma has called a meeting to discuss its relationship with W&C, (2) the "waters" of the relationship between W&C and Pauma have been "tainted," and (3) the relationship is "likely irreparably damaged." (ECF No. 105-2 at 57–58 ¶¶ 177, 178.) With respect to the first allegation, the fact that a meeting has been called does not suggest that Pauma will, with any level of appreciable certainty, decide to terminate W&C as its counsel. As for the latter two allegations, they are much too vague to suggest any type of harm. *Cf. Blantz v. Cal. Dep't of Corrs. & Rehab.*, 727 F.3d 917, 927 (9th Cir. 2013) (affirming denial of leave to amend because the proposed allegations were too conclusory to survive the Rule 12(b)(6) standard).[2]

Of course, if in the future Pauma severs ties with W&C or that relationship is harmed in some concrete way, W&C might be able to satisfy the harm elements of the interference with contract or economic advantage claims. But the Court will not permit W&C to add a claim premised on events that have not yet occurred. Thus, the Court will deny leave to amend as to this aspect of the interference claim without prejudice to W&C reasserting it in the event that concrete harm to this relationship occurs.

//

---

[2] Because the Court finds that adding this aspect of the interference claim would be futile on the ground that no damage is adequately alleged, it is unnecessary to reach the parties' arguments over whether the litigation privilege applies to this aspect of the claim. It should be noted, however, that the validity of one of the decisions relied upon by Plaintiffs in resisting the application of that privilege, *Cutter v. Brownbridge*, 228 Cal. Rptr. 545 (Ct. App. 1986), has been seriously called into question by an intervening decision of the Supreme Court of California, *see Jacob B. v. Cty. of Shasta*, 154 P.3d 1003 (Cal. 2007).

### ii. W&C's Relationship with Quechan

While a closer question, adding an intentional interference claim with respect to alleged interference with W&C's relationship with Quechan would also be futile because the Rosette Defendants' actions, as alleged, fall within California's statutory litigation privilege. California Civil Code 47(b) immunizes, in relevant part, "publications" or "broadcasts" in any "judicial proceeding." Despite its brevity, Section 47(b)'s breadth "cannot be understated." *Finton Constr. Inc. v. Bidna & Keys, APLC*, 190 Cal. Rptr. 3d 1, 10–11 (Ct. App. 2015). It is a codification of a longstanding common-law immunity for "communications with 'some relation' to judicial proceedings." *Rubin v. Green*, 847 P.2d 1044, 1047 (Cal. 1993). The purpose of this immunity is to protect access to the courts and maximize litigants' abilities to "secure and defend their rights." *Id.* It also encourages an attorney to zealously protect her clients' interests by protecting the attorney "from the fear of subsequent derivative actions for communications made in the context of judicial proceedings." *Edwards v. Centex Real Estate Corp.*, 61 Cal. Rptr. 2d 518, 527 (Ct. App. 1997). "California courts have given the privilege an expansive reach, and held that the privilege is absolute, even if the result is inequitable"; "any doubt as to whether the privilege applies is resolved in favor of applying it." *Morales v. Coop. of Am. Physicians, Inc., Mut. Prot. Tr.*, 180 F.3d 1060, 1062 (9th Cir. 1999) (citation omitted). The litigation privilege immunizes defendants "from tort liability based on theories of . . . intentional inducement of breach of contract [and] intentional interference with prospective economic advantage." *Silberg v. Anderson*, 786 P.2d 365, 371 (Cal. 1990) (citations omitted).

In *Rubin*, the Supreme Court of California held that the litigation privilege precludes contract-interference claims resulting from attorneys' unlawful solicitation of clients. There, Rubin—part owner of a mobile home park—sued Green—an attorney and resident of the same park—and her law firm for illegally soliciting park residents to join a suit against Green. 847 P.2d at 1045–46. The court first held that Green and her firm's solicitations of the residents were protected by the privilege: "[w]hether these acts

amounted to wrongful attorney solicitation or not, they were communicative in their essential nature and therefore within the privilege of section 47(b)." *Id.* at 1049. The court then considered "the extent of that protection," and determined that Rubin's claims, including the claim for intentional interference with contract, could not proceed. *See id.* at 1053 ("[T]he conduct of defendants alleged in the complaint is . . . absolutely immune from civil tort liability, including plaintiff's interference with contract and related claims."). In reaching that conclusion, the court balanced the "utility of permitting a litigant in a civil action to maintain an unlawful solicitation claim against the attorneys for the opposing party against the untoward effects of such a proceeding on the administration of civil justice." *Id.* at 1050. It noted that permitting such claims would disrupt access to counsel, intimidate and distract attorneys, and "dampen" the "unobstructed presentation of claims which we have identified as the central value supporting limitations on other derivative tort actions." *Id.* What's more, permitting Rubin's suit to punish illegal solicitation would have "marginal" value because other protections against such conduct existed: (1) California's criminalization of "solicitation through the use of 'runners' or 'cappers,'" and (2) the state bar's power to discipline attorneys who engage in misconduct. *Id.* at 1050–51. The court expressly rejected Rubin's argument that these alternate enforcement routes were inadequate to prevent attorney misconduct; according to the court, the answer to that problem was not to encourage litigation like Rubin's. *Id.* at 1051 ("[I]t does not follow that we should adopt a remedy that itself encourages a spiral of lawsuits.").

