1  Cheryl A. Williams (Cal. Bar No. 193532)
2  Kevin M. Cochrane (Cal. Bar No. 255266)
   caw@williamscochrane.com
3  kmc@williamscochrane.com
   WILLIAMS & COCHRANE, LLP
4  125 S. Highway 101
   Solana Beach, CA 92075
5  Telephone: (619) 793-4809

6  Attorneys for Plaintiffs
7  WILLIAMS & COCHRANE, LLP, *et al.*

8              **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10

11  **WILLIAMS & COCHRANE, LLP**; *and*           Case No.: 17-CV-01436 GPC MDD
    **FRANCISCO AGUILAR, MILO**
12  **BARLEY, GLORIA COSTA,**                      **MEMORANDUM OF POINTS**
    **GEORGE DECORSE, SALLY**                      **AND AUTHORITIES IN**
13  **DECORSE**, *et al., on behalf of themselves*  **SUPPORT OF WILLIAMS &**
    *and all those similarly situated*;            **COCHRANE'S MOTION TO**
14                                                  **DISMISS QUECHAN TRIBE'S**
                                                    **ANSWER TO PLAINTIFFS'**
15       *(All 27 Individuals Listed in ¶ 12)*      **FIRST AMENDED COMPLAINT**
                                                    **AND COUNTERCLAIMS**
16              Plaintiffs,                          **PURSUANT TO FEDERAL**
                                                    **RULES OF CIVIL PROCEUDRE**
17       vs.                                        **12(b)(1) AND 12(b)(6) [ECF NO.**
                                                    **94]**
18
    **ROBERT ROSETTE**; **ROSETTE &**              Date:    November 30, 2018
19  **ASSOCIATES, PC**; **ROSETTE, LLP**;          Time:    1:30 PM
    **RICHARD ARMSTRONG**;                         Dept:    2D
20  **QUECHAN TRIBE OF THE FORT**                  Judge:   The Honorable Gonzalo P.
    **YUMA INDIAN RESERVATION**, *a*                        Curiel
21  *federally-recognized Indian tribe*;
    **KEENY ESCALANTI, SR.**; **MARK**
22  **WILLIAM WHITE II**, *a/k/a WILLIE*
    *WHITE*; *and* **DOES 1 THROUGH 100**;
23
                Defendants.
24

25

26

27

28
                                                    Case No.: 17-CV-01436 GPC MDD
      MEM. OF P. & A. ISO MOT. TO DISMISS TRIBE'S ANSWER & COUNTERCLS.

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………… 1

ARGUMENT ………………………………………………………………5

I.    QUECHAN LACKS ARTICLE III STANDING TO RAISE THE COUNTER-
CLAIMS BECAUSE IT HAS NOT SHOWN A CONCRETE INJURY THAT
IS ATTRIBUTABLE TO WILLIAMS & COCHRANE …………………….. 5

II.    COUNTERCLAIM ONE FOR BREACH OF FIDUCIARY DUTY IS BASED
UPON NON-PARTICULAR AND/OR NONSENSICAL MISREPRESENTA-
TIONS ABOUT A MATTER THAT TURNED OUT FOR QUECHAN'S EX-
TREME BENEFIT ………………………………………………….. 9

A. LEGALLY-INSUFFICIENT, NONSENSICAL ARGUMENT …………………9

B. FAILURE TO SATISFY THE HEIGHTENED PLEADING STANDARD ………. 9

C. LACK OF CAUSATION ………………………………………….. 10

D. NON-ACTIONABLE OPINIONS AS TO FUTURE EVENTS, NOT
PROMISES ………………………………………………… 11

E. CONTRACT EXPRESSLY DISCLAIMS PROMISES ……………………… 11

F. WHAT HARM? …………………………………………………12

III.    COUNTERCLAIM TWO FOR THE BREACH OF THE IMPLIED COVEN-
ANT OF GOOD FAITH AND FAIR DEALING DOES NOT GEL WITH
EITHER THE TERMS OR PURPOSES OF THE ATTORNEY-CLIENT FEE
AGREEMENT …………………………………………………12

A. NO SECOND-GUESSING OF REASONED PROFESSIONAL DECISIONS ….. 13

B. THE LENGTH OF THE REPRESENTATION IS CONTRACTUALLY AWE-
SOME …………………………………………………... 15

C. THE LEVEL OF PRODUCTIVITY IS CONTRACTUALLY IRRELEVANT …... 16

i    Case No.: 17-CV-01436 GPC MDD

MEM. OF P. & A. ISO MOT. TO DISMISS TRIBE'S ANSWER & COUNTERCLS.

IV.    COUNTERCLAIM THREE FOR NEGLIGENCE RAISES A VAGUE ETHI-
       CAL VIOLATION THAT IS ILL-SUITED FOR THIS FORUM ..................... 16

       A. WRONG FORUM ....................................................................17

       B. CLAIM IS NOT PLAUSIBLE ................................................... 17

       C. QUECHAN IS THE PROXIMATE CAUSE OF ITS HARMS ................... 18

       D. WHAT DAMAGES? ...............................................................19

V.     COUNTERCLAIM FOUR FOR BREACH OF CONTRACT ALLEGES AN IM-
       MATERIAL BREACH OF A CONTRACT THAT QUECHAN PREVIOUSLY
       REPUDIATED ........................................................................20

       A. CLAIM FORECLOSED BY QUECHAN'S PRIOR BREACH ...................20

       B. CLAIMED BREACH IS IMMATERIAL ........................................ 21

       C. DAMAGES ARE UNFORESEEABLE, UNCERTAIN, AND ENTIRELY
          AVOIDABLE .....................................................................21

VI.    COUNTERCLAIM FIVE FOR UNFAIR COMPETITION IS NOT AVAILABLE
       TO A GOVERNMENTAL ENTITY LIKE QUECHAN, WHO WOULD NEVER-
       THELESS BE BARRED FROM RELIEF BY EQUITABLE DOCTRINES LIKE
       UNCLEAN HANDS AND IN PARI DELICTO ....................................22

       A. NO STANDING TO SUE ......................................................... 22

       B. ALLEGATIONS ARE NOT REASONABLY PARTICULAR ....................22

       C. SAFE HARBOR APPLIES ...................................................... 23

       D. REQUESTED MONETARY REMEDIES ARE UNAVAILABLE .................24

       E. EQUITY BARS RELIEF ........................................................24

VII.   COUNTERCLAIM SIX FOR RECOUPMENT/SETOFF IS NEITHER A COUN-
       TERCLAIM NOR AVAILABLE TO ONE WHO HAS ENGAGED IN INEQUIT-

ABLE CONDUCT ………………………………………………… 25

CONCLUSION ………………………………………………………….25

# TABLE OF AUTHORITIES

## CASES

*Allen v. Wright,*
    468 U.S. 737 (1984) ……………………………………………………… 8

*Aviel v. Sorgen,*
    2001 Cal. App. Unpub. LEXIS 3644 (1st Dist. 2002) ………………………… 17

*Cal. Med. Ass'n v. Regents of Univ. of Cal.,*
    79 Cal. App. 4th 542 (2d Dist. 2000) ……………………………………… 22

*Camp v. Jeffer, Mangels, Butler & Marmaro,*
    35 Cal. App. 4th 620 (2d Dist. 1995) ……………………………………… 24

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
    20 Cal. 4th 163 (1999) ……………………………………………………...24

*Chavez v. Carter,*
    256 Cal. App. 2d 577 (2d Dist. 1967) ……………………………………... 16

*City of St. Paul v. Evans,*
    344 F.3d 1029 (9th Cir. 2003) ……………………………………………...25

*Cohen v. S & S Const. Co.,*
    151 Cal. App. 3d 941 (4th Dist. 1983) ……………………………………... 11

*Cortez v. Purolator Air Filtration Prods. Co.,*
    23 Cal. 4th 163 (2000) ……………………………………………………...24

*Daly v. United Healthcare Ins. Co.,*
    2010 U.S. Dist. LEXIS 116048 (N.D. Cal. 2010) ………………………...13

*De Burgh v. De Burgh,*
    39 Cal. 2d 858 (1952) ……………………………………………………… 20

*Diamond v. Charles,*
    476 U.S. 54 (1986) ……………………………………………………….. 5

*///*

iv     Case No.: 17-CV-01436 GPC MDD

MEM. OF P. & A. ISO MOT. TO DISMISS TRIBE'S ANSWER & COUNTERCLS.

