1  Cheryl A. Williams (Cal. Bar No. 193532)
2  Kevin M. Cochrane (Cal. Bar No. 255266)
   caw@williamscochrane.com
   kmc@williamscochrane.com
3  WILLIAMS & COCHRANE, LLP
   125 S. Highway 101
4  Solana Beach, CA 92075
   Telephone: (619) 793-4809
5

6  Attorneys for Plaintiffs
   WILLIAMS & COCHRANE, LLP, *et al.*
7

8              **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10

11  **WILLIAMS & COCHRANE, LLP**; *and*          Case No.: 17-CV-01436 GPC MDD
    **FRANCISCO AGUILAR, MILO**
12  **BARLEY, GLORIA COSTA,**                    **WILLIAMS & COCHRANE'S**
    **GEORGE DECORSE, SALLY**                    **OPPOSITION TO QUECHAN**
13  **DECORSE**, *et al., on behalf of themselves*  **DEFENDANTS' MOTION TO**
    *and all those similarly situated*;          **DISMISS (ECF No. 115)**
14
                                                 Date:     October 12, 2018
15        *(All 27 Individuals Listed in ¶ 12)*  Time:     1:30 p.m.
                                                 Dept:     2D
16              Plaintiffs,                       Judge:    The Honorable Gonzalo P.
                                                           Curiel
17          vs.

18

19  **ROBERT ROSETTE**; **ROSETTE &**
    **ASSOCIATES, PC**; **ROSETTE, LLP**;
20  **RICHARD ARMSTRONG**;
    **QUECHAN TRIBE OF THE FORT**
21  **YUMA INDIAN RESERVATION**, *a*
    *federally-recognized Indian tribe*;
22  **KEENY ESCALANTI, SR.**; **MARK**
    **WILLIAM WHITE II**, *a/k/a WILLIE*
23  *WHITE*; *and* **DOES 1 THROUGH 100**;
24

25              Defendants.

26

27

28
                                                 Case No.: 17-CV-01436 GPC MDD
      WILLIAMS & COCHRANE'S OPP'N TO QUECHAN'S MOT. TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………… 1

ARGUMENT ………………………………………………………………………2

I.    QUECHAN already Answered and cannot Pursue this Second Motion to Dismiss ………………………………………………... 2

II.   THE ARGUMENT ON THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM THAT SHOULD HAVE BEEN BROUGHT IN CONNECTION WITH THE FIRST MOTION TO DISMISS IS BOTH UNTIMELY AND MERITLESS ……………………………………………………………..5

    A. NEW ARGUMENT ON OLD CLAIMS IS NOT ALLOWED …………………5

    B. THE IMPLIED COVENANT PROTECTS CONTINGENTLY-PAID PARTIES WHO ARE VULNERABLE TO THE PREDATORY WHIMS OF THE OTHER CONTRACTING PARTY ……………………………………… 6

    C. THE IMPLIED COVENANT HAS TO APPLY WITH EVEN MORE FORCE IN THE CASE OF PROFESSIONALS WHOSE ETHICAL DUTIES MAY EXPOSE THEM TO THE SKULLDUGGERY OF UNSCRUPULOUS CLIENTS ………………………………………………………..9

    D. FINDING A LEGAL DEFECT IN THE IMPLIED COVENANT CLAIM SHOULD SIMPLY RESULT IN LEAVE TO AMEND TO CORRECT THE DEFICIENCY AND ADD CONTRACTUAL TORT CLAIMS ……………… 10

III.  THE ARGUMENT ON THE CONSPIRACY TO COMMIT RICO CLAIM IS LARGELY COMPRISED OF REHASHED AND UNEXECUTED, BELATED POINTS THAT ARE NOT SURPRISINGLY UNRESPONSIVE TO THE COURT'S ORDER ………………………………………………………...10

    A. UNDERLYING MOTION IS LARGELY NON-RESPONSIVE ………………10

    B. LATEST COMPLAINT DETAILS *THOUSANDS* OF PREDICATE ACTS ……. 12

    C. GRANT DISCOVERY, NOT DISMISSAL ………………………………...15

1

2

D. "Sovereign… Inherent Authority" Argument Rejected in *Miccosukee* ……………………………………………………... 16

3

4

E. Damages are Sufficiently Alleged ……………………………. 18

5

Conclusion ……………………………………………………………………….20

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WILLIAMS & COCHRANE'S OPP'N TO QUECHAN'S MOT. TO DISMISS

# TABLE OF AUTHORITIES

**CASES**

*Aetna Life Ins. Co. v. Alla Med. Servs., Inc.,*
    855 F.2d 1470 (9th Cir. 1988) …………………………………………………2

*Apache Tribe of Okla. v. Brown,*
    2013 U.S. Dist. LEXIS 114776 (W.D. Okla. 2013) ……………………………16

*Brooks v. Harlon Rip Caswell,*
    2016 U.S. Dist. LEXIS 26832 (D. Or. 2006) ……………………………… 4

*Covell v. Nine W. Holdings, Inc.,*
    2018 U.S. Dist. LEXIS 12437 (S.D. Cal. 2018) ………………………………..16

*Diaz v. Gates,*
    420 F.3d 897 (9th Cir. 2005) …………………………………………... 18, 19

*Doe v. United States,*
    419 F.3d 1058 (9th Cir. 2005) ……………………………………………… 4

*Fin. Tech. Partners L.P. v. FNX, Ltd.,*
    2007 U.S. Dist. LEXIS 48355 (N.D. 2007) ……………………………………. 6

*Flora v. Home Fed. Sav. & Loan Ass'n,*
    685 F.2d 209 (7th Cir. 1982) …………………………………………………...4

*Guz v. Bechtel Nat'l, Inc.,*
    24 Cal. 4th 317 (2000) ………………………………………………………8

*Hicks v. E. T. Legg & Assocs.,*
    89 Cal. App. 4th 496 (4th Dist. 2001) …………………………………… 8

*Hild v. Bank of Am., N.A.,*
    2015 U.S. Dist. LEXIS 55029 (C.D. Cal. 2015) …………………………5, 6, 16

*Jeffredo v. Macarro,*
    599 F.3d 913 (9th Cir. 2010) …………………………………………………20

*///*

*Jordan v. Duff & Phelps, Inc.,*
   815 F.2d 429 (7th Cir. 1987) …………………………………………………...9

*KEMA, Inc. v. Koperwhats,*
   658 F. Supp. 2d 1022 (N.D. Cal. 2009) ……………………………………..4

*Lewis v. Clarke,*
   581 U.S. __, 137 S. Ct. 1285 (2017) ……………………………………… 18

*Locke v. Warner Bros., Inc.,*
   57 Cal. App. 4th 354 (2d Dist. 1997) …………………………………….. 8

