1                    UNITED STATES DISTRICT COURT

2               FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   WILLIAMS & COCHRANE, LLP; and .
    FRANCISCO AGUILAR, MILO       .
5   BARLEY, GLORIA COSTA, GEORGE  .
    DECORSE, SALLY DECORSE,       .
6   et al., on behalf of          .
    themselves and all those      .
7   similarly situated,           .
                                  . Docket
8              Plaintiffs,        . No. 17-cv-1436-GPC(MDD)
                                  .
9                   v.            . October 12, 2018
                                  . 1:30 p.m.
10  ROBERT ROSETTE; ROSETTE &     .
    ASSOCIATES, PC; ROSETTE, LLP; .
11  RICHARD ARMSTRONG; QUECHAN    .
    TRIBE OF THE FORT YUMA INDIAN .
12  RESERVATION, a federally      .
    recognized Indian tribe; KEENY.
13  ESCALANTI, SR.; MARK WILLIAM  .
    WHITE II, a/k/a WILLIE WHITE; .
14  and DOES 1 THROUGH 100,       .

15             Defendants.        . San Diego, California.
    . . . . . . . . . . . . . . . .

16

17                    TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE GONZALO P. CURIEL
                   UNITED STATES DISTRICT JUDGE

18

19

20

21
    Court Reporter:         Chari L. Bowery, RPR, CRR
22                          USDC Clerk's Office
                            333 West Broadway, Suite 420
23                          San Diego, California 92101
                            chari_bowery@casd.uscourts.gov
24
    Reported by Stenotype, Transcribed by Computer
25

```
 1                      A-P-P-E-A-R-A-N-C-E-S

 2   For the Plaintiffs:
                             Williams & Cochrane LLP
 3                           125 South Highway 101
                             Solana Beach California 92075
 4                           By:  CHERYL A. WILLIAMS, ESQ.
                                  KEVIN M. COCHRANE, ESQ.
 5
     For the Defendant Quechan Tribe:
 6                           WilmerHale
                             150 South Grand Avenue, Suite 2100
 7                           Los Angeles, California 90071
                             By:  CHRISTOPHER T. CASAMASSIMA, ESQ.
 8                                REBECCA A. GIROLAMO, ESQ.

 9   For the Rosette Defendants:
                             O'Melveny & Myers, LLP
10                           400 South Hope Street, Suite 1050
                             Los Angeles, California 90071
11                           By:  BRITTANY A. ROGERS, ESQ.
                                  MATTHEW W. CLOSE, ESQ.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          SAN DIEGO, CALIFORNIA; OCTOBER 12, 2018; 1:30 P.M.

2                              -o0o-

3          THE CLERK:  Calling Item Number 17 on the calendar,

4     Case Number 17-cv-1436, Williams & Cochrane, LLP, v. Quechan

5     Tribe of the Fort Yuma Indian Reservation, on for a motion

6     hearing.

7          THE COURT:  Appearances, please.

8          MS. WILLIAMS:  Cheryl Williams on behalf of

9     plaintiffs.

10          MR. COCHRANE:  Kevin Cochrane also appearing on

11     behalf of the plaintiffs.

12          THE COURT:  Good afternoon.

13          MR. CLOSE:  Good afternoon, Your Honor.  Matthew

14     Close on behalf of the Rosette defendants.

15          MS. ROGERS:  Good afternoon, Your Honor.  Brittany

16     Rogers also on behalf of the Rosette defendants.

17          MR. CASAMASSIMA:  Good afternoon, Your Honor.  Chris

18     Casamassima on behalf of the Quechan defendants.

19          MS. GIROLAMO:  Good afternoon, Your Honor.  Rebecca

20     Girolamo on behalf of the Quechan defendants.

21          THE COURT:  Good afternoon to you all.

22          We are here on a number of motions, including two motions

23     to dismiss and motion to strike.  At this point, let me let you

24     know how I would like to proceed.  I have some tentative

25     rulings in mind, and I am going to keep you in suspense as to

1   those; and then I have a number of questions I would like to

2   pose relating to the substantive RICO action.  So I would like

3   to begin with those queries, and then following that

4   back-and-forth, then I will give you my tentative as to the

5   remaining motions and then allow you to address them further to

6   the extent that you wish.  All right?

7        So with respect to the RICO, let me begin by focusing on

8   the alleged scheme to defraud.  And the first element of a RICO

9   action requires a scheme to deprive another of money or

10  property by means of false or fraudulent pretenses,

11  representations or promises.  And let me direct myself

12  initially to plaintiffs' counsel, and I am not sure who would

13  like to field the questions that I would like to ask.  If you

14  would like me to ask it first and then decide between you who

15  will answer it, that's fine, too.

16       But as I understand it, the second amended complaint

17  alleges that the defendants sought to fraudulently interfere

18  with contracts.  Is that the scheme that is set forth in the

19  second amended complaint?  I am reading from the fourth cause

20  of action in the second amended complaint, and that's

21  specifically at page 71, at lines five through six.

22            MS. WILLIAMS:  Of the complaint?

23            THE COURT:  Yes, of the second amended complaint.

24            MS. WILLIAMS:  Your Honor, the RICO scheme is

25  actually much broader than just interference with contract.  We

1    have alleged a year's-long pattern of the Rosette defendants to

2    put our firm out of business --

3            THE COURT:  But don't you have to identify a scheme

4    so we can determine whether or not the alleged predicate acts

5    coincide or have a sufficient relationship with the scheme?

6            MS. WILLIAMS:  That is the scheme, is to use false

7    statements to others to take credit for the firm's work, to

8    profit from taking credit for the firm's work, and put the firm

9    out of business through those false statements and fraudulent

10   actions, representing that they represent clients when they

11   don't.

12           THE COURT:  Are you basically saying all the

13   predicate acts reveal the scope of the scheme?

14           MS. WILLIAMS:  All the predicate acts reveal the

15   scope?

16           THE COURT:  Right.  Normally, you would have a scheme

17   identified in terms of the scheme was to take consumers' moneys

18   through a pattern of falsehoods, or there was an insurance

19   company that would misrepresent the value of annuities, so the

20   scheme was to take money from insureds through this particular

21   scheme.

22       You agree that you have to have a scheme specifically

23   identified, correct?

24           MS. WILLIAMS:  Right.

25           THE COURT:  So my question is what is the precise

1  scheme?  Is it listed somewhere in count four or cause of

2  action four?

3       MS. WILLIAMS:  False statements in order to take

4  credit for the firm's work in order to profit from doing so,

5  taking those clients away from the firm and putting the firm

6  out of business.  And also -- I am sorry.  Go ahead.

