UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAMS & COCHRANE, LLP; and FRANCISCO AGUILAR, MILO BARLEY, GLORIA COSTA, GEORGE DECROSE, SALLY DECORSE, et al., on behalf of themselves and all others similarly situated,<br><br>              Plaintiffs,<br><br>v.<br><br>QUECHAN TRIBE OF THE FORT YUMA INDIAN RESERVATION; ROBERT ROSETTE; ROSETTE & ASSOCIATES, PC; ROSETTE, LLP; RICHARD ARMSTRONG; KEENY ESCALANTI, SR.; MARK WILLIAM WHITE II, a/k/a WILLIE WHITE; and DOES 1 THROUGH 100,<br><br>              Defendant. | Case No.: 3:17-cv-01436-GPC-MDD<br><br>**ORDER:**<br><br>**(1) GRANTING ROSETTE DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FOURTH, FIFTH, AND SIXTH CLAIMS;**<br><br>**[ECF No. 110]**<br><br>**(2) DENYING QUECHAN DEFENDANTS' MOTION TO DISMISS;**<br><br>**[ECF No. 115]**<br><br>**(3) DENYING AS MOOT ROSETTE DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' SIXTH CLAIM.**<br><br>**[ECF No. 109]** |

A number of motions are currently pending before the Court. Defendants Quechan Tribe of the Fort Yuma Indian Reservation ("Quechan," or the "Tribe"), Keeny Escalanti, Sr., and Mark White II (collectively, the "Quechan Defendants") have filed a motion to dismiss Plaintiffs' Second Cause of Action (breach of implied covenant) and the Fifth Cause of Action (RICO conspiracy) in the operative Second Amended Complaint ("SAC"). ECF No. 115. Meanwhile, Defendants Richard Armstrong, Robert Rosette, Rosette & Associates, and Rosette, LLP (collectively, the "Rosette Defendants") have moved to dismiss the Fourth Cause of Action (RICO), Fifth Cause of Action (RICO conspiracy) and Sixth Cause of Action (negligence/malpractice); have moved to strike portions of the SAC; and have filed an Anti-SLAPP motion to strike the Sixth Cause of action. ECF Nos. 110 and 127.

A hearing was held on the motions on October 12, 2018. For the reasons stated below, the Court GRANTS with prejudice the Rosette Defendants' Motion to Dismiss Plaintiffs' Sixth Cause of Action, ECF No. 110; GRANTS without prejudice Defendants' Motion to Dismiss Plaintiffs' Fourth and Fifth Cause of Action, ECF No. 110; and DENIES as moot their Motion to Strike Plaintiffs' Sixth Cause of Action, ECF No. 109. The Court DENIES IN PART without prejudice the Quechan Defendants' Motion to Dismiss Plaintiffs' Second Cause of Action, and DENIES IN PART as moot its Motion to Dismiss Plaintiffs' Fifth Cause of Action, ECF No. 115.

## I. BACKGROUND

### A. Procedural History

Plaintiff Williams & Cochrane, LLP ("W&C") filed its first Complaint on July 17, 2017, ECF No. 1, which the Court struck, ECF No. 3. Two months later, W&C filed an Amended Complaint. ECF No. 5. On March 2, 2018, Plaintiffs filed their First Amended Complaint ("FAC"). ECF No. 39. As relevant here, the FAC advanced breach of contract and breach of the implied covenant of food faith and fair dealing claims against Quechan. *Id.* at 97-102. The good faith and fair dealing claim alleges that Quechan breached the covenant by terminating W&C just three days before the end of

negotiations, refusing to pay any contingency fee, demanding that W&C turn over the latest draft compact, and having Mr. Rosette come in as the attorney of record for the signed compact. *Id.* at 101. Plaintiffs also brought a RICO claim against the Rosette Defendants and a RICO conspiracy claim against all Defendants. *Id.* at 109. Finally, the FAC advanced a negligence/breach of fiduciary duty claim against the Rosette Defendants for their allegedly deficient representation of Quechan during the compact negotiations. *Id.* at 118.

In an order entered on June 7, 2018, the Court dismissed part of the FAC. Order, ECF No. 90. With respect to W&C's good faith and fear dealing claim, the Court rejected the Quechan Defendants' sole argument that such claim was duplicative of the breach of contract claim. *Id.* at 18. The Court dismissed without prejudice both the FAC's substantive RICO and RICO conspiracy claims, finding that the FAC failed to allege a sufficient pattern of racketeering and failed to allege that Defendants agreed to violate the substantive provisions of RICO or agreed to commit or participate in a violation of two predicate acts. *Id.* at 29, 32.

Plaintiffs filed their SAC, reasserting claims for breach of contract, breach of the covenant of good faith and fair dealing, a Lanham Act violation, a RICO violation, RICO conspiracy, and professional negligence. Three motions are currently before the Court. The Rosette Defendants move to dismiss the SAC's substantive RICO claim, RICO conspiracy claim, and professional negligence claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The Rosette Defendants have also filed a separate motion to strike the professional negligence claim. The Quechan Defendants move to dismiss the RICO conspiracy claim and good faith and fear dealing claim.

**B.   Factual Background**

**1.   The Parties**

The following facts are alleged in Plaintiffs' SAC. Plaintiff W&C is a California legal services partnership formed in 2010 by Cheryl Williams and Kevin Cochrane.

SAC, ECF No. 100 ¶¶ 11, 35. All other Plaintiffs in this case are enrolled members of Defendant Quechan, which is a federally-recognized Indian tribe. *Id.* ¶¶ 11, 12.

The "Rosette Defendants" consist of Robert Rosette, Rosette & Associates, PC, Rosette, LLP, and Richard Armstrong. Mr. Rosette is an Indian law attorney and the President and Director of Rosette & Associates. *Id.* ¶ 14. Rosette & Associates is a corporation and general partner of a parent entity Rosette LLP, which is a law firm. *Id.* ¶¶ 14-16. Armstrong is senior counsel with Rosette LLP. *Id.* at 17. The "Quechan Defendants" consist of Quechan, Defendant Keeny Escalanti, Sr., and Defendant Mark William White II. Escalanti is the Tribal Chairman of Quechan. *Id.* ¶ 18. White is a Tribal Councilmember of Quechan. *Id.* ¶ 19.

## 2. W&C Secures a Massive Victory Representing Pauma, a Former Client of Rosette & Associates

In 1999, California entered into a compact with over sixty Indian tribes, permitting the tribes to operate a base number of slot machines and allowing the tribes to increase the number of machines through a licensing system. *Id.* ¶ 22. The Pauma Band of Mission Indians ("Pauma") was one such tribal signatory to this compact. *Id.* ¶ 26. In 2004, the compact was amended ("2004 Amendment"), which resulted in Pauma paying approximately twenty-four times as much revenue sharing in order to operate machines that should have been available under its original compact. *Id.*

In 2009, Pauma filed suit in federal court, requesting rescission of the 2004 Amendment and restitution of the heightened fees paid under that amendment. *Id.* ¶ 27. Rosette & Associates represented Pauma in that lawsuit. *Id.* ¶ 28. The two attorneys in that firm that did all of the litigation work for Pauma were Williams and Cochrane. *Id.* ¶¶ 28-29. Pauma quickly obtained a preliminary injunction to reduce the revenue sharing fees of the 2004 Amendment to the prior rates of the 1999 Compact. *Id.* ¶ 30.

