UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAMS & COCHRANE, LLP; and FRANCISCO AGUILAR, MILO BARLEY, GLORIA COSTA, GEORGE DECROSE, SALLY DECORSE, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUECHAN TRIBE OF THE FORT YUMA INDIAN RESERVATION; ROBERT ROSETTE; ROSETTE & ASSOCIATES, PC; ROSETTE, LLP; RICHARD ARMSTRONG; KEENY ESCALANTI, SR.; MARK WILLIAM WHITE II, a/k/a WILLIE WHITE; and DOES 1 THROUGH 100,<br><br>Defendant. | Case No.: 3:17-cv-01436-GPC-MSB<br><br>**ORDER DENYING WILLIAMS & COCHRANE'S MOTION TO DISMISS QUECHAN TRIBE'S ANSWER TO PLAINTIFFS' FIRST AMENDED COMPLAINT AND COUNTERCLAIMS PURSUANT TO RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)**<br><br>**[ECF No. 138]** |

Plaintiff/Counter-Defendant Williams & Cochrane ("W&C") is a law firm that specializes in Indian law. Defendant/Counter-Plaintiff Quechan Tribe of the Fort Yuma Indian Reservation ("Quechan" or "the Tribe") hired W&C to negotiate with the State of California on its behalf regarding the Tribe's gaming compact. After months of

1

negotiations, Quechan terminated W&C, refused to pay any contingency fee, and demanded that W&C hand over the Tribe's case file.

In this litigation, W&C sued Quechan for terminating W&C and refusing to pay the attorneys' fees W&C claims it is owed under their agreement. The Tribe filed counterclaims against W&C, contending that W&C's representation was deficient and that the firm has refused to turn over Quechan's case file. W&C initially responded by moving to strike Quechan's answer, and the Court denied that motion. W&C now moves to dismiss Quechan's counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(1), for lack of jurisdiction and Rule 12(b)(6) for failure to state a claim.

For the reasons articulated below, the Court finds that Quechan has sufficiently alleged an injury and causation to establish Article III standing; therefore, Quechan has demonstrated that the Court has subject-matter jurisdiction over the Tribe's counterclaims. Moreover, the Court finds that W&C's 12(b)(6) arguments are procedurally improper because it failed to raise them in its previously filed Rule 12(f) motion to strike. Accordingly, the Court denies W&C's motion to dismiss.

## I. BACKGROUND

A. <u>Factual Background</u>

  1. <u>Quechan Hires W&C for Compact Negotiations</u>

The following factual allegations are taken from Quechan's Counterclaims. Quechan is a federally-recognized Indian tribe located along the Colorado River. CC, ECF No. 94 ¶¶ 14, 20. Its operations and the majority of the reservation land is in California. *Id.* ¶ 20. The Tribe negotiated gaming compacts with the State of California in 1998 and 2006. *Id.* ¶ 22. In the summer of 2016, the Tribal Council of Quechan sought representation to reduce its payment obligations to the State under the compact amended it had signed in 2006 ("2006 Amendment"). *Id.* ¶ 23. The Tribe had owed approximately $4 million to the State under that amendment. *Id.* ¶ 3. The Tribal Council contacted W&C, a law firm in California. *Id.* ¶¶ 16, 24. Cheryl Williams and Kevin Cochrane are attorneys at W&C.

In September 2016, the Tribe hired W&C for representation in gaming compact negotiations and for resolution of Tribe's underpayments, and the parties executed an Attorney-Client Fee Agreement. *Id.* ¶ 25. The Fee Agreement provides that the Tribe would pay W&C $50,000 per month for its services. *Id.* ¶ 26. The Fee Agreement also provides that the Tribe may have access to its case file upon request at any reasonable time, and that at the end of the engagement, the Tribe may request the return of its case file. *Id.*

