1
2
3
4
5

Cheryl A. Williams (Cal. Bar No. 193532)
Kevin M. Cochrane (Cal. Bar No. 255266)
caw@williamscochrane.com
kmc@williamscochrane.com
WILLIAMS & COCHRANE, LLP
125 S. Highway 101
Solana Beach, California 92075
Telephone: (619) 793-4809

6
7

Attorneys for Plaintiffs
WILLIAMS & COCHRANE, LLP, *et al.*

8      **IN THE UNITED STATES DISTRICT COURT**

9      **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**WILLIAMS & COCHRANE, LLP**;

vs.

**ROBERT ROSETTE**; **ROSETTE & ASSOCIATES, PC**; **ROSETTE, LLP**; **RICHARD ARMSTRONG**; **QUECHAN TRIBE OF THE FORT YUMA INDIAN RESERVATION**, *a federally-recognized Indian tribe*; *and* **DOES 1 TO 100**.

——————————————————

**FRANCISCO AGUILAR, MILO BARLEY, GLORIA COSTA, GEORGE DECORSE, SALLY DECORSE**, *et al., on behalf of themselves and all those similarly situated*;

vs.

**ROBERT ROSETTE**; **ROSETTE & ASSOCIATES, PC**; **RICHARD ARMSTRONG**; *and* **DOES 1 TO 100**.

Case No.: 17-CV-01436 GPC MSB

**THIRD AMENDED COMPLAINT**

<u>**CLASS ACTION COMPONENT**</u>

<u>**JURY TRIAL DEMANDED**</u>

**[ACTION FILED JULY 17, 2017]**

28

**INTRODUCTION**

1. This case concerns the tortious interference of a contract by an individual who has now done or attempted to do the same with three different clients of the plaintiff over the span of the past eight years. In 2016, the firm of Williams & Cochrane concluded a gaming compact-based lawsuit in this district against the State of California on behalf of the Pauma Band of Mission Indians that led to the payment of a $36.3 million judgment in September 2016. *See Pauma Band of Luiseno Mission Indians v. California,* No. 09-01955 (S.D. Cal. 2016) ("*Pauma*"). A case involving so much money naturally draws a lot of undesired attention, and, in an unusual turn of events, an attorney by the name of Robert Rosette tried to settle the case with the State of California even though he did not represent the plaintiff tribe in the suit and even admitted as much in his covert communications with the Office of the Governor.[1] Lacking these e-mails, the presiding judge in the prior case – Judge Cathy Ann Bencivengo – naturally took issue with the actions of Robert Rosette, but, ultimately refrained from doing anything about his questionable conduct since he was not formally involved in the proceeding.

2. At the time various media outlets around Southern California were reporting on the State paying this once-in-a-generation judgment to Pauma, another tribe situated in this district known as the Quechan Tribe of the Fort Yuma Indian Reservation reached out to Williams & Cochrane and asked if the firm could solve a similar but more complicated dispute that the tribe had with the State of California concerning approximately $40 million in overpayments under an allegedly void compact. After an in-person meeting, numerous phone calls, and weeks of discussion and negotiation, Williams & Cochrane and Quechan ultimately executed an Attorney-Client Fee Agreement that incorporated a discounted 15% contingency fee in the event the firm was able to find an expedient way to recover the $40 million in overpayments (or the value thereof) through either negotia-

---

[1] A true and correct copy of a series of July 2011 e-mails between Robert Rosette and the State of California's then-compact negotiator Jacob Appelsmith is attached hereto as **Exhibit 1**.

tion or litigation.[2] Along with signing the contract, the Quechan Tribal Council executed a tribal resolution indicating that it had voted "5 for," "0 against" on the issue of whether to accept the terms of the Attorney-Client Fee Agreement.[3]

3. With that, Williams & Cochrane got down to work and over the course of the next nine months, from October 2016 to June 2017, was able to convince the Office of the Governor to provide Quechan with a replacement compact that would eliminate over $120 million in revenue sharing fees during the next 28 years and provide the tribe with the ability to generate another $660 million in additional revenue as a result of new gaming rights. ████████████████████████████

████████████████████████████████████████

██████████████████. And yet, on June 27, 2017, just three days before the parties were supposed to execute the compact and the 15% contingency fee would definitively attach without the aid of the premature termination section of the Attorney-Client Fee Agreement, the putative President of Quechan Keeny Escalanti transmitted a letter to Williams & Cochrane, via an e-mail on which no other Tribal Councilmembers were carbon copied, indicating that the tribe was terminating the firm effective immediately and would not pay either the contingency fee or a reasonable fee in lieu thereof based upon the value of the services the tribe had received.[4] In an apparent effort to convince Williams & Cochrane to simply walk away from the contract, putative Quechan President Keeny Escalanti included an extortive threat at the end of the letter that stated, "[w]e strongly advise you against pressing your luck any further out of concern for the reputation of your firm in Indian Country and in the State of California" – language that is reminiscent of what putative Quechan President Keeny Escalanti included in a separate

---

[2] A true and correct copy of the September 29, 2016 "Attorney-Client Fee Agreement" between Williams & Cochrane and Quechan is attached hereto as **Exhibit 2**.

[3] A true and correct copy of the September 29, 2016 Quechan Resolution No. "R-195-16" is attached hereto as **Exhibit 3**.

[4] A true and correct copy of a June 26, 2017 letter from putative Quechan President Keeny Escalanti to Williams & Cochrane is attached hereto as **Exhibit 4**.

"Demand for Cease and Desist" three days later.[5] After conveying the original threat, putative Quechan President Keeny Escalanti then ended the June 27th letter by explaining that Williams & Cochrane could not tell anyone else in the tribe about the message they had just received (*i.e.*, other Tribal Councilmembers, tribal members, etc.), and simply instructed the firm to turn over the latest draft of the compact that Quechan and the State of California were days away from executing to one Robert Rosette.

4. The bizarreness of the situation was not lost on the attorney general representing the State of California in the compact negotiations, who called one of the partners of Williams & Cochrane named Cheryl Williams after receiving a similar letter three days before the conclusion of the negotiations and exclaimed "This has never happened before [in my twenty-plus years of representing the Office of the Governor in tribal affairs] and we don't know what to do." Unfortunately, Williams & Cochrane did know what to do – and that was to turn over its incalculably valuable work product and simply step away from the situation. While it does not know the full extent of the fraud in this matter, what Williams & Cochrane does know is that Robert Rosette actually advertises on his website that *he* successfully litigated the *Pauma* case that resulted in the $36.3 judgment, and he accordingly solicited Quechan with similar misrepresentations about his role in the case and then told the tribe to fire Williams & Cochrane once a compact in principle had been reached so he could swoop in and take credit for the outcome.[6] [7] This is the only logical telling of a story that involves a person who either has or has tried to interfere with significant contracts between Williams & Cochrane and third parties on at least four separate occasions this decade. Unfortunately, the only forum for resolving this issue is in federal court because Robert Rosette has a long and well-documented history of coming in to

---

[5] A true and correct copy of a June 30, 2017 letter from putative Quechan President Keeny Escalanti to Williams & Cochrane is attached hereto as **Exhibit 5**.

[6] A true and correct copy of a June 28, 2017 screen capture of the website biography for Robert Rosette is attached hereto as **Exhibit 6**.

[7] A true and correct copy of an August 25, 2014 screen capture of the website biography for Robert Rosette from the Internet Archive is attached hereto as **Exhibit 7**.

tribes through dubious means – like by representing singular persons or "factions" and then claiming he represents the tribe as a whole – and then doing whatever it takes to assume control and advance his agenda, even if it means the divided tribal members turn against each other and resort to mass armed violence. *See* General Allegations, § II(A), *infra.*

5. The decision to step to the side enabled Quechan to execute the compact Williams & Cochrane had negotiated, but this story has an all-too-familiar and unfortunate addendum about the abuses that happen once Robert Rosette has found a side door into a tribe and is fixated on advancing his personal agenda with the help of a select few rogue insiders. Despite sitting on many millions of dollars in monies earmarked for revenue sharing fees that were never actually paid to the State of California during the compact negotiations, the Robert Rosette-guided Tribal Council actually cut off per capita payments altogether and manipulated other forms of financial assistance to thousands of tribal members – like monies in minor trust accounts – while nevertheless contemporaneously representing to outside government that such payments were being made. Efforts to bring an end to the abuses of this Tribal Council have been ineffective, as recalled Tribal Councilmembers have refused to step down and even retaliated against those who have tried to shed light on their wrongdoing – like by threatening to banish the proposed class members from the reservation if not outright disenroll them from the tribe. As for Williams & Cochrane, Robert Rosette and his confidantes on the Quechan Tribal Council have followed through on their threat to ruin the "reputation of your firm in Indian Country and in the State of California" through an unremitting course of actions that continues to this very day – one that is designed to both put Williams & Cochrane out of business and corruptly obstruct the administration of justice in the case at hand. These latest events should suffice to state two cognizable claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, to go along with the claims for breach of the Attorney-Client Fee Agreement and false advertising under the Lanham Act, 15 U.S.C. § 1051 *et seq.*

1

**JURISDICTION**

2     6. The district court has jurisdiction over this matter pursuant RICO; the Lanham

3 Act; the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.* (*see Caba-*

4 *zon Band of Mission Indians v. Wilson,* 124 F.3d 1050, 1056 (9th Cir. 1997)); and 28

5 U.S.C. §§ 1331 ("Federal Question Jurisdiction") & 1367 ("Supplemental Jurisdiction").

6     7. Venue is proper in this district under both the general venue statute and Section

7 1965(a) of RICO, respectively, since a substantial part of the events giving rise to this

8 suit occurred within this district – including the execution and subsequent breach of the

9 Attorney-Client Fee Agreement – and Robert Rosette "transacts his affairs" in San Diego

10 and Imperial Counties. 28 U.S.C. § 1391(b)(2); 18 U.S.C. § 1965(a); *Yavapai-Apache*

11 *Nation v. La Posta Band of Diegueno Mission Indians,* 2017 Cal. App. Unpub. LEXIS

12 4430 (4th Dist. June 28, 2017) (indicating Rosette represents the Southern District-based

13 La Posta tribe in a breach of contract lawsuit that resulted in a $48,893,407.97 adverse

14 judgment); *Yavapai-Apache Nation v. Ipay Nation of Santa Ysabel,* 201 Cal. App. 4th

15 190 (4th Dist. 2011) (indicating Rosette has defended the Southern District-based Santa

16 Ysabel tribe in a like breach of contract action involving $30+ million in damages).

17     8. Quechan has waived its sovereign immunity to suit in federal court pursuant to

18 Section 13 of the Attorney-Client Fee Agreement. *See* Ex. 2, § 13. Furthermore, Quechan

19 has also waived its sovereign immunity as to "compensatory and punitive damages,"

20 "pre-judgment and post-judgment interest," "restitution," "disgorge[ment]," "offset/re-

21 coupment," and "costs and expenses" through its Answer. *See* Dkt. No. 94, p. 24 (listing

22 the affirmative remedies sought from Quechan's counterclaims); *Guidiville Rancheria of*

23 *Cal. v. United States,* 2015 U.S. Dist. LEXIS 109057, *16-*18 (N.D. Cal. 2017), *aff'd in*

24 *part,* 704 F. App'x 655, 660 (9th Cir. 2017).

25     9. This action presents an actual and live controversy, in part, as to whether

26 Quechan repudiated the Attorney-Client Fee Agreement at the direction, and with the as-

27 sistance, of Robert Rosette, an attorney that has used the mail and wires to perpetuate an

28 ongoing series of fraud against Williams & Cochrane and the general members of its past

and present tribal clients, including Quechan. The district court has the power to remedy the dispute in accordance with the Prayer for Relief, *infra*.

## PARTIES

10. Williams & Cochrane, LLP is a partnership registered in the State of California to provide legal services, with offices in both Solana Beach and Temecula, California.

11. Francisco Aguilar, Milo Barley, Gloria Costa, George DeCorse, Sally DeCorse, Charles Denard, Gailla Golding, Jessica Golding, Mona Hartt, Tracey Hartt, Michael Jack, James Jackovich, Tashena Johns, Leon Machada, Kenneth Meeden, Melissa Mills, Cecil Palone, Dwayne Porter, Lamuel Porter, Louis Rosevelt, Priscilla San Miguel, Daniel Sestiaga, James Slaughter, Kyle Slaughter, Kara Slaughter, Franklin Smith, Pascha Stoit, and Frank White are individuals and enrolled members of Quechan.

12. The Quechan Tribe of the Fort Yuma Indian Reservation is a federally-recognized Indian tribe listed in the January 30, 2018 Federal Register as the "Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona."

13. Robert Rosette is an individual and attorney licensed to practice law in the States of Arizona and California who is the President and Director of Rosette & Associates, PC, which is in turn a general partner of a parent entity named Rosette, LLP.

14. Rosette & Associates, PC is a corporation organized in the State of Arizona to provide legal services, with its principal office at 565 West Chandler Boulevard, Suite 212, Chandler, Arizona 85225.

15. Rosette LLP is also an entity registered in the State of Arizona to provide legal services, with at least twenty-three attorneys and five offices, the principal one for which is also located at 565 West Chandler Boulevard, Suite 212, Chandler, Arizona 85225.

16. Richard Armstrong is an individual and attorney licensed to practice law in the States of Arizona and California who is a senior of counsel with Rosette, LLP.

17. Does 1 through 100 are other individuals or entities associated with Robert Rosette or Quechan who partook in the fraud in this case. The "Doe" designations represent fictitious names, with Williams & Cochrane ignorant of the true names on account of the

material evidence being within the exclusive possession of those parties or the presently-named defendants in this action.

## GENERAL ALLEGATIONS[8]

### I.   THE CONTRACT BETWEEN QUECHAN AND WILLIAMS & COCHRANE

#### A. Background on the 1999 Compacts

18. Congress enacted the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*, in 1988 to regulate the various forms of gaming on Indian lands, including "class III" games like house-banked card games and slot machines. For a tribe, class III gaming is only legal if done pursuant to a tribal/state gaming compact, which a state must negotiate in "good faith." *See, e.g.,* 25 U.S.C. § 2710(d).

19. In 1999, the administration of then-California Governor Gray Davis negotiated a model gaming compact for interested tribes ("1999 Compact"),[9] which gave the signatory tribe the right to, *inter alia*, operate a base number of slot machines that it could then increase up to a maximum of 2,000 by obtaining licenses from a communal pool.

20. The only catch was that the 1999 Compact did not specify the total number of available slot-machine licenses, instead including the "following opaque formula within Section 4.3.2.2(a)(1) of the agreement that states:

> (1). The maximum number of machines that all Compact Tribes in the aggregate may license pursuant to this Section shall be a sum equal to 350 multiplied by the number of Non-Compact tribes as of September 1, 1999, plus the difference between 350 and the lesser number authorized under Section 4.3.1.

*See* Ex. 8 at § 4.3.2.2(a)(1).

21. During the summer of 2002, approximately two-and-a-half years into the life of the 1999 Compacts, the California Gambling Control Commission ("CGCC") unilaterally

---

[8] Any general or claim-specific allegations that are made on information and belief are believed to be "likely [to] have evidentiary support after a reasonable opportunity for further investigation or discovery." *See* FED. R. CIV. P. 11(b)(3).

[9] A true and correct copy of excerpts of the "Tribal-State Compact between the State of California and the Quechan Indian Nation" is attached hereto as **Exhibit 8**.

determined that this "license pool" formula provided for 32,151 licenses, and then used this number when reviewing tribal license applications. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California,* 618 F.3d 1066, 1071 (9th Cir. 2010).

22. Yet, on April 22, 2009, the United States District Court for the Eastern District of California held that the license pool actually contains upwards of 10,549 more licenses than the CGCC determined, and directed the Commission to make those additional licenses available to the signatory tribes. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California,* 629 F. Supp. 2d 1091 (E.D. Cal. 2009) ("*Colusa*").

### B. The Pauma Band and its Compact Suit against the State of California

23. The Pauma Band of Mission Indians ("Pauma") was one of the sixty-plus original tribal signatories to the 1999 Compact – an agreement it amended in 2004 ("2004 Amendment") to obtain the ability to operate 2,000 slot machines after the CGCC determined the tribe could not obtain the necessary licenses under the 1999 Compact given its restrictive interpretation of the license pool formula. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* 813 F.3d 1155, 1161-62 (9th Cir. 2015) ("*Pauma*"). The result of the amendment was that Pauma ended up paying approximately twenty-four times as much revenue sharing each year in order to operate machines that should have been available under its original compact. *Id.* at 1162.

24. After learning about the ruling by the Eastern District of California in *Colusa*, Pauma filed suit in the Southern District of California on September 4, 2009, requesting rescission of the 2004 Amendment and restitution of the heightened fees paid thereunder on the basis of any one of seven claims: unilateral and mutual mistake of fact, unilateral and mutual mistake of law, frustration of purpose/failure of consideration, and two IGRA violations. *See Pauma,* No. 09-01955, Dkt. No. 1, pp. 19-26 (S.D. Cal. Sept. 4, 2009).

25. At the time, Pauma was represented in the lawsuit by a law firm named Rosette & Associates. The two attorneys solely responsible for preparing and filing the complaint in the case were Cheryl A. Williams and Kevin M. Cochrane.

26. In fact, Cheryl Williams and Kevin Cochrane performed all the litigation work

in the case from the outset of the proceeding until their eventual departure from the firm the ensuing year. This allegation is verified by Robert Rosette's October 26, 2010 deposition testimony in the antecedent case of *Pauma Band of Luiseno Mission Indians of the Pauma Yuima Reservation, Cal. v. Harrah's Operating Co.*, No. GIC847406 (San Diego County Sup. Ct. 2012). After suggesting he was the lead strategist for the case, Robert Rosette responded as follows when asked about his specific involvement in the compact litigation by the deposing attorney for Harrah's:

> Q. Now, in terms of the [compact] litigation, the drafting and filing of the complaint and the arguing, did you do all that yourself up to the time you were removed from the case?
>
> A. No, I – I have employees that work for me that conduct research, draft, make court appearances, so on and so forth.
>
> Q. All right. So outside of being sort of the lead strategist, did you make any appearances or become an attorney of record at all?
>
> A. I was an attorney of record. There was only one appearance that was actually showing up, the oral argument for the preliminary injunction. And I had a conflict that day.
>
> Q. Who argued that case from your firm?
>
> A. Cheryl Williams.

27. Shortly after filing suit, Pauma moved for a preliminary injunction to reduce the revenue sharing fees of the 2004 Amendment to the prior rates of the 1999 Compact, which the initial district judge assigned to the action – Judge Larry Alan Burns – granted on April 12, 2010. *Pauma,* No. 09-01955, Dkt. No. 44 (S.D. Cal. Apr. 12, 2010).

28. Approximately one month after Judge Burns' issued his injunction order, on or about May 15, 2010, both Cheryl Williams and Kevin Cochrane departed Rosette & Associates, leaving the case in the care of their prior firm.

29. As the two attorneys were departing, the State of California appealed the injunction order to the United States Court of Appeals for the Ninth Circuit and then moved to stay the order pending appeal. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* No. 10-55713, Dkt. No. 7 (9th Cir. May 21, 2010).

30. Though having left the firm, Cheryl Williams nevertheless offered to assist Rosette & Associates in preparing the opposition to the State's motion to stay in the Ninth Circuit so Pauma's interests would not be harmed. However, this request was quickly rebuffed and the replacement attorneys with Rosette & Associates filed Pauma's opposition on June 11, 2010. *See Pauma,* No. 10-55713, Dkt. No. 15 (9th Cir. June 11, 2010).

31. On July 28, 2010, the motions panel of the Ninth Circuit granted the State's request to stay the injunction in a summary one-paragraph order. *See Pauma,* No. 10-55713, Dkt. No. 39 (9th Cir. July 28, 2010).

