8    UNITED STATES DISTRICT COURT

9    SOUTHERN DISTRICT OF CALIFORNIA

10

11   WILLIAMS & COCHRANE, LLP; and
     FRANCISCO AGUILAR, MILO
12   BARLEY, GLORIA COSTA, GEORGE
     DECROSE, SALLY DECORSE, et al., on
13   behalf of themselves and all others
     similarly situated,
14
15                           Plaintiff,
16   v.
17   QUECHAN TRIBE OF THE FORT
18   YUMA INDIAN RESERVATION;
     ROBERT ROSETTE; ROSETTE &
19   ASSOCIATES, PC; ROSETTE, LLP;
     RICHARD ARMSTRONG; KEENY
20   ESCALANTI, SR.; MARK WILLIAM
     WHITE II, a/k/a WILLIE WHITE; and
21   DOES 1 THROUGH 100,
22
23                           Defendant.
24
25
26
27
28

Case No.:  3:17-cv-01436-GPC-MDD

**ORDER**

**(1) GRANTING QUECHAN DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' REPLY CLAIM**

**[ECF Nos. 184]**

Plaintiff/Counter-Defendant Williams & Cochrane ("W&C") is a law firm that specializes in Indian law. Defendant/Counter-Plaintiff Quechan Tribe of Fort Yuma Indian Reservation ("Quechan" or "the Tribe") hired W&C to negotiate with the State of California on its behalf regarding the Tribe's gaming compact. After months of negotiations, Quechan terminated W&C, refused to pay any contingency fee, hired Defendants Richard Armstrong, Robert Rosette, Rosette & Associates, and Rosette, LLP (collectively, the "Rosette Defendants"), and subsequently demanded that W&C hand over the Tribe's case file.

In this litigation, W&C sued Quechan for terminating W&C and refusing to pay the attorneys' fees W&C claims it is owed under their agreement. The Tribe filed counterclaims against W&C, contending that W&C's representation was deficient and that the firm has refused to turn over Quechan's case file as required by law. W&C initially responded by moving to strike Quechan's answer, and the Court denied that motion. W&C next sought to dismiss Quechan's counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(1), for lack of jurisdiction and Rule 12(b)(6) for failure to state a claim. The Court again denied that motion on the basis that (1) Quechan had sufficiently alleged an injury and causation to establish Article III standing; and (2) W&C's 12(b)(6) arguments were procedurally improper because they were not raised in its prior Rule 12(f) motion to strike. On December 10, 2018, W&C filed an answer to the Tribe's counterclaims that contained a "reply claim" for tortious breach of contract against the Quechan, Keeny Escalanti, Sr., and Mark White II (collectively, the "Quechan Defendants"). ECF No. 179 at 6.

Now before the Court is the Quechan Defendants' motion to dismiss W&C's "Reply claim" in Plaintiff's answer to the Tribe's counterclaims pursuant to Rule 12(f) and 12(b)(6). ECF No. 184. For the reasons stated below, the Court **GRANTS** the Quechan Defendants' Motion to Dismiss Plaintiffs' 'Reply Claim.'

## BACKGROUND

### I.    Factual Background

#### a.   Quechan Hires W&C for Compact Negotiations

The following factual allegations are taken from Quechan's Counterclaims and the

facts alleged in W&C's "reply claim."  Quechan is a federally-recognized Indian tribe

located along the Colorado River.  ECF No. 94 ¶¶ 14, 20.  Its operations and the majority

of the reservation land is in California.  *Id.* ¶ 20.  The Tribe negotiated gaming compacts

with the State of California in 1998 and 2006.  *Id.* ¶ 22.  In the summer of 2016, the

Tribal Council of Quechan sought representation to reduce its payment obligations to the

State under the compact amendment it had signed in 2006 ("2006 Amendment").  *Id.* ¶

23.  The Tribe had owed approximately $4 million to the State under that amendment.

*Id.* ¶ 3.  After another tribe successfully reduced the underpayments that it owed to the

State, Quechan's Tribal Council contacted W&C, a law firm in California.  *Id.* ¶¶ 16, 24.

Cheryl Williams and Kevin Cochrane are attorneys at W&C.

