UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAMS & COCHRANE, LLP; and FRANCISCO AGUILAR, MILO BARLEY, GLORIA COSTA, GEORGE DECROSE, SALLY DECORSE, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>QUECHAN TRIBE OF THE FORT YUMA INDIAN RESERVATION; ROBERT ROSETTE; ROSETTE & ASSOCIATES, PC; ROSETTE, LLP; RICHARD ARMSTRONG; KEENY ESCALANTI, SR.; MARK WILLIAM WHITE II, a/k/a WILLIE WHITE; and DOES 1 THROUGH 100,<br><br>Defendant. | Case No.: 3:17-cv-01436-GPC-MDD<br><br>**ORDER:**<br><br>**(1) GRANTING ROSETTE DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FOURTH AND FIFTH CLAIMS;**<br><br>**(2) GRANTING ROSETTE DEFENDANTS' MOTION TO STRIKE**<br><br>**[ECF No. 185]** |

This case involves a dispute between Williams & Cochrane, LLP (W&C) and the Quechan Tribe of the Fort Yuma Indian Reservation (Quechan"), a former W&C client, over attorney fees that W&C claims it is owed for their work renegotiating a gambling compact between Quechan and the State of California. This part of the litigation is straightforward and, although contentious, manageable. The case is made acrimonious by the disdain that exists between W&C and Richard Rosette, an attorney who formerly employed the attorneys who comprise W&C and succeeded W&C as attorney for Quechan in the renegotiation of the compact. Both W&C and Mr. Rosette operate in a niche market involving the representation of Indian tribes. The competition between the respective firms is fierce and cutthroat. Mr. Rosette is accused of, among other things, falsely taking credit for the work of W&C, engaging in professional misconduct and making false and scandalous statements about W&C. The claims raised in this action are based on contract, the Lanham Act and RICO. This litigation has produced five complaints and two orders which have upheld the contract and Lanham Act claims and dismissed the RICO claims on a number of grounds.

Beyond the contract, Lanham Act and RICO allegations, the complaints have been filled with allegations that amount to, at best, other bad act evidence, relating to Mr. Rosette's improper conduct in his representation of other Indian tribes. These allegations suggest that Rosette has been involved in kickback schemes, improper billing practices and advising other tribes to default on their contractual obligations. The Court has stricken some of these allegations only to have them reappear in successive complaints. The Court has rejected RICO predicate acts only to find them return in the next complaint. Here, Defendants Richard Armstrong, Robert Rosette, Rosette & Associates, and Rosette, LLP (collectively, the "Rosette Defendants") have moved to dismiss and strike the Fourth and the Fifth Causes of Action in Williams & Cochrane's Third Amended Complaint ("TAC"), which are both RICO conspiracy claims. ECF No. 185.

The ultimate question is whether the RICO allegations plausibly describe a racketeering enterprise that engaged in fraud and that caused concrete financial loss, and not mere injury to an intangible property interest. The answer is no.[1]

For the reasons stated below, the Court **GRANTS** the Rosette Defendants' Motion to Dismiss Plaintiffs' Fourth and Fifth Causes of Action with prejudice.

## BACKGROUND

### I. Procedural History

Plaintiff initiated this action on July 17, 2017, by filing its original complaint. ECF No. 1. Plaintiff sought leave to seal its entire complaint because the complaint contained confidential information. ECF No. 2. The Court denied Plaintiff leave to file the entire complaint under seal because Plaintiff had not offered a compelling reason why sealing the complaint—as opposed to redacting it—was appropriate. ECF No. 3. The Court ordered the Clerk of Court to "unseal the case, strike the complaint from the record, and file the motion to seal on the public docket." Id. at 5. On September 19, 2017, W&C filed an Amended Complaint, ECF No. 5, and on March 2, 2018, Plaintiffs filed their First Amended Complaint ("FAC"). The FAC advanced breach of contract and breach of the implied covenant of good faith and fair dealing claims against Quechan. Id. at 97-102. The good faith and fair dealing claims allege that Quechan breached the covenant

---

[1] Moreover, the Court notes that the evidence presented "does not establish the sort of *long-term criminal activity* to which [the RICO statute] was directed." *Midwest Grinding Co. Inc. v. Spitz*, 759 F. Supp. 1457, 1469 (N. D. Ill. June 20, 1991) (citing *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 243 (1989). In *Midwest Grinding Co.*, the court observed that filing a civil RICO suit has become a catch-all litigation tactic for even garden-variety business fraud "to which the RICO statute and its treble damage provision should have no application." *Id.* There, Plaintiffs alleged that Defendant tortiously interfered with Plaintiff's business relationships by among other things, soliciting and servicing Plaintiff's customers. At its most basic level, that matter was a "purely private business dispute between Spitz and Midwest [ . . . ] occasioned solely by their previously existing business relationship." *Id.* Here, a private dispute occasioned by a prior existing relationship similarly lies at the heart of this fractious matter.

by terminating W&C just three days before the completion of compact negotiations, refusing to pay any contingency fee, demanding that W&C turn over the latest draft compact, and having Mr. Rosette come in as the attorney of record for the signed compact. *Id.* at 101. Plaintiffs also brought a RICO claim against the Rosette Defendants and a RICO conspiracy claim against all Defendants. *Id.* at 109. Finally, the FAC advanced a negligence/breach of fiduciary duty claim against the Rosette Defendants for their allegedly deficient representation of Quechan during the compact negotiations. *Id.* at 118.

In an order entered on June 7, 2018, the Court DENIED the motion to dismiss as to part of the breach of contract claim and good faith and dealing claim filed against Quechan, and a Lanham Act claim against Rosette. Order, ECF No. 90. The Court dismissed without prejudice both the FAC's substantive RICO and RICO conspiracy claims, finding that the FAC failed to allege a sufficient pattern of racketeering and failed to allege that Defendants agreed to violate the substantive provisions of RICO or agreed to commit or participate in a violation of two predicate acts. *Id.* at 29, 32.

On July 20, 2018, Plaintiffs filed their SAC, reasserting claims for breach of contract, breach of the covenant of good faith and fair dealing, a Lanham Act violation, a RICO violation, RICO conspiracy, and professional negligence. ECF No. 100. The Rosette Defendants moved to dismiss the SAC's substantive RICO claim, the RICO conspiracy claim, and the professional negligence claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 110. The Quechan Defendants also moved to dismiss the RICO conspiracy claim and good faith and fair dealing claim.

On November 18, 2018, the Court entered an order that dismissed part of the SAC. Order, ECF No. 171. In its order, the Court once again rejected – in large part – W&C's substantive RICO claim in Count Four of the SAC, which alleged that the Rosette Defendants "sought to fraudulently interfere with William & Cochrane's contracts (often

4

to commit fraud against the firm's tribal clients)." SAC at 71. The Court found that Plaintiffs had sufficiently alleged three related predicate acts that might suggest an injury and a pattern of racketeering activity through mail or wire fraud: (1) the posting on Rosette's website of Mr. Rosette's claimed success in litigating the Pauma case; (2) the email terminating W&C's representation; and (3) the email demanding a copy of the draft compact from W&C. *Id.* at 19. However, the Court found that Plaintiffs failed to articulate how the predicate acts directly caused the alleged injuries. In addition, the Court dismissed without prejudice W&C's fifth cause of action – for RICO conspiracy against the Rosette Defendants and Quechan individuals – on the basis that the claim was pled without specificity or the use of wires and mails in furtherance of a fraudulent scheme. ECF No. 171. In the Order, the Court permitted Plaintiffs one final attempt to amend their Complaint to address the identified portions of the two RICO claims that had not been dismissed with prejudice. *Id.*

Afterwards, Plaintiffs filed their Third Amended Complaint ("TAC"), reasserting claims for breach of contract, breach of the covenant of good faith and fair dealing, a Lanham Act violation, and two RICO conspiracy claims. In the fourth cause of action, W&C presents a RICO conspiracy claim against Mr. Rosette, Mr. Armstrong, and Rosette & Associates. On the fifth cause of action, W&C on behalf of the named Quechan General Councilmembers against Mr. Rosette, Mr. Armstrong, Rosette & Associates, and Does 1 through 100.

