1  Cheryl A. Williams (Cal. Bar No. 193532)
   Kevin M. Cochrane (Cal. Bar No. 255266)
2  caw@williamscochrane.com
   kmc@williamscochrane.com
3  WILLIAMS & COCHRANE, LLP
   125 S. Highway 101
4  Solana Beach, California 92075
   Telephone: (619) 793-4809
5

6  Attorneys for Plaintiff
   WILLIAMS & COCHRANE, LLP
7

8          **IN THE UNITED STATES DISTRICT COURT**

9        **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10

11  **WILLIAMS & COCHRANE, LLP**;          Case No.: 17-CV-01436 GPC MSB

12              vs.                        **FOURTH AMENDED
                                           COMPLAINT**
13  **ROBERT ROSETTE; ROSETTE &
    ASSOCIATES, PC; ROSETTE, LLP;**
14  **QUECHAN TRIBE OF THE FORT            **JURY TRIAL DEMANDED**
    YUMA INDIAN RESERVATION**, *a*
15  *federally-recognized Indian tribe*; *and*  **[ACTION FILED JULY 17, 2017]**
16  **DOES 1 TO 100**.

17

18

19

20

21

22

23

24

25

26

27

28

                                          Case No.: 17-CV-01436 GPC MSB

**INTRODUCTION**

1. This case concerns the tortious interference of a contract by an individual who has now done or attempted to do the same with three different clients of the plaintiff over the span of the past eight years.[1] In 2016, the firm of Williams & Cochrane concluded a gaming compact-based lawsuit in this district against the State of California on behalf of the Pauma Band of Mission Indians that led to the payment of a $36.3 million judgment in September 2016. *See Pauma Band of Luiseno Mission Indians v. California,* No. 09-01955 (S.D. Cal. 2016) ("*Pauma*"). A case involving so much money naturally draws a lot of undesired attention, and, in an unusual turn of events, an attorney by the name of Robert Rosette tried to settle the case with the State of California even though he did not represent the plaintiff tribe in the suit and even admitted as much in his covert communications with the Office of the Governor.[2] Lacking these e-mails, the presiding judge in the prior case – Judge Cathy Ann Bencivengo – naturally took issue with the actions of Robert Rosette, but, ultimately refrained from doing anything about his questionable conduct since he was not formally involved in the proceeding.

2. At the time various media outlets around Southern California were reporting on the State paying this once-in-a-generation judgment to Pauma, another tribe situated in this district known as the Quechan Tribe of the Fort Yuma Indian Reservation reached out to Williams & Cochrane and asked if the firm could solve a similar but more complicated dispute that the tribe had with the State of California concerning approximately $40 million in overpayments under an allegedly void compact. After an in-person meeting, numerous phone calls, and weeks of discussion and negotiation, Williams & Cochrane and Quechan ultimately executed an Attorney-Client Fee Agreement that incorporated a

---

[1] In accordance with Civil Local Rule 15.1(c), a redlined copy of this Fourth Amended Complaint indicating changes made from the Third Amended Complaint is attached hereto as **Exhibit 28**.

[2] A true and correct copy of a series of July 2011 e-mails between Robert Rosette and the State of California's then-compact negotiator Jacob Appelsmith is attached hereto as **Exhibit 1**.

discounted 15% contingency fee in the event the firm was able to find an expedient way to recover the $40 million in overpayments (or the value thereof) through either negotiation or litigation.[3] Along with signing the contract, the Quechan Tribal Council executed a tribal resolution indicating that it had voted "5 for," "0 against" on the issue of whether to accept the terms of the Attorney-Client Fee Agreement.[4]

3. With that, Williams & Cochrane got down to work and over the course of the next nine months, from October 2016 to June 2017, was able to convince the Office of the Governor to provide Quechan with a replacement compact that would eliminate over $120 million in revenue sharing fees during the next 28 years and provide the tribe with the ability to generate another $660 million in additional revenue as a result of new gaming rights. ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████. And yet, on June 27, 2017, just three days before the parties were supposed to execute the compact and the 15% contingency fee would definitively attach without the aid of the premature termination section of the Attorney-Client Fee Agreement, the putative President of Quechan Keeny Escalanti transmitted a letter to Williams & Cochrane, via an e-mail on which no other Tribal Councilmembers were carbon copied, indicating that the tribe was terminating the firm effective immediately and would not pay either the contingency fee or a reasonable fee in lieu thereof based upon the value of the services the tribe had received.[5] In an apparent effort to convince Williams & Cochrane to simply walk away from the contract, putative Quechan President Keeny Escalanti included an extortive threat at the end of the letter that stated, "[w]e strongly advise you against pressing your luck any further out of concern for the

---

[3] A true and correct copy of the September 29, 2016 "Attorney-Client Fee Agreement" between Williams & Cochrane and Quechan is attached hereto as **Exhibit 2**.
[4] A true and correct copy of the September 29, 2016 Quechan Resolution No. "R-195-16" is attached hereto as **Exhibit 3**.
[5] A true and correct copy of a June 26, 2017 letter from putative Quechan President Keeny Escalanti to Williams & Cochrane is attached hereto as **Exhibit 4**.

reputation of your firm in Indian Country and in the State of California" – language that is reminiscent of what putative Quechan President Keeny Escalanti included in a separate "Demand for Cease and Desist" three days later.[6] After conveying the original threat, putative Quechan President Keeny Escalanti then ended the June 27th letter by explaining that Williams & Cochrane could not tell anyone else in the tribe about the message they had just received (*i.e.*, other Tribal Councilmembers, tribal members, etc.), and simply instructed the firm to turn over the latest draft of the compact that Quechan and the State of California were days away from executing to one Robert Rosette.

4. The bizarreness of the situation was not lost on the attorney general representing the State of California in the compact negotiations, who called one of the partners of Williams & Cochrane named Cheryl Williams after receiving a similar letter three days before the conclusion of the negotiations and exclaimed "This has never happened before [in my twenty-plus years of representing the Office of the Governor in tribal affairs] and we don't know what to do." Unfortunately, Williams & Cochrane did know what to do – and that was to turn over its incalculably valuable work product and simply step away from the situation. While it does not know the full extent of the fraud in this matter, what Williams & Cochrane does know is that Robert Rosette actually advertises on his website that *he* successfully litigated the *Pauma* case that resulted in the $36.3 judgment, and he accordingly solicited Quechan with similar misrepresentations about his role in the case and then told the tribe to fire Williams & Cochrane once a compact in principle had been reached so he could swoop in and take credit for the outcome.[7][8] This is the only logical telling of a story that involves a person who either has or has tried to interfere with significant contracts between Williams & Cochrane and third parties on at least four separate

---

[6] A true and correct copy of a June 30, 2017 letter from putative Quechan President Keeny Escalanti to Williams & Cochrane is attached hereto as **Exhibit 5**.

[7] A true and correct copy of a June 28, 2017 screen capture of the website biography for Robert Rosette is attached hereto as **Exhibit 6**.

[8] A true and correct copy of an August 25, 2014 screen capture of the website biography for Robert Rosette from the Internet Archive is attached hereto as **Exhibit 7**.

occasions this decade. Unfortunately, the only forum for resolving this issue is in federal court because Robert Rosette has a long and well-documented history of coming in to tribes through dubious means – like by representing singular persons or "factions" and then claiming he represents the tribe as a whole – and then doing whatever it takes to assume control and advance his agenda, even if it means the divided tribal members turn against each other and resort to mass armed violence. *See* General Allegations, § II(A), *infra.*

5. The decision to step to the side enabled Quechan to execute the compact Williams & Cochrane had negotiated, but this story has an all-too-familiar and unfortunate addendum about the abuses that happen once Robert Rosette has found a side door into a tribe and is fixated on advancing his personal agenda with the help of a select few rogue insiders. As for Williams & Cochrane, Robert Rosette and his confidantes on the Quechan Tribal Council have followed through on their threat to ruin the "reputation of your firm in Indian Country and in the State of California" through an unremitting course of actions that continues to this very day – one that is designed to both put Williams & Cochrane out of business.

## JURISDICTION

6. The district court has jurisdiction over this matter pursuant to the Lanham Act; the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.* (*see Cabazon Band of Mission Indians v. Wilson,* 124 F.3d 1050, 1056 (9th Cir. 1997)); and 28 U.S.C. §§ 1331 ("Federal Question Jurisdiction") & 1367 ("Supplemental Jurisdiction").

7. Venue is proper in this district under both the general venue statute since a substantial part of the events giving rise to this suit occurred within this district – including the execution and subsequent breach of the Attorney-Client Fee Agreement – and Robert Rosette "transacts his affairs" in San Diego and Imperial Counties. 28 U.S.C. § 1391(b)(2); 18 U.S.C. § 1965(a); *Yavapai-Apache Nation v. La Posta Band of Diegueno Mission Indians,* 2017 Cal. App. Unpub. LEXIS 4430 (4th Dist. June 28, 2017) (indicating Rosette represents the Southern District-based La Posta tribe in a breach of

contract lawsuit that resulted in a $48,893,407.97 adverse judgment); *Yavapai-Apache Nation v. Iipay Nation of Santa Ysabel,* 201 Cal. App. 4th 190 (4th Dist. 2011) (indicating Rosette has defended the Southern District-based Santa Ysabel tribe in a like breach of contract action involving $30+ million in damages).

8. Quechan has waived its sovereign immunity to suit in federal court pursuant to Section 13 of the Attorney-Client Fee Agreement. *See* Ex. 2, § 13. Furthermore, Quechan has also waived its sovereign immunity as to "compensatory and punitive damages," "pre-judgment and post-judgment interest," "restitution," "disgorge[ment]," "offset/re-coupment," and "costs and expenses" through its Answer. *See* Dkt. No. 94, p. 24 (listing the affirmative remedies sought from Quechan's counterclaims); *Guidiville Rancheria of Cal. v. United States,* 2015 U.S. Dist. LEXIS 109057, *16-*18 (N.D. Cal. 2017), *aff'd in part,* 704 F. App'x 655, 660 (9th Cir. 2017).

9. This action presents an actual and live controversy, in part, as to whether Quechan repudiated the Attorney-Client Fee Agreement at the direction, and with the assistance, of Robert Rosette, an attorney that has perpetuated an ongoing series of illegal acts against Williams & Cochrane. The district court has the power to remedy the dispute in accordance with the Prayer for Relief, *infra.*

## PARTIES

10. Williams & Cochrane, LLP is a partnership registered in the State of California to provide legal services, with offices in both Solana Beach and Temecula, California.

11. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

12. The Quechan Tribe of the Fort Yuma Indian Reservation is a federally-recognized Indian tribe listed in the January 30, 2018 Federal Register as the "Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona."

13. Robert Rosette is an individual and attorney licensed to practice law in the States of Arizona and California who is the President and Director of Rosette & Associates, PC, which is in turn a general partner of a parent entity named Rosette, LLP.

14. Rosette & Associates, PC is a corporation organized in the State of Arizona to provide legal services, with its principal office at 565 West Chandler Boulevard, Suite 212, Chandler, Arizona 85225.

15. Rosette LLP is also an entity registered in the State of Arizona to provide legal services, with at least twenty-three attorneys and five offices, the principal one for which is also located at 565 West Chandler Boulevard, Suite 212, Chandler, Arizona 85225.

16.. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

17.. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

## GENERAL ALLEGATIONS[9]

### I. THE CONTRACT BETWEEN QUECHAN AND WILLIAMS & COCHRANE

#### A. Background on the 1999 Compacts

18. Congress enacted the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*, in 1988 to regulate the various forms of gaming on Indian lands, including "class III" games like house-banked card games and slot machines. For a tribe, class III gaming is only legal if done pursuant to a tribal/state gaming compact, which a state must negotiate in "good faith." *See, e.g.,* 25 U.S.C. § 2710(d).

19. In 1999, the administration of then-California Governor Gray Davis negotiated a model gaming compact for interested tribes ("1999 Compact"),[10] which gave the signatory tribe the right to, *inter alia*, operate a base number of slot machines that it could then increase up to a maximum of 2,000 by obtaining licenses from a communal pool.

20. The only catch was that the 1999 Compact did not specify the total number of available slot-machine licenses, instead including the following opaque formula within

---

[9] Any general or claim-specific allegations that are made on information and belief are believed to be "likely [to] have evidentiary support after a reasonable opportunity for further investigation or discovery." *See* FED. R. CIV. P. 11(b)(3).

[10] A true and correct copy of excerpts of the "Tribal-State Compact between the State of California and the Quechan Indian Nation" is attached hereto as **Exhibit 8**.

Section 4.3.2.2(a)(1) of the agreement that states:

> (1). The maximum number of machines that all Compact Tribes in the aggregate may license pursuant to this Section shall be a sum equal to 350 multiplied by the number of Non-Compact tribes as of September 1, 1999, plus the difference between 350 and the lesser number authorized under Section 4.3.1.

*See* Ex. 8 at § 4.3.2.2(a)(1).

21. During the summer of 2002, approximately two-and-a-half years into the life of the 1999 Compacts, the California Gambling Control Commission ("CGCC") unilaterally determined that this "license pool" formula provided for 32,151 licenses, and then used this number when reviewing tribal license applications. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California,* 618 F.3d 1066, 1071 (9th Cir. 2010).

22. Yet, on April 22, 2009, the United States District Court for the Eastern District of California held that the license pool actually contains upwards of 10,549 more licenses than the CGCC determined, and directed the Commission to make those additional licenses available to the signatory tribes. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California,* 629 F. Supp. 2d 1091 (E.D. Cal. 2009) ("*Colusa*").

