MATTHEW W. CLOSE (S.B. #188570)
mclose@omm.com
BRITTANY ROGERS (S.B. #274432)
brogers@omm.com
KATE M. IKEHARA (S.B. #313431)
kikehara@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

Attorneys for Defendants Robert Rosette,
Rosette & Associates, PC, and Rosette, LLP

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAMS & COCHRANE, LLP,<br><br>    Plaintiff,<br><br>  v.<br><br>QUECHAN TRIBE OF THE FORT YUMA INDIAN RESERVATION, a federally-recognized Indian tribe; ROBERT ROSETTE; ROSETTE & ASSOCIATES, PC; and ROSETTE, LLP,<br><br>    Defendants.<br><br>───────────────<br>AND ALL RELATED COUNTER CLAIMS | **REDACTED**<br><br>Case No. 17-CV-01436 GPC DEB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ROSETTE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Notice of Motion; Separate Statement of Undisputed Material Facts; Rogers Declaration; Rosette Declaration; Escalanti Declaration; White Declaration; Deschene Declaration Filed Concurrently]<br><br>Date:  December 4, 2020<br>Time:  1:30 pm<br>Judge:  Hon. Gonzalo P. Curiel<br>Courtroom: 2D<br>Trial Date: Not Set |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................. 1

II.  STATEMENT OF FACTS ..................................................................... 3

    A.  Robert Rosette and the Rosette Firm ........................................ 3

    B.  The Pauma Litigation ................................................................ 3

    C.  The Biographical Statement ...................................................... 5

    D.  Mr. Rosette's Introduction to Quechan ................................... 6

    E.  Quechan's Dissatisfaction with W&C ...................................... 7

    F.  W&C Sues Rosette for Alleged RICO Violations and
        Malpractice ................................................................................ 8

III.  ARGUMENT .................................................................................... 9

    A.  Rosette Is Entitled to Summary Judgment Because W&C Has
        No Evidence of Injury, Damages, or Causation. ..................... 10

        1.  Quechan Fired W&C Because of Its Poor Work and
            Unusually High Fees, Not Mr. Rosette's Attorney
            Biography. ....................................................................... 10

        2.  W&C Cannot Prove Any Other Injury or Damages ................ 13

    B.  Rosette Is Entitled to Summary Judgment Because W&C
        Cannot Prove the Biographical Statement Was False. ............ 14

        1.  Rosette Litigated the Preliminary Injunction that Saved
            the Tribe Approximately $100 Million. ............................ 14

        2.  W&C's Claim Is Barred Because W&C's Current Client
            Prevented Rosette from Using Pertinent Evidence. ............ 20

    C.  W&C Has No Evidence That the Statement Was Material. ....... 23

    D.  W&C's Claim Is Barred by Laches. .......................................... 24

IV.  CONCLUSION ................................................................................ 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.L.S. Enters., Inc. v. Robinson Outdoor Prods., LLC,*
   2017 WL 393307 (W.D. Mich. Jan. 30, 2017)....................................................12

*Apotex Inc. v. Acorda Therapeutics, Inc.,*
   823 F.3d 51 (2d Cir. 2016) ................................................................................24

*Appliance Recycling Ctrs. of Am., Inc. v. JACO Envt'l, Inc.,*
   378 F. App'x 652 (9th Cir. 2010)........................................................................15

*Baby Trend, Inc. v. Playtex Prods., LLC,*
   2013 WL 4039451 (C.D. Cal. Aug. 7, 2013) ....................................................24

*Balance Dynamics Corp. v. Schmitt Indus., Inc.,*
   204 F.3d 683 (6th Cir. 2000).............................................................................20

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ..........................................................................................9

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH,*
   2018 WL 4253181 (S.D.N.Y. Sept. 5, 2018) ....................................................14

*Conopco, Inc. v. Campbell Soup Co.,*
   95 F.3d 187 (2d Cir. 1996) ................................................................................25

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.,*
   911 F.2d 242 (9th Cir.1990) ..............................................................................14

*Davis v. Avvo, Inc.,*
   345 F. Supp. 3d 534 (S.D.N.Y. 2018) ...............................................................15

*Diamond Tr. of Estate of Howrey LLP v. Hogan Lovells US LLP,*
   950 F.3d 1200 (9th Cir. 2020)...........................................................................11

*Dietz v. Meisenheimer & Herron,*
   177 Cal. App. 4th 771 (2009)......................................................................21, 22

*Gensler v. Strabala,*
   764 F.3d 735 (7th Cir. 2014) .............................................................................16

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Harper House, Inc. v. Thomas Nelson, Inc.*,
889 F.2d 197 (9th Cir. 1989) .................................................................. 13

*In re Outlaw Lab., LP Litig.*,
424 F. Supp. 3d 973 (S.D. Cal. 2019) ............................................. 10, 12

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
304 F.3d 829 (9th Cir. 2002) .................................................................. 24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ................................................................................ 10

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ................................................................................ 21

*McDermott, Will & Emery v. Super. Ct.*,
83 Cal. App. 4th 378 (2000) ................................................................... 21

*McGirr v. Rehme*,
891 F.3d 603 (6th Cir. 2018) .................................................................. 15

*Nichia Am. Corp. v. Seoul Semiconductor Co.*,
2008 WL 11342571 (C.D. Cal. Oct. 7, 2008) ....................................... 24

*Nutrition Distribution LLC v. PEP Research, LLC*,
2019 WL 652391 (S.D. Cal. Feb. 15, 2019) .......................................... 18

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
18 F.3d 1468 (9th Cir. 1994) .................................................................... 9

*Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*,
310 F. Supp. 3d 1089 (S.D. Cal. 2018) ................................................. 24

*Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas
Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir.
2019) ........................................................................................................ 15

*Rice v. Fox Broadcasting Co.*,
330 F.3d 1170 (9th Cir. 2003) ................................................................ 23

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*SKEDKO, Inc. v. ARC Prods., LLC*,
     2014 WL 2465577 (D. Or. June 2, 2014)...........................................................19

*Skydive Arizona, Inc. v. Quattrocchi*,
     673 F.3d 1105 (9th Cir. 2012)..........................................................................23

*Societe Civile Succession Richard Guiono v. Beseder Inc.*,
     2007 WL 3238703 (D. Ariz. Oct. 31, 2007) ......................................................13

*Solin v. O'Melveny & Myers, LLP*,
     89 Cal. App. 4th 451 (2001)..............................................................................21

*Southland Sod Farms v. Stover Seed Co.*,
     108 F.3d 1134 (9th Cir. 1997).........................................................14, 15, 17, 19

*Taheri Law Grp. v. Evans*,
     160 Cal. App. 4th 482 (2008).............................................................................11

*United States v. James*,
     980 F.2d 1314 (9th Cir. 1992)............................................................................22

*Univision Music LLC v. Banyan Entm't*,
     2004 WL 5574359 (C.D. Cal. Nov. 15, 2004) .............................................19, 23

*Verisign, Inc. v. XYZ.COM LLC*,
     848 F.3d 292 (4th Cir. 2017)..............................................................................12

*Weinberger v. Romero-Barcelo*,
     456 U.S. 305 (1982) ..........................................................................................15

*William H. Morris Co. v. Grp. W, Inc.*,
     66 F.3d 255 (9th Cir. 1995)................................................................................23