Here, of course, the circumstances of W&C's intentional interference claim differ from those in *Rubin* because the Rosette Defendants and W&C were not opposing counsel in some other litigation. Rather, according to W&C, Rosette Defendants took W&C's client using misrepresentations. But that makes no difference with respect to the litigation privilege. *Olsen v. Harbison*, 119 Cal. Rptr. 3d 460, 469 (Ct. App. 2010) ("Plaintiff asserts that the trial court erred in granting summary adjudication on his cause of action for intentional interference with contractual relations because defendant and

8

plaintiff were not adverse parties at the time defendant made his statements. *The litigation privilege does not include such a requirement*." (emphasis added)). Permitting W&C's suit under these circumstances would have the same adverse effects discussed in *Rubin*: it would make it more difficult for a litigant (or potential litigant) receiving bad legal advice from obtaining better counsel, because that better counsel would be "intimidated" and "distracted" by the threats of action by the litigant's current counsel. Moreover, the value of permitting such a claim would, just as in *Rubin*, be marginal. If the Rosette Defendants lied to Quechan in order to get its business, the state bar surely can take action against the Rosette Defendants. And as the Court has previously found, Plaintiffs may pursue an action under the Lanham Act against the Rosette Defendants for putting false information about Rosette's accomplishments in their advertisements. The fact that these alternative means of policing the Rosette Defendants' conduct might not be perfect, as the *Rubin* court explained, does not warrant allowing W&C's intentional interference claim.

This reasoning led the court in *Grant & Eisenhofer, P.A. v. Brown*, No. CV 17-5968 PSG (PJWx), 2017 WL 6343506 (C.D. Cal. Dec. 6, 2017), to reach the same conclusion under analogous facts. There, the plaintiff-law-firm ("G&E") sued its former client and other attorneys after the client refused to pay G&E its fee after the client reached a substantial settlement. *Id.* at *1. G&E brought an interference claim against the defendant-attorneys, who G&E claimed "continue[d] to interfere with [the client's] obligation to share with G&E" the fees to which G&E was entitled. *Id.* at *2. Addressing an anti-SLAPP motion by the defendant-attorneys, the court found that G&E had no probability of prevailing on its interference claim because the defendant-attorneys' actions were immunized by California's litigation privilege. *Id.* at *5–7. The court explained:

> A cornerstone of any client's rights is the ability to select counsel of her choosing. As underhanded as the actions of [defendant-attorneys] may have been, communications and related acts in service of a client's selection of the best possible lawyer for her case is the sort of activity that falls within

the ambit of both the anti-SLAPP statute and the litigation privilege. *Id.* at *7 (internal quotation marks omitted). *Grant* took significant guidance from *Olsen*, in which the Court of Appeal held that the privilege applied under analogous facts. There, after plaintiff and defendant—both attorneys—signed a fee-sharing arrangement for their representation of a single client, the client fired plaintiff and kept defendant as her sole counsel. 119 Cal. Rptr. 3d at 463. After the client settled the case a few weeks later, she refused to pay plaintiff any fee. *Id.* Plaintiff brought a claim against defendant for, *inter alia*, intentional interference of contract. *Id.* The Court of Appeal affirmed the trial court's conclusion that the litigation privilege applied and precluded this claim. *Id.* at 469–70.

Plaintiffs respond with two arguments, neither of which are persuasive. First, they attempt to cast the Rosette Defendants' actions as "conduct," rather than communication. The *Rubin* court rejected the same exact argument. It explained:

> Nor does the fact that defendants' communications with the [park] residents necessarily involved related acts destroy the privilege. . . . Judging from the allegations of the amended complaint, plaintiff's claims, however styled, are founded essentially upon alleged misrepresentations made by the law firm (and Green) to [park] residents in the course of discussions over park conditions and the possibility of being retained to prosecute the failure-to-maintain action, and the subsequent filing of pleadings in the lawsuit itself. Whether these acts amounted to wrongful attorney solicitation or not, they were communicative in their essential nature and therefore within the privilege of section 47(b).