*Ebner v. Fresh, Inc.,*
 818 F.3d 799 (9th Cir. 2016) …………………………………………………23

*Estom Yumeka Tribe of Enter. Rancheria v. California,*
 163 F. Supp. 3d 769 (E.D. Cal. 2016) ………………………………… 15, 16

*FDIC v. Jacobs,*
 2014 U.S. Dist. LEXIS 6671 (D. Nev. 2014) …………………………………..25

*Friends of Earth, Inc. v. Laidlaw Envtl. Serv., Inc.,*
 528 U.S. 167 (2000) ………………………………………………………… 5

*Graham v. Bank of Am., N.A.,*
 226 Cal. App. 4th 594 (4th Dist. 2014) …………………………………… 11

*Hollingsworth v. Perry,*
 570 U.S. __, 133 S. Ct. 2652 (2013) ………………………………………... 5

*In re NationsMart Corp. Sec. Litig.,*
 130 F.3d 309 (8th Cir. 1997) …………………………………………………10

*In re Sizzler Rests. Int'l,*
 225 B.R. 466 (Bankr. C.D. Cal. 1998) ………………………………………... 13

*In re Straightline Invs.,*
 525 F.3d 870 (9th Cir. 2008) …………………………………………………25

*In re Tobacco Cases II,*
 240 Cal. App. 4th 779 (4th Dist. 2015) …………………………………… 24

*In re Vioxx Prods. Liab. Litig.,*
 874 F. Supp. 2d 599 (E.D. La. 2012) …………………………………….. 6, 7

*Khoury v. Maly's of Cal., Inc.,*
 14 Cal. App. 4th 612 (2d Dist. 1993) ………………………………………… 23

*Korea Supply Co. v. Lockheed Martin Corp.,*
 29 Cal. 4th 1134 (2003) …………………………………………………24

*Kraus v. Trinity Mgmt. Servs., Inc.,*
 23 Cal. 4th 116 (2000) …………………………………………………..24

v   Case No.: 17-CV-01436 GPC MDD

MEM. OF P. & A. ISO MOT. TO DISMISS TRIBE'S ANSWER & COUNTERCLS.

*Levy v. State Farm Mut. Auto Ins. Co.,*
    150 Cal. App. 4th 1 (4th Dist. 2007) …………………………………………… 13

*Mattco Forge, Inc. v. Arthur Young & Co.,*
    52 Cal. App. 4th 820 (2d Dist. 1997) ……………………………………… 19

*Maya v. Centex Corp.,*
    658 F.3d 1060 (9th Cir. 2011) ………………………………………………5, 8

*Nat'l Audubon Soc., Inc. v. Davis,*
    307 F.3d 835 (9th Cir. 2002) …………………………………………………... 8

*Nijjar v. Mittal,*
    2006 Cal. App. Unnpub. LEXIS 11741 (2d Dist. 2006) …………………………21

*Noble v. Sears, Roebuck & Co.,*
    33 Cal. App. 3d 654 (2d Dist. 1973) ……………………………………… 17

*Oetting v. Green Jacobsen, P.C.,*
    2014 U.S. Dist. LEXIS 31147 (E.D. Mo. 2014) ………………………………... 5

*Oil Express Nat'l, Inc. v. Burgstone,*
    958 F. Supp. 366 (N.D. Ill. 1997) …………………………………………..13

*Osornio v. Weingarten,*
    124 Cal. App. 4th 304 (6th Dist. 2004) ………………………………………10

*Pauma Band of Luiseno Mission Indians v. California,*
    813 F.3d 1155 (9th Cir. 2015) ……………………………………………… 1

*Reading Int'l, Inc. v. Malulani Grp., Ltd.,*
    2018 U.S. Dist. LEXIS 88583 (D. Haw. 2018) ………………………………...21

*Scharrer v. Fundamental Admin. Servs., LLC,*
    2013 U.S. Dist. LEXIS 195600 (M.D. Fla. 2013) …………………………24, 25

*Svela v. Union Oil Co. of Cal.,*
    807 F.2d 1494 (9th Cir. 1987) ………………………………………………..13

*Tellabs, Inc. v. Maker Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ………………………………………………………… 1

vi          Case No.: 17-CV-01436 GPC MDD
MEM. OF P. & A. ISO MOT. TO DISMISS TRIBE'S ANSWER & COUNTERCLS.

*Vaxiion Therapeutics, Inc v. Foley & Lardner LLP,*
    593 F. Supp. 2d 1153 (S.D. Cal. 2008) …………………………………... 10, 12

*Vess v. Ciba-Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003) …………………………………………...10

*Viner v. Sweet,*
    30 Cal.4th 1232 (2003) …………………………………………..5, 8, 19

*Walker v. Countrywide Home Loans, Inc.,*
    98 Cal. App. 4th 1158 (2d Dist. 2002) ……………………………….. 23

*Watson v. Bank of Am., N.A.,*
    2016 U.S. Dist. LEXIS 85580 (S.D. Cal. 2016) ………………………..23

*Wilhelm v. Pray, Price, Williams & Russell,*
    186 Cal. App. 3d 1324 (2d Dist. 1986) ……………………………... 17, 19

**STATUTES**

Indian Gaming Regulatory Act (25 U.S.C. § 2701 *et seq.*)
    *generally* ……………………………………………………………….7
    § 2710(d)(7)(B)(ii) …………………………………………………...7

California Business and Professions Code
    § 17201 ……………………………………………………………….. 22
    § 17204 ……………………………………………………………….. 22

**RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    8(c)(2) ……………………………………………………………….. 25
    9(b) ………………………………………………………………….. 10
    12(b)(1) ………………………………………………………………. 5
    12(b)(6) ………………………………………………………………. 5

Restatement (Second) of Contracts (1981)
    § 205 cmt. a ………………………………………………………….. 12
    § 237 …………………………………………………………………. 20
    § 237 illus. 1 …………………………………………………………. 20
    § 241 …………………………………………………………………. 21

§ 350 ……………………………………………………………..21
§ 351 ……………………………………………………………..21
§ 352 ……………………………………………………………..21

**SECONDARY SOURCES**

Black's Law Dictionary (7th ed. 1999)
        p. 794 ………………………………………………………… 25

Witkin, *Cal. Procedure* (3d ed. 1985)
        § 728 ……………………………………………………………..23

Richard A. Lord, *Williston on Contracts* (4th ed. 2002)
        § 63:3 ……………………………………………………………21

MEM. OF P. &. A. ISO MOT. TO DISMISS TRIBE'S ANSWER & COUNTERCLS.

**INTRODUCTION**

Never in the history federal litigation has a client been so pleased with supposed professional negligence. The Answer cherry picks certain actual and fictitious events and presents them in a vacuum in the hopes of painting the picture that Williams & Cochrane ("Firm") was derelict in its representation of the Quechan Tribe of the Fort Yuma Indian Reservation ("Quechan" or "Tribe") – from being too slow, to too unproductive, to too non-compliant, to too avaricious. This last accusation is a rather brazen one for Quechan's litigation counsel WilmerHale to make seeing that it has now billed the Tribe in excess of **$1.5 million** (*i.e.*, roughly 1/4th of the total damages sought against Quechan) to defend a suit that is still in the pleading stage. *See* Williams Decl., Ex. 1. This fanciful depiction of events is anything but accurate, however – a fact that becomes evident after filling in the narrative gaps with a few pieces of key evidence that are referenced in the underlying First (and now Second) Amended Complaint. *See Tellabs, Inc. v. Maker Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (requiring consideration of the entire complaint and other sources that are incorporated by reference or judicially noticeable).

The genesis of this case is Quechan hiring Williams & Cochrane on a largely contingency basis to obtain a replacement tribal/State gaming compact with the State of California, right as the Firm was receiving a significant amount of press for prevailing in a similar compact dispute for a different tribe. *See Pauma Band of Luiseno Mission Indians v. California,* 813 F.3d 1155 (9th Cir. 2015). Yet, as the Court noted in its latest order, "[j]ust days before Quechan was set to sign a new compact with California, Quechan sent [Williams & Cochrane] a letter firing [the Firm] as its counsel... [and] indicat[ing] that it would not pay [Williams & Cochrane] *any* fee." (ECF No. 135, 2:28-3:2) The letter did not end there, though, as Quechan sought to deter any efforts by Williams & Cochrane to collect the fees to which it has a right by including a warning that states, "We strongly advise you against pressing your luck further out of concern for the reputation of your firm in Indian Country and in the State of California." (ECF No. 94-4, p. 3)

Shortly after the transmission of this letter, an associate attorney with the replace-

1

Case No.: 17-CV-01436 GPC MDD

MEM. OF P. & A. ISO MOT. TO DISMISS TRIBE'S ANSWER & COUNTERCLS.

ment firm of Rosette, LLP sent one of the partners of Williams & Cochrane, LLP an e-mail in order to obtain the final draft version of the compact Quechan was days away from executing with the State of California so the firm could simply carry out the final step of the process by getting the parties to sign on the dotted lines. *See* Williams Decl., Ex. 2. The body of this e-mail from the Rosette attorney to Cheryl Williams states:

> As you know, our firm has been retained to represent the Fort Yuma Quechan Indian Tribe in their compact negotiations with the State. *While there is a formal file request forthcoming*, it is imperative that we receive, immediately, the last compact, with any redlines, that was transmitted to the State during your negotiations. Please provide said compact as soon as possible. I am available to discuss any questions or concerns.