*McCollum v. Xcare.net, Inc.,*
   212 F. Supp. 2d 1142 (N.D. Cal. 2002) …………………………….....6, 7, 8, 9

*Mendoza v. Zirkle Fruit Co.,*
   301 F.3d 1163 (9th Cir. 2002) …………………………………………...19

*Miccosukee Tribe of Indians of Fla. v. Cypress,*
   814 F.3d 1202 (11th Cir. 2015) …………………………………….. 16, 17

*Michaels Bldg. Co. v. Ameritrust Co.,*
   848 F.2d 674 (6th Cir. 1998) ………………………………………… 16

*Moore v. Kayport Package Express, Inc.,*
   885 F.2d 531 (9th Cir. 1989) ………………………………………… 15

*Northstar Fin. Advisors, Inc. v. Schwab Invs.,*
   135 F. Supp. 3d 1059 (N.D. Cal. 2015) ………………………………...5

*Ojmar US, LLC v. Sec. People, Inc.,*
   2017 U.S. Dist. LEXIS 190045 (N.D. Cal. 2017) …………………………5

*Paulfrey v. Blue Chip Stamps,*
   150 Cal. App. 3d 187 (2d Dist. 1983) ………………………………… 8

*Pilgrim Badge & Label Corp. v. Barrios,*
   857 F.2d 1 (1st Cir. 1988) …………………………………………... 5

*Rubenstein v. Neiman Marcus Grp., LLC,*
   687 F. App'x 564 (9th Cir. 2017) …………………………………….....15

WILLIAMS & COCHRANE'S OPP'N TO QUECHAN'S MOT. TO DISMISS

*Sedima, S.P.R.I. v. Imrex Co.,*
    473 U.S. 479 (1985) ……………………………………………………….. 19

*Specker v. Kazma,*
    2016 U.S. Dist. LEXIS 95516 (S.D. Cal. 2016) …………………………………4

*State Farm Fire & Cas. Co., v. Spradling Home Inspections, LLC,*
    2011 U.S. Dist. LEXIS 103292 (E.D. Mo. 2011) ………………………………. 2

*Tamiami Partners Ltd. v. Miccosukee Tribe of Indians of Fla.,*
    177 F.3d 1212 (11th Cir. 1999) …………………………………………………17

*Uffner v. La Reunion Francaise, S.A.,*
    244 F.3d 38 (1st Cir. 2001) ……………………………………………………… 5

*Westcott v. City of Omaha,*
    901 F.2d 1486 (8th Cir. 1990) …………………………………………………2

*Wood v. IGATE Techs., Inc.,*
    2015 U.S. Dist. LEXIS 189105 (N.D. Cal. 2015) …………………………………6

**STATUTES**

Indian Gaming Regulatory Act (25 U.S.C. § 2701 *et seq.*)
    *generally* …………………………………………………………………13, 14
    § 2702(1) …………………………………………………………………... 13
    § 2702(2) …………………………………………………………………... 13
    § 2710(d)(3)(A) ………………………………………………………… 13

Racketeer Influenced & Corrupt Organizations Act (18 U.S.C. § 1961 *et seq.*)
    *generally* …………………………………………1, 3, 10, 12, 14, 15, 16, 17, 18, 19
    § 1964(c) …………………………………………………………………18

**RULES AND REGULATIONS**

Code of Federal Regulations
    25, § 290.12 …………………………………………………………………... 13
    25, § 290.14 …………………………………………………………………... 13

Federal Rules of Civil Procedure
    12 …………………………………………………………………………………4, 5

12(b) ……………………………………………………………… 2
12(b)(6) …………………………………………………………… 2
12(c) ………………………………………………………………4
12(g) …………………………………………………... 5, 17
12(g)(2) …………………………………………………………5

Restatement (Second) of Contracts (1981)
§ 205 …………………………………………………………… 9
§ 237 …………………………………………………………… 9

**SECONDARY SOURCES**

C. Wright & A. Miller, *Federal Practice & Procedure* (3d ed.)
5B, § 1342 …………………………………………………………... 5

Richard A. Posner, *Economic Analysis of Law* (3d ed. 1986)
p. 81 ……………………………………………………………… 9

## INTRODUCTION

One of the more iconic movie scenes in cinematic history is in the 1952 movie Sailor Beware!, in which the late, great Jerry Lewis plays the role of a boxer squaring off against a formidable adversary.[1] After getting knocked down, the character played by Jerry Lewis pins his hopes of winning on showing a patent disregard for the rules of the contest, dancing around the ring and taking one swipe after the next at the pate, knees, feet, and really any exposed area of his utterly bemused foe. For the sake of analogy, that boxing ring is this courtroom and that fleet-footed and improvident boxer is WilmerHale. To explain, a short window of time existed after the issuance of the June 7, 2018 order on the first round of responsive motions during which the Court was addressing a separate issue and deciding how long the Plaintiffs could have to file a Second Amended Complaint. Though it did not have to, litigation counsel for the Quechan Tribe of the Fort Yuma Indian Reservation ("Quechan" or "Tribe") WilmerHale elected to file an Answer. It answered as to all claims. It intentionally answered as to all claims. It intentionally answered as to all claims simply because it did not feel like waiting until after the filing of the Second Amended Complaint. And yet, here the parties are, with WilmerHale dancing around the ring throwing jab after jab *once again* even though it should be sitting in the corner waiting for the next round to start. What is even more confounding about this situation is that virtually all of the argument contained within this *second* motion to dismiss is stuff that could have been raised in the *first* motion to dismiss. Quechan may want to argue for the first time that the implied covenant of good faith and fair dealing is inapplicable to at-will employment contracts in California or that a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., alleging a gross misuse of public funds unreasonably impinges upon the dignity of the tribe, but the "first time" it can actually raise those arguments is after the close of the pleadings when Williams & Cochrane ("Firm") has a chance to punch back.

---

[1] Classic Boxing scene from Sailor Beware!, https://www.youtube.com/watch?v=LSAXPzcFupM (last visited Sept. 5, 2018).