7       MR. COCHRANE:  I was going to say, there's probably a

8  number of different ways you could frame it, whether it's

9  interference with contract or putting the firm out of business.

10  I think those are more or less one and the same.  But if you

11  look at the various allegations, they point to that action

12  being the ultimate goal of the scheme.  In terms of the Lanham

13  Act claims, this isn't what you would see in a normal Lanham

14  Act case, where you would have a manufacturer or producer of

15  grape blueberry soda, who would misrepresent the ingredients to

16  compete with somebody else.  In that situation, they are

17  essentially trying to prop up their own product as an indirect

18  effect on the competitor.

19     Here, the effect was not only to take credit for the work,

20  but to try to also sever the relationships in the process.  We

21  feel like we showed that through a number of examples through

22  the interference of the court case, obviously the interference

23  of Quechan, elsewhere.

24       THE COURT:  So at this time, let me ask you, with

25  respect to what was otherwise in the complaint as to

1    fraudulently interfering with contracts of Williams & Cochrane,

2    specifically which contracts are included.

3              MS. WILLIAMS:  Definitely the Quechan contract.

4              THE COURT:  Right.

5              MR. COCHRANE:  And, obviously, we have the Pauma

6    contract.

7              THE COURT:  The what?

8              MR. COCHRANE:  The Pauma Band of Mission Indians.

9              THE COURT:  The current contract -- you are still

10   working for Pauma, correct?

11             MS. WILLIAMS:  That's right.

12             THE COURT:  It is that contract?

13             MR. COCHRANE:  Right.  We would also probably try to

14   incorporate the contract that we had with the La Pena law firm,

15   the of counsel arrangement.

16             THE COURT:  Tell me about that.  Was there a contract

17   that had been signed and entered into?

18             MR. COCHRANE:  There had been, yes, sir.

19             THE COURT:  So then your assertion is it was

20   terminated or breached as a result of misrepresentations by the

21   defendants?

22             MR. COCHRANE:  That's correct.  Yes.  I think the

23   misrepresentations are really no different in color than what

24   we have seen later on.  Even though the year was prior to some

25   of the other ones, it was still responsible for this lawsuit,

1    and they are kind of making this stuff up.

2         THE COURT:  Let me ask you, with respect to that, the

3    termination by the La Pena or the termination of a contract,

4    which you indicate existed.  One of the reasons that you gave,

5    I believe, in the complaint is that there was this

6    communication or call between La Pena and Mr. Rosette doing a

7    due diligence, following up with Mr. Rosette to determine

8    whether or not he wanted to have -- whether or not Ms. La Pena

9    wanted to have an ongoing relationship with both of you.

10        Are you asserting that, to the extent that someone

11   contacts a former employer and the employer makes statements

12   that are not flattering and that ultimately it has the effect

13   of that applicant not receiving a position, that that could

14   qualify as a RICO predicate act?

15        MR. COCHRANE:  No, it is certainly not that broad.

16        I think what we found out from the prior declarations that

17   the Rosette defendants submitted in connection with the first

18   motion to dismiss is that they admitted they were making these

19   statements that ultimately found their way onto the website

20   about their role in the Pauma litigation as early as 2010 or

21   2011.  I believe the statement that they made to Ms. La Pena is

22   very similar to the one that they put on the statements --

23        THE COURT:  One part of it.  But you also recounted

24   one of the things Mr. Rosette did is he basically gave you a

25   bad recommendation or gave you a poor rating, evaluation, as

1  employees, or at least as employees who left and then

2  supposedly stole clients?

3       MR. COCHRANE:  I guess the way I would reframe that

4  is when we went in -- excuse me -- when I went into her office

5  at that point in time, we had a candid conversation with her

6  and she said she wanted to merge firms, and she actually

7  provided me with a copy of a memorandum Mr. Rosette prepared,

8  and she said specifically that he was going around representing

9  that he was responsible for the Pauma litigation --

10      THE COURT:  Did she claim that that memorandum did

11  that?

12      MR. COCHRANE:  No.  It was actually statements in

13  connection with the memorandum, and then she provided the

14  memorandum to me.

15      THE COURT:  With respect to what had happened up to

16  that point, as I understand it, you had performed some work for

17  Ms. La Pena and she was very impressed by it, and due to how

18  impressed she was by your work, she then offered up this

19  possibility of merging or coming together; is that right?

20      MR. COCHRANE:  That is correct.  And it was a pretty

21  significant proposal because at the time she was the general

22  counsel for at least two of the largest gaming tribes in the

23  state of California.  She also operated in an office where I

24  think she had one or two associates and obviously was very

25  outstaffed.

```
 1          THE COURT:  So at that point, there wasn't a contract
 2   about being absorbed or merging?
 3          MR. COCHRANE:  No.  We had a contract in place
 4   specifically for the work, but then that's when she broached
 5   the idea of, I guess, entering into some collaboration, whether
 6   it was a merger, absorption, something like that.
 7          THE COURT:  With respect to the contract with
 8   Ms. La Pena, is it referenced in the second amended complaint?
 9          MR. COCHRANE:  I believe we do have it referenced in
10   the complaint itself.  I don't believe we have an actual copy
11   of the contract as an exhibit.
12          THE COURT:  I ask because I may have missed it.  At
13   the same time, it's possible, in reviewing the 80-page second
14   amended complaint, I inadvertently didn't catch it.
15       The question I have is, given this work that had been done
16   which impressed Ms. La Pena, given the reported conversations
17   thereafter with Mr. Rosette where Mr. Rosette indicated that
18   the attorneys of Williams & Cochrane had stolen his client and
19   would invariably steal her clients as well, isn't it equally
20   plausible that Ms. La Pena's decision was based upon this
21   report of stealing clients versus a claim to having done work
22   on the Pauma litigation?
23          MR. COCHRANE:  I suppose it could be a contributing
24   factor.  I imagine that both of these things probably weighed
25   into the decision.
```

```
 1          According to the terms of the e-mail that she sent in the
 2   aftermath, I remember she said something to the effect of there
 3   were issues with confidentiality and conflicts that couldn't be
 4   overcome, which didn't really have anything to do with work
 5   product.  I also don't feel that, given the nature of the
 6   relationship with those clients and my lack of knowledge of
 7   anybody who was inside those tribes, that the idea of actually
 8   stealing the clients was the issue.  I think it was just more
 9   fundamentally about we had sort of misrepresented our way into
10   being in position to kind of come aboard as part of equal
11   partners or merging with her firm.