On May 15, 2010, Williams and Cochrane left Rosette & Associates and started their own law firm, W&C. *Id.* ¶ 31. Soon after, the State of California appealed the preliminary injunction to the Ninth Circuit and moved to stay the injunction pending the

appeal. *Id.* ¶ 32. The Ninth Circuit granted the stay. *Id.* ¶ 34. The Pauma General Council voted to terminate Rosette & Associates and replace them with W&C. *Id.* ¶ 35. W&C then convinced the Ninth Circuit to vacate its stay order, reinstate the preliminary injunction, and later, dispose of the appeal in November 2010. *Id.* ¶¶ 36, 37.

On July 26, 2011, Armstrong sent an email to Jacob Appelsmith, the Office of Governor's compact negotiator, explaining that the Pauma Tribal Council "requests a meeting with the Governor's office . . . to discuss compact related matters." *Id.* ¶ 156. Armstrong later emailed Appelsmith stating that the tribe wants to meet without their attorneys present. *Id.* ¶ 158. Minutes later, Mr. Rosette emailed Appelsmith to explain that his firm was not engaged as legal counsel to the litigation. *Id.* ¶ 159.

With the case back in district court, W&C filed an amended complaint in September 2011, raising new claims for relief. *Id.* ¶ 39. The district court granted summary judgment to Pauma, rescinding the 2004 Amendment and ordering the State pay $36.3 million to Pauma. *Id.* ¶ 40.

Though W&C secured the victory for Pauma, Mr. Rosette took credit for the outcome in the case. *Id.* ¶ 134. He advertises on his website and other promotional materials that he successfully litigated the case. *Id.* ¶¶ 134-35.

### 3. W&C's Merger Talks with La Pena Breakdown after Mr. Rosette's Involvement

In July 2010, Cochrane met with another Indian law attorney, Michelle La Pena. The two discussed whether their firms could work together on a compact dispute involving a tribe that La Pena represented. *Id.* ¶ 146. After meeting together, La Pena told Cochrane that she wanted to either absorb or merge with W&C. *Id.* ¶ 149. However, La Pena informed Cochrane that Mr. Rosette told her that he was responsible for litigating the Pauma case. *Id.* Mr. Rosette later stated to La Pena that W&C stole his client and would invariable steal her clients as well. *Id.* ¶ 150. Days later, La Pena told Cochrane that she was ending any arrangement between the two. *Id.* ¶ 151.

//

### 4.    Quechan Hires W&C to Renegotiate Its Compact

After Pauma's massive victory garnered public attention, Mike Jackson, President of Quechan, contacted Williams to see if W&C could represent Quechan in a similar compact dispute. *Id.* ¶ 52. Quechan had amended its compact in 2007 ("2007 Amendment"), which allowed Quechan to operate up to 1,100 slot machines in exchange for a 10% revenue sharing fee for the first $50 million of Quechan's net profit each year. *Id.* ¶ 54. In September 2016, W&C met with several Quechan leaders to discuss the 2007 Amendment. *Id.* ¶ 55.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████ The 2007 Amendment provides that if Quechan does not pay its revenue sharing on time for more than two occasions, the State can shut down Quechan's gaming floor until 30 days after full payment of the outstanding balance. *Id.* ¶ 57. Basically, Quechan could lose ██████████ revenue if the State took action. *Id.* ██

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██

But first things first, W&C wanted to make sure it was getting paid if it took on Quechan as a client. The parties worked out a fee agreement that has given rise to some of the claims in this litigation. The Attorney-Client Agreement contains a monthly flat fee of $50,000 for W&C's services. *Id.* ¶ 65. The agreement also included a contingency fee, which is the focus of much of this litigation. The contingency fee is a percentage of Quechan's "net recovery," which is "any credit, offset or other reduction in future compact payments to the State in a successor compact (whether new or amended) as a result of the excess payments made under Client's tribal/State compact amended in 2006 in lieu of or in addition to a monetary 'net recovery.'" ECF No. 100-2 at 2. The contingency fee rate is 15% "[i]f the matter is resolved before the filing of a lawsuit or within 12 months thereof." *Id.* at 3. "[T]he matter is resolved at the point in time that the

6

Client signs a successor compact (whether new or amended), which subsequently obtains the requisite State and federal approvals and takes effect under the Indian Gaming Regulatory Act." *Id.* The 15% rate "is higher than the formative rates for resolving the case through court action . . . based upon the Client's express request after consultation and stated need to resolve the situation in as effective and expeditious a manner as possible." *Id.*

The agreement provides that the "Client may discharge Firm at any time." *Id.* at 4. If Quechan discharges W&C "before Client otherwise becomes entitled to any other monetary constituting the 'net recovery,'" W&C "will be entitled to be paid by Client a reasonable fee for the legal services provided in lieu of the contingency fee set forth." *Id.* at 5. The amount of such an alternate fee is based on ten factors set forth in the agreement. *Id.* "In the event of Firm's discharge after . . . Client otherwise becomes entitled to any other monetary amount constituting the 'net recovery,' . . . the Client will pay the contingency fee . . . upon receipt of the 'net recovery' amount." *Id.*

**5.** **Quechan Fires W&C and Hires Rosette to Complete the Negotiations**

Turning back to Quechan's legal issues with the State, on October 12, 2016, W&C reached out to the governor's office to try to get negotiations going for a replacement compact to Quechan's 2007 Amendment. *Id.* ¶ 70. Within a month, the parties held a negotiation session. *Id.* ¶ 72. ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████



The State set up another negotiation session for June 14, 2017. *Id.*

Williams sent a draft compact to the State on June 21, 2017. *Id.* ¶ 93.

On June 16, 2017, Mr. Rosette inserted himself into the picture when he met with White and Escalanti to discuss compact matters. *Id.* ¶ 181. On information and belief, W&C alleges that Mr. Rosette brought some of his firm's promotional brochures that claim he successfully litigated the Pauma case and said as much during the meeting to White and Escalanti. *Id.* ¶¶ 182-83. Though Mr. Rosette was unfamiliar with Quechan's legal issues, he told White and Escalanti that he would take over representing Quechan in their compact negotiations. *Id.* ¶ 185.

On June 27, 2017, the State's attorney informed Williams that the State received a letter indicating W&C had been terminated from the negotiations and replaced by Mr.

Rosette. *Id.* ¶ 94. That same day, Williams received an e-mail from Quechan Executive Secretary Linda Cruz, but signed by Escalanti, entitled "Termination of Attorney-Client Relationship." *Id.* ¶ 95. The letter stated that Quechan is terminating the services of W&C effective immediately. *Id.* Furthermore, the letter explained that Quechan would pay a prorated portion of the monthly flat fee for W&C's services for June, but that the Tribe would not pay any contingency fee or reasonable fee for the legal services provided in lieu thereof. *Id.* ¶ 96. The letter also explained that W&C should direct all communications to Mr. Rosette and provide him with a copy of Quechan's case file. *Id.* ¶ 99. W&C believes that this letter was drafted by Mr. Rosette or one of his attorneys. *Id.* ¶ 100.

On June 27, 2017, an attorney from Rosette LLP emailed Williams, informing her that Rosette LLP had been retained to represent Quechan in their compact negotiations and demanding that she immediately turn over a copy of the "last compact, with any redlines, that was transmitted to the State during your negotiations." *Id.* ¶ 103. W&C sent Rosette LLP and Quechan a copy of the June 21, 2017 draft compact. *Id.* ¶ 108.