2. W&C Begins Negotiations with California as Quechan's Counsel

The initial compact negotiations between Quechan and the State began on November 9, 2016. *Id.* ¶ 27. On December 6, 2016, the State provided to W&C an initial discussion draft of a gaming compact for the Tribe. On December 14 and December 28, 2017, Ms. Williams sent to Michael Jackson, Sr., who was President of Quechan at the time, the draft compact. *Id.* ¶ 29. W&C asserted that the draft compact was "as good as it can get from a financial perspective," and that the "vast majority of the draft compact was boilerplate." *Id.*

On January 11, 2017, Ms. Williams sent the State a letter requesting that the State and the California Gambling Control Commission ("CGCC") refrain from enforcing the Tribe's payment obligations under the 2006 Amendment, i.e. the underpayments. *Id.* ¶ 31. On January 18, 2017, the State responded that it did not have the legal authority to excuse the Tribe's payment obligations. *Id.* ¶ 31. W&C met with the State on January 31, 2017, for further negotiations. *Id.* ¶ 32. As of that date, W&C had not provided a revised draft to the State in response to the State's December 6, 2016 initial discussion draft. *Id.* In an email dated February 3, 2017, Ms. Williams claimed that W&C had the legal and textual authority to support the Tribe making reduced payments to the State under the 1999 compact terms. *Id.* ¶ 33. Ms. Williams also stated that California agreed to increase Quechan's gaming machine limit by 100, but other issues would take some time to iron out and W&C would work hard to redline the draft compact. *Id.*

At some point around the end of March or beginning of April 2017, Ms. Williams sent a letter to the Tribal Council asserting that W&C had done its best to buy time to keep the December draft compact offer on the table. *Id.* ¶ 34. Quechan alleges that W&C did very little or no work at all between December 2016 to that time. *Id.* Quechan further alleges that W&C made this representation to induce the Tribe into maintaining its relationship with W&C. *Id.* W&C further reported to the Tribe that negotiations with the State would continue and that the CGCC sought the payments the Tribe owed. *Id.*

On April 13, 2017, Ms. Williams emailed the State a revised draft compact. *Id.* ¶ 35. This draft was nearly identical to the State's December 2016 draft. *Id.* In May 2017, the State and W&C exchanged compact drafts. *Id.* ¶ 36. On June 9, 2017, Mr. Cochrane emailed the CEO of Quechan's casinos and explained that the compact would be ready to sign within the following week. *Id.* ¶ 37. Quechan alleges that this statement was not true, as the State was not ready to sign any draft of the compact in existence at that time. *Id.*

W&C and the State met on June 14, 2017. *Id.* ¶ 38. W&C sent the State a revised compact draft on June 21, 2017. *Id.* This was not a final draft and the State was not prepared to sign it. This draft did not address the underpayment issue; furthermore, there was a litany of other unresolved issues. *Id.*

### 3. Quechan Has Concerns with W&C and Hires New Counsel

Back in April 2017, the Quechan Tribal Council reviewed the status of the negotiations and W&C's work. *Id.* ¶ 39. It was clear to the Tribal Council that W&C was not diligently pursuing negotiations and that W&C was having difficulties in the negotiations. *Id.* W&C had recommended retaining a lobbyist in Sacramento, for an additional fee, to assist getting the compact approved. *Id.* The Tribal Council was also concerned with the fact that the underpayment issue was unresolved, as the drafts exchanged to that point did not deal with that issue. *Id.*

Based on these concerns, coupled with Quechan's payment of $50,000 a month to W&C, the Tribal Council started to explore the possibility of hiring new counsel to

4

3:17-cv-01436-GPC-MSB

replace W&C. *Id.* ¶ 40. Because the Tribal Council was dissatisfied with W&C's fees and performance, it invited Robert Rosette, an Indian law attorney, to discuss the possibility of Rosette LLP (Mr. Rosette's firm) representing the Tribe in compact negotiations. *Id.* ¶ 43. After meeting with Mr. Rosette, the Tribal Council hired him on June 26, 2017. *Id.*

Also on June 26, 2017, Quechan President Escalanti sent W&C a letter terminating the firm's representation. *Id.* ¶ 44. Escalanti asked W&C to transmit the Tribe's entire case file to its new counsel, Rosette LLP. *Id.* W&C had not sent the Tribe the most recent draft compact at that time. *Id.* ¶ 46. Moreover, W&C refused to give the Tribe or its counsel the full case file. *Id.*

On June 30, 2017, President Escalanti sent a letter to W&C demanding its case file and most recent draft compact. *Id.* W&C eventually sent the most recent draft of the compact but has refused to send the case file or any time records. *Id.* ¶ 47.