32. Just two days after Rosette & Associates filed its ineffective opposition brief, on or about Sunday June 13, 2010, the Pauma General Council held a meeting and voted to terminate Rosette & Associates from the compact litigation and replace the firm with Cheryl Williams and Kevin Cochrane, who had just formed their own law firm named Williams & Cochrane, LLP. This allegation that Rosette & Associates was removed from the case is again verified by Robert Rosette's October 26, 2010 deposition testimony in the antecedent *Pauma v. Harrah's* case. When the deposing attorney for Harrah's asked him to generally describe the status of the compact litigation as of that date (*i.e.*, just four months after his termination), Robert Rosette explained that he did not know because he was removed from the case in an exchange that went as follows:

Q. And then what is the current status of that case?

A. I don't know. I'm not – I was removed. …

Q. And why were you terminated from representing Pauma?

A. They chose different legal counsel. Specifically, Cheryl Williams had left my firm and started her own firm and took the case with her.

Q. Is she a solo practitioner now?

A. She's got a law partner, but I don't – I don't know how they're formed or structured or anything. I don't – I don't care.

Q. And so she left your firm and simultaneously the matter transferred with her; is that right?

A. No, I had the matter for probably over a month. I actually filed the initial

– I took it over myself for a while, just because I was the main attorney. I just handled it myself for about 45 days and actually filed the preliminary answers in federal court, and then I was told shortly thereafter that I was being removed.

Q. And who told you that?

A. The chair – I was actually at – you know, my father had just passed away. I was at his funeral in Montana. That's why I couldn't go to the general council meeting. And the chairman had called me on – I think their general council meetings are the first Sunday of every month. He called me on Monday, when I was at home at Rocky Boy, Montana, and told me that the general council made a decision to remove me.

Q. Was there any claim that you had some conflict in going ahead with this case or any other reason other than simply going ahead with Cheryl? …

A. I told you earlier that I respect tribal decisions, don't question them, don't pry. I told them thank you for letting me know and that I would transfer the files and I didn't ask any other – and, you know, like I said, I don't care. I got other things I could do.

33. After resuming their role as counsel of record in the case, Cheryl Williams and Kevin Cochrane convinced the Ninth Circuit to vacate its stay order and reinstate the preliminary injunction. *See Pauma,* No. 10-55713, Dkt. No. 62 (9th Cir. Aug. 23, 2010).

34. The Ninth Circuit then followed this order up with another one disposing of the interlocutory appeal entirely that kept the injunction in place pending any further consideration by the district court. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* 410 F. App'x 20 (9th Cir. Nov. 30, 2010).

35. The procedural handling of the case following remand involved multiple transfers as magistrates were promoted to district judgeships, with the case first going from Judge Burns to Judge Battaglia, and then from Judge Battaglia to Judge Bencivengo. *See Pauma,* No. 09-01955, Dkt. Nos. 104 & 176 (S.D. Cal. Mar. 22, 2011 & Mar. 6, 2012)).

36. In the midst of these transfers, Williams & Cochrane filed a First Amended Complaint on Pauma's behalf with Judge Battaglia on September 9, 2011 that added a wealth of allegations and a new claim for relief based on misrepresentation under federal contract law. *See Pauma,* No. 09-01955, Dkt. No. 130, pp. 55 (S.D. Cal. Sept. 9, 2011).

37. When the case finally wound up before Judge Bencivengo, the court resolved the case on summary judgment in Pauma's favor on the basis of the misrepresentation claim that Williams & Cochrane added in September 2011. *See Pauma,* No. 09-01955, Dkt. No. 227 (Mar. 18, 2013). As a result of the decision, Pauma was immediately "entitled to rescission of the 2004 Amendment" and also subsequently received an order allowing it to recoup the approximately $36.3 million in overpayments the tribe made to the State under the amendment as "specific performance" of the original 1999 Compact. *See Pauma,* No. 09-01955, Dkt. Nos. 238 & 245 (S.D. Cal. June 11, 2013 & Dec. 2, 2013).

38. Along with that, the initial summary judgment order from Judge Bencivengo also contained a *sua sponte* statute of limitations analysis that the State of California failed to argue, presumably to stave off any future copycat suits. *See Pauma,* No. 09-01955, Dkt. No. 227, pp. 17-18 (S.D. Cal. Mar. 18, 2013).

39. However, before awarding specific performance, Judge Bencivengo ordered Pauma and the State of California to participate in a settlement conference with Magistrate Judge Mitchell Dembin to see if the dispute could be resolved without the need for an appeal. *See Pauma,* No. 09-01955, Dkt. No. 227, p. 31 (S.D. Cal. Mar. 18, 2013).

40. The Pauma General Council met in advance of the settlement conference and voted to negotiate for an extension on the term of the largely-revenue-sharing-free 1999 Compact with the State of California, using the $36.3 million it was about to receive as a bargaining chip. *See Pauma,* No. 09-01955, Dkt. No. 256-1, ¶ 4 (S.D. Cal. Jan. 30, 2014).

41. The parties met for settlement conferences with Magistrate Judge Dembin on May 9, 2013 and May 20, 2013, but unfortunately "[n]o settlement was reached." *Pauma,* No. 09-01955, Dkt. Nos. 234 & 235 (S.D. Cal. May 9, 2013 & May 20, 2013).

42. On appeal, the Ninth Circuit affirmed the summary judgment orders of the district court, reclassifying the $36.3 million award as a form of restitution rather than specific performance in the process. *See Pauma,* 813 F.3d 1155.

43. The State of California subsequently chose to petition the Supreme Court for a writ of certiorari, but the Court ultimately declined to hear the petition after Williams &

Cochrane filed a competing one in the hopes of defusing the State's petition. *Compare California v. Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation, __ U.S. __, 136 S. Ct. 2511 (2016) with Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California, __ U.S. __, 136 S. Ct. 2512 (2016).*

44. Following the termination of the appeal process, the State of California satisfied the judgment in full during September 2016.

45. This $36.3 million payment marked the first time that the State of California has paid a monetary remedy to a tribe as part of a compact dispute since the late 1990s, and even then the amount of funds at issue was a small fraction of those involved in Pauma's case. *See Cabazon v. Wilson,* 124 F.3d at 1053-55 (explaining that the State had to return license fees for simulcast wagering facilities).

46. When all was said and done, the Pauma case involved more than three-hundred docket entries in the district court, two motions to dismiss, four summary judgement processes, two appeals, and competing petitions for writs of certiorari to the Supreme Court during the seven-plus-year history of the case.

47. At the culmination of the suit, Williams & Cochrane turned its attention to litigating other complex and novel federal-Indian-law issues while Robert Rosette championed the Pauma victory, advertising on his website that he "successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California… ." *See* Exs. 6 & 7.

**C. The Quechan Tribe Hires Williams & Cochrane in the Wake of *Pauma***

48. The decision by the Supreme Court to deny the State's petition for a writ of certiorari in *Pauma* garnered a significant amount of media attention around California. *See, e.g., California pays tribe $36 million to settle years-old fight,* SAN DIEGO UNION-TRIBUNE, Sept. 9, 2016, *available at* http://www.sandiegouniontribune.com/sdut-california-pays-tribe-36-million-to-settle-years-2016sep09-story.html (last visited July 2, 2017); *A Schwarzenegger-era casino deal will cost state $36.3 million,* SACRAMENTO BEE, Aug. 23, 2016, *available at* http://www.sacbee.com/news/politics-government/

capitol-alert/article97452877.html (last visited July 2, 2017).

49. Shortly after these news articles became public, the President of Quechan Mike Jackson contacted Cheryl Williams to find out whether Williams & Cochrane was interested in representing his tribe to solve a similar compact dispute with the State of California, and invited her and her partner Kevin Cochrane to come out to the tribe's reservation near Yuma, Arizona to discuss the situation with the Tribal Council.

50. Quechan has a long history of political infighting, but the one constant and stabilizing force has been President Mike Jackson, a military veteran and son and grandson of tribal leaders who, aside from a single four-year hiatus, occupied the office of President continuously from 1995 through 2016. President Jackson, who was profiled by the New York Times in 2007 as he sought to protect Quechan's sacred sites from the potential harms of a $4 billion oil refinery (*see Far from the Reservation, but Still Sacred?,* NEW YORK TIMES, Aug. 12, 2007, *available at* http://www.nytimes.com/2007/08/12/business/yourmoney/12tribe.html (last visited July 2, 2017)), is the signatory for the tribe's original and amended compacts with the State of California and held the position of President when the tribe opened its original casino in California, the permanent resort facility that replaced it, its casino in Arizona, and also when the tribe broke ground on a health clinic designed to serve all the Yuma-area tribes.[10] *See* Ex. 8; *Ground finally broken on clinic for local tribes,* YUMA SUN, Jan. 28, 2016, *available at* https://www. pressreader.com/usa/yuma-sun/20160128/281479275438281 (last visited July 2, 2017).

51. As mentioned above, Quechan has an amended compact with the State of California that was approved by the Bureau of Indian Affairs on January 4, 2007 ("2007 Amendment"), or roughly two-and-a-half years after Pauma's amendment and four-and-a-half years after the CGCC restricted the size of the license pool under the 1999 Compacts. *See* 72 Fed. Reg. 2007-08 (Jan. 17, 2007). The 2007 Amendment allows Quechan

---

[10] A true and correct copy of excerpts of the "Amendment to Tribal-State Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation" is attached hereto as **Exhibit 9**.

to operate up to 1,100 slot machines inside of one reservation-based gaming facility until December 31, 2025 in exchange for a base revenue sharing fee of 10% of the first $50 million in net win the tribe generates each year. *See* Ex. 9 at § 4.3.3(a). For all intents and purposes, the practical effect of this revenue sharing structure is that Quechan pays 10% of its net win to the State of California off of the ███████████ in revenues the tribe typically generates each year at its California casino.

52. Williams & Cochrane initially met with Quechan about its issues with its 2007 Amendment on or about September 14, 2016. Along with the partners for Williams & Cochrane, the persons present at the meeting included President Jackson, four of the five Tribal Councilmembers, the Tribal Council Secretary Regina Escalanti, the General Manager of the Quechan Casino Resort Charles Montague (who is himself a Quechan tribal member), and the Chief Financial Officer for the Quechan Casino Resort Phil Simons.

53. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

54. The cessation of revenue sharing payments is extremely dangerous under the 2007 Amendment, as it can empower the State of California to hold the tribe in material breach of its compact, and/or shut down Quechan's gaming floor until "30 days after full payment of all outstanding amounts has been made" if the tribe's revenue sharing is "overdue… on more than two occasions." *See* Ex. 9 at § 4.3.3(f). For Quechan, the enforcement of this provision could result in the loss of at least ███████████ in gaming revenue, and that assumes the tribe made immediate payment after the State of California shuttered the casino's gaming floor. One of the pertinent parts of the 2007 Amendment detailing the State of California's rights in the event of non-payment by Quechan states:

> (f) Notwithstanding anything to the contrary in Section 9.0, if any portion of the payments referenced in subdivision (a) pursuant to subdivisions (b) and (d), is overdue after the State Gaming Agency has provided written notice to the Tribe of the overdue amount with an opportunity to cure for at least 15 business days, and if more than 60 days has passed from the due date, then

the Tribe shall cease operating all Gaming Devices until full payment is made; provided further that if any portion of the payments is overdue as specified above on more than two occasions, the Tribe shall be required to cease operating all Gaming Devices for an additional 30 days after full payment of all outstanding amounts has been made.

*See* Ex. 9 at § 4.3.3(f).

55. ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████.[11]

56. ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████:

Sec. 12.1. The terms and conditions of this Gaming Compact may be amended at any time by the mutual and written agreement of both parties.

---

[11] A true and correct copy of a spreadsheet entitled ████████████████████ ████████████████████████████████, is attached hereto as **Exhibit 10**.

Ex. 8 at § 12.1.

57. ██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████.

58. As for the terms of the fee agreement between the parties, the Quechan Tribal Council explained that they were exceedingly familiar with the costs of matters that had a high likelihood of spiraling into federal litigation (*see, e.g., Quechan Tribe of Fort Yuma Indian Reservation v. U.S. DOI,* 2012 U.S. Dist. Lexis 71248 (S.D. Cal. 2012); *Quechan Indian Tribe v. United States,* 535 F. Supp. 2d 1072 (S.D. Cal. 2008)), and preferred to create a hybrid structure whereby the tribe would pay a discounted rate going forward and then combine that with a contingency fee that was less than the normal 30 to 35% that a firm would normally command. In response, Cheryl Williams explained that she would provide the Quechan Tribal Council with two different proposals by the end of the week, and the parties could then negotiate the final terms of a services agreement once the Quechan Tribal Council selected the proposal with the general structure it preferred.

59. On September 16, 2016, Cheryl Williams sent an e-mail to the Quechan Tribal Secretary Regina Escalanti and President Jackson to convey two different hybrid fee proposals. As explained by Cheryl Williams, the fee structures were meant to be "a fair middle ground choice on the spectrum of fee arrangements that range from purely hourly on one end (*i.e.,* $475-$500 per hour) to purely contingency on the other (*i.e.,* 33%-35% of net recovery)." Further, they were also sensitive to (1) the potential liability for the firm given the millions of dollars at stake, and (2) the massive amount of work that a representation of this nature would likely require given Williams & Cochrane's experience representing Pauma in negotiations and litigation during its seven-year dispute with the State of California. As for the terms of the proposals, both contained a progressive contingency fee structure that started at 5% of any recovered value of the excess revenue sharing payments Quechan made under the 2007 Amendment "if the matter is resolved before the

filing of a lawsuit or within 12 months thereof" and gradually increased to 15% "[i]f the matter is resolved after 36 months of filing a lawsuit." Along with this contingency fee, one of the fee proposals was based on a discounted hourly rate of $350 per hour while the other incorporated a monthly flat fee of $50,000 in lieu of the hourly rate.

60. On the ensuing Wednesday, September 21, 2016, President Jackson called Cheryl Williams and explained the Quechan Tribal Council had discussed the terms of the proposal fee agreements amongst themselves and an independent attorney and decided that they wanted to go with the proposal containing the flat monthly fee arrangement. However, since Quechan wanted a fix as quickly as possible, President Jackson stated that the Tribal Council desired to modify the contingency fee structure to provide Williams & Cochrane with the 15% contingency fee if the firm was somehow able to resolve the matter expediently through negotiations. Upon hearing this comment, Cheryl Williams double checked whether President Jackson and the Quechan Tribal Council wanted this change (they did), inquired whether they wanted to negotiate any other provisions of the proposed agreement (they did not), and then explained that she would get them a revised and final version of the Attorney-Client Fee Agreement to re-review the next week.

61. On Monday, September 26, 2016, Cheryl Williams e-mailed a copy of the final version of the Attorney-Client Fee Agreement to Tribal Secretary Regina Escalanti, an Executive Secretary named Linda Cruz, and President Jackson.

62. As previously mentioned, the Attorney-Client Fee Agreement contains a "Monthly Flat Fee" in Section 4, which explains that the "Client agrees to pay a flat fee of $50,000 per month for Firm's services under this Agreement." *See* Ex. 2 at § 4.

63. In addition, Section 5 of the Attorney-Client Fee Agreement contains a contingency fee provision that explains Quechan will pay Williams & Cochrane a 15% contingency fee on any revenue sharing discount Quechan receives under a negotiated successor compact as a result of the heightened payments the tribe made under the 2007 Amendment, and that such fee attaches the moment the tribe signs the new agreement. *See* Ex. 2 at § 5. The pertinent part of Section 5 of the Attorney-Client Fee Agreement states:

Firm's contingency fee will be calculated as follows if the representation matter is resolved through settlement or negotiation:

(a)   If the matter is resolved before the filing of a lawsuit or within 12 months thereof, then Firm's contingency fee will be fifteen percent of the net recovery. …

(b)   For purposes of subsection (a) alone, the matter is resolved at the point in time that the Client signs a successor compact (whether new or amended), which subsequently obtains the requisite State and federal approvals and takes effect under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq*.

(c)   The contingency fee above is higher than the formative rates for resolving the case through court action set forth in the ensuing subsections below based upon the Client's express request after consultation and stated need to resolve the situation in as effective and expeditious a manner as possible.

*See* Ex. 2 at § 4.

64. To address opportunistic early termination, the Attorney-Client Fee Agreement also contains a Section 11 that explains that if Williams & Cochrane is discharged before the contingency fee normally attaches, Quechan would still have to pay this fee if it had become "entitled" to any amounts constituting the "net recovery" for contingency fee purposes. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 758 (2002) (defining "entitle" as "furnish with proper grounds for seeking or claiming something"). For other situations, Section 11 states that "Client agrees that Firm will be… paid… a reasonable fee for the legal services provided in lieu of the contingency fee set forth in paragraph 5 of this Agreement," the amount of which "will be determined by considering" a list of factors that primarily turns upon the value of the services performed. *See* Ex. 2 at § 11.

65. Finally, the Attorney-Client Fee Agreement also contains a waiver of sovereign immunity that provides in relevant part that the "Client hereby expressly and irrevocably waives its sovereign immunity (and any defense based thereon) from any suit, action, or proceeding or from any legal process with respect to any claims the Firm may bring seeking payment under the terms of this Agreement." *See* Ex. 2 at § 13(a).

66. As for the execution of the Attorney-Client Fee Agreement, President Jackson

signed the document at a Special Tribal Council Meeting on Monday, September 26, 2016, at which the Tribal Council passed a resolution by a vote of "5 for" and "0 against" to "approve the attorney-client fee agreement between the Quechan Indian Tribe and Williams & Cochrane." *See* Ex. 3. The attorneys for Williams & Cochrane countersigned and thereby executed the Attorney-Client Fee Agreement on September 29, 2016, providing Quechan with a copy of the fully-executed contract afterwards.

### D. Williams & Cochrane gets Quechan a Compact Offer that Excises $120 Million in Revenue Sharing Payments and Enables the Generation of around $660 Million in New Gaming Revenues

67. With the Attorney-Client Fee Agreement executed, Williams & Cochrane sent a notice of dispute to the Office of the Governor on October 12, 2016 to convince it to sit down with Quechan and negotiate a replacement compact for the 2007 Amendment.

68. On October 17, 2016, just five days later and approximately one month after the State paid $36.3 million to Pauma, the Office of the Governor agreed to "enter into negotiations for a new tribal state gaming compact," in a letter signed by the Office of the Governor's Senior Advisor for Tribal Negotiations Joginder ("Joe") Dhillon.[12]

69. As a result of this letter, the parties held their first negotiation session on November 9, 2016 at the State Capitol. Appearing on behalf of the Office of the Governor was Senior Advisor Joe Dhillon, Senior Assistant Attorney General Sara Drake, and Deputy Attorney General Jennifer Henderson. For Quechan, all seven members of the Tribal Council were present as well as Cheryl Williams and Kevin Cochrane. ███████████
██████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████.

70. ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████.[13]

---

[12] A true and correct copy of an October 17, 2016 letter from the Office of the Governor's Senior Advisor for Tribal Negotiations Joe Dhillon to Cheryl A. Williams is attached hereto as **Exhibit 11**.

[13] A true and correct copy of the December 6, 2016 draft "Tribal-State Compact

1 [redacted]

2 [redacted]

3 [redacted]

4 [redacted]

5 [redacted]

6 [redacted]

7 [redacted]

8 [redacted]

9 [redacted]

10 [redacted]

11 [redacted] [15]

12 [redacted]

13 [redacted]

14 [redacted]

15 [redacted]

16 [redacted]

17 [redacted]

18 [redacted]

19 [redacted]

20 [redacted].

71. From a substantive perspective, the revenue sharing terms of the December 7th initial draft compact were quite a victory to Williams & Cochrane because the State's

---

between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation" is attached hereto as **Exhibit 12**.