In September 2016, the Tribe hired W&C for representation in gaming compact

negotiations and for resolution of the Tribe's underpayments.  Subsequently, the parties

executed an Attorney-Client Fee Agreement.  *Id.* ¶ 25.  The Fee Agreement provided that

the Tribe would pay W&C a fixed monthly fee of $50,000 for its services as well as a

separate contingency fee structure dependent on the monetary reduction of its

underpayments and the successful execution of a new gaming compact.  *Id.* ¶ 26.  The

Fee Agreement also provided that the Tribe could terminate its relationship with W&C at

any time.  *Id.* In addition, the Fee Agreement dictated that the Tribe may have access to

its case file upon request at any reasonable time, and that at the end of the engagement,

the Tribe may request the return of its case file.  *Id.*

#### b.   Q&C Begins Negotiations with California as Quechan's Counsel

1    The initial compact negotiations between Quechan and the State began on

2    November 9, 2016.  *Id.* ¶ 27.  On December 6, 2016, the State provided to W&C an

3    initial discussion draft of a gaming compact for the Tribe.  On December 14 and

4    December 28, 2017, Ms. Williams sent the draft compact to Michael Jackson, Sr., who

5    was then President of Quechan.  *Id.* ¶ 29.  W&C asserted that the draft compact was "as

6    good as it can get from a financial perspective" and that the "vast majority of the draft

7    compact was boilerplate."  *Id.*

8         On January 11, 2017, Ms. Williams sent the State a letter requesting that they and

9    the California Gambling Control Commission ("CGCC") refrain from enforcing the

10   Tribe's payments obligations under the 2006 Amendment, i.e. the underpayments.  *Id.* ¶

11   31.  On January 18, 2017, the State responded that it did not have the legal authority to

12   excuse the Tribe's payment obligations.  *Id.* ¶ 31.  Afterwards, W&C met with the State

13   on January 31, 2017, for further negotiations.  *Id.* ¶ 32.  As of that date, W&C had not

14   provided a revised draft to the State in response to the State's December 6, 2016 initial

15   discussion draft.  *Id.*  In an email dated February 3, 2017, Ms. Williams claimed that

16   W&C had the legal and textual authority to support the Tribe making reduced payments

17   to the State under the 1999 compact terms.  *Id.* ¶ 33.  Ms. Williams also stated that

18   California agreed to increase Quechan's gaming machine limit by 100, but other issues

19   would take some time to iron out and W&C would work hard to redline the draft

20   compact.  *Id.*

21        At some point near the end of March or beginning of April 2017, Ms. Williams

22   sent a letter to the Tribal Council asserting that W&C had done its best to buy time to

23   keep the December draft compact offer on the table.  *Id.* ¶ 34.  W&C further reported to

24   the Tribe that negotiations with the State would continue and that the CGCC sought the

25   payments that the Tribe owed.  *Id.*  Quechan alleges that W&C did very little or no work

26   at all between December 2016 to that time.  *Id.*  Quechan further alleges that W&C made

27

28                                    4

this representation to induce the Tribe into maintaining its relationship with W&C and force the Tribe to continue paying the fixed monthly legal fees required under the attorney-client agreement. *Id.*

On April 13, 2017, Ms. Williams emailed the State a revised draft compact. *Id.* ¶ 35. This draft was nearly identical to the State's December 2016 draft. *Id.* In May 2017, the State and W&C exchanged compact drafts. *Id.* ¶ 36. On June 9, 2017, Mr. Cochrane emailed the CEO of Quechan's casinos and explained that the compact would be ready to sign within the following week. *Id.* ¶ 37. Quechan alleges that this statement was not true, as the State was not ready to sign any draft of the compact in existence at that time. *Id.*

W&C and the State met on June 14, 2017. *Id.* ¶ 38. W&C sent the State a revised compact draft on June 21, 2017. *Id.* This was not a final draft and the State was not prepared to sign it. This draft did not address the underpayment issue; furthermore, there was a litany of other unresolved issues. *Id.* According to W&C, however, this version was near-final and was based on the State's offer for a twenty-five year gaming contract that would dispense with all revenue sharing aside from costs that would simply cover the tribe's *pro rata* share for Indian gaming regulation by the State. ECF No. 179 at 4. In addition, W&C asserts that the tribe and firm would meet on or about June 30, 2017 so that the Tribe could sign and execute the compact. *Id.*

### c. Quechan Has Concerns with W&C and Hires New Counsel

Back in April 2017, the Quechan Tribal Council reviewed the status of the negotiations and W&C's work. ECF No. 94 ¶ 39. It was clear to the Tribal Council that W&C was not diligently pursuing negotiations and that W&C was having difficulties in the negotiations. *Id.* W&C had recommended retaining a lobbyist in Sacramento, for an additional fee, to assist getting the compact approved. *Id.* The Tribal Council was also

concerned with the fact that the underpayment issue was unresolved, as the drafts exchanged to that point did not deal with that issue. *Id.*