The Rosette Defendants have moved to dismiss or strike the TAC's RICO conspiracy claims pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(f). The Quechan Defendants have separately moved to dismiss a "reply claim" based on tortious breach of contract filed by Williams & Cochrane in response to the Defendants' counterclaim and answer to the TAC. ECF No. 179. The motion to dismiss the "reply claim" is addressed by separate order.

## II.    Factual Background

The facts in this matter, now on its third amended complaint, are familiar to this Court and the following facts are alleged in Plaintiffs' TAC.

### 1.    The Parties

Plaintiff W&C is a California legal services partnership formed in 2010 by Cheryl Williams and Kevin Cochrane.  ECF No. 178 at 7.  All other Plaintiffs in this case are enrolled members of Defendant Quechan, which is a federally recognized Native American tribe.  *Id.* ¶¶ 11, 12.

The "Rosette Defendants" consist of Robert Rosette, Rosette & Associations, PC, Rosette, LLP, and Richard Armstrong.  Mr. Rosette is a tribal law attorney and the President and Director of Rosette & Associates, PC, which is in turn a general partner of a parent entity named Rosette, LLP.  *Id.* ¶ 13.  Armstrong is an attorney who serves as senior of counsel with Rosette LLP.  *Id.* ¶ 16.  The "Quechan Defendants" consist of the individuals associated with the Quechan Tribe that allegedly took part in the fraud.  *Id.* ¶ 17.  Although they are not named Defendants in this case, Plaintiff has also filed a "reply claim" against Keeny Escalanti Sr., and Mark William White II.  Escalanti is the Tribal Chairman of Quechan.  White is a Tribal Councilmember of Quechan.

### 2.    Representation of Pauma, a Former Client of Rosette & Associates

In 1999, California entered into a compact with over sixty Indian tribes, permitting the tribes to operate a base number of slot machines and allowing the tribes to increase the number of machines through a licensing system.  ECF No. 178 at 7-8.  The Pauma Band of Mission Indians ("Pauma") was one such tribal signatory to this compact.  *Id.*  In 2004, the compact was amended ("2004 Amendment"), which resulted in Pauma paying approximately twenty-four times as much revenue sharing in order to operate machines that should have been available under its original compact.  *Id.* at 8.

In September 2009, Pauma filed suit in the Southern District of California, requesting rescission of the 2004 Amendment and restitution of the heightened fees paid under that amendment. *Id.* Rosette & Associates represented Pauma in that lawsuit. But according to the TAC, the two attorneys that were solely responsible for doing all of the litigation work for Pauma were Cheryl Williams and Kevin Cochrane. *Id.* Pauma quickly obtained a preliminary injunction to reduce the revenue sharing fees of the 2004 Amendment to the prior rates of the 1999 Compact. *Id.* at 8-10.

On May 15, 2010, about one month after the injunction order was issued, Williams and Cochrane left Rosette & Associates and started their own law firm, W&C. *Id.* W&C then convinced the Ninth Circuit to vacate its stay order, reinstate the preliminary injunction, and later dispose of the appeal in November 2010. *Id*. at 9-10.

On July 26, 2011, Armstrong sent an email to Jacob Appelsmith, the Office of the Governor's compact negotiator, explaining that the Pauma Tribal Council "requests a meeting with the Governor's office . . . to discuss compact related matters." *Id.* at 50. Armstrong later emailed Appelsmith stating that the tribe wanted to meet without their attorneys present. *Id.* at 50-51. Minutes later, Mr. Rosette emailed Appelsmith to explain that his firm was not engaged as legal counsel to the litigation. *Id.*

With the case back in district court, W&C filed an amended complaint in September 2011, raising new claims for relief. *Id.* The district court granted summary judgment to Pauma, rescinding the 2004 Amendment and ordering the State to pay $36.3 million to Pauma. *Id.*

Though W&C secured the victory for Pauma, Mr. Rosette took credit for the outcome in the case. He advertises on his website and other promotional materials that he successfully litigated the case. *Id.* at 55-56.

### 3.    Williams & Cochrane's Departure from Rosette & Associates

7

Just fourteen or so months after they both joined the firm, Williams & Cochrane sought to leave. *Id.* ¶ 122. On April 28, 2010, prior to their departure, W&C offered a proposition that they remain affiliated with Rosette & Associates via a separate litigation-oriented "of counsel" entity that would be removed from other aspects of the firm. *Id.* Mr. Rosette quickly rejected this proposal. *Id.*

W&C's departure quickly became contentious. When Williams proposed to Mr. Rosette that they send out a joint email to alert impacted clients about her impending departure, Mr. Rosette and Armstrong proceeded to make calls and sent emails to the affected clients and told them damaging falsehoods about W&C. Mr. Rosette and Armstrong articulated that W&C had been terminated because of their incompetence and that Mr. Rosette had done all of their work. In addition, Mr. Rosette alleged that Mr. Cochrane, in particular, was a "deviant homosexual" with whom the clients would be crazy to associate. *Id.* at ¶ 123, 124. On or about May 15, 2010, Mr. Rosette and Armstrong exchanged phone calls and emails in which they discussed interfering with future contracts secured by W&C. *Id.*

**4.    W&C's Merger Talks with La Pena Break Down after Mr. Rosette's Involvement**

In July 2010, Cochrane met with another tribal law attorney, Michelle La Pena. The two discussed whether their firms could work together on a compact dispute involving a tribe that La Pena represented. *Id.* at 47-48. Soon thereafter, W&C entered into an of counsel relationship with La Pena Law and was tasked with preparing litigation memorandums and supporting materials for a presentation. On August 11, 2010, La Pena met with Cochrane and expressed that she was impressed with the quality of their work. After she asked Cochrane to prepare a number of last-minute documents for the following morning, La Pena told Cochrane that she wanted to either absorb or merge with W&C. *Id.* Such an event would have been lucrative for W&C.

However, La Pena also informed Cochrane that Mr. Rosette had recently sent her an email suggesting that he was responsible for litigating the Pauma case. *Id.* ¶ 147. At some point between August 12, 2010 and August 15, 2010, La Pena spoke with Mr. Rosette over the phone to vet W&C. *Id.* ¶ 147-49. During the phone call, Mr. Rosette falsely stated that attorneys should be conflicted out of the ongoing litigation matters because they represented a nearby tribe and also could not be trusted to keep attorney-client confidentiality. *Id.*

Just days later on August 15, 2010, La Pena told Cochrane that she was ending any arrangement between the two. *Id.* at 149-50. Though she mentioned that the quality of W&C's work was stellar, La Pena attributed the end of the relationship to the firm's need to staff internal attorneys instead of using outside counsel. *Id*; *see* ECF No. 174-23 at 2-4. La Pena specifically cited general confidentiality and conflicts issues with W&C. *Id.* La Pena also noted that since she had been meeting with other local litigators and interviewing attorneys, she had found two separate attorneys to join her firm full-time to handle litigation matters. ECF No. 178 ¶¶ 148-50. This email was the last communication between La Pena and W&C. *Id.*

### 5. Quechan Hires W&C to Renegotiate Its Compact

After Pauma's victory in court garnered public attention, Mike Jackson, President of Quechan, contacted Williams to see if W&C could represent Quechan in a similar compact dispute. ECF No. 178 at 13-16. Quechan had amended its compact in 2007 ("2007 Amendment"), which allowed Quechan to operate up to 1,100 slot machines in exchange for a 10% revenue sharing fee for the first $50 million of Quechan's net profit each year. *Id.* In September 2016, W&C met with several Quechan leaders to discuss the 2007 Amendment. *Id.*

The Quechan Tribal Council explained that it had stopped making monthly revenue sharing payments to the State and was looking for a way to get out of the

amendment. *Id.* The 2007 Amendment provides that if Quechan does not pay its revenue sharing on time for more than two occasions, the State can shut down Quechan's gaming floor until 30 days after full payment of the outstanding balance. *Id.* Basically, Quechan could lose $3 million revenue if the State took action. The Quechan Tribal Council also wanted to recoup the heightened revenue sharing payments it paid to the State under the 2007 Amendment, which totaled almost $40 million. *Id.*