**B. The Pauma Band and its Compact Suit against the State of California**

23. The Pauma Band of Mission Indians ("Pauma") was one of the sixty-plus original tribal signatories to the 1999 Compact – an agreement it amended in 2004 ("2004 Amendment") to obtain the ability to operate 2,000 slot machines after the CGCC determined the tribe could not obtain the necessary licenses under the 1999 Compact given its restrictive interpretation of the license pool formula. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* 813 F.3d 1155, 1161-62 (9th Cir. 2015) ("*Pauma*"). The result of the amendment was that Pauma ended up paying approximately twenty-four times as much revenue sharing each year in order to operate machines that should have been available under its original compact. *Id.* at 1162.

24. After learning about the ruling by the Eastern District of California in *Colusa*, Pauma filed suit in the Southern District of California on September 4, 2009, requesting

rescission of the 2004 Amendment and restitution of the heightened fees paid thereunder on the basis of any one of seven claims: unilateral and mutual mistake of fact, unilateral and mutual mistake of law, frustration of purpose/failure of consideration, and two IGRA violations. *See Pauma,* No. 09-01955, Dkt. No. 1, pp. 19-26 (S.D. Cal. Sept. 4, 2009).

25. At the time, Pauma was represented in the lawsuit by a law firm named Rosette & Associates. The two attorneys solely responsible for preparing and filing the complaint in the case were Cheryl A. Williams and Kevin M. Cochrane.

26. In fact, Cheryl Williams and Kevin Cochrane performed all the litigation work in the case from the outset of the proceeding until their eventual departure from the firm the ensuing year. This allegation is verified by Robert Rosette's October 26, 2010 deposition testimony in the antecedent case of *Pauma Band of Luiseno Mission Indians of the Pauma Yuima Reservation, Cal. v. Harrah's Operating Co.*, No. GIC847406 (San Diego County Sup. Ct. 2012). After suggesting he was the lead strategist for the case, Robert Rosette responded as follows when asked about his specific involvement in the compact litigation by the deposing attorney for Harrah's:

Q. Now, in terms of the [compact] litigation, the drafting and filing of the complaint and the arguing, did you do all that yourself up to the time you were removed from the case?

A. No, I – I have employees that work for me that conduct research, draft, make court appearances, so on and so forth.

Q. All right. So outside of being sort of the lead strategist, did you make any appearances or become an attorney of record at all?

A. I was an attorney of record. There was only one appearance that was actually showing up, the oral argument for the preliminary injunction. And I had a conflict that day.

Q. Who argued that case from your firm?

A. Cheryl Williams.

27. Shortly after filing suit, Pauma moved for a preliminary injunction to reduce the revenue sharing fees of the 2004 Amendment to the prior rates of the 1999 Compact, which the initial district judge assigned to the action – Judge Larry Alan Burns – granted

on April 12, 2010. *Pauma,* No. 09-01955, Dkt. No. 44 (S.D. Cal. Apr. 12, 2010).

28. Approximately one month after Judge Burns' issued his injunction order, on or about May 15, 2010, both Cheryl Williams and Kevin Cochrane departed Rosette & Associates, leaving the case in the care of their prior firm.

29. As the two attorneys were departing, the State of California appealed the injunction order to the United States Court of Appeals for the Ninth Circuit and then moved to stay the order pending appeal. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* No. 10-55713, Dkt. No. 7 (9th Cir. May 21, 2010).

30. Though having left the firm, Cheryl Williams nevertheless offered to assist Rosette & Associates in preparing the opposition to the State's motion to stay in the Ninth Circuit so Pauma's interests would not be harmed. However, this request was quickly rebuffed and the replacement attorneys with Rosette & Associates filed Pauma's opposition on June 11, 2010. *See Pauma,* No. 10-55713, Dkt. No. 15 (9th Cir. June 11, 2010).

31. On July 28, 2010, the motions panel of the Ninth Circuit granted the State's request to stay the injunction in a summary one-paragraph order. *See Pauma,* No. 10-55713, Dkt. No. 39 (9th Cir. July 28, 2010).

32. Just two days after Rosette & Associates filed its ineffective opposition brief, on or about Sunday June 13, 2010, the Pauma General Council held a meeting and voted to terminate Rosette & Associates from the compact litigation and replace the firm with Cheryl Williams and Kevin Cochrane, who had just formed their own law firm named Williams & Cochrane, LLP. This allegation that Rosette & Associates was removed from the case is again verified by Robert Rosette's October 26, 2010 deposition testimony in the antecedent *Pauma v. Harrah's* case. When the deposing attorney for Harrah's asked him to generally describe the status of the compact litigation as of that date (*i.e.*, just four months after his termination), Robert Rosette explained that he did not know because he was removed from the case in an exchange that went as follows:

Q. And then what is the current status of that case?

A. I don't know. I'm not – I was removed. …

Q. And why were you terminated from representing Pauma?

A. They chose different legal counsel. Specifically, Cheryl Williams had left my firm and started her own firm and took the case with her.

Q. Is she a solo practitioner now?

A. She's got a law partner, but I don't – I don't know how they're formed or structured or anything. I don't – I don't care.

Q. And so she left your firm and simultaneously the matter transferred with her; is that right?

A. No, I had the matter for probably over a month. I actually filed the initial – I took it over myself for a while, just because I was the main attorney. I just handled it myself for about 45 days and actually filed the preliminary answers in federal court, and then I was told shortly thereafter that I was being removed.

Q. And who told you that?

A. The chair – I was actually at – you know, my father had just passed away. I was at his funeral in Montana. That's why I couldn't go to the general council meeting. And the chairman had called me on – I think their general council meetings are the first Sunday of every month. He called me on Monday, when I was at home at Rocky Boy, Montana, and told me that the general council made a decision to remove me.

Q. Was there any claim that you had some conflict in going ahead with this case or any other reason other than simply going ahead with Cheryl? …

A. I told you earlier that I respect tribal decisions, don't question them, don't pry. I told them thank you for letting me know and that I would transfer the files and I didn't ask any other – and, you know, like I said, I don't care. I got other things I could do.

33. After resuming their role as counsel of record in the case, Cheryl Williams and Kevin Cochrane convinced the Ninth Circuit to vacate its stay order and reinstate the preliminary injunction. *See Pauma,* No. 10-55713, Dkt. No. 62 (9th Cir. Aug. 23, 2010).

34. The Ninth Circuit then followed this order up with another one disposing of the interlocutory appeal entirely that kept the injunction in place pending any further consideration by the district court. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* 410 F. App'x 20 (9th Cir. Nov. 30, 2010).

10                    Case No.: 17-CV-01436 GPC MSB
FOURTH AMENDED COMPLAINT

35. The procedural handling of the case following remand involved multiple transfers as magistrates were promoted to district judgeships, with the case first going from Judge Burns to Judge Battaglia, and then from Judge Battaglia to Judge Bencivengo. *See Pauma,* No. 09-01955, Dkt. Nos. 104 & 176 (S.D. Cal. Mar. 22, 2011 & Mar. 6, 2012)).

36. In the midst of these transfers, Williams & Cochrane filed a First Amended Complaint on Pauma's behalf with Judge Battaglia on September 9, 2011 that added a wealth of allegations and a new claim for relief based on misrepresentation under federal contract law. *See Pauma,* No. 09-01955, Dkt. No. 130, pp. 55 (S.D. Cal. Sept. 9, 2011).

37. When the case finally wound up before Judge Bencivengo, the court resolved the case on summary judgment in Pauma's favor on the basis of the misrepresentation claim that Williams & Cochrane added in September 2011. *See Pauma,* No. 09-01955, Dkt. No. 227 (Mar. 18, 2013). As a result of the decision, Pauma was immediately "entitled to rescission of the 2004 Amendment" and also subsequently received an order allowing it to recoup the approximately $36.3 million in overpayments the tribe made to the State under the amendment as "specific performance" of the original 1999 Compact. *See Pauma,* No. 09-01955, Dkt. Nos. 238 & 245 (S.D. Cal. June 11, 2013 & Dec. 2, 2013).

38. Along with that, the initial summary judgment order from Judge Bencivengo also contained a *sua sponte* statute of limitations analysis that the State of California failed to argue, presumably to stave off any future copycat suits. *See Pauma,* No. 09-01955, Dkt. No. 227, pp. 17-18 (S.D. Cal. Mar. 18, 2013).

39. However, before awarding specific performance, Judge Bencivengo ordered Pauma and the State of California to participate in a settlement conference with Magistrate Judge Mitchell Dembin to see if the dispute could be resolved without the need for an appeal. *See Pauma,* No. 09-01955, Dkt. No. 227, p. 31 (S.D. Cal. Mar. 18, 2013).

40. The Pauma General Council met in advance of the settlement conference and voted to negotiate for an extension on the term of the largely-revenue-sharing-free 1999 Compact with the State of California, using the $36.3 million it was about to receive as a bargaining chip. *See Pauma,* No. 09-01955, Dkt. No. 256-1, ¶ 4 (S.D. Cal. Jan. 30, 2014).

41. The parties met for settlement conferences with Magistrate Judge Dembin on May 9, 2013 and May 20, 2013, but unfortunately "[n]o settlement was reached." *Pauma,* No. 09-01955, Dkt. Nos. 234 & 235 (S.D. Cal. May 9, 2013 & May 20, 2013).

42. On appeal, the Ninth Circuit affirmed the summary judgment orders of the district court, reclassifying the $36.3 million award as a form of restitution rather than specific performance in the process. *See Pauma,* 813 F.3d 1155.

43. The State of California subsequently chose to petition the Supreme Court for a writ of certiorari, but the Court ultimately declined to hear the petition after Williams & Cochrane filed a competing one in the hopes of defusing the State's petition. *Compare California v. Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation, __ U.S. __,* 136 S. Ct. 2511 (2016) *with Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California, __ U.S. __,* 136 S. Ct. 2512 (2016).

44. Following the termination of the appeal process, the State of California satisfied the judgment in full during September 2016.

45. This $36.3 million payment marked the first time that the State of California has paid a monetary remedy to a tribe as part of a compact dispute since the late 1990s, and even then the amount of funds at issue was a small fraction of those involved in Pauma's case. *See Cabazon v. Wilson,* 124 F.3d at 1053-55 (explaining that the State had to return license fees for simulcast wagering facilities).

46. When all was said and done, the Pauma case involved more than three-hundred docket entries in the district court, two motions to dismiss, four summary judgement processes, two appeals, and competing petitions for writs of certiorari to the Supreme Court during the seven-plus-year history of the case.

47. At the culmination of the suit, Williams & Cochrane turned its attention to litigating other complex and novel federal-Indian-law issues while Robert Rosette championed the Pauma victory, advertising on his website that he "successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California… ." *See* Exs. 6 & 7.

### C. The Quechan Tribe Hires Williams & Cochrane in the Wake of *Pauma*

48. The decision by the Supreme Court to deny the State's petition for a writ of certiorari in *Pauma* garnered a significant amount of media attention around California. *See, e.g., California pays tribe $36 million to settle years-old fight,* SAN DIEGO UNION-TRIBUNE, Sept. 9, 2016, *available at* http://www.sandiegouniontribune.com/sdut-california-pays-tribe-36-million-to-settle-years-2016sep09-story.html (last visited July 2, 2017); *A Schwarzenegger-era casino deal will cost state $36.3 million,* SACRAMENTO BEE, Aug. 23, 2016, *available at* http://www.sacbee.com/news/politics-government/capitol-alert/article97452877.html (last visited July 2, 2017).

49. Shortly after these news articles became public, the President of Quechan Mike Jackson contacted Cheryl Williams to find out whether Williams & Cochrane was interested in representing his tribe to solve a similar compact dispute with the State of California, and invited her and her partner Kevin Cochrane to come out to the tribe's reservation near Yuma, Arizona to discuss the situation with the Tribal Council.

50. Quechan has a long history of political infighting, but the one constant and stabilizing force has been President Mike Jackson, a military veteran and son and grandson of tribal leaders who, aside from a single four-year hiatus, occupied the office of President continuously from 1995 through 2016. President Jackson, who was profiled by the New York Times in 2007 as he sought to protect Quechan's sacred sites from the potential harms of a $4 billion oil refinery (*see Far from the Reservation, but Still Sacred?,* NEW YORK TIMES, Aug. 12, 2007, *available at* http://www.nytimes.com/2007/08/12/business/yourmoney/12tribe.html (last visited July 2, 2017)), is the signatory for the tribe's original and amended compacts with the State of California and held the position of President when the tribe opened its original casino in California, the permanent resort facility that replaced it, its casino in Arizona, and also when the tribe broke ground on a health clinic designed to serve all the Yuma-area tribes.[11] *See* Ex. 8; *Ground finally*

---

[11] A true and correct copy of excerpts of the "Amendment to Tribal-State Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian

FOURTH AMENDED COMPLAINT

*broken on clinic for local tribes,* YUMA SUN, Jan. 28, 2016, *available at* https://www.pressreader.com/usa/yuma-sun/20160128/281479275438281 (last visited July 2, 2017).

51.  As mentioned above, Quechan has an amended compact with the State of California that was approved by the Bureau of Indian Affairs on January 4, 2007 ("2007 Amendment"), or roughly two-and-a-half years after Pauma's amendment and four-and-a-half years after the CGCC restricted the size of the license pool under the 1999 Compacts. *See* 72 Fed. Reg. 2007-08 (Jan. 17, 2007). The 2007 Amendment allows Quechan to operate up to 1,100 slot machines inside of one reservation-based gaming facility until December 31, 2025 in exchange for a base revenue sharing fee of 10% of the first $50 million in net win the tribe generates each year. *See* Ex. 9 at § 4.3.3(a). For all intents and purposes, the practical effect of this revenue sharing structure is that Quechan pays 10% of its net win to the State of California off of the ████████████ in revenues the tribe typically generates each year at its California casino.