*Youngevity Int'l v. Smith*,
     2019 WL 2918161 (S.D. Cal. July 5, 2019)........................................................9

**Other Authorities**

11A Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* §
     2942 (3d ed.).....................................................................................................15

6 William F. Patry, *Patry on Copyright* § 22:7 (2020) ...........................................15

MEM. OF POINTS & AUTHORITIES
ISO ROSETTE'S MSJ
17-CV-01436 GPC DEB

1    **I.    Introduction**

2        After three years of litigation and excessive motion practice, Williams &

3    Cochrane ("W&C") has no evidence to prove its lone surviving claim against

4    Rosette:[1] that a single sentence in Mr. Rosette's biographical materials somehow

5    caused the Quechan Tribe of the Fort Yuma Reservation ("Quechan" or the

6    "Tribe") to fire W&C as its counsel, a decision that in turn supposedly caused

7    W&C to suffer millions of dollars in damages.  To the contrary, the undisputed

8    evidence shows that Quechan's leadership was unhappy with W&C months before

9    the Tribe ever met or thought about Rosette.  As the Tribe's leaders, including its

10   then-President, have now testified, Quechan fired W&C because it was frustrated

11   with the pace, cost, and quality of W&C's work on the gaming compact Quechan

12   hired it to renegotiate with the State of California.  The termination had nothing to

13   do with Rosette.  W&C was charging the Tribe $50,000 a month, regardless of the

14   work it completed or time it spent, and was expecting a multimillion-dollar payout

15   at the end of the representation, regardless of how well it performed.  Quechan was

16   behind on its payments to the State, and the end of the legislative session was fast

17   approaching—the Tribe's last chance that year to finalize a compact.  With the

18   clock ticking, W&C was not making progress on the Tribe's goals.  And Quechan,

19   of course, had the absolute right to fire its counsel.

20       Because there is no triable issue of fact on W&C's sole claim against Rosette

21   under the Lanham Act, Rosette is entitled to summary judgment in this case.  W&C

22   elected not to take any depositions; it has been apparent from the beginning that all

23   the individuals with relevant knowledge reject W&C's unsubstantiated assertions

24   out of hand.  W&C also did not put forth a single expert to opine on causation or

25   estimate alleged damages proximately caused by the supposed Lanham Act

26   _____

27   [1] Robert Rosette, Rosette & Associates, PC, and Rosette, LLP are referred to
     collectively as "Rosette."  Citations to "Ex. __ " refer to exhibits to the Declaration

28   of Brittany Rogers.  All internal citations and quotation marks in case quotations
     are omitted and all emphasis is added, unless noted.

MEM. OF POINTS & AUTHORITIES
ISO ROSETTE'S MSJ
17-CV-01436 GPC DEB

1   violation.  The Court already warned W&C last year that it "cannot plausibly allege

2   that Rosette's actions proximately caused Quechan to terminate the attorney-client

3   contract, since termination could have resulted from any number of issues with the

4   firm's performance."  (Dkt. No. 217 at 28–29.)  W&C has done nothing to alter that

5   conclusion.  The evidence shows that Quechan fired W&C because of its own

6   deficiencies, so causation is lacking as a matter of law.  And the evidence shows

7   that Quechan hired Rosette because Rosette charged a small fraction of W&C's

8   monthly fee and had substantial experience getting deals done.

9        There is also no evidence that Quechan was misled by a single 32-word

10  sentence in a 453-word attorney biography.  There is no evidence that decision-

11  makers at Quechan read or relied on Mr. Rosette's biography when deciding to fire

12  W&C or hire Rosette.  And the one disputed sentence about an old litigation matter

13  that was first handled by Rosette and later handled by W&C was not false or

14  misleading.  As the only expert witness in this case on attorney advertising and

15  ethics has testified: law firm partners in charge of matters (like Mr. Rosette)

16  ethically and practically can advertise successes attained by their firms; doing so is

17  standard practice and understood by prospective clients; consumers generally do

18  not rely on attorney advertising when making hiring decisions; and few even look

19  at attorney advertising or websites in the process.  (Ex. 56 ¶¶ 53–55, 70–74.)

20       Summary judgment is warranted for multiple independent reasons:

21   • W&C has no evidence of an injury, damages, or causation;

22   • W&C cannot prove that Rosette's advertising was false or misleading;

23   • W&C has no evidence that the biographical statement was material; and

24   • W&C's Lanham Act claim is barred by laches.

25  Rosette has maintained from the beginning that W&C is abusing the litigation

26  process to vindicate some long-held grudge and to punish Rosette for replacing

27  W&C as Quechan's lawyers.  W&C's total lack of evidence at this stage confirms

28  that a Lanham Act claim was never an appropriate vehicle for that campaign.

MEM. OF POINTS & AUTHORITIES
ISO ROSETTE'S MSJ
17-CV-01436 GPC DEB

## II.    Statement of Facts

### A.    Robert Rosette and the Rosette Firm

Robert Rosette is an enrolled member of the Chippewa-Cree Tribe, Rocky Boy Indian Reservation.  (Declaration of Robert Rosette in Support of Rosette Defendants' Motion for Summary Judgment ("Rosette Decl.") ¶ 4.)  He grew up in a town bordering the reservation, and after attending college in New Mexico, he earned both his juris doctor and MBA from Arizona State University in 1996.  (*Id.*)  After eight years of practicing federal Indian law, Mr. Rosette founded his own firm: Rosette & Associates, PC (later called Rosette, LLP).  (Dkt. No. 52-2 ¶ 4.)  The Rosette firm has represented over three dozen tribes in various legal disputes at the state and federal level.  (Separate Statement of Undisputed Material Facts ("UF") #1.)  The firm currently employs 24 attorneys across five offices, from Sacramento, California, to Washington, D.C., and exclusively represents tribes and tribal entities.  (Rosette Decl. ¶ 6.)  Mr. Rosette is an active member of the tribal law community and founded the Rosette, LLP, American Indian Economic Development Program at Arizona State University.  (Dkt. No. 52-2 ¶ 3.)

### B.    The Pauma Litigation

Beginning in 2007, the Pauma Band of Luiseño Mission Indians ("Pauma") retained Mr. Rosette as its lead attorney in negotiations with state and local governments about tribal gaming.  (Rosette Decl. ¶ 9; 4AC ¶¶ 117–18.)  Pauma had initially entered into a gaming compact with the State of California in 1999, then executed an amendment in 2004 to allow it to operate additional slot machines.  (Ex. 1.)  Ultimately, Pauma's goal was to build a state-of-the-art casino, but that aspiration dimmed when the global financial markets collapsed and development stalled.  (Rosette Decl. ¶ 11.) ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮  (Ex. 2 at 72–74; Ex. 12 at 79:17–80:4.)

Leveraging his knowledge of California's tribal-state gaming compact

MEM. OF POINTS & AUTHORITIES
ISO ROSETTE'S MSJ
17-CV-01436 GPC DEB

history, Pauma's factual and legal situation, and recent trends in federal and state law, Mr. Rosette developed a legal strategy, litigation case theories, and claims to challenge the validity of Pauma's 2004 amendment.  (UF #3–5.)  Mr. Rosette led pre-lawsuit meetings with the State and explained the potential litigation that Pauma was threatening: the 2004 amendment was a nullity because the State had misrepresented the total number of available machine licenses.  (UF #5.)