847 P.2d at 1048–49 (citations omitted). The same applies here: the Rosette Defendants engaged in communication when they allegedly convinced Quechan to cut ties with W&C in their negotiations with California. Plaintiffs also attempt to cast these actions—soliciting Quechan to fire W&C and hire Rosette—simply as "false commercial advertising," thereby suggesting that Rosette never actually spoke or personally solicited Quechan's business. But the SAC's allegations belie this assertion. According to the SAC, Rosette met with Defendants White and Escalanti and convinced them to fire W&C and hire Rosette to complete Quechan's negotiations with California. (SAC ¶¶ 180–88.)

These are undoubtedly communications; under *Rubin*, they fall within the litigation privilege.

Second, Plaintiffs argue that because the Rosette Defendants' solicitation of Quechan was unlawful and also violated California's Rules of Professional Conduct, it is not covered by the privilege. (ECF No. 124 at 8.) But, as just noted above, *Rubin* makes clear that even unlawful communications are covered by the litigation privilege. 847 P.2d at 1049 ("Whether these acts amounted to wrongful attorney solicitation or not, they were communicative in their essential nature and therefore within the privilege of section 47(b)."). In support of their position, Plaintiffs cite *Coretronic Corp. v. Cozen O'Connor*, 121 Cal. Rptr. 3d 254 (Ct. App. 2011), *Gaynor v. Bulen*, 228 Cal. Rptr. 3d 243 (Ct. App. 2018), and *Chodos v. Cole*, 148 Cal. Rptr. 3d 451 (Ct. App. 2012), asserting that these decision held that unlawful activity is not "protected." But these decisions dealt with the protections of California's anti-SLAPP law, which enables defendants to strike causes of action that implicate defendants' constitutional rights to free speech and petitioning activity. *See* Cal. Code Civ. Proc. § 425.16(b)(1) ("A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."). In *Coretronic*, *Gaynor*, and *Chodos*, the courts held that the anti-SLAPP law could not operate in those cases because the defendants' conduct did not fall within their *constitutional rights to free speech or to petition the government*. That determination is distinct from the issue of whether communications are privileged under California's statutory litigation privilege.

It is clear that the litigation privilege immunizes the Rosette Defendants' actions in soliciting Quechan to fire W&C and hire Rosette to complete the negotiations with California. With respect to this aspect of the intentional interference claim, there is "no set of facts [that] can be proved under the amendment to the pleadings that would

constitute a valid and sufficient claim." *Miller v. Rykof-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1998). As a result, the Court denies, with prejudice, leave to add this aspect of the proposed interference claim.

### III. Motion to Strike

After the Court issued its first motion to dismiss ruling in this case, but before Plaintiffs filed the SAC, Quechan filed an answer to the FAC that included several counterclaims against W&C. (ECF No. 94.) Plaintiffs have filed a motion to strike that filing. (ECF No. 95.) According to Plaintiffs, Quechan's answer was procedurally improper because at the time Quechan filed it, the Court was considering a motion by Plaintiffs for leave to file a supplemental complaint. Regardless of whether it was improper for Quechan to file that answer, striking the answer is not appropriate under these circumstances. Federal Rule of Civil Procedure 12(f) allows the Court to strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Quechan's answer is not redundant, immaterial, impertinent, or scandalous. Moreover, motions to strike are generally disfavored. *See Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 965 (9th Cir. 2014).

The procedural posture of this case does raise the question of whether W&C must answer Quechan's counterclaims even though W&C has since filed the SAC. The answer is yes. Despite W&C's filing of the SAC, Quechan's counterclaims are currently operative. A plaintiff's filing of an amended complaint does not moot a counterclaim alleged within an answer to the original complaint. *See Hayden v. Ariz. Pool & Fountain Guys, LLC*, No. CV-16-00840-PHX-SRB, 2016 WL 9456363, at *1 (D. Ariz. Aug. 2, 2016) (because "[w]hile an amendment to a complaint requires revisions to answer, it does not necessitate revisions to a counterclaim," counterclaims are not "mooted by [an] Amended Complaint"). Regardless of what happens to W&C's claims, Quechan's counterclaims have been asserted and must be answered. The Court will give W&C 14 days from the date this order is issued to file an answer to Quechan's counterclaims.

//

## IV. Conclusion

In sum, the Court concludes that permitting Plaintiffs to file the Proposed Third Amended Complaint would be futile. With respect to the proposed claim regarding intentional interference with W&C's relationship with Pauma, the Court denies leave to amend without prejudice. With respect to alleged interference with W&C's relationship with Quechan, however, the Court denies leave to amend with prejudice. The Court also concludes that striking Quechan's answer to the FAC is inappropriate. Within 14 days, W&C must file an answer to Quechan's counterclaims. (*See* ECF No. 94 at 15–24.)

**IT IS SO ORDERED.**

Dated: August 20, 2018

Hon. Gonzalo P. Curiel
United States District Judge