*Id*. Just days later, Ms. Williams heeded the instructions in the e-mail from replacement counsel and turned over the final draft of the compact and waited to receive the indicated "formal file request" so she could see what else, if anything, Quechan needed to simply get the State of California to sign the compact her firm had negotiated. Yet, this e-mail was the last Williams & Cochrane would hear from Rosette, LLP until it issued a press release some two months later to publicly announce that Quechan had executed its compact with the State of California. *See* Williams Decl., Ex. 3.

In all positive material respects, the executed compact is one and the same as Williams & Cochrane's final draft, from eliminating approximately $4,000,000 in annual revenue sharing on Quechan's preexisting machines, to increasing the machine cap from 1,100 to 1,600, to increasing the total number of permitted casinos from one to three. (ECF No. 136, ¶ 110) Remarkably, the press release issued by Rosette, LLP to announce the compact contains one glowing endorsement after the next by putative Quechan President Keeny Escalanti about the terms and effect of the agreement. *See* Williams Decl., Ex. 3. He was "grateful" to the State for making the agreement possible, "pleased" to move forward under the new agreement, and excited that "[t]he Tribe's savings under the new Compact will allow the Tribe to provide critical services to its Members" – even though he had cut off all financial assistance to the tribal members just months earlier. *Id*.

Putative Quechan President Escalanti was *so* grateful for the new compact that he even went on a traveling road show from Yuma, Arizona to Washington, D.C. so he could testify about the benefits of the agreement before the United States Senate Committee on Indian Affairs. *See* Williams Decl., Ex. 4. This testimony that took place on the morning of October 4, 207 reiterates many of the buzzwords in the press release, as putative Quechan President Escalanti talks about how "grateful" and "pleased" the Tribe is with the new agreement, and how those involved worked "tirelessly" to bring it about:

> To alleviate the financial hardship that we experienced under the 2006 amendment, our Tribe recently negotiated a new Tribal-State Compact with Governor Edmund G. Brown ("2017 Compact"). Governor Brown's administration worked tirelessly to finalize our new compact, allowing the parties to reach an agreement in August 2017, in time for the California Legislature to ratify the compact before the end of this year's legislative session. The Tribe commends and is grateful for the hard work exhibited by Governor Brown and his administration. We are pleased with the terms of our new compact, as it allows for an expansion of gaming devices while offering up more favorable revenue-sharing provisions for the Tribe that will allow it to improve its financial status and augment services that we can provide its membership.

Unsurprisingly, during this time of recurrent public adulations about the benefits conferred by Williams & Cochrane's work, there was nary a peep from either Quechan or Rosette, LLP to Williams & Cochrane since they believed they had successfully bullied the Firm into walking away from its contract rights by threatening to ruin its reputation. Yet, this abject silence disappeared after the service of the complaint in this case, replaced with renewed attempts at retribution. As to that, the Department of the Interior formally approved Quechan's compact on December 15, 2017, and Williams & Cochrane began to serve the original complaint in this case contemporaneous therewith. *See* Williams Decl., Ex. 5. (ECF Nos. 22-28) The disclosure of the complaint sparked significant outrage amongst the tribal membership for the stunt putative Quechan President Escalanti and his cohorts pulled, so the Tribal Council tried to cover their backs by posting a notice on the door of the Tribal Administrative Building at approximately 4:30 p.m. on Friday,

December 29, 2017 (*i.e.*, the day before the New Year's weekend) to announce the Tribe had been "frivolous[ly]" sued and the Tribal Council was exploring whether it had claims of its own that it could bring against Williams & Cochrane. *See* Williams Decl., Ex. 6.

This admission that a certain segment of the Tribal Council terminated Williams & Cochrane simply because it did not want to pay a specifically-requested fee under a long-negotiated contract did little to pacify the Quechan general membership, who set up two recall elections to remove the vast majority of the Tribal Council from office. *See* Williams Decl., Ex. 7. Ultimately, the general membership of Quechan voted to recall five of the seven officers, with each recalled Tribal Councilmember refusing to step down afterwards by claiming that the votes were invalid "because the total tall[ies] didn't meet a constitutional threshold." *See id.* Nevertheless, just three days after the second recall election on January 20, 2018, the lead attorney for WilmerHale sent a letter to the partners for Williams & Cochrane, presumably on behalf of rogue Councilmembers, that sought a litany of materials related to the now-concluded compact negotiations – materials ranging from "all time sheets or time records" to "all… computer records relating to services performed by Williams & Cochrane for the Quechan Tribe." (ECF No. 94-5, p. 2).

In other words, opposing counsel was trying to invent harm in order to level the playing field for a plainly duplicitous client. "Invent" is not only the key word in the foregoing sentence but also goes to show the problem with all the counterclaims filed by Quechan. This tribe that has received the benefits of a compact its leaders publicly lauded as being pleasing and eliciting feelings of extreme gratitude *without paying for it* simply has not suffered the sort of concrete injury needed for Article III standing in federal court, much less to serve as the basis for harm underlying any claims. Not only that, but should such an injury exist, at no point does the Answer explain how those injuries are attributable to Williams & Cochrane rather than Quechan's own troubles, whether it is the Tribe's infighting or inept business decisions that led to the complaint in this case. Lest anyone forget, the California Supreme Court specifically cautioned courts in the context of malpractice claims arising from "business transactions [actually] gone awry" to really look

1  into the fact pattern at issue to make sure the "[c]lient… [is not] attempt[ing] to shift
2  some part of the loss and disappointment of a deal that goes sour onto the shoulders of
3  persons who were responsible for the underlying legal work." *Viner v. Sweet,* 30 Cal.4th
4  1232, 1241 (2003). Perhaps the most remarkable thing about the present situation is that
5  this is *not* one involving a business transaction gone awry; Quechan actually got *more*
6  than it bargained for, and is now simply trying to punish the firm responsible for attaining
7  these results because it admittedly does not want to pay anything under the contract. If
8  false cries of harm like this do not warrant dismissal of the counterclaims with prejudice
9  under Federal Rule of Civil Procedure ("Rule") 12(b)(1), then each of the counterclaims
10  has a host of fatal defects that make the same outcome appropriate under Rule 12(b)(6).

**ARGUMENT**

11

12  **I.   QUECHAN LACKS ARTICLE III STANDING TO RAISE THE COUNTERCLAIMS BE-
13       CAUSE IT HAS NOT SHOWN A CONCRETE INJURY THAT IS ATTRIBUTABLE TO WIL-
       LIAMS & COCHRANE**

14       One overarching problem with *all* the counterclaims raised by Quechan is that the
15  Tribe does not have Article III standing to pursue them. Two of the three elements for
16  Article III standing in federal court are an injury in fact and causation. *See Maya v. Cen-*
17  *tex Corp.,* 658 F.3d 1060, 1069 (9th Cir. 2011). For the first of these elements, an injury
18  in fact means that the alleged harm must be "concrete and particularized" and "actual or
19  imminent, not conjectural or hypothetical." *Id.* (citing *Friends of Earth, Inc. v. Laidlaw*
20  *Envtl. Serv., Inc.,* 528 U.S. 167, 180-81 (2000)). As with all other claims, one asserting
21  legal malpractice must evidence an injury, and "[t]he presence of a disagreement, howev-
22  er sharp and acrimonious it may be, is insufficient by itself to meet [Article] III's require-
23  ments." *Hollingsworth v. Perry,* 570 U.S. __, 133 S. Ct. 2652, 2661 (2013) (quoting
24  *Diamond v. Charles,* 476 U.S. 54, 62 (1986)); *see Oetting v. Green Jacobsen, P.C.,* 2014
25  U.S. Dist. LEXIS 31147, *7-*8 (E.D. Mo. 2014) (dismissing legal malpractice claims be-
26  cause "plaintiff has not assuaged the Court's grave doubts regarding his standing").
27       By now, Quechan has received the benefit of the bargain (and then some) it struck

28

MEM. OF P. & A. ISO MOT. TO DISMISS TRIBE'S ANSWER & COUNTERCLS.