WILLIAMS & COCHRANE'S OPP'N TO QUECHAN'S MOT. TO DISMISS

# ARGUMENT

## I. QUECHAN ALREADY ANSWERED AND CANNOT PURSUE THIS SECOND MOTION TO DISMISS

Federal Rule of Civil Procedure 12(b) explains that a responsive motion asserting *any* of the defenses provided for therein – whether lack of subject-matter jurisdiction or failure to state a claim upon which relief can be granted – "must be made before pleading if a responsive pleading is allowed." FED. R. CIV. P. 12(b). This rule means that a federal court loses the ability to hear a motion to dismiss if it arises *after* an answer, even if the answer is "entered and docketed before the[] 12(b)… motion to dismiss" by even a matter of minutes. *State Farm Fire & Cas. Co., v. Spradling Home Inspections, LLC,* 2011 U.S. Dist. LEXIS 103292, *3 (E.D. Mo. 2011) (citing *Westcott v. City of Omaha,* 901 F.2d 1486, 1488 (8th Cir. 1990) ("Technically, however, a Rule 12(b)(6) motion cannot be filed after an answer has been submitted.")); *cf. Aetna Life Ins. Co. v. Alla Med. Servs., Inc.,* 855 F.2d 1470, 1474 (9th Cir. 1988). As mentioned at the outset, litigation counsel for the Quechan defendants faced a fork in the litigative road following the June 7, 2018 order on the first round of responsive motions; it could either answer right then and there or wait to file some type of responsive document until after the submission of the Second Amended Complaint. What WilmerHale ultimately elected to do was answer because, by its own admission, it wanted to get a jumpstart on pursuing the bevy of counterclaims against Williams & Cochrane that it began conjuring up after the service of the complaint in this case – ones that claim the firm committed untold harms by failing to turn over un-identified documents from the client file following its supposed termination. (ECF Nos. 94; 98, 5:4-12) Not only that, but WilmerHale even expressly acknowledged that it was answering *each* and *every* claim in the First Amended Complaint. (ECF No. 98, 2:5-8) Thus, the Answer responded to the Second Claim for Relief that alleges a breach of the implied covenant of good faith and fair dealing:

**(CONTINUED ON NEXT PAGE)**

2                    Case No.: 17-CV-01436 GPC MDD
WILLIAMS & COCHRANE'S OPP'N TO QUECHAN'S MOT. TO DISMISS

**SECOND CLAIM FOR RELIEF**

260.   To the extent a response is required, the Tribe denies the allegations in Paragraph 260.

- 51 -

THE TRIBE'S ANSWER AND COUNTERCLAIMS
Case No.:  17-cv-01436-GPC-MDD

Case 3:17-cv-01436-GPC-MDD   Document 94   Filed 06/21/18   PageID.7952   Page 53 of 61

261.   Paragraph 261 contains conclusions of law to which no response is required.  To the extent a response is required, the Tribe denies the allegations in Paragraph 261.

262.   The Tribe admits that the Tribe and W&C executed the Attorney-Client Fee Agreement and denies the remaining allegations in Paragraph 262.

263.   The documents referenced in Paragraph 263 speaks for themselves.  The Tribe denies any characterization of the documents referenced in Paragraph 263 and denies the remaining allegations in Paragraph 263.

264.   The documents referenced in Paragraph 264 speaks for themselves.  The Tribe denies any characterization of the documents referenced in Paragraph 264 and denies the remaining allegations in Paragraph 264.

265.   The Tribe denies the allegations in Paragraph 265.

(ECF No. 94, 52:23-53:12) And it also addressed the then-Seventh (and now Sixth) Claim for Relief that concerns whether or not the ongoing and considerable financial irregularities at Quechan constitute a conspiracy to violate RICO:

**SEVENTH CLAIM FOR RELIEF**

291.   The allegations referenced in Paragraph 291 pertain to a claim dismissed by the Court and as a result, no response is required.  To the extent a

- 55 -

THE TRIBE'S ANSWER AND COUNTERCLAIMS
Case No.:  17-cv-01436-GPC-MDD

Case 3:17-cv-01436-GPC-MDD   Document 94   Filed 06/21/18   PageID.7956   Page 57 of 61

response is required, the Tribe denies the allegations in Paragraph 291.

292.   Paragraph 292 contains conclusions of law to which no response is required.  The allegations referenced in Paragraph 292 pertain to a claim dismissed by the Court and as a result, no response is required.  To the extent a response is required, the Tribe denies the allegations in Paragraph 292.

293.   The allegations referenced in Paragraph 293 pertain to a claim dismissed by the Court and as a result, no response is required.  To the extent a response is required, the Tribe denies the allegations in Paragraph 293.

294.   The allegations referenced in Paragraph 294 pertain to a claim dismissed by the Court and as a result, no response is required.  The documents referenced in Paragraph 294 speaks for themselves.  The Tribe denies any characterization of the documents referenced in Paragraph 294 and denies the remaining allegations in Paragraph 294.

295.   The allegations referenced in Paragraph 295 pertain to a claim dismissed by the Court and as a result, no response is required.  To the extent a response is required, the Tribe denies the allegations in Paragraph 295.

296.   The allegations referenced in Paragraph 296 pertain to a claim dismissed by the Court and as a result, no response is required.  To the extent a response is required, the Tribe denies the allegations in Paragraph 296.

(ECF No. 94, 56:25-56:19) The filing of this Answer should have marked the point when the proceedings orderly transitioned from the parties debating the sufficiency of the allegations in the operative complaint against the Quechan defendants to dealing with the counterclaims they raised in turn. Yet, in faithful Jerry Lewis-esque fashion, WilmerHale remains undeterred and keeps wildly flailing away.

Even the most black-and-white of rules tend to have some sort of ameliorative loophole, but the applicable one in this situation that WilmerHale is bound to bring up still does not help its cause. According to one line of cases, a court facing a belated motion to dismiss has the power to convert the motion into one for judgment on the pleadings. *See Brooks v. Harlon Rip Caswell,* 2016 U.S. Dist. LEXIS 26832, *5 (D. Or. 2006). Yet, a motion of this nature may only be filed *after* the pleadings are closed (*see Doe v. United States,* 419 F.3d 1058, 1061 (9th Cir. 2005) (citing FED. R. CIV. P. 12(c)), which, in the case of an "answer containing counterclaims," only occurs when "the plaintiff serves his reply." *KEMA, Inc. v. Koperwhats,* 658 F. Supp. 2d 1022, 1027 (N.D. Cal. 2009) (citing *Flora v. Home Fed. Sav. & Loan Ass'n,* 685 F.2d 209, 211 n.4 (7th Cir. 1982)). Given that this point is *way* off in the future now that Williams & Cochrane has moved to dismiss the considerable number of counterclaims filed by the Quechan defendants (*see* ECF No. 138-1), the Court should heed the directive of the United States Court of Appeals for the Ninth Circuit (*see Doe,* 419 F.3d at 1061) and follow the lead of the spate of sister districts that have faced similar situations and elected to deny the motion to dismiss without prejudice to its potential refiling as a motion for judgment on the pleadings *after* the close of the pleading stage and *once* the adverse party has a right to file a counter motion. *See, e.g., KEMA,* 658 F. Supp. 2d at 1027; *Specker v. Kazma,* 2016 U.S. Dist. LEXIS 95516, *16-*17 (S.D. Cal. 2016) (dismissing a post-answer motion to dismiss as untimely and explaining that the defendants has "other remedies it can pursue, though, as described in Rule 12").