12          THE COURT:  How much weight should be given to that
13   representation by Ms. La Pena, that this of counsel arrangement
14   should be concluded because there were issues with
15   confidentiality and conflicts?  Those don't seem to coincide
16   with these asserted false claims by Rosette as to the work he
17   had done in the Pauma case, correct?
18          MR. COCHRANE:  I will say that the conversation that
19   I had with her and then the follow-up e-mails in which she
20   concluded the representation and ended all communication were
21   relatively short in time.  So it went from a position where the
22   relationship was one where there was significant potential for
23   a permanent relationship that would go on for a considerable
24   number of years to one in which the relationship just ended, no
25   further communications, no anything.  So, sort of based upon
```

1    that one phone call, I think a lot of weight should be placed

2    upon the conversation that took place between those two events

3    and the fact that what was in all plausibility said was that we

4    were misrepresenting what we had done in order to find

5    ourselves in a position where we could work for her or with

6    her.

7            THE COURT:  But she didn't say issues of credibility

8    versus conflicts and such, correct?

9            MR. COCHRANE:  Well, what she said was in the e-mail.

10   I am sure it was very carefully worded, especially if she

11   received information from Mr. Rosette saying we have a penchant

12   for misrepresenting things.

13           THE COURT:  And then there's a question regarding

14   injury to property interest that has been raised by the

15   defense, and that corresponds to the Cedema case, the McNally

16   case, and most notably the Lancaster Community Hospital case.

17      Let me inquire with respect to the notion of market share.

18   In your view, would conduct that impacts market share be

19   compensable or covered under the injury to property

20   requirement?

21           MS. WILLIAMS:  It is not a question of market share.

22   These were actual fees --

23           THE COURT:  My question is, to the extent that one

24   were to find one or more of these predicate acts related to

25   market share, is your view that the law of the Ninth Circuit

1    would find that market share is intangible and is not

2    compensable or is not property for purposes of wire fraud?

3            MS. WILLIAMS:  I don't know if I can really speak to

4    that because that wasn't really how our claim was framed.  It

5    was framed under these contracts from which we had a reasonable

6    expectation of fees.

7            MR. COCHRANE:  And I don't have a case in front of

8    me, and I apologize for that; it doesn't necessarily speak to

9    RICO.  But I do remember a case in which, in the Lanham Act

10   context, the Court essentially came out and said that an injury

11   is much more significant in which it is a smaller market and

12   there's less participants because it is likely that a

13   misrepresentation is going to have a much larger effect on you.

14   So depending how you want to frame the market in this case, if

15   this is a market specifically about attorneys who deal with

16   compact issues in the state of California, then

17   misrepresentations of that nature are rather profound.

18           THE COURT:  I guess that brings me to my next

19   question, and that relates to the 2013 postings of false

20   advertisements on websites and disseminating promotional

21   materials to prospective clients which contain this

22   misrepresentation regarding Mr. Rosette successfully litigating

23   a case, saving the Pauma Band of Luiseno Mission over

24   $100 million in compact payments.  With respect to who received

25   this message, are you claiming that there is a tie-in as to who

1    received this message and damages or compensable harm under the

2    mail fraud act, under the mail fraud statute?

3              MS. WILLIAMS:  Absolutely.

4              THE COURT:  In what way?

5              MS. WILLIAMS:  These false statements damaged our

6    contractual relationships.

7              THE COURT:  Which ones?

8              MS. WILLIAMS:  We believe, starting back with the

9    La Pena relationship --

10             THE COURT:  No, but specifically as to those two

11   predicate acts, beginning on or about March 18, 2013, to post a

12   false advertisement, and then countless times since March 18,

13   2013, to disseminate promotional materials.

14             MR. COCHRANE:  I suppose there would be a market

15   share aspect of that as well.  There's a large number of

16   potential clients within the state of California, and even

17   surrounding states, that have compacts either with the state or

18   similar to the ones enacted in the state of California.

19        The materials that Mr. Rosette was sending out, which were

20   obviously to any prospective client, would sort of preempt us

21   or Bogart us to be able to make the case we were responsible

22   for that work.

23        So, for somebody in our position, you know, who, I guess,

24   their face for doing this work is essentially court filings,

25   for the most part, court filings that are beyond pay walls that

1   most people are not going to see.  So we have that on one hand,

2   and on the other hand, we have somebody who is actively going

3   out and taking credit for your work.  And from what I

4   understand, this was even taking place before the final

5   judgment even came out.

6        So there is a large pool of clients, and in the state of

7   California, you have 100-plus tribes.  I think there are

8   about 70-plus have compacts, a significant number of those

9   compacts that have issues.  We were sort of deprived of that

10  opportunity to have a candid conversation with those tribes

11  based on those actions.

12          THE COURT:  Does that go back to my question about

13  market share and whether or not that is considered to be

14  property for purposes of the mail fraud statute?  And if so,

15  does the Lancaster case speak to that type of harm?

16          MR. COCHRANE:  I can't speak directly to the

17  Lancaster case, but I will come back to the fact that market

18  share, from what I remember, was identified as something that

19  could be negatively impacted as an injury under the Lanham Act

20  statute.  Given that --

21          THE COURT:  But you are not claiming that the Lanham

22  Act statute is a predicate violation which supports a RICO

23  action, correct?

24          MR. COCHRANE:  Not automatically.

25          THE COURT:  Under any circumstances --

1          MS. WILLIAMS:  Not in and of itself.

2          MR. COCHRANE:  Not in and of itself.  It would depend

3     on the circumstances of the case.

4          THE COURT:  Again, as far as the circumstances of the

5     case, you would still have to fit it into one of the predicate

6     offenses, mail fraud, wire fraud or any of the others provided,

7     right?

8          MR. COCHRANE:  That's correct.

9          THE COURT:  All right.  So, with respect to the

10    predicate fact or act of on or about June 16, 2017, the

11    dissemination or arrangement to disseminate those promotional

12    materials, which included this asserted misrepresentation to

13    Keeny Escalanti and Willie White for a June 16, 2017 meeting,

14    is there any indication that the wires were used for purposes

15    of disseminating those promotional materials?

16         MR. COCHRANE:  I will say I believe it was a

17    declaration of Christian Cienfuegos, where she said the

18    promotional materials were sort of made in the ordinary course

19    of business and distributed to clients.  Also from --

20         THE COURT:  But that's going back to March 18, 2013,

21    correct?

22         MR. COCHRANE:  Right.  I am assuming from about that

23    point onwards.