Quechan ended up signing a compact with the State with Rosette as counsel. *Id.* ¶ 109. The executed agreement was not as favorable to Quechan as W&C's final draft compact. *Id.* ¶ 111. The State required Quechan to pay back $2 million, which is half of what it owed under the 2007 Amendment. *Id.* ¶ 113.

### 6. Quechan's Internal Turmoil

Quechan's Tribal Revenue Allocation Plan states that 40% of the Tribe's casino revenue shall go to the Tribe's general membership in the form of per capita payments. *Id.* ¶ 196. On April 18, 2017, Escalanti sent a letter to the Arizona Department of Gaming certifying Quechan's compliance with the Indian Gaming Regulatory Act by using 40% of the net gaming revenues for per capita payments. *Id.* ¶ 197. Escalanti sent a similar certification to the National Indian Gaming Commission to inform the agency that 40% of the Tribe's net gaming revenues were being used for per capita payments. *Id.* ¶ 198.

However, on April 20, 2017, Escalanti issued a letter to the tribal member stating that there will be no per capita payment for 2017.  *Id.* ¶ 195.  Members of Quechan have questioned the Tribal Council where the casino revenue is going, but the Tribal Council refuses to disclose any financial information or audit reports.  *Id.* ¶ 202.  ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████

On January 17, 2018, Quechan held a recall election to remove Escalanti and White from office.  *Id.* ¶ 201.  Of the votes cast, a majority voted to remove Escalanti and White.  *Id.*  However, they devised a plan to remain in office with the assistance of Mr. Rosette, refusing to step down on the basis that the votes were invalid because the total number of voters did not meet the minimum set by the Tribe's constitution.  *Id.*

## II. DISCUSSION

### A.    Legal Standard

A Rule 12(b)(6) motion attacks the complaint as not containing sufficient factual allegations to state a claim for relief.  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While "detailed factual allegations" are unnecessary, the complaint must allege more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Iqbal*, 556 U.S. at 678.  "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."  *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

### B.    Analysis

The Court will first address the Rosette Defendants' Motion to Dismiss Plaintiffs' Fourth, Fifth, and Sixth Claims for Relief.  Those claims are a substantive RICO claim, a

RICO conspiracy claim, and a legal malpractice claim. The Court will address each in turn.

### 1.    Substantive RICO Claim – Count IV

Count IV of the SAC advances a RICO claim against the Rosette Defendants. SAC at 70. This claim alleges that the Rosette Defendants "sought to fraudulently interfere with Williams & Cochrane's contracts (often to commit fraud against the firm's tribal clients)." *Id.* at 71. "To state a civil claim for a RICO violation under 18 U.S.C. § 1962(c), a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 873 (9th Cir. 2010) (quotation marks and citation omitted).

### a.    Enterprise

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same "person" referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). This "require[s] some distinctness between the RICO defendant and the RICO enterprise." *Id.* at 162. The Rosette Defendants argue that the SAC fails to meet this requirement of distinctiveness because W&C fails to allege how the "associated in fact" enterprise is different from the RICO person. W&C takes the position that "Mr. Rosette is operating the Rosette law firm in violation of RICO, which is sufficient to allege a requisite distinction between the individual RICO defendant and the enterprise." Pls.' Opp. at 16. It thus appears that according to W&C, Rosette LLP is the enterprise.

The Court finds that the SAC alleges sufficient distinctness. "[A]n employee who conducts the affairs of a corporation through illegal acts comes within the terms of a statute that forbids any 'person' unlawfully to conduct an 'enterprise.'" *Cedrick Kushner*, 533 U.S. at 163. The Rosette Defendants' arguments that the SAC fails to allege an associated in fact enterprise are unpersuasive. Under RICO, two types of associations meet the definition of enterprise: 1) organizations such as corporations and partnerships, and other legal entities; and 2) any union or group of individuals associated

in fact although not a legal entity. *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1053 (C.D. Cal. 2016) (citing *United States v. Turkette*, 452 U.S. 576, 581-82 (1981)). W&C alleges that the enterprise is Rosette LLP, a corporation, and thus has not alleged an association in fact.

However, the SAC names Rosette LLP as a Defendant. "Each RICO defendant must be distinct from the alleged enterprise." *Alexander v. Incway Corp.*, 633 F. App'x 472, 473 (9th Cir. 2016). To the extent the SAC alleges that Rosette LLP is an enterprise, Rosette LLP cannot be named as a Defendant in the RICO claim, and the Court will dismiss it from this claim.

### b. Predicate Acts of Mail and Wire Fraud

A "'pattern of racketeering activity' requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). Racketeering activity includes the predicate acts of mail fraud and wire fraud. *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 557 (9th Cir. 2010). W&C alleges that the Rosette Defendants have engaged in at least two predicate acts of mail or wire fraud. SAC at 71. "The mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). "The first element covers 'any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises.'" *United States v. Brugnara*, 856 F.3d 1198, 1207 (9th Cir. 2017) (quoting *Carpenter v. United States*, 484 U.S. 19, 27 (1987)).

> A wire communication is "in furtherance" of a fraudulent scheme if it is "incident to the execution of the scheme," *United States v. Lo,* 231 F.3d 471, 478 (9th Cir. 2000), meaning that it "need not be an essential element of the scheme, just a 'step in the plot,'" *United States v. Garlick,* 240 F.3d 789, 795 (9th Cir.2001) (quoting *Schmuck v. United States,* 489 U.S. 705, 711 (1989)); *accord United States v. Garner,* 663 F.2d 834, 838 (9th Cir. 1981) (explaining that the wire transfer "need only be made for the purpose of executing the scheme").

12

*United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013).

Rule 9(b)'s requirement that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity" applies to civil RICO fraud claims. *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir.1989). To avoid dismissal for inadequacy under Rule 9(b), W&C's SAC would need to "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Id.* at 1393 (*quoting Schreiber Distrib. Co. v. Serv–Well Furniture Co*., 806 F.2d 1393, 1401 (9th Cir. 1986)).

As a starting point, the scheme is cast as "an enterprise that has sought to fraudulently interfere with Williams & Cochran's contracts." The SAC lists a number of alleged predicate acts of mail and wire fraud committed by Richard Rosette:

(a) On or about August 11, 2010, to interfere with W&C's contract with La Pena Law by erroneously claiming he was responsible for litigating the Pauma case (see ¶ 149);

(b) On or about July 26, 2011, to direct Richard Armstrong to e-mail the State's negotiator to try and settle Pauma's compact suit even though his firm did not represent the tribe in the matter (see ¶ 156);

(c) On or about July 27, 2011, to communicate with the State's negotiator and erroneously claim that Pauma desired to settle its compact lawsuit through negotiations using him (see ¶ 159);

(d) Beginning on or about March 18, 2013, to post a false advertisement on his website that he "successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California" (see ¶ 134);

(e) Countless times since March 18, 2013, to disseminate promotional materials to actual and prospective clients in the admitted "ordinary course of business" that contain identical representations that Mr. Rosette "successfully litigated a case saving the Pauma Band of Luiseno Mission over $100 Million in Compact payments allegedly owed to the State of California" (see ¶ 182);

(f) On or about June 16, 2017, to disseminate or arrange to disseminate these promotional materials to putative Quechan President Keeny Escalanti and

13

putative Councilmember Willie White for the June 16, 2017 meeting (see ¶ 183);