Rosette LLP proceeded to conduct negotiations on behalf of the Tribe, even though it did not have access to the full case file. *Id.* ¶ 48. In July 2017, Rosette LLP submitted to the State the first of several draft compacts. *Id.* ¶ 49. On August 4, 2017, Mr. Rosette met with the State to discuss the terms of the compact. Over the following weeks, the parties discussed a multitude of issues, including the $4 million dollar underpayment owed to the State under the 2006 Amendment. *Id.* The parties resolved this issue, agreeing that the Tribe would pay the state half of the amount owed. *Id.* ¶ 50. In late August 2017, negotiations concluded, and Quechan obtained significant benefits beyond what W&C had been able to achieve. *Id.* ¶ 52. The parties signed the compact in August 2017. *Id.*

B. Procedural History

On March 2, 2018, W&C filed its First Amended Complaint against Defendants Quechan, Mr. Rosette, Rosette & Associates, PC, Rosette, LLP, Richard Armstrong, Keeny Escalanti, and Mark William White. ECF No. 39. On June 21, 2018, the Quechan filed an Answer to the First Amended Complaint and Counterclaims. ECF No. 94.

Count I of Quechan's counterclaims brings a claim for breach of fiduciary duty. *Id.* at 15. The Tribe alleges that W&C failed to perform under the Fee Agreement in exchange for the $50,000 monthly fee, dragged out negotiations to extend its representation and collect more monthly fees, and falsely represented to the Tribe that W&C was effectively and diligently performing its duties. *Id.* at 15-16. Quechan claims that W&C's conduct caused the Tribe to expend $50,000 a month for eight months without receiving service from W&C consistent with its fiduciary obligations. *Id.* at 16.

In Count II, Quechan claims that W&C breached the implied covenant of good faith and fair dealing by failing to perform under the Fee agreement, structuring negotiations to elongate the timeframe of its representation and maximize its fees, and failing to attempt to resolve the underpayment issue. *Id.* at 17-18. As a result, the Tribe was allegedly deprived of efficient and competent representation. *Id.* Count III advances a negligence claim against W&C. Quechan asserts that W&C was obligated to promptly release all of Quechan's papers and property upon termination of W&C's representation. *Id.* at 18. Quechan alleges that though President Escalanti and the Tribe's counsel have repeatedly requested the Tribe's entire case file, W&C has only turned over a draft compact, and has refused to send the case file. *Id.* at 18-19. Quechan claims that it did not have all available information relating to the compact negotiations, which extended the negotiations, resulting in increased legal fees to conclude the negotiations. *Id.* at 19. The breach of contract claim in Count IV asserts a similar theory. Quechan alleges that the Fee Agreement provides that Quechan may have access to its case file upon request at any reasonable time, and at the end of W&C's representation, the Tribe may request the return of its case file. *Id.* at 20.

Count V brings an unfair competition claim. *Id.* at 21. Quechan alleges that W&C has engaged in unfair competition by violating the California Rules of Professional Conduct and breaching fiduciary duties. *Id.* Quechan alleges in Count V that it has been injured in its business and property because it has incurred additional legal expenses to conclude the compact negotiations, W&C continues to improperly withhold the case file,

and the Tribe has incurred further legal expenses in this action to respond to W&C's unlawful business practices. *Id.* Finally, in Count VI, Quechan seeks to set off any damages that W&C may be entitled to from its affirmative claims against Quechan. *Id.* at 22.