[14] A true and correct copy of the "Regulatory Cost Reimbursement Invoice" that accompanied the December 6th draft compact is attached hereto as **Exhibit 13**.

[15] A true and correct copy of a December 6, 2016 letter from the Office of the Governor's Senior Advisor for Tribal Negotiations Joe Dhillon to Quechan President Mike Jackson is attached hereto as **Exhibit 14**.

general practice is to demand a revenue sharing fee that totals at least six percent of net win on all machines over 350 *in addition to the basic SDF payment that was included in Quechan's draft proposal. See, e.g.,* California Gambling Control Commission, *Tribal-State Compact between the State of California and the Pala Band of Mission Indians* § 5.2(a) (May 6, 2016) (imposing a 6% revenue sharing fee on all machines above 350 into the Revenue Sharing Trust Fund), *available at* http://www.cgcc.ca.gov/documents/ compacts/amended_compacts/Pala_Compact_2016.pdf (last visited July 2, 2017). And this standard arrangement does not even account for the intergovernmental agreements that tribes are required to execute with political subdivisions to cover the cost of public services – something that hardly effects Quechan since its location (at least on the California side of the border) is far removed from other municipalities. *See id.* at § 4.4.

72. From a procedural standpoint, the December 7th initial draft compact came about much quicker than any tribe should expect. For instance, a coalition of dozens of tribes called the 1999 Compact Tribes Steering Committee has been negotiating new compacts with the Office of the Governor since the spring of 2013 and, based on information and belief, these tribes are unlikely to execute finalized compacts before, at best, the tail end of the 2019 legislative session. Quite simply, compact negotiations around the Nation are traditionally rather time-consuming processes, as the factual backgrounds of successful bad faith suits prove. *See, e.g., North Fork Rancheria of Mono Indians v. California,* 2015 U.S. Dist. LEXIS 154729, *5-*6 (E.D. Cal. 2015) (indicating compact negotiations went from July 2004 to April 2008); *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger,* 2008 WL 6136699, *3 & *7 (S.D. Cal. 2008) (indicating negotiations went from February 26, 2004 to November 3, 2006).

73. ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████.

74. With their marching orders in hand, Williams & Cochrane scheduled a follow-up meeting with the Office of the Governor on January 31, 2016 at the State Capitol to go through the December 7th initial draft compact and find out what the State was willing to negotiate above and beyond the base offer it provided.

75. However, before this meeting could take place, election chaos erupted at Quechan. President Jackson and Vice President Michael Jack were in the midst of four-year terms and not up for reelection during the midterm election in December 2016. However, all five biannual Councilmember seats were up for vote, and initial results reportedly indicated that aspirants won four of the five Council seats that were on the ballot. A recount was soon ordered and Quechan spent the next two months mired in intractable infighting. *See Quechan Tribe to re-do vote,* YUMA SUN, Feb. 9, 2017, *available at* https://www.pressreader.com/usa/ yuma-sun/20170209/281509340930239 (last visited June 30, 2017).

76. Ultimately, the four challengers were sworn into office on or about March 3, 2017. *See New Quechan Tribe Council Members sworn in nearly two months after election,* KYMA-TV, Mar. 3, 2017, *available at* http://www.kyma.com/news/new-quechan-tribe-council-members-sworn-in-nearly-two-months-after-election/372997144 (last visited June 30, 2017). In succession, President Jackson resigned from his position almost instantaneously with the swearing in of the new councilmembers and then Vice President

1    Jack stepped down in the ensuing months.

2        77.   As the political turmoil at Quechan raged on, ███████████████

3    ████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████.

20       78. After the election turmoil at Quechan died down, ███████████████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████.

79. ███████████████████████████████████████████-
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████.16  17 ████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████.

80. ████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████.

81. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████.

---

[16] A true and correct copy of a March 9, 2017 letter from CGCC Executive Director Stacy Luna Baxter to President Jackson is attached hereto as **Exhibit 15**.

[17] A true and correct copy of an April 12, 2017 letter from CGCC Executive Director Stacy Lunda Baxter to the "Honorable Keeny Escalanti Sr., President Quechan Indian Nation" is attached hereto as **Exhibit 16**.

Case No.: 17-CV-01436 GPC MSB
THIRD AMENDED COMPLAINT

1    82. ███████████████████████████████████████████████

2    ████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████████.

10   83. ███████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ████████████████████████.

16   84. ███████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   █████████████████.[18] ██████████████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   ████████████████████████████████████████.

23   85. ███████████████████████████████████████████████

24   ████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████

26   _____

27   [18] A true and correct copy of excerpts of the May 12, 2017 draft "Tribal State Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation" is attached hereto as **Exhibit 17**.

28

██████████████████████████.[19] After relaying the compact, Senior Assistant Attorney General Sara Drake set up another negotiation session between the attorneys for the parties on June 14, 2017 at the Office of the Attorney General in Sacramento, California.

86.   █████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████████.

87.   █████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[19] A true and correct copy of the May 19, 2017 draft "Tribal State Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation" is attached hereto as **Exhibit 18**.

1 ████████████████████████████████████████████████████████████████████

2 ████████████████████. Thus, the State of California had not only offered an agreement that

3 would eliminate at least $112 million in revenue sharing payments over the next 28 years,

4 but one that could generate another $661,000,000 in new gaming revenue. ██████████

5 ████████████████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████████████████

7 ██████████████████████████.

8     88. ████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████.

21 **E. The Putative President of Quechan Keeny Escalanti Terminates Williams**
22 **& Cochrane Three Days before the Conclusion of Compact Negotiations to**
   **Avoid Paying the Contingency Fee, Demanding that the Firm Turn Over**
23 **its Work Product to Robert Rosette by Using Threats to its Reputation**

24     89. ████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████████████████

28 ████████████████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ██████████████████████████████████████████████.

90. In keeping with the schedule agreed upon by the attorneys during the June 14th negotiation session, Cheryl Williams transmitted the final set of redlines to the State of California at 1:12 a.m. in the morning of Wednesday, June 21, 2017.[20]

91. However, the next conversation between Cheryl Williams and Senior Assistant Attorney General Sara Drake did not begin with a discussion about finalizing the Quechan compact. Rather, on Tuesday, June 27, 2016, Ms. Drake – who has been one of (if not) the principal attorneys representing the State of California in tribal matters since the mid-1990s (*see Cabazon Band of Mission Indians v. Wilson,* No. 90-01118, Dkt. Nos. 159 & 177 (E.D. Cal. Feb. 12, 1999 & Mar. 23 1999)) – began the conversation by stating, "This has never happened before and we don't know what to do." With that, Ms. Drake then informed Cheryl Williams that the State had just received a letter indicating that Williams & Cochrane had been terminated from the compact negotiations, just three days before the negotiations were set to conclude, and replaced by Robert Rosette.

92. That same day Cheryl Williams received a similar letter. The letter was sent by e-mail from the Quechan Executive Secretary Linda Cruz to Cheryl Williams with no other individuals carbon copied on the message. The June 26, 2017 letter enclosed therein was entitled "Termination of Attorney-Client Relationship" and signed by the putative Quechan President Keeny Escalanti, Sr., who had purportedly assumed the seat left vacant following President Jackson's departure. *See* Ex. 4. The June 26th letter began by explaining "[t]he Fort Yuma Quechan Indian Tribe… is terminating the services of Wil-

---

[20] A true and correct copy of the June 21, 2017 draft "Tribal State Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation" is attached hereto as **Exhibit 19**.

liams & Cochrane… effective immediately upon your receipt of this letter." *See id.*

93. Around the same time as the Quechan Executive Secretary had transmitted this letter, Quechan had also sent four paychecks to Williams & Cochrane to cover the base monthly fees for February 2017 to May 2017 that the tribe was behind in paying. With that, the June 26th letter went on to explain that the tribe intended to pay a "prorated [portion of the monthly flat] fee for your services" for the month of June (which it never did), but that it would "not pay any contingency fee or 'reasonable fee for the legal services provided in lieu' thereof." *See* Ex. 4.

94. As for the reasons for repudiating the Attorney-Client Fee Agreement at the eleventh hour, the June 26th letter stated that Williams & Cochrane had already been "grossly overcompensated" given its failure to "produce better-than-boilerplate terms in your negotiations so far with the State." As such, the June 26th letter explained that the payment of fees to date was "more than fair" and then warned, "***We strongly advise you against pressing your luck further out of concern for the reputation of your firm in Indian Country and in the State of California.***" *See* Ex. 4.

95. After conveying this threat, the June 26th letter that was signed only by putative Quechan President Keeny Escalanti explained that Williams & Cochrane could not relay the message conveyed by this letter (or any other information obtained during their representation, like the draft compacts) to anyone else within the tribe:

> Finally, I remind you of the… confidentiality provisions which govern attorney-client relations and that you not disclose to any employee, officer, or official of the Tribe or any subdivision, agency, or enterprise of the Tribe regarding any matter that was the subject of your engagement.

*See* Ex. 4.

96. Nevertheless, the June 26th letter then concludes by explaining that Williams & Cochrane should "direct all communications regarding this matter to Robert A. Rosette" and promptly provide him with a copy of Quechan's case file – the very "confidential" materials that no one else within the tribe was supposedly allowed to see. *See* Ex. 4.

97. Though signed by putative Quechan President Keeny Escalanti, Williams &

Cochrane is informed and believes that the June 26th letter was actually drafted by Robert Rosette or one of the attorneys in his employ at Rosette, LLP.

98. Unlike the execution of the Attorney-Client Fee Agreement, the June 26th letter was *not* accompanied by a resolution indicating how the Quechan Tribal Council members voted on the issue – or if the other Councilmembers even knew about putative Quechan President Keeny Escalanti's actions at all.

99. The lack of any corroborating tribal resolution led Cheryl Williams to ask Senior Assistant Attorney General Sara Drake whether she had received a resolution removing Williams & Cochrane from the matter. In response, Ms. Drake indicated that she had not but she planned on asking Mr. Rosette to provide one before the negotiations would go forward. Further, before the call ended, Ms. Drake explained that she thought the compact negotiation materials in the State's possession were protected by the work product privilege, and suggested Cheryl Williams carefully review the applicable case law and ethical rules to determine whether she could lawfully disclose the compact negotiation materials in this highly unusual situation given her duties to her actual client and, supposedly, the State of California.

100. Following this call, on June 27, 2017, a second-year associate with Rosette, LLP who works under the supervision of Richard Armstrong in the Folsom, California office sent Cheryl Williams an e-mail demanding that she immediately turn over a copy of the June 21st draft compact:

> Ms. Williams,
>
> As you know, our firm has been retained to represent the Fort Yuma Quechan Indian Tribe in their compact negotiations with the State. While there is a formal file request forthcoming, it is imperative that we receive, immediately, the last compact, with any redlines, that was transmitted to the State during your negotiations. Please provide said compact as soon as possible. I am available to discuss any questions or concerns.
>
> Thank you,
>
> Cecilia Guevara Zamora
> Rosette, LLP

101. While Cheryl Williams was considering the propriety of this request, Williams & Cochrane is informed and believe that on either June 28, 2017 or June 29, 2017, Senior Assistant Attorney General Sara Drake spoke with Robert Rosette (or one of his attorneys at Rosette, LLP) and asked him to provide an authenticating tribal resolution for his involvement in the compact negotiations, explaining that she would not turn over the most recent redlined draft of the compact until she received one.

102. Shortly thereafter, on June 30, 2017, Cheryl Williams received a second email from the Quechan Executive Secretary, this time containing a "Demand for Cease and Desist" letter that was signed by putative President Keeny Escalanti and again written by Robert Rosette or an attorney in his employ at Rosette, LLP. *See* Ex. 5.

103. Since Robert Rosette was seemingly unable to obtain any of the negotiation materials in his conversation with Senior Assistant Attorney General Sara Drake, the June 30th letter demanded under threat of legal action that Williams & Cochrane refrain from speaking with anyone from the State and immediately furnish "the most recent redlined changes to the draft State-Tribal Compact, including any comments incorporated therein" *See* Ex. 5. Though the previous June 26th letter purportedly terminated Williams & Cochrane on the basis that it did not "produce better-than-boilerplate terms in your negotiations so far with the State," the June 30th letter reversed course and indicated that the failure to produce the most recent redlines and comments would "result in irreparable harm to the Tribe, particularly given the California legislative deadlines associated with timely consideration of the Tribe's Gaming Compact." *See* Ex. 5.

104. Much like the prior June 26th letter, this second June 30th letter was not without its own threats based on misrepresentations (*i.e.*, "Should you continue your obstruction of the Tribe's interests, the Tribe will be left with no other choice than to pursue the legal remedies available to it. We trust that the Firm will see the wisdom in promptly complying with these demands.") and hyperbolic if not slanderous accusations ("Through its decades of dealings with numerous attorneys and law firms across the country, the Tribe has not witnessed these types of outlandish actions or this level of unprofessional-

Case No.: 17-CV-01436 GPC MSB

ism as it has from your Firm.").

105. After spending the ensuing July 4th weekend reviewing the ethical rules and Robert Rosette's well-documented history of exacerbating intra-tribal strife when his position is threatened (*see* General Allegations, § II(A), *infra*), the attorneys at Williams & Cochrane decided that the best way to "avoid reasonably foreseeable prejudice" to Quechan was to provide Rosette, LLP and the tribe (principally through its Executive Secretary Linda Cruz) with a copy of the June 21st draft compact in the hopes that they could still convince the State of California to execute a compact based on those terms before the end of the legislative session, and to simply step away from the matter entirely. With that, Williams & Cochrane heard nothing else from either the putative Quechan Tribal Council or anyone with Rosette, LPP until after the service of the complaint in this case.

106. A little over two months later, on September 5, 2017, Robert Rosette issued a press release – which he contemporaneously uploaded to his firm's website – announcing that "Governor Edmund G. Brown and the Fort Yuma Quechan Indian Tribe… signed a new Tribal-State Gaming Compact" the prior week that will "reduce the Tribe's revenue sharing obligations by approximately four million dollars ($4,000,000) per year."[21]

107. The compact, which took effect on January 22, 2018 (*see* 83 Fed. Reg. 3015-16 (Jan. 22, 2018)), in all positive material respects is one and the same with the one Williams & Cochrane sent to the State of California on June 21, 2017, including the reduced revenue sharing fee structure for Quechan's preexisting 1,100 machines (and the first 100 new ones). Like Rosette's press release, both the recitals and Section 4.8 of the compact contain language like the following that memorializes the $4-plus million Quechan will save each year as a result of the agreement Williams & Cochrane negotiated:

> This Compact reduces the Tribe's revenue sharing obligations by approximately four million dollars ($4,000,000) per year, and simultaneously increases the Tribe's ability to generate revenues through its Gaming

---

[21] A true and correct copy of the August 31, 2017 "Tribal-State Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation" is attached hereto as **Exhibit 20**.

Operation by providing the right to operate additional Gaming Facilities and Gaming Devices.

*See* Ex. 41 at Recitals & § 4.8.

108. The only material difference between Williams & Cochrane's June 21, 2017 final draft compact and the executed agreement lies in what the State took away. It turns out that despite its good faith negotiation obligation, the State actually demanded, *inter alia*, that the tribe pay back roughly half of the amount it had failed to pay under the 2007 Amendment from July 2016 onward (*i.e.*, $2 million), which the State memorialized by inserting the following entirely new language into the compact:

> [T]he Tribe agrees to satisfy its outstanding payment obligations to the State under the 2006 Amendment, which obligations are ongoing and total approximately four million dollars ($4,000,000), exclusive of interest, as of the execution date of this Compact, by making a reduced total payment of two million dollars ($2,000,000) to the State. The Tribe shall remit the payment required by this section over a period not to exceed six years by paying four (4) equal quarterly installments…

*See* Ex. 42 at § 4.8.

109. If not for Robert Rosette's interference at Quechan, Williams & Cochrane would have received monthly flat fees of $50,000 from June 1, 2017 to January 22, 2018 (*i.e.*, the date the compact took effect) and a contingency fee of roughly $5,959,916.10, a sum equivalent to 15% of the $39,732,774.00 in heightened revenue sharing payments that Quechan recouped under the new compact.

## II.   THE TORTS BY ROBERT ROSETTE AGAINST WILLIAMS & COCHRANE

### A. Background on Robert Rosette

110. Robert Rosette is an Indian law attorney who, according to public records, has a history of representing individual persons or factions within tribes while purporting to represent the tribe itself, particularly when a tribe is fighting for control of sometimes massive amounts of gaming revenues. For example, Robert Rosette and his firm Rosette, LLP represented some "faction" of the Alturas tribe, who had over $2 million in Revenue Sharing Trust Funds ("RSTF") frozen on account of a leadership dispute that has spanned

more than seven years and frayed government-to-government relations with the United States. *See Alturas Indian Rancheria v. Calif. Gambling Control Comm'n,* No. 11-02070, Dkt. No. 9 (E.D. Cal. Aug. 9, 2011). Similarly, according to numerous adverse federal court opinions, Robert Rosette and his firm have represented a four-person faction of a supposedly five-member tribe known as the California Valley Miwok Tribe, the quartet of which tried to disenroll the other member and block the enrollment of upwards of two hundred and fifty Indians as they fight to get the CGCC to release over $15.0 million in frozen RSTF funds to themselves alone. *See, e.g., Calif. Valley Miwok Tribe v. Jewell,* 5 F. Supp. 3d 86 (D.D.C. 2013); California Gambling Control Commission, *Revenue Sharing Trust Fund Report (RSTF) of Distribution of Funds to Eligible Recipient Indian Tribes for the Quarter Ended December 31, 2017* at p. 12, *available at* http://www.cgcc. ca.gov/documents/rstfi/2017/14_RSTF_ Distrib_65th_CommStaffReport.pdf (last visited Jan. 26, 2018) (detailing the total amount of frozen RSTF funds).

111. These intra-tribal battles over accessing withheld revenue sharing allocations pale in comparison to the fights that have erupted at tribes with immensely profitable casino operations that have Robert Rosette lurking around in some capacity. As to that, a Fresno Bee article from 2012 indicates that Robert Rosette represented some part of the Tribal Council for the Picayune Rancheria of Chukchansi Indians – the tribe that operates the 1,800-machine Chukchansi Gold Resort & Casino that is situated between Fresno and Yosemite. *See Chukchansi fight partly over disenrollments,* Fresno Bee, Feb. 26, 2012. According to the Fresno Bee, after the Tribal Council represented by Robert Rosette lost a majority of seats at a December 2011 election, it held on to power by disqualifying one of the election winners and then disenrolling large numbers of tribal members. *Id.* Other news reports indicate that tribal members were concerned that the Tribal Council represented by Robert Rosette was misappropriating casino revenues and failing to file audits with the National Indian Gaming Commission (which threatened to shut down the casino because of this), and this led a group of twenty tribal members armed with bullet-proof vests and guns to storm the casino in an attempt to take over the facility. *See, e.g.,*

*Gunmen storm Chukchansi Gold Resort & Casino in Madera County,* KFSN-TV, Oct. 9, 2014, *available at* http://abc7.com/news/gunmen-storm-chukchansi-casino-in-madera-county/344900/ (last visited July 3, 2017). Ultimately, the State of California obtained injunctive relief in federal court to shut down the Chukchansi Gold Resort & Casino in a suit in which Robert Rosette and a slew of other attorneys purported to represent the tribe. *See California v. Picayune Rancheria of Chukchansi Indians of Cal.,* 2014 U.S. Dist. LEXIS 153737 (E.D. Cal. 2014). As a result, the tribe's casino was shuttered from roughly October 10, 2014 to December 31, 2015. *See Chukchansi resort and casino holds grand opening ceremony Friday,* FRESNO BEE, Jan. 14, 2016, *available at* http://www. fresnobee.com/news/local/ article54783505.html (last visited July 3, 2017). An attorney employed by Rosette, LLP who still appears on the firm website indicated to the Fresno Bee shortly after the district judge issued its initial temporary restraining order that the Chukchansi Gold Resort & Casino generated more than $100,000,000 a year in net win (*see Chukchansi casino hearing one for the history books,* FRESNO BEE, Oct. 15, 2014, *available at* http://www.fresnobee.com/news/local/news-columns-blogs/city-beat/article1 9526154.html (last visited July 3, 2017)), meaning that the nearly fifteen-month closure likely cost the tribe at least $120,000,000 in revenues. Nevertheless, the disenrollments reignited just months after Picayune was able to convince the federal and state regulatory authorities to allow the casino to reopen. *See Chukchansi starting disenrollment for some founding families' members,* FRESNO BEE, July 30, 2016, *available at* http://www.fresno bee.com/news/local/article92839572.html (last visited July 3, 2017).