Based on these concerns, coupled with Quechan's fixed payment of $50,000 a month to Q&C, the Tribal Council started to explore the possibility of hiring new counsel to replace W&C. *Id.* ¶ 40. Because the Tribal Council was dissatisfied with W&C's fees and performance, it invited Robert Rosette, and Indian law attorney, to discuss the possibility of Rosette, LLP (Mr. Rosette's firm) representing the Tribe in compact negotiations. *Id.* ¶ 43. After meeting with Mr. Rosette, the Tribal Council hired him on June 26, 2017. *Id.*

### d. Aftermath of W&C's Termination

Also on June 26, 2017, Quechan President Escalanti sent W&C a letter terminating the firm's representation. *Id.* ¶ 44. In this letter, Escalanti asked W&C to transmit the Tribe's entire case file and most recent draft compact to its new counsel, Rosette LLP. ECF No. 94 ¶ 44. Escalanti further explained that the Tribe would not pay any contingency fee or additional reasonable fee in lieu for the legal services provided. Escalanti's letter stated that the W&C had failed to produce better-than-boilerplate terms in its negotiations with the State and appeared not to have dedicated the amount of time and labor that would justify monthly flat fee that had been paid. ECF No. 179 at 3-4. In addition, Escalanti noted that that confidentiality provisions of the Attorney-Client Fee Agreement would prevent W&C from disclosing any aspects of the matter to "any employee, officer, or official of the tribe or any subdivision agency, or enterprise of the Tribe." *Id.* The letter also "strongly advise[d]" W&C "against pressing your luck further out of concern for the reputation of your firm in Indian Country and the State of California." *Id.*

On June 30, 2017, President Escalanti sent another letter to W&C demanding its case file and most recent draft compact. *Id.* In this letter, Mr. Escalanti stated that

"[s]hould you continue your obstruction of the Tribe's interests, the Tribe will be left with no other choice than to pursue the legal remedies available to it. We trust that the Firm will see the wisdom in promptly complying with these demands." ECF No. 179 at 5. In conclusion, the letter added that "[t]hrough its decades of dealings with numerous attorneys and law firms across the county, the Tribe has not witnessed these types of outlandish actions or this level of unprofessionalism as it has from your Firm." *Id.* W&C believes that these letters were disseminated in at least some capacity by Escalanti and Councilmember Willie White to multiple representations in the Office of the Governor and tribal members from at least one of the Firm's other tribal clients. *Id.*

W&C eventually sent the most recent draft compact but has refused to send the case file or any time records. ECF No. 94 ¶ 47.

Rosette LLP proceeded to conduct negotiations on behalf of the Tribe, even though it did not have access to the full case file. *Id.* ¶ 48. In July 2017, Rosette, LLP submitted to the State the first of several draft compacts. *Id.* ¶ 49. On August 4, 2017, Mr. Rosette met with the State to discuss the terms of the compact. Over the following weeks, the parties discussed a multitude of issues, including the $4 million underpayment owed to the State under the 2006 Amendment. *Id.* Ultimately, the parties resolved this issue, agreeing that the Tribe would pay the state half of the amount owed. *Id.* ¶ 50. In late August 2017, negotiations concluded, and Quechan obtained significant benefits beyond what W&C had been able to achieve. *Id.* ¶ 52. The parties then signed the amended compact in August 2017. *Id.*

## II.    Procedural History

On March 2, 2018, W&C filed its First Amended Complaint against Defendants Quechan, Mr. Rosette, Rosette & Associates, PC, Rosette, LLP, Richard Armstrong, Keeny Escalanti, and Mark William White. ECF No. 39. On June 21, 2018, the Quechan Tribe filed an Answer to the First Amended Complaint and Counterclaims. ECF No. 94.

That Answer included six counterclaims based on the above facts, including: Count I – a claim for breach of fiduciary duty; Count II – a breach of the implied covenant of good faith and fair dealing; Count III – a negligence claim; Count IV a breach of contract claim; Count V – an unfair competition claim; and Count VI – an entitlement to offset any damages that W&C may be entitled to from its affirmative claims against Quechan. The Court held that these counterclaims would survive the subsequent motions to strike and dismiss brought by W&C. ECF No. 173.

In the instant motion, W&C now brings a "reply claim" against Quechan, Escalanti, and White on the basis that the Quechan Defendants committed the intentional tort of civil extortion by wrongfully retaining monies that were due to W&C under the Attorney-Client Fee Agreement and obtaining work-product property through the use of threats and insinuation of legal action. ECF No. 179. W&C also alleges that the Quechan defendants intentionally defamed W&C through its statements about the abilities, work ethic, and honesty of W&C, which were sent to representatives in the Governor's Office and possibly one of the Firm's other tribal clients. In addition, W&C submits that the Quechan defendants engaged in undue coercion and committed the intentional tort of economic duress by threatening to ruin W&C's reputation and pursue legal action if the firm did not turn over its work product and suffer the breach. According to W&C, these actions culminated in "substantial consequential damages," "contract damages," and "additional injuries in an amount to be proven at trial." ECF No. 179 at 8-9.