But first, W&C wanted to make sure it was getting paid if it took on Quechan as a client. The parties worked out a fee agreement that has given rise to some of the claims in this litigation. ECF No. 178 at 18-19. The Attorney-Client Agreement contains a monthly flat fee of $50,000 for W&C's services. *Id.* The agreement also included a contingency fee, which is the focus of much of this litigation. The contingency fee is a percentage of Quechan's "net recovery," which is "any credit, offset, or other reduction in future compact payments to the State in a success of compact (whether new or amended) as a result of the excess payments made under Client's tribal/State compact amended in 2006 in lieu of or in addition to a monetary 'net recovery.'" ECF No. 100-2 at 2. The contingency fee rate is 15% "[i]f the matter is resolved before the filing of a lawsuit or within 12 months thereof." *Id.* at 3. "[T]he matter is resolved at the point in time that the Client signs a successor compact (whether new or amended), which subsequently obtains the requisite State and federal approvals and takes effect under the Indian Gaming Regulatory Act." *Id.* The 15% rate is "higher than the formative rates for resolving the case through court action . . . based upon the Client's express request after consultation and stated need to resolve the situation in as effective and expeditious a manner as possible." *Id.*

The agreement provides that the "Client may discharge Firm at any time." *Id.* at 4. If Quechan discharges W&C "before Client otherwise becomes entitled to any other monetary constituting the 'net recovery,'" W&C "will be entitled to be paid by Client a

reasonable fee for the legal services provided in lieu of the contingency fee set forth." *Id.*

at 5. The amount of such an alternate fee is based on ten factors set forth in the

agreement. *Id.* "In the event of Firm's discharge after . . . Client otherwise becomes

entitled to any other monetary amount constituting the 'net recovery,' . . . the Client will

pay the contingency fee . . . upon receipt of the 'net recovery' amount." *Id.*

### 6.  Quechan Fires W&C and Hires Rosette to Complete the Negotiations

Turning back to Quechan's legal issues with the State, on October 12, 2016, W&C

reached out to the governor's office to try to get negotiations going for a replacement

compact to Quechan's 2007 Amendment. ECF No. 178 ¶ 67. Within a month, the

parties held a negotiation session. *Id.* ¶ 69. On December 7, 2016, the State sent an

initial draft compact to Quechan. *Id.* ¶ 70. This draft included the following material

terms: (1) a twenty-five year term with a possible three-year extension; (2) removing the

10% baseline revenue sharing fee, which would save Quechan about $4 million a year;

and (3) allowing Quechan to operate two, rather than one, gaming facilities of 1,100 slot

machines. *Id.*

This draft compact was well received amongst the Quechan Tribal Council, and the

Council told W&C that it wanted to move quickly and finalize a compact. *Id.* at 73.

W&C set up a meeting with the governor's office to be held on January 31, 2017, to see

if W&C could get more concessions from the State. *Id.* W&C persuaded the State to

increase Quechan's slot limit to 1,200 and include a provision in the compact that would

allow Quechan to trigger negotiations if it desired additional gaming rights. *Id.* ¶ 77.

On April 13, 2017, W&C sent the governor's office a new draft compact that

incorporated the State's concessions during the January meeting. *Id.* ¶ 83. W&C then

sent another draft compact that contained all the other provisions Quechan wanted to

discuss during the remaining weeks of negotiation. *Id.* ¶ 85. The State set up another

negotiation session for June 14, 2017. *Id.* Before that meeting, the Quechan General

Council (the entire voting membership) directed the Tribal Council to execute "whatever compact" W&C negotiated with the State in June. *Id.* ¶ 86. The Tribal Council intended to meet with W&C immediately after negotiations finished in the coming weeks to execute the final agreement.

During the June 14 meeting, Cochrane obtained a litany of concessions favorable to Quechan. *Id.* ¶ 87. The governor's office acknowledged "that time was of the essence" and asked W&C to memorialize the agreed-upon terms. *Id.* ¶ 88. The parties agreed that they would finalize the compact so it would be ready for signature by the end of June. *Id.* On June 15, 2017, Quechan Vice President Virgil Smith told Williams that the Tribal Council was prepared to meet the following week to sign the compact W&C had negotiated. *Id.* ¶ 89. Williams sent a draft compact to the State on June 21, 2017. *Id.* ¶ 90.

On June 16, 2017, Mr. Rosette inserted himself into the picture when he learned that W&C represented Quechan in its compact negotiations with the State of California. *Id.* ¶¶ 169, 170. Just two weeks before the California compact negotiations were set to conclude and after W&C had already received sign-off to execute their proposed agreement, Mark William "Willie" White, a tribal member running for a Councilmember seat, set up a discreet meeting with Quechan Chairman Keeny Escalanti in order to discuss the negotiations. *Id.* ¶ 170. On information and belief, W&C alleges that it was standard practice for Mr. Rosette to distribute the firm's promotional brochures that claim he successfully litigated the Pauma case. *Id.* ¶¶ 171, 172. Though Mr. Rosette was unfamiliar with the details of Quechan's compact negotiations, Mr. Rosette emailed copies of these marketing brochures to Escalanti and White in the days before the June 6, 2017 meeting. *Id.* ¶ 172. Though he was unfamiliar with Quechan's legal issues, Mr. Rosette told White and Escalanti at the meeting that he would take over representing Quechan in their compact negotiations and could help enable Quechan to dodge its

obligations under its existing Attorney-Client Fee Agreement with W&C. *Id.* ¶ 173. Mr. Rosette also told White and Escalanti that since the attorneys were simply memorializing the ultimate terms after the final compact negotiation session, Rosette & Associates would prepare a letter for Escalanti to send to W&C right before the anticipated execution date of the compact to terminate the firm, obtain the end work product, and commit a total repudiation of the Attorney-Client Fee Agreement. *Id.* ¶ 201.

On June 27, 2017, the State's attorney informed Williams that the State received a letter indicating W&C had been terminated from negotiations and replaced by Mr. Rosette. *Id.* ¶ 91. That same day, Williams received an e-mail from Quechan Executive Secretary Linda Cruz, but signed by Escalanti, entitled "Termination of Attorney-Client Relationship." *Id.* ¶ 95. The letter stated that Quechan is terminating the services of W&C effective immediately. *Id.* Furthermore, the letter explained that Quechan would pay a prorated portion of the monthly flat fee for W&C's services for June, but that the Tribe would not pay any contingency fee or reasonable fee for the legal services provided in lieu thereof. *Id.* ¶ 93. The letter also explained that W&C should direct all communications to Mr. Rosette and provide him with a copy of Quechan's case file. *Id.* ¶ 96. W&C believes that this letter, as well as the termination letter, was drafted by Mr. Rosette or one of his attorneys and transmitted via email. *Id.* ¶ 97.

On June 27, 2017, an attorney from Rosette LLP emailed Williams, informing her that Rosette LLP had been retained to represent Quechan in their compact negotiations and demanding that she immediately turn over a copy of the "last compact, with any redlines, that was transmitted to the State during your negotiations." *Id.* ¶ 160. W&C sent Rosette LLP and Quechan a copy of the June 21, 2017 draft compact. *Id.* ¶ 105.

Quechan ended up signing a compact with the State with Rosette as counsel. *Id.* ¶ 106. The executed agreement, which was announced on September 5, 2017, was not as favorable to Quechan as W&C's final draft compact. *Id.* ¶ 108. The State required

Quechan to pay back $2 million, which is half of what it owed under the 2007
Amendment. *Id.* ¶ 110.

**7.    Rosette Further Interferes with W&C after Quechan Negotiations**

In the second half of March 2018, Mr. Rosette engaged in a series of electronic and
telephonic communications with the Office of the Governor.  During these
communications, Mr. Rosette falsely told the State's Senior Advisor for Tribal
Negotiations Joginder Dhillon that the attorneys of W&C had made a number of vicious
personal attacks against his character.  As a result of these conversations, Mr. Dhillon
filed a "partial" declaration in the instant suit that testified to some of the events in
Quechan's negotiations.

Mr. Rosette also began emailing the sealed versions of W&C's filings in this
instant case to a Pauma tribal member. *Id.* ¶ 181, 182.  Mr. Rosette misrepresented the
contents and effects of the filings in by telling the Pauma tribal members to falsely spread
that multiple Pauma tribal members were named as defendants in the case and would
soon also be sued as part of the RICO claims in this case. *Id.*  In addition, Mr. Rosette
emailed versions of the Defendants' answer in this case to Pauma tribal members to
spread that W&C had committed the unethical conduct detailed within. *Id.*  The Pauma
Tribe ultimately held a special meeting to discuss the employment status of W&C and
ultimately decided to significantly diminish the role of the firm. *Id.* ¶ 183.