52. Williams & Cochrane initially met with Quechan about its issues with its 2007 Amendment on or about September 14, 2016. Along with the partners for Williams & Cochrane, the persons present at the meeting included President Jackson, four of the five Tribal Councilmembers, the Tribal Council Secretary Regina Escalanti, the General Manager of the Quechan Casino Resort Charles Montague (who is himself a Quechan tribal member), and the Chief Financial Officer for the Quechan Casino Resort Phil Simons.

53. ████████████████████████████████████████████████████████████████████████████████████████████████.

54. The cessation of revenue sharing payments is extremely dangerous under the 2007 Amendment, as it can empower the State of California to hold the tribe in material breach of its compact, and/or shut down Quechan's gaming floor until "30 days after full payment of all outstanding amounts has been made" if the tribe's revenue sharing is

Reservation" is attached hereto as **Exhibit 9**.

"overdue… on more than two occasions." *See* Ex. 9 at § 4.3.3(f). For Quechan, the enforcement of this provision could result in the loss of at least ▮▮▮▮▮ in gaming revenue, and that assumes the tribe made immediate payment after the State of California shuttered the casino's gaming floor. One of the pertinent parts of the 2007 Amendment detailing the State of California's rights in the event of non-payment by Quechan states:

> (f) Notwithstanding anything to the contrary in Section 9.0, if any portion of the payments referenced in subdivision (a) pursuant to subdivisions (b) and (d), is overdue after the State Gaming Agency has provided written notice to the Tribe of the overdue amount with an opportunity to cure for at least 15 business days, and if more than 60 days has passed from the due date, then the Tribe shall cease operating all Gaming Devices until full payment is made; provided further that if any portion of the payments is overdue as specified above on more than two occasions, the Tribe shall be required to cease operating all Gaming Devices for an additional 30 days after full payment of all outstanding amounts has been made.

*See* Ex. 9 at § 4.3.3(f).

55. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[12]

56. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[12] A true and correct copy of a spreadsheet entitled ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is attached hereto as **Exhibit 10**.

[REDACTED]

Sec. 12.1. The terms and conditions of this Gaming Compact may be amended at any time by the mutual and written agreement of both parties.

Ex. 8 at § 12.1.

57. [REDACTED]

58. As for the terms of the fee agreement between the parties, the Quechan Tribal Council explained that they were exceedingly familiar with the costs of matters that had a high likelihood of spiraling into federal litigation (*see, e.g., Quechan Tribe of Fort Yuma Indian Reservation v. U.S. DOI,* 2012 U.S. Dist. LEXIS 71248 (S.D. Cal. 2012); *Quechan Indian Tribe v. United States,* 535 F. Supp. 2d 1072 (S.D. Cal. 2008)), and preferred to create a hybrid structure whereby the tribe would pay a discounted rate going forward and then combine that with a contingency fee that was less than the normal 30 to 35% that a firm would normally command. In response, Cheryl Williams explained that she would provide the Quechan Tribal Council with two different proposals by the end of the week, and the parties could then negotiate the final terms of a services agreement once the Quechan Tribal Council selected the proposal with the general structure it preferred.

59. On September 16, 2016, Cheryl Williams sent an e-mail to the Quechan Tribal Secretary Regina Escalanti and President Jackson to convey two different hybrid fee proposals. As explained by Cheryl Williams, the fee structures were meant to be "a fair mid-

dle ground choice on the spectrum of fee arrangements that range from purely hourly on one end (*i.e.*, $475-$500 per hour) to purely contingency on the other (*i.e.*, 33%-35% of net recovery)." Further, they were also sensitive to (1) the potential liability for the firm given the millions of dollars at stake, and (2) the massive amount of work that a representation of this nature would likely require given Williams & Cochrane's experience representing Pauma in negotiations and litigation during its seven-year dispute with the State of California. As for the terms of the proposals, both contained a progressive contingency fee structure that started at 5% of any recovered value of the excess revenue sharing payments Quechan made under the 2007 Amendment "if the matter is resolved before the filing of a lawsuit or within 12 months thereof" and gradually increased to 15% "[i]f the matter is resolved after 36 months of filing a lawsuit." Along with this contingency fee, one of the fee proposals was based on a discounted hourly rate of $350 per hour while the other incorporated a monthly flat fee of $50,000 in lieu of the hourly rate.

60. On the ensuing Wednesday, September 21, 2016, President Jackson called Cheryl Williams and explained the Quechan Tribal Council had discussed the terms of the proposal fee agreements amongst themselves and an independent attorney and decided that they wanted to go with the proposal containing the flat monthly fee arrangement. However, since Quechan wanted a fix as quickly as possible, President Jackson stated that the Tribal Council desired to modify the contingency fee structure to provide Williams & Cochrane with the 15% contingency fee if the firm was somehow able to resolve the matter expediently through negotiations. Upon hearing this comment, Cheryl Williams double checked whether President Jackson and the Quechan Tribal Council wanted this change (they did), inquired whether they wanted to negotiate any other provisions of the proposed agreement (they did not), and then explained that she would get them a revised and final version of the Attorney-Client Fee Agreement to re-review the next week.

61. On Monday, September 26, 2016, Cheryl Williams e-mailed a copy of the final version of the Attorney-Client Fee Agreement to Tribal Secretary Regina Escalanti, an Executive Secretary named Linda Cruz, and President Jackson.

62. As previously mentioned, the Attorney-Client Fee Agreement contains a "Monthly Flat Fee" in Section 4, which explains that the "Client agrees to pay a flat fee of $50,000 per month for Firm's services under this Agreement." *See* Ex. 2 at § 4.

63. In addition, Section 5 of the Attorney-Client Fee Agreement contains a contingency fee provision that explains Quechan will pay Williams & Cochrane a 15% contingency fee on any revenue sharing discount Quechan receives under a negotiated successor compact as a result of the heightened payments the tribe made under the 2007 Amendment, and that such fee attaches the moment the tribe signs the new agreement. *See* Ex. 2 at § 5. The pertinent part of Section 5 of the Attorney-Client Fee Agreement states:

> Firm's contingency fee will be calculated as follows if the representation matter is resolved through settlement or negotiation:
>
> (a) If the matter is resolved before the filing of a lawsuit or within 12 months thereof, then Firm's contingency fee will be fifteen percent of the net recovery. …
>
> (b) For purposes of subsection (a) alone, the matter is resolved at the point in time that the Client signs a successor compact (whether new or amended), which subsequently obtains the requisite State and federal approvals and takes effect under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq*.
>
> (c) The contingency fee above is higher than the formative rates for resolving the case through court action set forth in the ensuing subsections below based upon the Client's express request after consultation and stated need to resolve the situation in as effective and expeditious a manner as possible.

*See* Ex. 2 at § 4.

64. To address opportunistic early termination, the Attorney-Client Fee Agreement also contains a Section 11 that explains that if Williams & Cochrane is discharged before the contingency fee normally attaches, Quechan would still have to pay this fee if it had become "entitled" to any amounts constituting the "net recovery" for contingency fee purposes. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 758 (2002) (defining "entitle" as "furnish with proper grounds for seeking or claiming something"). For other situations, Section 11 states that "Client agrees that Firm will be… paid… a reasonable

fee for the legal services provided in lieu of the contingency fee set forth in paragraph 5 of this Agreement," the amount of which "will be determined by considering" a list of factors that primarily turns upon the value of the services performed. *See* Ex. 2 at § 11.

65. Finally, the Attorney-Client Fee Agreement also contains a waiver of sovereign immunity that provides in relevant part that the "Client hereby expressly and irrevocably waives its sovereign immunity (and any defense based thereon) from any suit, action, or proceeding or from any legal process with respect to any claims the Firm may bring seeking payment under the terms of this Agreement." *See* Ex. 2 at § 13(a).

66. As for the execution of the Attorney-Client Fee Agreement, President Jackson signed the document at a Special Tribal Council Meeting on Monday, September 26, 2016, at which the Tribal Council passed a resolution by a vote of "5 for" and "0 against" to "approve the attorney-client fee agreement between the Quechan Indian Tribe and Williams & Cochrane." *See* Ex. 3. The attorneys for Williams & Cochrane countersigned and thereby executed the Attorney-Client Fee Agreement on September 29, 2016, providing Quechan with a copy of the fully-executed contract afterwards.

**D. Williams & Cochrane gets Quechan a Compact Offer that Excises $120 Million in Revenue Sharing Payments and Enables the Generation of around $660 Million in New Gaming Revenues**

67. With the Attorney-Client Fee Agreement executed, Williams & Cochrane sent a notice of dispute to the Office of the Governor on October 12, 2016 to convince it to sit down with Quechan and negotiate a replacement compact for the 2007 Amendment.

68. On October 17, 2016, just five days later and approximately one month after the State paid $36.3 million to Pauma, the Office of the Governor agreed to "enter into negotiations for a new tribal state gaming compact," in a letter signed by the Office of the Governor's Senior Advisor for Tribal Negotiations Joginder ("Joe") Dhillon.[13]

69. As a result of this letter, the parties held their first negotiation session on No-

---

[13] A true and correct copy of an October 17, 2016 letter from the Office of the Governor's Senior Advisor for Tribal Negotiations Joe Dhillon to Cheryl A. Williams is attached hereto as **Exhibit 11**.

vember 9, 2016 at the State Capitol. Appearing on behalf of the Office of the Governor was Senior Advisor Joe Dhillon, Senior Assistant Attorney General Sara Drake, and Deputy Attorney General Jennifer Henderson. For Quechan, all seven members of the Tribal Council were present as well as Cheryl Williams and Kevin Cochrane. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

70. ████████████████████████████████████████████████

████████████████████████████████████████████[14] ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████[15] ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████"[16]

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[14] A true and correct copy of the December 6, 2016 draft "Tribal-State Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation" is attached hereto as **Exhibit 12**.

[15] A true and correct copy of the "Regulatory Cost Reimbursement Invoice" that accompanied the December 6th draft compact is attached hereto as **Exhibit 13**.

[16] A true and correct copy of a December 6, 2016 letter from the Office of the Governor's Senior Advisor for Tribal Negotiations Joe Dhillon to Quechan President Mike Jackson is attached hereto as **Exhibit 14**.

Case No.: 17-CV-01436 GPC MSB

FOURTH AMENDED COMPLAINT

1

2

3

4

5

6

7    71. From a substantive perspective, the revenue sharing terms of the December 7th

8    initial draft compact were quite a victory to Williams & Cochrane because the State's

9    general practice is to demand a revenue sharing fee that totals at least six percent of net

10   win on all machines over 350 *in addition to the basic SDF payment that was included in*

11   *Quechan's draft proposal*. *See, e.g.,* California Gambling Control Commission, *Tribal-*

12   *State Compact between the State of California and the Pala Band of Mission Indians* §

13   5.2(a) (May 6, 2016) (imposing a 6% revenue sharing fee on all machines above 350 into

14   the Revenue Sharing Trust Fund), *available at* http://www.cgcc.ca.gov/documents/

15   compacts/amended_compacts/Pala_Compact_2016.pdf (last visited July 2, 2017). And

16   this standard arrangement does not even account for the intergovernmental agreements

17   that tribes are required to execute with political subdivisions to cover the cost of public

18   services – something that hardly effects Quechan since its location (at least on the Cali-

19   fornia side of the border) is far removed from other municipalities. *See id.* at § 4.4.

20   72. From a procedural standpoint, the December 7th initial draft compact came

21   about much quicker than any tribe should expect. For instance, a coalition of dozens of

22   tribes called the 1999 Compact Tribes Steering Committee has been negotiating new

23   compacts with the Office of the Governor since the spring of 2013 and, based on infor-

24   mation and belief, these tribes are unlikely to execute finalized compacts before, at best,

25   the tail end of the 2019 legislative session. Quite simply, compact negotiations around the

26   Nation are traditionally rather time-consuming processes, as the factual backgrounds of

27   successful bad faith suits prove. *See, e.g., North Fork Rancheria of Mono Indians v.*

28   *California,* 2015 U.S. Dist. LEXIS 154729, *5-*6 (E.D. Cal. 2015) (indicating compact

negotiations went from July 2004 to April 2008); *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger,* 2008 WL 6136699, *3 & *7 (S.D. Cal. 2008) (indicating negotiations went from February 26, 2004 to November 3, 2006).

73. ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████.

74. With their marching orders in hand, Williams & Cochrane scheduled a follow-up meeting with the Office of the Governor on January 31, 2016 at the State Capitol to go through the December 7th initial draft compact and find out what the State was willing to negotiate above and beyond the base offer it provided.

75. However, before this meeting could take place, election chaos erupted at Quechan. President Jackson and Vice President Michael Jack were in the midst of four-year terms and not up for reelection during the midterm election in December 2016. However, all five biannual Councilmember seats were up for vote, and initial results reportedly indicated that aspirants won four of the five Council seats that were on the ballot. A recount was soon ordered and Quechan spent the next two months mired in intractable infighting.

*See Quechan Tribe to re-do vote,* YUMA SUN, Feb. 9, 2017, *available at* https://www. pressreader.com/usa/ yuma-sun/20170209/281509340930239 (last visited June 30, 2017).

76. Ultimately, the four challengers were sworn into office on or about March 3, 2017. *See New Quechan Tribe Council Members sworn in nearly two months after election,* KYMA-TV, Mar. 3, 2017, *available at* http://www.kyma.com/news/new-quechan-tribe-council-members-sworn-in-nearly-two-months-after-election/372997144 (last visited June 30, 2017). In succession, President Jackson resigned from his position almost instantaneously with the swearing in of the new councilmembers and then Vice President Jack stepped down in the ensuing months.