Rosette hired Cheryl Williams and Kevin Cochrane in late February 2009, after Mr. Rosette had devised the Pauma strategy, developed the claims, and conducted preliminary meetings with the State.  (UF #4–7.) ███████████

███████████████████████████████████████████████ (UF #9.) ███████████████████████████████ (UF #8.) ██████████████████████████████████████ (UF #8–9.)  Mr. Rosette remained the partner in charge of the Pauma relationship and the litigation after Ms. Williams and Mr. Cochrane were hired, but he employed them to work on the litigation.  (UF #11.)  He relied on them and other Rosette associates to complete supportive legal research and draft documents implementing his directives. (Rosette Decl. ¶ 19.)  Following Mr. Rosette's direction and approach, Ms. Williams, Mr. Cochrane, and others worked on the Pauma complaint.  (*Id.* ¶ 20.) Mr. Rosette reviewed and revised it and other filings, and his name appeared at the top of each Rosette pleading and filing.  (*Id.*; UF #11.)  He was responsible for the case, whether it was a success or failure.

██████████████████████████████████████████████████ (UF #6; Ex. 12 at 77:8–81:15.)  To achieve this goal, Rosette filed a motion for preliminary injunction after briefing a motion to dismiss.  (UF #10, 12.)  The motion for preliminary injunction was filed in February 2010.  (UF #12.)  The district court granted the preliminary injunction in April 2010, allowing Pauma to begin paying the State under the 1999

compact.  (UF #13.)  This saved Pauma approximately $100 million over the life of the 2004 compact, and the hope had been that it would pressure the State to renegotiate.  (UF #22; Rosette Decl. ¶ 22.)  The State appealed the district court's order.  (UF #14.)  The State asked the district court to stay the injunction, Rosette opposed, and the motion was denied on May 7, 2010.  (UF #14.)  Ms. Williams and Mr. Cochrane resigned from Rosette days later.  (UF #15.)

Rosette litigated the case for another month, during which the firm opposed the State's renewed motion to stay the injunction pending appeal.  (UF #16.)  On or about June 13, 2010, Pauma's General Council voted to terminate Rosette and hire a new firm founded by Ms. Williams and Mr. Cochrane, W&C.  (UF #17.)  A month and a half after W&C took over, the Ninth Circuit entered a procedural order granting the State's motion to stay pending appeal.  (UF #18.)  W&C moved for relief, and the stay was set aside on August 23, 2010.  (UF #19.)  About three months passed before the Ninth Circuit remanded the case, rejecting the appeal due to then-recent precedent, and the stay became moot.  (UF #20.)  In March 2013, based on the misrepresentation theory that Rosette developed and that the original complaint encompassed, Pauma (represented by W&C) received a judgment for $36 million to compensate it for past overpayments to the State.  (Ex. 16.)

## C. The Biographical Statement

Mr. Rosette's attorney biography lists many career achievements.  (Ex. 43.) It covers four printed pages, and the primary text (not including his background and education) comprised 453 words when this dispute originated.  (*Id*.)  As early as May 9, 2011, it and certain Rosette proposal materials listed among those achievements a statement about Mr. Rosette's and the Rosette firm's work for Pauma.  (UF #21.)  The statement took two slightly different forms: (1) "Mr. Rosette also successfully litigated a case saving [Pauma] over $100 million in Compact payments allegedly owed to the State of California against then Governor Schwarzenegger"; and (2) "Rosette brought suit against the State of California and

then-Governor Schwarzenegger and successfully obtained a preliminary injunction against the State, saving the tribe over $100 million in Compact payments allegedly owed to the State." (UF #23.) Mr. Rosette wrote the statement because he was proud of his and his firm's work helping Pauma achieve approximately $100 million in savings through the strategic securing of the preliminary injunction, which tipped the litigation in Pauma's favor. (UF #25.) He removed it after the Court denied Rosette's motion to dismiss W&C's Lanham Act claim early in this action. (UF #26.) W&C never complained about the statement before filing this case, despite it appearing on the Rosette website for over six years. (UF #27.)

### D. Mr. Rosette's Introduction to Quechan

In 2017, Mr. Rosette represented the Tonto Apache Tribe of Arizona ("Tonto Apache") in efforts to negotiate gaming compacts with the State of Arizona. (Dkt. No. 52-2 ¶¶ 6–7.) Rural and urban tribes were divided over strategy, so Tonto Apache decided to reach out to other rural Arizona tribes to build a coalition. (*Id.* ¶¶ 8–9; UF #45–46.) One of those tribes was Quechan; its tribal lands border both California and Arizona. (UF #46.) Tonto Apache President Calvin Johnson wrote to many tribal leaders in Arizona, among them newly elected Quechan President Keeny Escalanti, requesting a meeting to discuss the Arizona negotiations. (UF #46.) President Johnson arranged for Mr. Rosette to meet with President Escalanti and Quechan Councilman William White at a June 2017 conference to discuss the Arizona negotiations. (UF #47.) This was Mr. Rosette's first meeting or discussion with either representative. (UF #49.) The undisputed evidence shows that, for months before this meeting, Quechan had been frustrated with W&C and intended to terminate the firm. (UF #35–38, 40–41, 44, 56.)

After discussing the Arizona negotiations over breakfast, Quechan leadership asked Mr. Rosette if he had experience with compact negotiations in California as well. (UF #52.) Mr. Rosette said he had a great deal of experience. (UF #52.) Over the last 24 years, Rosette has represented at least two dozen tribes in

MEM. OF POINTS & AUTHORITIES
ISO ROSETTE'S MSJ
17-CV-01436 GPC DEB

negotiations over gaming compacts, compact provisions, compact amendments, binding compact interpretations, and California Gambling Control Commission compact rule promulgations. (UF #2.) When President Escalanti asked about the cost for resolving Quechan's compact negotiations, Mr. Rosette stated that he could handle the work for $10,000 a month. (UF #53.) At no time during the meeting did the subject of the Pauma litigation come up. (UF #54.) Mr. Rosette did not send Quechan's leaders any Rosette materials before the meeting, and neither leader reviewed Rosette marketing or biography materials before the meeting. (UF #50.)

Quechan's Tribal Council then invited Mr. Rosette to make a presentation on June 19, 2017, because the Tribal Council was interested in replacing W&C due to the cost and pace of W&C's unsuccessful negotiations with the State of California. (UF #55–56.) Again, the subject of the Pauma litigation never came up. (UF #57.) Quechan was not interested in litigating against the State of California. (UF #71.) Its goal was to reach agreement on a compact in time for ratification during that year's legislative session. (UF #70.) The Tribe was impressed with Rosette's experience in negotiating compacts and Rosette's willingness to work on both the Arizona and California compacts for just a fraction—one-fifth or less—of the monthly fees the Tribe was paying W&C. (UF #61.) The choice was obvious. Rosette was hired and wrapped up negotiations with the State of California by the end of August, securing substantial benefits for the Tribe in the process. (UF #62; Dkt. No. 29-2 ¶ 19; Dkt. No. 29-3 ¶ 19.)