with Williams & Cochrane and it is thus legally incapable of evidencing an injury arising from that relationship. *See In re Vioxx Prods. Liab. Litig.,* 874 F. Supp. 2d 599, 604 (E.D. La. 2012) (finding no injury in fact where the party targeted by a claim had done what it advertised and claimant "received the benefit of [their] bargain"). Even as the State's negotiator admits in his dubious declaration submitted in support of Quechan's first motion to dismiss, the gist of the dispute giving rise to the Attorney-Client Fee Agreement between the Tribe and Williams & Cochrane was "related to payments owed by the Tribe to the State under [its 2007 Compact]" (ECF No. 50-4, ¶ 9), and the parties executed the Attorney-Client Fee Agreement "for the purpose of reducing [the Tribe's] payments under its tribal/State gaming compact," with the Firm's success judged in part by the amount it could reduce those fees going forward. (ECF No. 100-2, §§ 2, 5) And Williams & Cochrane was *wildly* successful in this regard, not only eliminating any and all non-regulatory revenue sharing for Quechan for the next twenty-eight years but also going above and beyond the call of duty by obtaining for the Tribe a slew of concessions that would help it generate hundreds of millions of dollars in additional revenues during the life of the replacement compact. (ECF No. 100, ¶ 90) The four-million-dollar annual reduction in revenue sharing set forth in Section 4.8 of the executed compact is one and the same as that negotiated by Williams & Cochrane in the initial December 6, 2016 draft compact. (*Compare* ECF Nos. 100-12 & 100-20) The increase in the machine limit from 1,100 to 1,600 in Section 4.1(a) of the executed compact is one and the same as that negotiated by Williams & Cochrane in its final June 21, 2017 draft compact. (*Compare* ECF Nos. 100-19 & 100-20) Further, the increase in the number of permissible casinos from one to three in Section 4.2 of the executed compact is one and the same as that negotiated by Williams & Cochrane in its final June 21, 2017 draft compact. *Id*. Thus, the concessions Williams & Cochrane indisputably obtained for Quechan easily satisfied the objective of the Attorney-Client Fee Agreement and pushed the Tribe far passed the dividing line separating injured parties from the hypochondriacs who actually benefited from the conduct they claim to be injurious.

All of these quibbles about something being done faster or more clearly or with more vigor are the legal equivalent of a patient taking a cancer medication that is 2.8% the cost of the normal treatment and then complaining that the drug, though successful, could have shrunk the tumor a bit faster or tasted more palatable on the way down. *Cf. In re Vioxx Prods. Liab. Litig.,* 874 F. Supp. 2d at 604. What is even more bizarre about these belated claims of harm is how much they contrast with what Quechan was representing before the Tribe knew it was sued. After the execution of the replacement compact that Williams & Cochrane had negotiated for Quechan, putative President Keeny Escalanti was telling anyone who would listen about what an amazing compact the Tribe had just secured. Quechan even issued a press release to *brag about this fact*. *See* Williams Decl., Ex. 3. Not only that, but Mr. Escalanti went to Washington to represent to members of Congress that Quechan had just entered into a "unique" compact, with which it was very "pleased," that "alleviate[d] the financial hardship that [the Tribe] experienced under the 2006 Amendment," and that he "commend[ed] and [was] grateful for the hard work exhibited by Governor Brown and his administration" in bringing the agreement about. Williams Decl., Ex. 4.

If Quechan truly had an issue with the representation provided by Williams & Cochrane, that is something the Tribe should have raised let alone addressed before it accepted the benefit of the Firm's work product. A perfect analogy exists in this case, and that relates to a tribe's ability to bring a bad faith suit under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C § 2701 *et seq*. According to the terms of the statute, an Indian tribe may bring a claim alleging that a state negotiated in bad faith but it *must* do so before executing a contract. *See* 25 U.S.C. § 2710(d)(7)(B)(ii) (explaining one of the prerequisites for a bad faith claim is that "a Tribal-State compact has not been entered into"). In other words, having your cake and eating it too is simply not allowed under the law, as a tribe must choose whether it believes the state negotiated in bad faith or offered a suitable compact. The same holds true in this situation; if Quechan legitimately believed Williams & Cochrane was derelict in its representation, it had the option to express

MEM. OF P. & A. ISO MOT. TO DISMISS TRIBE'S ANSWER & COUNTERCLS.

at least a subjectively-sincere claim shortly after the conclusion of the services rather than engaging in an illogical course of conduct that involved the Tribe breaching the Attorney-Client Fee Agreement, threatening to ruin the Firm's reputation, and then running around the Nation praising the quality of the work Williams & Cochrane produced. Quite simply, there is no actual injury on the part of Quechan that this Court is capable of redressing.

Compounding this absence of injury is the fact that any such injury, should it exist, is assuredly self-inflicted. When it comes to showing that a party is responsible (or the cause) for a suffered injury, the claimant "must establish a 'line of causation' between defendants' actions and their alleged harm that is more than 'attenuated.'" *Maya,* 658 F.3d at 1070 (quoting *Allen v. Wright,* 468 U.S. 737, 757 (1984)). The "length of the chain of causation" is not the dispositive issue in this analysis, with that instead being the "plausibility of the links that comprise the chain." *Nat'l Audubon Soc., Inc. v. Davis,* 307 F.3d 835, 849 (9th Cir. 2002). However, the California Supreme Court has already commented on causation in the attorney malpractice context and explained that a claimant suffering an *actual* injury must still establish that "but for the alleged negligence of the… attorney, the [claimant] would have obtained a more favorable judgment or settlement in the action in which the malpractice allegedly occurred." *Viner,* 30 Cal.4th at 1052. In other words, the requisite inquiry at this stage of the proceeding should be whether it is plausible that Williams & Cochrane is the "but for" cause of the harms Quechan alleges.

As the ensuing sections will explain in even greater detail, it is simply impossible for Quechan to present a plausible case with respect to any of its arguments. Quechan says eight months is too long to negotiate a compact, but it specifically negotiated a contract that would *reward* Williams & Cochrane with a higher contingency fee if it somehow completed the work "before the filing of a lawsuit or within 12 months thereof." (ECF No. 100-2, § 5) Quechan complains that Williams & Cochrane failed to perform an adequate amount of work, but the Attorney-Client Fee Agreement explicitly says that the reduced monthly flat fee "is fixed and does not depend on the amount of work performed or the results obtained." (ECF No. 100-2, ¶ 4) Quechan claims that certain misrepresen-

Case No.: 17-CV-01436 GPC MDD
MEM. OF P. & A. ISO MOT. TO DISMISS TRIBE'S ANSWER & COUNTERCLS.

tations made in June influenced its decision months earlier to stick with Williams & Cochrane, but, even if true, the Answer makes it clear that the Tribe did not rely on them because it was already "explor[ing] the possibility of hiring new counsel to replace [Williams & Cochrane] " in "late Spring 2017." (ECF No. 94, ¶ 39). And finally, Quechan claims that Rosette, LLP not having "*all* available information relating to the gaming compact negotiations… extended the Tribe's negotiations with the State," but Rosette, LLP never ended up requesting these materials and any added delay in the negotiations resulted from Quechan's last minute bait and switch as it sought to obtain the compact without paying for it. The Answer paints a picture in which Quechan was injured time and time again by the counsel that negotiated a compact that could change the Tribe's financial fortunes by a billion dollars, but the sad reality is that all of these alleged injuries were self-inflicted in the haste to cheat those who brought about the windfall.

## II.   COUNTERCLAIM ONE FOR BREACH OF FIDUCIARY DUTY IS BASED UPON NON-PARTICULAR AND/OR NONSENSICAL MISREPRESENTATIONS ABOUT A MATTER THAN TURNED OUT FOR QUECHAN'S EXTREME BENEFIT

### A. Legally-Insufficient, Nonsensical Argument

The purpose of the pleading stage is to root out any claims that are not plausible on their face. *See Twombly,* 550 U.S. at 562. The first counterclaim in the Answer is one such claim. The allegations in Paragraph 61 therein explain that "[Williams & Cochrane] [erroneously] told the Tribe [in June 2017] that the Tribe would have a final signed compact by the end of June," and this was "a substantial factor in causing the Tribe to expend $50,000/month for eight months without receiving services from [Williams & Cochrane] consistent with its fiduciary obligations." (ECF No. 94, ¶¶ 61-62) In other words, a supposed future misrepresentation controlled the antecedent behavior of the other party. This argument is not just implausible; it flat out does not make any sense.

### B. Failure to Satisfy the Heightened Pleading Standard

The first counterclaim is based upon what Quechan describes as "knowingly false representation" motivated by a desire to obtain additional fees – or, in other words: fraud.