///

///

## II. THE ARGUMENT ON THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM THAT SHOULD HAVE BEEN BROUGHT IN CONNECTION WITH THE FIRST MOTION TO DISMISS IS BOTH UNTIMELY AND MERITLESS

### A. New Argument on Old Claims is not Allowed

Federal Rule of Civil Procedure 12(g)(2) places strict limits on what a responding party can do down the line when it files successive motions to dismiss, explaining that "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." FED. R. CIV. P. 12(g)(2). The United States District Court for the Central District of California recently discussed this rule and the rationale for it in great depth in *Hild v. Bank of America, North America,* 2015 U.S. Dist. LEXIS 55029, *8 (C.D. Cal. 2015). According to the Court, "[t]he general purpose of Rule 12 is 'to expedite and simplify the pretrial phase of federal litigation while at the same time promoting the just disposition of civil cases.'" *Hild,* 2015 U.S. Dist. LEXIS 55029 at *8 (citing C. Wright & A. Miller, 5B *Federal Practice & Procedure* § 1342, p. 23 (3d ed.)) The limitation on successive motions set forth in the foregoing Rule 12(g) helps achieve this end by serving "to eliminate the presentation of [Rule 12] defenses in a piecemeal fashion." *Id.* (citing, *e.g.*, *Uffner v. La Reunion Francaise, S.A.,* 244 F.3d 38, 41 (1st Cir. 2001)). In particular, it does this by contemplating "the presentation of an omnibus pre-answer motion in which [the] defendant advances *every* available Rule 12 defense and objection he may have that is assertable by motion." *Id.* (citing *Pilgrim Badge & Label Corp. v. Barrios,* 857 F.2d 1, 3 (1st Cir. 1988)). Like the order in *Hild,* the "weight of authority" from federal courts around the Nation supports interpreting Rule 12(g) just as it is written (*see, e.g., Northstar Fin. Advisors, Inc. v. Schwab Invs.,* 135 F. Supp. 3d 1059, 1071 (N.D. Cal. 2015) (collecting cases)), and district courts from this circuit are no strangers to chiding parties for trying to get "do-overs" or "a second bite at the apple after neglecting to set forth arguments that were fully available to [them] when moving to dismiss the [earlier complaints]." *Ojmar US, LLC v. Sec. People, Inc.,* 2017 U.S. Dist. LEXIS 190045, *12 (N.D. Cal. 2017) (cit-

1    ing, *e.g.*, *Hild,* 2015 U.S. Dist. Lexis 55029 at *3).

2              In this case, nothing about the breach of the implied covenant of good faith and fair

3    dealing claim changed between the First and Second Amended Complaints, and yet Que-

4    chan is rather up front that it simply wants to renew its attack on the claim using argu-

5    ment it *could* have raised in its first motion but *didn't.* As to that, the June 6, 2018 order

6    on the initial round of responsive motions indicated that the only argument Quechan

7    raised against the implied covenant claim is that it is duplicative of the breach of contract

8    claim, expressly noting "[t]hey [*i.e.*, Quechan] do not offer any argument that the *merits*

9    of the implied covenant claim fail." (ECF No. 89, 18:21-13) The motion to dismiss by

10   Quechan picks up right where the Court left off, treating the fact that the "Court did

11   not… address the merits of the claim" as a supposed invitation to explain now "why the

12   breach of the implied covenant of good faith and fair dealing is barred and should be

13   dismissed." (ECF No. 115-1, 6:10-15) There was a proper time to question whether the

14   allegations underlying the implied covenant claim were sufficient to state a plausible

15   claim for relief, and that was on the *first* round of motion to dismiss briefing, not now.

16   **B. The Implied Covenant Protects Contingently Paid Parties who are Vulner-**
17   **able to the Predatory Whims of the other Contracting Party**

18            Though the Court should not reach the merits of Quechan's belated argument, the

19   contention in the motion to dismiss that "[a]n action cannot lie for breach of the implied

20   covenant of good faith[] when an employee may be terminated at will" (ECF No. 115-1,

21   10:12-14) is flatly inaccurate and directly rejected by any number of federal courts in

22   cases where an employer holds the discretionary power to terminate an at-will employee

23   who receives compensation in the form of commissions or other delayed or contingent

24   sums. *See, e.g., Wood v. IGATE Techs., Inc.,* 2015 U.S. Dist. Lexis 189105, *10 (N.D.

25   Cal. 2015); *Fin. Tech. Partners L.P. v. FNX, Ltd.,* 2007 U.S. Dist. Lexis 48355, *10-*12

26   (N.D. 2007). In fact, one such federal court applied this principle in the remarkably an-

27   alogous case of *McCollum v. Xcare.net, Inc.,* 212 F. Supp. 2d 1142 (N.D. Cal. 2002). In

28   *McCollum,* the plaintiff was hired by the defendant XCare for a regional sales manager

position pursuant to an at-will contract that provided her with a base salary of $85,000 per year and the ability "to receive sales commissions over and above her salary" in accordance with a compensation plan. *See Id.* at 1144. The only existing client for XCare that was headquartered within the plaintiff's sales territory upon the commencement of her employment was Foundation Health Systems, and the plaintiff was tasked with consummating a "Technology Partnership Contract" with this client that "would have resulted in approximately $10 million in revenue to [the] Defendant" XCare. *Id.*

The plaintiff seemingly carried out the sales work she was assigned to do, as the parties were set "to sign the [Technology Partnership Contract] on Thursday, October 12, 2000." *Id.* However, just *six* days before then, "[o]n October 6, 2000, a Senior Vice President for XCare circulated an E-mail entitled 'Layoffs-Reorganization/Cost Cutting'" in which he stated that the "[p]laintiff would be 'let go' at the end of the business day of October 11" – the day before XCare was set to sign the contract the plaintiff worked to secure. *Id.* Via subsequent communications, various high ranking employees informed plaintiff that her termination "was [supposedly] because her 'performance had not met expectations,'" and that she was "not to make any contact with FHS [*i.e.*, the party on the other side of the bargaining table] or any associated business of FHS/NVG." *Id.* With the pretext and prior restraints in place, XCare then "took the position" that plaintiff's employment came to an end on October 11, 2000, subsequently refusing to pay her "*any* commission on the Technology Partnership Contract" that the companies ultimately executed. *Id.* at 1145.