24         Also, from what I remember, there was a response, a

25    paragraph, an answer provided by the Quechan Tribe where they

1    specifically said that the parties -- Mr. Escalanti, Mr. White,

2    and Mr. Rosette -- specifically discussed his work in

3    California compacts at that meeting in which they all met.

4        So there was at least a presumption that this one case,

5    which he had touted rather significantly on his website and all

6    of his promotional materials was certainly to come up,

7    especially since the Quechan matter, at least in some respect,

8    is based upon that work.

9        THE COURT:  Okay.  But it's one thing for there to be

10   some suspicion or even a presumption that it came up; but my

11   question is whether or not the mails or wires were used to

12   disseminate those materials.  Is there any indication that they

13   were used?

14       MS. WILLIAMS:  As we said in our brief, they are

15   hundreds of miles apart.  The Rosette office, in Phoenix --

16       THE COURT:  But they actually met, didn't they, on

17   June 16?

18       MS. WILLIAMS:  They did.  But we know there were

19   communications leading up to that meeting.  It is just the

20   normal business practice that you communicate by phone or

21   e-mail in setting up a meeting, and the normal pattern and

22   practice of law firms is to send your promotional materials

23   ahead of time, bios, promotional brochures and the like, which

24   we have seen in connection with the Cienfuegos declaration.

25   It's certainly a reasonable inference those were sent ahead of

1    time, in advance of the meeting.

2         THE COURT:  With respect to the

3    on-or-about-December-2016 attempt to interfere with Williams &

4    Cochrane's contract with Pauma by working through a straw-man

5    attorney for the tribe's subordinate gaming facility, you

6    reference, I believe, paragraph 170, which states, "With that

7    overture going nowhere, Robert Rosette changed tactics and

8    began covertly working for the new manager of the tribe's

9    subordinate gaming facility, with whom Mr. Rosette has a

10   preexisting relationship through a straw-man attorney, so the

11   Pauma Tribal Council and general counsel would be none the

12   wiser."

13       How does that correspond to this RICO arrangement?

14        MS. WILLIAMS:  It is another interference with

15   contracts, accomplished through fraud, that he is working

16   behind the scenes to accomplish certain things at Pauma, but

17   without openly disclosing that he is improperly influencing

18   actions at Pauma in order to oust our firm.

19       So, in other words, because he knew that he could not be

20   hired by Pauma directly, he had this straw-man attorney working

21   at Pauma while he directed the straw-man attorney.

22        THE COURT:  And who is the straw-man attorney?  Not

23   Flint Richardson?

24        MS. WILLIAMS:  No.  He was the CEO that they

25   attempted to -- or that Rosette attempted to have hired at

1    Casino Pauma.

2         THE COURT:  It appears, strikes me, that it is

3    somewhat vague and conclusory to speak in terms of "is trying

4    to interfere by working through a straw-man attorney for the

5    tribe's subordinate gaming facility," and then tacking it on to

6    this RICO enterprise.  Can you offer me a little bit more as

7    far as the nexus of how this relates to the overarching RICO

8    scheme or mail fraud scheme?

9         MS. WILLIAMS:  As we explain in the complaint, there

10   was this improper interference with Mr. Rosette in an improper

11   attempt to settle the Pauma litigation back in 2013.  So, after

12   that point, it was widely known within the Pauma tribe that

13   Mr. Rosette was a persona non grata to the tribal council, for

14   the most part.  So he knew that he could not approach the tribe

15   and reasonably expect to be hired back.

16      So, instead, he started working with friends and started

17   angling to get his associates, so to speak -- not associates

18   within his firm but associates that he has dealings with, and

19   one of those who managed to get hired as the general manager

20   was Michael Olujic, a friend of his.  And from that point

21   forward, we started to notice strange events happening.

22         MR. COCHRANE:  And I should say that a lot of this

23   coincided with some of the other things that have been raised

24   in this case, such as the dissemination of the sealed documents

25   that have been filed in this matter.

1          What we know for sure is Mr. Rosette disseminated those to

2     Mr. Olujic.  He submitted a declaration to that effect, saying

3     that the dissemination was inadvertent; he didn't mean to

4     disseminate the sealed versions, but he at least just wanted to

5     provide Mr. Olujic public copies to let him know his name was

6     mentioned in the complaint.  And at the same time, Mr. Rosette

7     was also disseminating the other sealed materials in the case

8     to other Pauma tribal members at the same time that he was kind

9     of hanging back behind the scenes, if you will.

10          THE COURT:  There's no allegation at this time, as I

11     understand it, that there has been any actual harm realized as

12     a result of these alleged acts of interference by the

13     defendants with Pauma beginning back in December of 2016 and

14     then continuing through what is complained of relating to the

15     dissemination of sealed documents, is there?

16          MR. COCHRANE:  I would say that there was.  It isn't

17     actually alleged in the complaint at this point because it's

18     sort of arisen after the fact.

19          THE COURT:  What has arisen after the fact?

20          MR. COCHRANE:  There's been a change in the scope of

21     the relationship, if you will.

22          THE COURT:  But that's not in the second amended

23     complaint?

24          MR. COCHRANE:  It is not.

25          MS. WILLIAMS:  It actually occurred after we filed

1    the second amended complaint.  So our -- basically, our work

2    has been diminished and reduced since the events in the

3    complaint, and that was -- it's a little bit difficult for us

4    to speak to that without putting this information under seal.

5            THE COURT:  All right.

6        And then let me inquire as to notions of enterprise, and

7    let me direct myself to defense counsel.

8        One of the arguments that is made by the defense relies

9    on, among other cases, *Moran v. Bromma*, and based upon *Bromma*

10   and related cases, argues that the plaintiffs have failed to

11   prove the existence of two distinct entities.  And my question

12   to you is is the set of facts that we have before us with

13   Rosette and the Rosette law firm, are those akin to the *Kushner*

14   *v. Don King* case, with respect to having one person who is sued

15   both individually as a person and then with respect to the

16   enterprise that they are the owner of?

17           MR. CLOSE:  Excuse me, Your Honor.  I think the facts

18   are more analogous to the *Moran* case, and the other cases

19   cited -- I think *Living Bridge* [sic]-- the statute, 18 1962

20   says, "It shall be unlawful for any person employed by or

21   associated with an enterprise to do," bam, bam, bam.  So there

22   needs to be a person and an enterprise.  And cases like *DuPont*,

23   in the Ninth Circuit, *Living Bridge* and *DuPont*, make clear that

24   these need to be distinct.

25       They have sued -- they have named all the parties as the

1    RICO person, and included in that -- there's no distinctiveness

2    within the enterprise.