(g) On or about June 27, 2017, to arrange to transmit the letter purportedly terminating the Attorney-Client Fee Agreement even though Rosette LLP did not officially represent Quechan at that point (see ¶¶ 95, 185);

(h) On or about December 2016, to try to interfere with Williams & Cochrane's contract with Pauma by working through a "strawman" attorney for the tribe's subordinate gaming facility (see ¶ 170);

(i) On or about April 18, 2018, to intentionally disseminate sealed documents in this case to the general manager of Pauma's gaming facility while erroneously claiming to this Court it was an inadvertent disclosure (see ¶ 172);

(j) On or about April 18, 2018, to intentionally disseminate sealed documents in this case to a Pauma tribal member who is related to putative Quechan President Keeny Escalanti while omitting this disclosure from its Court filing (see ¶ 173);

(k) On or about June 7, 2018, to arrange to have the attorney representing Quechan, WilmerHale, file a premature answer for the real purpose of disseminating the document around Pauma as supposed proof that the attorneys with W&C engaged in unethical conduct (see ¶ 174); and

(l) On or about June 21, 2018, to intentionally disseminate the answer in this case to a Pauma tribal member who is related to putative Quechan President Keeny Escalanti along with the deceitful message that the allegations therein are proof positive of unethical conduct (see ¶ 175).

Meanwhile, the remaining predicate acts involve the following actions by Richard Armstrong:

(m) On or about July 26, 2011, to e-mail the States's negotiator to erroneously claim the Pauma Tribal Council desired a meeting to discuss its compact when he was not even retained on the matter (see ¶ 156);

(n) On or about July 27, 2011, to e-mail the State's negotiator to erroneously claim that Pauma wanted "to meet without their attorneys present . . . with the goal of settling the pending lawsuit" when he was not even retained on the matter (see ¶ 158);

14

(o) On or about June 27, 2017, to arrange, or assist in arranging, to send the letter purportedly terminating the Attorney-Client Fee Agreement even though Rosette LLP did not officially represent Quechan at that point (see ¶¶ 95, 185); and

(p) On or about June 27, 2017, to direct a subordinate associate to e-mail Cheryl Williams in an attempt to get the June 21st draft compact even though Rosette LLP did not officially represent Quechan at that point (see ¶ 103).

The predicate acts span eight years and can be grouped into four categories. The first group of predicate acts relate to interference with W&C's contract with La Pena Law; the second relates to Defendants' 2011 attempts to settle the claims of Pauma Band of Luiseno Mission, the third involves claims by Richard Rosette that he successfully litigated the litigation for the Pauma Band that produced savings of over $100 million in Compact payments, and the fourth group alleges interference with W&C's contract with Pauma from December 2016 through April 2018.

### i. Interference with Relationship with La Pena Law

W&C alleges Robert Rosette interfered with W&C's contract with La Pena Law on August 11, 2010, "by erroneously claiming he was responsible for litigating the Pauma case." SAC ¶ 225(a). "Erroneously claiming" credit for the work of another approaches but does not qualify as fraud. It is along the lines of negligence. In addition, W&C has not sufficiently alleged the required element of the use of mails or wires. The SAC alleges that La Pena provided Cochrane with a memorandum that Rosette sent to La Pena regarding compact litigation, *id.* ¶ 149, and then La Pena alerted Cochrane that Mr. Rosette "was representing that he was responsible for litigating the Pauma case," *id.* Mr. Rosette's alleged misrepresentation is not contained in that memorandum,[1] and the SAC does not allege when and how that misrepresentation was communicated to La Pena.

---

[1] The SAC does not allege that this memorandum was a mailing or wiring in furtherance of the scheme to defraud.

W&C contends in its opposition that Mr. Rosette made this misrepresentation "via email and phone." But the specific allegation of the communication over the phone or through email is not present in the SAC. W&C also makes much of the fact that the Rosette office is in Arizona, while La Pena is in California. But that does nothing to alleviate the failure of the SAC to allege that Mr. Rosette communicated his alleged Pauma success to La Pena on the phone or by email. Therefore, the SAC fails to provide a sufficient factual background to plausibly show the use of the mails or wires in support of this predicate act.

### ii.      2011 Attempts to Settle Pauma Claims

These alleged predicate acts relate to Rosette's attempts to settle the Pauma Tribe compact dispute in 2011 (predicate acts b, c, m and n) and do not reveal any false statements nor support a fraudulent interference with a contract scheme. Also, these acts do not provide context for any properly alleged misrepresentation. Instead, they evidence sharp elbowed attempts by Rosette to represent Pauma in compact settlement discussions with state negotiators while admitting that Pauma "had not hired him" and that Rosette "was not engaged as legal counsel." SAC ¶ 159. They are not properly construed as predicate acts that support the alleged scheme of fraudulent interference with contracts.

### iii.      Mr. Rosette Claims Pauma Litigation Success

Since 2013, Mr. Rosette has allegedly posted advertisements, disseminated promotional materials, and made statements to Quechan officials containing the false representation that Rosette successfully litigated a settlement for the Pauma Band that produced savings of over $100 million in Compact payments (predicate acts d, e, f, n and o).

The SAC alleges that since March 18, 2013, Rosette's website advertises that Mr. Rosette successfully litigated the Pauma case. SAC ¶¶ 134, 225(d). The Court has previously found the statement taking credit for the Pauma successful settlement was plausibly false. This is sufficiently alleged as a predicate act. The SAC also alleges that Rosette LLP prints and distributes marketing brochures that claim that Mr. Rosette

successfully litigated the Pauma case. *Id.* ¶ 182.

The SAC alleges that Mr. Rosette brought these promotional materials to an in-person meeting with White and Escalanti on June 16, 2017. *Id.* ¶ 183. Further, Mr. Rosette allegedly explained at this meeting that he was responsible for litigating the Pauma suit. *Id.* The SAC fails to allege a wiring or mailing to support these actions as acts of mail or wire fraud. W&C contends in its opposition that the promotional materials were sent to Quechan via the wires in advance of the June 16, 2017 meeting. However, no such allegation is contained the SAC.

The SAC alleges that on June 27, 2017, Williams received an e-mail enclosed with Quechan's letter terminating W&C's representation. *Id.* ¶¶ 95, 187. Furthermore, the SAC alleges that on June 27, 2017, an associate from Rosette LLP sent an e-mail to Williams demanding that she turn over a copy of the draft compact. *Id.* ¶ 103. These acts are sufficiently alleged as predicate acts. These acts furthered the fraudulent scheme to interfere with W&C's representation because the termination letter finalized the scheme, and obtaining the draft compact helped effectuate the scheme by easing Rosette's ability to take over representation, which was part of the goal of the scheme. *See Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 196 (9th Cir. 1987) (*citing United States v. Sampson*, 371 U.S. 75 (1962)) (use of the mails or wires does not have to happen concurrently with the fraud).

### iv.  Interference with W&C's Contract with Pauma from 2016 through 2018

The final five predicate acts relate to alleged attempts to interfere with W&C's ongoing representation of the Pauma Tribe from December 2016 through June 2018. These allegations focus on improper dissemination of sealed documents and responsive pleadings in an attempt to interfere with W&C's relationship with the Pauma Tribe, a current client of W&C.