A day after the Tribe filed its counterclaims, W&C filed a Motion to Strike Quechan Tribe's Answer to Plaintiffs' First Amended Complaint and Counterclaims, or, Motion to Continue Response Obligation under Federal Rule of Civil Procedure 12. ECF No. 95. W&C argued that Quechan's answer was premature and procedurally improper because W&C had not served Quechan with its amended complaint and at the time Quechan filed its responsive pleading, the Court was considering a motion by W&C for leave to file a supplemental complaint.

The Court construed W&C's motion as a motion to strike under Federal Rule of Civil Procedure 12(f). *See* Order, ECF No. 135 at 12. The Court found that striking the answer was not appropriate because the answer was not redundant, immaterial, impertinent, or scandalous. *Id.* The Court ordered W&C to file an answer to Quechan's counterclaims within 14 days. *Id.* at 13.

W&C did not file an answer, but instead, brought this instant motion. W&C moves to dismiss Quechan's counterclaims under Rule 12(b)(1), contending that Quechan lacks Article III standing because it has not shown an injury attributable to W&C. In the alternative, W&C contends Quechan fails to state a claim upon which relief can be granted.

## II. DISCUSSION

A. <u>Legal Standard</u>

1. <u>Rule 12(b)(1)</u>

The jurisdiction of federal courts is constitutionally-limited to actual cases or controversies. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). The standing to sue doctrine is "rooted in the traditional understanding of a case or controversy" and "limits the category of litigants

7

empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* The party invoking federal jurisdiction bears the burden of establishing Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

A Rule 12(b)(1) jurisdictional attack may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (citation omitted). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.*

2. Rule 12(b)(6)

A Rule 12(b)(6) motion attacks the complaint as not containing sufficient factual allegations to state a claim for relief. "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "detailed factual allegations" are unnecessary, the complaint must allege more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

B. Analysis

1. Article III Standing

As a preliminary matter, Quechan contends that W&C's motion violates the Court's order denying W&C's motion to strike. Quechan notes that the Court ordered W&C to file an answer to Quechan's counterclaims, but W&C has not done so and instead filed this motion to dismiss.

W&C brings two sets of arguments for dismissal here. W&C argues, pursuant to Federal Rule of Civil Procedure 12(b)(1), that the Court lacks subject-matter jurisdiction over Quechan's counterclaims because Quechan does not have Article III standing. W&C also argues that W&C fails to state a plausible claim for relief under Rule 12(b)(6).

Federal Rule of Civil Procedure 12(b)(1) allows a party to raise the defense of lack of subject-matter jurisdiction. Rule 12(h)(3) states: "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." "The objection that a federal court lacks subject-matter jurisdiction, may be raised at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 500 (2006) (citing Fed. R. Civ. P. 12(b)(1) & 12(h)(3)). "The defense of lack of subject matter jurisdiction cannot be waived, and the court is under a continuing duty to dismiss an action whenever it appears that the court lacks jurisdiction." *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) (citations omitted).

Though the Court ordered W&C to answer Quechan's counterclaims, the Court maintains its duty to ensure that it has subject-matter jurisdiction over Quechan's counterclaims. The Court must have subject-matter jurisdiction at every step of this case. Accordingly, the Court will address W&C's arguments for dismissal under Rule 12(b)(1).

      a.    <u>Injury</u>

The doctrine of standing is rooted in the "Cases or Controversies" clause of Article III of the Constitution. *Spokeo*, 136 S.Ct. at 1547. To establish standing, a plaintiff must demonstrate a "personal stake in the outcome of the controversy." *Gill v. Whitford*, 138 S.Ct. 1916, 1929 (2018). Federal courts "enforce that requirement by insisting that a plaintiff satisfy the familiar three-part test for Article III standing: that [the plaintiff] '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Spokeo*, 136 S.Ct. at 1547).

W&C first contends that Quechan cannot show that they suffered any injury from W&C's representation. "[T]he plaintiff must have suffered an injury in fact—an invasion

of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations and quotation marks omitted). "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Spokeo*, 136 S. Ct. at 1548 (citing Black's Law Dictionary 479 (9th ed. 2009)). "'Concrete' is not, however, necessarily synonymous with 'tangible.'" *Id.* The Supreme Court has recognized that "intangible injuries can nevertheless be concrete." *Id.* at 1549.