112. A situation like the one at Picayune should be unique in the annals of Indian gaming, but a similar event happened almost contemporaneously at another tribe that Robert Rosette claimed to represent. According to a special agent with the California Bureau of Narcotic Enforcement named Eric Linch, two factions were vying for control of the Paskenta Band of Nomlaki Indians, the tribe that operates the 840-machine Rolling Hills casino located just off Interstate 5 due west of Chico, California. *See California v. Paskenta Band of Nomlaki Indians,* No. 14-01449, Dkt. No. 3-4, ¶ 4 (E.D. Cal. June 17,

2014) ("*Paskenta*"). According to Special Agent Linch, a "significant number of Paskenta tribal members recently were disenrolled from the Tribe, including a majority of the Paskenta tribal council." *Id.* As a result of the action, "there was a new majority on the tribal council, the new majority was in charge of operating the Casino, and the disenrolled members of the tribal council were escorted off tribal property." *Id.* at ¶ 5. The attorney for the "faction" responsible for allegedly wresting control of the Tribal Council and instituting these disenrollments was none other than Robert Rosette, who defiantly explained to the San Jose Mercury News that the "tribe followed proper procedure when removing the members." *Northern California tribe in tense dispute over roll removal, casino,* SAN JOSE MERCURY NEWS, June 11, 2014, *available at* http://www.mercurynews.com/2014/06/11/northern-california-tribe-in-tense-dispute-over-roll-removal-casino/ (last visited July 3, 2017). Nevertheless, the disenrollments spurred those affected to "plan to conduct a hostile takeover of the Casino" using at least "two helicopters" before fifty members of this group ultimately settled upon engaging in a "hand gun[], pepper spray, and baton[]"-laden armed standoff outside the casino with an equal number of agents for the other faction. *Id.* at ¶¶ 7-14. While the State of California refrained from shutting down the casino in this instance, it did have to obtain injunctive relief in federal court to prevent tribal members or armed personnel in their employ from bringing fire-arms within one hundred yards of the Rolling Hills Casino. *See Paskenta,* No. 14-01449, Dkt Nos. 18 & 30 (E.D. Cal. Jun. 18, 2014 & July 7, 2014) (orders granting injunctive relief).

113. The questionable ways in which Robert Rosette tries to obtain tribal clients has caused him trouble in the past. For instance, the Twenty-Nine Palms Band of Mission Indians brought a civil action against a number of individuals including Robert Rosette, claiming the tribe's general counsel Gary Kovall had an arrangement with Robert Rosette whereby he would refer work to him in exchange for a kickback that Mr. Rosette would pay from an artificially-inflated fee that he would charge the tribe. *See Twenty-Nine Palms Band of Mission Indians of Cal. v. Edwards, Kovall, Rosette, et al.,* No. 30-2009 00311045 (Orange County Sup. Ct. 2010). The allegations in the complaint ultimately led

the United States Attorney's Office to obtain an indictment for Mr. Kovall, who in turn pled guilty to conspiracy to commit federal programs bribery under 18 U.S.C. § 371. *See United States v. Kovall,* 857 F.3d 1060, 1063 (9th Cir. 2017). About eight months after the grand jury indicted Mr. Kovall, Robert Rosette entered into a settlement with Twenty-Nine Palms, the terms of which are apparently confidential.

114. Claims of improper billing practices by Robert Rosette continued after the Twenty-Nine Palms incident. For example, on April 21, 2011, the Havasupai tribe sent a letter to Robert Rosette to inform him that his firm had "submitted invoices without supporting documents" and "the Tribal Council ha[d] passed a motion to initiate an investigation of your firm's business with us." The Havasupai Tribal Council indicated that Robert Rosette's firm was "instructed not to conduct any more work or act on our behalf" and to expect "no further payment" until "the investigation [was] completed."

115. Representational questions aside, issues of improper conduct also affect the decision-making of some of the tribes Robert Rosette is known to represent. For instance, Robert Rosette also represents multiple tribal clients who have entered into significant commercial contracts that they subsequently breached without making *any* meaningful payments. As an example, the fifteen-member La Posta Band of Diegueno Mission Indians breached a $23 million construction loan for its gaming facility without making any payments, which recently resulted in an adverse judgment totaling $48,893,407.97. *See Yavapai-Apache Nation v. La Posta Band of Diegueno Mission Indians*, 2017 Cal. App. Unpub. Lexis 4430, *2 (4th Dist. June 28, 2017). The attorney representing La Posta in this litigation is Robert Rosette (*see id.* at *1), who, on information and belief, was also the attorney advising the tribe when it elected to completely default on its obligations.

116. The fact pattern in *Yavapai-Apache* closely mirrors that in another case involving Robert Rosette, wherein he defended another tribe for defaulting on "$36 million-plus" in payments on a loan agreement that enabled the tribe to construct its own gaming facility. *See Yavapai-Apache Nation v. Iipay Nation of Santa Ysabel,* 201 Cal. App. 4th 190, 203 (4th Dist. 2011). This tribe was recently sued yet again for breaching a

contract with a medical marijuana grow company, with damages alleged to be in excess of $25,000,000. *See Outliers Collective v. Santa Ysabel Tribal Dev. Corp.,* No. 18-0834, Dkt. No. 1 (S.D. Cal. Apr. 30, 2018). Based on information and belief, Williams & Cochrane also believes that Robert Rosette advised San Pasqual when it elected to default on its contractual obligations, just as he seemingly did with La Posta.

**B. Rosette's Beginning and End at Pauma**

117. Despite these allegations of questionable representations and dubious contract breaches, Robert Rosette actually started out providing legal representation to Pauma in a forthright manner. One requirement of Pauma's now rescinded 2004 Amendment was that the tribe commence negotiations with San Diego County for an intergovernmental agreement ("MOU") before beginning construction on any gaming-related project in order "to [provide] compensation for[:] law enforcement, fire protection, emergency medical services and any other public services to be provided by the County to the Tribe… as a consequence of the Project," a gambling addiction program, and the general mitigation of any adverse "effect on public safety attributable to the Project."

118. On or about May 15, 2007, Robert Rosette executed a contract with Pauma to "assist in negotiating an MOU with the County of San Diego" after the tribe hired him for that specific purpose. A year-and-a-half later, on or about August 6, 2008, Pauma executed a MOU with San Diego County that Robert Rosette negotiated, which, on top of the $7,750,000 in base revenue sharing each year of the 2004 Amendment, required annual payments of $400,000 for sheriff's protection, $200,000 for a gambling addiction program, $40,000 for the prosecution of casino related crimes, and some of the upwards of $38 million in road improvement expenditures the tribe committed itself to under the agreement. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* No. 14-56104, Dkt. No. 29-1, p.89 (9th Cir. Apr. 13, 2015).

119. Despite being burdened with a very costly MOU, the following year Pauma retained Rosette & Associates again in order to resolve the tribe's dispute with the State of California over the 2004 Amendment. The attorney who presented the idea of Rosette

& Associates doing the litigation work to the General Council was Cheryl Williams.

120. Approximately three to four months before this presentation, during February and March 2010, Robert Rosette hired two attorneys by the names of Cheryl Williams and Kevin Cochrane in anticipation of litigating the *Pauma* case – with Ms. Williams coming from the class action law firm of Milberg LLP and Mr. Cochrane having worked for an inter-tribal circuit-style court that served upwards of twenty tribes in the Southern California area, including Pauma. As to that, Robert Rosette testified during his October 26, 2010 deposition in the *Pauma v. Harrah's* case about his lack of litigation experience and consequent habit of simply delegating this work wholesale to subordinate attorneys:

> Q. All right. And during that period of time [before starting your own firm], were you actively in litigation also as a –
>
> A. From time to time I either assigned litigation to attorneys who have a knack for doing that. You know, very rarely I'll make the court appearances or head the litigation. I try to stay out of court. I like to – I like the business transactions and I like to try to keep my clients out of litigation, but, you know, sometimes you can't avoid it.
>
> Q. The silver lining in every cloud. Some people have to be involved in it. So did you have any major litigation, what you would describe as major litigation, in which you were actually functioning as a litigator during your… years [at the prior firm]?
>
> A. Yeah, there were a few cases, I guess, I was involved in. I can't really remember the captions or the names. I can remember the issues and the tribes.
>
> Q. Just generally, what were the tribes?
>
> A. Well, Santa Rosa Rancheria, I was involved in the – CD Architects sued the tribe. And that was an arbitration, actually. I was involved in that piece. At the La Posta tribe here I was the lead attorney against the County of San Diego with regard to mitigation of off-reservation impacts.
>
> Q. Who is that on behalf of?
>
> A. The La Posta Band of Mission Indians. It was a good result for the tribe, bad result for San Diego County.
>
> Q. What year was that?
>
> A. That was in 2005. I was involved with an election issue, the application

of state law with regard to contributions. That was with the Santa Rosa Rancheria. But like I said, I tried to avoid litigation mostly and would just – you know, I've always hired litigators that I could delegate and assign work to.

121. In keeping with this, although Robert Rosette claims to have been the brain-child behind the litigation," Cheryl Williams and Kevin Cochrane did all of the litigation work in the *Pauma* case for Rosette & Associates during their time at the firm, a fact that is again confirmed by Robert Rosette's deposition testimony in *Pauma v. Harrah's*:

Q. Now, in terms of the litigation, the drafting and filing of the complaint and the arguing, did you do all that yourself up to the time you were removed from the case?

A. No, I – I have employees that work for me that conduct research, draft, make court appearances, so on and so forth.

Q. All right. So outside of being sort of the lead strategist, did you may any appearances or become an attorney or record at all?

A. I was an attorney of record. There was only one appearance that was actually showing up, the oral argument for the preliminary injunction. And I had a conflict that day.

Q. Who argued that case from your firm?

A. Cheryl Williams.

122. Concerns about the ethical practices at Rosette & Associates led Cheryl Williams and Kevin Cochrane to leave the firm the month after the issuance of the injunction order in the *Pauma* case – just fourteen or so months after they both had joined the firm. *See Pauma,* No. 09-01955, Dkt. No. 44 (S.D. Cal. Apr. 12, 2010). Nevertheless, before leaving, Cheryl Williams and Kevin Cochrane tried to sidestep the ethical issues by proposing, on or about April 28, 2010, to remain affiliated with Rosette & Associates via a separate litigation-oriented "of counsel" entity that would be far removed from the day-to-day entanglements in which the firm often found itself mired – a proposal that Robert Rosette quickly rejected.

123. All this proposal and subsequent notice of departure did was produce virulent animosity amongst Robert Rosette and the partners and other senior attorneys at his firm

towards Cheryl Williams and Kevin Cochrane. As to that, in connection with the separation process, Cheryl Williams proposed to Robert Rosette that they send out a joint e-mail to alert the impacted clients about her impending departure. Robert Rosette feigned that he would consider her suggestion and then immediately proceeded, along with Richard Armstrong, to make dozens of telephonic and electronic communications to the affected clients in which he, on information and belief, told them numerous severely damaging and fraudulent falsehoods about Cheryl Williams and Kevin Cochrane – from saying they had been terminated on account of abject incompetence (and he had done all of their work, in any event) to Mr. Cochrane being a "deviant homosexual" (in his words) with whom the clients would be crazy to associate. Of course, none of these statements were true, and all were designed to permanently sever the personal and professional relationships between the departing attorneys and their preexisting clients so the latter would feel compelled to remain with Mr. Rosette.

124. In fact, for Cheryl Williams and Kevin Cochrane, the mere act of departing Rosette & Associates was *so* acrimonious that, on information and belief, Robert Rosette and Richard Armstrong, amongst others, exchanged multiple phone calls and e-mails on or about May 15, 2010 in which they conspired and committed to interfere with any and all future contracts secured by Cheryl Williams and Kevin Cochrane, including through the use of fraudulent means.

125. As for some of the ethical concerns prompting the departure of Cheryl Williams and Kevin Cochrane from Rosette & Associates, the civil suit brought by Twenty-Nine Palms against Robert Rosette had been pending for the better part of a year with rumors of federal indictments forthcoming (*see Twenty-Nine Palms Band of Mission Indians of Cal. v. Edwards, Kovall, Rosette, et al.,* No. 30-2009 00311045, Dkt. No. 1 (Orange County Sup. Ct. Oct. 13, 2009)), and Mr. Rosette had also begun taking a position with another one of his clients that Cheryl Williams and Kevin Cochrane felt was irreconcilable with his representation of Pauma. As to that, Robert Rosette had negotiated a California compact for Upper Lake in 2009 that required the tribe to pay 15% of

its net win in order to operate 750 machines. And yet, while Robert Rosette was claiming the revenue sharing fees in this partially-executed compact were legal, Cheryl Williams and Kevin Cochrane were conversely arguing in *Pauma* while at Rosette & Associates that a 10-15% revenue sharing fee was an illegal tax that necessarily voided a compact.

126. After the Assistant Secretary for Indian Affairs disapproved the Upper Lake compact on account of it imposing an illegal tax under IGRA, Robert Rosette rushed to meet with the newly-elected Governor Brown and negotiated a replacement compact for Upper Lake that once again included a 15% revenue sharing fee for 750 devices, only this time the fee escalated up to that point.

127. This second Upper Lake compact was derided by gaming tribes throughout California, who felt that Governor Brown took advantage of a tribe that was willing to "cut… a quick deal" and now had a template that his office would impose in all future compact negotiations. When the attorney behind the seminal *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger,* 602 F.3d 1019 (9th Cir. 2010) (holding "[t]he State's demand for 10-15% of… net win… is simply an impermissible demand for the payment of a tax by the tribe"), sent out a scathing mass e-mail that claimed the revenue sharing structure of the new Upper Lake compact was nothing more than "a tax… a tax… a tax," Robert Rosette fired back, explaining that "[i]t is completely unreasonable to expect Indian Tribes to pay little or nothing in exchange for compacts."

128. Meanwhile in the *Pauma* suit, the departure of Cheryl Williams and Kevin Cochrane from Rosette & Associates meant that Robert Rosette and his firm were first tasked with opposing a motion for stay by the State of California that asked the Ninth Circuit to halt the injunction order for the duration of the interlocutory appeal – a motion that the Ninth Circuit would soon thereafter grant. *See Pauma,* No. 10-55713, Dkt. Nos. 15 & 39 (9th Cir. June 11, 2010 & July 28, 2010).

129. Just two days after Rosette & Associates filed its opposition brief, on Sunday, June 13, 2010, the Pauma General Council convened for a meeting and voted to terminate Rosette & Associate's contract and to replace the firm with Williams & Cochrane.

### C. Rosette's Tortious Interference at Pauma (Part One)

130. After assuming the representation, Williams & Cochrane was able to convince the Ninth Circuit to reinstate the injunction. *See Pauma*, No. 10-55713, Dkt. No. 55 (9th Cir. Aug. 23, 2010) (order reinstating the injunction).

131. From thereon, Williams & Cochrane singlehandedly litigated the *Pauma* case for the next six-plus years, ultimately convincing Judge Bencivengo to rescind the 2004 Amendment and restitute $36.3 million in heightened revenue sharing payments on account of a misrepresentation claim that Williams & Cochrane added to the complaint on September 9, 2011 – a full fifteen months *after* Robert Rosette was terminated from the case. *See Pauma,* No. 09-01955, Dkt. No. 130, pp. 54-58 (S.D. Cal. Sept. 9, 2011).

132. An utter lack of involvement in the case has, nevertheless, not stopped Robert Rosette for taking credit for the outcome in the *Pauma* litigation for four years now, as his website (and, admittedly, numerous other promotional materials) advertises that "Mr. Rosette also successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California against then Governor Schwarzenegger." *See* Exs. 6, 7.

133. This claim that he had litigated the case has even been repeated in both print and electronic format as part of a "25 People to Watch in the Gaming Industry" piece by Global Gaming Business Magazine. As to that, the profile of Robert Rosette ends with:

> Rosette also successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 million in compact payments allegedly owed to the State of California against then-Governor Arnold Schwarzenegger.

134. Williams & Cochrane is informed and believes that Robert Rosette has made similar claims about his supposed involvement in litigating the *Pauma* suit in other advertisements, promotional materials, and in both oral and written solicitations that have been transmitted across state lines using the wires and mail, as the case may be, including to Quechan (*see* General Allegations, § II(F), *infra*).

135. The termination of Robert Rosette from the Pauma compact litigation should

have marked the end of his interaction with Williams & Cochrane, but his aforesaid fraud pact, especially when coupled with the lure of the monies saved by the injunction order, brought him back around. To explain, in an act of prudence, the monies Pauma saved under the injunction order issued by Judge Burns were placed into a special, set aside account so the tribe would not find itself in a financial bind if this preliminary remedy (which the Ninth Circuit had already stayed for a brief period of time) was overturned and then vacated *en toto*.

136. Before his termination, on April 29, 2010, Robert Rosette wrote an opinion letter that was not shared with any other attorneys in his firm working on Pauma's compact litigation in which he opined that the injunction savings "could… be distributed to Pauma's Tribal Government" even though the General Council had made no such directive.[22] After his ouster, Robert Rosette transmitted a June 23, 2010 letter to Pauma's then-Chairman Christobal Devers in which he acknowledged his termination from the compact litigation, claimed the Williams & Cochrane attorneys were "seek[ing] to have their selfish concerns take precedent [sic] over the best interests of the Tribe" by urging caution with the injunction savings in light of the substandard opposition brief Mr. Rosette filed before his termination, and stated that "[p]erhaps their issuance of a Legal Opinion allowing the tribe to distribute [the reserved] funds to the General Council will demonstrate the contrary." Based on information and belief, Williams & Cochrane believes that Robert Rosette was trying to get the injunction savings freed up for his own personal gain, not for the benefit of the Pauma General Council.

137. What followed next was a five-month quest to tap into the injunction savings by removing Williams & Cochrane from the picture. At the time, Robert Rosette still had a powerful ally on the Pauma Tribal Council – then-Chairman Christobal Devers – and Williams & Cochrane is informed and believes that Mr. Rosette advised Chairman Devers both in writing and telephonically to withhold payment of the firm's invoices in the

---

[22] A true and correct copy of the June 23, 2010 letter from Robert Rosette to Christobal Devers, then-Chairman of Pauma, is attached hereto as **Exhibit 21**.

hopes that the action would financially devastate the new business and enable Rosette & Associates to take over the work.

138. As such, even though Williams & Cochrane began working for Pauma shortly after the General Council vote on June 13, 2010, it nevertheless did not receive its first payment until the morning of October 3, 2010 – just moments before Williams & Cochrane presented to the General Council for the first time on the status of the compact suit.

139. However, before this happened, Cheryl Williams and Kevin Cochrane met with the Pauma Tribal Council on Friday, August 6, 2010, during which then-Chairman Devers indicated that he would never pay Williams & Cochrane under their contract and suggested that the two attorneys walk away from the representation altogether or he would "ruin [their] reputation in Indian Country" – an abnormal statement that is nearly verbatim to the one contained in the June 26th letter from putative Quechan President Keeny Escalanti that was actually written by Robert Rosette or an attorney in his employ.