## DISCUSSION

### I. Legal Standard

#### a. Rule 12(f)

A court has discretion to order stricken "from a[ny] pleading a[ny] insufficient defense or any redundant, immaterial, impertinent, or scandalous" material. Fed. R. Civ.

8

P. 12(b). Immaterial matter is "that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Cal. Dept. of Toxic Substances Control v. ALCO Pac., Inc.*, F. Supp. 2d 1028, 1032 (C.D. Cal. 2002) (internal citations and quotation marks omitted). Impertinent material consists of statements that do not pertain, and are not necessary to the issues in question. *Id.* The "function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Zest IP Holdings, LLC v. Implant Direct Mfg., Inc.*, 2013 WL 5674834, at *2 (S.D. Cal. Oct. 16, 2013,) (quoting *Sidley-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983)). A district court has authority under Rule 12(f) to strike a pleading, in whole or in part, to address improperly-filed pleadings. *See id.* at *6 (striking answer and counterclaim); *see also Nutrishare, Inc. v. Connecticut Gen. Life Ins. Co.*, 2014 WL 6669825, at *3 (E.D. Cal. Nov. 24, 2014) (granting motion to strike counterclaim in reply "as an improper pleading").

### b. Rule 12(b)(6)

A Rule 12(b)(6) motion attacks the complaint as not containing sufficient factual allegations as to state a claim for relief. "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "detailed factual allegations" are unnecessary, the complaint must allege more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

9

## II.   Analysis

First, the Quechan Defendants argue that W&C's "reply claim" is procedurally improper because counterclaims-in-reply have only been allowed in limited circumstances that are very different from those alleged in this suit.  In addition, Escalanti and White proffer that they cannot be subject to the counterclaim-in-reply since they were dropped from the Third Amended Complaint ("TAC") and were not parties to the case when W&C filed its Reply Claim.

Substantively, Quechan asserts that the "reply claim" would also fail.  First, W&C notes that neither Escalanti nor White were parties to the Attorney-Client agreement between W&C and Quechan.  As non-parties to the contract, they could not have breached the agreement – tortiously or otherwise.  Next, Defendants argue that the claim is barred because of litigation privilege.  Finally, Defendants alleges that W&C fails to plead facts that could support a plausible tortious breach of contract claim.  The Court will first address Defendants' assertions that W&C's reply claim fails on procedural grounds.

### a.   Procedural Permissibility of a Counterclaim-in-Reply

As a preliminary matter, the Court agrees with Quechan that there is no such thing as a "reply claim" under the federal rules.  Instead, the Court will interpret W&C's reply claim as a "counterclaim in reply."  *See Mattel, Inc. v. MGA Entm't, Inc.*, 705 F.3d 1108, 1110 (9th Cir. 2013); *see also Warner v. Sims Metal Management*, 2013 WL 4777314 (N.D. Cal. Sept. 6, 2013) ("Under Rule 7 of the Federal Rules of Civil Procedure, there is no such thing as a 'cross-counterclaim,' but our court of appeals has read into the rule and recognized 'counterclaims in reply.'  Plaintiff's 'cross-counterclaims' will be treated as such.")

The Ninth Circuit permits counterclaims in reply to an opposing party's counterclaims "only if they are compulsory in nature."  *Id.* (quoting *Conceptus, Inc. v.*

*Hologic, Inc.*, 2010 WL 1460162, at *1 (N.D. Cal. April 12, 2010)).  Similar to other counterclaims, a "counterclaim in reply" is compulsory if it "arises from the same transaction or occurrence as the [defendant's] counterclaim."  *Id.* (quoting *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1525 (9th Cir. 1985)).  To assess whether a counterclaim-in-reply is permitted, the Ninth Circuit applies the "logical relationship test," *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1195-96 (9th Cir. 2005), which holds that:

> A logical relationship exists when the counterclaim arises from the same aggregate set of operative facts as the initial claim, in that the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights otherwise dormant in the defendant. *Id.* At 1196; *see also Moore v. N.Y. Cotton Exch.*, 270 U.S. 593, 610 (1926).

*Mattel, Inc. v. MGA Ent'mt, Inc.*, 705 F.3d 1108, 1110-11.  Moreover, the "facts, not the legal theory, are what matters."  *Id*. at 1110-11.  "[E]ven the most liberal construction of ['transaction'] cannot operate to make a counterclaim that arises out of an entirely different or independent transaction or occurrence compulsory under Rule 13(a).  *Id.* And to the extent that the counterclaim is not compulsory pursuant to Rule 13(a), "it is permissive and the counterdefendant is required to seek leave to amend the complaint." *Grumpy Cat Ltd. v. Grenade Beverage, LLC*, 2017 WL 9831406, at *3 (C.D. Cal. Jan. 17, 2017).