On November 1, 2018, Mr. Rosette issued a press release to announce the merger
of Rosette & Associates with Ms. LaPena's law firm, the LaPena Law Corporation. *Id.* ¶
185.  As a result, Ms. LaPena was brought on to Rosette, LLP as a shareholder. *Id.*
Although Ms. LaPena had retired from the practice of law in recent years, W&C alleges
that Ms. LaPena and Mr. Rosette engaged in extensive email and telephonic
communications between October 13, 2018 and November 1, 2018, to facilitate an

arrangement for Ms. LePena to join his firm and destroy any damaging files from her prior firm that were relevant to this case. *Id.* ¶ 185-87.

### 8. Quechan's Internal Turmoil

Quechan's Tribal Revenue Allocation Plan states that 40% of the Tribe's casino revenue shall go to the Tribe's general membership in the form of per capita payments. *Id.* ¶ 197. On April 18, 2017, Escalanti sent a letter to the Arizona Department of Gaming certifying Quechan's compliance with the Indian Gaming Regulatory Act by using 40% of the net gaming revenues for per capita payments. *Id.* ¶ 198. Escalanti sent a similar certification to the National Indian Gaming Commission to inform the agency that 40% of the Tribe's net gaming revenues were being used for per capita payments.

However, on April 20, 2017, Escalanti issued a letter – authored by the Rosette defendants – to the tribal members stating that there will be no per capita payment for 2017. *Id.* This followed a March 2017 meeting where Mr. White informed the general membership that there would be no further per capita payments.

Per capita payments did not resume despite similar letters sent by Escalanti to the Arizona Department of Gaming and the National Indian Gaming Commission in the spring of 2018. *Id.* ¶ 199. All of these letters were authored by the Rosette defendants with the help of wires and sent to White and Escalanti using either email and mail. *Id.* ¶ 201. Mr. Rosette also removed legal oversight and accountability measures, which included shutting down the tribal court in January 2018. *Id.* He also removed W&C as representation, the firm that was responsible for ensuring that Quechan retained the excess monies that should have been paid to the State as revenue shares for its members. *Id.*

On January 17, 2018, Quechan held a recall election to remove Escalanti and White from office. *Id.* ¶ 202. Of the votes cast, a majority voted to remove Escalanti and White. *Id.* However, they devised a plan to remain in office with the assistance of Mr.

Rosette, refusing to step down on the basis that the votes were invalid because the total number of voters did not meet the minimum set by the Tribe's constitution. *Id.* To effectuate the plan, Mr. Rosette and Armstrong authored notices for the results of the recall elections which were sent over email for posting at the Tribal Administration Building. *Id.*

In addition, Mr. Rosette instructed Escalanti and White over the wires during November 2018 to disqualify four-plus challengers who were running for seats on the Tribal Council who are either named plaintiffs or sympathetic to the named plaintiff. *Id.* ¶ 203-04. These challengers were disqualified on false grounds. *Id.* ¶ 204.

/ / /

## DISCUSSION

### I. Legal Standard

#### a. Rule 12(b)(6)

A Rule 12(b)(6) motion attacks the complaint as not containing sufficient factual allegations to state a claim for relief. "To survive a motion to dismiss [under 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "detailed factual allegations" are unnecessary, the complaint must allege more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" *Iqbal*, 556 U.S. at 678. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

#### b. Rule 12(b)(1)

16

The jurisdiction of federal courts is constitutionally limited to actual cases or controversies. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2017) (citing *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). The standing to sue doctrine is "rooted in the traditional understanding of a case or controversy" and "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* The party invoking federal jurisdiction bears the burden of establishing Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

A Rule 12(b)(1) jurisdictional attack may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (citation omitted). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.*

## II. Analysis

The Court will address the Rosette Defendants' Motion to Dismiss Plaintiffs' Fourth and Fifth Claims in turn. Both of these claims are RICO conspiracy claims.

### 1. RICO Conspiracy Claim – Count IV

Count IV of the TAC advances a RICO conspiracy claim against the Rosette Defendants. TAC at 77. This claim alleges that the Rosette Defendants have either "conspired to participate in or participated in and/or conducted an enterprise that has sought to fraudulently interfere with Williams & Cochrane's contracts (often to commit fraud against the firm's tribal clients)." *Id.* at 78.

To state a civil claim for a RICO violation under 18 U.S.C. § 1962(c), a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 873 (9th Cir. 2010) (quotation marks and citation omitted).

A RICO conspiracy claim is governed by the traditional concepts of conspiracy law, and "should not require anything beyond that required for a conspiracy to violate any other crimes." *United States v. Neapolitan*, 791 F.2d 489, 497 (7th Cir. 1986). A conspirator must "intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997). A defendant must also have been "aware of the essential nature and scope of the enterprise and intended to participate in it." *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993) (internal quotation marks omitted). To establish a violation of RICO conspiracy under Section 196(d), Plaintiffs must "allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard*, 208 F.3d at 751.

### a. Predicate Acts of Mail and Wire Fraud

A "pattern of racketeering activity" requires at least two acts of racketeering activity within ten years of each other. 18 U.S.C. § 1961(5). Racketeering activity includes the predicate acts of mail fraud and wire fraud. *Sanford v. MemberWorks, Inc.*, 624 F.3d 550, 557 (9th Cir. 2010). "The mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). "The first element covers 'any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises.'" *United States v. Brugnara*, 856 F.3d 1198, 1207 (9th Cir. 2017) (quoting *Carpenter v. United States*, 484 U.S. 19, 27 (1987)).

A wire communication is "in furtherance" of a fraudulent scheme if it is "incident to the execution of the scheme," *United States v. Lo,* 231 F.3d 471, 478 (9th Cir. 2000), meaning that it "need not be an essential element of the

18

scheme, just a 'step in the plot,'" *United States v. Garlick,* 240 F.3d 789, 795 (9th Cir.2001) (quoting *Schmuck v. United States,* 489 U.S. 705, 711 (1989)); *accord United States v. Garner,* 663 F.2d 834, 838 (9th Cir. 1981) (explaining that the wire transfer "need only be made for the purpose of executing the scheme").

*United States v. Jinian*, 725 F.3d 952, 960 (9th Cir. 2013).

Rule 9(b)'s requirement that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity" applies to civil RICO fraud claims. *Alan Neuman Prods. Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1989). To avoid dismissal under Rule 9(b), W&C's TAC would need to "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Id.* at 1393 (*quoting Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). The plaintiff must set forth "more than neutral facts necessary to identify the transaction [. . .] and [plead] what is false or misleading about the statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). In order to satisfy Rule 9(b) the Plaintiff must plead "the time, place and contents of false representation, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby" *Murr Plumbing , Inc. v. Scherer Brothers Financial Services Company*, 48 F 3d 1066 (8th Cir. 2006)

In this present case, the scheme is cast as an "eight-year scheme" and "enterprise that has sought to fraudulently interfere with Williams & Cochrane's contracts." TAC at 79. The TAC lists nineteen alleged predicate acts of mail and wire fraud committed by Richard Rosette and nearly all fail to identify the time, place and contents of the false representation, fail to identify who the representation was made to, or fail to identify why the statements are false. The allegations fail to allege what contracts were involved or what was obtained or given up as a result of the false statements. The Plaintiff alleges:

(a) On or about May 15, 2010, to interfere with Cheryl Williams & Kevin Cochrane's relationships with existing clients by telling them fraudulent falsehoods like they had both been terminated on account of abject incompetence and Kevin Cochrane was a "deviant homosexual" (*see* ¶ 123);

(b) On or about May 15, 2010, to conspire and commit to interfere with any and all future contracts secured by Cheryl Williams and Kevin Cochrane, including through the use of fraudulent means (*see* ¶ 124);

(c) On or about August 11, 2010, to interfere with Williams & Cochrane's existing and proposed contracts with La Pena Law by falsely and fraudulently claiming he was responsible for litigating the *Pauma* case (*see* ¶ 147);