77. ███████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████.

78. After the election turmoil at Quechan died down, ████████████████████

1

2

3

4

5

6

7

8

79.

9

10

11

12

13                                                                    [17] [18]

14

15

16

17

18

19

20

21

22

23

80.

24

25

26   [17] A true and correct copy of a March 9, 2017 letter from CGCC Executive Director Stacy Luna Baxter to President Jackson is attached hereto as **Exhibit 15**.

27   [18] A true and correct copy of an April 12, 2017 letter from CGCC Executive Director Stacy Lunda Baxter to the "Honorable Keeny Escalanti Sr., President Quechan Indian Nation" is attached hereto as **Exhibit 16**.

28

1 ███████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████.

4    81. ████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████████████████

8 █████████████████████████████████████

9    82. ████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ████████████████████████████████████████████

17 ████████████████████████████████.

18    83. ████████████████████████████████

19 ████████████████████████████████████████████

20 ████████████████████████████████████████████

21 ████████████████████████████████████████████

22 ████████████████████████████████████████████

23 █████████████████

24    84. ████████████████████████████████

25 ████████████████████████████████████████████

26 ████████████████████████████████████████████

27

28

1   ██████████████████████.[19] ████████████████████████

2   ████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████

4   ███████████████████████████████████████████████.

5   85.   ██████████████████████████████████████████████

6   ████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████

8   ██████████████████████████.[20] After relaying the compact, Senior Assistant Attorney

9   General Sara Drake set up another negotiation session between the attorneys for the par-

10   ties on June 14, 2017 at the Office of the Attorney General in Sacramento, California.

11   86.   ██████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ███████████████████████████████████████████████.

20   87.   ██████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████

23   ███████████████████████████████████████████████████t

24

25   [19] A true and correct copy of excerpts of the May 12, 2017 draft "Tribal State
     Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian

26   Reservation" is attached hereto as **Exhibit 17**.

27   [20] A true and correct copy of the May 19, 2017 draft "Tribal State Compact
     between the State of California and the Quechan Tribe of the Fort Yuma Indian

28   Reservation" is attached hereto as **Exhibit 18**.

1  ███████████████████████████████████████████████████████

2  ███████████████████████████████████████████████████████

3  ███████████████████████████████████████████████████████

4  ███████████████████████████████████████████████████████

5  ███████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████████

8  ███████████████████████████████████████████████████████

9  ███████████████████████████████████████████████████████

10 ███████████████████████████████████████████████████████

11 ████████████████████  Thus, the State of California had not only offered an agreement that

12 would eliminate at least $112 million in revenue sharing payments over the next 28 years,

13 but one that could generate another $661,000,000 in new gaming revenue. ████████

14 ███████████████████████████████████████████████████████

15 ███████████████████████████████████████████████████████

16 ████████████████████████████

17     88. ████████████████████████████████████████████

18 ███████████████████████████████████████████████████████

19 ███████████████████████████████████████████████████████

20 ███████████████████████████████████████████████████████

21 ███████████████████████████████████████████████████████

22 ███████████████████████████████████████████████████████

23 ███████████████████████████████████████████████████████

24 ███████████████████████████████████████████████████████

25 ███████████████████████████████████████████████████████

26 ███████████████████████████████████████████████████████

27 ███████████████████████████████████████████████████████

28 ███████████████████████████████████████████████████████

1  ████████████████████████████████████████████████████████.

**E. The Putative President of Quechan Keeny Escalanti Terminates Williams & Cochrane Three Days before the Conclusion of Compact Negotiations to Avoid Paying the Contingency Fee, Demanding that the Firm Turn Over its Work Product to Robert Rosette by Using Threats to its Reputation**

89. █████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████.

90. In keeping with the schedule agreed upon by the attorneys during the June 14th negotiation session, Cheryl Williams transmitted the final set of redlines to the State of California at 1:12 a.m. in the morning of Wednesday, June 21, 2017.[21]

91. However, the next conversation between Cheryl Williams and Senior Assistant Attorney General Sara Drake did not begin with a discussion about finalizing the Quechan compact. Rather, on Tuesday, June 27, 2016, Ms. Drake – who has been one of (if not) the principal attorneys representing the State of California in tribal matters since the mid-1990s (*see Cabazon Band of Mission Indians v. Wilson,* No. 90-01118, Dkt. Nos. 159 & 177 (E.D. Cal. Feb. 12, 1999 & Mar. 23 1999)) – began the conversation by stating, "This has never happened before and we don't know what to do." With that, Ms. Drake then informed Cheryl Williams that the State had just received a letter indicating

---

[21] A true and correct copy of the June 21, 2017 draft "Tribal State Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation" is attached hereto as **Exhibit 19**.

that Williams & Cochrane had been terminated from the compact negotiations, just three days before the negotiations were set to conclude, and replaced by Robert Rosette.

92. That same day Cheryl Williams received a similar letter. The letter was sent by e-mail from the Quechan Executive Secretary Linda Cruz to Cheryl Williams with no other individuals carbon copied on the message. The June 26, 2017 letter enclosed therein was entitled "Termination of Attorney-Client Relationship" and signed by the putative Quechan President Keeny Escalanti, Sr., who had purportedly assumed the seat left vacant following President Jackson's departure. *See* Ex. 4.  The June 26th letter began by explaining "[t]he Fort Yuma Quechan Indian Tribe… is terminating the services of Williams & Cochrane… effective immediately upon your receipt of this letter." *See id.*

93. Around the same time as the Quechan Executive Secretary had transmitted this letter, Quechan had also sent four paychecks to Williams & Cochrane to cover the base monthly fees for February 2017 to May 2017 that the tribe was behind in paying. With that, the June 26th letter went on to explain that the tribe intended to pay a "prorated [portion of the monthly flat] fee for your services" for the month of June (which it never did), but that it would "not pay any contingency fee or 'reasonable fee for the legal services provided in lieu' thereof." *See* Ex. 4.

94. As for the reasons for repudiating the Attorney-Client Fee Agreement at the eleventh hour, the June 26th letter stated that Williams & Cochrane had already been "grossly overcompensated" given its failure to "produce better-than-boilerplate terms in your negotiations so far with the State." As such, the June 26th letter explained that the payment of fees to date was "more than fair" and then warned, "***We strongly advise you against pressing your luck further out of concern for the reputation of your firm in Indian Country and in the State of California.***" *See* Ex. 4.

95. After conveying this threat, the June 26th letter that was signed only by putative Quechan President Keeny Escalanti explained that Williams & Cochrane could not relay the message conveyed by this letter (or any other information obtained during their representation, like the draft compacts) to anyone else within the tribe:

> Finally, I remind you of the… confidentiality provisions which govern attorney-client relations and that you not disclose to any employee, officer, or official of the Tribe or any subdivision, agency, or enterprise of the Tribe regarding any matter that was the subject of your engagement.

*See* Ex. 4.

96. Nevertheless, the June 26th letter then concludes by explaining that Williams & Cochrane should "direct all communications regarding this matter to Robert A. Rosette" and promptly provide him with a copy of Quechan's case file – the very "confidential" materials that no one else within the tribe was supposedly allowed to see. *See* Ex. 4.

97. Though signed by putative Quechan President Keeny Escalanti, Williams & Cochrane is informed and believes that the June 26th letter was actually drafted by Robert Rosette or one of the attorneys in his employ at Rosette, LLP.

98. Unlike the execution of the Attorney-Client Fee Agreement, the June 26th letter was *not* accompanied by a resolution indicating how the Quechan Tribal Council members voted on the issue – or if the other Councilmembers even knew about putative Quechan President Keeny Escalanti's actions at all.

99. The lack of any corroborating tribal resolution led Cheryl Williams to ask Senior Assistant Attorney General Sara Drake whether she had received a resolution removing Williams & Cochrane from the matter. In response, Ms. Drake indicated that she had not but she planned on asking Mr. Rosette to provide one before the negotiations would go forward. Further, before the call ended, Ms. Drake explained that she thought the compact negotiation materials in the State's possession were protected by the work product privilege, and suggested Cheryl Williams carefully review the applicable case law and ethical rules to determine whether she could lawfully disclose the compact negotiation materials in this highly unusual situation given her duties to her actual client and, supposedly, the State of California.

100. Following this call, on June 27, 2017, a second-year associate with Rosette, LLP who works under the supervision of Richard Armstrong in the Folsom, California

office sent Cheryl Williams an e-mail demanding that she immediately turn over a copy of the June 21st draft compact:

> Ms. Williams,
>
> As you know, our firm has been retained to represent the Fort Yuma Quechan Indian Tribe in their compact negotiations with the State. While there is a formal file request forthcoming, it is imperative that we receive, immediately, the last compact, with any redlines, that was transmitted to the State during your negotiations. Please provide said compact as soon as possible. I am available to discuss any questions or concerns.
>
> Thank you,
>
> Cecilia Guevara Zamora
> Rosette, LLP

101. While Cheryl Williams was considering the propriety of this request, Williams & Cochrane is informed and believe that on either June 28, 2017 or June 29, 2017, Senior Assistant Attorney General Sara Drake spoke with Robert Rosette (or one of his attorneys at Rosette, LLP) and asked him to provide an authenticating tribal resolution for his involvement in the compact negotiations, explaining that she would not turn over the most recent redlined draft of the compact until she received one.

102. Shortly thereafter, on June 30, 2017, Cheryl Williams received a second email from the Quechan Executive Secretary, this time containing a "Demand for Cease and Desist" letter that was signed by putative President Keeny Escalanti and again written by Robert Rosette or an attorney in his employ at Rosette, LLP. *See* Ex. 5.

103. Since Robert Rosette was seemingly unable to obtain any of the negotiation materials in his conversation with Senior Assistant Attorney General Sara Drake, the June 30th letter demanded under threat of legal action that Williams & Cochrane refrain from speaking with anyone from the State and immediately furnish "the most recent redlined changes to the draft State-Tribal Compact, including any comments incorporated therein" *See* Ex. 5. Though the previous June 26th letter purportedly terminated Williams & Cochrane on the basis that it did not "produce better-than-boilerplate terms in your negotiations so far with the State," the June 30th letter reversed course and indicated that

the failure to produce the most recent redlines and comments would "result in irreparable harm to the Tribe, particularly given the California legislative deadlines associated with timely consideration of the Tribe's Gaming Compact." *See* Ex. 5.

104. Much like the prior June 26th letter, this second June 30th letter was not without its own threats based on misrepresentations (*i.e.*, "Should you continue your obstruction of the Tribe's interests, the Tribe will be left with no other choice than to pursue the legal remedies available to it. We trust that the Firm will see the wisdom in promptly complying with these demands.") and hyperbolic if not slanderous accusations ("Through its decades of dealings with numerous attorneys and law firms across the country, the Tribe has not witnessed these types of outlandish actions or this level of unprofessionalism as it has from your Firm.").

105. After spending the ensuing July 4th weekend reviewing the ethical rules and Robert Rosette's well-documented history of exacerbating intra-tribal strife when his position is threatened (*see* General Allegations, § II(A), *infra*), the attorneys at Williams & Cochrane decided that the best way to "avoid reasonably foreseeable prejudice" to Quechan was to provide Rosette, LLP and the tribe (principally through its Executive Secretary Linda Cruz) with a copy of the June 21st draft compact in the hopes that they could still convince the State of California to execute a compact based on those terms before the end of the legislative session, and to simply step away from the matter entirely. With that, Williams & Cochrane heard nothing else from either the putative Quechan Tribal Council or anyone with Rosette, LPP until after the service of the complaint in this case.

106. A little over two months later, on September 5, 2017, Robert Rosette issued a press release – which he contemporaneously uploaded to his firm's website – announcing that "Governor Edmund G. Brown and the Fort Yuma Quechan Indian Tribe… signed a new Tribal-State Gaming Compact" the prior week that will "reduce the Tribe's revenue sharing obligations by approximately four million dollars ($4,000,000) per year."[22]

---

[22] A true and correct copy of the August 31, 2017 "Tribal-State Compact between the State of California and the Quechan Tribe of the Fort Yuma Indian Reservation" is

107. The compact, which took effect on January 22, 2018 (*see* 83 Fed. Reg. 3015-16 (Jan. 22, 2018)), in all positive material respects is one and the same with the one Williams & Cochrane sent to the State of California on June 21, 2017, including the reduced revenue sharing fee structure for Quechan's preexisting 1,100 machines (and the first 100 new ones). Like Rosette's press release, both the recitals and Section 4.8 of the compact contain language like the following that memorializes the $4-plus million Quechan will save each year as a result of the agreement Williams & Cochrane negotiated:

> This Compact reduces the Tribe's revenue sharing obligations by approximately four million dollars ($4,000,000) per year, and simultaneously increases the Tribe's ability to generate revenues through its Gaming Operation by providing the right to operate additional Gaming Facilities and Gaming Devices.

*See* Ex. 41 at Recitals & § 4.8.

108. The only material difference between Williams & Cochrane's June 21, 2017 final draft compact and the executed agreement lies in what the State took away. It turns out that despite its good faith negotiation obligation, the State actually demanded, *inter alia*, that the tribe pay back roughly half of the amount it had failed to pay under the 2007 Amendment from July 2016 onward (*i.e.*, $2 million), which the State memorialized by inserting the following entirely new language into the compact:

> [T]he Tribe agrees to satisfy its outstanding payment obligations to the State under the 2006 Amendment, which obligations are ongoing and total approximately four million dollars ($4,000,000), exclusive of interest, as of the execution date of this Compact, by making a reduced total payment of two million dollars ($2,000,000) to the State. The Tribe shall remit the payment required by this section over a period not to exceed six years by paying four (4) equal quarterly installments…

*See* Ex. 42 at § 4.8.