**E.     Quechan's Dissatisfaction with W&C**

Unbeknownst to Mr. Rosette, Quechan had already grown dissatisfied with W&C's work by the time he met the Tribe. (UF #35–38, 40–41, 44, 56.) Quechan's new leadership assumed their roles in March 2017. (UF #35.) They were looking to engage a new law firm or attorney to perform Quechan's general legal services months before their first meeting with Mr. Rosette. (UF #35–38; 40–41, 56.) And in April 2017, still months before meeting Rosette, they began to

MEM. OF POINTS & AUTHORITIES
ISO ROSETTE'S MSJ
17-CV-01436 GPC DEB

raise questions about W&C's performance and fees.  (UF #35–38; 40–41.)  W&C had charged the Tribe $50,000 a month since October 2016, and the Tribe was not seeing results.  (UF #34, 65.)  As of the first week of April, W&C had not even responded with proposed edits to a draft compact that the State of California sent four months earlier.  (UF #42–43.)  And W&C insisted that, even if there was no litigation, it was entitled to a contingency fee of over $6 million.  (UF #37–38.)  On April 27, 2017, Councilman White contacted Oklahoma-based attorney Wilson Pipestem to discuss W&C's attorney fee agreement in light of the Tribal Council's concerns.  (UF #40.)  Mr. White believed that W&C had not "provided services adequate of the level of compensation."  (UF #41.)

Even in June 2017 when Mr. Rosette had his initial meeting with Quechan's leaders, W&C was nowhere near a final negotiated compact.  (UF #66–67.)  At that point, W&C had already charged Quechan approximately $400,000, and time was running out to reach an agreement that could be ratified in the legislative session. (UF #65.)  ██████████████████████████████████████████████████

████████████████████████████████████████████

██████████  (Ex. 52 at 162:22–168:11, 284:5–285:11.)  And W&C told Quechan in June that it would need to hire an expensive lobbyist to finalize the compact.  (UF #44.)  Neither Ms. Williams nor Mr. Cochrane had ever negotiated a final, executed compact with the State of California, or any other state.  (Ex. 48 at 1124–25; Ex. 52 at 34:14–35:2; Ex. 53 at 20:11–14.)  So when the Tribal Council met Mr. Rosette, whose firm was significantly less expensive and significantly more experienced in forging intergovernmental deals, Quechan made the logical choice to change lawyers.  (UF #61–62.)  W&C filed a lawsuit less than a month later.

**F.    W&C Sues Rosette for Alleged RICO Violations and Malpractice**

Despite its name, the Fourth Amended Complaint ("4AC") is the sixth pleading in this case.  (*See* Dkt. Nos. 1, 5, 39, 100, 174, 220.)  It might have been the eighth, but the Court rebuffed W&C's attempts to file two others.  (Dkt. Nos.

97, 135.)  All told, W&C has asserted or tried to assert against Rosette several RICO and RICO conspiracy claims based on a litany of struck allegations, as well as claims for intentional interference with contractual relationship, intentional interference with prospective economic advantage, and—after briefly recruiting a faction at Quechan to get involved—malpractice.  (*See* Dkt. Nos. 1, 5, 39, 97, 100, 135, 174, 220.)  Each and every claim against Rosette, except one, was abandoned by W&C or rejected by the Court.  All that remains is one piece of one claim for false advertising under the Lanham Act, 15 U.S.C. section 1125(a): W&C alleges that Rosette violated federal unfair competition law by representing that it "successfully litigated a case saving [Pauma] over $100 million in Compact payments allegedly owed to the State of California."  (*See, e.g.*, 4AC ¶ 47.)  W&C seeks over $19 million from Rosette based on this statement.  (*See id.* at Prayer.)

## III.   Argument

Summary judgment is "an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Chief among summary judgment's objectives: "to avoid unnecessary trials when there is no dispute as to the facts before the court."  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994).  Where, as here, the movant does not bear the burden of proof at trial, "the [movant] need only point to the insufficiency of the [non-movant's] evidence to shift the burden to the [non-movant] to raise genuine issues of fact as to each claim by substantial evidence."  *Youngevity Int'l v. Smith*, 2019 WL 2918161, at *1 (S.D. Cal. July 5, 2019).

W&C's evidence is not just insufficient, it is nonexistent.  To prevail on its sole claim, W&C "must establish: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing

1  decision; (4) the defendant caused its false statement to enter interstate commerce;

2  and (5) the plaintiff has been or is likely to be injured as a result of the false

3  statement." *In re Outlaw Lab., LP Litig.*, 424 F. Supp. 3d 973, 980 (S.D. Cal.

4  2019) (Curiel, J.).   W&C must also show that it suffered compensable damages

5  proximately caused by the violation.   *See Lexmark Int'l, Inc. v. Static Control*

6  *Components, Inc.*, 572 U.S. 118, 140 (2014).   W&C can do none of these things.

7    A.   **Rosette Is Entitled to Summary Judgment Because W&C Has No**
      **Evidence of Injury, Damages, or Causation.**
8

9       1.   **Quechan Fired W&C Because of Its Poor Work and**
             **Unusually High Fees, Not Mr. Rosette's Attorney**
10            **Biography.**

11   A plaintiff suing under section 1125(a) "must plead (and ultimately prove) an

12  injury to a commercial interest in sales or business reputation proximately caused

13  by the defendant's misrepresentations." *Lexmark*, 572 U.S. at 140.  "[T]he

14  proximate-cause requirement generally bars suits for alleged harm that is 'too

15  remote' from the defendant's unlawful conduct." *Id.* at 133.  "To establish

16  proximate cause . . . a plaintiff ordinarily must show economic or reputational

17  injury flowing directly from the deception wrought by the defendant's advertising."

18  *Outlaw*, 424 F. Supp. 3d at 982.  W&C cannot carry its burden.

19   W&C alleges that Quechan fired it and hired Rosette ***because of*** one line in

20  Mr. Rosette's biography, and it asserts that this single sentence supposedly entitles

21  W&C to three times the contingency fee that it had hoped to extract from the

22  Tribe—over $19 million.  (*See* 4AC ¶ 223.)  The crux of W&C's theory is that

23  President Escalanti and Councilman White saw the statement in Mr. Rosette's

24  biography and were deceived by the statement, and that this caused the Tribe to fire

25  W&C, thereby depriving W&C of a $6.3 million fee it purportedly would have

26  earned had it not been fired.  (*See id.* ¶ 221.)  But none of this ever happened.  The

27  undisputed facts, based on direct testimony from Escalanti and White, are that:

28    • Months before meeting or considering Rosette, Quechan was looking to

MEM. OF POINTS & AUTHORITIES
ISO ROSETTE'S MSJ
17-CV-01436 GPC DEB

replace W&C because it was dissatisfied with the pace and cost of W&C's work (UF #35–38, 40–41, 44, 56);

- Quechan's decision-makers did not review and were not deceived by the biographical statement or the scope of Mr. Rosette's role in the Pauma case (UF #50, 51, 54, 56–61; 68–80);

- Even if it had been seen, the statement was irrelevant to Quechan's decision-making process because it concerned old litigation, and Quechan was not interested in litigating against the State at that time (UF #71); and

- Quechan hired Mr. Rosette because of his experience and willingness to complete the same work for a fraction of the price (UF #61).

- W&C was also far from executing a deal with the State when it was fired, so it could not have been entitled to any contingency fee (UF #66–67).