(ECF No. 94, ¶¶ 60-61) Yet, the Federal Rules of Civil Procedure impose a heightened pleading standard for any claims that are grounded in either fraud or mistake. *See In re NationsMart Corp. Sec. Litig.,* 130 F.3d 309, 315 (8th Cir. 1997) (citing FED. R. CIV. P. 9(b)). This heightened pleading standard requires that "[a]verments of fraud must be accompanied by the 'who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003). Despite this, the introduction of Paragraph 61 merely says that "in April 2017, [Williams & Cochrane] misrepresented its efforts and the State's position… to the newly-seated Tribal Council." (ECF No. 94, ¶ 61) This allegation is absolutely devoid of substance showing *what* Williams & Cochrane allegedly said and *how* that qualifies as a misrepresentation, making this claim deficient under *any* pleading standard and impossible for Williams & Cochrane to rebut with an intelligible response.

### C. Lack of Causation

Causation is not only an element of Article III standing, but also an independent and "necessary element[ ] for a finding of malpractice liability as well as breach of fiduciary duty liability." *Vaxiion Therapeutics, Inc v. Foley & Lardner LLP,* 593 F. Supp. 2d 1153, 1164 (S.D. Cal. 2008) (citing *Osornio v. Weingarten,* 124 Cal. App. 4th 304, 319 (6th Dist. 2004)). The aforementioned nonsensical argument contained in Paragraphs 61 and 62 about alleged subsequent misrepresentations determining prior behavior also fails to show causation because the Answer earlier on admits that "the Tribal Council started to explore the possibility of hiring new counsel to replace [Williams & Cochrane]" in "late Spring 2017," ostensibly before the "misrepresentations" ever took place. (ECF No. 94, ¶¶ 39-40) The general allegations in the Answer, in other words, undercut the specific allegations in the first counterclaim, as Quechan admits it was looking to replace Williams & Cochrane before any supposed misrepresentations were made. Thus, assuming this is true, the delay in terminating Williams & Cochrane had nothing to do with misrepresentations by the firm and everything to do with finding an attorney foolish enough to try and interfere with complex and high-stakes negotiations during the waning days.

### D. Non-Actionable Opinions as to Future Events, not Promises

An important legal distinction exists between an *opinion* and a statement of *fact*. A statement of opinion is one that offers the speaker's own views on a matter of judgment, and is generally non-actionable. *See, e.g., Graham v. Bank of Am., N.A.,* 226 Cal. App. 4th 594, 606-07 (4th Dist. 2014) (detailing how professional judgments by accountants, appraisers, and others are not actionable misrepresentations of fact). This is especially true if the opinion pertains to a future event rather than a past or present state of affairs. *See Cohen v. S & S Const. Co.,* 151 Cal. App. 3d 941, 946 (4th Dist. 1983) (explaining "predictions as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud"). Here, the first counterclaim asserts that Williams & Cochrane made a "knowingly false representation" by telling the "Tribe that [it] would have a final signed compact by the end of June." (ECF No. 94, ¶¶ 60-61) Yet, this statement both concerns future events and implies what a third party would do – *i.e.*, that the State of California would sign the compact by a date certain. Regardless of how Quechan may feel, the law considers these statements to be mere expressions of profess-sional opinion, not actionable misrepresentations.

### E. Contract Expressly Disclaims Promises

Not to mention, Quechan knew at the time these *alleged* misrepresentations were *allegedly* being made that Williams & Cochrane was not making promises or guarantees about any future events, such as the likely outcome of the matter. As to that, Section 16 of the Attorney-Client Fee Agreement expressly provides that

> [n]othing in this Agreement and nothing in Firm's statements to Client will be construed as a promise or guarantee about the outcome of the matter. Firm makes no such promises or guarantees. Firm's comments about the outcome of the matter are expressions of opinion only, are neither promises nor guarantees, and will not be construed as promises or guarantees.

(ECF No. 100-2, § 16) Thus, the claim that Williams & Cochrane made misrepresenta-tions is not only fatally flawed as a matter of law, but also foreclosed by the terms of the underlying contract that Quechan has gone to great lengths to ignore.

### F. What Harm?

Along with causation, damages is a necessary element for a breach of fiduciary duty claim. *See Vaxiion,* 593 F. Supp. 2d at 1164. Here, Quechan contends that "[Williams & Cochrane's] motivation [in making the alleged misrepresentations] was to [string things out and] continue to receive $50,000/month in fees, and eventually, an additional contingency fee." (ECF No. 94, § 62). "Continue" is an odd word choice because Quechan *was not even paying the $50,000 monthly flat fee during the course of the representation*, electing instead to "send four paychecks to Williams & Cochrane to cover the base monthly fees for February 2017 to May 2017" right before repudiating the Attorney-Client Fee Agreement at the end of June 2017. (ECF No. 136, ¶ 96) When a primarily contingently-paid attorney is dealing with a client that fails to honor its contractual obligations and seems to spend most of its time fighting amongst itself, the only plausible inference from the allegations is that the attorney wanted to get the work done as quickly as possible so it could get paid and get out. Further, harm should not be able to arise from a legal perspective as a result of a client complying with financial obligations it specifically requested in the underlying contract after it has already received benefits far exceeding what it had bargained for at the outset of the representation. (ECF No. 100-12) The means to alleviate any perceived harm existed, and Quechan could have accomplished this by terminating the relationship in accordance with the terms of the Attorney-Client Fee Agreement rather than what it ultimately did.

### III. COUNTERCLAIM TWO FOR THE BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING DOES NOT GEL WITH EITHER THE TERMS OR PURPOSES OF THE ATTORNEY-CLIENT FEE AGREEMENT

The second counterclaim is largely a rehash of the first one save for the fact that Quechan tries to suggest the conduct also violates an implied term of the Attorney-Client Fee Agreement. As has been oft-repeated now, "[g]ood faith performance… of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205 cmt. a (1981).

1   "The exact nature and scope of this duty is a factual inquiry and is based on the purposes

2   of the Agreement, the express terms of the Agreement, and the reasonable expectations of

3   both parties." *Daly v. United Healthcare Ins. Co.,* 2010 U.S. Dist. LEXIS 116048, *10

4   (N.D. Cal. 2010). "[L]ike all essential elements of a breach of contract cause of action,"

5   the facts constituting a breach of the implied covenant of good faith and fair dealing

6   "must be pleaded with specificity." *Levy v. State Farm Mut. Auto Ins. Co.,* 150 Cal. App.

7   4th 1, 5 (4th Dist. 2007). With these principles in mind, the subsections below will refute

8   each of the material allegations in the second counterclaim claiming an implied breach.

9       **A. No Second-Guessing of Reasoned Professional Decisions**

10      For a contract that vests one of the parties with discretion in its performance, the

11  implied covenant requires that such discretion be exercised reasonably (rather than arbi-

12  trarily or capriciously), but "bad faith is not synonymous with erroneous judgment." *Oil*

13  *Express Nat'l, Inc. v. Burgstone,* 958 F. Supp. 366, 369 (N.D. Ill. 1997). Thus, the in-

14  quiry is not one that "looks to results, but… [rather] the actual decision-making process

15  to determine whether it was legitimate – *i.e.*, honest or within accepted commercial

16  practices." *In re Sizzler Rests. Int'l,* 225 B.R. 466, 474 (Bankr. C.D. Cal. 1998) (citing

17  *Svela v. Union Oil Co. of Cal.,* 807 F.2d 1494, 1501 (9th Cir. 1987)). Here, Paragraph 69

18  suggests that Williams & Cochrane breached the implied covenant because it "never tried

19  resolving the underpayment issue." (ECF No. 94, ¶ 69). Yet, as the Second Amended

20  Complaint explains, ███████████████████████████████████████████████

21  ████████████████████████████████████████, and, nevertheless, the strategy the Firm

22  implemented ███████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████ at the time putative President

25  Escalanti transmitted his termination letter. (ECF No. 136, ¶¶ 71-94) What this shows is

26  that these outstanding revenue sharing payments only became an issue for the Office of

27  the Governor *after* the firm switch when it realized it was facing off against an adversary

28  that lacked the requisite savvy or skill (in negotiations, litigation, or otherwise) to keep its

overreach in check. With that said, the relevant inquiry is still whether Williams & Cochrane's approach to the outstanding revenue sharing payments was reasonable, and quite simply, why would the Firm make a negotiation demand that was harmful to its client's interests when the Office of the Governor had not shown the backbone to raise the issue during the prior eight-plus months of negotiation?