Like any rational person subjected to such dastardly and unforgiveable actions, the plaintiff brought suit against XCare, claiming through breach of contract and breach of the implied covenant of fair dealing claims that she was "entitled to a commission of $570,130 for her work on that [$10 million] contract." *Id.* The attorneys for XCare borrowed a page from the WilmerHale playbook, though, and moved to dismiss the implied covenant claim – in this instance on summary judgment – on the basis that the express terms of the contract enabled the company to terminate the plaintiff at *any* time and for

WILLIAMS & COCHRANE'S OPP'N TO QUECHAN'S MOT. TO DISMISS

*any* reason regardless of what implied-covenant case law says. *See id.* at 1152. The district court saw things differently, though, and explained that "California law is clear… that 'where a contract confers one party with discretionary powers affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.'" *Id.* (citing *Locke v. Warner Bros., Inc.,* 57 Cal. App. 4th 354, 363 (2d Dist. 1997)). What this means is that an employer *cannot* seek shelter under the terms of an at-will contract and thereby escape the reach of the implied covenant if it terminates an employee as a mere pretext to cheat the worker out of benefits. *Id.* at 1153 (citing *Guz v. Bechtel Nat'l, Inc.,* 24 Cal. 4th 317, 353 (2000)). With this principle in mind, the district court denied XCare's motion and explained there was a legitimate issue of fact as to whether the company "frustrate[d] Plaintiff's legitimate expectations under the [compensation plan] by reassigning the FHS account, and/or terminating Plaintiff's employment, less than two weeks before the [Technology Partnership] was signed." *Id.* After all, "the issue of whether the implied covenant of good faith and fair dealing has been breached is ordinarily a 'question of fact *unless only one inference [can] be drawn from the evidence.*'" *Hicks v. E. T. Legg & Assocs.,* 89 Cal. App. 4th 496, 509 (4th Dist. 2001) (citing *Paulfrey v. Blue Chip Stamps,* 150 Cal. App. 3d 187, 194 (2d Dist. 1983)).

As mentioned, the similarities between the fact patterns in *McCollum* and the present case are plainly apparent. Both plaintiffs had contracts with a base rate of pay and the ability to obtain an additional "commission" that was a percentage of some benefit the employer would receive under the resultant multi-*multi*-million dollar contract. (ECF No. 100-2, § 5) The plaintiff in XCare was constructively terminated six days before the contract at issue was signed, while Williams & Cochrane was blocked from completing the negotiations just three days before the long-anticipated signing date for the compact. (ECF No. 100, ¶ 3) Both employers tried to subsequently justify their actions by claiming the plaintiff was derelict in some way (*see id*. at ¶ 97), yet neither shied away from accepting the full benefits of the contracts the plaintiffs brought about. (*id*. at ¶ 110) But, this side-by-side factual comparison goes well beyond the very limited legal challenge

Case No.: 17-CV-01436 GPC MDD
WILLIAMS & COCHRANE'S OPP'N TO QUECHAN'S MOT. TO DISMISS

WilmerHale has now belatedly raised, one that seems to not only ignore the strictures of the implied covenant but the fact that "[t]he fundamental function of contract law (and recognized as such since Hobbes's day) is to deter people from behaving opportunistically toward their contracting parties, in order to encourage the optimal timing of economic activity and to make costly self-protective measures unnecessary." *Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 438 (7th Cir. 1987) (quoting Richard A. Posner, *Economic Analysis of Law* 81 (3d ed. 1986); and citing, *e.g.*, Restatement (Second) of Contracts § 205 (1981)).

### C. The Implied Covenant has to Apply with even more Force in the Case of Professionals whose Ethical Duties may Expose them to the Skullduggery of Unscrupulous Clients

The *McCollum* opinion goes to great lengths to stress the importance of applying the implied covenant in situations in which one party in a superior position of power has unfair control over whether it is going to comply with its financial obligations under a contract. In the normal commercial world, this principle is not *that* important since one of the basic tenants of contract law is that "it is a condition of each party's remaining duties to render performance to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." Restatement (Second) of Contracts § 237 (1981). In other words, you don't pay for the house, you don't get the house. But, here, the whole crux of the Answer by Quechan is that it believes the California Rules of Professional Conduct require an attorney to hand over its final work product to the client – even if is worth hundreds of millions of dollars and even if the client refuses to pay for it. Hold that the implied covenant does not apply in *this* situation and *any* law firm would have to be absolutely insane to take on a high-stakes contingency case for a client, particularly one it does not know beforehand. At the end of the day, all this is going to do is hurt the clients in need of representation, as the one in this case would have found itself being sued for material breach of compact by the State of California rather than receiving a new compact that doubled

its machine count, tripled its casinos, and cut its revenue sharing payments by more than 90%.

### D. Finding a Legal Defect in the Implied Covenant Claim should simply Result in Leave to Amend to Correct the Deficiency *and* Add Contractual Tort Claims

As a postscript to this implied covenant argument, litigation counsel for Quechan seems to view the pleading stage like shooting fish in a barrel, whereby it can knock out any and every claim it supposedly does not like on the basis of some legal technicality. In other words, five become four, four become three, and so on and so forth. Here, Williams & Cochrane has set forth just two contract claims against Quechan because those are the most direct route to obtaining the monies that are due the Firm under the inequitably repudiated contract. Should either one of these contract claims against Quechan fail for whatever reason, then Williams & Cochrane intends to amend the operative complaint to raise contractual tort claims, even if some or all of the recovery for those claims has to come from the responsible tribal "officials" who acted outside the proper channels to terminate the Attorney-Client Fee Agreement.

### III. THE ARGUMENT ON THE CONSPIRACY TO COMMIT RICO CLAIM IS LARGELY COMPRISED OF REHASHED AND UNEXCUSED, BELATED POINTS THAT ARE NOT SURPRISINGLY UNRESPONSIVE TO THE COURT'S ORDER

#### A. Underlying Motion is largely Non-Responsive

The June 7, 2018 order on the first round of responsive motions is pretty specific as to the information the Court wanted to see in the next amended pleading for the conspiracy to commit RICO claim to go forward. Despite this, the argument in the second motion to dismiss by the Quechan defendants is chock-a-block full of discussion on tangents that has nothing to do with the issues the parties were supposed to focus upon. Much of this simply results from the Quechan defendants doing a cut-and-paste job, believing the Court must have overlooked some of its argument on the first go around so they might as well import it wholesale and argue it once again for posterity sake. For instance, here is a screen capture of a section of the conspiracy to commit RICO argument

WILLIAMS & COCHRANE'S OPP'N TO QUECHAN'S MOT. TO DISMISS

from the first motion to dismiss contending that the scheme alleged in the First Amended Complaint lacks both structure and/or an illicit purpose:

> W&C provides no description of the structure of the purported payday lending RICO enterprise, nor can it. It was never discussed with Rosette,[6] and indeed, W&C acknowledges it never existed. *See* FAC ¶ 222 (listing alleged Rosette-related payday lending businesses). The most W&C can do is make the conclusory allegation that "Rosette and Quechan-related defendants are individuals and business entities that are associated in fact and have either conspired to participate in or conduct an enterprise aimed at creating a sham online payday lending business at the tribe in an environment that will avoid detection by the tribe at large." *See* FAC ¶ 293. That is not a description of the structure of a cognizable RICO enterprise in this or any other case; it is merely a legal definition of what a RICO enterprise is generally in the context of a RICO conspiracy claim.
>
> *Finally*, W&C does not even plead that any such Quechan payday lending business, if it existed, would actually be fraudulent or illegal. Instead, it insinuates

(ECF No. 50-1, 25:1-13) Now, compare this screen cap against a portion of the related section in the latest motion to dismiss, which, surprise, argues in nearly identical fashion, using nearly identical language, that the detailed scheme lacks both structure and/or an illicit purpose:

> W&C provides no description of the structure of the purported payday lending RICO enterprise or "other elicit end," nor can it. Such plans were never discussed with Rosette,[3] and indeed, W&C acknowledges that a Quechan payday lending business never existed. *See* SAC ¶ 179 (listing alleged Rosette-related payday lending businesses). The most W&C can do is make the conclusory allegation that "Rosette and Quechan-related defendants are individuals and business entities that are associated in fact and have either conspired to participate in or conduct an enterprise aimed at fraudulently abusing the finances of the tribe in pursuit of a sham online payday lending business or for some other elicit end." *See* SAC ¶ 230. That is a legal conclusion; not a factual allegation that describes the structure of a cognizable RICO enterprise.
>
> *Third*, W&C does not plead that any fraudulent or illegal conduct by the purported enterprise—a deficiency the Court found was a "vital flaw" in W&C's FAC. Order at 33. To the extent that W&C contends that President Escalanti and

(ECF No. 115-1, 13:1-14) What the Court asked for is "another viable allegation suggesting that the relevant defendants… agreed to commit or participated in wire or mail fraud" on top of "with[o]ld[ing] per capita payments from Quechan membership using the allegedly false pretense that Quechan's casinos were not profitable." (ECF No. 89, 33:16-24) Given this, the primary focus of this opposition will be upon showing how the new information detailed in the Second Amended Complaint provides the second (and third, and fourth, and fifth…) predicate act needed for the conspiracy to commit RICO claim to head out of the pleading stage and into discovery.

## B. Latest Complaint Details *Thousands* of Predicate Acts

One admitted problem with the First Amended Complaint is that it painted the withholding of per capita payments from the Quechan membership as one discreet act, simply stating that "the Quechan Tribal Council [had] stop[ed] per capita payments to the general membership of the tribe." (ECF No. 39, ¶ 236) What is described as one event in the First Amended Complaint was treated as such by the Court in its ensuing June 7, 2018 order; the analysis section of this order frames the action of "with[o]ld[ing] per capita payments from [the] Quechan membership using… allegedly false pretense[s]" as one singular act and asks for a second "viable allegation" of wire or mail fraud for the conspiracy to commit RICO claim to proceed. (ECF No. 89, 33:16-24) In actuality, this one *course of conduct* described in the allegation is comprised of thousands of individual *acts*. As the Second Amended Complaint discusses in greater detail, the Quechan tribe is made up of approximately "2,565 adult members… and 1,172 minors," all of whom failed to receive per capita payments into their respective accounts (trust or otherwise) for at least the *entire* seventeen month period spanning from April 2017 to July 2018. (ECF No. 136, ¶ 196) With surplus monies going from the casino to the tribe on a monthly basis, the single *allegation* of wire fraud actually consists of upwards of 63,259 predicate *acts*.

Realizing that this added information changes the dynamics of the claim, the Quechan defendants cite to a document that may or may not be the tribal Revenue Allocation

Plan[2] to argue that the Tribal Council has absolute discretion as to *when* to make per capita payments and *what* to pay out to tribal members. However, this position goes against the very purpose of the authorizing statute, the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq*. Lest anyone forget, Congress enacted IGRA "to provide a statutory basis for the operation of gaming by Indian tribes" in a manner that "shield[ed] [the tribes] from organized crime and other corrupting influences." 25 U.S.C. §§ 2702(1) & (2). As part of this commitment to stave off the corrupting influences that tend to follow around large amounts of visible and fluid cash, Congress allowed tribes to use the proceeds from gaming activities as direct payments to tribal members so long as the tribe had an approved "plan to allocate revenues" in place that complied with certain conditions. *See* 25 U.S.C. § 2710(d)(3)(A). One of these conditions is that the revenue allocation plan has to detail the percentage of monies that is being used for per capita payments, and the tribe must distribute the monies in equal shares to *all* members of the tribe unless is has a lawful and reasonable justification for limiting the receipts to just an "identified group of members." 25 C.F.R. §§ 290.12 & 290.14. In other words, the allocation of monies from these economic engines that act as a substitute for a viable taxing authority and serve to provide general welfare to the tribe at large is supposed to be fair, certain, and well documented. However, the Quechan defendants try to argue that *the tribe* can covenant to the federal government that forty percent of the available receipts will go to per capita payments and that these monies will be apportioned equally among all eligible tribal members, but the *Tribal Council* can instead disregard all of this and determine in its absolute and sole discretion what to do with the funds. A position like this does more than create an unintended loophole in IGRA; it just creates one giant gaping hole, a crater in which an opportunistic exception has swallowed the homeostatic rule. And because of that, here the parties sit briefing while looking up at the ground be-

---

[2] The concurrently-filed opposition to Quechan's Request for Judicial Notice lays out Williams & Cochrane's serious concerns about the authenticity and completeness of the information supplied by the tribe.

low simply because the Quechan Tribal Council refused to comply with the text and purposes of IGRA when it comes to Revenue Allocation Plans.

The years-long pattern of withholding per capita payments is just the first category of fraud for purposes of the RICO statute, with the second being the misrepresentations the Quechan Tribal Council made to other governments to cover up what is taking place. Having per capita payments decrease from forty percent of the available tribal distribution down to zero is a remarkable deviation from the norm and one that would lead any outside regulatory body to question (and rather legitimately so) what is taking place inside the tribe that would cause these financial assistance payments to be at an all-time low when gaming income was conversely at an all-time high. To avoid any scrutiny of this nature, putative President Keeny Escalanti used the wires and mail to send letters to the Arizona Department of Gaming and the National Indian Gaming Commission, if not others, in which he made the falsified claim that Quechan was still using *forty percent* of its net gaming revenues for per capita payments. (ECF No. 136, ¶ 197) Contrary to the argument in the underlying motion to dismiss, this conduct has a perfectly clear "nexus to [Williams & Cochrane's] allegations that defendants were using the Tribe's funds for their own personal enrichment" (ECF No. 115-1, 21:3:7), and seems par for the course for a tribal council of a successful gaming tribe that is represented by Robert Rosette.