3        THE COURT:  But in the *King* case, didn't you

4    basically have a situation where you had a person and then you

5    had him also being the sole owner of a business, and so the

6    Court found that, any way you size it up, you had complied with

7    the requirements?

8        MR. CLOSE:  With all due respect, I read the Supreme

9    Court decision as basically addressing a different, narrower

10   issue.  The issue that I think it was Justice Breyer addressed

11   in that decision was, as a matter of law, it is impossible for

12   an employee and a corporation to be part of a -- for an

13   employee to operate a RICO enterprise through the corporation

14   that employs him or her.  So is it, under the -- comparable to

15   the discussion sometimes where they can't conspire, an officer

16   can't conspire -- an agent can't conspire with a principal?

17       So the issue that was actually addressed was a defense

18   argument that you could never, under any set of circumstances,

19   have a situation where an executive operated a RICO enterprise

20   through the corporation that employed him; that basically there

21   would be no possibility of RICO liability in those

22   circumstances.  And the Supreme Court rejected that.

23       And then it comes back, and we have a series of Ninth

24   Circuit cases after that which have made clear that nothing

25   about the *Kushner* case was intended to eliminate the

1    distinctness requirement.  It exists.  I don't think that is

2    even disputed.

3        And our position is not that they could never have a

4    situation where an owner was the RICO person and operated the

5    company as the RICO enterprise.  Our position is they have

6    alleged -- the complaint that they are on their fourth pleading

7    on --

8                MS. WILLIAMS:  Third.

9                MR. CLOSE:  -- excuse me -- continues to allege that

10   the RICO person is the Rosette law firm, is each of the

11   individuals, and that the enterprise is also the Rosette law

12   firm.  So that is why it fails the requirement of having a

13   distinct enterprise.

14               THE COURT:  So in *Bromma*, the Court found that Bromma

15   himself, who was a corporate officer, was sufficiently distinct

16   from the corporation for which he worked such that the

17   plaintiff could allege the officer as the RICO person and the

18   corporation as the RICO enterprise.  Is that correct?

19               MR. CLOSE:  I believe that's right.

20               THE COURT:  And is that at all analogous with

21   Mr. Rosette's relationship with the Rosette law firm?

22               MR. CLOSE:  Well, it could be analogous.  What is

23   different is the pleading before the courts.

24       And I would, Your Honor, respectfully say that we were

25   looking at the *Living Designs v. DuPont* case, where the Ninth

1    Circuit said, "To be sure, if the enterprise consisted only of

2    DuPont and its employees, the pleading would fail for lack of

3    distinctiveness."  That's the pleading we have here.  And

4    that's *Living Designs*, 431 F.3d. at 361.

5        And I think the real issue I wanted to stress on this

6    point, Your Honor, if I may, is we all take the pleadings where

7    they come.  This pleading fails to allege a distinct

8    enterprise.  Could someone else's pleading in another case do

9    so?  Certainly.

10            MS. WILLIAMS:  Can I address that, Your Honor?

11            THE COURT:  Yes.

12            MS. WILLIAMS:  To be honest, I don't really know

13   where he is coming from because Mr. Rosette is not an employee.

14   He is an owner.  He is essentially a director.  And the *Living*

15   *Spaces* [sic] case specifically says, "Just as a corporate

16   officer can be a person distinct from the corporate enterprise,

17   DuPont is separate from its legal defense team."

18       So *Living Designs* itself recognizes the principle that we

19   cited in our opposition brief, that *Cedric Kushner* stands for

20   the proposition Mr. Rosette, as the owner of Rosette LLP, is

21   distinct from the enterprise of the firm.

22            MR. CLOSE:  Actually, I completely disagree.

23       The holding of *Living Designs* is that a corporation, its

24   outside counsel, and some of the employees of the corporation

25   could all be an associated-in-fact enterprise that is distinct

```
 1   from either one of those three bodies.  That's the holding of
 2   DuPont.  Corporation, certain employees, outside counsel --
 3   they form an association in fact that's distinct from each and
 4   every one of those.  That's the key holding and point of the
 5   DuPont case, and that is what is lacking here.
 6            MS. WILLIAMS:  I am sorry.  But that's not the
 7   holding.  The sentence you read was dicta, because the Court
 8   found there was a distinction.
 9            THE COURT:  Let me move to another area because I
10   think you just are arguing -- if not in circles, you are
11   basically offering your position.
12       And to be frank, with respect to a number of these terms,
13   including the one we are going to address next, continuity
14   requirement, the Supreme Court has oftentimes noted in their
15   rulings -- if not confusing, there's really a lack of clarity.
16   There's much that lends itself to contrary views.  And we have
17   seen, time and time and time again, where certain views of the
18   Courts of Appeal have been overturned by the Supreme Court as
19   to what these terms mean.
20       So I understand and I get that there's arguments that can
21   be made from both sides, but I don't think we need to spend too
22   much time having each side point to a favorite phrase and give
23   me your view on that.
24       But that brings me to my next set of questions, and that
25   relates to the continuity requirement.  And in this case, the
```

1    question is whether or not we have a series of a related

2    criminal predicates extending over a substantial period of

3    time.  And I guess when you first look at these asserted

4    predicates that begin in 2010 and 2018, one would say, "Well,

5    that's eight years' worth of predicates."  But it strikes me

6    that a number of these predicates, for one reason or another,

7    can be problematic.  And to the extent that they are

8    problematic, it is something that I would like for the parties

9    to address.

10        Let me begin with defense counsel.  Why do you believe

11   that the continuity requirement is not established in this

12   case?

13            MR. CLOSE:  Because the supposed predicate acts do

14   not qualify under the RICO statute.  The statute -- I may be an

15   old-timer here, but I like to go back to the statute.

16   18 U.S.C. 1961 defines racketeering activity as either threats

17   involving murder, sub (a) -- not applicable -- or sub (b), any

18   act which is indictable under any of the following provisions

19   of Title 18.  They list about 20 criminal -- so, any act

20   indictable.

21        So then let's overlay that on the mail and wire.  So the

22   civil statute says it has to be an act indictable under the

23   mail or wire fraud.  As Your Honor excellently pointed out in

24   some of the earlier questions and in the prior order that the

25   Court entered in June, almost every predicate act that they

1   supposedly identified could not and is not alleged to either be

2   a fraudulent statement -- there's no allegation in most

3   instances of any scheme or artifice to defraud.  There's no --

4   in most of these instances, no allegation of an intent to

5   defraud.  And certainly nothing, no set of allegations here, to

6   suggest any of these are indictable under the wire or mail

7   fraud statute.