W&C alleges as a predicate act that Mr. Rosette developed a plan for Quechan's counsel to file a premature answer. However, this is protected petitioning activity. *Sosa*

*v. DirecTV, Inc.*, 437 F.3d 923, 929-30 (9th Cir. 2006). W&C also alleges that Rosette disseminated sealed documents in this case to Pauma. Even if dissemination of court documents could be construed as RICO predicate acts, which the Court doubts, *see id.*, W&C fails to allege with particularity what sort of fraud or deceit was used. The SAC alleges that Mr. Rosette spread a message that allegations in the answer are proof of W&C's unethical behavior, but W&C does not explain why this statement was false. Finally, the allegation that Rosette used a "strawman" to interfere with W&C's contract with Pauma does not reveal any specifics or any nexus with the alleged scheme. This purported predicate act also fails to allege wiring or mailing in furtherance of any scheme.

### v. Intent to Defraud

In order to prove mail or wire fraud, "there must be a showing of a specific intent to defraud." *United States v. Peters*, 962 F.2d 1410, 1414 (9th Cir. 1992). "[S]pecific intent to deceive or defraud . . . requires only a showing of the defendants' state of mind, for which general allegations are sufficient." *Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007). W&C has alleged that Mr. Rosette falsely claimed that he successfully litigated the Pauma case as a way to end W&C's representation with Quechan. "[B]y examining the scheme itself" the Court finds that the SAC plausibly alleges the specific intent to defraud. *United States v. Green*, 745 F.2d 1205, 1207 (9th Cir. 1984).

The Rosette Defendants argue that the SAC does not allege facts that exclude the innocent alternative explanation for their actions – that they were advising potential and actual clients in the course of operating their law practice. "When faced with two possible explanations, *only one of which can be true* and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678) (emphasis added). "Something more is needed, such as facts tending to exclude

the possibility that the alternative explanation is true." *Id.* Here, however, it is not the case that only one of two explanations (that the Rosette Defendants intended to defraud or that they were just advising clients) can be true. The Rosette Defendants could have intended to misrepresent their success in the Pauma litigation while at the same time advising Quechan about compact matters. Therefore, W&C is not required to allege facts tending to exclude the alternative innocent explanation.

### c. Pattern of Racketeering Activity

In sum, Plaintiffs have sufficiently alleged as predicate acts: 1) the posting on Rosette's website of his claimed success litigating the Pauma case; 2) the e-mail terminating W&C's representation; and 3) the e-mail demanding a copy of the draft compact from W&C. The Rosette Defendants contend that a single false statement does not constitute a pattern under RICO. "To plead a pattern of racketeering activity, plaintiffs must allege: (i) that the racketeering predicates are related, and (ii) that they amount to or pose a threat of continued criminal activity." *Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1177 (E.D. Cal. 2017) (citing *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004)). "Related conduct embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Howard v. Am. Online Inc.*, 208 F.3d 741, 749 (9th Cir. 2000) (citation and quotation marks omitted). The continuity requirement is satisfied if plaintiffs allege "either a series of related predicates extending over a substantial period of time, i.e., closed-ended continuity, or past conduct that by its nature projects into the future with a threat of repetition, i.e., open-ended continuity." *Id.* at 750.

The Court finds that the predicate acts are sufficiently related. The predicate acts had the similar participants of Mr. Rosette and those working in his firm. The predicate acts had the similar purpose of attempting to interfere with W&C's business through misrepresenting that Rosette successfully litigated the Pauma case. As alleged by the SAC, these predicate acts do not appear to be isolated events; rather, Rosette first began

the scheme by claiming on his website that he successfully litigated the Pauma case, and the termination of W&C's agreement with Quechan was the culmination of the part of that scheme as it related to interference with Quechan. As these acts stretch from 2013 to 2017, the Court finds that the acts extend over a substantial period of time.

### d. Injury

W&C claims that the Rosette Defendants interfered with the Attorney Fee Agreement and encouraged the termination of the agreement, thereby causing injury to W&C's business and property interest in the Fee Agreement. "To demonstrate injury for RICO purposes, plaintiffs must show proof of concrete financial loss, and not mere injury to a valuable intangible property interest." *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1086–87 (9th Cir. 2002). In a similar vein, "'[m]arket share' is neither tangible or intangible property; its loss is far too amorphous a blow to support a claim of mail fraud." *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 406 (9th Cir. 1991).

Here, the alleged interference with a contract on the eve of the consummation of a Compact which would have triggered the contingency fee award is more than an intangible interest.[2] Moreover, W&C lost out on the flat monthly fee – money that it would have received under the contract. W&C has sufficiently alleged a RICO injury.

### e. Causation

Citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006), the Rosette Defendants contend that W&C has not suffered a loss proximately caused by a RICO violation. "A RICO claimant must also plausibly allege that any compensable property injury was proximately caused by the defendant's racketeering activity." *Ainsworth v. Owenby*, 326 F. Supp. 3d 1111 (D. Or. 2018). "When a court evaluates a RICO claim for

---

[2] The Court will note, however, that for many of the other alleged predicate acts, W&C has not sufficiently alleged a cognizable injury. With regard to Mr. Rosette's alleged interference with La Pena, Pauma, and "potential clients," W&C fails to point to a concrete financial loss that it suffered as a result of the alleged interference.

3:17-cv-01436-GPC-MDD

proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza*, 547 U.S. at 461.

In *Anza*, Ideal Steel Supply Corporation sold steel mill products. *Id.* at 453. Its main competitor was National Steel Supply. *Id.* at 454. Ideal brought RICO claims based on predicate acts of mail and wire fraud against National. National's alleged fraudulent scheme went like this: National did not charge its customers the New York sales tax on cash purchases, which allowed National to reduce its prices, and then National submitted false tax returns to the State in order to conceal their scheme. *Id.* Ideal's RICO claim alleged that National's goal was to give it a competitive advantage over Ideal.

Ideal advanced the theory that National harmed Ideal by defrauding the New York tax authority and offering lower prices to attract more customers. The Supreme Court concluded that Ideal failed to allege proximate cause under § 1962(c), because the cause of Ideal's injury was "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* at 458. The Court noted that National "could have lowered its prices for any number of reasons unconnected to the" fraud and, moreover, that "Ideal's lost sales could have resulted from factors other than" the fraud. *Id.* at 458-59. The Supreme Court expressed concerns with such apportionment, finding that a court would have to calculate the portion of National's price drop and portion of Ideal's lost sales attributable to the fraud. *Id.* at 459. However, proximate causation "is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation." *Id.* at 460.

The Supreme Court also addressed another factor weighing against proximate causation. "The requirement of a direct casual connection is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Id.* at 460. The Court noted that the State was defrauded, and therefore "the State can be expected to pursue appropriate remedies." *Id.*

Furthermore, the adjudication of the State's claims "would be relatively straightforward," whereas apportioning Ideal's claims would have been difficult. *Id.*

The Supreme Court further clarified proximate causation in RICO cases in *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010). In RICO claims, the proximate cause requirement turns on a direct relationship between the fraud and the harm, and does not turn on foreseeability. *Id.* at 12. Furthermore, a court facing a RICO claim should not focus on the "*intended* consequences of the defendant's unlawful behavior." *Id.* (quoting *Anza*, 547 U.S. at 470 (Thomas, J., concurring in part and dissenting in part)) (emphasis in original).