According to W&C, the firm accomplished what Quechan had hired it do, which was to reduce the Tribe's payments to the State. W&C's alleges that its representation actually benefitted the Tribe, thus the Tribe cannot claim that it was injured. As evidence of this, W&C notes that many of the material terms in the signed compact were terms negotiated by W&C. Moreover, the signed compact (which allegedly was largely W&C's doing) was publically celebrated by President Escalanti. W&C argues that it is therefore inconceivable that Quechan can claim it was harmed by W&C's legal work.

In Counts III, IV, and V (negligence, breach of contract, unfair competition), Quechan alleges that under the Fee Agreement and California law, W&C was required to provide Quechan the entire case file upon termination of W&C's representation. Quechan alleges that W&C has failed to do so, thus depriving Quechan of its access to information to which it is entitled. This is sufficient to constitute an injury. Moreover, Quechan has alleged further injuries arising from the deprivation of its case file. In Counts III and V, Quechan alleges that it and Rosette did not have all available information regarding the compact negotiations, which extended the negotiations and thus increased Quechan's legal fees expended to conclude the negotiations. Quechan has therefore alleged an economic injury.

Furthermore, Counts I and II (breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing) allege that W&C dragged out the negotiations in order to prolong the period of its representation and therefore extend the time in which it would collect the $50,000 monthly fee. Quechan claims that because of these stall

tactics, it overpaid W&C. This alleged overpayment of fees constitutes an injury. The Court finds that Quechan has sufficiently alleged an injury-in-fact.

        b.     <u>Causation</u>

W&C contends that even if any injury exists, Quechan inflicted such injury on itself, and Quechan has not alleged that W&C plausibly caused any injury. "To survive a motion to dismiss for lack of constitutional standing, plaintiffs must establish a 'line of causation' between defendants' action and their alleged harm that is more than 'attenuated.'" *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. CV 17-8587-GW(ASX), 2018 WL 3004594, at *5 (C.D. Cal. June 8, 2018) (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011)). "To show causation, the plaintiff must demonstrate a 'causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008) (quoting *Lujan*, 504 U.S. at 560-61).

As to Quechan's allegation that it was injured by not having its case file, that injury is alleged to be caused by W&C's refusal to turn it over. In regards to Quechan's claim that it allegedly overpaid W&C for months of fees that it should not have, that injury is alleged to be caused by W&C failing to work diligently and intentionally extending the negotiations in order to collect the monthly fees. Therefore, Quechan has sufficiently alleged an injury caused by W&C's conduct. The Court finds that Quechan has demonstrated its standing under Article III to raise its counterclaims.

    2.     <u>W&C's 12(b)(6) Arguments</u>

The Court will turn back to Quechan's argument that W&C's motion violates the Court's order for W&C to answer the counterclaims. Though, as discussed above, this did not prevent W&C from raising its lack of subject-matter jurisdiction arguments, motions to dismiss under Rule 12(b)(6) are treated differently in some aspects than those under Rule 12(b)(1).

Rule 12(g)(2) states that, except as provided in Rule 12(h)(2) or (3), "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." W&C brought a motion "under this rule" (Rule 12) when it filed its motion to strike, and now W&C has brought another motion under Rule 12 raising the defense of failure to state a claim. That defense was available to W&C when it filed its motion to strike. W&C could have raised its 12(b)(6) arguments together with its initial 12(f) motion to strike.[1] *See* Fed. R. Civ. P. 12(g)(1) ("A motion under this rule may be joined with any other motion allowed by this rule."). W&C cannot raise its 12(b)(6) arguments in this second motion.

W&C contends that a party can file a motion to strike and then follow that up with a Rule 12(b) motion. The Court disagrees.