140. Based on information and belief, Williams & Cochrane believes that Robert Rosette instructed Pauma's then-Chairman Christobal Devers both telephonically and electronically in the days leading up to the August 6th meeting to threaten the attorneys from Williams & Cochrane in the hopes that it would get them to abandon their client and precipitate the freeing up of the millions of dollars in injunction savings for Mr. Rosette.

### D. Rosette's Tortious Interference at La Pena Law

141. The aforesaid efforts by Robert Rosette to sever Williams & Cochrane's contractual relationship with Pauma coincided with attempts to do the same elsewhere.

142. In 2010, one of the more successful Indian law attorneys in the State of California was an individual named Michelle La Pena, who represented a number of the largest gaming tribes in the State of California, including the Yocha Dehe Wintun Nation – a tribe that operated the 2,000-machine Cache Creek Casino approximately thirty miles west of Davis – and the Shingle Springs Rancheria, which about a year-and-a-half earlier opened the 2,000-machine Red Hawk Casino about fifteen miles east of Folsom. As a consequence, Michelle La Pena generated many millions of dollars per year in revenue.

143. The Shingle Springs Rancheria experienced a somewhat similar compact fate as Pauma, in that the CGCC told the tribe that it would have to execute an amendment in order to obtain licenses that should have been available under the 1999 Compact. Shingle Springs did this and entered into an amendment with the State of California on June 30, 2008 that allowed it to increase its machine count in exchange for base annual payments of a staggering 20% of net win into the General Fund plus $4,600,000 into the RSTF. *See* California Gambling Control Commission, *Amendment to the Tribal-State Gaming Compact between the State of California and the Shingle Springs Band of Miwok Indians* §§ 4.3.1 & 4.3.2.2, *available at* http://www.cgcc.ca.gov/documents/compacts/amended_compacts/Shingle_Springs_Compact.pdf (last visited July 4, 2017).

144. Knowing that Michelle La Pena served in a general-counsel-like capacity for these tribes and had little to no litigation experience, Kevin Cochrane met with Ms. La Pena at her offices during the second half of July 2010 to discuss whether their firms could work together to solve Shingle Springs' compact issue.

145. The initial meeting was productive, as Williams & Cochrane entered into an of counsel relationship with La Pena Law and was immediately tasked with preparing a presentation that Michelle La Pena could pitch to the Shingle Springs Tribal Council in order to see if it had any interest in fixing the tribe's amended compact.

146. On or about Wednesday, August 4, 2010, Kevin Cochrane provided Michelle La Pena with the desired litigation memorandum and supporting materials, which led her to ask Mr. Cochrane to meet her at her office on the next Wednesday, August 11, 2010.

147. During the August 11th meeting, Michelle La Pena stated that she was rather impressed with the quality of the Shingle Springs litigation memorandum and asked Kevin Cochrane to prepare a number of last minute documents for a temporary restraining order hearing that she had to appear at the following morning. After Mr. Cochrane agreed to do this last-minute work, Michelle La Pena explained that she thought the of-counsel arrangement was not enough, and wanted to either absorb or merge with Williams & Cochrane so she could obtain the benefit of the firm's litigation knowhow – an event that

would have been immensely lucrative for the attorneys of Williams & Cochrane. Right after making this comment, Michelle La Pena told Kevin Cochrane to take some time to consider the proposal and then provided him with a copy of a memorandum Robert Rosette had recently sent her via e-mail "explor[ing] the possibility of compact litigation for… Shingle Springs… based on its similarities to the Pauma Band of Mission Indians," to alert him to the fact that Robert Rosette, who at this point had been terminated from the Pauma compact litigation for almost two months, was representing that he was still responsible for litigating the Pauma case and was trying to drum up work with Shingle Springs through her on that basis.[23] As indicated above, Robert Rosette had used the wires to send this memorandum to Michelle La Pena via e-mail shortly before the August 11th meeting, and on information and belief, the representation that Robert Rosette "was responsible for litigating the Pauma case" is included, amongst other mailed and wired communications, in the body of the e-mail attaching the memorandum.

148. Based on information and belief, Williams & Cochrane believes that Michelle La Pena spoke with Robert Rosette while vetting Kevin Cochrane and Williams & Cochrane at some point between Thursday, August 12, 2010 and the morning of Sunday, August 15, 2010. During that phone call, upon hearing Michelle La Pena say that she was not only planning to use the of-counsel attorneys of Williams & Cochrane to do the Shingle Springs work but moreover planning to merge with or absorb their firm, Robert Rosette used the wires to spread fraudulent falsehoods about the attorneys in order to interfere with their existing and proposed contracts, stating that the attorneys should be conflicted out from the Shingle Springs work because they represented a nearby tribe and could not be trusted in any event because they had been publicly and rather widely bragging that they had just been hired by the tribe to exclusively take on this rather sensitive compact work. In fact, neither of these statements was true, and Robert Rosette knew as much at the time he made them.

---

[23] A true and correct copy of an August 2, 2010 memorandum from Rosette & Associates, PC to La Pena Law Corporation is attached hereto as **Exhibit 22**.

149.  At 11:25 a.m. on the morning of Sunday, August 15, 2010, just four days after suggesting that Williams & Cochrane merge with or be acquired by her firm, Michelle La Pena e-mailed Kevin Cochrane and explained that she was ending the of counsel arrangement altogether, and "apologize[d]" if the decision "comes as a surprise, as I really like you and think you have a great career ahead of you."[24] Though stating that the quality of work prepared by Williams & Cochrane was "quite stellar," Michelle La Pena went on to explain for the first time that "[t]here are issues with confidentiality and conflicts that I do not believe we can overcome with your firm."

150. With that, Michelle La Pena terminated all communication with Williams & Cochrane – the August 15th e-mail, in other words, marking the last communication that Ms. La Pena has *ever* had with either Mr. Cochrane or Cheryl Williams. The termination of this relationship that was directly caused by Robert Rosette's fraudulent telephonic remarks between August 12, 2010 and August 15, 2010 resulted not only in the loss of significant revenues under the existing of counsel arrangement, but the prospect of substantially more under the partnership agreement arising out of La Pena Law merging with or acquiring Williams & Cochrane. Furthermore, the interference also deprived Williams & Cochrane of the ability to cultivate important professional relationships with one of the most successful Indian law attorney at the time who had a specific need for skilled litigators, and both leaders and future leaders of prominent and well-to-do Indian tribes.

**E. Rosette's Tortious Interference at Pauma (Part Two)**

151. After the La Pena incident, Cheryl Williams and Kevin Cochrane long feared that Robert Rosette had become emboldened and would try to interfere with their other contracts, especially with respect to Pauma's compact litigation since the amount of set-aside monies saved by the injunction order grew as time went on.

152. Unfortunately, this situation came to pass during the summer of 2011. On August 4, 2011, the counsel of record for the State of California in the compact litigation

---

[24] A true and correct copy of an August 15, 2010 e-mail from Michelle La Pena to Kevin Cochrane is attached hereto as **Exhibit 23**.

– Deputy Attorney General T. Michelle Laird – called Cheryl Williams and in a rather audibly uncomfortable manner explained that, after she "thought about it for a few days," she felt her ethical duties required her to disclose that Robert Rosette and his firm had set up a meeting with the Office of the Governor's then-compact negotiator (*i.e.*, Jacob Appelsmith) for August 18, 2011, with the intention of settling "the federal [compact] case." *See, e.g., Pauma,* No. 09-01955, Dkt. Nos. 118-2, 123-1 (S.D. Cal. Aug. 22, 2011).

153. At the time, Williams & Cochrane had no idea how this meeting was set up, and the State of California was neither willing to disclose that information nor cancel the August 18th settlement meeting. In light of this situation, Williams & Cochrane filed a motion for protective order on August 15, 2011, asking the district court to direct the State's negotiator (who was a private attorney and not a public official) to communicate through proper channels when dealing with matters related to Pauma's compact or the pending litigation. *See Pauma,* No. 09-01955, Dkt. No. 118 (S.D. Cal. Aug. 15, 2011).

154. The actual communications between Rosette, LLP and the State's negotiator were not before the district court as part of Pauma's motion for protective order, but have been attached to this complaint. *See* Ex. 1. The exchange started with Richard Armstrong – a senior of-counsel attorney at Rosette, LLP who is typically deeply involved in Robert Rosette's schemes and appears to be an active participant in the Quechan situation (*see* ¶ 100) – sending an e-mail to Mr. Appelsmith on July 26, 2011 explaining that the Pauma "Tribal Council respectfully requests a meeting with the Governor's office at your earliest convenience to discuss compact related matters." *See* Ex. 1. As is the case with every communication between Rosette, LLP and the State's negotiator detailed below, not a single person affiliated with Pauma – including all four Tribal Councilmembers – was carbon copied or otherwise included on this e-mail.

155. The next morning, Jacob Appelsmith replied to Richard Armstrong and asked whether the meeting would involve "settlement discussion in the lawsuit" or instead "seek[ ] to amend or renegotiate the compact." See Ex. 1. After presenting these options, Jacob Appelsmith suggested that "[i]t would seem to make more sense to have a settle-

ment discussion since the lawsuit is about the compact, but I leave that up to you." *See id.*

156. Richard Armstrong responded by e-mail at 2:00 p.m. that afternoon, stating "[t]he tribe indeed wants to meet *without their attorneys present* in order to establish a better government to government relationship with the goal of settling the pending lawsuit with a new compact." *See* Ex. 1.

157. A mere ten minutes later, and before Jacob Appelsmith could respond, Robert Rosette sent a follow-up e-mail to Mr. Appelsmith, explaining that his firm was "not engaged as legal counsel on the litigation," Pauma had not been hired to resolve the dispute, but he nevertheless wanted to set up a settlement process that would not involve the tribe's attorneys of record but would involve him after an initial meeting between the parties:

> Jacob,
>
> I believe only the first meeting is without lawyers. Obviously thereafter we will need to be involved. The good news is that the Tribe wants to pull us in, and as you know, we are not engaged as legal counsel on the litigation. The Tribe expressed to me a desire to settle the lawsuit through compact negotiations. I think they want to meet with you to understand this process first.
>
> Thanks,
>
> - Rob.

*See* Ex. 1.

158. In response to hearing that an attorney who admittedly had not been hired by a tribe was nevertheless interested in settling a federal lawsuit behind the backs of the tribe's counsel of record, Jacob Appelsmith replied that he wanted to go forward with the settlement negotiation and to do so without other attorneys present:

> I would like to meet with the Tribe and to do so as a settlement negotiation, and I assume there will be no lawyers present (except myself, which I can't avoid).

*See* Ex. 1.

159. Yet, the filing of the motion for protective order caused all those involved to

try and cover their tracks. Jacob Appelsmith transmitted a letter to Pauma postponing the planned August 18, 2011 settlement meeting (*see Pauma,* No. 09-01955, Dkt. No. 123-2, p. 6 (S.D. Cal. Aug. 22, 2011)), and Robert Rosette began to send e-mails to select members of the Pauma Tribal Council in the hopes of absolving himself of any wrongdoing.

160. As to that, on August 23, 2011, Robert Rosette sent an e-mail that was addressed to the Pauma Tribal Council as a whole but excluded the tribe's then-Chairman Randall Majel from the recipient list.[25] The purpose of the e-mail was to transmit two pre-prepared letters that Robert Rosette wanted a Pauma Tribal Councilmember to sign that day. The first letter was prepared for the signature of Pauma's then-Secretary/Treasurer by Robert Rosette, explaining that Mr. Rosette's actions were appropriately authorized and that the tribe would "not hold [Mr. Rosette's] firm liable for any unauthorized actions with the State of California, because no such actions were taken."[26] In pertinent part, this letter drafted by Robert Rosette for the benefit of Robert Rosette states:

> This letter is to make clear that your firm's action with respect to scheduling a meeting with the Governor's Office, and any communications related thereto, were all done at the express directive of the Tribal Council. You notified every Tribal Council member of your actions and your communications with the Governor's Office at every stage during this process. We do not and will not hold your firm liable for any unauthorized actions with the State of California, because no such actions were taken. It is not the intention of the Tribal Council that any recently filed briefs may have indicated the contrary.

*See* Ex. 36.

161. The second letter attached to Robert Rosette's August 23rd e-mail was a similar one intended for the signature of Pauma's Secretary/Treasurer that was instead addressed to the State's negotiator Jacob Appelsmith.[27] As with the first one, this letter again

---

[25] A true and correct copy of an August 23, 2011 e-mail from Robert Rosette to various members of the Pauma Tribal Council is attached hereto as **Exhibit 24**.

[26] A true and correct copy of the draft August 23, 2011 letter purportedly from Pauma's then-Secretary/Treasurer to Robert Rosette, which was actually prepared by Robert Rosette, is attached hereto as **Exhibit 25**.

[27] A true and correct copy of the draft August 23, 2011 letter purportedly from

falsely disclaims that Robert Rosette's actions were done at the "express directive of the Tribal Council" and that "Rosette, LLP notified every Tribal Council member of his actions and his communications with the Governor's Office at every stage during this process."

162. Based on information and belief, Williams & Cochrane believes that Pauma's then-Secretary/Treasurer would not sign the two letters prepared by Robert Rosette that sought to absolve Mr. Rosette of any wrongdoing, which in turn led Mr. Rosette to pressure Pauma's then-Chairman Randall Majel (whom he had omitted from the earlier communications) telephonically *over the course of the next twenty days* to sign a watered-down version of the initial letter.

163.  When the motion for protective order finally came on for hearing in the *Pauma* case on May 18, 2012, Judge Bencivengo took issue with Robert Rosette even though she did not have the benefit of any of the above e-mails, stating in pertinent part:

> Well, I have a different issue with Mr. Rosette, who is not here today I believe[,] as to whether or not he should be out purporting that he represents your client when it's not clear to me that he actually has that authority based on some of the declarations that were provided.

*See Pauma,* No. 09-01955, Dkt. No. 182, 19:1-5 (S.D. Cal. May 23, 2012).

164. Ultimately, Judge Bencivengo directed the State of California to agree upon "protocol to control [communications and] settlement discussions in this matter" (*see Pauma,* No. 09-01955, Dkt. No. 183 (S.D. Cal. May 23, 2012)), though she refrained from doing anything about Mr. Rosette since he was not formally part of the proceeding.

**F.  Rosette's Tortious Interference at Pauma (Part Three) and Quechan**

165. The motion for protective order quelled interference from Robert Rosette in the compact suit, but the conclusion of the case in September 2016 – and the consequent publicity it brought Williams & Cochrane – led him to resurface and to do so with a vengeance.

---

Pauma's then-Secretary/Treasurer to Jacob Appelsmith, which was actually prepared by Robert Rosette, is attached hereto as **Exhibit 26**.

166. With the rescissionary and restitutionary remedies in hand, the Pauma General Council tasked Williams & Cochrane with wrapping up its dispute with the State of California by negotiating or litigating for a successor agreement to the 1999 Compact.

167. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

168. With that consensual overture going nowhere, Robert Rosette changed tactics and decided to force his way into the tribe, beginning to covertly work for the new general manager of the tribe's subordinate gaming facility – with whom Mr. Rosette has a preexisting relationship – through a "straw man" attorney in the hopes that doing so would positon him so he could fraudulently interfere with Williams & Cochrane's contract in a manner that left the Pauma tribal members none the wiser. And with that, Robert Rosette laid in wait for an opportunity through which he could carry out his plan.

169. As he was waiting for that to happen, Robert Rosette had his sights set elsewhere as well. One of the individuals running for one of the five Tribal Councilmember seats during Quechan's bitter election of Winter 2016/17 was an individual named Mark William "Willie" White, a tribal member who campaigned for the seat by publicly telling other tribal members he had an attorney "friend" (*i.e.*, Robert Rosette) who could get the tribe into the payday lending fold. *See* General Allegations, § II(H), *infra*.

170. Through this relationship, Robert Rosette would learn that Williams & Cochrane represented Quechan in its compact negotiations with the State of California, and he used his relationship with the by-then-seated Willie White to, by his own admission, set up a discreet meeting with Mr. White and putative Quechan Chairman Keeny Escalanti on June 16, 2017 in order to discuss the California compact negotiations – just two weeks before the California compact negotiations were set to conclude and after point-persons for both the Tribal Council and casino told Cheryl Williams that the Tribal Council in-

tended to abide by the General Council's directive and execute whatever compact Williams & Cochrane negotiated by the end of June. *See* Dkt. No. 52-2, ¶ 19.[28]

171. According to a declaration filed in this case by an executive assistant for Robert Rosette, the law firm of Rosette LLP "commission[s] the printing and distribution of marketing brochures" in the "ordinary course of business" – brochures that contain a biography for Mr. Rosette that mirrors the one on his website claiming he "successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California against then-Governor Schwarzenegger." Dkt. No. 54-2, ¶ 4 & p. 12.

172. It is not only standard practice for Rosette, LLP to print these brochures, but also to distribute them to actual and potential clients over the wires and through the mail in advance of meetings that will broach new or enlarged work projects so the client has some familiarity with the "accomplishments" of the firm by the time the meeting takes place. On information and belief, Robert Rosette adhered to this standard practice with respect to the June 16, 2017 meeting by e-mailing copies of the marketing brochure containing the false advertisement about the *Pauma* litigation to Willie White and putative Quechan President Keeny Escalanti before said meeting occurred. On top of which, Robert Rosette also repeatedly used the wires to e-mail with both Willie White and putative Quechan President Keeny Escalanti in the days immediately before June 16, 2017 in order to nail down the logistics for this clandestine meeting at which he planned on interfering with Williams & Cochrane's contract using fraudulent means.

173. When the meeting finally took place on the morning of June 16, 2017, Robert Rosette parroted the false claim in his promotional materials that he successfully litigated

---

[28] The allegations in this subsection pertaining to the June 16, 2017 meeting are based upon or built off of evidence the Rosette defendants submitted with the Court early in the Rule 12 motion practice. *See, e.g.,* Dkt. No. 52-2, ¶ 19. However, as the allegations in the final subsection II(H), *infra*, will show, Robert Rosette was actually lurking behind the scenes at Quechan since March 2017, when the reconstituted Tribal Council (including his accomplice Willie White) took office.

the *Pauma* case, and then explained to Willie White and putative Quechan President Keeny Escalanti that he could simply step in and take over the negotiations at the final moment and thus try to enable Quechan to dodge its obligations under the Attorney-Client Fee Agreement. To assuage some very real concerns on the part of the putative Tribal Councilmembers about acting in a rogue manner,[29] Robert Rosette explained that he would try and deter Williams & Cochrane from telling anyone else in the tribe about the interference in the California compact negotiations in the termination letter he and the attorneys at this firm (including Richard Armstrong) would draft and then transmit to Willie White and Keeny Escalanti using the wires, further assuring the two putative Quechan Tribal Councilmembers that he could prepare and backdate a seemingly-authentic resolution regarding his hiring once the coast was clear.

174. Yet, rather than simply assume Quechan's California compact work in a lawful manner, the termination letter prepared by Robert Rosette and transmitted by the tribe on June 27, 2017 caused a total repudiation of the Attorney-Client Fee Agreement by explaining that "[t]he Tribe will not pay any contingency fee or 'reasonable fee for the legal services provided in lieu thereof.'" Ex. 4. The decision to take this approach towards concluding the Attorney-Client Fee Agreement has caused Quechan to be named as a defendant in this federal lawsuit in which it has paid WilmerHale more than $2,000,000 to simply engage in basic pleading practice, and will likely pay WilmerHale more than the full amount of the contingency fee once all is said and done.