W&C argues that the filing of Defendant's counterclaims waived the Tribe's sovereign immunity, activating an additional dormant legal right.  W&C also relies on *Grumpy Cat* to show that the "logical relationship test" for compulsory counterclaims simply requires that the claims be generated from the same set of facts.  Here, the counterclaims-in-reply are based on Defendants' tortious breach of Quechan's attorney-client agreement with W&C.  Quechan's counterclaims are based on W&C's performance under that same contract and subsequent failure to turn over Quechan's case

11

file.  According to W&C, these claims all stem from the same agreement and the same operative facts.

Defendants aver that no authority stands for the proposition that a party should be able to bring a counterclaim-in-reply where it has been aware of the underlying facts since the time of the filing of the initial complaint and throughout multiple subsequent amended complaints.  The Reply Claim – which relates to W&C's termination and purported communications relating to that termination – does not arise from the same operative set of facts as the counterclaim – which is based on W&C's failure to turn over the case file and poor performance under the Fee Agreement.  In addition, Defendants argue that nothing in the Tribe's counterclaims activated additional legal rights that were otherwise dormant.  The sovereign immunity argument is unavailing because the Court ruled more than six months prior that the Tribe had waived its sovereign immunity as to claims based on W&C's attorney-client relationship with the Tribe.  ECF No. 94.  Since then, W&C has already pled a number of claims against the Tribe, Escalanti, and White under different theories and taken the position that sovereign immunity did not apply.

As such, Defendants proffer that the counterclaim-in-reply has no logical relationship to the facts underlying the counterclaim.  Thus, the counterclaim in reply is noncompulsory.  Defendants surmise that the Reply Claim is a "thinly veiled attempt to have its *eighth* bite at the apple" in spite of the Court's limitation that W&C could file a TAC only to amend its Fourth and Fifth Causes of Action.  ECF No. 184 at 7.

While this order is sympathetic to Defendants' assertions that "W&C's Reply Claim is a thinly veiled attempt to have its *eighth* bite at the apple," ECF No. 184 at 13, settled law in our circuit "allows, even requires, a plaintiff to raise *compulsory* counterclaims in reply to a defendant's counterclaims under FRCP 13."  *Warner v. Sims Metal Management*, 2013 WL4777314, at *1 (N.D. Cal. Sept. 6, 2013) (noting also that "this order is sympathetic to Defendants' argument that allowing plaintiff to assert

12

counterclaims in reply to defendant's counterclaims leads the parties and this court down an endless hold of pleadings") (internal citations omitted) (emphasis in original); *see American Fireglass v. Moderustic Inc.*, 2018 WL 176564 (S.D. Cal. April 10, 2018) (where a Court denied Defendants' motion to strike Plaintiffs' counterclaims-in-reply); *see also Sporting Supplies Int'l, Inc. v. Tulammo USA, Inc.*, 2012 WL 12892310 (C.D. Cal. March 5, 2012) ("while the Rules do not expressly authorize a plaintiff's bringing of counterclaims in reply to a defendant's counterclaims, the weight of the authority allows the plaintiff to file such pleadings if the counterclaims are *compulsory*") (internal quotes omitted) (emphasis in original). To prove that a logical relationship exists under 13(a) "does not require that the factual bases underlying the claim and counterclaim to be identical, however." *Aliya Medcare Finance, LLC v. Nickell*, 2016 WL744610, at *7 (C.D. Cal. Aug. 16, 2016). Rather, this association is liberally construed – "that [the facts] are not precisely identical, or that the counterclaim embraces additional allegations does not matter." *Id.*

In *American Fireglass*, another court in this district found that Defendant's counterclaims and Plaintiff's counterclaims-in-reply were compulsory simply because they shared a common fact: whether Plaintiff's products infringed one of Defendant's patents. 2018 WL 176564, at *3-4. And in *Sporting Supplies Int'l*, Plaintiff's fraud-based counterclaims-in-reply were based on rights to a brand mark under supply agreements, while Defendants' counterclaims related to their reliance on false representations to enter into the supply agreements in the first place. 2018 WL 176564 (S.D. Cal. April 10, 2018). Since the subject matter of the counterclaims were the supply agreements themselves, the court found that the claims were logically connected and thus compulsory. As a result, Plaintiff had properly asserted its claim for fraud as a counterclaim-in-reply.