(d) On or about August 12, 2010, to interfere with Williams & Cochrane's existing and proposed contracts with La Pena Law by falsely claiming Cheryl Williams and Kevin Cochrane represented a tribe near Shingle Springs Rancheria and were thus conflicted out from the representation (*See* ¶ 148);

(e) On or about August 12, 2010, to interfere with Williams & Cochrane's existing and proposed contracts with La Pena Law by falsely claiming Cheryl Williams and Kevin Cochrane had been publicly and rather widely bragging that they had just been hired by Shingle Springs to exclusively take on the tribe's rather sensitive compact work (*see* ¶ 148);

(f) On or about July 26, 2011, to direct Richard Armstrong to e-mail the State's negotiator to try and settle Pauma's compact suit even though his firm did not represent the tribe in the matter and had not been so retained (*see* ¶ 154);

(g) On or about July 27, 2011, to communicate with the State's negotiator and falsely claim that Pauma desired to settle its compact lawsuit through negotiations using him (*see* ¶ 157);

(h) Beginning on or about March 18, 2013, to post a false advertisement on his website that he "successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California" (*see* ¶ 132);

(i) Countless times since March 18, 2013, to disseminate promotional materials to actual and prospective clients in the admitted "ordinary course of business" that

20

contain identical representations that Mr. Rosette "successfully litigated a case saving the Pauma Band of Luiseno Mission over $100 Million in Compact payments allegedly owed to the State of California" (*see* ¶ 171);

(j) Shortly before June 16, 2017, to disseminate or arrange to disseminate these promotional materials to putative Quechan President Keeny Escalanti and putative Councilmember Willie White for the June 16, 2017 meeting (*see* ¶ 172);

(k) On or about June 26, 2017, to author and arrange to transmit the letter purportedly terminating the Attorney-Client Fee Agreement even though Rosette, LLP did not officially represent Quechan then (*see* ¶¶ 92, 173);

(l) On or about June 27, 2018, to direct an associate attorney in the Sacramento office to email Cheryl Williams in an attempt to get the final draft compact even though Rosette, LLP did not officially represent Quechan then (*see* ¶ 100);

(m) Repeatedly between June 27, 2017 and June 30, 2017, to communicate with Representatives of the California Office of the Governor in order to take over Quechan's compact negotiations even though Rosette, LLP did not officially represent Quechan then (*see* ¶ 105);

(n) On or about June 30, 2017, to author and arrange to transmit the demand for cease and desist to Williams & Cochrane in order to get the final draft compact even though Rosette, LLP did not officially represent Quechan then (*see* ¶ 201);

(o) On or about January 15, to author a fraudulent, backdated resolution to make it appear that the Quechan Tribal Council had hired Rosette, LLP as of June 27, 2017 – a date on which Robert Rosette could not produce the resolution when requested by the Office of the Attorney General (*see* ¶ 201);

(p) Repeatedly during the latter part of March 2018, to falsely tell the State's Senior Advisor for Tribal Negotiations Joe Dhillon that the attorneys of Williams & Cochrane had made a number of vicious personal attacks against his character (*see* ¶ 179); and

(q) Repeatedly between October 13, 2018 and November 1, 2018 to communicate with Michelle La Pena to arrange for her to join his firm as a partner on the conditions that she testify in the manner desired by Mr. Rosette in the instant case and further destroy any relevant files from her prior firm, including any damaging

21

communications concerning Kevin Cochrane, Cheryl Williams, or Williams & Cochrane (*see* ¶ 186)

In addition, W&C alleges that Mr. Rosette committed two other predicate acts in attempting to tamper with a witness, victim, or informant by telling both Cheryl Williams and Kevin Cochrane that he was going to "hurt them" or "get them." (*See* ¶ 180).

The remaining ten predicate acts involve the following actions by Richard Armstrong:

(a) On or about May 15, 2010, to interfere with Cheryl Williams & Kevin Cochrane's relationships with existing clients by telling them fraudulent falsehoods like they had both been terminated on account of abject incompetence and Kevin Cochrane was a deviant homosexual (*see* ¶ 123);

(b) On or about May 15, 2010, to conspire and commit to interfere with any and all future contracts secured by Cheryl Williams and Kevin Cochrane, including through the use of fraudulent means (*see* ¶ 124);

(c) On or about July 26, 2011, to e-mail the State's negotiator to falsely claim the Pauma Tribal Council desired a meeting to discuss its compact when he was not even retained on the matter for such purpose (*see* ¶ 156);

(d) On or about July 27, 2011, to e-mail the State's negotiator to falsely claim that Pauma wanted "to meet without their attorneys present… with the goal of settling the pending lawsuit" when he was not even retained on the matter or for such purpose (*see* ¶ 154);

(e) On or about June 2, 2017, to arrange, or assist in arranging, to send the letter purportedly terminating the Attorney-Client Fee Agreement even though Rosette, LLP did not officially represent Quechan then (*see* ¶¶ 173, 201);

(f) On or about June 27, 2017, to direct a subordinate associate to e-mail Cheryl Williams in an attempt to get the June 21st draft compact even though Rosette, LLP did not officially represent Quechan then (*see* ¶ 100);

(g) On or about June 30, 2017, to arrange, or assist in arrange, to send the demand for cease and desist even though Rosette, LLP did not officially represent Quechan then (*see* ¶ 201);

22

(h) On or about January 15, 2018, to author a fraudulent, backdated resolution to make it appear that the Quechan Tribal Council had hired Rosette, LLP as of June 27, 2017 – a date on which Robert Rosette could not produce the resolution when requested by the Office of the Attorney General (*see* ¶ 201);

(i) Repeatedly during the latter part of March 2018, to falsely tell the State's Senior Advisor for Tribal Negotiations Joe Dhillon that the attorneys of Williams & Cochrane had made a number of vicious personal attacks against his character (*see* ¶ 179); and

(j) Repeatedly between October 13, 2018 and November 1, 2018, to communicate with Michelle La Pena to arrange for her to join Rosette, LLP as a partner on the conditions that she testify in the manner desired by Mr. Rosette in the instant case and further destroy any relevant files from her prior firm, including any damaging communications concerning Kevin Cochrane, Cheryl Williams, or Williams & Cochrane (*see* ¶ 186).

In addition, W&C asserts that both Mr. Rosette and Mr. Armstrong engaged in further predicate acts by attempting to influence Dhillon to testify in a partial manner (*see* ¶ 179) and endeavoring to influence W&C to drop the present suit using threats of force and/or a threatening communication. *See* ¶ 180.

The predicate acts span over eight years and can be grouped into six categories. The first group of predicate acts relate to interference with W&C's contracts with all past, present, and future clients; the second relates to interference with W&C's contract with La Pena Law; the third involves Defendants' 2011 attempts to settle the claims of Pauma Band of Luiseno Mission; the fourth is based on claims that Richard Rosette successfully litigated the Pauma Band matter that produced savings of over $100 million Compact payments; the fifth asserts interference between W&C's attorney-client relationship with the Quechan Tribe; and the final group alleges post-filing misconduct with respect to this present litigation.

### i.    Plaintiff's Amendments Exceed the Scope of the Court's Leave

As a preliminary matter, the Rosette Defendants argue that W&C's amendments exceed the Court's leave as outlined in its last order on the motion to dismiss the Second Amended Complaint ("SAC").  ECF No. 171.  According to the Rosette Defendants, Plaintiffs went far beyond simply amending its Fourth and Fifth RICO claims.  Instead, Plaintiffs added two new RICO conspiracy claims with numerous additional predicate acts that were not identified in its prior Complaints.  Given the limited scope of the Court's proscribed leave, Defendants proffer that these new claims should be struck or dismissed as procedurally improper.