109. If not for Robert Rosette's interference at Quechan, Williams & Cochrane would have received monthly flat fees of $50,000 from June 1, 2017 to January 22, 2018 (*i.e.*, the date the compact took effect) and a contingency fee of roughly $5,959,916.10, a

attached hereto as **Exhibit 20**.

sum equivalent to 15% of the $39,732,774.00 in heightened revenue sharing payments that Quechan recouped under the new compact.

## II.   THE TORTS BY ROBERT ROSETTE AGAINST WILLIAMS & COCHRANE

### A. Background on Robert Rosette

110. Robert Rosette is an Indian law attorney who, according to public records, has a history of representing tribes. The remainder of this paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

111. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

112. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

113. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

114. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

115. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

116. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

### B. Rosette's Beginning and End at Pauma

117. Robert Rosette actually started out providing legal representation to Pauma in a forthright manner. One requirement of Pauma's now rescinded 2004 Amendment was that the tribe commence negotiations with San Diego County for an intergovernmental agreement ("MOU") before beginning construction on any gaming-related project in order "to [provide] compensation for[:] law enforcement, fire protection, emergency medical services and any other public services to be provided by the County to the Tribe… as a consequence of the Project," a gambling addiction program, and the general mitigation of any adverse "effect on public safety attributable to the Project."

118. On or about May 15, 2007, Robert Rosette executed a contract with Pauma to "assist in negotiating an MOU with the County of San Diego" after the tribe hired him for that specific purpose. A year-and-a-half later, on or about August 6, 2008, Pauma executed a MOU with San Diego County that Robert Rosette negotiated, which, on top of the $7,750,000 in base revenue sharing each year of the 2004 Amendment, required annual payments of $400,000 for sheriff's protection, $200,000 for a gambling addiction program, $40,000 for the prosecution of casino related crimes, and some of the upwards of $38 million in road improvement expenditures the tribe committed itself to under the agreement. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* No. 14-56104, Dkt. No. 29-1, p.89 (9th Cir. Apr. 13, 2015).

119. Despite being burdened with a very costly MOU, the following year Pauma retained Rosette & Associates again in order to resolve the tribe's dispute with the State of California over the 2004 Amendment. The attorney who presented the idea of Rosette & Associates doing the litigation work to the General Council was Cheryl Williams.

120. Approximately three to four months before this presentation, during February and March 2010, Robert Rosette hired two attorneys by the names of Cheryl Williams and Kevin Cochrane in anticipation of litigating the *Pauma* case – with Ms. Williams coming from the class action law firm of Milberg LLP and Mr. Cochrane having worked for an inter-tribal circuit-style court that served upwards of twenty tribes in the Southern California area, including Pauma. As to that, Robert Rosette testified during his October 26, 2010 deposition in the *Pauma v. Harrah's* case about his lack of litigation experience and consequent habit of simply delegating this work wholesale to subordinate attorneys:

> Q. All right. And during that period of time [before starting your own firm], were you actively in litigation also as a –
>
> A. From time to time I either assigned litigation to attorneys who have a knack for doing that. You know, very rarely I'll make the court appearances or head the litigation. I try to stay out of court. I like to – I like the business transactions and I like to try to keep my clients out of litigation, but, you know, sometimes you can't avoid it.

Q. The silver lining in every cloud. Some people have to be involved in it. So did you have any major litigation, what you would describe as major litigation, in which you were actually functioning as a litigator during your… years [at the prior firm]?

A. Yeah, there were a few cases, I guess, I was involved in. I can't really remember the captions or the names. I can remember the issues and the tribes.

Q. Just generally, what were the tribes?

A. Well, Santa Rosa Rancheria, I was involved in the – CD Architects sued the tribe. And that was an arbitration, actually. I was involved in that piece. At the La Posta tribe here I was the lead attorney against the County of San Diego with regard to mitigation of off-reservation impacts.

Q. Who is that on behalf of?

A. The La Posta Band of Mission Indians. It was a good result for the tribe, bad result for San Diego County.

Q. What year was that?

A. That was in 2005. I was involved with an election issue, the application of state law with regard to contributions. That was with the Santa Rosa Rancheria. But like I said, I tried to avoid litigation mostly and would just – you know, I've always hired litigators that I could delegate and assign work to.

121. In keeping with this, although Robert Rosette claims to have been the brain-child behind the litigation," Cheryl Williams and Kevin Cochrane did all of the litigation work in the *Pauma* case for Rosette & Associates during their time at the firm, a fact that is again confirmed by Robert Rosette's deposition testimony in *Pauma v. Harrah's*:

Q. Now, in terms of the litigation, the drafting and filing of the complaint and the arguing, did you do all that yourself up to the time you were removed from the case?

A. No, I – I have employees that work for me that conduct research, draft, make court appearances, so on and so forth.

Q. All right. So outside of being sort of the lead strategist, did you may any appearances or become an attorney or record at all?

A. I was an attorney of record. There was only one appearance that was actually showing up, the oral argument for the preliminary injunction. And I had a conflict that day.

Q. Who argued that case from your firm?

A. Cheryl Williams.

122. Concerns about the ethical practices at Rosette & Associates led Cheryl Williams and Kevin Cochrane to leave the firm the month after the issuance of the injunction order in the *Pauma* case – just fourteen or so months after they both had joined the firm. *See Pauma,* No. 09-01955, Dkt. No. 44 (S.D. Cal. Apr. 12, 2010). Nevertheless, before leaving, Cheryl Williams and Kevin Cochrane tried to sidestep the ethical issues by proposing, on or about April 28, 2010, to remain affiliated with Rosette & Associates via a separate litigation-oriented "of counsel" entity that would be far removed from the day-to-day entanglements in which the firm often found itself mired – a proposal that Robert Rosette quickly rejected.

123. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

124. In fact, for Cheryl Williams and Kevin Cochrane, the mere act of departing Rosette & Associates was *so* acrimonious that, on information and belief, Robert Rosette and Richard Armstrong, amongst others, exchanged multiple phone calls and e-mails on or about May 15, 2010 in which they conspired and committed to interfere with any and all future contracts secured by Cheryl Williams and Kevin Cochrane, including through the use of fraudulent means.

125. As for some of the ethical concerns prompting the departure of Cheryl Williams and Kevin Cochrane from Rosette & Associates, the civil suit brought by Twenty-Nine Palms against Robert Rosette had been pending for the better part of a year with rumors of federal indictments forthcoming (*see Twenty-Nine Palms Band of Mission Indians of Cal. v. Edwards, Kovall, Rosette, et al.,* No. 30-2009 00311045, Dkt. No. 1 (Orange County Sup. Ct. Oct. 13, 2009)), and Mr. Rosette had also begun taking a position with another one of his clients that Cheryl Williams and Kevin Cochrane felt was irreconcilable with his representation of Pauma. As to that, Robert Rosette had negotiated a California compact for Upper Lake in 2009 that required the tribe to pay 15% of

its net win in order to operate 750 machines. And yet, while Robert Rosette was claiming the revenue sharing fees in this partially-executed compact were legal, Cheryl Williams and Kevin Cochrane were conversely arguing in *Pauma* while at Rosette & Associates that a 10-15% revenue sharing fee was an illegal tax that necessarily voided a compact.

126. After the Assistant Secretary for Indian Affairs disapproved the Upper Lake compact on account of it imposing an illegal tax under IGRA, Robert Rosette rushed to meet with the newly-elected Governor Brown and negotiated a replacement compact for Upper Lake that once again included a 15% revenue sharing fee for 750 devices, only this time the fee escalated up to that point.

127. This second Upper Lake compact was derided by gaming tribes throughout California, who felt that Governor Brown took advantage of a tribe that was willing to "cut… a quick deal" and now had a template that his office would impose in all future compact negotiations. When the attorney behind the seminal *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger,* 602 F.3d 1019 (9th Cir. 2010) (holding "[t]he State's demand for 10-15% of… net win… is simply an impermissible demand for the payment of a tax by the tribe"), sent out a scathing mass e-mail that claimed the revenue sharing structure of the new Upper Lake compact was nothing more than "a tax… a tax… a tax," Robert Rosette fired back, explaining that "[i]t is completely unreasonable to expect Indian Tribes to pay little or nothing in exchange for compacts."

128. Meanwhile in the *Pauma* suit, the departure of Cheryl Williams and Kevin Cochrane from Rosette & Associates meant that Robert Rosette and his firm were first tasked with opposing a motion for stay by the State of California that asked the Ninth Circuit to halt the injunction order for the duration of the interlocutory appeal – a motion that the Ninth Circuit would soon thereafter grant. *See Pauma,* No. 10-55713, Dkt. Nos. 15 & 39 (9th Cir. June 11, 2010 & July 28, 2010).

129. Just two days after Rosette & Associates filed its opposition brief, on Sunday, June 13, 2010, the Pauma General Council convened for a meeting and voted to terminate Rosette & Associate's contract and to replace the firm with Williams & Cochrane.

### C. Rosette's Tortious Interference at Pauma (Part One)

130. After assuming the representation, Williams & Cochrane was able to convince the Ninth Circuit to reinstate the injunction. *See Pauma*, No. 10-55713, Dkt. No. 55 (9th Cir. Aug. 23, 2010) (order reinstating the injunction).

131. From thereon, Williams & Cochrane singlehandedly litigated the *Pauma* case for the next six-plus years, ultimately convincing Judge Bencivengo to rescind the 2004 Amendment and restitute $36.3 million in heightened revenue sharing payments on account of a misrepresentation claim that Williams & Cochrane added to the complaint on September 9, 2011 – a full fifteen months *after* Robert Rosette was terminated from the case. *See Pauma,* No. 09-01955, Dkt. No. 130, pp. 54-58 (S.D. Cal. Sept. 9, 2011).

132. An utter lack of involvement in the case has, nevertheless, not stopped Robert Rosette for taking credit for the outcome in the *Pauma* litigation for four years now, as his website (and, admittedly, numerous other promotional materials) advertises that "Mr. Rosette also successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California against then Governor Schwarzenegger." *See* Exs. 6, 7.

133. This claim that he had litigated the case has even been repeated in both print and electronic format as part of a "25 People to Watch in the Gaming Industry" piece by Global Gaming Business Magazine. As to that, the profile of Robert Rosette ends with:

> Rosette also successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 million in compact payments allegedly owed to the State of California against then-Governor Arnold Schwarzenegger.

134. Williams & Cochrane is informed and believes that Robert Rosette has made similar claims about his supposed involvement in litigating the *Pauma* suit in other advertisements, promotional materials, and in both oral and written solicitations that have been transmitted across state lines using the wires and mail, as the case may be, including to Quechan (*see* General Allegations, § II(F), *infra*).

135. The termination of Robert Rosette from the Pauma compact litigation should

have marked the end of his interaction with Williams & Cochrane, but his aforesaid fraud pact, especially when coupled with the lure of the monies saved by the injunction order, brought him back around. To explain, in an act of prudence, the monies Pauma saved under the injunction order issued by Judge Burns were placed into a special, set aside account so the tribe would not find itself in a financial bind if this preliminary remedy (which the Ninth Circuit had already stayed for a brief period of time) was overturned and then vacated *en toto*.

136. Before his termination, on April 29, 2010, Robert Rosette wrote an opinion letter that was not shared with any other attorneys in his firm working on Pauma's compact litigation in which he opined that the injunction savings "could… be distributed to Pauma's Tribal Government" even though the General Council had made no such directive.[23] After his ouster, Robert Rosette transmitted a June 23, 2010 letter to Pauma's then-Chairman Christobal Devers in which he acknowledged his termination from the compact litigation, claimed the Williams & Cochrane attorneys were "seek[ing] to have their selfish concerns take precedent [sic] over the best interests of the Tribe" by urging caution with the injunction savings in light of the substandard opposition brief Mr. Rosette filed before his termination, and stated that "[p]erhaps their issuance of a Legal Opinion allowing the tribe to distribute [the reserved] funds to the General Council will demonstrate the contrary." Based on information and belief, Williams & Cochrane believes that Robert Rosette was trying to get the injunction savings freed up for his own personal gain, not for the benefit of the Pauma General Council.

137.  What followed next was a five-month quest to tap into the injunction savings by removing Williams & Cochrane from the picture. At the time, Robert Rosette still had a powerful ally on the Pauma Tribal Council – then-Chairman Christobal Devers – and Williams & Cochrane is informed and believes that Mr. Rosette advised Chairman Devers both in writing and telephonically to withhold payment of the firm's invoices in the

---

[23] A true and correct copy of the June 23, 2010 letter from Robert Rosette to Christobal Devers, then-Chairman of Pauma, is attached hereto as **Exhibit 21**.

hopes that the action would financially devastate the new business and enable Rosette & Associates to take over the work.

138. As such, even though Williams & Cochrane began working for Pauma shortly after the General Council vote on June 13, 2010, it nevertheless did not receive its first payment until the morning of October 3, 2010 – just moments before Williams & Cochrane presented to the General Council for the first time on the status of the compact suit.

139. However, before this happened, Cheryl Williams and Kevin Cochrane met with the Pauma Tribal Council on Friday, August 6, 2010, during which then-Chairman Devers indicated that he would never pay Williams & Cochrane under their contract and suggested that the two attorneys walk away from the representation altogether or he would "ruin [their] reputation in Indian Country" – an abnormal statement that is nearly verbatim to the one contained in the June 26th letter from putative Quechan President Keeny Escalanti that was actually written by Robert Rosette or an attorney in his employ.