There is no basis, in fact or law, to let this claim go to trial.  Even if there were evidence that Rosette somehow persuaded Quechan to fire W&C, that is not an actionable claim.  Clients can discharge their lawyers at any time, for any reason—just as Pauma fired Rosette in favor of W&C.  *See Taheri Law Grp. v. Evans*, 160 Cal. App. 4th 482, 492 (2008) (client has the "fundamental right . . . to choose and change his legal representation").  "[A] law firm does not own client legal matters, clients own their matter—clients have the right to transfer their matters to new counsel, to terminate representation, and to hire new counsel."  *Diamond Tr. of Estate of Howrey LLP v. Hogan Lovells US LLP*, 950 F.3d 1200, 1209 (9th Cir. 2020).  It follows that, "[b]ecause clients retain all rights associated with representation of their legal matters, law firms do not have a reasonable expectation, or legitimate claim of entitlement, that they will continue working on these client matters and earn future fees."  *Id.*  "Law firm expectations of continued work are best understood as essentially unilateral, and too contingent in nature and speculative to create a present or future property interest."  *Id.*  These binding authorities are consistent with this Court's ruling that it "cannot agree with W&C

MEM. OF POINTS & AUTHORITIES
ISO ROSETTE'S MSJ
17-CV-01436 GPC DEB

that at the time Quechan discharged W&C, Quechan was 'entitled'—under any understanding of that term—to any of the net recovery it obtained as a result of the compact it signed with California." (*See* Dkt. No. 89 at 15.)

Besides the law not permitting such a claim, there is no genuine dispute as to any material fact about causation. The Court already observed the fundamental causation problem in the case: "W&C . . . cannot plausibly allege that Rosette's actions proximately caused Quechan to terminate the attorney-client contract, since termination could have resulted from any number of issues with the firm's performance." (Dkt. No. 217 at 28–29.) Now, after discovery, the evidence is overwhelming and undisputed that one sentence buried at the bottom of Mr. Rosette's attorney biography did not cause Quechan to terminate W&C. All of the evidence is to the contrary. ████████████████████████ ████████████████████████████████████████ (Ex. 54 at 186:19–187:22.) Relying solely on guesswork belied by the actual evidence, W&C cannot "establish a sufficiently close connection between plaintiff's harm and 'the conduct the statute prohibits.'" *Outlaw*, 424 F. Supp. 3d at 982.

Undisputed evidence instead shows that there was ***no connection*** between W&C's alleged harm, the fees it supposedly lost when it was terminated, and the marketing at issue. (UF #50, 51, 54, 56–61; 68–80.) The mountain of evidence showing that W&C was terminated because of its own failings defeats any attempt to show otherwise. (UF #35–38, 40–41, 44, 56, 65–67.) And these credible alternative explanations for W&C's termination foreclose W&C's ability to infer causation from W&C's unsupported guesses. (*See* Dkt. No. 217 at 28–29); *see also, e.g.*, *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 301 (4th Cir. 2017) (affirming summary judgment where statements were not "causally linked to damages"); *A.L.S. Enters., Inc. v. Robinson Outdoor Prods., LLC*, 2017 WL 393307, at *7–8 (W.D. Mich. Jan. 30, 2017) (rejecting "*post hoc ergo propter hoc*" theory "[g]iven the number of potential reasons for [plaintiff's] declining sales").

Summary judgment should be granted in Rosette's favor, and W&C should be precluded from pursuing any claim that Rosette can be held liable for W&C's termination or its "lost" fees from the Tribe.

**2.      W&C Cannot Prove Any Other Injury or Damages.**

W&C has no evidence of any other injury to a commercial interest in sales or business reputation.  W&C cannot identify a single client or prospective client that fired W&C, limited the scope of its work, or declined to hire it because of Rosette's statement.  (UF #80.)  W&C has no evidence that anyone was ever deceived by the statement.  (UF #50, 51, 54, 56–61; 68–80.)  Indeed, W&C has no evidence that anyone else—***anywhere***—reviewed, heard, or was moved to act or refrain from acting by the statement.  (UF #68–80.)  And as Rosette's expert testified, consumers of legal services generally do not review or rely on law firms' marketing material to make decisions about their representation.  (UF #32.)  W&C did not rebut this evidence or provide any of its own to create a genuine issue of fact.

Because W&C seeks damages, not an injunction, "actual evidence of some injury resulting from the deception is an essential element of the plaintiff's case." *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989) (holding that failure to present evidence of actual injury required entry of judgment notwithstanding verdict).  W&C's inability to prove any cognizable injury is fatal to its claim.  *See Societe Civile Succession Richard Guiono v. Beseder Inc.*, 2007 WL 3238703, at *4 (D. Ariz. Oct. 31, 2007) ("[E]vidence of some damage or harm to a Lanham Act plaintiff is still required to justify [a monetary] award.").

W&C also cannot prove any damages stemming from non-Quechan relationships.  W&C has produced no evidence of client diversion or lost profits.  "[T]he case law is clear that when a plaintiff cannot prove a diversion of sales, or does not account for clearly established external factors—such as the presence of other competitors, pricing differentials, etc.—the plaintiff cannot recover its lost profits."  *See Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*,

2018 WL 4253181, at *15 (S.D.N.Y. Sept. 5, 2018).  Here, Rosette was far more experienced in compact negotiations and was charging a fraction of the price. Since W&C cannot prove essential elements of its Lanham Act claim against Rosette—injury, damages, or causation related to its engagement by Quechan or anyone else—its Lanham Act claim must fail.  No further analysis is needed to enter judgment in Rosette's favor and dispose of this meritless claim.

**B.     Rosette Is Entitled to Summary Judgment Because W&C Cannot Prove the Biographical Statement Was False.**

**1.     Rosette Litigated the Preliminary Injunction that Saved the Tribe Approximately $100 Million.**

W&C also cannot prove another required element of its claim: falsity.  At issue is a statement in Mr. Rosette's attorney biography that he "successfully litigated a case saving [Pauma] over $100 million in Compact payments allegedly owed to the State of California against then Governor Schwarzenegger."  (Ex. 43.) The Court has already held that "the statement that Rosette was involved with, or even 'litigated,' the Pauma case is not actionable."  (Dkt. No. 89 at 23–24.)  The question the Court left open is whether Rosette violated the Lanham Act by using the word "successfully" or referring to $100 million in future savings.  (*Id.*)  "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). After discovery, it is clear that W&C cannot carry its burden to show either.

Neither piece of the statement is literally false.  First, as a matter of law, the word "successfully" is subjective and constitutes inactionable puffery.  *See Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 245 (9th Cir.1990) (puffery may be determined as a matter of law and is not actionable under Lanham Act).  The word conveys "no meaningful, objective data," so it is not verifiable. *Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F.

Supp. 3d 551, 569–70 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) (collecting authorities holding that "successfully" is puffery).  Instead, it is the type of "blustering, and boasting upon which no reasonable buyer would rely."  *Southland Sod Farms*, 108 F.3d at 1145.  Rejecting a similar Lanham Act claim, one court held that calling attorneys "'highly qualified,' 'the right,' or the 'best' attorneys, . . . especially in the context of the defendant's advertisements, can be seen only as subjective, commendatory statements of the defendant; in other words, mere puffery."  *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 542 (S.D.N.Y. 2018).  And this conclusion makes sense.