The inevitable and illogical response from Quechan is that Williams & Cochrane *had* to raise the issue because the State's negotiator Joginder Dhillon made it clear earlier on in the negotiations that "neither the CGCC nor the Office of the Governor had the 'legal authority to excuse' the Tribe's payment obligations." (ECF No. 94, ¶ 31) Who then, pray tell, is able to settle contract disputes on behalf of the State of California if its chief executive lacks such power? Santa Clause? The Easter Bunny? In fact, Williams & Cochrane *knew* this statement was a ruse at the time it was made because the Firm engaged in a settlement process during the prior *Pauma* suit in which it executed settlement protocol with the State of California that specifically designated the Office of the Governor or one of its advisors as the representative for the State in any "discussions… directed toward… trying to effectuate a settlement, resolution, or other end" to this similar revenue sharing dispute. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* No. 09-01955, Dkt. No. 192, ¶¶ 1-7 (S.D. Cal. Aug. 7, 2012). Of course, this whole protocol only came about because the very person who interfered with Williams & Cochrane's representation at Quechan also interfered in the Pauma suit and elicited an admission from Mr. Dhillon's predecessor that he had the power to settle a lawsuit that involved significant amounts of disputed revenue sharing. (ECF No. 100-1) As it turns out, Mr. Dhillon *did* in fact have the "legal authority to excuse" Quechan's payment obligations, as the State waived ████████████████████████ ███████████████████████████████████████████████████████████ when it executed the compact. (ECF No. 100-20, § 4.8) Thus, the only "second-guessing" that is appropriate should be on the part of a certain segment of the Quechan Tribal Council in examining its careless behaviors in wrapping up the negotiations for the Tribe.

### B. The Length of the Representation is Contractually Awesome

Along with questioning Williams & Cochrane's decision-making processes, Quechan also claims that the Firm took too long to do the work, as it negotiated for "eight [whole] months… [and] deliberately structured [the process] to elongate the timeframe of its representation." (ECF No. 94, ¶ 69) Yet, this claim that eight months is unreasonably long for the completion of compact negotiations is directly undermined by the Attorney-Client Fee Agreement. Per Quechan's request, this agreement actually *rewarded* Williams & Cochrane if it somehow completed the project within twelve months of the filing of an at-the-time seemingly-forthcoming lawsuit:

> Firm's contingency fee will be calculated as follows if the representation matter is resolved through settlement or negotiations:
> (a) If the matter is resolved before the filing of a lawsuit or within 12 months thereof, Firm's contingency fee will be fifteen percent (15%) of the net recovery. …
> (d) The contingency fee rate above is higher than the formative rates for resolving the case through court action set forth in the ensuing subsections below based upon the Client's express request after consultation and stated need to resolve the situation in as effective and expeditious manner as possible.

(ECF No. 100-1, § 5) Even putting aside this contract language, the second counterclaim does not plead with specificity as to *why* eight months of complex and contested inter-governmental negotiations constitutes a breach of the implied covenant of good faith and fair dealing. For instance, the remarks by putative President Escalanti before the Senate Committee on Indian Affairs that are attached to the accompanying declaration indicate that Quechan was in compact negotiations with the State of Arizona for an undefined but potentially significant amount of time as of October 4, 2017, and the Tribe has *still* yet to execute the resultant compact. *See* Williams, Ex. 4. Not to mention, our noble adversary WilmerHale that dubs itself as being "uniquely positioned to counsel tribal governments on difficult…. legal questions" was seemingly involved in the ultimately unsuccessful on-again, off-again compact negotiations for the Enterprise Rancheria that spanned the time period of June 2000 to July 1, 2014. *See Estom Yumeka Tribe of Enter. Rancheria v.*

*California,* 163 F. Supp. 3d 769, 770 & 773-74 (E.D. Cal. 2016). Perhaps WilmerHale can explain to the Court why fourteen years of unsuccessful negotiations is reasonable while eight months of successful ones are not.

### C. The Level of Productivity is Contractually Irrelevant

Finally, Quechan also claims that Williams & Cochrane "fail[ed] to perform under the Fee Agreement" for months on end while receiving "the $50,000/month flat fee." (ECF No. 94, ¶ 67) Again, the terms of the Attorney-Client Fee Agreement make it crystal clear that Quechan was paying this amount irrespective of the level of performance:

> Client agrees to pay a flat fee of $50,000 per month for Firm's service under this Agreement. This fee is fixed and does not depend on the amount of work performed or the results obtained.

(ECF No. 100-2, § 5) Yet, the period during the first quarter of 2017 in which Quechan laments the amount of work done by Williams & Cochrane coincides with the time in which the Tribe was all-consumed with infighting over election results, and the State showed little to no desire to negotiate further. (ECF No. 136, ¶¶ 78-80) By this point, Williams & Cochrane had already obtained for Quechan the first draft compact that reduced the Tribe's future revenue sharing load by more than $4,000,000 per year. (ECF No. 100-14) This is the same financial arrangement that putative President Escalanti recurrently touted time and time again after the execution of the compact, which makes Quechan's latest "failure to perform" argument all the more hard to swallow.

## IV. COUNTERCLAIM THREE FOR NEGLIGENCE RAISES A VAGUE ETHICAL VIOLATION THAT IS ILL-SUITED FOR THIS FORUM

The third counterclaim in the Answer is based upon the negligence of Williams & Cochrane in supposedly not providing "Quechan" materials from in its client file when requested. A negligence claim has four essential elements, "duty, breach of duty, proximate cause, and damage." *Chavez v. Carter,* 256 Cal. App. 2d 577, 579 (2d Dist. 1967). As the subsections below show, Quechan has not stated a legally-cognizable negligence claim for at least *four* separate reasons, including that the Tribe did not suffer any damages and, even if it did, Williams & Cochrane is not the proximate cause of those injuries.

## A. Wrong Forum

The alleged violation of a rule of professional conduct "does not subject an attorney to civil liability in damages, [although] it may subject him or her to State Bar Disciplinary proceedings." *Aviel v. Sorgen*, 2001 Cal. App. Unpub. LEXIS 3644, *13-*14 (1st Dist. 2002) (citing *Wilhelm v. Pray, Price, Williams & Russell,* 186 Cal. App. 3d 1324, 1333 n.5 (2d Dist. 1986)). In line with this, when a party cites a discrete violation of the professional rules as the sole basis for a negligence claim, courts have understandably been loath to allow the party to pursue a damage claim, instead directing them to the administrative process set up by the State Bar. *See Wilhelm,* 186 Cal. App. 3d at 1333 (citing *Noble v. Sears, Roebuck & Co.,* 33 Cal. App. 3d 654, 658-59 (2d Dist. 1973)). Here, Paragraph 75 makes it clear that the negligence claim is based entirely on Williams & Cochrane supposedly not releasing "all of the Tribe's 'paper and property' upon termination of the attorney client relationship" under "California Rule of Professional Conduct 3-700(D)(1)" after Quechan repudiated the Attorney-Client Fee Agreement, threatened to ruin the reputation of the Firm, and nevertheless obtained the invaluable work product that its new attorney requested. (ECF No. 94, ¶ 75) Thus, any complaints about inadequate compliance with Rule 3-700(D)(1) are best addressed before the administrative body that oversees the professional rules, not this Court.

## B. Claim is not Plausible

The crux of the third counterclaim is that Williams & Cochrane's alleged "refus[al] to transmit the Tribe's case file in violation of its duty to do so" caused "the Tribe [to] incur[] further legal expense to conclude the gaming compact negotiations." (ECF No. 94, ¶¶ 79, 81) One key omission from Quechan's portrayal of the factual background is the fact that an attorney for the replacement firm reached out to a partner for Williams & Cochrane and stated that it was "imperative" that she "immediately" receive the final version of the draft compact that the parties were just days away from executing, indicating in the process that a "formal file request" was forthcoming. *See* Williams Decl., Ex. 2. As it turned out, this forthcoming file request was *never* forthcoming, however, which

MEM. OF P. & A. ISO MOT. TO DISMISS TRIBE'S ANSWER & COUNTERCLS.

conveyed to the attorneys with Williams & Cochrane that the replacement firm had what it needed to adeptly carry out the ministerial task of getting the Office of the Governor to sign an agreement that was all but complete.