In fact, two of the most memorable instances of suspected financial fraud at Indian tribes in recent years occurred on Robert Rosette's watch. There was the extensively-reported situation at Picayune, in which the Rosette-led Tribal Council failed to file casino audits with the National Indian Gaming Commission amidst a backdrop of recurrent accusations concerning the misappropriation of large sums of money, a tinder keg that eventually exploded when "a group of twenty tribal members armed with bullet-proof vests and guns… storm[ed] the casino in an attempt to take over the facility." (ECF No. 136, ¶ 116) Then there was the similar situation at Paskenta, where the Tribal Council backed by Robert Rosette disenrolled a mass of tribal members to seemingly increase its own financial standing – a situation that also sparked a violent stand-off at the tribe's

gaming facility. (*See id.* at ¶ 117) The motions to dismiss filed by the Quechan defend-ants can keep shouting from the rooftops that the relevant allegations in the Second A-mended Complaint are nothing more than a "laundry list of isolated events" (*see* ECF No. 115-1, 21:3-8), but this evidence of a well-orchestrated and well-hidden systemic scheme that closely mirrors what happened at other tribes represented by the same attorney simply belies this argument. And all of this says nothing about the other allegations of the conspiracy to commit RICO that the Quechan defendants simply failed to address in their motion to dismiss, like the one that explains the financial manipulation has even reached the corpora of the minor trust accounts so the "amounts distributed from these accounts to tribal members who reach the age of majority as of late are substantially less than the total amount of per capita payments that should have accumulated over time." (ECF No. 136, ¶ 199) All it takes is two predicate acts for a RICO claim to reach the level of plausi-bility, and the Second Amended Complaint details *thousands* of such acts.

### C. Grant Discovery, not Dismissal

The foregoing subsection, like the body of the Second Amended Complaint, details the overall structure of the conspiracy to commit RICO scheme with considerable precis-ion. Nevertheless, the underlying motion nitpicks the allegations with questions only the defendants in this case can answer, like "how funds were misused" or "how President Escalanti and Councilman White participated in misappropriating tribal funds." (ECF No. 115-1, 14:11-15) The abundance of case law that describes the need for a plaintiff to set forth a *plausible* claim for relief does not require this level of exactitude, though. In fact, there is plenty of case law just from the Ninth Circuit explaining that the pleading stand-ard for fraud "may be relaxed as to matters within the opposing party's knowledge" such that the plaintiff only needs to identify "the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." *Rubenstein v. Neiman Marcus Grp., LLC,* 687 F. App'x 564, 567-68 (9th Cir. 2017) (citing *Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 540 (9th Cir. 1989)). What this means in the RICO context is that a plaintiff only needs to *outline* the fraudulent scheme, like Williams &

WILLIAMS & COCHRANE'S OPP'N TO QUECHAN'S MOT. TO DISMISS

Cochrane did in the preceding subsection of this argument, and then it "should have an opportunity to flesh out [its] claim through evidence unturned in discovery" in order to fill in the details of this outline with "specific information that is under the exclusive control of the defendant." *Apache Tribe of Okla. v. Brown,* 2013 U.S. Dist. LEXIS 114776, *21 (W.D. Okla. 2013) (citing, e.g., *Michaels Bldg. Co. v. Ameritrust Co.,* 848 F.2d 674, 680 (6th Cir. 1998)); *see Covell v. Nine W. Holdings, Inc.,* 2018 U.S. Dist. LEXIS 12437, *12 (S.D. Cal. 2018) ("Here, the particular facts as to whether the SUGG. RETAIL prices are fictitious are likely only known to Nine West. Without an opportunity to conduct any discovery, Plaintiff cannot reasonably be expected to have detailed personal knowledge of Nine West's internal pricing policies."). Here, the final general allegation in the Second Amended Complaint explains that the Tribal Council will not disclose *any* information that will answer the question of where the monies previously earmarked for per capita payments are actually going. (*See* ECF No. 136, ¶ 202 ("As Mr. Escalanti and Mr. White have entrenched themselves in power, the general membership of Quechan has repeatedly questioned the Tribal Council regarding where the money from the casino is going, but the Tribal Council refuses to disclose any financial information or audit reports)) So, no, Williams & Cochrane cannot explain "how… Councilman White participated in misappropriating tribal funds," but that is something Mr. White can answer for himself when being deposed during the discovery stage of this proceeding.

### D. "Sovereign… Inherent Authority" Argument was Rejected in *Miccosukee*

Among the many arguments in the conspiracy-to-commit-RICO section of the motion to dismiss is a new one that claims Williams & Cochrane cannot raise the claim *at all* because "the alleged predicate acts are within the Tribe's inherent authority as a sovereign nation… to [do things like] 'determine tribal membership' and 'to regulate domestic relations among members.'" (ECF No. 115-1, 17:22:28). Once again, this is an argument that was readily available to the Quechan defendants on the first round of motion-to-dismiss briefing, which means there is no legitimate basis for pursuing the argument for the first time now. *See Hild,* 2015 U.S. Dist. LEXIS 55029 at *7-*11 (citing, *e.g.*, FED.

WILLIAMS & COCHRANE'S OPP'N TO QUECHAN'S MOT. TO DISMISS

R. CIV. P. 12(g)). All the same, this argument that a federal court is powerless to redress gross abuses of power by tribal officials met its fate just a few years ago when the United States Court of Appeals for the Eleventh Circuit addressed the issue in *Miccosukee Tribe of Indians of Florida v. Cypress,* 814 F.3d 1202 (11th Cir. 2015). *Miccosukee* involved a federally-recognized Indian tribe that brought a RICO suit against its former chairman of twenty-two years and his professional accomplices, who together allegedly carried out a scheme to pilfer tens of millions of dollars from the tribe one fraudulent ATM withdrawal or credit card transaction at a time. *See id.* at 1205. In defending against these claims, the principal argument raised by the "non-Tribal-member attorney defendants" was that the federal courts lacked the necessary jurisdiction to hear any claim involving fraud or embezzlement because it would inherently require an "explor[ation] [of] the limits of [the former chairman]'s authority under Tribal law." *Id.* at 1209. The basic gist of the argument went, "if Tribal law permitted [the former chairman] to take over $26 million in cash and services for himself and his close confidants while concealing the scheme from the Tribe, than any alleged conspiracy and self-dealing were not actually illegal (and the alleged secrecy may have been mere political image control rather than a conspiratorial attempt to conceal an illegality)." *Id.*