8        I think, fundamentally, our continuity and pattern

9   argument springs from the notion that there are no underlying

10  predicate acts.  And they seem -- our interpretation of this

11  79-page complaint is that they have put a lot of their chips in

12  on the notion that the Court found this one statement at the

13  bottom of the bio to be pled sufficiently as it could be

14  misleading.  And they are putting all their chips in that that

15  statement, one statement repeated, is enough to get them into

16  pleading a RICO claim under Rule 9(b).

17       And in response to that, we have argued that is one

18  statement, and cases have held that one statement, even if

19  repeated -- you know, one false statement mailed 100 times is

20  still one predicate act.  It doesn't make a pattern as

21  required.

22       So that's where that argument is coming from, Your Honor,

23  and it really springs from the fact that the number of

24  predicate acts here is zero, in our view; but Your Honor

25  previously in his order said, "Well, this one thing about

1    'responsible, successfully litigated,' maybe that's one," and

2    their complaint kind of tries to use that one to create the

3    pattern.

4         THE COURT:  So let me inquire of plaintiffs' counsel

5    as to that argument, that basically you have one specific

6    misrepresentation alleged as to falsely taking credit for the

7    successful litigation in the Pauma action.  And then, death by

8    1,000 cuts; you have it repeated over and over and over again,

9    but at the end of the day, for purposes of RICO, we have one

10   predicate act.  What is the position of the plaintiffs?

11        MS. WILLIAMS:  That's -- I am sorry.  That's just not

12   sensible to me at all.  You are saying -- they are saying you

13   can make a fraudulent statement but as long as the verbiage is

14   similar to the one made before, it doesn't matter how many

15   people you make it to and the harm doesn't matter whatsoever?

16   I am sorry.  It doesn't make sense.

17        THE COURT:  Let me ask you, if the Court were to

18   find, for example, that the false advertisements and the

19   dissemination of promotional materials, beginning back on

20   March 18, 2013, running up through today, that that relates to

21   market share, and that, under the *Lancaster* case, that market

22   share wouldn't be a property interest that would be recoverable

23   under the wire fraud statute, where would we find the

24   continuity that's contemplated by RICO?

25        MS. WILLIAMS:  We do allege acts going back to 2010

1    all the way through this year, 2018, and we have --

2          THE COURT:  So we have the 2010 interference with

3    La Pena law contract.  We have the 2011 attempts to negotiate

4    on behalf of Pauma.  And then we jump to 2017.  In the event

5    that one were to view that these 2013-and-on advertisements

6    basically bear on market share or are ones that related to

7    intangible interest, so we wouldn't have those.  So, then, we

8    have 2010, 2011 and then, suddenly, 2017.  Is there a

9    continuity between that point and period?

10         MS. WILLIAMS:  I think we have alleged more that

11   occurred in between that time period.  We do have --

12         THE COURT:  So where is the continuity?  Could you

13   point me to that?

14         MR. COCHRANE:  It does seem that the false

15   advertisements would tend to come out and the interference

16   would tend to come out around seminal or important events in

17   the litigation.  From what we assumed, the advertisement went

18   up on the website shortly after the summary judgment order in

19   2013.  The interference of Quechan happened shortly after

20   judgment became final.  Payment was made in 2017.

21       So, to pull back a little bit -- and this isn't a case

22   that's been before the Court because it just came out -- but

23   October 5, the Northern District issued an order on a motion to

24   dismiss in a case called J.W. Gaming Development v. James.  And

25   what it dealt with is a company who had invested about

1   $5.6 million into a casino project for the Pinoleville Tribe,

2   up in Northern California.  And he made these payments under

3   the assumption that they were actually going to go towards a

4   casino development.  It turns out that's not what happened.

5   You make the payments, and then the individual defendants, who

6   are all within the tribe, would then just use the money

7   willy-nilly for whatever purposes they wanted.

8       So this sort of presents the more typical standard RICO

9   situation in which you have, over a year or two period, a set,

10  discrete number of financial transactions.  In that situation,

11  it was probably in the range of four or five.

12      So I understand this looks a little bit different but

13  extends over a much larger time.  And to us, it is sort of like

14  you are dealing with a villain in a horror movie.  You knock

15  him down; you think he is dead; you wait a little bit; and he

16  is going to pop right back up.

17      We sort of have what we feel is four periods stretched

18  over a six- or seven-year period in which you have very

19  discrete instances of predicate acts.  And that takes entirely

20  off the table the whole idea that Mr. Rosette is using the

21  false advertisements to solicit business and obtain clients and

22  essentially depriving us of those opportunities.

23          THE COURT:  All right.  I think those are the

24  questions that I have regarding the RICO substantive cause of

25  action.  That is the fourth cause of action.

 1        And at this point, let me provide you with a tentative as

 2   to the remaining motions, and then I will let you address the

 3   remaining motions to the extent that you wish.

 4        I am prepared to deny the Quechan motion to dismiss the

 5   implied covenant claim.  Quechan had their opportunity to

 6   challenge that covenant claim previously.  It has been

 7   reasserted in the second amended complaint but without any

 8   additional dressing or theories.  So at this point, the Court

 9   would be prepared to deny that motion to dismiss.

10        The Court is prepared to grant the motion to dismiss as to

11   the negligence or the malpractice for similar reasons as were

12   previously identified in my last order, basically a failure to

13   identify what actions were deficient.  Given that ruling, the

14   Court would find that the anti-SLAPP motion is moot.

15        I am, at this point, prepared to grant the motion to

16   strike allegations which are justified as Rule 404 conduct.

17   They may be admissible at trial under Rule 404(b).  That

18   doesn't mean that they get to come into the complaint.

19        And then, with respect to the RICO conspiracy, I am also

20   prepared to pretty much, for reasons previously stated, grant

21   the motion to dismiss the RICO conspiracy.

22        So with that, I will turn to plaintiffs' counsel and then

23   allow you to address any or all of these tentatives.

24             MS. WILLIAMS:  I would like to address the negligence

25   claim.

1          THE COURT:  All right.

2          MS. WILLIAMS:  I think one of the things that we are

3    overlooking here is that negotiations are not a typical

4    representation matter, where everything that is done creates a

5    written record and you can just sort of transfer it over and

6    someone can pick up and run.  These are meetings that happen

7    for the most part off the record.  There are behaviors,

8    gestures, subtle clues that you take from the other side of the

9    table from a negotiation.  There's a wealth of knowledge from

10   being present at the negotiation that someone can never have

11   that who was not there.