The rejection of a foreseeability standard for proximate cause in a RICO claim was also demonstrated in *Slay's Restoration, LLC v. Wright National Flood Insurance Co.*, 884 F.3d 489 (4th Cir. 2018). In that case, City Line Associates owned an apartment complex that was damaged by flooding. City Line hired First Atlantic Restoration to do repairs. *Id.* at 491. First Atlantic then hired plaintiff Slay's Restoration as a subcontractor to perform some of the repair work. *Id.* City Line submitted claims to its insurance company, defendant Wright National Flood Insurance Company, for the work Slay's Restoration did. To adjust the claim, Wright hired Colonial Claims Corporation and two consulting firms to provide professional assessments of the repair work. *Id.* Based on the consultants' assessments, Wright offered City Line less than half the amount City Line requested. *Id.*

Slay's Restoration brought a RICO claim against Wright Insurance, Colonial Claims, and the two consulting firms, alleging that they participated in a fraudulent scheme to create false reports to deny policy benefits. *Id.* at 492. Slay's Restoration's theory was that the reduction of City Line's claims as a result of this scheme prevented First Atlantic from receiving full payment, which then prevented Slay's Restoration from receiving full payment. *Id.*

The Fourth Circuit found that Slay's Restoration did not allege facts showing that its injury was the direct result of the defendants' conduct. *Id.* at 494. The court

acknowledged that Slay's Restoration had alleged that the defendants' fraudulent conduct caused its injury. However, Slay's Restoration's theory of causation extended significantly beyond the first step: the injury from the fraud proceeded from Wright Insurance to City Line, then to First Atlantic, and then ultimately to Slay's Restoration. Because the injury "was not the direct result" of the fraud, the injury was not proximately caused by the fraudulent conduct. *Id.*

Slay's Restoration argued that its injury was sufficient to show proximate cause because it was the "expected recipient of insurance funds dispersed by Wright Insurance under the policy." *Id.* The Fourth Circuit rejected this contention as it was "nothing more than a claim that Slay's Restoration's injury foreseeably resulted from the defendants' conduct." *Id.* The court noted, however, that "regardless of how foreseeable a plaintiff's claimed injury might be or even what motive underlaid the conduct that caused the harm, the injury for which a plaintiff may seek damages under RICO cannot be contingent on or derivative of harm suffered by a different party." *Id.*

Here, many of the *Anza* Court's concerns are present. First, W&C's claim is that Rosette falsely took credit for W&C's success in the Pauma litigation and made these misrepresentations to Quechan in order to lure Quechan away from W&C. If true, Rosette misrepresented the level of its skill and expertise and Quechan was defrauded as to the quality of legal representation it was getting. The Tribe, then, was the direct victim of this fraud. In addition, the injury W&C alleges results from Quechan terminating its attorney-client agreement with W&C.[3] But Quechan could have terminated the agreement "for any number of reasons unconnected to the asserted pattern of fraud." One

---

[3] The Court will also note that even if W&C had sufficiently alleged that Rosette's interference with La Pena constituted RICO predicate acts, the SAC fails to plausibly allege proximate cause of any injury from those acts. The SAC alleges that La Pena shared with W&C that Rosette informed her that the attorneys of W&C had "stole" his client and would invariably "steal" her clients. La Pena then ended the of counsel relationship based upon "issues with confidentiality and conflicts" that could not be overcome. Nothing supports the conclusion that La Pena terminated the of counsel relationship because of Robert Rosette "claiming he was responsible for litigating the Pauma case."

such reason appears in the SAC.  Quechan may have been persuaded to retain Rosette based on Rosette's monthly fee of $10,000 and no contingency fee, which as W&C concedes, is a "bargain basement rate," and much lower than W&C's monthly fee of $50,000 and 15% contingency fee.  Even beyond that, attorneys lose and gain clients for many reasons, such as dissatisfaction with current counsel or rapport, and "it would require a complex assessment to establish what portion" of the termination was the product of Rosette telling Quechan that he had successfully litigated the Pauma case.

W&C's theory of proximate cause extends beyond the first step in the chain of causation and essentially relies on a foreseeability theory to establish causation.  Though W&C alleges that the fraudulent scheme was to put W&C out of business, this contention is unavailing because the intended consequences and underlying motivation for the Rosette Defendants' fraudulent conduct are not relevant to the Court's RICO proximate cause analysis.  *Hemi Group*, 559 U.S. at 12; *Slay's Restoration*, 884 F.2d at 494. Though W&C was the expected recipient of attorney's fees from Quechan, this only shows that W&C's injury was foreseeable, not that it directly resulted from the Rosette Defendants' conduct.

W&C has failed to plausibly allege that its injury was proximately caused by the Rosette Defendants' racketeering activity.  Given the nature of the deficiencies discussed above, the Court concludes that amendment will prove futile as to the predicate acts relating to Quechan's termination of the attorney-client agreement with W&C.  However, the Court finds that further amendment may nudge the remaining RICO claims "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  As a result, W&C's substantive RICO claim against the Rosette Defendants will be dismissed without prejudice.  Plaintiffs are placed on notice that in the event that they choose to amend this claim, it will be the last opportunity to do so.

### 2.  RICO Conspiracy Claim – Count V

The SAC's fifth claim advances a RICO conspiracy claim against the Rosette Defendants and Quechan Individuals.  The SAC claims that Defendants conspired to use

the Tribe's funds for their own personal enrichment. "A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997). A defendant must also have been "aware of the essential nature and scope of the enterprise and intended to participate in it." *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993) (internal quotation marks omitted). "To establish a violation of section 1962(d), Plaintiffs must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard*, 208 F.3d at 751. The SAC alleges that Defendants engaged in at least two predicate acts of mail or wire fraud. This claim lists the following as alleged predicate acts:

> (a) On April 20, 2017, cutting off per capita and minor trust account payments to the general membership of Quechan;
> (b) Withholding financial distributions to the general members of Quechan;
> (c) On April 18, 2017, to certifying to the Arizona Department of Gaming that Quechan was complying with its Tribal Revenue Allocation Plan by using 40% of the net gaming revenues for per capita payments when it was not;
> (d) On or about May 2017, certifying to the National Indian Gaming Commission that Quechan was complying with its Tribal Revenue Allocation Plan when it was not;
> (e) Refusing to turn over any financial information or audit reports to the general membership;

SAC at 74-75.

The Rosette Defendants argue that the SAC fails to allege that they and the Quechan Defendants committed, or agreed to commit, two predicate acts. Defs.' Mem., ECF No. 114 at 23. W&C counters that the predicate acts for this claim sufficiently allege fraud over the wires. Pls.' Mem., ECF No 160 at 11. With regard to the

allegations that payments to the members of Quechan were cut off and withheld, the SAC alleges that Escalanti issued a letter to the membership stating that there will be no per capita payments, and that he has refused to comply with the Tribal Revenue allocation Plan. SAC ¶¶ 195-96. The SAC does not allege that he agreed with another Defendant to take such action, nor does the SAC allege any other Defendants' involvement in this act. The same applies to the certifications to the Arizona Department of Gaming and National Indian Gaming Commission. The SAC alleges that Escalanti sent such certifications, and does not allege that he conspired with anyone else to do so. *Id.* ¶¶ 197-98. In addition, as to the April 18, 2017 certification, Plaintiffs fail to identify how this statement was false or misleading where the letter cutting off payments was not sent until April 20, 2018.