> Rule 12(g) is written in broad terms and requires consolidation of Rule 12 defenses and objections whenever a party makes a motion under "this rule." Motions to strike and for a more definite statement are motions under Rule 12 and thus clearly are within the language of subdivision (g). Nor is there a policy reason why a party should be permitted first to attack the opposing party's pleading under Rule 12(e) or Rule 12(f) and then be allowed to follow with a Rule 12(b) motion when these defenses and objections might have been presented together.
> . . .
> Therefore, a litigant moving to strike or for a more definite statement should be barred from making a second preliminary motion based on any Rule 12 defense that he reasonably was capable of asserting with the initial motion.

5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1388 (3d ed. 2018).

---

[1] Indeed, W&C is aware of Rule 12's requirements, as it opposed part of the Tribe, Escalanti, and White's motion to dismiss as untimely because one of their arguments "should have been brought in connection with the first motion to dismiss." W&C Opp., ECF No. 148 at 5 (citing Fed. R. Civ. 12(g)(2)).

12

W&C asserts that the Ninth Circuit has addressed a situation like this and held that Rule 12(g)(2) does not apply. W&C is incorrect. In *Aetna Life Insurance Co. v. Alla Medical Services, Inc.*, the defendants filed a motion to stay or dismiss the federal case based upon concurrent state proceedings dealing with the same issues. 855 F.2d 1470, 1474 (9th Cir. 1988). The district court denied the motion. The defendants then brought a motion to dismiss under Rule 12(b)(6). The district found that the motion was barred by Rule 12(g) because they had previously filed a motion under 12(b). *Id.* at 1472.

On appeal, the defendant argued that the initial motion to stay was not brought pursuant to Rule 12. *Id.* at 1475. The Ninth Circuit agreed, finding that the motion to dismiss or stay based on a pending state court action involving the same subject matter was not a Rule 12(b) motion. *Id.* Accordingly, the court of appeals concluded that the district court erred in holding that the second motion violated Rule 12(g). *Id.*

*Aetna* is inapposite. There, defendants brought a motion to dismiss or stay based on parallel state court proceedings. The Ninth Circuit found that such motion is not a Rule 12(b) motion. For that reason, Rule 12(g)'s bar did not apply because Rule 12(g) prohibits successive Rule 12 motions. The defendants did not bring a Rule 12(f) motion, as is the case here, and nowhere in *Aetna* did the court of appeals address Rule 12(f) motions in conjunction with Rule 12(g)'s prohibition. To the contrary of W&C's position, courts have found that a Rule 12(f) motion will trigger Rule 12(g)'s bar on second motions. *See Baroness Small Estates, Inc. v. BJ's Restaurants, Inc.*, No. SACV 11-468-JST (EX), 2011 WL 13228020, at *2 (C.D. Cal. Sept. 15, 2011) (denying second Rule 12(f) motion as procedurally improper because "Baroness waived its objections to those allegations by not including them in its first 12(f) motion."); *Broomfield v. Doolittle*, 2 F.R.D. 517, 519 (S.D.N.Y. 1942) (denying motion to dismiss as untimely because defendants previously brought a Rule 12(f) motion).

W&C contends that, for policy reasons, the Court should entertain its 12(b)(6) arguments. This Court is of a different view. At this juncture, both parties have brought improper, successive 12(b)(6) arguments. The Court does not believe that round after

13

round of Rule 12 motions for claims and counterclaims is an efficient use of the Court's resources, when those motions could have been consolidated into one motion. Furthermore, allowing such practice would grant an end run around Local Rule 7.1(h), which requires that memoranda in support of all motions noticed for the same motion day must not exceed twenty-five pages. As this Court has noted before, parties on both sides have previously failed to comply this rule. Order, ECF No. 157 at 2. In sum, the motion practice in this case needs to start falling in accordance with the federal and local rules. The Court denies W&C's arguments for dismissal of Quechan's counterclaims for failure to state a claim.

### III. CONCLUSION

For the reasons explained above, the Court denies Williams and Cochrane's Motion to Dismiss Quechan Tribe's Answer to Plaintiffs' First Amended Complaint and Counterclaims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Within 14 days, W&C must file an answer to Quechan's counterclaims.

**IT IS SO ORDERED.**

Dated: November 26, 2018

Hon. Gonzalo P. Curiel
United States District Judge