175. In keeping with his promise, however, the July 26, 2017 termination letter prepared by Robert Rosette tries to keep Williams & Cochrane quiet about the interference by explaining "the confidentiality provisions of the Agreement and the confidentiality provisions which govern attorney-client relations" require "that you not disclose to any employee, officer, or official of the Tribe or any subdivision, agency, or enterprise of the Tribe regarding any matter that was the subject of your engagement." Ex. 4.

---

[29] A true and correct copy of the "Constitution and By-Laws of the Quechan Tribe of the Fort Yuma Reservation California" is attached hereto as **Exhibit 27**.

176. In the hopes of ensuring that the attorneys heeded this warning, the June 26, 2017 termination letter went one step further and warned the attorneys of Williams & Cochrane that, "[w]e strongly advise you against pressing your luck further out of concern for your reputation of your firm in Indian Country and in the State of California." Ex. 4.

### G. Rosette's Tortious Interference at Pauma (Part Three Cont.) and All Over

177. Since the service of the complaint in this case, Robert Rosette has gone to extraordinary lengths to follow through on the threat he wrote into the Quechan termination letter to ruin "the reputation of your firm in Indian Country and the State of California" should Williams & Cochrane try and obtain the monies that are owed to it under the Attorney-Client Fee Agreement.

178. Initially, he held this plan in reserve and instead decided he was going to try and take care of the perceived problem by misusing litigation processes, hiring two of the largest and most expensive law firms in the country – including an "independent" one for Quechan with whom he has a longstanding and tangled relationship representing factions of tribes – and directing them to both file anti-SLAPP motions against Williams & Cochrane in the hopes that any attorney fee award arising from a favorable order would financially devastate the firm and leave it unable to pursue the remainder of the lawsuit.

179. After Williams & Cochrane amended around the two anti-SLAPP motions as it is allowed to do under federal law, Robert Rosette took matters into his own hands. Latching on to the part of the threat to ruin "the reputation of your firm in… the State of California," he and other members on his firm (like Richard Armstrong), on information and belief, engaged in a series of electronic and telephonic communications with the Office of the Governor during the second half of March 2018 in which they told the State's Senior Advisor for Tribal Negotiations Joginder Dhillon that the attorneys of Williams & Cochrane had made a number of vicious personal attacks against his character – none of which were actually made, though. For Robert Rosette, the goal of conveying these remarks was twofold: to have Mr. Dhillon (1) reveal the identities of the other tribes Wil-

liams & Cochrane represents so Mr. Rosette could sever those contracts as well, and (2) file a stilted declaration in the instant suit that only testified as to some of the events in Quechan's negotiations and only disclosed those materials that Mr. Rosette wanted disclosed. The result of these conversations was that Mr. Dhillon acquiesced, at least in part, to Robert Rosette's request and filed a "partial" declaration in both senses of the word – the confidentiality provisions in the compact notwithstanding, an act the State is loath to do even in a lawsuit in which it is a named party, and knowing full well that Williams & Cochrane would assuredly be unable to obtain the rest of the negotiation materials before they were put under lock and key at the State Archives for a period of fifty years at the end of 2018. *See* Cal. Gov't Code § 6268.

180. At this point, the animosity on the part of Robert Rosette towards the attorneys at Williams & Cochrane was boiling over and the situation came to a head at the annual National Indian Gaming Association conference that took place in Las Vegas, Nevada during the week of Monday, April 16, 2018. Though they had no real interaction with Robert Rosette since winding up their departure from his firm during May 2010, the attorneys of Williams & Cochrane encountered Mr. Rosette at the Las Vegas Convention Center on or about April 18, 2018. With the attorneys for Williams & Cochrane engaged in conversation alongside the wall in one of the main foyers, Robert Rosette walked past and with teeth barred, seething with anger, pointed his finger at both Cheryl Williams and Kevin Cochrane and violently emitted in the most guttural of growls either "I'm going to hurt you" or "I'm going to get you." This gesture came as quite a shock to the attorneys of Williams & Cochrane, and not just because they had not seen Mr. Rosette for years on end; rather, they perceived it to be threatening in nature and conveying that Robert Rosette was prepared to do whatever it took – in or outside of the courtroom, physically or litigiously – to make sure the instant suit did not progress any further.

181. With that, Robert Rosette then turned his attention to following through on the first part of his threat to ruin "the reputation of your firm in Indian Country." As mentioned earlier, Robert Rosette created a foothold for himself at Pauma by working behind

the scenes for his friend who happened to be the general manager of the tribe's gaming facility. Though the Court had issued a protective order allowing certain types of information to be filed under seal, Robert Rosette nevertheless began using the mail and wires to funnel all of the sealed versions of Williams & Cochrane's filings in this case to his general manager friend and a Pauma tribal member who happens to be related to putative Quechan President Keeny Escalanti. On top of simply disseminating these filings, Robert Rosette also used the wires to misrepresent the contents and effect of the filings with the aim of trying to sever Williams & Cochrane's relationship with Pauma – notably, telling these two aforesaid individuals to spread around the tribe the falsehood that multiple Pauma tribal members were "named" as defendants in the case and would soon be sued as part of the Rosette-based RICO claim through the "Doe" designations.

182. The attorneys of Williams & Cochrane tried to bring this issue to the Court's attention via a motion for leave to file a Second Amended Complaint on May 11, 2018 (*see* Dkt. No. 71), to which Rosette's counsel filed a "notice of inadvertent disclosure" and a bogus declaration from a partner at Rosette, LLP who claimed she had mistakenly sent just the sealed version of the First Amended Complaint to only the general manager of Pauma's gaming facility. While the Court was considering the breadth of the leave it had granted Williams & Cochrane to amend the operative complaint, Robert Rosette instructed his allies at WilmerHale to file a premature Answer containing a slew of counterclaims alleging Williams & Cochrane violated its ethical duties in connection with its representation of Quechan. With the Answer now on the docket, Robert Rosette then used the wires to once again disseminate this pleading to his two confidantes inside of Pauma along with instructions that they spread the document around the tribe as well as the falsehood that the attorneys of Williams & Cochrane had now been adjudged to have committed the unethical conduct alleged therein and that was further proof that, despite whatever they said, they intended to name Pauma tribal members as part of the Rosette-based RICO claim.

183. This unrelenting course of using the wires to disseminate falsehoods about the status of this case around Pauma achieved its long-desired end, as the Tribe held a special meeting to discuss the employment status of Williams & Cochrane and ultimately decided to significantly diminish the role of the firm.[30]

184. Yet, the fraud did not end there. Fast forward two months and, on October 12, 2018, the Court conducted a hearing on the second round of motions to dismiss and/or strike filed by the defendants in this action. A significant amount of the conversation focused upon the events surrounding Michelle La Pena, and the Court conveyed the impression that the viability of the RICO claim against the Rosette defendants would likely turn upon the ability of the attorneys of Williams & Cochrane to more specifically identify the content of and modes of transmission for the fraudulent communications that had taken place.

185. And yet, not even three weeks later, on November 1, 2018, Robert Rosette issued a press release – part of which is included in picture form below – to announce "the merger of its practice with LaPena Law Corporation, a highly esteemed law firm based in Sacramento, California, that has serviced the needs of California tribal clients for over a decade." Quoting from the words of Robert Rosette in the press release, "Michelle is a California Indian attorney that is a one of a kind – smart, tenacious, and indefatigable defender of California Indian tribes." Furthermore, bringing Michelle LaPena on as a shareholder in his firm, according to Robert Rosette, was "a tremendous opportunity for Rosette, LLP to broaden its presence in California and serve the needs of tribes in the region."

---

[30] Williams & Cochrane reserves the right to either amend this Third Amended Complaint or file a supplemental complaint raising interference with contract and/or economic relations claims against the Rosette defendants on account of these harms, as the Court previously explained it would allow should the situation come to pass. *See* Dkt. No. 135, 6:19-21 ("Thus, the Court will deny leave to amend as to this aspect of the interference claim without prejudice to W&C reasserting it in the event that concrete harm to this relationship occurs.").


## Prominent Sacramento Tribal Law Firm Lapena Law Corporation Merges With National Law Firm Rosette, LLP

**NEWS PROVIDED BY**
**Rosette, LLP** →
Nov 01, 2018, 13:30 ET

**SHARE THIS ARTICLE**

WASHINGTON, Nov. 1, 2018 /PRNewswire/ -- Rosette, LLP, a majority - Indian owned national law firm, specializing in the practice of federal Indian law, is thrilled to announce the merger of its practice with LaPena Law Corporation, a highly esteemed law firm based in Sacramento, California, that has serviced the needs of California tribal clients for over a decade. Michelle L. LaPena, owner of LaPena Law Corporation, has joined Rosette, LLP as a shareholder and will co-manage the firm's Sacramento, California office.

"Michelle is a California Indian attorney that is one of a kind—smart, tenacious, and indefatigable defender of California Indian tribes. This new partnership brings a tremendous opportunity for Rosette, LLP to broaden its presence in California and serve the needs of tribes in the region," says Robert Rosette, Founder and Managing Partner of Rosette, LLP. "Working with Michelle as a fellow shareholder and fellow tribal member is a great honor and privilege."

"This merger with Rosette, LLP will allow our practices to combine resources and strengthen our ability to be of service to our tribal clients," says Michelle LaPena. "I look forward to working with this incredibly talented team for the betterment of the tribal communities that are so important to us."

186. With Michelle La Pena having retired from the practice of law in recent years, on information and belief Williams & Cochrane believes that the merger is simply a ruse, a sham business transaction the real motivation for which is Robert Rosette's desire to buy off Ms. La Pena and thereby corruptly influence the disposition of this suit. To that end, on information and belief, Williams & Cochrane further believes that Robert Rosette and other attorneys in his firm (like Richard Armstrong) used the wires extensively between October 13, 2018 and November 1, 2018 to communicate with Michelle La Pena and facilitate an arrangement whereby she would join his firm as a partner on the conditions that she testify in the manner desired by Mr. Rosette in the instant case and further destroy any relevant files from her prior firm, including any damaging communications concerning Kevin Cochrane, Cheryl Williams, or Williams & Cochrane.

## H. The Rosette Tribal Council's Largescale Financial Fraud

187. Although Robert Rosette claims his first interaction with any of the Quechan leadership was at the meeting on June 16, 2018, the truth of the matter is that Mr. Rosette arrived at the tribe much earlier and for another purpose altogether.

188. One of the reasons trouble tends to follow Robert Rosette is because he has a well-documented history of exploiting tribal sovereignty for his own personal enrichment. In recent years, a leading embodiment of this idea has been the creation of internet-based "payday" lending operations on tribal lands so Mr. Rosette can evade state usury laws and the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, and stick unsuspecting borrowers with loans carrying APRs of 800% or higher.

189. Any question about whether these payday lending operations are legitimate tribal enterprises rather than deviously-concealed personal businesses disappeared when Robert Rosette admitted during a presentation at the "Wiring the Rez" conference in Phoenix, Arizona earlier this year that 97% of the generated revenues are directed to himself and other associates outside of the tribe.[31] According to Robert Rosette, the blame for the prevailing moral repugnancy for these "rent a tribe" schemes should fall not on the conniving businessmen who venture into Indian Country to use a tribe's name for their own personal benefit, but on the courts for questioning how a tribe conducts its affairs:

> The tribes are only making 3% gross approximately, [shifting to talk from his perspective] because they like to use gross numbers when talking about Indians in business. [Shifting back] They're making approximately 3% of gross profit. That's awful. Who is making the other 97%? And how much do your third parties make? …
>
> [Shifting again to talk from his perspective] Since when did these questions become the litmus test for determining whether you are the arm of a tribe? … It has never been about how much a tribe makes nor should it be. If a tribe starts a business or pursues an opportunity in this new economy, and they're good at it and make money, you don't look at how much they make versus everyone else, you look at the decision making of the tribe that put them in the position to make that profit. …
>
> [I know a lot of casinos in rural areas where] [e]veryone is making money *but* the tribe. [Why is that not a rent-a-tribe scheme?] Why, because we have always been able to articulate this test that it doesn't come down to these notions of who's making what and how much and this is suspicious. Okay. So we shouldn't allow judges or anybody to go down that road today.

---

[31] A true and correct copy of an excerpt from a February 1, 2018 presentation by Robert Rosette at the "Wiring the Rez" conference is attached hereto as **Exhibit 28.**

190. The impact of this 97%-3% split becomes apparent upon translating the percentages into real dollars. One of the many of lawsuits filed against a Rosette online payday lending businesses was brought by the Consumer Financial Protection Bureau against the lending entities superficially operated by the Upper Lake tribe. *See Consumer Fin. Prot. Bureau v. Golden Valley Lending, Inc.*, No. 17-3155 (N.D. Ill. Filed on Apr. 27, 2017). The initial complaint filed by the Consumer Financial Protection Bureau explained that during a five month period in 2013, two of the Upper Lake tribe's lending enterprises "paid [their] business partners approximately $35.8 million" while they "distributed approximately $536,000 to accounts held by the [tribe]." *Id*. at Dkt. No. 1, ¶¶ 91-92.

191. To date, Robert Rosette has created in excess of thirty distinct online payday lending enterprises at more than a dozen tribes, including the following:

a.     Golden Valley Lending (Habematolel Pomo of Upper Lake)

b.     Mountain Summit Financial (Habematolel Pomo of Upper Lake)

c.     Silver Cloud Financial (Habematolel Pomo of Upper Lake)

d.     Arrow One Lending (Iipay Nation of Santa Ysabel)

e.     Sierra Lending (Iipay Nation of Santa Ysabel)

f.     Tall Grass Finance (Iipay Nation of Santa Ysabel)

g.     123 Wages (Kashia Band of Pomo Indians)

h.     ABC Wages (Kashia Band of Pomo Indians)

i.     Geyser Lending (Kashia Band of Pomo Indians)

j.     InboxLoan (Kashia Band of Pomo Indians)

k.     netPDL (Kashia Band of Pomo Indians)

l.     Oxford Funding (Kashia Band of Pomo Indians)

m.     PDLNow (Kashia Band of Pomo Indians)

n.     PDY Services (Kashia Band of Pomo Indians)

o.     QXL Online (Kashia Band of Pomo Indians)

p.     ReadySetGo Finance (Kashia Band of Pomo)

q.     Harvest Moon Loans (La Posta Band of Diegueno Mission Indians)

r.  Blue Trust Loans (Lac Courte Oreilles Band of Ojibwe Indians)

s.  Ladder Credit (Lac Courte Oreilles Band of Ojibwe Indians)

t.  ChoiceLease (Lac Courte Oreilles Band of Ojibwe Indians)

u.  Bright Star Cash (Lac du Flambeau Band of Lake Superior Chippewa Indians)

v.  Lend Green (Lac du Flambeau Band of Lake Superior Chippewa Indians)

w.  Radiant Cash (Lac du Flambeau Band of Lake Superior Chippewa Indians)

x.  Sky Trail Cash (Lac du Flambeau Band of Lake Superior Chippewa Indians)

y.  Big Picture Loans (Lac Vieux Desert Band of Chippewa Indians)

z.  American Web Loan (Otoe-Missouria Tribe of Indians)

aa.  Great Plains Lending (Otoe-Missouria Tribe of Indians)

bb.  Blue King Loans (Picayune Rancheria of Chukchansi Indians)

cc.  Advance Me Today (Rosebud Sioux Tribe)

dd.  First Pay Loans (Rosebud Sioux Tribe)

ee.  MyQuickWallet (Rosebud Sioux Tribe)

ff.  Q Credit (Rosebud Sioux Tribe)

gg.  ZocaLoans (Rosebud Sioux Tribe)

hh.  Blue Pine Lending (Sokaogon Chippewa Community of Mole Lake)

ii.  Green Pine Lending (Sokaogon Chippewa Community of Mole Lake)

jj.  Red Pine Lending (Sokaogon Chippewa Community of Mole Lake)

kk.  White Pine Lending (Sokaogon Chippewa Community of Mole Lake)

ll.  Comet Loans (Tonto Apache Tribe)

192. The standard business structure for entities like this involves a tribal council – or some segment of it – exercising control over the regulatory *and* operational aspects of the business, which enables it to run the enterprise in a clandestine manner, free from any oversight or interference by the general membership of the tribe. This was the case for both the Lac Vieux Desert Band and the Lac Courte Oreilles Band ("LCO"), tribes that created subordinate regulatory and operational authorities that were either directly responsive to the respective tribal councils or actually comprised of Tribal Councilmem-

bers and confidantes with "substantial business, financial or industry experience" (*i.e.*, a Rosette, LLP attorney or someone linked to the firm). *See, e.g.*, Lac Vieux Desert Band of Lake Superior Chippewa Indians, *Tribal Consumer Financial Services Regulatory Code, available at* http://www.lvdtribal.com/pdf/2014-10-31-Tribal-Consumer-Financial-Services-Regulatory-Code.pdf (last visited Feb. 21, 2018).

193. Before long, this scheme that survives on furtiveness comes to light because the involved parties begin to misappropriate the other revenues of the tribe to further their ends. For instance, this happened at LCO, where the general membership discovered that the Tribal Council was not only operating an unaudited online payday lending enterprise, but that it was also misusing significant funds, including roughly $800,000 in federal grant funds that were earmarked for the remediation of fifty-plus mold-infested homes on the reservation. See *Duffy alleges gross mismanagement of funds for tribe*, BARRON NEWS-SHIELD, June 21, 2017, available at http://www.news-shield.com/news/free_news/article_a1616b1c-5681-11e7-9b03-3778827028c0.html (last visited Feb. 21, 2017). At the behest of one-hundred and thirteen (113) petitioning tribal members, United States Representative Sean Duffy made a public request on October 6, 2016 that the LCO Tribal Council allow the federal government to conduct an independent forensic audit of the tribe – a request that the defiant and entrenched Tribal Council simply chose to ignore.[32]

194. For Quechan, the same sorts of financial irregularities began to arise once the reconstituted Tribal Council assumed power in March 2017. Unbeknownst to the tribe at large, Robert Rosette had begun covertly working for Willie White – with whom he had a preexisting relationship from his payday lending experiences – behind the scenes, and had conspired over the wires with other members of his firm to use this "in" at the tribe to exploit tribal resources for their own benefit.[33] Soon thereafter, this cloak and dagger re-

---

[32] A true and correct copy of an October 6, 2016 letter from Representative Sean P. Duffy to Interior Secretary Sally Jewel, amongst others, is attached hereto as **Exhibit 29.**

[33] From here on out, when the allegations talk about Robert Rosette using the wires to further his fraudulent scheme, that should be understood to include Richard Armstrong and other Doe defendants within his firm.

lationship between the Rosette defendants and individual members of the Quechan Tribal Council would come to include putative Quechan President Keeny Escalanti.

195. The first sign of trouble occurred right away, at the first official tribal meeting in March 2017 after the reconstituted Tribal Council took their seats. For background purposes, the suspension of revenue sharing payments to the State of California at the beginning of July 2016 means that the tribe had in the vicinity of an additional $370,000 in gaming revenues each month. This translates to an extra $2,930,000 by the time the new Tribal Council came into office in March 2017, and $7,030,000 by the time the new compact took effect near the end of January 2018. Despite this influx of additional income, Willie White explained at this meeting that the Tribal Council had decided to discontinue Per Capita payments altogether going forward, which the body would verify for any absentees in letter form in short order. On information and belief, Williams & Cochrane believes that the Rosette defendants – including Robert Rosette and Richard Armstrong – had used the wires in advance of the March 2017 meeting to communicate with Willie White and direct him to make this statement that the Tribal Council was cutting off per capita payments.

196. As for the follow-up letter, putative Quechan President issued said letter to the tribal membership on April 20, 2017 stating "there will be no Per Capita payment for the [entire] 2017 calendar year" – a practice he has continued through at least July 2018. Again, this was a letter authored by the Rosette defendants – including Robert Rosette and Richard Armstrong – with the help of the wires and sent to Willie White and Keeny Escalanti, again using the wires, for dissemination to the general membership of the tribe through the mail and over the wires.