In this case, Plaintiff's counterclaims-in-reply for tortious breach of interference similarly arise from the same attorney-client agreement and relationship at issue in Defendants' counterclaims. Plaintiff's tortious interference claim argues that the Defendants extorted, defamed, coerced, and threatened W&C under economic duress to obtain work product produced through the attorney-client fee agreement between W&C and Quechan. Defendants' counterclaims are based on W&C's poor performance under the attorney-client fee agreement as well as refusal to turn over the case file and other work product generated during the firm's representation of the Tribe under the attorney-client agreement. Like in *American Fireglass*, the subject matter of the counterclaims centers largely on the attorney-client agreement itself. Therefore, plaintiff's counterclaims in reply are based on the same set of aggregate facts as defendant's counterclaims.

Whether the Plaintiffs may have attempted to assert this claim before – and then subsequently dropped it, has no bearing on whether they can now reassert them at this juncture based on Defendants' counterclaims. *See, e.g., Aliya Medcare Finance, LLC v. Nickell*, 2016 Wl7444610 (C.D. Cal. Aug. 16, 2016) (allowing a counterclaim-in-reply from Plaintiff even though Plaintiff's original complaint had been dismissed for lack of subject matter jurisdiction). Since Quechan has now raised counterclaims based on W&C's performance and work product under the attorney-client fee agreement, W&C may respond with counterclaims-in-reply that rely on the same operative facts. Accordingly, Plaintiff's counterclaim-in-reply are compulsory and procedurally permitted.

**b. Whether the Counterclaim-in-Reply Can Be Asserted Against Escalanti and White**

Next, Defendants argue that W&C cannot allege claims against Escalanti and White because neither were parties to the case when W&C filed its counterclaim-in-

14

reply.  According to Defendants, counterclaims can only be brought against opposing parties under the Federal Rules.  Since Escalanti and White are neither "opposing parties" nor required parties under Rule, counterclaims against them should be stricken.

Plaintiffs counter that Federal Rule of Civil Procedure 13(a) does not dictate that only "required parties" or "opposing parties" can be subject to counterclaims.  Rather, a counterclaim can name someone other than an opposing party so long as the court can acquire jurisdiction over them.  Escalanti and White have both accepted service of the complaint and subsequently participated in the litigation of this case.  According to Plaintiffs, it follows that the Court can continue to exert jurisdiction over them.

The Court agrees.  Courts in this circuit have certainly disallowed counterclaimants from asserting counterclaims only against nonparties.  *See, e.g., GIA-GMI, LLC v. Michener*, 2007 WL 1655614, at *4 (N.D. Cal. June 7, 2007).  But in this case, W&C have brought counterclaims-in-reply against not just Escalanti and White, but also the Quechan Tribe.  There is no question that Quechan is an opposing party in this litigation. W&C asserts claims against Quechan in its complaint and Quechan's counterclaims against W&C serve as the backdrop for this motion.  And even a narrow interpretation of "opposing party" includes "a named party who asserted a claim against the counterclaimants."  *See Aliya Medcare Finance*, 2016 WL 7444610, *at 11 (quoting *GIA-GMI, LLC*, 2007 WL 1655614, at *4).

Once a counterclaim is brought against an opposing party, FRCP 13(h) explicitly provides that "Rule 19 and 20 govern the addition of a person as a party to a counterclaim."  *See* FED. R. CIV. PRO. 20(a)(2).  Rule 20 states that a party may be added as a defendant where "any right to relief is asserted against [the party] jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and [ ] any question of law or fact common to all defendants will arise in the action."  FED. R. CIV. PROC. 20(a)(2).  Because Quechan is a

counterclaimant and an "opposing party" pursuant to the counterclaims, a "reply counterclaim" can be brought against the Tribe.  Consequently under Rule 20, W&C's may also join non-party defendants Escalanti and White in that same counterclaim-in-reply.  *See, e.g., Aliya Medcare Finance, LLC v. Nickell*, 2016 WL 7444610, at *4 (holding that plaintiff could assert counterclaims-in-reply jointly against parties and non-parties to the suit).

### c.  The Merits of W&C's Counterclaim-in-Reply

The Quechan Defendants also argue that W&C's counterclaim-in-reply fails on the merits.  Specifically, they argue that the claim should be dismissed against Escalanti and White because W&C cannot bring a tortious breach of contract claim against non-parties to the agreement.  In addition, they assert that W&C's counterclaim is based on communications protected by the litigation privilege.  And finally, the Quechan Defendants argue that W&C fails to state a plausible claim for relief based on tortious breach of contract.  The Court will address these in turn.