The Court agrees that in its prior order leave to amend was limited to curing the existing deficiencies in W&C's Fourth and Fifth RICO claims.  At this stage in the litigation – when the parties are on their Third Amended Complaint, leave to amend does not imply a blanket license for Plaintiffs to assert entirely new sets of predicate acts, claims, and parties.[2]  Indeed, the Court was specific that Plaintiffs would be allowed a Third Amended Complaint only to amend those specific deficiencies of the Plaintiff's Fourth and Fifth RICO claims from the SAC that had been dismissed without prejudice. *See* ECF No. 171 at 24.  And "[w]here leave to amend is given to cure deficiencies in certain specified claims, courts have agreed that new claims alleged for the first time in the amended pleading should be dismissed or stricken."  *See DeLeon v. Wells Fargo Bank, B.A.*, 2010 WL 4285006, at *3 (N.D. Cal. Oct. 22, 2010) (dismissing new claims);

---

[2] *See* Order on Motion to Dismiss the SAC, ECF No. 171 at 24. ("Given the nature of the deficiencies discussed above, the Court concludes that amendment will prove futile as to the predicate acts relating to Quechan's termination of the attorney-client agreement with W&C.  However, the Court finds that further amendment may nudge ***the remaining RICO claims*** "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  As a result, W&C's substantive RICO claim against the Rosette Defendants will be dismissed without prejudice.  Plaintiffs are placed on notice that in the event that they choose to amend this claim, it will be the last opportunity to do so [ ]").  (Emphasis added).

24

*see also King v. City of Los Angeles*, 2016 WL 893617, at *3-4 (C.D. Cal. Mar. 8, 2016) (dismissing new claims and newly added parties that exceeded the scope of a Court's order granting leave to amend). Because the Court was "specific about the purpose of the limited leave granted, [the] new claims are improperly before the Court and should be dismissed[.]" *Kouretas v. Nationstar Mrtg. Holdings, Inc.*, 2016 WL 1751750m at *2 (E. D. Cal. Apr. 16, 2015).

In its prior Order, ECF No. 171, the Court thoroughly assessed each claim and category of the predicate acts at issue in the SAC's Fourth and Fifth RICO causes of action. The Court identified the respective deficiencies of these claims and gave leave to amend with respect to some of those surviving claims. Here, the TAC alleges additional claims and categories of predicate acts that go beyond the limited scope of the Court's lenience as circumscribed in that Order. First, W&C articulates a novel claim that the Rosette Defendants sought generally to interfere with any and all of W&C's existing and future contracts through fraudulent means (predicate acts a and b for both Rosette and Armstrong; p and q for Rosette).[3] Next, W&C brings forth a new category of predicate acts that involve Defendants' interference with and misconduct in this instant litigation.[4]

---

[3] Even if this broad category of proximate acts were within the scope of leave to amend, the Court finds that these claims are could not pass muster under Rule 9(b)'s heightened pleading requirements. These claims assert largely vague and general wrongdoings such as "spread[ing] fraudulent falsehoods" through "fraudulent means" without specifying the time, place, content, the actual misrepresentations, or the parties that may have been privy to such misrepresentations. *See* ECF No. 178 at ¶¶ 123-24. In addition, the Court can identify no tangible or concrete RICO injury for these claims – as the TAC does not allege that any specific contractual relationships were terminated on the basis of these actions.

[4] Predicate acts p (Rosette) and i (Armstrong) in the TAC identify the allegations that involve Defendants' interference and post-filing misconduct in this case. These claims, even if they were permissible, would still fail substantively as predicate acts because W&C has not alleged the required element of the use of mails or wires for these communications between Rosette and Joe Dhillon. Meanwhile, predicate act q (Rosette) is not sufficiently related to the alleged scheme to interfere with W&C's contracts. And finally, again the Court cannot identify any concrete tangible financial losses or

25

Neither of these categories of predicate acts were at issue in the previous Complaint. They are also not relevant to the surviving claims or the claims that were dismissed from the SAC without prejudice. As such, the Court will not permit them at this late stage in the pleadings process.

### ii.    Interference with W&C's Relationship with La Pena Law

Next, the Court will turn to the merits of the remaining three categories of RICO predicates. W&C alleges anew that Robert Rosette interfered with W&C's contract with La Pena Law by "falsely and fraudulently claiming he was responsible for litigating the *Pauma* case." *See* TAC ¶ 147. In addition, the TAC alleges that Mr. Rosette told Ms. La Pena two other falsehoods: (1) that W&C represented a tribe near Shingle Springs Rancheria and were conflicted out from La Pena's Shingle Springs matter; and (2) that W&C had publicly bragged about how they had been hired by Shingle Springs to take on the tribe's sensitive compact work. *See* TAC ¶ 148. The TAC asserts that Mr. Rosette emailed a memorandum about Shingle Springs and Pauma to Ms. La Pena shortly within two weeks prior to August 11, 2010 and made false representations that he was responsible for litigating the Pauma case in the body of the email. TAC ¶ 147-48. W&C asserts that the other misrepresentations were made over a phone call between Mr. Rosette and Ms. La Pena sometime between August 12, 2010 and August 15, 2010. *Id.*

The Court finds that these acts are sufficiently alleged as predicate acts. These misrepresentations plausibly furthered the Rosette Defendants' scheme to interfere with W&C's relationship with La Pena Law by taking wrongful credit for W&C's prior successes and by spreading known falsehoods about Plaintiffs' potential conflicts and inability to respect attorney-client confidentiality. These misrepresentations effectuated

---

cognizable injuries that may have resulted from these allegations, a necessary element for them to survive as predicate acts in furtherance of a RICO scheme.

the scheme because they were plausibly made with the purpose of depriving W&C of its potential business opportunity with La Pena Law.

### iii. 2011 Attempts to Settle Pauma Claims

The next group of predicate acts relate to Rosette's attempts to settle the Pauma Tribe compact dispute in 2011 (predicate acts f and g for Rosette; predicate acts c and d for Armstrong). Although these allegations were dismissed in the Court's prior Order on the Motion to Dismiss the SAC, ECF No. 171 at 16, W&C has not made any substantive changes to cure the defects that the Court identified. In fact, the allegations look to be almost identical in both versions of the Complaint. *Compare* SAC ¶¶ 153-66, TAC ¶¶ 151-64, ECF No. 178-11 at 55-59.

As re-pled in the TAC, these acts still do not reveal any false statements nor support a fraudulent interference with a contract scheme. They do not provide context for any properly alleged misrepresentation. And as this Court has held before, they evidence only "sharp elbowed attempts by Rosette to represent Pauma in compact settlement discussions with state negotiators while admitting that Pauma 'had not hired him' and that Rosette 'was not engaged as legal counsel.'" ECF No. 171 at 16. Once again, they are "not properly construed as predicate acts that support the alleged scheme of fraudulent interference with contracts." *Id.* Accordingly, the Court directs that they be removed from the operative pleadings.

### iv. Mr. Rosette Claims Pauma Litigation Success

The TAC next alleges that since 2013, Mr. Rosette has posted advertisements, disseminated promotional materials, and made statements to prospective clients with the false representation that Rosette successfully litigated a case for the Pauma Band of Luiseno Mission that produced savings of over $100 million compact payments owed to the State of California. TAC ¶¶ 132. The Court has previously found the statement

27

taking credit for the Pauma settlement is plausibly false and sufficiently alleged as a predicate act.

The TAC also alleges that Rosette prints and distributes brochures which claim that Mr. Rosette successfully litigated the Pauma case. *Id.* ¶¶ 171.  With the exception of these advertising claims that relate to the Quechan Tribe, which will be discussed separately below, the TAC fails to allege that these brochures were disseminated through mailings or wirings.  The TAC fails to identify who may have received these brochures and when they might have received them, a requirement under Rule 9(b).  As such, this allegation does not qualify as a predicate act.

### v. Interference with W&C's Attorney-Client Relationship with Quechan

The remainder of the alleged predicate acts all relate to the deterioration of W&C's attorney-client relationship with Quechan.  In its last order on the motion to dismiss the SAC, ECF No. 171, the Court engaged in an extensive analysis of the deficiencies of this cause of action.  Ultimately, the Court concluded that "W&C had failed to plausibly allege that its injury was proximately caused by the Rosette Defendants' racketeering activity" with respect to these claims.  ECF No. 171 at 24.  As a result of these insurmountable RICO causation issues, the Court concluded that amendment would prove futile as to the predicate acts relating to Quechan's termination of the attorney-client agreement with W&C and dismissed these claims *with prejudice*.  *Id.*

In the TAC, W&C re-alleges a number of claims related to Quechan's termination of W&C's representation.  Although these claims have been tweaked and several new allegations have been added, they do not address the Court's holding that that these predicate acts could not validly assert an injury within the meaning of RICO.  Nor could they, since the Court dismissed with prejudice all claims relating to this theory.  As the Court has already held, W&C could not and still cannot plausibly that Rosette's actions

proximately caused Quechan to terminate the attorney-client contract, since termination could have resulted from any number of issues with the firm's performance.