140. Based on information and belief, Williams & Cochrane believes that Robert Rosette instructed Pauma's then-Chairman Christobal Devers both telephonically and electronically in the days leading up to the August 6th meeting to threaten the attorneys from Williams & Cochrane in the hopes that it would get them to abandon their client and precipitate the freeing up of the millions of dollars in injunction savings for Mr. Rosette.

**D. Rosette's Tortious Interference at La Pena Law**

141. The aforesaid efforts by Robert Rosette to sever Williams & Cochrane's contractual relationship with Pauma coincided with attempts to do the same elsewhere.

142. In 2010, one of the more successful Indian law attorneys in the State of California was an individual named Michelle La Pena, who represented a number of the largest gaming tribes in the State of California, including the Yocha Dehe Wintun Nation – a tribe that operated the 2,000-machine Cache Creek Casino approximately thirty miles west of Davis – and the Shingle Springs Rancheria, which about a year-and-a-half earlier opened the 2,000-machine Red Hawk Casino about fifteen miles east of Folsom. As a consequence, Michelle La Pena generated many millions of dollars per year in revenue.

143. The Shingle Springs Rancheria experienced a somewhat similar compact fate as Pauma, in that the CGCC told the tribe that it would have to execute an amendment in order to obtain licenses that should have been available under the 1999 Compact. Shingle Springs did this and entered into an amendment with the State of California on June 30, 2008 that allowed it to increase its machine count in exchange for base annual payments of a staggering 20% of net win into the General Fund plus $4,600,000 into the RSTF. *See* California Gambling Control Commission, *Amendment to the Tribal-State Gaming Compact between the State of California and the Shingle Springs Band of Miwok Indians* §§ 4.3.1 & 4.3.2.2, *available at* http://www.cgcc.ca.gov/documents/compacts/amended_compacts/Shingle_Springs_Compact.pdf (last visited July 4, 2017).

144. Knowing that Michelle La Pena served in a general-counsel-like capacity for these tribes and had little to no litigation experience, Kevin Cochrane met with Ms. La Pena at her offices during the second half of July 2010 to discuss whether their firms could work together to solve Shingle Springs' compact issue.

145. The initial meeting was productive, as Williams & Cochrane entered into an of counsel relationship with La Pena Law and was immediately tasked with preparing a presentation that Michelle La Pena could pitch to the Shingle Springs Tribal Council in order to see if it had any interest in fixing the tribe's amended compact.

146. On or about Wednesday, August 4, 2010, Kevin Cochrane provided Michelle La Pena with the desired litigation memorandum and supporting materials, which led her to ask Mr. Cochrane to meet her at her office on the next Wednesday, August 11, 2010.

147. During the August 11th meeting, Michelle La Pena stated that she was rather impressed with the quality of the Shingle Springs litigation memorandum and asked Kevin Cochrane to prepare a number of last minute documents for a temporary restraining order hearing that she had to appear at the following morning. After Mr. Cochrane agreed to do this last-minute work, Michelle La Pena explained that she thought the of-counsel arrangement was not enough, and wanted to either absorb or merge with Williams & Cochrane so she could obtain the benefit of the firm's litigation knowhow – an event that

would have been immensely lucrative for the attorneys of Williams & Cochrane. Right after making this comment, Michelle La Pena told Kevin Cochrane to take some time to consider the proposal and then provided him with a copy of a memorandum Robert Rosette had recently sent her via e-mail "explor[ing] the possibility of compact litigation for… Shingle Springs… based on its similarities to the Pauma Band of Mission Indians," to alert him to the fact that Robert Rosette, who at this point had been terminated from the Pauma compact litigation for almost two months, was representing that he was still responsible for litigating the Pauma case and was trying to drum up work with Shingle Springs through her on that basis.[24] As indicated above, Robert Rosette had used the wires to send this memorandum to Michelle La Pena via e-mail shortly before the August 11th meeting, and on information and belief, the representation that Robert Rosette "was responsible for litigating the Pauma case" is included, amongst other mailed and wired communications, in the body of the e-mail attaching the memorandum.

148. Based on information and belief, Williams & Cochrane believes that Michelle La Pena spoke with Robert Rosette while vetting Kevin Cochrane and Williams & Cochrane at some point between Thursday, August 12, 2010 and the morning of Sunday, August 15, 2010. During that phone call, upon hearing Michelle La Pena say that she was not only planning to use the of-counsel attorneys of Williams & Cochrane to do the Shingle Springs work but moreover planning to merge with or absorb their firm, Robert Rosette used the wires to spread fraudulent falsehoods about the attorneys in order to interfere with their existing and proposed contracts, stating that the attorneys should be conflicted out from the Shingle Springs work because they represented a nearby tribe and could not be trusted in any event because they had been publicly and rather widely bragging that they had just been hired by the tribe to exclusively take on this rather sensitive compact work. In fact, neither of these statements was true, and Robert Rosette knew as much at the time he made them.

---

[24] A true and correct copy of an August 2, 2010 memorandum from Rosette & Associates, PC to La Pena Law Corporation is attached hereto as **Exhibit 22**.

149.  At 11:25 a.m. on the morning of Sunday, August 15, 2010, just four days after suggesting that Williams & Cochrane merge with or be acquired by her firm, Michelle La Pena e-mailed Kevin Cochrane and explained that she was ending the of counsel arrangement altogether, and "apologize[d]" if the decision "comes as a surprise, as I really like you and think you have a great career ahead of you."[25] Though stating that the quality of work prepared by Williams & Cochrane was "quite stellar," Michelle La Pena went on to explain for the first time that "[t]here are issues with confidentiality and conflicts that I do not believe we can overcome with your firm."

150. With that, Michelle La Pena terminated all communication with Williams & Cochrane – the August 15th e-mail, in other words, marking the last communication that Ms. La Pena has *ever* had with either Mr. Cochrane or Cheryl Williams. The termination of this relationship that was directly caused by Robert Rosette's fraudulent telephonic remarks between August 12, 2010 and August 15, 2010 resulted not only in the loss of significant revenues under the existing of counsel arrangement, but the prospect of substantially more under the partnership agreement arising out of La Pena Law merging with or acquiring Williams & Cochrane. Furthermore, the interference also deprived Williams & Cochrane of the ability to cultivate important professional relationships with one of the most successful Indian law attorney at the time who had a specific need for skilled litigators, and both leaders and future leaders of prominent and well-to-do Indian tribes.

**E. Rosette's Tortious Interference at Pauma (Part Two)**

151. After the La Pena incident, Cheryl Williams and Kevin Cochrane long feared that Robert Rosette had become emboldened and would try to interfere with their other contracts, especially with respect to Pauma's compact litigation since the amount of set-aside monies saved by the injunction order grew as time went on.

152. Unfortunately, this situation came to pass during the summer of 2011. On August 4, 2011, the counsel of record for the State of California in the compact litigation

---

[25] A true and correct copy of an August 15, 2010 e-mail from Michelle La Pena to Kevin Cochrane is attached hereto as **Exhibit 23**.

– Deputy Attorney General T. Michelle Laird – called Cheryl Williams and in a rather audibly uncomfortable manner explained that, after she "thought about it for a few days," she felt her ethical duties required her to disclose that Robert Rosette and his firm had set up a meeting with the Office of the Governor's then-compact negotiator (*i.e.*, Jacob Appelsmith) for August 18, 2011, with the intention of settling "the federal [compact] case." *See, e.g., Pauma,* No. 09-01955, Dkt. Nos. 118-2, 123-1 (S.D. Cal. Aug. 22, 2011).

153. At the time, Williams & Cochrane had no idea how this meeting was set up, and the State of California was neither willing to disclose that information nor cancel the August 18th settlement meeting. In light of this situation, Williams & Cochrane filed a motion for protective order on August 15, 2011, asking the district court to direct the State's negotiator (who was a private attorney and not a public official) to communicate through proper channels when dealing with matters related to Pauma's compact or the pending litigation. *See Pauma,* No. 09-01955, Dkt. No. 118 (S.D. Cal. Aug. 15, 2011).

154. The actual communications between Rosette, LLP and the State's negotiator were not before the district court as part of Pauma's motion for protective order, but have been attached to this complaint. *See* Ex. 1. The exchange started with Richard Armstrong – a senior of-counsel attorney at Rosette, LLP who is typically deeply involved in Robert Rosette's schemes and appears to be an active participant in the Quechan situation (*see* ¶ 100) – sending an e-mail to Mr. Appelsmith on July 26, 2011 explaining that the Pauma "Tribal Council respectfully requests a meeting with the Governor's office at your earliest convenience to discuss compact related matters." *See* Ex. 1. As is the case with every communication between Rosette, LLP and the State's negotiator detailed below, not a single[ ] person affiliated with Pauma – including all four Tribal Councilmembers – was carbon copied or otherwise included on this e-mail.

155. The next morning, Jacob Appelsmith replied to Richard Armstrong and asked whether the meeting would involve "settlement discussion in the lawsuit" or instead "seek[ ] to amend or renegotiate the compact." See Ex. 1. After presenting these options, Jacob Appelsmith suggested that "[i]t would seem to make more sense to have a settle-

ment discussion since the lawsuit is about the compact, but I leave that up to you." *See id.*

156. Richard Armstrong responded by e-mail at 2:00 p.m. that afternoon, stating "[t]he tribe indeed wants to meet *without their attorneys present* in order to establish a better government to government relationship with the goal of settling the pending lawsuit with a new compact." *See* Ex. 1.

157. A mere ten minutes later, and before Jacob Appelsmith could respond, Robert Rosette sent a follow-up e-mail to Mr. Appelsmith, explaining that his firm was "not engaged as legal counsel on the litigation," Pauma had not been hired to resolve the dispute, but he nevertheless wanted to set up a settlement process that would not involve the tribe's attorneys of record but would involve him after an initial meeting between the parties:

> Jacob,
>
> I believe only the first meeting is without lawyers. Obviously thereafter we will need to be involved. The good news is that the Tribe wants to pull us in, and as you know, we are not engaged as legal counsel on the litigation. The Tribe expressed to me a desire to settle the lawsuit through compact negotiations. I think they want to meet with you to understand this process first.
>
> Thanks,
>
> - Rob.

*See* Ex. 1.

158. In response to hearing that an attorney who admittedly had not been hired by a tribe was nevertheless interested in settling a federal lawsuit behind the backs of the tribe's counsel of record, Jacob Appelsmith replied that he wanted to go forward with the settlement negotiation and to do so without other attorneys present:

> I would like to meet with the Tribe and to do so as a settlement negotiation, and I assume there will be no lawyers present (except myself, which I can't avoid).

*See* Ex. 1.

159. Yet, the filing of the motion for protective order caused all those involved to

try and cover their tracks. Jacob Appelsmith transmitted a letter to Pauma postponing the planned August 18, 2011 settlement meeting (*see Pauma,* No. 09-01955, Dkt. No. 123-2, p. 6 (S.D. Cal. Aug. 22, 2011)), and Robert Rosette began to send e-mails to select members of the Pauma Tribal Council in the hopes of absolving himself of any wrongdoing.

160. As to that, on August 23, 2011, Robert Rosette sent an e-mail that was addressed to the Pauma Tribal Council as a whole but excluded the tribe's then-Chairman Randall Majel from the recipient list.[26] The purpose of the e-mail was to transmit two pre-prepared letters that Robert Rosette wanted a Pauma Tribal Councilmember to sign that day. The first letter was prepared for the signature of Pauma's then-Secretary/Treasurer by Robert Rosette, explaining that Mr. Rosette's actions were appropriately authorized and that the tribe would "not hold [Mr. Rosette's] firm liable for any unauthorized actions with the State of California, because no such actions were taken."[27] In pertinent part, this letter drafted by Robert Rosette for the benefit of Robert Rosette states:

> This letter is to make clear that your firm's action with respect to scheduling a meeting with the Governor's Office, and any communications related thereto, were all done at the express directive of the Tribal Council. You notified every Tribal Council member of your actions and your communications with the Governor's Office at every stage during this process. We do not and will not hold your firm liable for any unauthorized actions with the State of California, because no such actions were taken. It is not the intention of the Tribal Council that any recently filed briefs may have indicated the contrary.

*See* Ex. 36.

161. The second letter attached to Robert Rosette's August 23rd e-mail was a similar one intended for the signature of Pauma's Secretary/Treasurer that was instead addressed to the State's negotiator Jacob Appelsmith.[28] As with the first one, this letter again

---

[26] A true and correct copy of an August 23, 2011 e-mail from Robert Rosette to various members of the Pauma Tribal Council is attached hereto as **Exhibit 24**.

[27] A true and correct copy of the draft August 23, 2011 letter purportedly from Pauma's then-Secretary/Treasurer to Robert Rosette, which was actually prepared by Robert Rosette, is attached hereto as **Exhibit 25**.

[28] A true and correct copy of the draft August 23, 2011 letter purportedly from

falsely disclaims that Robert Rosette's actions were done at the "express directive of the Tribal Council" and that "Rosette, LLP notified every Tribal Council member of his actions and his communications with the Governor's Office at every stage during this process."

162. Based on information and belief, Williams & Cochrane believes that Pauma's then-Secretary/Treasurer would not sign the two letters prepared by Robert Rosette that sought to absolve Mr. Rosette of any wrongdoing, which in turn led Mr. Rosette to pressure Pauma's then-Chairman Randall Majel (whom he had omitted from the earlier communications) telephonically *over the course of the next twenty days* to sign a watered-down version of the initial letter.

163.  When the motion for protective order finally came on for hearing in the *Pauma* case on May 18, 2012, Judge Bencivengo took issue with Robert Rosette even though she did not have the benefit of any of the above e-mails, stating in pertinent part:

> Well, I have a different issue with Mr. Rosette, who is not here today I believe[,] as to whether or not he should be out purporting that he represents your client when it's not clear to me that he actually has that authority based on some of the declarations that were provided.