Success in the litigation context is highly dependent on a client's goals and expectations, and subjective characterizations are not actionable.  *See Appliance Recycling Ctrs. of Am., Inc. v. JACO Envt'l, Inc.*, 378 F. App'x 652, 654 (9th Cir. 2010) (a "general, subjective claim," rather than a statement about "specific or absolute characteristics" is inactionable).  ██████████████████████████████████████████████████████████████████  (Ex. 12 at 80:13–81:15)  As a litigation tool, "[t]he preliminary injunction serves an important purpose—to allow a victory by [the plaintiffs] to be meaningful."  *McGirr v. Rehme*, 891 F.3d 603, 614 (6th Cir. 2018) (alteration in original); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (injunctive relief requires "irreparable injury and the inadequacy of legal remedies").  "Since an injunction is regarded as an extraordinary remedy, it is not granted routinely; indeed, the court usually will refuse to exercise its equity jurisdiction unless the right to relief is clear."  11A Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2942 (3d ed.).  Thus, "[t]he decision whether to grant a preliminary injunction may be the single most important decision in a case since the outcome of that decision more often than not ends the litigation."  6 William F. Patry, *Patry on Copyright* § 22:7 (2020).

It is undisputed that Rosette secured Pauma's preliminary injunction, which gave Pauma the immediate relief it needed and provided what should have been a

bargaining chip for negotiations.  (UF #6, 12–13.)  It was a client success (Ex. 12 at 88:15–18), and the advertising of victories obtained by a team under an individual attorney's name "is a standard practice in the legal profession and understood by prospective clients when reviewing a lawyer's biographical information."  (Ex. 56 ¶ 55.)  Clients "who pay millions for substantial projects . . . know full well that it takes [a] team to design and execute the plans.  They also know that teams have leaders . . . ."  *See Gensler v. Strabala*, 764 F.3d 735, 738 (7th Cir. 2014).

That Rosette associates, including Ms. Williams and Mr. Cochrane, played a substantial role in drafting pleadings and filings, and appeared at the preliminary injunction hearing, or that the litigation continued to a restitutionary judgment after Rosette was fired, does not render the statement about Mr. Rosette's role, and the firm's role, false.  Mr. Rosette has always credited his team's contributions to the victory, while consistently testifying that he developed the litigation strategy, including theories of relief and preliminary injunction tactics, reviewed and revised key filings and documents, and directed the team on how to build the factual record to obtain the preliminary injunction.  (*See*, *e.g.*, Ex. 12 at 85:11–86:19.)  He was the lead (and only) partner on the pleadings.  He bore ultimate responsibility for the outcome of the case, not the two associates who had been employed less than a year and had no relevant experience with compacts.

Second, there is nothing false about stating that the preliminary injunction stood to save Pauma $100 million.  W&C repeatedly made the same claims as early as 2013.  (Ex. 17.)  The injunction allowed Pauma to stop paying the State under its 2004 amendment and start paying under the lower-cost 1999 compact.  (UF #13.)  The $100 million figure is an estimate of the difference between Pauma's going-forward obligations under the two agreements.  (UF #22.)  And it is a conservative estimate.  After starting her own firm, Ms. Williams told potential clients that the injunction would save Pauma considerably more—at least $148.7 million.  (Ex. 62 at 2516.)  And the statement, first published as early as May 2011, could have

MEM. OF POINTS & AUTHORITIES
ISO ROSETTE'S MSJ
17-CV-01436 GPC DEB

1    referred only to going-forward savings obtained through the preliminary injunction.

2    (UF #21.)  The statement did not refer to a $36 million award obtained years later,

3    as the alternative version, contained in Rosette's proposal materials, confirms:

4    "Rosette brought suit against the State of California and then-Governor

5    Schwarzenegger and ***successfully obtained a preliminary injunction against the***

6    ***State*** . . . ." (Ex. 14 at 589.)  "When evaluating whether an advertising claim is

7    literally false, the claim must always be analyzed in its full context."  *Southland*

8    *Sod Farms*, 108 F.3d at 1139.  Here, the full context shows that the statement was

9    not false.

10           W&C disclosed three experts, none of whom offer testimony to create a

11   genuine issue of material fact on falsity.  W&C's primary expert on this point,

12   Bryan A. Garner, a law professor and grammarian, opined based on the duration

13   and complexity of the Pauma litigation that it was literally false for Mr. Rosette to

14   state "that he 'successfully litigated' the case." (Ex. 57 ¶ 14.)  Mr. Garner assumes

15   that Mr. Rosette took credit for the entire case.  But that is not what the statement

16   says. (UF #23–24.)  Even the shorter version of the statement qualifies what,

17   exactly, Mr. Rosette litigated: "a case saving [Pauma] over $100 million in

18   Compact payments allegedly owed to the State of California . . . ." Mr. Garner's

19   conclusions are also based on an incomplete hypothetical submitted by W&C and

20   several inaccurate assumptions.  First, he assumes that the Pauma case was

21   successful because of W&C's emergency motion to set aside a stay of the

22   injunction pending appeal, rather than the injunction itself. (Ex. 57 ¶ 10)

23   Obviously, preserving a victory for a few short months is not as important as

24   securing that victory in the first place, especially if it ultimately prevails.  Second,

25   Mr. Garner assumes that W&C was solely responsible for the legal theory that led

26   to a $36 million judgment.  (*Id.* ¶ 11)  This is incorrect—the original complaint,

27   under Mr. Rosette's direction, introduced and encompassed the winning theory.

28   (UF #4–6, 10.)  Third, Mr. Garner conflates the $36 million restitutionary award

MEM. OF POINTS & AUTHORITIES
ISO ROSETTE'S MSJ
17-CV-01436 GPC DEB

1   with Rosette's preliminary injunction win, inexplicably claiming that the statement

2   is false because Pauma received $36 million, as though both could not be true.  (Ex.

3   57 ¶ 11.)  Finally, he applies a hyper-technical reading of the phrase "successfully

4   litigated," concluding with no support (or marketing expertise) that "an average

5   person . . . would consider Mr. Rosette's website statement to be both false and

6   misleading."  (*Id.* ¶ 16.)  There is no evidence that anyone at Quechan or in the

7   relevant market shares Mr. Garner's punctilious approach to the English language.

8   Mr. Garner and his $2,000 hourly rate are in no way representative of the "average

9   person."  In fact, W&C's other "experts" directly contradict him.

10       Anthony Miranda, for example, a purported "non-legal expert on tribal

11   gaming in California" who has never testified as an expert on anything and has no

12   qualifications in this arena other than his "general knowledge" of the Pauma case,

13   opined that tribal leaders "do not have advanced degrees or extensive education,"

14   suggesting they are more likely than an average person to be misled.  (Ex. 58 at

15   2346.)  Mr. Miranda's offensive generalizations and categorical biases against the

16   intelligence of tribal leaders should be rejected.  Like Mr. Garner, he also opined

17   that the statement was false purely based on the duration of the litigation.  (*Id.*)

18   Again, Mr. Rosette did not take credit for the whole case—the statement was

19   written years before the case was completed.  And "[a]n advertisement is not

20   literally false if consumers need extrinsic information, assumptions, or inferences to

21   reach the false conclusion."  *Nutrition Distribution LLC v. PEP Research, LLC*,

22   2019 WL 652391, at *4 (S.D. Cal. Feb. 15, 2019).  The length of the case or later

23   developments, like a monetary award, are extrinsic information.  George Forman, a

24   tribal law attorney and W&C's other "expert," expresses similar views that suffer

25   from the same bias and stereotyping as Mr. Miranda's.  (*See generally* Ex. 59.)