The status of the negotiations also raises a question as to what exactly Quechan needed in addition to the final draft compact in order to finish the project. At a minimum, Quechan already had the opening draft compact, and the communications between Quechan and the State of California – including the demand letters from the CGCC – were all addressed to the Tribe as well. (ECF Nos. 100-15; 100-16; 136, ¶¶ 76, 82) This is an important consideration to keep in mind because the ethics opinions interpreting California Rule of Professional Conduct 3-700(D)(1) do not equate "all… papers and property" with "*all*… papers and property." Rather, the documents which a client may obtain upon an attorney's termination are the "significant" ones (*see* San Diego County Bar Association Ethics Opinion 2001-1), the definition of which "is not static… and will change depending on circumstances." Bar Association of San Francisco Ethics Opinion 1996-1. In fact, one would be remiss to think that all the draft compacts – the very materials the Office of the Governor's legal counsel at the Department of Justice even said should *not* be turned over (ECF No. 136, ¶ 102) – fall within this definition since the client only has a right to this sort of work-product if the failure to turn it over "would result in reasonably foreseeable prejudice to the client's rights." Bar Association of San Francisco Ethics Opinion 1990-1. Simply put, Williams & Cochrane gave Quechan *precisely* what it wanted despite the reputational threats and refusal to pay; the least the Tribe could do now is identify those materials it did not receive that would have actually aided its new attorney in finishing up the negotiations at a faster rate. As for the claims of continuing harm, virtually every material document related to the now-concluded compact negotiations was attached as an exhibit to the original complaint, which means WilmerHale should have everything it needs to defend against the breach of contract claims. (ECF Nos. 5-12-5-20)

## C. Quechan is the Proximate Cause of its Harms

"In a litigation malpractice action, the [claimant] must establish that *but for* the al-

18                    Case No.: 17-CV-01436 GPC MDD
MEM. OF P. & A. ISO MOT. TO DISMISS TRIBE'S ANSWER & COUNTERCLS.

leged negligence of the… attorney, the [claimant] would have obtained a more favorable judgment or settlement in the action in which the malpractice allegedly occurred." *Viner,* 30 Cal. 4th at 1241. This but for test means that an "independent intervening act" – like a client's discussions with its "own [replacement] counsel" – can sever the line of causation and relieve an attorney of supposed negligence. *Wilhelm,* 186 Cal. App. 3d at 1333. Here, Paragraph 80 seems to concede that Quechan hired Rosette, LLP so this firm could simply swoop in at the last moment and have the parties sign the compact. (ECF No. 94, ¶ 80) Counterclaim three attributes the delay in the occurrence of this event to Quechan not possessing its client file. *Id.* However, Williams & Cochrane provided exactly what the new law firm requested, which means the cause of any supposed negligence – to the extent it is external to Quechan – rests on the shoulders of the firm that failed to send the indicated file request. *See* Williams Decl., Ex. 2. Plus, Quechan simply points at the two-month delay between the termination of Williams & Cochrane and the execution of the compact and says that is proof positive that the lack of a client file is to blame. However, with the Answer never detailing what Quechan was missing that it actually needed, the more reasonable inference from the allegations is that the two month delay resulted from a factor entirely unrelated to Williams & Cochrane – like Rosette, LLP having to get up to speed with a matter with which its principal was privately and admittedly unfamiliar just two weeks earlier or the State of California changing its bargaining position to take advantage of a less skilled, less prepared law firm. (ECF Nos. 52-2, ¶ 20; 136, ¶¶ 111-13)

### D. What Damages?

The foregoing proximate-causation rule is a "safeguard against speculative and conjectural claims… [and] serves the essential purpose of ensuring that damages awarded for the attorney's malpractice actually have been caused by the malpractice." *Viner,* 30 Cal. 4th at 1241 (citing *Mattco Forge, Inc. v. Arthur Young & Co.,* 52 Cal. App. 4th 820, 832-34 (2d Dist. 1997)). To continue the discussion from the previous subsection, two months' worth of work by a replacement attorney to carry out the final step of a negotiated settlement is a perfectly reasonable outcome, particularly in light of the fact that the

attorney – by his own *post hoc* admission – had no clue about the particulars of the nego-tiations shortly before taking on the work. (ECF No. 52-2, ¶ 20) Not to mention, Quechan seems to be of the mindset that the revenue sharing dispute was *not* settled by the time Williams & Cochrane was terminated (ECF No. 94, ¶ 69), which means Rosette, LLP could have spent the next two months finishing up that issue irrespective of *when* it got the client file (which it never requested) or *what* it obtained from it. Finally, from a finan-cial perspective, Quechan simply was not harmed because it obtained the full benefit of the Attorney-Client Fee Agreement and actually spent less during the next two months with Rosette (at least superficially) than it withheld from Williams & Cochrane during its final month of work, the promise in the June 26, 2017 termination letter notwithstanding.

## V.   COUNTERCLAIM FOUR FOR BREACH OF CONTRACT ALLEGES AN IMMATERIAL BREACH OF A CONTRACT THAT QUECHAN PREVIOUSLY REPUDIATED

### A. Claim Foreclosed by Quechan's Prior Breach

One generally-accepted rule of contract law states that "it is a condition of each party's remaining duties to render performance to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." Restatement (Second) of Contracts § 237 & illus. 1 (1981) (citing example where a failure to pay by one relieves the other of "all remaining duties of performance under the exchange"); *see De Burgh v. De Burgh,* 39 Cal. 2d 858, 863 (1952). Here, the e-mail from the Rosette attorney requesting the "last compact" and indicating a "formal file request is forthcoming" was transmitted late in the evening of June 27, 2017, the day *after* putative President Escalanti seemingly mailed the notice of termination that explained "the Tribe will not pay any contingency fee or 'reasonable fee for the legal services provided in lieu' thereof." (ECF No. 100-4). This first-in-time com-munication that Quechan was repudiating the Attorney-Client Fee Agreement technically relieved Williams & Cochrane of any further compliance with the agreement. Thus, the alleged failure to transmit the client file *may* constitute a violation of professional duties, but it *cannot* legally constitute a breach of contract.

## B. Claimed Breach is Immaterial

A material breach is one that "substantially defeats the contract's purpose, or the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract." *Nijjar v. Mittal,* 2006 Cal. App. Unnpub. LEXIS 11741, *23-*24 (2d Dist. 2006) (citing 23 *Williston on Contracts* § 63:3, pp. 438-39 (4th ed. 2002)); *see Reading Int'l, Inc. v. Malulani Grp., Ltd.,* 2018 U.S. Dist. LEXIS 88583, *10-*11 & n.7 (D. Haw. 2018) (collecting cases). Circumstances are significant in determining whether a breach if material, and a court will often look "to the extent to which the injured party [was] deprived of the benefit which he reasonably expected." Restatement (Second) of Contracts § 241 (1981). To the extent that Quechan could reasonably expect *anything* after repudiating the Attorney-Client Fee Agreement and threatening to ruin the reputation of the Firm if it did not simply walk away from the contract, the Tribe received all that was reasonable when the Firm handed over its incalculably-valuable final draft of the compact, just as the replacement counsel requested. This single act ensured that Quechan could still obtain the benefit of the bargain despite its unwillingness to perform in a reciprocal manner. While Quechan is now feigning that it wanted more than it needed at the time, subsequent events prove that the supposed failure to deliver those materials was *not* a material event that defeated the contract's purpose.

## C. Damages are Unforeseeable, Uncertain, and entirely Avoidable

Damages are not recoverable under a contract claim if they are unforeseeable (*see* Restatement (Second) of Contracts § 351 (1981)), uncertain (*see* Restatement (Second) of Contracts § 352 (1981)), or "could have been avoided [by the allegedly injured party] without undue risk, burden or humiliation." Restatement (Second) of Contracts § 350 (1981). Here, all three of these limitations apply. The damages are unforeseeable because Quechan waited till the very last moment to terminate Williams & Cochrane to ensure there were no unexpected contingencies; certainly no one could have reasonably predicted at the time that the mere possession of certain unidentified materials from the client file *other than* the final draft compact would have prevented the State of California from

1  opening up negotiations and suddenly demanding that the Tribe make good on half of its
2  past due payments. (ECF No. 136, ¶ 112) The damages are also uncertain because it is far
3  more likely that the two months of last-minute negotiations had less to do with a
4  supposedly-deficient client file than it did an overreaching State or a secretly-unprepared
5  replacement firm. (ECF Nos. 52-2, ¶ 20; 136, ¶ 112) Finally, the damages were and are
6  entirely avoidable because Quechan could have waited a few days until *after* signing the
7  compact to repudiate the Attorney-Client Fee Agreement, or simply directed the replace-
8  ment firm to finally send its abandoned file request in order to obtain the materials sup-
9  posedly needed to finish out negotiations that should have already been finished.

10 **VI.  COUNTERCLAIM FIVE FOR UNFAIR COMPETITION IS NOT AVAILABLE TO A GOV-
11  ERNMENTAL ENTITY LIKE QUECHAN, WHO WOULD NEVERTHELESS BE BARRED
12  FROM RELIEF BY EQUITABLE DOCTRINES LIKE UNCLEAN HANDS AND *IN PARI
DELICTO***

13 **A. No Standing to Sue**

14  The California unfair competition law explains that "[a]ctions for relief pursuant to
15  this chapter shall be prosecuted… by a *person* who has suffered injury in fact and has lost
16  money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204.
17  As used in this jurisdictional section, the term "person" is defined to "mean and include
18  persons, corporations, firms, partnerships, joint stock companies, associations, and other
19  organizations of persons." Cal. Bus. & Prof. Code § 17201. However, governmental
20  entities are *not* considered persons "within the meaning of the Unfair Practices Act." *Cal.
21  Med. Ass'n v. Regents of Univ. of Cal.,* 79 Cal. App. 4th 542, 551 (2d Dist. 2000)
22  (collecting cases). Here, the Answer makes it perfectly clear that "Tribe" means the
23  federally-recognized "Quechan Tribe of the Ft. Yuma Indian Reservation" (ECF No. 94,
24  p. 1 & ¶ 14), and *the Tribe* is the one that "has been injured in its business and property…
25  [and] is accordingly" seeking "restitution or disgorgement" under the unfair competition
26  claim. (ECF No. 94, ¶¶ 94-95) Whether or not it actually suffered injuries, Quechan
27  simply does not have standing to pursue relief under California's unfair competition law.