The Eleventh Circuit was not buying this argument, though. It noted that claims of fraud and embezzlement do not touch upon the core issues of tribal sovereignty that the Quechan defendants themselves cite in their underlying motion – namely "membership disputes, active disputes between competing factions claiming current leadership power, domestic relations, or inheritance rules." *Id.* at 1210. Rather, at best, the only tribal-sovereignty issue related to the fraud and embezzlement claims then before the court was "a potential scope-of-authority question [the Eleventh Circuit] previously ha[d] examined in the context of suits against Tribal officials." *Id.* at (citing *Tamiami Partners Ltd. v. Miccosukee Tribe of Indians of Fla.,* 177 F.3d 1212, 1225 (11th Cir. 1999)). And this was the Eleventh Circuit saying in 2015 that it believed it could address a suit against a tribal official who had acted outside his or her authority *before* the Supreme Court of the Uni-

ted States made that definitively clear a mere two years later in *Lewis v. Clarke,* 581 U.S. __, 137 S. Ct. 1285 (2017). (ECF 89, 30:14-31:15) Here, the effect of this case on the doctrine of tribal sovereignty is really in the eye of the beholder. The Quechan defendants contend that the claims inherently harm tribal sovereignty because "official government actions by a sovereign tribal nation [can never] constitute RICO predicate acts." (ECF No. 115-1, 18:3-5) Williams & Cochrane on the other hand believes that tribal sovereignty gains strength by holding accountable officials who act outside of their authority to misdirect monies that are supposed to go towards the public good. On this point, not only does the Eleventh Circuit agree, but this Court does as well in light of its prior statement that the "RICO conspiracy claim against Escalanti and White… is clearly a personal-capacity suit" that will require "*the[m]*… to pay damages to W&C, not Quechan," if it proves successful. (ECF No. 89, 31:10-15) If any doubt remains about a federal court's authority to hear these claims, it is important to remember that the *claim* at issue arises under federal law and the *conduct* alleged is proscribed by yet other federal statutes. *See, e.g.,* 18 U.S.C. § 666. Thus, the whole point of the conspiracy to commit RICO claim is that is has nothing to do with the *tribe* and everything to do with the *individuals* named in the claim.

### E. Damages are Sufficiently Alleged

Lastly, the underlying motion to dismiss raises a question about damages, latching on to the Court's comment in its June 7, 2018 order and suggesting that Williams & Cochrane "does not include any allegation or any plausible inference that actions taken by the Tribal Council or other tribal governmental agencies caused any harm to [the Firm]." (ECF No. 115-1, 22:3-5) Yet, as articulated by both the Supreme Court and the Ninth Circuit, the test for damages under RICO is a lax and simple one that follows the logic, "[i]f the defendant engages in a pattern of racketeering in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under [Section] 1964(c). There is no room in the statutory language for an additional, amorphous 'racketeering injury' requirement." *Diaz v.*

*Gates,* 420 F.3d 897, 901 (9th Cir. 2005) (*en banc*) (*per curiam*) (quoting *Sedima, S.P.R.I. v. Imrex Co.,* 473 U.S. 479, 495 (1985)). In this equation, the requisite injury to a business or property interest only needs to be a tangible loss like interference with a con- tract or a prospective business relationship, and "[t]here is simply no room in the statu- tory language for an additional amorphous requirement that… the business or property interest [must] have been the 'direct target' of the predicate act." *Id.* at 900-01. Here, the Second Amended Complaint paints a rather basic story – Robert Rosette came *into* the tribe by falsely advertising that he was responsible for litigating the case upon which the Quechan compact negotiations was modeled, and then moved Williams & Cochrane *out* so he could help perpetrate the same sort of furtive financial fraud at Quechan that has seemingly taken place at other tribes he represents like Picayune and Paskenta. (*See, e.g.,* ECF No. 136, ¶¶ 116-17) After all, a savvy and experienced business attorney like Robert Rosette who has quietly built a payday loan empire while somehow managing to evade the harsh glare of the federal spotlight is *not* going to interfere with high-stakes compact negotiations mere days before their expected conclusion for *a pro rata* portion of a fee that works out to $10,000 per month. (ECF No. 54-2, Ex. 2) So, the damage issue, too, is one that is a matter of perspective. The Quechan defendants have made it perfectly clear that their primary motivation, at least initially, was to take the "less expensive option for completing the work" once it was all but done. (ECF No. 115-1, 9:25-27) But you know what helped seal the deal? The Rosette defendants articulating a plan for the monies freed up by the compact negotiations that have nothing to do with making per capita payments to the individual tribal members in accordance with the tribal Revenue Allocation Plan.[3]

    Even if Williams & Cochrane is not the *most* direct victim of the conspiracy to commit RICO scheme, there is no reason why it should not be able to pursue the claim in lieu of the individual tribal members. *See Mendoza v. Zirkle Fruit Co.,* 301 F.3d 1163, 1170 (9th Cir. 2002) (noting that "undocumented workers cannot be 'counted on to bring

---

[3] Kind of like what he was trying to do at Pauma for years on end. (*See, e.g.,* ECF No. 136, ¶ 142)

suit for the law's vindication'" in an illegal-hiring case). Claims brought by one tribal member against the next are *extremely* acrimonious and can produce ill-feelings that run for generations. This sort of scathing, all-consuming vitriol can create non-redressable harms for tribal-member plaintiffs like those that are already being threatened in this case, with the "Tribal Council… [having] sa[id] at least once that the proposed class members… should be banned from coming on to the reservation if not outright disenrol-led from the tribe" for simply bringing a claim against the outside *attorney* for the Tribal Council, Mr. Rosette. Imagine what will happen if these plaintiffs bring a claim against a fellow tribal member who is defiantly holding on to his position of power on the Tribal Council, instead. *See Jeffredo v. Macarro,* 599 F.3d 913 (9th Cir. 2010) (explaining federal courts are unable to redress banishment let alone disenrollment issues). With that said, Williams & Cochrane believes there is a significant public interest underlying this claim and would like to reiterate its request in the Second Amended Complaint to have the opportunity to discuss the future configuration of the claim with the individual tribal members should the Court dismiss the claim on account of the failure to show damages. (ECF No. 136, p. 74 n.33)

## CONCLUSION

For the foregoing reasons, Williams & Cochrane respectfully requests the Court to deny Quechan's motion to dismiss *en toto*.

RESPECTFULLY SUBMITTED this 7th day of September, 2018

WILLIAMS & COCHRANE, LLP, *et al*.

By: */s/ Kevin M. Cochrane*
Cheryl A. Williams
Kevin M. Cochrane
caw@williamscochrane.com
kmc@williamscochrane.com
WILLIAMS & COCHRANE, LLP
125 S. Highway 101
Solana Beach, CA 92075
Telephone: (619) 793-4809