12         THE COURT:  So how would you recreate it, at this

13   point, to the extent that you have all these off-the-record

14   meetings?  There is no record.

15         MS. WILLIAMS:  Right.  I mean, obviously, there's the

16   written exchange of materials.  But my point is that

17   Mr. Rosette could not come in at the last minute and

18   competently represent the Quechan Tribe, not having any

19   involvement in the prior negotiations, not once reaching out

20   with any questions whatsoever as to what happened.

21         THE COURT:  Under that theory, wouldn't you have a

22   claim of negligence and ineffective assistance of counsel any

23   time you had a substitute attorney?

24         MS. WILLIAMS:  It would depend on the manner in which

25   it was done.  For example --

1          THE COURT:  It would.  But to the extent there's this

2     argument that, "Well, Rosette could not come in at the last

3     minute and then perform competently," it seems to me that

4     ignores the reality that that happens quite frequently in

5     criminal cases, oftentimes in civil cases.  So the fact that

6     somebody comes in as replacement counsel doesn't then

7     automatically produce the conclusion that, "Well, they must

8     have been negligent and ineffective and unprepared."

9          MS. WILLIAMS:  Well, the State said it had never

10    happened to them before, that after eight months, when you are

11    close to the end --

12         THE COURT:  Somebody new coming in, versus that the

13    level or quality, or lack thereof, of the attorney was

14    something they had never encountered.

15       I do appreciate that this is an unusual set of

16    circumstances.  I get that.  I am not saying all this in order

17    to find that it was a great idea for anybody.  But as it

18    relates to a negligence cause of action, I don't see

19    allegations which point to deficient performance.

20       And I understand that there are reasons why the plaintiffs

21    may be in a box or in a difficult set of circumstances in

22    trying to identify specific deficient performance, but the

23    question is do we put the discovery cart in front of the horse?

24         MR. COCHRANE:  My point will sort of go to that, and

25    at this point I am not necessarily trying to change your mind

1   on the subject.  But in response to the comment there is not a

2   record, we think there is.  The State actually came forward --

3             THE COURT:  No; actually, your co-counsel was the one

4   that said that where there is no record, and so I was just

5   following up on that; well, if there's no record, then how do

6   we recreate it?

7             MS. WILLIAMS:  There are the drafts exchanged between

8   the parties.

9             MR. COCHRANE:  Okay.

10            THE COURT:  So, then, there is a way, according to

11  the plaintiffs.  All right.

12      And do you wish to be heard on any of other tentatives?

13            MS. WILLIAMS:  We talked about the RICO conspiracy.

14  Were you talking about the fourth claim?

15            THE COURT:  The fifth, the conspiracy.

16            MS. WILLIAMS:  So we haven't discussed that claim

17  yet.

18            THE COURT:  And I am not as full of questions as it

19  relates to the conspiracy as I was as to the substantive.  But

20  it appears to the Court that a number of the deficiencies that

21  were previously identified as to the conspiracy continue to

22  exist here.

23            MR. COCHRANE:  And the fifth claim for the

24  conspiracy, that was the one where the Court essentially asked

25  for the second predicate act in order to better fill out the

```
 1   RICO conspiracy?
 2            THE COURT:  I guess the conspiracy ends up being kind
 3   of a potpourri of different allegations, different theories,
 4   different players, but it's basically a parade of asserted
 5   acts.  But in terms of conspiracy, to show that there's this
 6   overarching agreement, it doesn't strike the Court that there
 7   is any real plausible allegations to support the existence of a
 8   conspiracy.  And that's even before you get to some of the
 9   other questions and issues that have been raised by defense
10   counsel.
11       So I think the nature of the way that that is alleged
12   doesn't lend itself to me identifying one or two particular
13   issues and questions that I need addressed.  I have your
14   respective positions on them, and at this point, my tentative
15   is to grant the motion to dismiss; although, I will ask one
16   question about one of the predicate acts.
17       One of the predicate acts includes, on April 18, 2017,
18   there was a certification to the Arizona Department of Gaming
19   that Quechan was complying with its tribal revenue allocation
20   plans, and there's a suggestion that that was false.
21       As I understand it, it wasn't until after April 18 -- that
22   is, April 20 -- when the per capita was cut off; is that
23   correct?
24            MS. WILLIAMS:  I am not 100 percent sure of the
25   timing, but I know generally, in the spring, that the
```

1    per capita payments were discontinued.  And I think it was

2    shortly after the new counsel came on board.  I believe it was

3    March or April.

4           THE COURT:  I am reading from the second amended

5    complaint, page 75, starting at line 17.  And it says, "On

6    April 20, 2017, to altogether cut off per capita and minor

7    trust account payments to general membership."

8      And then you have, "On or about April 18, 2017, to certify

9    to the Arizona Department of Gaming that Quechan was complying

10   with his tribal revenue allocation plan."

11     Are those two predicate acts related as far as the moneys

12   that they are referencing?

13          MS. WILLIAMS:  Yes.  Those would be related.

14          THE COURT:  So then, the certification was on

15   April 18, and then it was not until April 20 that there was a

16   cutoff of the per capita?

17          MR. COCHRANE:  The letter on April 20th was the

18   formal indication that the tribe was not going to be making

19   per capita payments from that month, that year, going forward.

20     From what we understand, from the moment the tribal

21   council came into power sometime in March, they had made it

22   clear informally to tribal members that there were not going to

23   be per capita payments forthcoming.  So it was sort of a matter

24   of memorializing that in a letter.

25          MS. WILLIAMS:  Letter to the tribal members.

1          THE COURT:  Certainly, as of April 18, there would

2     not have been any official decision made, correct?

3          MS. WILLIAMS:  Well, I am sure it actually took a

4     couple of days to put a notice together to go out to 3,000

5     Pauma tribal members -- I am sorry -- Quechan tribal members.

6     So it would seem nonsensical to say, on the 18th, that you are

7     complying with the revenue allocation plan and 48 hours later,

8     you are not, and sending out a notice to over 3,000 tribal

9     members saying that they will not be getting any per capita

10    payments.

11         THE COURT:  But the April 18 certification didn't

12    certify that "We intend to continue with any particular

13    allocation plan"; it was merely saying that as of April 18,

14    they have complied.

15       And I guess this raises an issue that the defense pointed

16    to, and that is the actual language of the allocation plan,

17    which appears to provide discretion to the tribe as to when it

18    will announce and when it will provide these shared revenues.

19       And I understand at this point we are just looking at this

20    through the lens of a motion to dismiss, and we are looking at

21    the four corners of this document; but do you contest this

22    assertion by the defense that the plan actually allowed for

23    this decision to be made, withholding these sums?