Other alleged predicate acts are plead insufficiently to be attributed to the Defendants. ████████████████████████████████████████████ ████████████████████████████████████████████████████████

████ The SAC further alleges that "the Tribal Council" refuses to disclose any financial information or audit reports. *Id.* ¶ 202. Although Escalanti is the Tribal Chairman and White is a Tribal Councilmember, the SAC fails to demonstrate with specificity any of the Defendants' involvement with the Tribal Council's actions that allegedly are predicate acts. In other words, W&C has not alleged that there was an agreement amongst specific Defendants to commit these allegedly predicate acts. The identification of the Tribal Council generally fails to comport with Rule 9(b)'s heightened pleading standard to identify the parties to the alleged misrepresentation. Moreover, with respect to the allegations that the Tribal Council refuses to disclose any financial information or audit report ████████████████████████████████████████, there is nothing to infer that these actions involved the use or wires or mail.

Plaintiffs, in their opposition to the Rosette Defendants' motion, raise predicate acts that were not identified as such in the SAC. W&C claims that the Rosette Defendants aided the Quechan Individuals by assisting them in quashing the recall efforts

that would have removed them from office.  Pls.' Mem., ECF No. 160 at 11.  W&C

further contends that the quashing of the recall involved Mr. Rosette preparing notices to

be sent to tribal members to falsely proclaim the recall vote invalid.  However, the SAC

is much more vague and insufficient.  The SAC alleges that the Quechan Individuals

devised a plan to remain in office with the assistance of Mr. Rosette, ultimately refusing

to step down on the basis that the votes were invalid because 'the total number of voters

did not meet the minimum set by the tribe's constitution.'"  *Id.* ¶ 201.  The SAC does not

allege that Mr. Rosette prepared notices.  Nothing about the allegation of refusing to step

down from office shows the use of the wires or mails in furtherance of the alleged

fraudulent scheme.  This is not a predicate act, nor an agreement to commit one.

In addition, Plaintiffs claim in their opposition a further unidentified predicate act,

which is "the emailed letter to the State and W&C falsely claiming that W&C had been

terminated and Rosette retained by proper governmental process."  Pls.' Mem., ECF No.

160 at 11.  The SAC alleges that the State's attorney informed Williams that the State had

just received a letter indicating that W&C had been terminated and replaced by Mr.

Rosette.  SAC ¶ 94.  The SAC does not allege who drafted or sent this letter.  Without

additional factual background, this unidentified predicate act would not sufficiently

allege a conspiracy to commit mail or wire fraud.  The SAC does allege that Williams

received a termination letter signed by Escalanti and drafted by Mr. Rosette or an

attorney at Rosette LLP.  *Id.* ¶¶ 95, 100.  Assuming that this allegation is sufficient to

allege an agreement by Escalanti and Rosette to commit wire fraud, this is only one

predicate act that Defendants agreed to commit.  W&C have not alleged that Defendants

agreed to commit two predicate acts as required.  In addition, the SAC fails to

demonstrate how any Plaintiff was a direct victim of this alleged fraudulent statement.

Therefore, W&C has not pleaded a plausible claim for a RICO conspiracy.  This claim

will be dismissed without prejudice but Plaintiffs are placed on notice that in the event

that they choose to amend this claim, it will be the last opportunity to do so.

Because the Court has found that W&C has not stated a plausible RICO conspiracy claim, the Court declines to address the Quechan Defendants' arguments for dismissal of this claim in their motion to dismiss, and denies those arguments as moot.

### 3. Professional Negligence – Count VI

Count VI of the SAC advances a claim for negligence/breach of fiduciary duty against the Rosette Defendants for their representation of Quechan in compact negotiations. SAC at 75. This claim alleges that Mr. Rosette knew nothing about the status of Quechan's compact negotiations, yet he dove in, causing Quechan to lose some of the State's concessions, including having to pay back $2 million that it owed under the 2007 Amendment. *Id.* at 78. This claim further asserts that Mr. Rosette orchestrated and carried out a total repudiation of the Attorney-Client Fee Agreement that has exposed Quechan to a bad-faith breach claim. *Id.*

In California,

> the elements of a legal malpractice action are: (1) the duty of the attorney to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence. . . . In addressing breach of duty, the crucial inquiry is whether the attorney's advice was so legally deficient when it was given that he or she may be found to have failed to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake.

*E-Pass Techs., Inc. v. Moses & Singer, LLP*, 117 Cal. Rptr. 3d 516, 521 (Cal. Ct. App. 2010) (citation and quotation marks omitted).

The Court previously dismissed this claim as alleged in the FAC. The Court found that the FAC did not point to "any conduct by the Rosette Defendants suggesting their representation fell below the appropriate standard of care," but rather, "the FAC focuses only on the consequences of the Rosette Defendants' representation." Order, ECF No. 89 at 36. The Court also noted that according to the FAC, the State changed its bargaining

stance after Quechan switched representation, yet the Rosette Defendants negotiated down the State's demand to pay back all of what Quechan owed. *Id.* at 37.

The Rosette Defendants argue that the SAC's professional negligence claim suffers from the same deficiencies. Defs.' Mem., ECF No. 114 at 20. The Court agrees. The SAC alleges that following W&C's removal, the State "decided to try and take advantage of the firm switch . . . by suddenly demanding that Quechan pay back all the revenue sharing payments that the tribe missed under the 2007 Amendment." SAC ¶ 112. The SAC does not allege that any deficient conduct on the part of the Rosette Defendants caused the State to change its position, it was only the firm switch. Furthermore, the SAC alleges that after two months of negotiations, the State "relented a bit" and let Quechan pay back only half of the amount it owed under the 2007 Amendment. SAC ¶ 113.

W&C contends that the State would not have demanded repayment from Quechan had been represented by W&C. Pls.' Mem., ECF No. 160 at 18. This contention again speaks to the State's negotiation positions, and does not provide specific allegations that the Rosette Defendants failed to use ordinary skill, prudence, and diligence during the negotiations.

The SAC alleges that Mr. Rosette was completely unfamiliar with Quechan's legal issues, including its compact negotiations, as of two weeks before the negotiations were set to conclude and one week before Rosette became Quechan's counsel. SAC ¶ 184. Along those lines, Plaintiffs maintain that the $2 million loss results from either Mr. Rosette not having the expertise or savvy to defend against the State's new bargaining position. Pls.' Mem., ECF No. 160 at 18. Plaintiffs seem to be advancing a theory of negligence per se based on lack of expertise or experience with a case, a theory that certainly should strike fear in the heart of any attorney that is newly barred or picking up a new case. The relevant inquiry to show an attorney's breach of duty to the client is not the level of knowledge or familiarity the attorney has of the client's legal issues prior to the attorney's representation. Rather, the crucial inquiry focuses on the attorney's

1  conduct or advice given to the client. The SAC simply has not provided sufficient factual
2  background to demonstrate that Rosette's conduct or advice was deficient.

3       Plaintiffs also assert that Mr. Rosette, in negotiations with tribes other than
4  Quechan, has "acceded to the State's demands, no matter how egregious." Pls.' Mem.,
5  ECF No. 160 at 18 (citing SAC ¶¶ 127-129). But Mr. Rosette's past representations do
6  not make it plausible that his conduct or advice specifically during Quechan's
7  negotiations fell below the professional standard.