197. What this means is that putative Quechan President Keeny Escalanti has flatly refused to comply with the "Tribal Revenue Allocation Plan" that the tribe enacted under IGRA, which explains that 40% of the revenues that the casinos sends to the tribe each month shall go to the general membership in the form of per capita payments. As a consequence, approximately 2,565 adult members of Quechan and 1,172 minors have lost

out on their requisite per capita payments and payments into trust accounts, respectively, for at least the seventeen month period extending from April 2017 through July 2018. Put differently, that is upwards of 63,529 missed financial distributions to the tribal members.

198. And yet, nearly a month after Willie White informed the general membership at the initial March 2017 meeting there would be no further per capita payments, on April 18, 2017, putative Quechan President Keeny Esclaanti sent a letter to the Arizona Department of Gaming to "certify that the Quechan Indian Tribe is complying with the Indian Gaming Regulatory Act regarding the Tribe's use of net revenues from Class IIII Gaming Activity," by using 40% of the net gaming revenues for per capita payments. Again, this was a letter authored by the Rosette defendants – including Robert Rosette and Richard Armstrong – with the help of the wires and sent to Willie White and Keeny Escalanti, again using the wires, for transmission to the Arizona Department of Gaming through the mail and over the wires.

199. Williams & Cochrane is informed and believes that putative Quechan President Keeny Escalanti sent a similar certification to the National Indian Gaming Commission after April 20, 2017 to falsely inform the federal agency that 40% of the tribe's net gaming revenues were being used for per capita payments. Williams & Cochrane is further informed and believes that putative Quechan President Keeny Escalanti sent similar letters to the Arizona Department of Gaming and the National Indian Gaming Commission in the spring of 2018 even though the tribe was *still* not complying with its Tribal Revenue Allocation Plan. As was the case with the Arizona Department of Gaming letter from the spring of 2017, all of these letters were authored by the Rosette defendants – including Robert Rosette and Richard Armstrong – with the help of the wires and sent to Willie White and Keeny Escalanti, again using the wires, for transmission to the respective government through the mail and over the wires.

200. In addition to stopping per capita payments into the minor trust accounts, the amounts distributed from these accounts to tribal members who reach the age of majority as of late are substantially less than the total amount of per capita payments that should

have accumulated over time. On information and belief, in one such instance, a newly-adult tribal member who elected to cash out his/her minor trust account got a payment of roughly $1,000 despite the expected balance of the account being ten-plus times higher.

201. In order to facilitate the misuse of tribal resources, Robert Rosette then turned his attention to removing any outside legal oversight, including disabling the tribal court (*see* ¶ 203, *infra*) and removing the firm that was responsible for ensuring Quechan retained the excess monies that should have been paid to the State as revenue sharing during the course of the compact negotiations – Williams & Cochrane. Despite the fact that interfering with this relationship could potentially alert the tribe at large to his presence and shed light on the ongoing financial irregularities, Robert Rosette nonetheless pitched the idea to Willie White and Keeny Escalanti at the June 16, 2017 meeting, explaining that, now that the final compact negotiation session had taken place and the attorneys were simply memorializing the ultimate terms, he and the other attorneys at his firm (including Richard Armstrong) would prepare a letter for Keeny Escalanti to send to Williams & Cochrane right before the anticipated execution date of the compact in order to terminate the firm, obtain the end work product, and commit a total repudiation of the Attorney-Client Fee Agreement. To that end, the two "Williams & Cochrane" termination letters dated June 26, 2017 and June 30, 2017 were actually authored by the Rosette defendants – including Robert Rosette and Richard Armstrong – with the help of the wires and sent to Willie White and Keeny Escalanti, again using the wires, for transmission to both Williams & Cochrane and multiple representatives for the Office of the Governor over the wires. What is more, Robert Rosette and the attorneys at his firm used the wires extensively between June 27th and June 30th to represent to the Office of the Governor that they had been lawfully hired to take over the compact negotiations even though they had not and could not produce a tribal resolution evidencing their hiring. As to that resolution, on information and belief, Robert Rosette and the attorneys at his firm – including Richard Armstrong – authored that document after the service of the complaint in this case with the help of the wires, and then sent it to Willie White and Keeny Escalanti,

1   again using the wires, with instructions that the latter sign the backdated document.

2       202. After the service of the complaint in this case, Robert Rosette's presence fin-

3   ally came to light and the general members of Quechan staged recall elections to remove

4   certain Tribal Councilmembers from office, Mr. Escalanti and Mr. White included. The

5   first recall election occurred on Friday, December 29, 2017 and involved putative Coun-

6   cilmember Willie White and one other officer.[34] The second recall election took place on

7   Wednesday, January 17, 2018, and focused upon putative President Keeny Escalanti and

8   three other officers.[35] The results of the recall saw a vast majority of Quechan voters elect

9   to remove both putative President Keeny Escalanti and putative Councilmember Willie

10  White from office, with the final tallies being 147-80 and 209-102, respectively. Never-

11  theless, the impacted Quechan Tribal Councilmembers devised a plan to remain in office

12  with the assistance of Robert Rosette, ultimately refusing to step down on the basis that

13  the votes were invalid because "the total number of voters did not meet the minimum set

14  by the tribe's constitution." In order to effectuate this plan, the Rosette defendants – in-

15  cluding Robert Rosette and Richard Armstrong – authored notices for the results of the

16  recall elections that indicated with a checkmark in a box labeled "No," the total number

17  of voters in the election did not meet some supposedly new threshold requirement of the

18  tribal constitution. As with all the other documents described in this subsection, these

19  election notices were authored by the Rosette defendants – including Robert Rosette and

20  Richard Armstrong – with the help of the wires and sent to Willie White and Keeny Esca-

21  lanti, again using the wires, for posting at the Tribal Administration Building shortly after

22  January 17, 2018.

23      203. On top of which, to make sure his support base would remain in power, Rob-

24  ert Rosette instructed Keeny Escalati and Willie White over the wires in the wake of the

25

26      [34] A true and correct copy of a January 12, 2018 Yuma Sun article inaptly entitled "Quechan council members survive recall effort" is attached hereto as **Exhibit 30**.

27

28      [35] A true and correct copy of a January 26, 2018 Yuma Sun article entitled "Results of Quechan Tribe's recall vote thrown out" is attached hereto as **Exhibit 31**.

recall elections to shut down Quechan's long-standing tribal court, which these two individuals did in January 2018 using the falsehood that the tribal court building had a faulty foundation which prevented the tribe from operating a tribal court in any fashion (even in a separate building).

204. The election rigging orchestrated by Robert Rosette during the recall elections of the Winter of 2016/2017 has resurfaced in recent weeks in advance of this year's tribal election. To make sure his base of support can remain in power, Robert Rosette repeated a tactic that he had used against Williams & Cochrane during the summer of 2018 by instructing Keeny Escalanti and Willie White over the wires to tell tribal members at large the misrepresentation that the Quechan General Councilmembers involved in this suit had sued not only Robert Rosette and his firm, but also the tribe as well. Robert Rosette did this for the explicit purpose of discrediting these individuals within the tribe and ensuring that they would not be able to unseat his tribal accomplices in the election. To make sure this would not happen, Robert Rosette went one step further and instructed Keeny Escalanti and Willie White over the wires during November 2018 to, once again, act outside the scope of their lawful authority by disqualifying – or causing to disqualify – four-plus challengers running for seats on the Tribal Council who are either named plaintiffs or sympathetic to them using false grounds, such as they had supposedly submitted an application with an illegible signature or did not satisfy a residency requirement.

## FIRST CLAIM FOR RELIEF

### [Breach of Contract]

### [By Williams & Cochrane and Against Quechan]

205. Williams & Cochrane incorporates by reference the preceding general allegations as if set forth in full.

206. A claim for a breach of contract requires an enforceable contract, the plaintiff's performance thereunder, the defendant's breach, and resultant damages. *See, e.g., Hickcox-Huffman v. US Airways, Inc.,* 855 F.3d 1057, 1062 (9th Cir. 2017) (citation omitted). Further, the terms of a contract may contain an implied in fact agreement that

limits the ability of one contracting party to fire the other, with such implied agreement standing on "equal footing with express terms." *See Foley v. Interactive Data Corp.,* 47 Cal. 3d 654, 677-78 (1988) (citing Restatement (Second) of Contracts §§ 4, 19 (1981)).

207. Quechan and Williams & Cochrane executed the Attorney-Client Fee Agreement on September 29, 2016 after arms-length negotiation and the tribe consulted with an independent attorney. The terms of the contract state that Williams & Cochrane would provide legal services to Quechan pertaining to "reducing [the tribe's] payments under its tribal/State gaming compact with the State of California and seeking return of payments made under such agreement." In return for these services, Quechan agreed to pay Williams & Cochrane a monthly flat fee of $50,000 and a 15% contingency fee on the roughly $39,732,774 in heightened revenue sharing that Quechan paid to the State of California under its 2007 Amendment if the firm was able to obtain a "credit, offset, or other reduction in future compact payments to the State in a successor compact (whether new or amended) as a result of" said past payments. The Attorney-Client Fee Agreement also explains that if Quechan discharges Williams & Cochrane before the contingency fee attaches, the tribe will still have to pay the full contingency fee if it has become "entitled" to the aforementioned "credit, offset, or other reduction in future compact payments" that serves as the basis for the fee. *See* Merriam-Webster, *Definition of Entitle*, *available at https://www.merriam-webster.com/dictionary/entitle* (last visited July 15, 2017) (defining "entitle" as "to furnish with proper grounds for seeking or claiming something"). Even if this is not the case, the Attorney-Client Fee Agreement still requires Quechan to pay the firm a "reasonable fee for the legal services provided in lieu of the contingency fee" that will be determined on the basis of a list of factors that first looks at "[t]he amount of the fee in proportion to the value of the services performed."

208. Williams & Cochrane performed under the Attorney-Client Fee Agreement from the execution date of the contract to June 27, 2017, by which point it had reached an agreement in principle with the State of California and was finalizing the terms of a twenty-five year gaming compact that would eliminate at least $112 million in revenue

sharing fees vis-à-vis the 2007 Amendment and provide Quechan with ability to generate another $660 million in additional gaming revenue as a result of new machine rights.

209. Yet, just three days before Quechan was tentatively set to sign the final compact, putative President Keeny Escalanti caused a letter to be e-mailed to Williams & Cochrane in which he stated that the firm had been terminated and the tribe would "not pay any contingency fee or 'reasonable fee for the legal services provided in lieu' thereof" as required by the terms of the Attorney-Client Fee Agreement. Between this and a second letter dated June 30, 2017, putative Quechan President Keeny Escalanti directed Williams & Cochrane to turn over the final draft of the compact to an attorney by the name of Robert Rosette so he could wind up the negotiations and have the tribe sign the compact Williams & Cochrane had negotiated without delay. To make it abundantly clear that Quechan would not pay any contingency or substitute fee under the Attorney-Client Fee Agreement, putative Quechan President included a threat in his June 26th termination letter, telling Williams & Cochrane that he "strongly advise[s] you against pressing your luck further out of concern for the reputation of your firm in Indian Country and in the State of California."

210. In addition to violating the express terms of the Attorney-Client Fee Agreement, putative Quechan President Keeny Escalanti also breached an implied in fact agreement that stands on "equal footing" with the express terms of the agreement, which ensured that the tribe would not terminate the firm during the conclusion of the time-sensitive negotiations. This implied in fact agreement is evidenced, in part, by the course of conduct between the parties, as the point persons for both the Tribal Council and the Quechan Casino Resort told Cheryl Williams in the weeks leading up to the transmission of putative President Keeny Escalanti's June 26th termination letter ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

1   ███████████████████████████.

2   211. Quechan's breach of both the express and implied terms of the Attorney-
3   Client Fee Agreement has caused Williams & Cochrane to suffer contract damages and
4   injuries totaling at least $6,345,399.97, which the district judge or a jury can resolve in
5   accordance with the Prayer for Relief, *infra*.

6   **SECOND CLAIM FOR RELIEF**
7   **[Breach of the Implied Covenant of Good Faith and Fair Dealing]**
8   **[By Williams & Cochrane and Against Quechan]**

9   212. Williams & Cochrane incorporates by reference the preceding general allega-
10  tions as if set forth in full.

11  213. The implied covenant of good faith and fair dealing imposes basic duties that
12  inhere in all contracts. *See Talden Inv. Co. v. Comerica Mortg. Corp.,* 1990 U.S. Dist.
13  LEXIS 19951, *47 (N.D. Cal. 1990) (citing Restatement (Second) of Contracts § 205
14  (1981)). These duties require that a party to a contract not act in an opportunistic or bad
15  faith manner that will deprive the other party of the benefits of the agreement. *See, e.g.,*
16  *Mitchell v. Exhibition Food, Inc.,* 184 Cal. App. 3d 1033, 1043 (1986). The term "bad
17  faith" is what courts consider an "excluder phrase" that is "without general meaning (or
18  meanings) of its own and serves to exclude a wide range of heterogeneous forms of bad
19  faith." *Price v. Wells Fargo Bank,* 213 Cal. App. 3d 465, 479 (1st Dist. 1989) (citation
20  omitted). While "a complete catalogue of types of bad faith is impossible" (Restatement
21  (Second) of Contracts § 205 cmt. d (1981)), judicial decisions have long recognized that
22  conduct that seeks to evade the spirit of the bargain is basic bad faith. *See id.* This princi-
23  ple means, *inter alia*, that "where a contract confers on one party a discretionary power
24  affecting the rights of the other, a duty is imposed to exercise that discretion in good faith
25  and in accordance with fair dealing." *Okun v. Morton,* 203 Cal. App. 3d 805, 820 (2d
26  Dist. 1988) (quoting *Cal. Lettuce Growers v. Union Sugar Co.,* 45 Cal. 2d 474 (1955)).

27  214. Quechan and Williams & Cochrane executed the Attorney-Client Fee Agree-
28  ment as is discussed in the First Claim for Relief, *supra*.

215. The Attorney-Client Fee Agreement explains that Quechan "may discharge [Williams & Cochrane] at any time," but it will still have to pay the contingency fee if the tribe has become "entitled" to a "credit, offset, or other reduction in future compact payments to the State in a successor compact (whether new or amended) as a result of" its past, excess payments under the 2007 Amendment. *See, e.g.,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 758 (2002) (defining "entitle" as "furnish with proper grounds for seeking or claiming something"). Even if this is not the case, the Attorney-Client Fee Agreement still requires Quechan to pay the firm a "reasonable fee for the legal services provided in lieu of the contingency fee," which primarily turns upon "[t]he amount of the fee in proportion to the value of the services performed."

216. However, in this case, putative Quechan President Keeny Escalanti caused to be transmitted to Williams & Cochrane a letter on July 27, 2017 that terminated the firm just three days before the end of the negotiations and the planned execution date for the resultant compact, explaining that the tribe would "not pay any contingency fee or 'reasonable fee for the legal services provided in lieu' thereof." Despite this, the putative Quechan President demanded that Williams & Cochrane turn over the latest draft compact to Robert Rosette using threats of legal action so this substitute attorney could simply step in as the attorney of record and have the tribe sign the compact that Williams & Cochrane negotiated. This course of conduct blatantly evades the spirit of the bargain, especially when a court takes into account that the point persons for both the Tribal Council and Quechan Casino Resort had informed Cheryl Williams in the weeks leading up to the transmission of the June 26th termination letter ███████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████.

217. Quechan's breach of the implied covenant of good faith and fair dealing that inheres in the Attorney-Client Fee Agreement has caused Williams & Cochrane to suffer

contract damages and injuries totaling at least $6,345,399.97, which the district judge or a jury can resolve in accordance with the Prayer for Relief, *infra*.

## THIRD CLAIM FOR RELIEF

**[Violation of the Lanham Act – Robert Rosette's False Advertising about the *Pauma* Suit (15 U.S.C. § 1051 *et seq*.)]**

**[By Williams & Cochrane and Against Robert Rosette; Rosette & Associates, PC; and Rosette, LLP]**

218. Williams & Cochrane incorporates by reference the preceding general allegations as if set forth in full.

219. The Lanham Act provides in relevant part that:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any… false or misleading description of fact, or false or misleading representation of fact, which –

[…]

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a). Thus, a claim for false advertising under the Lanham Act requires a plaintiff to show five things akin to: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." *Skydive Ariz., Inc. v. Quattrocchi,* 673 F.3d 1105, 1110 (9th Cir. 2012).

220. Robert Rosette has a literally false representation of fact on the website for his firm Rosette, LLP (of which Rosette & Associates, PC is a general partner), which advertises to the general public and all potential clients in the Indian law field that "Mr. Ros-

ette… successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California against then Governor Schwarzenegger." This statement is unequivocally false, though, given that the attorneys for Williams & Cochrane (*i.e.*, Cheryl Williams and Kevin Cochrane) were counsel of record in that matter from June 2010 till the conclusion of the case in September 2016, and responsible for upholding the preliminary injunction, rescinding the tribe's 2004 Amendment on the basis of a claim they added to the complaint in September 2011, and obtaining $36.3 million as restitution for the excess payments the tribe made to the State of California under its amendment. In fact, according to his own deposition testimony, Robert Rosette admits that he only had the case for forty-five days, during which time he filed one substantive brief that resulted in the Ninth Circuit overturning the preliminary injunction Cheryl Williams and Kevin Cochrane had obtained the tribe, thus leaving the tribe with no interim or final remedies as a result of his short-lived representation in the case. Not only that, but Robert Rosette's deposition testimony also reveals that Mr. Rosette did not even know what was happening in the *Pauma* case as of October 2010 – a mere four months after his termination, eleven months before Williams & Cochrane added the claim to the complaint on which Pauma would ultimately prevail, and almost six years before the case would finally conclude.

221. This website advertisement by Robert Rosette about his involvement in the Pauma litigation (which, he admits, is also part of his promotional materials) appears to have actually deceived Quechan President Keeny Escalanti and putative Councilmember Willie White, as they concocted a scheme to have Mr. Rosette (*i.e.,* the one other attorney who was supposedly responsible for litigating the case on which their dispute was, in part, based) replace Williams & Cochrane right on the cusp of the negotiations concluding. Moreover, this advertisement would also deceive most other tribal leaders not affiliated with Pauma in the normal course because the attorney information for the *Pauma* suit is largely hidden behind the paywalls for the federally-run PACER site, and Robert Rosette is capable of producing early court filings to substantiate his supposed claim

given that his firm represented Pauma for nine months at the outset of the case, from the filing of the complaint on September 4, 2009 to approximately June 13, 2010.

222. Robert Rosette also caused this literally false statement of fact to enter interstate commerce by putting it on his website and keeping it there for four years now.

223. The abovenamed Rosette defendants' violation of the Lanham Act has caused Williams & Cochrane to suffer contract damages and injuries totaling at least $6,345,399.97, which the district judge or a jury can resolve in accordance with the Prayer for Relief, *infra*.

### FOURTH CLAIM FOR RELIEF

**[Conspiring to Violate and/or Violating the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 *et seq*.)]**

**[By Williams & Cochrane and Against Robert Rosette; Rick Armstrong; Rosette & Associates, PC; and Does 1 through 100]**

224. Williams & Cochrane incorporates by reference the preceding general allegations as if set forth in full.

225. A *prima facie* RICO case requires that the plaintiff show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Avalos v. Baca,* 596 F.3d 583, 592 (9th Cir. 2010) (citing *Miller v. Yokohama Tire Corp.,* 358 F.3d 616, 620 (9th Cir. 2004)). A "pattern" of racketeering activity requires proof of "at least two [predicate] acts of racketeering activity" within ten years of each other. *See* 18 U.S.C. § 1961(5). A predicate act of racketeering activity is defined as any act indictable under specified provisions of Title 18 of the United States Code, "and includes the predicate acts of mail [and] wire fraud." *Cochran Firm P.C. v. McMurray,* 2014 U.S. Dist. LEXIS 194663, *17 (C.D. Cal. 2014) (quoting *Turner v. Cook,* 362 F.3d 1219, 1229 (9th Cir. 2004)). In passing RICO, Congress mandated that "the provisions of this title shall be liberally construed to effectuate its remedial purposes." *See* Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 904(a), 84 Stat. 947 (1970).