### 1.  W&C's Tortious Breach of Contract Claim Against Escalanti and White

First, Defendants argue that W&C cannot bring a tortious breach of contract claim against Escalanti and White because they are not parties to the agreement at issue.  Defendants proffer that it is fundamental California law that a breach of contract claim cannot be asserted against non-parties to the contract at issue.  The relevant fee agreement was executed by W&C and the Tribe in September 2016.  *See* ECF No. 174.  Since Escalanti and White were not parties to the Fee Agreement, they could not have breached the agreement as a matter of law

Plaintiffs point to *Century of Progress Productions v. Vivendi, S.A.*, 2018 as an illustrative counterexample.  2018 WL 4191340 (C.D. Cal. Aug. 28, 2018).  In *Century of Progress*, the creators of a mockumentary pursued what W&C claims was "essentially a

16

tortious breach of contract claim" against a chief executive who was not subject to the royalty agreement at issue in the case.  *Id.*  In allowing the claim to proceed against all named defendants, the district court noted that the "fraud allegations on conduct that goes above and beyond the [royalty's agreement's] obligations even though the events giving rise to the cause of action occurred in the context of the alleged contractual relationship between the parties."  *Id.* at *10.  As a result, the named defendants – including the nonparty chief executive – could all share in liability stemming from the tortious conduct "not arising from the contract, and [the] resulting harm distinct from breach."  *Id.* at *12.  In this case, Plaintiffs aver that Escalanti and White should similarly be liable for a tortious breach of contract claim "for any torts they commit in connection with breaching [this] contract."  ECF No. 190 at 27.

The Court disagrees.  First, Plaintiff's reliance on *Century of Progress* is misplaced.  There, the claims against the company and the chief executive were for fraud – not tortious breach of contract – and additional allegations including "separate nefarious . . . practices to conceal and underreport profits, self-dealing between subsidiaries, and lying about the recovery of a settlement."  2018 WL 4191340, at *11.  That stand-alone fraud claim is distinguishable from the tortious breach of contract claim in this case.  In addition, W&C ignores that court's dismissal of a breach of contract claim against a recording company because the company was not party to the contract at issue and could also not be held liable under alternative theories of successor-in-interest or assignee liability.  *Id.* at *5-6.

In this case, W&C does not allege wholly separate claims beyond a breach of the Fee Agreement.  W&C's allegations against Escalanti are based on termination letters that he signed to sever the attorney-client agreement between Quechan and W&C.  The content of those letters and Escalanti and White's roles in sending them do not rise to the level of wrongful conduct "above and beyond" a breach of the Fee Agreement akin to the

circumstances in *Century of Progress*. And as nonparties to the agreement, Escalanti and White – without more – cannot be liable for a tortious breach of contract claim. *See* Judicial Council of California Civil Jury Instruction 303—Essential Factual Elements ("To recover damages . . . for breach of contract, [a plaintiff] must prove all of the following [, including] [t]hat the [parties] entered a contract"); *see also Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 515 (1994) (conduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law). Accordingly, the Court will **DISMISS** the claim against Escalanti and White as a matter of law.

### 2. Whether the June 26 and June 30, 2017 Letters are Protected by the Litigation Privilege

Next, Defendants argue that W&C's counterclaim is based on two pre-litigation communications made in connection with this lawsuit. Defendants surmise that these communications and demands, which necessarily rely on the June 26 and June 30, 2017 termination letters sent by Quechan to W&C, are protected by the litigation privilege.

W&C counters that litigation privilege is not a carte blanche weapon that shields wrongful conduct extraneous to the anticipated litigation. Although a demand letter can contemplate a potential breach of contract action, litigation privilege does not prop the door open so that the author can make threats, defamatory statements, or try to deceive the other party. W&C proffers that the threat "[w]e strongly advise you against pressing your luck further out of concern for the reputation of your firm" is unrelated to any potential litigation. ECF No. 179 at 3-4. The defamatory statement that "[t]hrough its decades of dealing with numerous attorneys and law firms across the country, the Tribe has not witnessed these types of outlandish actions or this level of unprofessionalism as it has from your firm" also is unrelated to anticipated litigation. *Id.* W&C also asserts that any protections related to those statements were lost upon dissemination to outside

18

parties. And finally, W&C provides that Quechan had neither a good faith belief that it was advancing a viable position or that litigation was impending, a necessary element to invoke litigation privilege.