### b. Pattern of Racketeering Activity

From the TAC, Plaintiffs have sufficiently alleged four predicate acts: (1) the e-mail from Mr. Rosette to Ms. La Pena claiming his success for litigating the *Pauma* case; (2) Mr. Rosette's misrepresentation to La Pena that W&C represented a tribe near Shingle Springs Rancheria and were conflicted out of the Shingle Springs matter; (3) Mr. Rosette's misrepresentation to La Pena that W&C had bragged publicly about their confidential representation of Shingle Springs in the tribe's compact work; and (4) the posting on Rosette's website of his claimed success litigating the Pauma case.

The Court finds that these acts are sufficiently related and continuous as to constitute a pattern of racketeering activity. To plead a "pattern of racketeering activity," plaintiffs must allege: (i) that the racketeering predicates are related, and (ii) that they amount to or pose a threat of continued criminal activity." *Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1177 (E.D. Cal. 2017) (citing *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004)). For acts to be related, they must have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics." *Howard v. Am. Online Inc.*, 208 F.3d 741, 749 (9th Cir. 2000) (citation and quotation marks omitted). Here, the surviving predicate acts here have the same or similar participants: Mr. Rosette and others at Rosette & Associates. The predicate acts are linked by the sufficiently similar purpose of attempting to interfere with W&C's business through either misrepresentations about W&C or false statements about Rosette's outsized role in the Pauma litigation. And these acts occurred over the course of three years between 2010 and 2013, which constitutes a substantial enough period of time to meet the continuity requirement of racketeering activity.

### c.    Injury and Causation

To have standing, a civil RICO plaintiff must show: (1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was by reason of the RICO violation, which requires the plaintiff to establish proximate causation. *Canyon Cty. v. Sygenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008); *see also Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 873 (9th Cir. 2010) ("To have standing under civil RICO, [plaintiff] is required to show that the racketeering activity was both a but-for cause and a proximate cause of his injury.")

To demonstrate injury for RICO purposes, plaintiffs must "show proof of concrete financial loss, and not mere injury to a valuable intangible property interest." *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1086-87 (9th Cir. 2002). The concrete, financial loss must be "a harm to a specific business or property interest." *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005). "[M]arket share is neither tangible or intangible property; its loss is far too amorphous a blow to support a claim of mail fraud." *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 406 (9th Cir. 1991). Similarly, the Ninth Circuit has found the loss of a prospective relationship to be equally insufficient for RICO purposes – since even when a competitor seeks to take or "steal" clients and customers, "it cannot be said that these customers [are . . .] property." *Id.* (finding that even "unalloyed anticompetitive conduct" did not rise to the level of RICO fraud) ("Put differently, it might be said that defendants hoped to 'steal' Lancaster's customers. But it cannot be said that these customers were Lancaster's property"). And finally, "allegations of injury to [] reputation or goodwill are personal injuries that are unconnected to a business or property interest recognized under state law[.]" *Cobb v. JPMorgan Chase Bank, N.A.*, 2012 WL 5335309, at *4, *5 (N.D. Cal. Oct. 26, 2012) (dismissing RICO claims with prejudice), *aff'd sub nom.* 594 F. App'x 395 (9th Cir. 2015).

W&C is required to allege a concrete financial harm to its business and property that proximately stemmed from the surviving predicate acts. W&C has not met their burden to do so. W&C only generally alleges that it "suffer[ed] contract damages and injuries in an amount to be proven at trial." *See* TAC ¶ 232. Outside of the attorneys' fees related to its termination by Quechan – which were dismissed with prejudice, W&C has not identified any damages, contracts, or specific business relationships lost as a result of Mr. Rosette's website posting. In addition, any injury related to a wholly unconfirmed potential merger or business relationship with La Pena Law meets the very definition of a prospective relationship that is not cognizable as a tangible property interest under RICO.

Injuries related to W&C's existing business relationship with La Pena would also run into the familiar proximate causation roadblocks under *Anza v. Ideal Steel Supply Corp.* 547 U.S. 451, 461 (2006). *Anza* held that a RICO violation must lead proximately and directly to the plaintiff's injuries. *Id.* Just as this Court found that W&C's termination by Quechan could have resulted from any number of issues with the firm's performance, Ms. La Pena's decision to conclude a business relationship with W&C could have occurred for any number of alternative reasons beyond Rosette's misrepresentations, including the preference that La Pena should staff litigation matters internally with attorneys from within the firm, one of the reasons Ms. La Pena herself offered. ECF No. 174-23 at 3. In fact, Plaintiffs themselves do not argue that Ms. La Pena's confidentiality and conflict concerns should be considered universally unwarranted with respect to other potential Indian country cases beyond the Shingle Springs matter.

As such, W&C has not sufficiently alleged a cognizable injury or financial loss that it suffered as a result of alleged interference identified in any of the surviving

predicate acts.  Accordingly, the Court GRANTS with prejudice Defendant's motion to dismiss the fourth cause of action in the TAC.

## 2.    RICO Conspiracy Claim – Count V

The TAC's fifth claim advances a class RICO conspiracy claim on behalf of the Named Quechan General Councilmembers against Mr. Rosette, Mr. Armstrong, Rosette & Associates, and Does 1 through 100.  *See* ECF No. 178 at 100.  Specifically, the TAC asserts that Defendants conspired to use the Tribe's funds to "participate in or conduct an enterprise aimed at fraudulently abusing the finances of the tribe in pursuit of a sham online payday lending business" or for some other elicit end.  TAC ¶¶ 236-37.  The following predicate acts are alleged in Count Five of the TAC:

(a) On or about March 15, 2017, to instruct Willie White to explain at his first Tribal Council meeting that the Tribal Council had decided to discontinue Per Capita payments altogether going forward (*see* ¶ 195)

(b) On or about March 15, 2017, to assist in the cutting off of Per Capita and minor trust account payments to the general membership of Quechan despite the Tribe having $3,000,000 in extra revenue (now over $7,000,000) from not paying revenue sharing to the State of California from July 2016 onwards (*see* ¶¶ 196);

(c) On a regular basis from April 2017 to the filing date of the complaint, to assist in withholding upwards of 63,529 financial distributions to the roughly 2,565 adult and 1,172 minor general members of Quechan (*see* ¶ 197);

(d) On or about April 18, 2017, to author and assist in the false certification to the Arizona Department of Gaming that Quechan was complying with its Tribal Revenue Allocation Plan by using 40% of the net gaming revenues for Per Capita payments when in reality it was not (*see* ¶ 198);

(e) On or about May 2017, to author and assist in the similarly false certification to the National Indian Gaming Commission that Quechan was complying with the percentages in its Tribal Revenue Allocation Plan when it was not (*see* ¶ 199);

32

(f) On or about April 2018, to author and assist in the similarly false certification to the Arizona Department of Gaming that Quechan was complying with the percentages in its Tribal Revenue Allocation Plan when it was not (*see ¶ 199*);

(g) On or about May 2018, to author and assist in the similarly false certification to the National Indian Gaming Commission that Quechan was complying with the percentages in its Tribal Revenue Allocation Plan when it was not (*see ¶ 199*)

(h) At least once during 2017 and 2018, to assist in the distribution of substantially less money from a minor's trust account to a newly-adult beneficiary than should have been available (*see ¶ 200*);

(i) On or about June 26, 2017, to author and assist in the June 26, 2017 letter purportedly terminating the Attorney-Client Fee Agreement even though Rosette, LLP did not officially represent Quechan then (*see ¶ 201*);

(j) On or about June 27, 2018, to direct an associate attorney in the Sacramento office to e-mail Cheryl Williams in an attempt to get the final draft compact even though Rosette, LLP did not officially represent Quechan then (*see ¶ 100*);

(k) Repeatedly between June 27, 2017, and June 30, 2017, to communicate with representatives of the California Office of the Governor in order to take over Quechan's compact negotiations even though Rosette, LLP did not officially represent Quechan then (*see ¶ 201*);

(l) On or about June 30, 2017, to author and assist in the June 30, 2017 demand for cease and desist to Williams & Cochrane in order to get the final draft compact even though Rosette, LLP did not officially represent Quechan then (*see ¶ 201*);