*See Pauma,* No. 09-01955, Dkt. No. 182, 19:1-5 (S.D. Cal. May 23, 2012).

164. Ultimately, Judge Bencivengo directed the State of California to agree upon "protocol to control [communications and] settlement discussions in this matter" (*see Pauma,* No. 09-01955, Dkt. No. 183 (S.D. Cal. May 23, 2012)), though she refrained from doing anything about Mr. Rosette since he was not formally part of the proceeding.

**F.  Rosette's Tortious Interference at Pauma (Part Three) and Quechan**

165. The motion for protective order quelled interference from Robert Rosette in the compact suit, but the conclusion of the case in September 2016 – and the consequent publicity it brought Williams & Cochrane – led him to resurface and to do so with a vengeance.

---

Pauma's then-Secretary/Treasurer to Jacob Appelsmith, which was actually prepared by Robert Rosette, is attached hereto as **Exhibit 26**.

166. With the rescissionary and restitutionary remedies in hand, the Pauma General Council tasked Williams & Cochrane with wrapping up its dispute with the State of California by negotiating or litigating for a successor agreement to the 1999 Compact.

167. ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████

168. With that consensual overture going nowhere, Robert Rosette changed tactics and decided to force his way into the tribe, beginning to covertly work for the new general manager of the tribe's subordinate gaming facility – with whom Mr. Rosette has a preexisting relationship – through a "straw man" attorney in the hopes that doing so would positon him so he could fraudulently interfere with Williams & Cochrane's contract in a manner that left the Pauma tribal members none the wiser. And with that, Robert Rosette laid in wait for an opportunity through which he could carry out his plan.

169. As he was waiting for that to happen, Robert Rosette had his sights set elsewhere as well. One of the individuals running for one of the five Tribal Councilmember seats during Quechan's bitter election of Winter 2016/17 was an individual named Mark William "Willie" White, a tribal member who campaigned for the seat by publicly telling other tribal members he had an attorney "friend" (*i.e.*, Robert Rosette) who could get the tribe into the payday lending fold. *See* General Allegations, § II(H), *infra*.

170. Through this relationship, Robert Rosette would learn that Williams & Cochrane represented Quechan in its compact negotiations with the State of California, and he used his relationship with the by-then-seated Willie White to, by his own admission, set up a discreet meeting with Mr. White and putative Quechan Chairman Keeny Escalanti on June 16, 2017 in order to discuss the California compact negotiations – just two weeks before the California compact negotiations were set to conclude and after point-persons for both the Tribal Council and casino told Cheryl Williams that the Tribal Council in-

tended to abide by the General Council's directive and execute whatever compact Williams & Cochrane negotiated by the end of June. *See* Dkt. No. 52-2, ¶ 19.[29]

171. According to a declaration filed in this case by an executive assistant for Robert Rosette, the law firm of Rosette LLP "commission[s] the printing and distribution of marketing brochures" in the "ordinary course of business" – brochures that contain a biography for Mr. Rosette that mirrors the one on his website claiming he "successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California against then-Governor Schwarzenegger." Dkt. No. 54-2, ¶ 4 & p. 12.

172. It is not only standard practice for Rosette, LLP to print these brochures, but also to distribute them to actual and potential clients over the wires and through the mail in advance of meetings that will broach new or enlarged work projects so the client has some familiarity with the "accomplishments" of the firm by the time the meeting takes place. On information and belief, Robert Rosette adhered to this standard practice with respect to the June 16, 2017 meeting by e-mailing copies of the marketing brochure containing the false advertisement about the *Pauma* litigation to Willie White and putative Quechan President Keeny Escalanti before said meeting occurred. On top of which, Robert Rosette also repeatedly used the wires to e-mail with both Willie White and putative Quechan President Keeny Escalanti in the days immediately before June 16, 2017 in order to nail down the logistics for this clandestine meeting at which he planned on interfering with Williams & Cochrane's contract using fraudulent means.

173. When the meeting finally took place on the morning of June 16, 2017, Robert Rosette parroted the false claim in his promotional materials that he successfully litigated the *Pauma* case, and then explained to Willie White and putative Quechan President Keeny Escalanti that he could simply step in and take over the negotiations at the final

---

[29] The allegations in this subsection pertaining to the June 16, 2017 meeting are based upon or built off of evidence the Rosette defendants submitted with the Court early in the Rule 12 motion practice. *See, e.g.,* Dkt. No. 52-2, ¶ 19.

moment and thus try to enable Quechan to dodge its obligations under the Attorney-Client Fee Agreement. To assuage some very real concerns on the part of the putative Tribal Councilmembers about acting in a rogue manner,[30] Robert Rosette explained that he would try and deter Williams & Cochrane from telling anyone else in the tribe about the interference in the California compact negotiations in the termination letter he and the attorneys at this firm (including Richard Armstrong) would draft and then transmit to Willie White and Keeny Escalanti using the wires, further assuring the two putative Quechan Tribal Councilmembers that he could prepare and backdate a seemingly-authentic resolution regarding his hiring once the coast was clear.

174. Yet, rather than simply assume Quechan's California compact work in a lawful manner, the termination letter prepared by Robert Rosette and transmitted by the tribe on June 27, 2017 caused a total repudiation of the Attorney-Client Fee Agreement by explaining that "[t]he Tribe will not pay any contingency fee or 'reasonable fee for the legal services provided in lieu thereof.'" Ex. 4. The decision to take this approach towards concluding the Attorney-Client Fee Agreement has caused Quechan to be named as a defendant in this federal lawsuit in which it has paid WilmerHale more than $2,000,000 to simply engage in basic pleading practice, and will likely pay WilmerHale more than the full amount of the contingency fee once all is said and done.

175. In keeping with his promise, however, the July 26, 2017 termination letter prepared by Robert Rosette tries to keep Williams & Cochrane quiet about the interference by explaining "the confidentiality provisions of the Agreement and the confidentiality provisions which govern attorney-client relations" require "that you not disclose to any employee, officer, or official of the Tribe or any subdivision, agency, or enterprise of the Tribe regarding any matter that was the subject of your engagement." Ex. 4.

176. In the hopes of ensuring that the attorneys heeded this warning, the June 26, 2017 termination letter went one step further and warned the attorneys of Williams &

---

[30] A true and correct copy of the "Constitution and By-Laws of the Quechan Tribe of the Fort Yuma Reservation California" is attached hereto as **Exhibit 27**.

Cochrane that, "[w]e strongly advise you against pressing your luck further out of concern for your reputation of your firm in Indian Country and in the State of California." Ex. 4.

### G. Rosette's Tortious Interference at Pauma (Part Three Cont.) and All Over

177. Since the service of the complaint in this case, Robert Rosette has gone to extraordinary lengths to follow through on the threat he wrote into the Quechan termination letter to ruin "the reputation of your firm in Indian Country and the State of California" should Williams & Cochrane try and obtain the monies that are owed to it under the Attorney-Client Fee Agreement.

178. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

179. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

180. At this point, the animosity on the part of Robert Rosette towards the attorneys at Williams & Cochrane was boiling over and the situation came to a head at the annual National Indian Gaming Association conference that took place in Las Vegas, Nevada during the week of Monday, April 16, 2018. Though they had no real interaction with Robert Rosette since winding up their departure from his firm during May 2010, the attorneys of Williams & Cochrane encountered Mr. Rosette at the Las Vegas Convention Center on or about April 18, 2018. With the attorneys for Williams & Cochrane engaged in conversation alongside the wall in one of the main foyers, Robert Rosette walked past and with teeth barred, seething with anger, pointed his finger at both Cheryl Williams and Kevin Cochrane and violently emitted in the most guttural of growls either "I'm going to hurt you" or "I'm going to get you." This gesture came as quite a shock to the attorneys of Williams & Cochrane, and not just because they had not seen Mr. Rosette for years on end; rather, they perceived it to be threatening in nature and conveying that Robert Rosette was prepared to do whatever it took – in or outside of the courtroom, physically or litigiously – to make sure the instant suit did not progress any further.

181. This paragraph is deleted in order to make sense in light of the allegations stricken by the Court's September 10, 2019 Order [Dkt. No. 216].

182. This paragraph is deleted in order to make sense in light of the allegations stricken by the Court's September 10, 2019 Order [Dkt. No. 216].

183. This paragraph is deleted in order to make sense in light of the allegations stricken by the Court's September 10, 2019 Order [Dkt. No. 216].

184. Yet, the fraud did not end there. Fast forward two months and, on October 12, 2018, the Court conducted a hearing on the second round of motions to dismiss and/or strike filed by the defendants in this action. A significant amount of the conversation focused upon the events surrounding Michelle La Pena, and the Court conveyed the impression that the viability of the RICO claim against the Rosette defendants would likely turn upon the ability of the attorneys of Williams & Cochrane to more specifically identify the content of and modes of transmission for the fraudulent communications that had taken place.

185. And yet, not even three weeks later, on November 1, 2018, Robert Rosette issued a press release – part of which is included in picture form below – to announce "the merger of its practice with LaPena Law Corporation, a highly esteemed law firm based in Sacramento, California, that has serviced the needs of California tribal clients for over a decade." Quoting from the words of Robert Rosette in the press release, "Michelle is a California Indian attorney that is a one of a kind – smart, tenacious, and indefatigable defender of California Indian tribes." Furthermore, bringing Michelle LaPena on as a shareholder in his firm, according to Robert Rosette, was "a tremendous opportunity for Rosette, LLP to broaden its presence in California and serve the needs of tribes in the region."

1
2
3
4
5
6
7
8
9
10
11
12
13



## Prominent Sacramento Tribal Law Firm Lapena Law Corporation Merges With National Law Firm Rosette, LLP

NEWS PROVIDED BY
**Rosette, LLP** →
Nov 01, 2018, 13:30 ET

SHARE THIS ARTICLE

WASHINGTON, Nov. 1, 2018 /PRNewswire/ -- Rosette, LLP, a majority - Indian owned national law firm, specializing in the practice of federal Indian law, is thrilled to announce the merger of its practice with LaPena Law Corporation, a highly esteemed law firm based in Sacramento, California, that has serviced the needs of California tribal clients for over a decade.  Michelle L. LaPena, owner of LaPena Law Corporation, has joined Rosette, LLP as a shareholder and will co-manage the firm's Sacramento, California office.

"Michelle is a California Indian attorney that is a one of a kind—smart, tenacious, and indefatigable defender of California Indian tribes. This new partnership brings a tremendous opportunity for Rosette, LLP to broaden its presence in California and serve the needs of tribes in the region," says Robert Rosette, Founder and Managing Partner of Rosette, LLP.  "Working with Michelle as a fellow shareholder and fellow tribal member is a great honor and privilege."

"This merger with Rosette, LLP will allow our practices to combine resources and strengthen our ability to be of service to our tribal clients," says Michelle LaPena.  "I look forward to working with this incredibly talented team for the betterment of the tribal communities that are so important to us."

14
15
16
17
18
19
20
21
22
23
24

186. With Michelle La Pena having retired from the practice of law in recent years, on information and belief Williams & Cochrane believes that the merger is simply a ruse, a sham business transaction the real motivation for which is Robert Rosette's desire to buy off Ms. La Pena and thereby corruptly influence the disposition of this suit. To that end, on information and belief, Williams & Cochrane further believes that Robert Rosette and other attorneys in his firm (like Richard Armstrong) used the wires extensively between October 13, 2018 and November 1, 2018 to communicate with Michelle La Pena and facilitate an arrangement whereby she would join his firm as a partner on the conditions that she testify in the manner desired by Mr. Rosette in the instant case and further destroy any relevant files from her prior firm, including any damaging communications concerning Kevin Cochrane, Cheryl Williams, or Williams & Cochrane.

25
26

187. This paragraph is deleted in order to make sense in light of the allegations stricken by the Court's September 10, 2019 Order [Dkt. No. 216].

27
28

188. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

189. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

190. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

191. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

192. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

193. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

194. This paragraph is deleted in order to make sense in light of the allegations stricken by the Court's September 10, 2019 Order [Dkt. No. 216].

195. This paragraph is deleted in order to make sense in light of the allegations stricken by the Court's September 10, 2019 Order [Dkt. No. 216].

196. This paragraph is deleted in order to make sense in light of the allegations stricken by the Court's September 10, 2019 Order [Dkt. No. 216].

197. This paragraph is deleted in order to make sense in light of the allegations stricken by the Court's September 10, 2019 Order [Dkt. No. 216].

198. This paragraph is deleted in order to make sense in light of the allegations stricken by the Court's September 10, 2019 Order [Dkt. No. 216].

199. This paragraph is deleted in order to make sense in light of the allegations stricken by the Court's September 10, 2019 Order [Dkt. No. 216].

200. This paragraph is deleted in order to make sense in light of the allegations stricken by the Court's September 10, 2019 Order [Dkt. No. 216].

201. This paragraph is deleted in order to make sense in light of the allegations stricken by the Court's September 10, 2019 Order [Dkt. No. 216].

202. This paragraph is deleted in order to make sense in light of the allegations stricken by the Court's September 10, 2019 Order [Dkt. No. 216].

203. This paragraph is deleted in order to make sense in light of the allegations stricken by the Court's September 10, 2019 Order [Dkt. No. 216].

204. This paragraph is deleted in order to make sense in light of the allegations stricken by the Court's September 10, 2019 Order [Dkt. No. 216].