26       By contrast, Rosette offered the testimony of Lynda Shely, an attorney who

27   provides ethics and risk-management advice to lawyers and who has worked

28   extensively on attorney advertising and ethics issues.  (Ex. 56.)  She has testified as

- 18 -

an expert numerous times, including four appearances in the past four years.  (*Id.* at
2318.)  Ms. Shely opined that the statement was not literally false.  "Law firm
partners who establish a client relationship and conceive the strategies to achieve a
client's goals ethically and practically can tout the successes obtained by their firm
for their clients" and "it is customary and routine for originating lawyers to
publicize successes achieved by their law firm teams on behalf of the originating
lawyers' clients including by using terms like 'litigated' and 'successfully.'"  (*Id.*
¶ 54.)  "This is a standard practice in the legal profession and understood by
prospective clients when reviewing a lawyer's biographical information."  (*Id.*
¶ 55.)  And, "[p]articularly on large litigation matters, prospective entity clients
understand that litigation is handled by more than one lawyer and a positive result
for a firm client may have included many attorneys at the firm."  (*Id.*)

     W&C also has no evidence that the statement was misleading or that it
somehow implied Mr. Rosette deserved sole credit for the preliminary injunction.
"[W]hen a plaintiff alleges that an advertisement is misleading, it carries an
additional burden of proving that the advertisement, though explicitly true,
nonetheless conveys a misleading message to the viewing public."  *SKEDKO, Inc.
v. ARC Prods., LLC*, 2014 WL 2465577, at *4 (D. Or. June 2, 2014).  Neither
W&C nor its experts contend that the statement was literally true but misleading.  If
W&C wanted to pursue a claim that the statement was misleading, it "must
demonstrate that consumers actually reacted to the advertisement at issue rather
than merely demonstrate that the advertisement was misleading in nature."  *Id*.
"Reactions of the public are typically tested through the use of consumer surveys."
*Southland Sod Farms*, 108 F.3d at 1140.  W&C has no such surveys, which "may
lead to an inference that the results of such a survey would be unfavorable."
*Univision Music LLC v. Banyan Entm't*, 2004 WL 5574359, at *3 (C.D. Cal. Nov.
15, 2004).  W&C has no marketing experts, surveys, or direct testimony from
consumers who were misled.  There is no triable issue of material fact.

Finally, where a plaintiff "seek[s] to recover monetary damages for false or misleading advertising that is not literally false, 'a violation can only be established by proof of actual deception (i.e., evidence that individual consumers perceived the advertisement in a way that misled them about the plaintiff's product).'" *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 690 (6th Cir. 2000). W&C has no such proof, and it cannot carry its burden on falsity.

### 2. W&C's Claim Is Barred Because W&C's Current Client Prevented Rosette from Using Pertinent Evidence.

W&C and its client Pauma have denied Rosette access to evidence that would further substantiate that Rosette's statement was not false or misleading. Ms. Williams and Mr. Cochrane claim that, while employed by Rosette, they "performed all the litigation work in the [Pauma litigation] from the outset of the proceeding until their eventual departure from the firm the ensuing year." (4AC ¶ 26; *see also id.* ¶ 25.) They claim that the biographical statement is false as a result. (*Id.* ¶¶ 25–26.) Mr. Rosette, on the other hand, has testified under oath that he "developed the legal strategy and case theories for the Pauma Litigation, using his knowledge of the history of tribal-state gaming compacts in California, Pauma's factual and legal situation, and recent trends in federal and state law, which resulted in Pauma obtaining a preliminary injunction against the State of California." (Rosette Decl. ¶ 13.) ███████████████████████████████████████████████ (Ex. 12 at 85:22–86:3), Mr. Rosette testified during a 2010 deposition in *Pauma v. Harrah's* that ████████████████████████████████████ (*Id.* at 94:14–18.) ████████ ████████████████████████████████ he testified (*id.* at 94:18–20), ████████████████████████████████████ ████████████████████████████ (*id.* at 95:4–8). He also supervised all aspects of the litigation while Rosette had the case. (Rosette Decl. ¶¶ 17–18.)

To support Mr. Rosette's testimony, and impeach W&C's assertions, Rosette sought to produce documents, but W&C's current client, Pauma, refused to waive the attorney-client privilege over those documents to the extent it applied.  (Rogers Decl. ¶¶ 2–9.)  In other words, W&C has filed a claim based on who did what work during a legal matter, yet its client is at the same time refusing to permit use of the documents from that representation to demonstrate Mr. Rosette's role.  It is patently unfair for W&C to attack Rosette while W&C and its client tie Rosette's hands.

Because Rosette cannot mount a full defense without this information, W&C's claim of falsity cannot proceed.  "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).  Due process is denied if a claim against a lawyer "effectively places the defendant attorney in the untenable position of having to preserve the attorney client privilege (the client having done nothing to waive the privilege) while trying to" defend himself or herself in court.  *McDermott, Will & Emery v. Super. Ct.*, 83 Cal. App. 4th 378, 384 (2000).  That is precisely the situation here.  And "there can be no balancing of the attorney-client privilege against the right to prosecute a lawsuit to redress a legal wrong."  *Solin v. O'Melveny & Myers, LLP*, 89 Cal. App. 4th 451, 457 (2001).

*Dietz v. Meisenheimer & Herron* sets out the test for determining whether a case must be terminated because a lawyer-defendant cannot meaningfully mount a defense without implicating attorney-client privilege and client confidentiality.  177 Cal. App. 4th 771, 795 (2009).  First, "the evidence at issue must be the client's confidential information, and the client must be insisting that the information remain confidential."  *Id.* at 792.  Here, the evidence at issue involves Mr. Rosette's substantive role in developing and litigating the Pauma case, and Pauma—*via W&C*—has insisted that the information remain confidential.  (UF #81; Rogers Decl. ¶¶ 2–9.)  Second, the evidence is "highly material to the defendants' defenses."  *Dietz*, 177 Cal. App. 4th at 792.  W&C has affirmatively alleged that

Ms. Williams and Mr. Cochrane, while associates at Rosette, were solely responsible for the Pauma litigation.  "Highly material" to this claim are documents Rosette possesses reflecting privileged drafts, memoranda, edits, and communications involving litigation strategy, including directives given to Ms. Williams and Mr. Cochrane by their supervising partner.  But Rosette cannot introduce that evidence because Pauma has asserted its privilege over the material. (UF #81; Rogers Decl. ¶¶ 2–9.)  Third, there are no *ad hoc* measures that would allow the evidence to be used.  *Dietz*, 177 Cal. App. 4th at 793.  Pauma cannot be compelled to waive the privilege because it is a sovereign tribe and a third party. *See United States v. James*, 980 F.2d 1314, 1316 (9th Cir. 1992) (holding that sovereign immunity protected third-party tribe "from responding to the subpoena issued by the district court").  Moreover, despite repeatedly warning W&C about the due process issues, Rosette had no opportunity to cross-examine W&C about the Pauma materials, so the damage is done.