28 **B. Allegations are not Reasonably Particular**

22        Case No.: 17-CV-01436 GPC MDD
MEM. OF P. & A. ISO MOT. TO DISMISS TRIBE'S ANSWER & COUNTERCLS.

1    "A plaintiff alleging unfair business practices under these statutes must state with

2    reasonable particularity the facts supporting the statutory elements of the violation."

3    *Khoury v. Maly's of Cal., Inc.,* 14 Cal. App. 4th 612, 619 (2d Dist. 1993) (citing, *e.g*., 5

4    Witkin, *Cal. Procedure* § 728, p. 176 (3d ed. 1985)). Speaking in conclusory terms is

5    insufficient to meet this standard, as it "do[es] not provide notice to [the opposing party]

6    as to what claims [the claimant] [is] asserting." *Watson v. Bank of Am., N.A.,* 2016 U.S.

7    Dist. Lᴇxɪs 85580, *16 (S.D. Cal. 2016) (Curiel, J.). Here, the few paragraphs in support

8    of the fifth counterclaim are utterly devoid of the requisite substance, offering just *one*

9    conclusory sentence stating Williams & Cochrane "committed acts of unfair competition"

10   and failing to even identify whether the act of unfair competition being alleged is of the

11   unfair, unlawful, or fraudulent variety. (ECF No. 94, ¶ 93) Allegations of unfair competi-

12   tion require significantly more detail before the defending party can reasonably be ex-

13   pected to provide an intelligible response.

14       **C. Safe Harbor Applies**

15       The California unfair competition law "forbids business practices that violate some

16   other law," but is toothless if the "other law" does not proscribe the conduct in question.

17   *See, e.g., Walker v. Countrywide Home Loans, Inc.,* 98 Cal. App. 4th 1158, 1175 (2d

18   Dist. 2002); *see Ebner v. Fresh, Inc.,* 818 F.3d 799, 804 (9th Cir. 2016) (barring a claim

19   challenging a lip balm manufacturer's net weight statement where the product complied

20   with federal and state laws regarding the issue). Here, to the extent the unfair competition

21   claim is premised upon an alleged violation of the California Rules of Professional Con-

22   duct, the preceding Section IV(B), *supra*, discusses both how Williams & Cochrane com-

23   plied with the file request sent by Quechan's replacement law firm, and how the ethics

24   opinions interpreting Rule 3-700(D)(1) only require a terminated attorney to turn over

25   work product if it is "significant" and the failure to disclose it would "result in reasonably

26   foreseeable prejudice to the client's rights." Bar Association of San Francisco Ethics

27   Opinion 1990-1. The final draft compact is all Quechan's replacement attorney wanted so

28   he could simply get the parties to sign the agreement; if he needed more, he should have

1  sent the formal file request that turned out to be never forthcoming.

2  **D. Requested Monetary Remedies are Unavailable**

3  The remedies provided by the California unfair competition law are rather

4  "limited," generally only extending to injunctive relief and restitution. *Korea Supply Co.*

5  *v. Lockheed Martin Corp.,* 29 Cal. 4th 1134, 1144 (2003) (citing *Cel-Tech Commc'ns,*

6  *Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal. 4th 163, 180 (1999)). Even then, in terms of

7  restitution, a claimant can only "recover disgorgement of profits earned by [the defending

8  party] *as a result of* their allegedly unfair practices." *Id.* (citing *Kraus v. Trinity Mgmt.*

9  *Servs., Inc.,* 23 Cal. 4th 116 (2000)). Here, again, the basis of the unfair competition

10  claim is presumably the "improper[] withhold[ing] [of] the Tribe's case file." (ECF No.

11  94, ¶ 94) Yet, all the monies Williams & Cochrane received from Quechan were "as a

12  result" of the Firm performing under the Attorney-Client Fee Agreement; not a single

13  dollar came via the Firm allegedly withholding certain materials in the client file after the

14  conclusion of the representation. This point about timing really gets to the heart of the

15  issue because the event that seemingly serves as the basis for the unfair competition claim

16  occurred *after* the end of the representation and *long after* Quechan made its final

17  payment to the Firm. Moreover, even if Quechan *could* obtain restitution in general, the

18  law still dictates that it *cannot* in these circumstances because of the one-sided benefits

19  the Tribe received under the Attorney-Client Fee Agreement. *Cf. In re Tobacco Cases II,*

20  240 Cal. App. 4th 779, 796 (4th Dist. 2015) ("A full refund is *unavailable* under the UCL

21  when the product had value to consumers notwithstanding the alleged deceptive [act].").

22  **E. Equity Bars Relief**

23  An unfair competition claim under California law is subject to equitable defenses.

24  *See Cortez v. Purolator Air Filtration Prods. Co.,* 23 Cal. 4th 163, 180-81 (2000). The

25  permissible defenses include unclean hands and *in pari delicto* (*see Camp v. Jeffer, Man-*

26  *gels, Butler & Marmaro,* 35 Cal. App. 4th 620, 638 (2d Dist. 1995)), both of which close

27  the courtroom doors to one tainted with "inequitableness or bad faith relative to the mat-

28  ter in which he seeks relief." *Id.*; *Scharrer v. Fundamental Admin. Servs., LLC,* 2013 U.S.

Dist. Lexis 195600, *16 (M.D. Fla. 2013) (citing Black's Law Dictionary 794 (7th ed. 1999)).  Here, the counterclaim at issue is presumably one for unfair competition for not fully turning over a client file, but this situation only arose because Quechan terminated the Firm at the last moment and then demanded the final compact so it could obtain the full benefits of the Attorney-Client Fee Agreement without satisfying any of its burdens. Thus, the inequity that spurred the situation also serves to block any backend remedy.

## VII.   Counterclaim Six for Recoupment/Setoff is neither a Counterclaim nor Available to One who has Engaged in Inequitable Conduct

Finally, the Answer contains a sixth counterclaim labelled "Recoupment/Setoff." (ECF No. 94, 22:22) Yet, the United States Court of Appeals for the Ninth Circuit has made it clear that "recoupment has been allowed by state courts… but it has always been recognized as a defense, not a claim." *City of St. Paul v. Evans,* 344 F.3d 1029 (9th Cir. 2003). The Federal Rules of Civil Procedure contain a process for re-designating a mis-labeled counterclaim as a defense if justice so requires (*see FDIC v. Jacobs,* 2014 U.S. Dist. Lexis 6671, *6 (D. Nev. 2014) (citing Fed. R. Civ. P. 8(c)(2)), but justice would be ill served by allowing Quechan to pursue a recoupment defense *at all*. The reason for this is an equitable remedy like recoupment "may not be invoked [*in any capacity*] to compensate someone who has engaged in inequitable conduct." *In re Straightline Invs.,* 525 F.3d 870, 882 (9th Cir. 2008). Here, Quechan seeks to reduce the very *real* and *concrete* damages caused by the total repudiation of the Attorney-Client Services Agreement by the completely *conjectural* damages from not receiving unspecified client file materials its new attorney never requested. If Quechan truly deserved the aid of an equity court, it would not have done *any* of the deplorable things discussed in the foregoing six sections – from repudiating a contract at the last moment to avoid payment to threatening to ruin the reputation of the injured party if it simply did not walk away from the situation.

## CONCLUSION

For the foregoing reasons, Williams & Cochrane respectfully request that the Court dismiss the counterclaims in the Answer with prejudice.

1    RESPECTFULLY SUBMITTED this 4th day of September, 2018

2

3                                        WILLIAMS & COCHRANE, LLP

4                                        By: /s/ Kevin M. Cochrane
5                                        Cheryl A. Williams
                                         Kevin M. Cochrane
6                                        caw@williamscochrane.com
                                         kmc@williamscochrane.com
7                                        WILLIAMS & COCHRANE, LLP
                                         125 S. Highway 101
8                                        Solana Beach, CA 92075
9                                        Telephone: (619) 793-4809

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28