24         MS. WILLIAMS:  We do contest that.  First of all, we

25    have information that leads us to believe that this is not the

1    most current version of the revenue allocation plan.  And

2    secondly, this is a highly regulated industry.  There's a

3    reason you have to have a revenue allocation plan and a reason

4    you have to stick to it so that tribes do have to follow the

5    regulations set forth by the National Indian Gaming Commission,

6    which requires that they have a revenue allocation plan and

7    specify a percentage that will be paid.  And they also have to

8    submit the certifications.  And they are not just once a year;

9    these are regular reporting requirements.

10         So we certainly have every reason to believe that even the

11   reporting letter that came after April 20 said the same thing.

12   If it didn't, why didn't they come forward with that, instead

13   of just point to an old version of the revenue allocation plan?

14         THE COURT:  The conspiracy also raises certain

15   predicate acts relating to retaliation of class members -- let

16   me take a look at that -- paragraph 200, which references that

17   retaliation doesn't name the potential class member.  As far as

18   this notion that the class members are trying to shine a light

19   on some of the problems swirling within the tribe, it just

20   seems that we have this collection of a parade of horribles

21   that is being committed allegedly by the defense, and in the

22   name of conspiracy, there's this assertion that they are all

23   related, and it's hard to wrap one's head around.

24         MS. WILLIAMS:  I agree with you.  It is hard.  It is

25   hard to comprehend that all this is happening.

1          THE COURT:  Well, besides whether or not, to the

2     extent it is happening, why it would happen; but with respect

3     to RICO conspiracies, it just is problematic.

4          And I think that's one of the things that leads the Court

5     to grant the motion to strike.  I understand that there's a lot

6     of, I guess, bad blood.  There's a lot of bad blood between

7     plaintiffs' counsel and Mr. Rosette, and I am sure it goes both

8     ways.  And I am sure if Mr. Rosette was here representing his

9     interest, we would be able to see that he is also upset,

10    rightfully, wrongfully.

11         But it seems that this vitriol or this disgust that

12    counsel has ends up finding its way into these complaints in

13    numerous ways.  And I think the conspiracy is kind of like a

14    witch's brew of sorts which combines a bunch of allegations of

15    vile behavior on the part of Mr. Rosette, and that this

16    conspiracy becomes the convenient place to dump it all.

17         So at this point, like I said, I don't have many specific

18    questions to ask.  I did ask a couple of specific questions,

19    but it is kind of just the general nature of this cause of

20    action that gives the Court concern, that there isn't one

21    conspiracy that's been charged here; that it is not a RICO

22    conspiracy.

23         Let me hear with respect to any other tentatives that I

24    have issued.  Is there anything else?

25         (Counsel confer.)

         1          MR. COCHRANE:  I think we are fine.

         2          THE COURT:  Defense counsel, do you wish to be heard

         3    on the implied covenant or any other claim?

         4          MR. CASAMASSIMA:  Your Honor, I mean -- I think, Your

         5    Honor, with respect, we have offered some additional argument

         6    around the propriety of the good faith and fair dealing.  I

         7    respect that you are probably not going to move off your

         8    tentative, but I do think there's additional authority that the

         9    claim, as pled, is inconsistent with the Supreme Court's

        10    opinion in the *Guz* case (phonetic), where an implied covenant

        11    is just plain inconsistent with the express terms of the

        12    written agreement, in this case being Section 11.

        13        And with that, that's what I have, Your Honor.

        14          THE COURT:  All right.  At this point, I am prepared

        15    to take the matter under submission.  I will certainly be

        16    granting some of the motions to dismiss even if I were to

        17    change my views on one or more, so we will, then, need for a

        18    cleaned-up version of the amended complaints to be filed which

        19    will reflect what the operative complaint will look like.

        20        I understand that there is a motion to amend yet again,

        21    and so I will take a look -- let's see.  Could you refresh my

        22    memory, was there a motion to amend?

        23          MR. COCHRANE:  Is there a motion to amend?

        24          MR. CASAMASSIMA:  There was a motion to amend, Your

        25    Honor, so they can sue me for something I didn't do, that they

 1   thought I did.  And you denied it, Your Honor.

 2            THE COURT:  Oh, we denied it.  Okay.

 3       So, given that, I will direct plaintiffs' counsel to file

 4   an amended complaint which also takes into account that we had

 5   previously granted the motion to dismiss the contract with

 6   respect to the entitlement portion of the argument.  There's an

 7   entitlement portion; there's a reasonable fee portion, which

 8   the Court denied the motion to dismiss that.  And so, to the

 9   extent that the Court has granted partially the motion to

10   dismiss on the breach of contract, then the Court will direct

11   that the cleaned-up amended complaint will reflect that.

12       And with respect to the motion to strike, it will be

13   granted with respect to the requested paragraphs.  And then the

14   negligence will be removed.  And then we will see what the RICO

15   ends up consisting of or how the Court treats those motions.

16       At this time, is there anything to address?  Anything else

17   since we have you here?

18            MR. CLOSE:  I don't think so.

19            MR. CASAMASSIMA:  Just a little -- on the conspiracy,

20   I want to be sure.  I don't hear your comment as inviting me to

21   have any comments on them.  To the extent they are still under

22   submission --

23            THE COURT:  They are.  They are under submission.  I

24   have given you my tentative.  I have voiced some of the reasons

25   as to the conspiracy.  And at this point, I didn't hear a lot

1    to change my mind, but I don't want to completely close the

2    door.  I will look a little bit closer at that and then

3    determine how I will rule.  I am not sure if any argument will

4    be helpful for you.

5              MR. CASAMASSIMA:  I hear you.

6              THE COURT:  So that will be all.  Thank you.

7              MR. CLOSE:  Thank you, Your Honor.

8              MS. WILLIAMS:  Thank you, Your Honor.

9         (End of proceedings at 2:43 p.m.)

10                           -o0o-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C-E-R-T-I-F-I-C-A-T-I-O-N


          I hereby certify that I am a duly appointed,

qualified and acting official Court Reporter for the United

States District Court; that the foregoing is a true and correct

transcript of the proceedings had in the aforementioned cause;

that said transcript is a true and correct transcription of my

stenographic notes; and that the format used herein complies

with rules and requirements of the United States Judicial

Conference.

               DATED:  October 17, 2018, at San Diego,

California.



                    /s/  Chari L. Bowery
                    _____
                    Chari L. Bowery
                    CSR No. 9944, RPR, CRR