8       With regard to Quechan's repudiation of W&C's Attorney-Client Fee Agreement,
9  the Rosette Defendants assert that Plaintiffs have failed to identify any specific action by
10 the Rosette Defendants that fell below professional standards. Defs.' Mem., ECF No.
11 114 at 21. Plaintiffs do not defend this claim in their opposition to the Rosette
12 Defendants' motion. The SAC does allege that Mr. Rosette prepared the W&C's
13 termination letter. SAC ¶ 187. There is no allegation as to whether Rosette decided to
14 draft the letter or Quechan instructed[4] Rosette to do so, whether it was Quechan's or
15 Rosette's decision to repudiate the agreement, and what advice, if any, Rosette gave to
16 Quechan about that repudiation. Without more, there is not a sufficient factual
17 background to support a plausible claim for legal malpractice.

18      Finally, Plaintiffs posit that they should be entitled to discovery to find out what
19 occurred during Mr. Rosette and the State's negotiations. Pls.' Mem., ECF No. 160 at
20 19. Plaintiffs assert that Defendants possess all of the relevant evidence of this claim. *Id.*
21 at 20. Plaintiffs' request to engage in discovery to then be able to state a plausible claim
22 for relief puts the cart before the horse. "Rule 8 . . . does not unlock the doors of
23 discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at
24 678-79. *See also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[F]actual

---

[4] "An attorney's duty, where he is specially instructed, is to follow the instructions of his client, except
as to matter of detail connected with the conduct of the suit, and he is liable for all losses resulting from
its failure to follow such instructions with reasonable promptness and care." *Lally v. Kuster*, 171 P. 961,
962 (Cal. 1918) (citation omitted).

allegations [in a complaint] that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.").

The Court has no reason to believe that further amendment to this claim could alleviate the pleading deficiencies. Plaintiffs concede that they do not have possession of any of the relevant evidence regarding this claim. Pls.' Opp., ECF No. 160 at 20. Therefore, Plaintiffs' negligence claim is dismissed with prejudice. Because the Court finds that the SAC fails to state a plausible claim for professional negligence, the Court declines to address the Rosette Defendants' special motion to strike this claim. That motion is denied as moot.

### 4. Breach of Implied Covenant of Good Faith and Fair Dealing – Count II

The SAC advances a claim for breach of the implied covenant of good faith and fair dealing against Quechan, on the basis that Quechan terminated W&C just days before the planned execution of the compact, required W&C to turn over the latest draft compact, and substituted Rosette to have the tribe sign the compact. SAC at 66-67. The Quechan Defendants move to dismiss this claim, contending that the claim fails as a matter of law because the Fee Agreement was an at-will legal services contract. Defs.' Mem., ECF No. 115 at 5. W&C counters that this argument is untimely because it should have been brought in the Quechan Defendants' first motion to dismiss. Pls.' Mem., ECF No. 148 at 5.

Federal Rule of Civil Procedure 12(g) states that "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." W&C brought this claim in the FAC. ECF No. 39 at 101. The Quechan Defendants moved to dismiss this claim in the FAC. Defs.' Mem., ECF No. 50-1 at 13. The sole argument the Quechan Defendants made was that this claim was duplicative of the breach of contract claim. *Id.*

The Quechan Defendants respond that the Quechan Tribe may move to dismiss W&C's good faith and fair dealing claim because the SAC supersedes the FAC and the Court is thus able to consider 12(b) motions on the SAC. Defs.' Mem., ECF No. 162 at 2. The Quechan Defendants are correct that "when a plaintiff asserts new allegations in an amended complaint, a defendant is free to file a subsequent 12(b)(6) motion raising arguments," but that only applies to arguments "that were previously unavailable." *Hild v. Bank of Am., N.A.*, No. EDCV 14-2126 JGB SPX, 2015 WL 1813571, at *4 (C.D. Cal. Apr. 21, 2015). "However, a defendant can neither object to allegations that were present in the first complaint nor revive defenses under Rule 12(g) and Rule 12(h) that were previously waived." *Id.* There appears to be no significant change in W&C's good faith and fair dealing claim between the FAC and SAC. The Quechan Defendants could have brought this argument in their motion to dismiss the FAC and cannot now bring this argument in a 12(b)(6) motion.

To add another wrinkle, Rule 12 does allow a defendant to raise, for a second time, the defense of failure to state a claim "by a motion under Rule 12(c)." Fed.R.Civ.P. 12(h)(2)(B). A Rule 12(c) motion, or a motion for judgment on the pleadings, may be brought "[a]fter the pleadings are closed." As surprising as it may be, though this case was filed in this Court over one year ago, the pleadings have not closed.

On June 21, 2018, the Quechan Tribe filed an Answer to the FAC and Counterclaims. ECF No. 94. W&C responded by filing a Rule 12(f) motion to strike. ECF No. 95. The Court denied W&C's motion and ordered W&C to file an answer to Quechan's counterclaims. Order, ECF No. 135 at 13. W&C then filed a motion to dismiss Quechan's counterclaims, in part based on a lack of subject matter jurisdiction. ECF No. 138. Because W&C has yet to file an answer, the Court declines to convert the Quechan Defendants' motion to dismiss into a motion for judgment on the pleadings. The Quechan Defendants' arguments with respect to W&C's good faith and fair dealing claim is denied without prejudice to Defendants reasserting the argument at a proper time.

### 5. Motion to Strike Allegations

The Rosette Defendants request the Court strike a host of allegations in the SAC. These allegations speak to Mr. Rosette's representations and dealings with other tribes and his supposed payday lending scheme. SAC ¶¶ 115-21, 178-79, 190-93. Federal Rule of Civil Procedure Rule 12(f) empowers a Court to "order stricken from any pleading . . . any redundant, immaterial, impertinent, or scandalous matter." "Motions to strike may be granted if it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Wilkerson v. Butler*, 229 F.R.D. 166, 170 (E.D. Cal. 2005) (citation and internal quotation marks omitted).

Plaintiffs respond that these allegations are relevant to the RICO and Lanham Act claims. As discussed above, the RICO claims have been dismissed. And the Court finds no relevance of these allegations to the Lanham Act claim that the Rosette Defendants falsely advertise that they successfully litigated the Pauma case. At this juncture of this case, the Court strikes these allegations. If Plaintiffs do not seek leave to amend their complaint, Plaintiffs must refile their complaint omitting these allegations.

### III. CONCLUSION

For the reasons explained above, the Court issues the following rulings:

1. The Rosette Defendants' Motion to Dismiss Plaintiffs' Fourth and Fifth Causes of Action, ECF No. 110, is **GRANTED WITHOUT PREJUDICE**.

2. The Rosette Defendants' Motion to Dismiss Plaintiffs' Fourth and Sixth Causes of Action, ECF No. 110, is **GRANTED WITH PREJUDICE**.

3. The Rosette Defendants' Motion to Strike Plaintiffs' Sixth Claim, ECF No. 109, is **DENIED AS MOOT**.

4. The Quechan Defendants' Motion to Dismiss, ECF No. 115, is **DENIED IN PART WITHOUT PREJUDICE** as to Plaintiffs' breach of implied covenant claim, and **DENIED IN PART AS MOOT** as to Plaintiffs' Fifth Cause of Action.

In the event that Plaintiffs wish to file a Third Amended Complaint (TAC) in order to amend the Fourth and Fifth Causes of Action, the TAC must be filed no later than twenty days following the filing of this order. Responsive pleadings are due twenty days thereafter.

**IT IS SO ORDERED.**

Dated:  November 15, 2018

Hon. Gonzalo P. Curiel
United States District Judge