226. A RICO conspiracy claim is governed by traditional concepts of conspiracy

law, and "should not require anything beyond that required for a conspiracy to violate any other crimes." *United States v. Neapolitan,* 791 F.2d 489, 497 (7th Cir. 1986)). Thus, "[i]t is the mere agreement to violate RICO that [the statute] forbids; it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy," *Oki Semiconductor Co. v. Wells Fargo Bank, N.A.,* 298 F.3d 768, 774-75 (9th Cir. 2002)). The illegal agreement need not be express "so long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Id.* at 775. Proving a RICO conspiracy means that "[a]ll conspirators are liable for the acts of their co-conspirators." *Id.*

227. The abovenamed Rosette defendants are individuals and business entities that are associated in fact and have either conspired to participate in or participated in and/or conducted an enterprise that has sought to fraudulently interfere with Williams & Cochrane's contracts (often to commit fraud against the firm's tribal clients) using the mail and wires and other specifically-identified offenses in 18 U.S.C. § 1961.

228. As to this, each of the abovenamed Rosette defendants has engaged in at least two predicate acts of mail or wire fraud under 18 U.S.C. §§ 1341 and 1343, respectively, over the last ten years, which includes the below defendants using said mails and wires:

**Robert Rosette (along with Rosette & Associates, PC)**

(a) On or about May 15, 2010, to interfere with Cheryl Williams & Kevin Cochrane's relationships with existing clients by telling them fraudulent falsehoods like they had both been terminated on account of abject incompetence and Kevin Cochrane was a "deviant homosexual" (*see* ¶123);

(b) On or about May 15, 2010, to conspire and commit to interfere with any and all future contracts secured by Cheryl Williams and Kevin Cochrane, including through the use of fraudulent means (*see* ¶ 124);

(c) On or about August 11, 2010, to interfere with Williams & Cochrane's existing and proposed contracts with La Pena Law by falsely and fraudulently claiming he was responsible for litigating the *Pauma* case (*see* ¶ 147);

(d) On or about August 12, 2010, to interfere with Williams & Cochrane's existing and proposed contracts with La Pena Law by falsely claiming Cheryl Williams and Kevin Cochrane represented a tribe near Shingle Springs Rancheria and were thus conflicted out from the representation (*see* ¶ 148);

(e) On or about August 12, 2010, to interfere with Williams & Cochrane's existing and proposed contracts with La Pena Law by falsely claiming Cheryl Williams and Kevin Cochrane had been publicly and rather widely bragging that they had just been hired by Shingle Springs to exclusively take on the tribe's rather sensitive compact work (*see* ¶ 148);

(f) On or about July 26, 2011, to direct Richard Armstrong to e-mail the State's negotiator to try and settle Pauma's compact suit even though his firm did not represent the tribe in the matter and had not been so retained (*see* ¶ 154);

(g) On or about July 27, 2011, to communicate with the State's negotiator and falsely claim that Pauma desired to settle its compact lawsuit through negotiations using him (*see* ¶ 157);

(h) Beginning on or about March 18, 2013, to post a false advertisement on his website that he "successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California" (*see* ¶ 132);

(i) Countless times since March 18, 2013, to disseminate promotional materials to actual and prospective clients in the admitted "ordinary course of business" that contain identical representations that Mr. Rosette "successfully litigated a case saving the Pauma Band of Luiseno Mission over $100 Million in Compact payments allegedly owed to the State of California" (*see* ¶ 171);

(j) Shortly before June 16, 2017, to disseminate or arrange to disseminate these promotional materials to putative Quechan President Keeny Escalanti and putative Councilmember Willie White for the June 16, 2017 meeting (*see* ¶ 172);

(k) On or about June 26, 2017, to author and arrange to transmit the letter purportedly terminating the Attorney-Client Fee Agreement even though Rosette, LLP did not officially represent Quechan then (*see* ¶¶ 92, 173);

(l) On or about June 27, 2018, to direct an associate attorney in the Sacramento office to e-mail Cheryl Williams in an attempt to get the final draft compact even though Rosette, LLP did not officially represent Quechan then (*see* ¶ 100);

(m)   Repeatedly between June 27, 2017 and June 30, 2017, to communicate with representatives of the California Office of the Governor in order to take over Quechan's compact negotiations even though Rosette, LLP did not officially represent Quechan then (*see* ¶ 105);

(n) On or about June 30, 2017, to author and arrange to transmit the demand for cease and desist to Williams & Cochrane in order to get the final draft compact even though Rosette, LLP did not officially represent Quechan then (*see* ¶ 201);

(o) On or about January 15, 2018, to author a fraudulent, backdated resolution to make it appear that the Quechan Tribal Council had hired Rosette, LLP as of June 27, 2017 – a date on which Robert Rosette could not produce the resolution when requested by the Office of the Attorney General (*see* ¶ 201);

(p) Repeatedly during the latter part of March 2018, to falsely tell the State's Senior Advisor for Tribal Negotiations Joe Dhillon that the attorneys of Williams & Cochrane had made a number of vicious personal attacks against his character (*see* ¶ 179); and

(q) Repeatedly between October 13, 2018 and November 1, 2018 to communicate with Michelle La Pena to arrange for her to join his firm as a partner on the conditions that she testify in the manner desired by Mr. Rosette in the instant case and further destroy any relevant files from her prior firm, including any damaging communications concerning Kevin Cochrane, Cheryl Williams, or Williams & Cochrane (*see* ¶ 186).

**Richard Armstrong (along with Rosette & Associates, PC)**

(a) On or about May 15, 2010, to interfere with Cheryl Williams & Kevin Cochrane's relationships with existing clients by telling them fraudulent falsehoods like they had both been terminated on account of abject incompetence and Kevin Cochrane was a deviant homosexual (*see* ¶123);

(b) On or about May 15, 2010, to conspire and commit to interfere with any and all future contracts secured by Cheryl Williams and Kevin Cochrane, including through the use of fraudulent means (*see* ¶ 124);

(c) On or about July 26, 2011, to e-mail the State's negotiator to falsely claim the Pauma Tribal Council desired a meeting to discuss its compact when he was not even retained on the matter or for such purpose (*see* ¶ 156);

(d) On or about July 27, 2011, to e-mail the State's negotiator to falsely claim that Pauma wanted "to meet without their attorneys present… with the goal of settling the pending lawsuit" when he was not even retained on the matter or for such purpose (*see* ¶ 154);

(e) On or about June 26, 2017, to arrange, or assist in arranging, to send the letter purportedly terminating the Attorney-Client Fee Agreement even though Rosette, LLP did not officially represent Quechan then (*see* ¶¶ 173, 201);

(f) On or about June 27, 2017, to direct a subordinate associate to e-mail Cheryl Williams in an attempt to get the June 21st draft compact even though Rosette, LLP did not officially represent Quechan then (*see* ¶ 100);

(g) On or about June 30, 2017, to arrange, or assist in arranging, to send the demand for cease and desist even though Rosette LLP did not officially represent Quechan then (*see* ¶ 201);

(h) On or about January 15, 2018, to author a fraudulent, backdated resolution to make it appear that the Quechan Tribal Council had hired Rosette, LLP as of June 27, 2017 – a date on which Robert Rosette could not produce the resolution when requested by the Office of the Attorney General (*see* ¶ 201);

(i) Repeatedly during the latter part of March 2018, to falsely tell the State's Sen-

ior Advisor for Tribal Negotiations Joe Dhillon that the attorneys of Williams & Cochrane had made a number of vicious personal attacks against his character (*see* ¶ 179); and

(j) Repeatedly between October 13, 2018 and November 1, 2018, to communicate with Michelle La Pena to arrange for her to join Rosette, LLP as a partner on the conditions that she testify in the manner desired by Mr. Rosette in the instant case and further destroy any relevant files from her prior firm, including any damaging communications concerning Kevin Cochrane, Cheryl Williams, or Williams & Cochrane (*see* ¶ 186).

229. Furthermore, Robert Rosette, Richard Armstrong, and Rosette & Associates PC have committed further predicate acts in an attempt to obstruct justice under 18 U.S.C. § 1503 by corruptly endeavoring to influence the State's Senior Advisor for Tribal Negotiations to testify in a partial manner (*see* ¶ 179), corruptly endeavoring to influence Michelle La Pena to testify in the desired manner and/or destroy material evidence concerning the merits of this claim (*see* ¶ 186), and, with respect to Mr. Rosette, endeavoring to influence Williams & Cochrane to not proceed with the present suit using threats of force and/or a threatening communication (*see* ¶ 180).

230. In addition, Robert Rosette has committed two further predicate acts in an attempt to tamper with a witness, victim, or an informant under 18 U.S.C. § 1512 by telling both Cheryl Williams and Kevin Cochrane that he was going to "hurt them" or "get them" if, as it appeared, they continued to prosecute the action and provide any testimony therein (*see* ¶ 180).

231. The aforementioned predicate acts and others evidence an eight-year scheme to defraud Williams & Cochrane that those involved with Rosette, LLP had the specific intent to carry out, and did in fact carry out.

232. The abovenamed Rosette defendants' violations of the Racketeer Influenced and Corrupt Organizations Act have caused Williams & Cochrane to suffer contract damages and injuries in an amount to be proven at trial, which the district judge or a jury

can resolve in accordance with the Prayer for Relief, *infra*.

## FIFTH CLAIM FOR RELIEF

**[Conspiring to Violate the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 *et seq*.)]**

**[By Named Quechan General Councilmembers on Behalf of Themselves and All Others Similarly Situated and Against Robert Rosette; Rick Armstrong; Rosette & Associates, PC; and Does 1 through 100]**

233. The named Quechan General Councilmembers incorporate by reference the preceding general allegations as if set forth in full.

234. Pursuant to Federal Rule of Civil Procedure 23, the named Quechan General Councilmembers bring this claim on behalf of themselves and all those similarly situated, who together form a class that is initially defined as follows:

> **Exploited Class:** All persons who are enrolled members of the Quechan Tribe of the Fort Yuma Indian Reservation that did not serve on the Tribal Council and did not have their individual interests represented by Robert Rosette from on or about March 15, 2017 to the filing date of this complaint.

235. Sufficient justification exists for allowing the Quechan General Councilmembers to proceed as a class, including the following showings under the Federal Rules of Civil Procedure:

(a) **Numerosity (Fed. R. Civ. P. 23(a)(1)).** On information and belief, the Quechan tribe is comprised of more than 3,200 members, which makes the class members so numerous that joinder is impractical;

(b) **Predominance of Common Questions of Law and Fact (Fed. R. Civ. P. 23(a)(2)).** The entire fact pattern at issue involves one common set of actions that affected all the members of the Quechan General Council in the same manner, which means that common questions of fact and law should not only predominate but control;

(c) **Typicality (Fed. R. Civ. P. 23(a)(3)).** The claims of the named Quechan General Councilmembers are typical of those of the entire class since each was a member of the entity that Rosette, without authority, exploited;

(d) **Adequacy of Representation (FED. R. CIV. P. 23(a)(4)).** Williams & Cochrane is not just adequate, but the best representation for the proposed class since it can effectively identify the typical and actual actions that Robert Rosette and his firm undertake to exploit Indian tribes. Plus, in addition to being competent to handle the representation, Williams & Cochrane intends to prosecute the action vigorously and has interests that align with, and are not antagonistic to the class. To that end, Williams & Cochrane will structure the case so as to protect the class' interests if any actual or perceived conflict exists; and

(e) **Superiority (FED. R. CIV. P. 23(b)(3)).** A class action is the superior method for handling claims of this nature for a multitude of reasons, including the sheer number of members in the tribe, the cost and difficulty of pursuing individual actions, and the fact that the Tribal Council has been compromised by Robert Rosette and is thus unable to press these issues on the General Council's behalf. Further, many class members are hesitant to serve as named plaintiffs out of the now very real fears of disenrollment, banishment, and other forms of retaliation.

236. The law related to a RICO conspiracy claim is set forth in paragraph 225 and is hereby reincorporated by reference as if set forth in full.

237. The abovenamed Rosette defendants are individuals and business entities that are associated in fact and have either conspired to participate in or conduct an enterprise aimed at fraudulently abusing the finances of the tribe in pursuit of a sham online payday lending business or for some other elicit end.

238. As to this, each of the abovenamed defendants – that is Robert Rosette, Richard Armstrong, Rosette & Associates, PC, and other yet-to-be-identified "Doe" individuals or entities (as footnote 33 indicates) – has engaged in at least two predicate acts of mail or wire fraud under 18 U.S.C. §§ 1341 and 1343, respectively, over the last ten years, which includes using said mails and wires:

(a) On or about March 15, 2017, to instruct Willie White to explain at his first Tribal Council meeting that the Tribal Council had decided to discontinue Per

Capita payments altogether going forward (*see* ¶ 195);

(b) On or about March 15, 2017, to assist in the cutting off of Per Capita and minor trust account payments to the general membership of Quechan despite the Tribe having $3,000,000 in extra revenue (now over $7,000,000) from not paying revenue sharing to the State of California from July 2016 onwards (*see* ¶¶ 196);

(c) On a regular basis from April 2017 to the filing date of the complaint, to assist in withholding upwards of 63,529 financial distributions to the roughly 2,565 adult and 1,172 minor general members of Quechan (*see* ¶ 197);

(d) On or about April 18, 2017, to author and assist in the false certification to the Arizona Department of Gaming that Quechan was complying with its Tribal Revenue Allocation Plan by using 40% of the net gaming revenues for Per Capita payments when in reality it was not (*see* ¶ 198);

(e) On or about May 2017, to author and assist in the similarly false certification to the National Indian Gaming Commission that Quechan was complying with the percentages in its Tribal Revenue Allocation Plan when it was not (*see* ¶ 199);

(f) On or about April 2018, to author and assist in the similarly false certification to the Arizona Department of Gaming that Quechan was complying with the per-centages in its Tribal Revenue Allocation Plan when it was not (*see* ¶ 199);

(g) On or about May 2018, to author and assist in the similarly false certification to the National Indian Gaming Commission that Quechan was complying with the percentages in its Tribal Revenue Allocation Plan when it was not (*see* ¶ 199);

(h) At least once during 2017 and 2018, to assist in the distribution of substantially less money from a minor's trust account to a newly-adult beneficiary than should have been available (*see* ¶ 200);

(i) On or about June 26, 2017, to author and assist in the June 26, 2017 letter purportedly terminating the Attorney-Client Fee Agreement even though Ros-ette, LLP did not officially represent Quechan then (*see* ¶ 201);

(j) On or about June 27, 2018, to direct an associate attorney in the Sacramento

office to e-mail Cheryl Williams in an attempt to get the final draft compact even though Rosette, LLP did not officially represent Quechan then (*see* ¶ 100);

(k) Repeatedly between June 27, 2017 and June 30, 2017, to communicate with representatives of the California Office of the Governor in order to take over Quechan's compact negotiations even though Rosette, LLP did not officially represent Quechan then (*see* ¶ 201);

(l) On or about June 30, 2017, to author and assist in the June 30, 2017 demand for cease and desist to Williams & Cochrane in order to get the final draft compact even though Rosette, LLP did not officially represent Quechan then (*see* ¶ 201);

(m) On or about January 15, 2018, to author and assist in a fraudulent, backdated resolution to make it appear that the Quechan Tribal Council had hired Rosette, LLP as of June 27, 2017 – a date on which Mr. Rosette could not produce the resolution when requested by the Office of the Attorney General (*see* ¶ 201);

(n) On or about January 17, 2018, to author and assist in notices for the recall election that indicated with a checkmark in a box labelled "No," the total number of voters in the election did not meet some supposed threshold requirement of the tribal constitution (*see* ¶ 202);

(o) On or about January 17, 2018, to direct Keeny Escalanti and Willie White to shut down Quechan's longstanding tribal court using the falsehood that the tribal court building had a faulty foundation which prevented the tribe from operating a tribal court in any fashion (even in a separate building) (*see* ¶ 203);

(p) On or about November 2018, to instruct Keeny Escalanti and Willie White to tell tribal members at large the misrepresentation that the Quechan General Councilmembers involved in this suit had not only sued Robert Rosette and his firm but the tribe as well, in the hopes that doing so would discredit these individuals within the tribe and ensure that Mr. Rosette's tribal confidantes would win the next election (*see* ¶ 204); and

(q) On or about November 2018, to instruct Keeny Escalanti and Willie White to,

once again, act outside the scope of their lawful authority by disqualifying – or causing to disqualify – four-plus challengers running for seats on the Tribal Council who are either proposed class members or sympathetic to them using false grounds, such as they had supposedly submitted an application with an illegible signature or did not satisfy a residency requirement (*see* ¶ 204).

239. The aforementioned predicate acts and others evidence a year-long conspiracy by the named defendants to take the necessary actions to use the public funds of the tribe for their own personally enrichment rather than the tribe generally.

240. The abovenamed Rosette defendants' conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act has caused the proposed class of Quechan General Councilmembers damages and injuries in an amount to be proven at trial, which the district judge or a jury can resolve in accordance with the Prayer for Relief, *infra*.

## PRAYER FOR RELIEF

**WHEREFORE**, Williams & Cochrane prays as follows:

1. That the Court award contract damages against the Quechan Tribe of the Fort Yuma Indian Reservation in an amount of at least **$6,345,399.97**;

2. That the Court award any other non-monetary relief (whether equitable or legal in nature) against Quechan on the contract claims as needed or otherwise requested;

3. That the Court award any other remedies against Quechan that the tribe affirmatively requested in its Answer (*see* Dkt. No. 94, 24:3-16), including "compensatory and punitive damages," "pre-judgment and post-judgment interest," "restitution," "disgorge-[ment]," "offset/recoupment," and "costs and expenses;"

4. That the Court award treble damages under the Lanham Act in an amount of at least **$19,036,199.91** against the indicated Rosette defendants for the false advertisement(s) about the *Pauma* lawsuit, as well as require the disgorgement of any of the direct or indirect profits that they may have obtained as a result of such advertisement(s);

5. That the Court award injunctive relief under the Lanham Act against the indicated Rosette defendants to block further false advertisements about the *Pauma* suit; and

6. That the Court award treble damages under the RICO/conspiracy to commit RICO claim in an amount to be proven at trial against the indicated Rosette defendants.

**WHEREFORE**, the named Quechan General Councilmembers pray as follows:

7. That the Court certify their claim to proceed as a class action; and

8. That the Court award treble damages under the conspiracy to commit RICO claim in an amount to be proven at trial against the indicated Rosette defendants.

**WHEREFORE**, all the plaintiffs pray as follows:

9. That the Court award pre- and post-judgment interest on any monetary awards at the maximum rate or rates permitted under State law;

10. That the Court award reasonable attorney fees as allowed by law (including statutes like RICO and the Lanham Act) or equity;

11. That the Court award the costs of suit as allowed by law (including statutes like RICO and the Lanham Act) or equity; and

12. That the Court award such other and further legal or equitable relief as it deems appropriate, as justice requires, or as the law allows.

RESPECTFULLY SUBMITTED this 6th day of December, 2018

WILLIAMS & COCHRANE, LLP, *et al.*

By: */s/ Kevin M. Cochrane*
Cheryl A. Williams
Kevin M. Cochrane
caw@williamscochrane.com
kmc@williamscochrane.com
WILLIAMS & COCHRANE, LLP
125 S. Highway 101
Solana Beach, California 92075
Telephone: (619) 793-4809