Under California law, litigation privilege is absolute, not qualified. *See Silberg v. Anderson*, 50 Cal.3d 205, 215 (1990). It applies to any communication made (1) in a judicial or quasi-judicial proceeding, (2) by litigants or other participants authorized by law, in or out of court, (3) to achieve the objects of litigation, (4) which has some connection or logical relation to the action. *See id.* at 212. To afford litigants and witnesses the utmost freedom of access to the courts, litigation privilege has generally been "broadly applied to demand letters and other prelitigation communications." *Fleming v. Coverstone*, 2009 WL 764887, at *4 (S.D. Cal. Mar. 18, 2009) (citations omitted); *see also Action Apartment Assn., Inc. v. City of Santa Monica*, 41 Cal. 4th 1232, 1241 (2007); *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1057 (2006). Some courts have extended the privilege even further to protect communications with "some relation to a proceeding that is actually contemplated in good faith and under serious consideration by . . . a possible party to the proceeding." *Block v. Sacramento Clinical Labs, Inc.*, 131 Cal. App. 3d 386, 393 (19820 (internal citation and quotation marks omitted); *see Malin v. Singer*, 159 Cal. App. 4th 1283, 1301-02 (2013) (holding that a demand letter was protected by litigation privilege). After all, it is the "*contemplation* of litigation that must be in good faith, not the merits of the actual litigation itself that animates the litigation privilege." 360 F. Supp. 2d 1064, 1069 (2005) (emphasis in original).

Litigation privilege is generally invoked "to preclude a tort claim," and "in some circumstances, it may preclude a breach of contract claim." *Misle v. Schnitzer Steel Industries, Inc.*, 2017 WL 731459, at *4 (N.D. Cal. Feb. 19, 2017). It is a defense to a number of torts, "including intentional interference and defamation." *Visto Corp v. Sproqit Tech., Inc.*, 360 F. Supp. 2d 1064, 1068 (N.D. Cal. 2005). *See also Rothman v.*

*Jackman*, 49 Cal. App. 4th, 1134, 1140 (1996) (stating that only malicious prosecution actions are exempt from § 47(b)).  According to the California Supreme Court, "[t]he policy of encouraging free access to the courts is so important that the litigation privilege extends beyond claims of defamation to claims of abuse of process, intentional infliction of emotional distress, negligent misrepresentation, invasion of privacy, fraud, and … interference with contract and prospective economic advantage."  *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1132 (1990).  Moreover, "pre-litigation demands in anticipation of litigation are protected as part of the price paid for affording litigants the utmost freedom of access to the courts."  *Visto Corp v. Sproqit Tech., Inc.*, 360 F. Supp. 2d 1064, 1068 (N.D. Cal. 2006) (internal quotes omitted).

Here, the Court finds that the alleged tortious "breach" claim consisted of prelitigation communications asking for the Tribe's case file.  These letters qualify as demand letters.  The June 26 letter contains an analysis of the Fee Agreement and demands that W&C both release its case file and adhere to its confidentiality obligations.  *See* TAC, Ex. 11.  The follow-up letter on June 30 again requested the compact materials and stated that if W&C again refused to do so, the Tribe would pursue litigation.  The facts communicated in the letters – W&C's performance under the contract, the Tribe's termination of W&C, and the Tribe's request for the case file – have more than "some bearing on or connection with the subject matter of the litigation."  *Nguyen v. Proton Technology Corp.*, 69 Cal. App. 4th 140, 149 (1999).  They are the main premise of Quechan's counterclaims in this case.  It follows that these letters were made in serious contemplation of potential litigation.

Although W&C takes issue with the aggressive language in these letters, the litigation privilege is absolute and applies regardless of malice.  *Malin v. Singer*, 159 Cal. App. 4th 1283, 1301-02 (2013).  And the Court is unconvinced by W&C's unsupported argument that the Tribe lost any privilege over the letters once they were sent to outside

20

parties. Plaintiff does not point to any authority that could support this assertion. Moreover, W&C's vague allegation that the letters were circulated to members of the Pauma tribe are wholly unspecific and insufficient under Rule 8. There is no indication as to where, when, or how these communications were made to Pauma or what exactly was communicated. Even if the letters were sent to the State, the "[litigation] privilege is not restricted to the parties but need merely be connected or related to the proceedings." *Sharper Image Corp. v. Target Corp.*, 425 F. Supp. 2d 1056, 1078 (N.D. Cal. 2006). Since State officials were in the process of negotiating the compact with the Tribe, they reasonably needed to know with whom they were negotiating. As such, the State qualifies as an authorized party "connected or related to the proceedings" included within the purview of privilege. *Id.*

Accordingly, the Court will **DISMISS** the tortious breach of contract claim against the Quechan Tribe. It is unnecessary for this Court to analyze the remainder of the claim on its merits and the Court will decline to do so. Since there is no possibility that this claim can be cured upon amendment against any of the named Defendants, the Court will dismiss the reply claim **with prejudice.**

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Quechan Defendants' Motion to Dismiss Plaintiffs' Reply Claim. ECF No. 184. W&C is directed to file an amended answer to Quechan's counterclaims within 14 days.

**IT IS SO ORDERED.**

Dated: September 10, 2019

Hon. Gonzalo P. Curiel
United States District Judge