(m)   On or about January 15, 2018, to author and assist in a fraudulent, backdated resolution to make it appear that the Quechan Tribal Council had hired Rosette, LLP as of June 27, 2017 – a date on which Mr. Rosette could not produce the resolution when requested by the Office of the Attorney General (*see ¶ 201*);

(n) On or about January 17, 2018, to author and assist in notices for the recall election that indicated with a checkmark in a box labelled "No," the total number of voters in the election did not meet some supposed threshold requirement of the tribal constitution (*see ¶ 202*);

3:17-cv-01436-GPC-MDD

(o) On or about January 17, 2018, to direct Keeny Escalanti and Willie White to shut down Quechan's longstanding tribal court using the falsehood that the tribal court building had a faulty foundation which prevented the tribe from operating a tribal court in any fashion (even in a separate building) (*see* ¶ 203);

(p) On or about November 2018, to instruct Keeny Escalanti and Willie White to tell tribal members at large the misrepresentation that the Quechan General Councilmembers involved in this suit had only sued Robert Rosette and his firm but the tribe as well, in the hopes that doing so would discredit these individuals within the tribe and ensure that Mr. Rosette's tribal confidantes would win the next election (*see* ¶ 204); and

(q) On or about November 2018, to instruct Keeny Escalanti and Willie White to once again, act outside the scope of their lawful authority by disqualifying – or causing to disqualify – four-plus challengers running for seats on the Tribal Council who are either proposed class members or sympathetic to them using false grounds, such as they had supposedly submitted an application with an illegible signature or did not satisfy a residency requirement (*see* ¶ 204).

The Rosette Defendants proffer that the TAC's repackaging of W&C's previous RICO conspiracy claim in the SAC flounders in the face of both jurisdictional and substantive issues. Since the Fifth Claim in the TAC is now pled on behalf of the Individual Plaintiffs, who are members of the Quechan Tribe, the Rosette Defendants argue that the issue becomes an intra-tribal affairs question outside of this Court's purview. In addition, the Rosette Defendants allege that the claim is unattached to a cognizable RICO injury or specifics as required under Rule 9(b). The Court agrees.

### a. Predicate Acts Based on Intra-Tribal Issues Exceed Federal Courts' Jurisdiction

The predicate acts under the Fifth Cause of Action largely fall into the following categories: per capita payments and revenue sharing for tribal members, the submission of false certifications about these per capita and revenue sharing percentages, the termination of W&C's attorney-client relationship with Quechan, tribal elections, and the

closure of Quechan's tribal court.  With the exception of Quechan's termination of W&C, the remainder of these predicate acts would require this Court to contemplate and adjudicate questions of tribal law.  These questions include, but are not limited to: whether the Tribal Council had the authority under Quechan's Constitution to discontinue per capita payments, TAC ¶ 238(a)-(c); whether the named Individual Plaintiffs were members of the Tribe who were owed gaming revenues under the Tribal Revenue Allocation Plan (TAC ¶ 238(c)); how much – if any – of the gaming revenues each tribal member would be entitled to under tribal law and the Tribal Revenue Allocation Plan (TAC ¶ 238); the number of voters necessarily to hold elections under Quechan's constitution; whether tribal elections complied with Quechan's constitution (TAC ¶ 238(a)-(c), (h), (o), (q)); whether the tribal court is an entity that must be in session without hiatus; and if tribal officials possessed the requisite authority to act on the Tribe's behalf.  Even W&C's termination and Rosette's subsequent retainer could be questions of individual authority that the Court would need to assess with an eye towards the Tribe's constitutional bylaws.

Federal courts routinely hold that these questions are outside of their jurisdiction. *See Wasson v. Pyramid Lake Paiutte Tribe*, 2010 WL 4293349, at *5 (D. Nev. Oct. 20, 2010) (noting that tribal election disputes based on the alleged violation of tribal election procedures and disagreements about the Tribe's internal governance conflicts and duties to its members qualify as issues of tribal law); *see also Montana v. United States,* 450 U.S. 544, 564 (1981); *Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Mississippi in Iowa*, 609 F.3d 927, 943 (8th Cir. 2010) (concluding that whether an individual has authority to act on behalf of a tribe was a question of tribal law and governance).  This is because Indian tribes are "distinct, independent political communities" that retain "their original natural rights in matters of local self-government."  *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978).  Along those

3:17-cv-01436-GPC-MDD

lines, Courts have long established that disputes over the use of pro rata allocation of gaming revenue are exclusively within the jurisdiction of the tribal courts. *See Lewis v. Norton*, 424 F.3d 959, 963 (9th Cir. 2005) ("25 C.F.R. § explicitly states that 'disputes arising from the allocation of net gaming revenue and the distribution of per capita payments' are to be resolved through 'a tribal court system, forum, or administrative process.'"); *see also Alvarado v. Table Mountain Rancheria*, 2005 WL 1806368, at *4 (N.D. Cal. July 28, 2005); *aff'd* 509 F.3d 1008 (9th Cir. 2007) (holding that federal courts do not have jurisdiction over tribal membership disputes even when those disagreements have been tied to congressional efforts to regulate gaming).

In this case, Plaintiffs have brought a wealth of tribal disputes as predicates acts in furtherance of its Fifth Claim for RICO Conspiracy. To address these disputes would require the Court to overstep the boundaries of its jurisdiction. And "Plaintiffs cannot eliminate this inherent issue just by bringing their challenge as a civil RICO action." *Rabang v. Kelly*, 328 F. Supp. 3d 1164, 1168 (W.D. Wash. 2018). Only tribal courts can adjudicate these issues and "[p]rinciples of comity require federal courts to dismiss or to abstain from deciding claims over which tribal court jurisdiction is colorable." *Watterson v. Fritcher*, 2018 WL 5880776, at *2 (E.D. Cal. Nov. 8, 2018). Exhaustion of tribal remedies is a mandatory requirement for claims "over which tribal court jurisdiction is colorable." *Marceau v. Blackfeet Housing Auth.*, 540 F.3d 916, 920-21 (9th Cir. 2008). Accordingly, the Court will dismiss the fifth cause of action from the TAC with prejudice; as a result, the Court need not address the other basis for Defendants' challenge.[5]

---

[5] Even if these issues were within the Court's jurisdictional scope, the Court notes that Plaintiffs have failed to identify a concrete injury, loss of tangible property interest, or financial harm proximately harmed by these predicate acts. As such, dismissal on the merits would also be proper. In addition, the TAC does not assert that the payday operation has been established or that Tribal Members are always entitled to pro rata gaming proceeds. There are also no allegations that support the required elements to

36

## III.   Motion to Strike

The Rosette Defendants also request that this Court strike a number of allegations in the TAC.  According to Defendants, these allegations include "*ad hominem* attacks that the Court previously struck," "inflammatory allegations of bigotry without a shred of support or any conceivable connection to any claim for relief in the TAC," and Mr. Rosette's alleged representations and dealings with other tribes unrelated to this case. TAC ¶¶ 110-16, 178-79, 188-93, 123, 228(a), 228(2nd a).

Plaintiffs argue that these allegations are relevant to the RICO and Lanham Act claims.  As discussed above, the Court has dismissed the RICO claims with prejudice. The Court also finds no relevance of these allegations to the false advertising claim under the Lanham Act.  Accordingly, the Court GRANTS Defendant's motion to strike these allegations.  Plaintiffs must refile their complaint omitting these allegations as well as the foregoing claims that have been dismissed.

## CONCLUSION

1.     The Rosette Defendants' Motion to Dismiss Plaintiffs' Fourth and Fifth Causes of Action, ECF No. 185, is **GRANTED WITH PREJUDICE**.

2.     The Rosette Defendants' Motion to STRIKE, ECF No. 185, is **GRANTED**. Plaintiffs are directed to refile their Fourth Amended Complaint in accordance with this order.

**IT IS SO ORDERED.**

Dated:  September 10, 2019

Hon. Gonzalo P. Curiel
United States District Judge

---

assert a RICO conspiracy claim.  The TAC does not mention an agreement among co-conspirators constituting a substantive violation of RICO – nor does the TAC support an inference that co-conspirators agreed to commit a violation of two predicate offenses.