## FIRST CLAIM FOR RELIEF

### [Breach of Contract]

### [By Williams & Cochrane and Against Quechan]

205. Williams & Cochrane incorporates by reference the preceding general allegations as if set forth in full.

206. A claim for a breach of contract requires an enforceable contract, the plaintiff's performance thereunder, the defendant's breach, and resultant damages. *See, e.g., Hickcox-Huffman v. US Airways, Inc.,* 855 F.3d 1057, 1062 (9th Cir. 2017) (citation omitted). Further, the terms of a contract may contain an implied in fact agreement that limits the ability of one contracting party to fire the other, with such implied agreement standing on "equal footing with express terms." *See Foley v. Interactive Data Corp.,* 47 Cal. 3d 654, 677-78 (1988) (citing Restatement (Second) of Contracts §§ 4, 19 (1981)).

207. Quechan and Williams & Cochrane executed the Attorney-Client Fee Agreement on September 29, 2016 after arms-length negotiation and the tribe consulted with an independent attorney. The terms of the contract state that Williams & Cochrane would provide legal services to Quechan pertaining to "reducing [the tribe's] payments under its tribal/State gaming compact with the State of California and seeking return of payments made under such agreement." In return for these services, Quechan agreed to pay Williams & Cochrane a monthly flat fee of $50,000 and a 15% contingency fee on the roughly $39,732,774 in heightened revenue sharing that Quechan paid to the State of California under its 2007 Amendment if the firm was able to obtain a "credit, offset, or other reduction in future compact payments to the State in a successor compact (whether new or amended) as a result of" said past payments. The Attorney-Client Fee Agreement also explains that if Quechan discharges Williams & Cochrane before the contingency fee

attaches, the tribe will still have to pay the full contingency fee if it has become "entitled" to the aforementioned "credit, offset, or other reduction in future compact payments" that serves as the basis for the fee. *See* Merriam-Webster, *Definition of Entitle*, *available at* *https://www.merriam-webster.com/dictionary/entitle* (last visited July 15, 2017) (defining "entitle" as "to furnish with proper grounds for seeking or claiming something"). Even if this is not the case, the Attorney-Client Fee Agreement still requires Quechan to pay the firm a "reasonable fee for the legal services provided in lieu of the contingency fee" that will be determined on the basis of a list of factors that first looks at "[t]he amount of the fee in proportion to the value of the services performed."

208. Williams & Cochrane performed under the Attorney-Client Fee Agreement from the execution date of the contract to June 27, 2017, by which point it had reached an agreement in principle with the State of California and was finalizing the terms of a twenty-five year gaming compact that would eliminate at least $112 million in revenue sharing fees vis-à-vis the 2007 Amendment and provide Quechan with ability to generate another $660 million in additional gaming revenue as a result of new machine rights.

209. Yet, just three days before Quechan was tentatively set to sign the final compact, putative President Keeny Escalanti caused a letter to be e-mailed to Williams & Cochrane in which he stated that the firm had been terminated and the tribe would "not pay any contingency fee or 'reasonable fee for the legal services provided in lieu' thereof" as required by the terms of the Attorney-Client Fee Agreement. Between this and a second letter dated June 30, 2017, putative Quechan President Keeny Escalanti directed Williams & Cochrane to turn over the final draft of the compact to an attorney by the name of Robert Rosette so he could wind up the negotiations and have the tribe sign the compact Williams & Cochrane had negotiated without delay. To make it abundantly clear that Quechan would not pay any contingency or substitute fee under the Attorney-Client Fee Agreement, putative Quechan President included a threat in his June 26th termination letter, telling Williams & Cochrane that he "strongly advise[s] you against pressing your luck further out of concern for the reputation of your firm in Indian

1    Country and in the State of California."

2    210. In addition to violating the express terms of the Attorney-Client Fee

3    Agreement, putative Quechan President Keeny Escalanti also breached an implied in fact

4    agreement that stands on "equal footing" with the express terms of the agreement, which

5    ensured that the tribe would not terminate the firm during the conclusion of the time-

6    sensitive negotiations. This implied in fact agreement is evidenced, in part, by the course

7    of conduct between the parties, as the point persons for both the Tribal Council and the

8    Quechan Casino Resort told Cheryl Williams in the weeks leading up to the transmission

9    of putative President Keeny Escalanti's June 26th termination letter t██████████████

10   ██████████████████████████████████████████████████████████████████████

11   ██████████████████████████████████████████████████████████████████████

12   ██████████████████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████████████████████████

14   ████████████████████████████

15   211. Quechan's breach of both the express and implied terms of the Attorney-

16   Client Fee Agreement has caused Williams & Cochrane to suffer contract damages and

17   injuries totaling at least $6,345,399.97, which the district judge or a jury can resolve in

18   accordance with the Prayer for Relief, *infra*.

19                          **SECOND CLAIM FOR RELIEF**

20        **[Breach of the Implied Covenant of Good Faith and Fair Dealing]**

21             **[By Williams & Cochrane and Against Quechan]**

22   212. Williams & Cochrane incorporates by reference the preceding general allega-

23   tions as if set forth in full.

24   213. The implied covenant of good faith and fair dealing imposes basic duties that

25   inhere in all contracts. *See Talden Inv. Co. v. Comerica Mortg. Corp.,* 1990 U.S. Dist.

26   LEXIS 19951, *47 (N.D. Cal. 1990) (citing Restatement (Second) of Contracts § 205

27   (1981)). These duties require that a party to a contract not act in an opportunistic or bad

28   faith manner that will deprive the other party of the benefits of the agreement. *See, e.g.,*

*Mitchell v. Exhibition Food, Inc.,* 184 Cal. App. 3d 1033, 1043 (1986). The term "bad faith" is what courts consider an "excluder phrase" that is "without general meaning (or meanings) of its own and serves to exclude a wide range of heterogeneous forms of bad faith." *Price v. Wells Fargo Bank,* 213 Cal. App. 3d 465, 479 (1st Dist. 1989) (citation omitted). While "a complete catalogue of types of bad faith is impossible" (Restatement (Second) of Contracts § 205 cmt. d (1981)), judicial decisions have long recognized that conduct that seeks to evade the spirit of the bargain is basic bad faith. *See id.* This principle means, *inter alia*, that "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." *Okun v. Morton,* 203 Cal. App. 3d 805, 820 (2d Dist. 1988) (quoting *Cal. Lettuce Growers v. Union Sugar Co.,* 45 Cal. 2d 474 (1955)).

214. Quechan and Williams & Cochrane executed the Attorney-Client Fee Agreement as is discussed in the First Claim for Relief, *supra.*

215. The Attorney-Client Fee Agreement explains that Quechan "may discharge [Williams & Cochrane] at any time," but it will still have to pay the contingency fee if the tribe has become "entitled" to a "credit, offset, or other reduction in future compact payments to the State in a successor compact (whether new or amended) as a result of" its past, excess payments under the 2007 Amendment. *See, e.g.,* Webster's Third New International Dictionary 758 (2002) (defining "entitle" as "furnish with proper grounds for seeking or claiming something"). Even if this is not the case, the Attorney-Client Fee Agreement still requires Quechan to pay the firm a "reasonable fee for the legal services provided in lieu of the contingency fee," which primarily turns upon "[t]he amount of the fee in proportion to the value of the services performed."

216. However, in this case, putative Quechan President Keeny Escalanti caused to be transmitted to Williams & Cochrane a letter on July 27, 2017 that terminated the firm just three days before the end of the negotiations and the planned execution date for the resultant compact, explaining that the tribe would "not pay any contingency fee or 'reasonable fee for the legal services provided in lieu' thereof." Despite this, the putative

Quechan President demanded that Williams & Cochrane turn over the latest draft compact to Robert Rosette using threats of legal action so this substitute attorney could simply step in as the attorney of record and have the tribe sign the compact that Williams & Cochrane negotiated. This course of conduct blatantly evades the spirit of the bargain, especially when a court takes into account that the point persons for both the Tribal Council and Quechan Casino Resort had informed Cheryl Williams in the weeks leading up to the transmission of the June 26th termination letter ███████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████.

217. Quechan's breach of the implied covenant of good faith and fair dealing that inheres in the Attorney-Client Fee Agreement has caused Williams & Cochrane to suffer contract damages and injuries totaling at least $6,345,399.97, which the district judge or a jury can resolve in accordance with the Prayer for Relief, *infra*.

### THIRD CLAIM FOR RELIEF

**[Violation of the Lanham Act – Robert Rosette's False Advertising about the *Pauma* Suit (15 U.S.C. § 1051 *et seq*.)]**

**[By Williams & Cochrane and Against Robert Rosette; Rosette & Associates, PC; and Rosette, LLP]**

218. Williams & Cochrane incorporates by reference the preceding general allegations as if set forth in full.

219. The Lanham Act provides in relevant part that:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any… false or misleading description of fact, or false or misleading representation of fact, which –

[…]

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities, shall be liable in a civil action by

any person who believes that he or she is likely to be damaged by such act. 15 U.S.C. § 1125(a). Thus, a claim for false advertising under the Lanham Act requires a plaintiff to show five things akin to: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." *Skydive Ariz., Inc. v. Quattrocchi,* 673 F.3d 1105, 1110 (9th Cir. 2012).

220. Robert Rosette has a literally false representation of fact on the website for his firm Rosette, LLP (of which Rosette & Associates, PC is a general partner), which advertises to the general public and all potential clients in the Indian law field that "Mr. Rosette… successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California against then Governor Schwarzenegger." This statement is unequivocally false, though, given that the attorneys for Williams & Cochrane (*i.e.*, Cheryl Williams and Kevin Cochrane) were counsel of record in that matter from June 2010 till the conclusion of the case in September 2016, and responsible for upholding the preliminary injunction, rescinding the tribe's 2004 Amendment on the basis of a claim they added to the complaint in September 2011, and obtaining $36.3 million as restitution for the excess payments the tribe made to the State of California under its amendment. In fact, according to his own deposition testimony, Robert Rosette admits that he only had the case for forty-five days, during which time he filed one substantive brief that resulted in the Ninth Circuit overturning the preliminary injunction Cheryl Williams and Kevin Cochrane had obtained the tribe, thus leaving the tribe with no interim or final remedies as a result of his short-lived representation in the case. Not only that, but Robert Rosette's deposition testimony also

reveals that Mr. Rosette did not even know what was happening in the *Pauma* case as of October 2010 – a mere four months after his termination, eleven months before Williams & Cochrane added the claim to the complaint on which Pauma would ultimately prevail, and almost six years before the case would finally conclude.

221. This website advertisement by Robert Rosette about his involvement in the Pauma litigation (which, he admits, is also part of his promotional materials) appears to have actually deceived Quechan President Keeny Escalanti and putative Councilmember Willie White, as they concocted a scheme to have Mr. Rosette (*i.e.,* the one other attorney who was supposedly responsible for litigating the case on which their dispute was, in part, based) replace Williams & Cochrane right on the cusp of the negotiations concluding. Moreover, this advertisement would also deceive most other tribal leaders not affiliated with Pauma in the normal course because the attorney information for the *Pauma* suit is largely hidden behind the paywalls for the federally-run PACER site, and Robert Rosette is capable of producing early court filings to substantiate his supposed claim given that his firm represented Pauma for nine months at the outset of the case, from the filing of the complaint on September 4, 2009 to approximately June 13, 2010.

222. Robert Rosette also caused this literally false statement of fact to enter interstate commerce by putting it on his website and keeping it there for four years now.

223. The abovenamed Rosette defendants' violation of the Lanham Act has caused Williams & Cochrane to suffer contract damages and injuries totaling at least $6,345,399.97, which the district judge or a jury can resolve in accordance with the Prayer for Relief, *infra*.

224. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

225. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

226. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

227. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

228. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

229. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

230. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

231. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

232. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

233. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

234. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

235. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

236. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

237. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

238. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

239. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

240. This paragraph is deleted pursuant to the Court's September 10, 2019 Order [Dkt. No. 216].

## PRAYER FOR RELIEF

**WHEREFORE**, Williams & Cochrane prays as follows:

1. That the Court award contract damages against the Quechan Tribe of the Fort Yuma Indian Reservation in an amount of at least **$6,345,399.97**;

2. That the Court award any other non-monetary relief (whether equitable or legal in nature) against Quechan on the contract claims as needed or otherwise requested;

3. That the Court award any other remedies against Quechan that the tribe affirmatively requested in its Answer (*see* Dkt. No. 94, 24:3-16), including "compensatory and punitive damages," "pre-judgment and post-judgment interest," "restitution," "disgorge-[ment]," "offset/recoupment," and "costs and expenses;"

4. That the Court award treble damages under the Lanham Act in an amount of at least **$19,036,199.91** against the indicated Rosette defendants for the false advertisement(s) about the *Pauma* lawsuit, as well as require the disgorgement of any of the direct or indirect profits that they may have obtained as a result of such advertisement(s);

5. That the Court award injunctive relief under the Lanham Act against the indicated Rosette defendants to block further false advertisements about the *Pauma* suit;

6. That the Court award pre- and post-judgment interest on any monetary awards at the maximum rate or rates permitted under State law;

7. That the Court award reasonable attorney fees as allowed by law (including statutes like the Lanham Act) or equity;

8. That the Court award the costs of suit as allowed by law (including statutes like the Lanham Act) or equity; and

9. That the Court award such other and further legal or equitable relief as it deems appropriate, as justice requires, or as the law allows.

RESPECTFULLY SUBMITTED this 25th day of September, 2019

WILLIAMS & COCHRANE, LLP, *et al.*

By: */s/ Kevin M. Cochrane*
Cheryl A. Williams
Kevin M. Cochrane
caw@williamscochrane.com
kmc@williamscochrane.com
WILLIAMS & COCHRANE, LLP
125 S. Highway 101
Solana Beach, California 92075
Telephone: (619) 793-4809