It is also "fundamentally unfair to allow the action to proceed" where the key factual dispute will be the relative roles played by three lawyers, while Pauma bars Rosette from using documents that would evidence each side's assertions.  *Dietz*, 177 Cal. App. 4th at 793.  This case is uniquely problematic because the plaintiff (W&C) represents the third party (Pauma) blocking Rosette's defensive use of evidence.  (Rogers Decl. ¶ 8.)  W&C's involvement on behalf of the third party preventing Rosette from mounting its defense raises even greater concerns about unfairness and gamesmanship.  There is an "inherent unfairness in allowing a plaintiff to bring a claim, which, by its very nature necessitates a defense based on confidential information, where the plaintiff has either directly supplied such confidential information to the defendant, as in *Solin*, or where the plaintiff seeks to derivatively represent a third party who has supplied such information to the defendant."  *Dietz*, 177 Cal. App. 4th at 793.  Due process thus dictates that W&C cannot maintain any argument that the statement was literally false.

### C.  W&C Has No Evidence That the Statement Was Material.

W&C also cannot establish that, if deceptive, one sentence in Mr. Rosette's attorney biography—32 of 453 words in the body of the document—was "material, in that it is likely to influence the purchasing decision" of any tribal organization. *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003).  Like the element of deception, "materiality in false advertising claims is 'typically' proven through consumer surveys," and it is the plaintiff's burden to prove.  *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012).  W&C conducted no surveys, implying that any such surveys would be unfavorable to its case.  *See Univision Music*, 2004 WL 5574359, at *3.  It also lacks evidence that any client or potential client found the statement likely to influence its decision to hire Rosette over another firm.  *See id.*  The only evidence about materiality comes from Rosette's expert Ms. Shely, who cited academic literature for her opinion that "consumers of legal services generally do not rely on advertising claims when deciding to hire a lawyer." (Ex 56 at 2301.)  According to market research, only 6% of consumers find lawyers through advertising, and tribes—which have significant experience running complex organizations and hiring lawyers—are even less likely to rely on "statements on a website or marketing brochure in deciding which lawyer to hire."  (*Id.*)  W&C has no contrary evidence.

Despite its lack of evidence, W&C has in the past asserted that it can avail itself of a waterfall of presumptions.  First, W&C is likely to claim that it does not have to show materiality if it proves the statement was literally false.  (*See* Dkt. No. 207-1.)  The statement is puffery, and this Court has already held that saying one litigated or was involved in litigation is inactionable.  (*See* Dkt. No. 89 at 23–24.)  It is also not literally false.  *See supra.*  But even if W&C had proved literal falsity, no presumption of materiality arises in the Ninth Circuit.  *See William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 257 (9th Cir. 1995) (finding no materiality despite falsity); *see also Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 310 F.

1   Supp. 3d 1089, 1125 (S.D. Cal. 2018) ("The Court is not convinced that the Ninth

2   Circuit has . . . determined that materiality is presumed for actually false statements,

3   nor has [movant] cited to a Ninth Circuit case stating this.").

4        Second, W&C is likely to argue that it is entitled to a presumption of

5   materiality flowing from a finding of intentional wrongdoing under the Lanham

6   Act.  (*See* Dkt. No. 207-1.)  Again, the Ninth Circuit has not adopted such a

7   presumption.  *See Nichia Am. Corp. v. Seoul Semiconductor Co.*, 2008 WL

8   11342571, at *8 (C.D. Cal. Oct. 7, 2008) (rejecting presumption); *see also Apotex*

9   *Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 67–68 (2d Cir. 2016).  W&C has

10  proffered no evidence to suggest that the statement was willfully deceitful, and Mr.

11  Rosette's own testimony is that it was not.  (Rosette Decl. ¶ 26.)

12       **D.**    **W&C's Claim Is Barred by Laches.**

13       Finally, W&C's Lanham Act claim is also barred by the equitable doctrine of

14  laches because W&C waited over six years to challenge the statement.  "It is well

15  established that laches is a valid defense to Lanham Act claims, including those for

16  false advertising," and "if the claim is filed after the analogous limitations period

17  has expired, the presumption is that laches is a bar to suit."  *Jarrow Formulas, Inc.*

18  *v. Nutrition Now, Inc.*, 304 F.3d 829, 835 & 837 (9th Cir. 2002).  Here, the

19  analogous statutory period is California's statute of limitations for fraud, which is

20  three years.  *Id.* at 838.  The statement first appeared on Rosette's website and in its

21  proposal material as early as May 2011.  (UF #21.)  W&C filed this case over six

22  years after the conduct at issue began—more than twice the statutory period.  The

23  Ninth Circuit has held that it is unreasonable to wait "more than double the time

24  available to file suit under the analogous limitations period."  *Id.* at 839; *see also*

25  *Baby Trend, Inc. v. Playtex Prods., LLC*, 2013 WL 4039451, at *5 (C.D. Cal. Aug.

26  7, 2013) (laches barred claim filed less than two years after statute of limitations.)

27       Like the plaintiff in *Jarrow*, W&C has offered no explanation for its delay,

28  and it has declined to answer any questions about its discovery of the statement on

MEM. OF POINTS & AUTHORITIES
ISO ROSETTE'S MSJ
17-CV-01436 GPC DEB

1   the basis of privilege.  (Rogers Decl. ¶¶ 2–9.)  And during all of this time, Ms.

2   Williams and Mr. Cochrane represented Pauma in the very case that the statement

3   is about, having left Rosette and taken the client with them.  There is every reason

4   to believe that W&C and Pauma were aware of what Mr. Rosette said about

5   Rosette's representation of Pauma.  In fact, Mr. Rosette explained under oath in

6   2010—in a case *where Pauma was the plaintiff*—███████████████████

7   █████████████████████████; neither Pauma nor W&C challenged those

8   assertions at any time before this lawsuit.  (*See* Ex. 12 at 77:8–81:15.)

9          Rosette was no doubt prejudiced by W&C's unreasonable delay.  Had W&C

10  brought suit within the statutory period, there would have been no question what

11  the statement referred to—the successful preliminary injunction.  Pauma did not

12  receive any restitution until more than three years after Rosette first published the

13  statement.  Waiting to bring suit also prevented Rosette from being able to

14  "effectively adopt an alternative marketing position."  *Conopco, Inc. v. Campbell*

15  *Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996) (finding prejudice from five-year delay).

16  **IV.   Conclusion**

17         W&C has had its chance to prove up a case, and W&C has failed.  In doing

18  so, it displayed a concerning "level of acrimony," created "unnecessary distraction"

19  with its "personal and sarcastic barbs," and "produce[d] many pages of irrelevant

20  material on the issues before the Court."  (Dkt. No. 285 at 20, n.9.)  These tactics

21  and accusations damaged Mr. Rosette's life, hurt his business, and forced him and

22  his firm to incur considerable expenses just to defend their reputations and integrity.

23  It is long past time to close this unfortunate chapter in the parties' lives.  The

24  Rosette Defendants respectfully request summary judgment in their favor.

25         Dated: September 9, 2020                Respectfully Submitted,

26

27         By:    */s/ Matthew W. Close*
               Matthew W. Close
               mclose@omm.com

28         Attorneys for Rosette Defendants

MEM. OF POINTS & AUTHORITIES
ISO ROSETTE'S MSJ
17-CV-01436 GPC DEB