Cheryl A. Williams (Cal. Bar No. 193532)
Kevin M. Cochrane (Cal. Bar No. 255266)
caw@williamscochrane.com
kmc@williamscochrane.com
WILLIAMS & COCHRANE, LLP
125 S. Highway 101
Solana Beach, CA 92075
Telephone: (619) 793-4809

Attorneys for Plaintiff
WILLIAMS & COCHRANE, LLP

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **WILLIAMS & COCHRANE, LLP**; <br><br> Plaintiff, <br><br> vs. <br><br> **ROBERT ROSETTE**; **ROSETTE & ASSOCIATES, PC**; **ROSETTE, LLP**; **QUECHAN TRIBE OF THE FORT YUMA INDIAN RESERVATION**, *a federally-recognized Indian tribe*; *and* **DOES 1 THROUGH 100**; <br><br> Defendants. | Case No.: 17-CV-01436 GPC DEB <br><br> **WILLIAMS & COCHRANE'S POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 56 AGAINST ROSETTE DEFENDANTS ON THIRD CLAIM FOR RELIEF IN FOURTH AMENDED COMPLAINT [DKT. NO. 220]** <br><br> Date:  December 4, 2020 <br> Time:  1:30 p.m. <br> Dept:  2D <br> Judge:  The Honorable Gonzalo P. Curiel |

# TABLE OF CONTENTS

INTRODUCTION………………………………………………………………… 1

LEGAL STANDARD …………………………………………………………….5

ARGUMENT …………………………………………………………………….5

I.   A SERIES OF PRESUMPTIONS – INCLUDING TWO MAJOR ONES – SHIFT THE BURDEN OF PROOF FOR THE FALSE ADVERTISING CLAIM UNDER THE LANHAM ACT ON TO THE ROSETTE DEFENDANTS TO TRY AND REBUT ELEMENTS OF THE TEST THAT ARE EITHER WHOLLY UNDISPUTED OR FOR WHICH THEY REFUSED TO PRODUCE RESPONSIVE EVIDENCE DURING DISCOVERY ……………………………………………………... 5

     A.   TEST …………………………………………………………………5

     B.   PRESUMPTIONS AND UNDISPUTED FACTS …………………………6

     C.   EVIDENTIARY ISSUES …………………………………………... 7

II.   THE *PAUMA* ADVERTISEMENTS ON THE ROSETTE DEFENDANTS' WEBSITE AND IN ITS MARKETING BROCHURES ARE LITERALLY FALSE ACCORDING TO EVERY CONCEIVABLE SOURCE – DICTIONARY DEFINITIONS, THE WORLD'S PREEMINENT LEGAL GRAMMARIAN, FEDERAL AUTHORITIES INTERPRETING LIKE LANGUAGE, AND THE DECISIONS OF FEDERAL JUDGES IN SIMILAR CASES …………………………… 8

     A.   LITERAL FALSITY – EXPRESS ………………………………... 8

          i.   DICTIONARY DEFINITIONS … ……………………………9

          ii.   BRYAN A. GARNER …………………………………..10

          iii.   FEDERAL COURTS GENERALLY ……………………………11

          iv.   THE *BRAVE LAW FIRM* CASE ……………………………… 12

          v.   THE *BENNETT* CASE …………………………………..13

     B.   LITERAL FALSITY – IMPLIED ………………………………… 14

     C.   MISLEADING ………………………………………………... 15

III.   CAUSATION OR CONSUMER DECEPTION IS PRESUMED IN AT LEAST FOUR WAYS, ESTABLISHED AS A MATTER OF LAW, AND FURTHER PROVEN THROUGH EVIDENCE LIKE ADMISSIONS BY QUECHAN AND EXPERT TESTIMONY FROM WILLIAMS & COCHRANE ……………………16

i               Case No.: 17-CV-01436 GPC DEB

W&C'S MOT. FOR SUMM. J. AGAINST ROSETTE DEFS. (LANHAM ACT CLAIM)

        A.    PRESUMPTIONS ……………………………………………...16

        B.    ESTABLISHED AS A MATTER OF LAW …………………………… 17

        C.    ADDITIONAL PROOF …………………………………………….. 18

IV.   MATERIALITY IS PRESUMED IN AT LEAST THREE WAYS, ESTABLISHED
      AS A MATTER OF LAW, AND FURTHER PROVEN BY THE ROSETTE DE-
      FENDANTS SELLING SOMETHING THEY KNEW WAS IMPORTANT TO
      QUECHAN …………………………………………………………19

V.    INTERSTATE COMMERCE IS SHOWN BY THE WEB-BASED SITUS ………... 22

VI.   THE COURT SHOULD AWARD DAMAGES IN THE AMOUNT OF WIL-
      LIAMS & COCHRANE'S LOSSES AND THE ROSETTE DEFENDANTS'
      GAINS AT QUECHAN, IF NOT TREBLING ONE OF BOTH OF THE FORE-
      GOING AMOUNTS FOR DETERRENCE PURPOSES ………………………… 22

VII.  THE COURT SHOULD EXCLUDE THE EXPERT REPORT OF LYNDA
      SHELLY, AN ALLEGED PROFESSIONAL ETHICS EXPERT WHO
      OPINES ON ADVERTISING AND MAKES NUMEROUS LEGAL CONCLU-
      SIONS IN CONNECTION THEREWITH EVEN THOUGH THERE IS NO PROOF
      SHE HAS EVER SURVEYED OR EVEN INTERACTED WITH INDIAN TRIBES … 23

CONCLUSION ……………………………………………………………………..25

# TABLE OF AUTHORITIES

**CASES**

*AECOM Energy & Constr., Inc. v. Ripley,*
  348 F. Supp. 3d 1038 (C.D. Cal. 2018) …………………………………6, 12

*Allen v. The Ghoulish Gallery,*
  2007 U.S. Dist. Lexis 86224 (S.D. Cal. 2007) ……………………………….. 19

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ……………………………………………………… 5

*Bennett v. Zydron,*
  2017 U.S. Dist. Lexis 154692 (E.D. Va. 2017) …………………………...13, 14

*Bennett v. Zydron,*
  2017 U.S. Dist. Lexis 15439 (E.D. Va. 2017) ………………...13, 14, 18, 19, 21

*Brave Law Firm, LLC v. Truck Accident Lawyers Grp., Inc.,*
  2020 U.S. Dist. Lexis 24201 (D. Kan. 2020) ………………………………… 13

*Brave Law Firm, LLC v. Truck Accident Lawyers Grp., Inc.,*
  2019 U.S. Dist. Lexis 79275 (D. Kan. 2019) ……………………………….. 12, 13

*Brockey v. Moore,*
  107 Cal. App. 4th 86 (3d Dist. 2003) …………………………………………… 15

*California v. Cabazon Band of Mission Indians,*
  480 U.S. 202 (1987) ………………………………………………………….. 19

*City of Roseville v. Norton,*
  248 F.3d 1020 (D.C. Cir. 2003) ……………………………………………….21

*Clorox Co. P.R. v. P&G,*
  228 F.3d 24 (1st Cir. 2000) ………………………………………………... 14

*Cottrell, Ltd. v. Biotrol, Int'l, Inc.,*
  191 F.3d 1248 (10th Cir. 1999) ………………………………………………15

*///*

*Convertino v. U.S. DOJ,*
    772 F. Supp. 2d 10 (D.D.C. 2010) …………………………………………….25

*Daniel v. Cook County,*
    833 F.3d 728 (7th Cir. 2016) ……………………………………………... 2

*FTC v. Colgate-Palmolive Co.,*
    380 U.S. 374 (1965) ………………………………………………….. 15

*Ghalehtak v. Fay Servicing, LLC,*
    304 F. Supp. 3d 877 (N.D. Cal. 2018) …………………………………...11

*Healthport Corp. v. Tanita Corp. of Am.,*
    563 F. Supp. 2d 1169 (D. Or. 2008) ……………………………… 12, 23

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC,*
    2014 U.S. Dist. Lexis 17376 (N.D. Cal. 2014) ……………………………… 24

*Larry Pitt & Assocs., v. Lundy Law LLP,*
    294 F. Supp. 3d 329 (E.D. Pa. 2018) …………………………………...17

*Lindy Pen Co. v. Bic Pen Corp.,*
    982 F.2d 1400 (9th Cir. 1993) ……………………………………... 7, 22

*Maier Brewing Co. v. Fleischmann Distilling Corp.,*
    390 F.2d 117 (9th Cir. 1968) …………………………………………….23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) …………………………………………………… 5

*Merck Eprova AG v. BrookStone Pharms., LLC,*
    920 F. Supp. 2d 404 (S.D.N.Y. 2013) …………………………………... 6, 20

*Metro Stevedore Co. v. Rambo,*
    521 U.S. 121 (1997) …………………………………………………… 6

*Miller Brewing Co. v. G. Heilman Brewing Co.,*
    561 F.2d 75 (7th Cir. 1977) …………………………………………….9

*MMM Healthcare, Inc. v. MCS Health Mgmt. Options,*
    818 F. Supp. 2d 439 (D.P.R. 2011) …………………………………... 14

*Mut. Pharm. Co. v. Ivax Pharms., Inc.,*
        459 F. Supp. 2d 925 (C.D. Cal. 2006) ……………………………………………8

*Nutrition Distrib. LLC v. PEP Research, LLC,*
        2019 U.S. Dist. Lexis 25352 (S.D. Cal. 2019) ………………………………6, 22

*OmniGen Research, LLC v. Yongqiang Wang,*
        2017 U.S. Dist. Lexis 189543 (D. Or. 2017) …………………………………23

*Pipe Restoration Techs., LLC v. Coast Bldg. & Plumbing, Inc.,*
        2018 U.S. Dist. Lexis 196094 (C.D. Cal. 2018) ………………………………22

*Quidel Corp. v. Siemens Med. Solutions USA, Inc.,*
        2017 U.S. Dist. Lexis 171757 (S.D. Cal. 2017) ………………………………21

*Rubenstein v. Fla. Bar,*
        72. F. Supp. 3d 1298 (S.D. Fla. 2014) ……………………………………21, 25

*Skydive Az., Inc. v. Quattrocchi,*
        673 F.3d 1105 (9th Cir. 2012) ……………………………………………...19

*Southland Sod Farms v. Stover Seed Co.,*
        108 F.3d 1134 (9th Cir. 1997) …………………………………………5, 8, 16, 22

*TrafficSchool.com, Inc. v. Edriver, Inc.,*
        653 F.3d 820 (9th Cir. 2011) …………………………………………………22

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors,*
        809 F.2d 626 (9th Cir. 1987) …………………………………………………...5

*U-Haul Int'l Inc. v. Jartran, Inc.,*
        793 F.2d 1034 (9th Cir. 1986) …………………………………………………6

*Univ. of Del. v. New Castle County,*
        2003 Del. Super. Lexis 37 (2003) ……………………………………………... 9

*Valador, Inc. v. HTC Corp.,*
        242 F. Supp. 3d 448 (E.D. Va. 2017) ………………………………………… 24

*Yeti Enters. v. Tang,*
        2017 U.S. Dist. Lexis 128779 (D. Or. 2017) …………………………………...5, 6

*Youngevity Int'l v. Smith,*
    2019 U.S. Dist. Lexis 112926 (S.D. Cal. 2019) ……………………………… 6, 20

**STATUTES**

Indian Gaming Regulatory Act (25 U.S.C. § 2701 *et seq.*)
    *generally* …………………………………………………………………… 19

Lanham Act (15 U.S.C. § 1051 *et seq.*)
    *generally* …………………………………………………………………*passim*
    § 1117(a) …………………………………………………………………… 22

**RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    56 ………………………………………………………………………*passim*

Federal Rules of Evidence
    201 …………………………………………………………………………… 2
    702 ………………………………………………………………………… 24

California Rules of Professional Conduct (1992)
    1-400(D)(1) ………………………………………………………………… 18
    1-400(D)(2) ………………………………………………………………… 18
    1-400(D)(3) ………………………………………………………………… 18

**SECONDARY SOURCES**

American Dictionary of the English Language (1st ed. 1828)
    *generally* ………………………………………………………………….. 9

Florida Supreme Court, *2011 Rules Cases – Sc11-1327 In re: Amendments*
    *to the Rules Regulating The Florida Bar – Subchapter 4-7, Lawyers*
    *Advertising, available at https://www.floridasupremecourt.org/*
    *Case-Information/Archive-Rules-Cases/2011-Rules-Cases (last*
    *visited Sept. 7, 2020)*
    *generally* ………………………………………………………………… 25

Bryan A. Garner, *The Elements of Legal Style* (2d ed. 2002)
    p. 99 ………………………………………………………………………… 9

Restatement (Second) of Judgments (1982)
§ 27 cmt. d ……………………………………………………………… 12

Webster's New International Dictionary (3d ed. 2002)
p. 584 …………………………………………………………………... 7
p. 1322 ………………………………………………………………… 9

Webster's New International Dictionary (2d ed. 1941)
p. 1444 ………………………………………………………………… 9
p. 2517 ………………………………………………………………... 10

# INTRODUCTION

By this motion, Williams & Cochrane, LLP ("Williams & Cochrane" or "Firm") moves for summary judgment on its Third Claim for Relief in the Fourth Amended Complaint alleging that Robert Rosette, Rosette & Associates, PC, and Rosette, LLP ("Rosette Defendants") engaged in false advertising in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq*. *See* Dkt. No. 220. The Fourth Amended Complaint presents the quintessential case of false advertising, one in which a direct competitor severs another's contract and takes over the work for itself at the last minute while contemporaneously advertising in both print and electronic media that it was actually responsible for achieving the result that led to the original contract in the first place.

As this Court is aware, at the time of the principal harm in this case the Rosette Defendants were advertising on their firm website the following statement:

> Mr. Rosette also successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California against then Governor Schwarzenegger.

*See* Declaration of Cheryl A. Williams ("Williams Decl."), Ex. 15. This fact is indisputable, as the Rosette Defendants admitted during discovery that this precise statement was on the firm website and "generally accessible by users who have access to the internet" from *at least* "May 31, 2017 through… July 1, 2017" (*i.e.*, the relevant time period). *See* Williams Decl., P0167. But, if this were not enough, the statement also made its way into the firm's marketing materials. *See* Williams Decl., Ex. 14. As the responsible executive assistant at the firm testified during the anti-SLAPP portion of the case, the Rosette Defendants commission the printing of marketing brochures in the ordinary course of business and *for years* these brochures that are sent to actual and prospective clients have contained the exact same representation, that Mr. Rosette "successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million." Williams Decl., Ex. 14, ¶¶ 4-6.

Of course, this statement is literally and unequivocally false, and proving as much

should require little more than scanning the federal court dockets for the referenced case – which, along with the filings therein, Williams & Cochrane asks the Court to judicially notice under Federal Rule of Evidence 201.[1] What the various dockets for this seven-year case show is that a predecessor of Mr. Rosette's current law firm had custody of this case for the initial nine-month period, from its filing on September 4, 2009 till roughly June 14, 2010. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* No. 09-01955 CAB MDD (S.D. Cal. 2017). For the first eight of these nine months, the two partners for Williams & Cochrane were attorneys at this firm and handled the case, as is evidenced by Cheryl Williams being the signatory on every substantive filing. They prepared the complaint, opposed a motion to dismiss by the State of California, and moved for and obtained a preliminary injunction on behalf of the Pauma tribe. Yet, when these two attorneys departed the firm on or about May 15, 2010, the Rosette Defendants took over responsibility for working the case and were immediately tasked with preserving the preliminary injunction in the face of an interlocutory appeal filed by the State of California – something they failed to do, as the United States Court of Appeals for the Ninth Circuit issued an order staying the injunction on July 28, 2010. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* No. 10-55713, Dkt. No. 39 (9th Cir. July 28, 2010). Just days after filing what would turn out to be its ineffective opposition brief, the Rosette Defendants were removed as counsel of record in the *Pauma* case and soon thereafter replaced by the attorneys for Williams & Cochrane, who would then exclusively handle the aforesaid case for the next six years. During this time, they convinced the Ninth Circuit to reinstate the injunction, kept the injunction in place at the end of the appeal, amended the complaint to add new claims for relief based upon an entirely different body of contract law, obtained summary

---

[1] "Courts routinely take notice of the actions of other courts or the contents of filings in other courts." *Daniel v. Cook County,* 833 F.3d 728, 742 (7th Cir. 2016) (citation omitted). As such, Williams & Cochrane requests notice of the following dockets and filings therein from the *Pauma* litigation: No. 09-01955 (S.D. Cal.), 10-55713 (9th Cir.), 14-56104 (9th Cir.), 14-56105 (9th Cir.), 15-1185 (U.S.), and 15-1291 (U.S.).

2                                Case No.: 17-CV-01436 GPC DEB
W&C'S MOT. FOR SUMM. J. AGAINST ROSETTE DEFS. (LANHAM ACT CLAIM)

judgment on account of one of those newly-added claims, defended the judgment on appeal to the Ninth Circuit and petition for writ of certiorari to the Supreme Court of the United States, and oversaw the post-judgment collection efforts to ensure the tribe obtained its $36 million restitution remedy.

After all of this, Williams & Cochrane then moved on to assist another tribe dealing with a similar but more complicated revenue sharing dispute with the State of California after it reached out in the wake of the press reporting on the State satisfying the *Pauma* judgment. Over the course of the next nine months, Williams & Cochrane did exactly what this tribe – the Quechan Tribe of the Fort Yuma Indian Reservation ("Quechan" or "Tribe") – requested (and then some), which was to effectuate a negotiated settlement of its dispute with the State of California without court involvement by obtaining a new compact that reduced its revenue sharing obligations. But, just days before the parties were supposed to sign and thereby execute the compact, the presumptive Chairman of Quechan terminated Williams & Cochrane pursuant to a letter that demanded the final draft compact, explained the Tribe would "not pay any contingency fee or 'reasonable fee for the legal services provided in lieu' thereof," advised the Firm "against pressing your luck further out of concern for the reputation of your firm in Indian Country and in the State of California," and instructed the Firm to "direct all communications regarding this matter to [one] Robert A. Rosette." Williams Decl., Ex. 41.

Apparently, losing custody of the *Pauma* case was something Mr. Rosette never got over. More than a year after his termination, he would instigate a series of e-mail communications with the California Office of the Governor in which he tried to settle the lawsuit even though he admittedly did not represent the tribe. *See* Williams Decl., Ex. 54. These communications only came to light after the deputy attorney general assigned to represent the State of California in the *Pauma* litigation became concerned about the unethicality of the situation, and putting a stop to them required obtaining a protective order from the district court. *See Pauma,* Dkt. No. 183. Rather remarkably, according to one of the select few documents produced by the Rosette Defendants during discovery, Mr. Ro-

W&C'S MOT. FOR SUMM. J. AGAINST ROSETTE DEFS. (LANHAM ACT CLAIM)

sette was *still* hung up on the motion for protective order nearly four years later, when, on May 31, 2015, he reached out to various individuals associated with the Pauma tribe that had fired him *years* earlier to tell them "[i]t appears that the Tribe's litigation attorneys have renewed their effort to seek a protective order through the Court," and he thus needed to obtain letters vouching for his past indiscretions "in order to restore my reputation with the State." Williams Decl., Ex. 55. Of course, no such motion for protective order was forthcoming; rather, the attorneys with Williams & Cochrane had already won before the district court and were focused upon preparing for the Ninth Circuit hearing, completely oblivious to the fact that Mr. Rosette was still trying to seek perceived retribution for being fired from the case so many years ago.

That retribution would ultimately come just two years later, when Mr. Rosette surfaced at Quechan during the summer of 2017 and succeeded in his efforts to interfere with Williams & Cochrane's business with the aid of the foregoing advertisements that proclaimed he (and not Williams & Cochrane) was actually responsible for "successfully litigat[ing]" the *Pauma* case – the very case that consumed his thoughts and energies for years on end. As the above facts show, a website advertisement run by one who ultimately takes from a direct competitor a client situated similarly to the imagined one in the advert is both "literally false" and intentionally done, which in turn creates presumptions for the remaining causation and materiality elements of the Lanham Act claim that the Rosette Defendants now have to rebut. Yet, with *everything* objective about the Rosette-Quechan relationship hidden from view on more than 110 pages of privilege logs (including the materials predating the start of the formal relationship), there is simply no way for the Rosette Defendants to carry its burden with credible evidence. As such, the Court should enter judgment in favor of Williams & Cochrane on its Lanham Act claim and award damages at least equivalent to the Firm's lost profits *and* the Defendants' financial gains at Quechan, if not trebling one or both of the foregoing amounts to help deter gross and intentional misconduct like this in the future.

///

**LEGAL STANDARD**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*, 809 F.2d 626, 630 (9th Cir. 1987). "When the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This situation arises when the evidence is "so one-sided" – like where the non-movant's offerings are "merely colorable" or "not significantly probative" – that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-52 (1986).

**ARGUMENT**

I.    A SERIES OF PRESUMPTIONS – INCLUDING TWO MAJOR ONES – SHIFT THE BURDEN OF PROOF FOR THE FALSE ADVERTISING CLAIM UNDER THE LANHAM ACT ON TO THE ROSETTE DEFENDANT TO TRY AND REBUT ELEMENTS OF THE TEST THAT ARE EITHER WHOLLY UNDISPUTED OR FOR WHICH THEY REFUSED TO PRODUCE RESPONSIVE EVIDENCE DURING DISCOVERY

A.    **Test**

The standard test for false advertising under the Lanham Act incorporates five elements, which are: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion or sales from itself to defendant or by a lessening of the goodwill associated with its products." *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir. 1997). To prevail, a plaintiff "bears the burden of proof to present evidence in support of the allegations in the complaint and to prove those allegations by a preponderance of the evidence." *Yeti Enters. v.*

1  *Tang,* 2017 U.S. Dist. Lexis 128779, *22 (D. Or. 2017) (citing *Merck Eprova AG v.*
2  *BrookStone Pharms., LLC,* 920 F. Supp. 2d 404, 415 (S.D.N.Y. 2013)). "The burden of
3  showing something by a preponderance of the evidence… simply requires the trier of fact
4  to believe that the existence of a fact is more probable than its nonexistence." *Id.* (citing
5  *Metro Stevedore Co. v. Rambo,* 521 U.S. 121, 137 n.9 (1997)).

6      **B.**    **Presumptions and Undisputed Facts**

7      While this "more likely than not" standard generally puts the burden on the pro-
8  ponent of a claim to show the weight of the evidence tips in his or her favor, a false ad-
9  vertising claim under the Lanham Act is different from most other claims in that a well-
10  established body of presumption law shifts the burden to the defendant in certain circum-
11  stances. Some of the lesser element-specific presumptions will be discussed in the sec-
12  tions devoted to those particular elements, but there are two major presumptions affecting
13  a false advertising claim on a more global level that warrant attention at the outset. Those
14  two presumptions relate to a statement being either "literally false" or done with an intent
15  to deceive, in which case "both actual deception and materiality are presumed." *AECOM*
16  *Energy & Constr., Inc. v. Ripley,* 348 F. Supp. 3d 1038, 1056 (C.D. Cal. 2018) (citing,
17  *e.g.,* *U-Haul Int'l Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1041-42 (9th Cir. 1986));
18  *Youngevity Int'l v. Smith,* 2019 U.S. Dist. Lexis 112926, *13-*14 (S.D. Cal. 2019) (ex-
19  plaining "[w]hen a claim is literally false, a plaintiff need not provide evidence on wheth-
20  er the claim was deceptive or material"); *Nutrition Distrib. LLC v. PEP Research, LLC,*
21  2019 U.S. Dist. Lexis 25352, *13 (S.D. Cal. 2019) (explaining presumptions of deception
22  and materiality arise if a defendant intended to deceive customers via a misleading adver-
23  tisement). Thus, take a literally false statement: this falsity not only satisfies the first ele-
24  ment of the test, but it also creates presumptions for the second and third elements which
25  the defendants then have to disprove. For a case like this in which the presence of the ad-
26  vertisement on a website and diversion of an actual customer prove the interstate com-
27  merce and injury requirements, respectively, what this in turn means is that the Rosette
28  Defendants have to come forward and disprove causation or materiality or the Court has

everything it needs in order to enter judgment for the plaintiff on the basis of the literally false statement. *See Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1411 (9th Cir. 1993) (explaining that a customer switching companies to a direct competitor is credible proof of the fact of damages). Much the same can be said about the presumption arising from the intent to deceive, or to lead someone to believe something is not true, typically in order to gain a personal advantage. *See* Webster's New International Dictionary 584 (3d ed. 2002). Even if the *Pauma* advertisement is somehow just misleading on account of its failure to detail a host of important contextual information, peddling a supposed legal victory with the goal of obtaining work from a similar client facing a similar plight (while seemingly also settling an age-old score) necessarily means that the burden of proof has become the burden of disproof that requires the defendant to show by a preponderance of the evidence that either the statement was not material or the cause of harm.

### C.   Evidentiary Issues

Unfortunately, this reality puts the Rosette Defendants in an impossible position because they are being asked to show how the viewing audience *might* react to the *Pauma* advertisement while suppressing the evidence on how Quechan actually *did* react at the outset of the relationship. As to that, the original discovery production by the Rosette Defendants in this case totaled 211 pages, a tender that Williams & Cochrane was expected to accept represents the entire quantum of evidence related to the Rosette Defendants winding up the one-hundred-plus-page Quechan compact, dealing with various State or federal entities, and communicating with or about the various stakeholders in this suit. *See* Williams Decl., Ex. 8. The reason this production was so paltry became evident late in the fact discovery period when the Defendants *finally* produced their respective privilege logs, which together add up to one-hundred and twelve pages and house more than a thousand documents – including those that predate the start of the representation. *See* Williams Decl., Exs. 5-6. Knowing claims of privilege were likely forthcoming, Williams & Cochrane tried to obtain the evidence about the origins of this situation from an alternate angle, by propounding requests for production on the Rosette Defendants asking for

W&C'S MOT. FOR SUMM. J. AGAINST ROSETTE DEFS. (LANHAM ACT CLAIM)

1    all documents mentioning Cheryl Williams and/or Kevin Cochrane after their departures

2    from Rosette & Associates, PC. *See* Williams Decl., Ex. 7. A reasonable person in the

3    position of the defendant should have something ranging between 0 and 10. However,

4    counsel for the Rosette Defendants indicated that she found in excess of 500 responsive

5    documents (or more than 50 per year), and fought tooth and nail to shield these materials

6    from disclosure during the consequent motion to compel proceedings even as the descrip-

7    tions of these documents morphed from being responsive to just junk mail in order to fit

8    some narrative that the requests were too outlandish for compliance purposes. *See* Wil-

9    liams Decl., P0205. Yet, no reasonable person is going to expend such effort and money

10   to protect that which is not worthy of protection. Thus, the decision by the Defendants to

11   suppress all internal documents related to the Rosette-Quechan relationship means the

12   Court would be incentivizing inequity by allowing the Rosette Defendants to prove in the

13   abstract subjects it would not permit inquiry of in the concrete.

14   **II.   THE *PAUMA* ADVERTISEMENTS ON THE ROSETTE DEFENDANTS' WEBSITE AND IN**
     **ITS MARKETING BROCHURES ARE LITERALLY FALSE ACCORDING TO EVERY**

15   **CONCEIVABLE SOURCE - DICTIONARY DEFINITIONS, THE WORLD'S PREEMINENT**

16   **LEGAL GRAMMARIAN, FEDERAL AUTHORITIES INTERPRETING LIKE LANGUAGE,**

17   **AND THE DECISIONS OF FEDERAL JUDGES IN SIMILAR CASES**

     **A.   Literal Falsity – Express**

18
     The first element in a false advertising claim under the Lanham Act of a false state-
19
     ment of fact requires a plaintiff to show "that the statement was literally false, either on
20
     its face or by necessary implication, or that the statement was literally true but likely to
21
     mislead or confuse consumers." *Southland Sod Farms,* 108 F.3d at 1139. For these two
22
     different showings, the general rule in marketplace settings unrelated to the legal field is
23
     that literal falsity is decided by the judge while the issue of whether or not an advertise-
24
     ment is misleading turns upon an assessment of how the buying public may react. *See*
25
     *Mut. Pharm. Co. v. Ivax Pharms., Inc.,* 459 F. Supp. 2d 925, 933 (C.D. Cal. 2006) (cita-
26
     tion omitted).
27
     ///
28

### i.   Dictionary Definitions

In this case, the *Pauma* advertisement on the Rosette website and in the firm's marketing materials is literally false, and the best way to prove as much is by dissecting the statement grammatically. Arguably the most revered series of dictionaries in the United States are those edited by Noah Webster, beginning with his American Dictionary of the English Language in 1828 and continuing on to his Third Edition of the New International Dictionary in 2002. Virtually all legal scholars agree on this point, with the "preeminent legal writing scholar" Bryan A. Garner (more on him later) even describing the most recent edition of these dictionaries as a "recommended" unabridged dictionary that "every self-respecting writer ought to own." *Univ. of Del. v. New Castle County,* 2003 Del. Super. Lexis 37, *27 n.58 (2003) (citing Bryan A. Garner, *The Elements of Legal Style* 99-100 (2d ed. 2002)). With that said, the Second Edition of the New International Dictionary is nearly twice the size of its successor, and many federal courts will still look to this "previous, and for many the classic, edition of the same dictionary" for guidance in resolving textual-based Lanham Act issues between competitors. *Miller Brewing Co. v. G. Heilman Brewing Co.,* 561 F.2d 75, 81 (7th Cir. 1977).

Here, the first time one should pause and question whether the *Pauma* advertisement is literally false is the fourth and fifth words of "successfully" and "litigated" in the statement Mr. Rosette also successfully litigated a case saving the Pauma tribe over $100 million. The transitive verb litigate is defined in the Second Edition of Webster's as "[t]o make the subject of a lawsuit; to contest in law; to prosecute or defend by pleadings, evidence, and debate in a court; as to litigate a cause." Webster's New International Dictionary 1444 (2d ed. 1941). A substantively similar definition is also included in both the first and last dictionaries under Noah Webster's name. *See* Webster's New International Dictionary 1322 (3d ed. 2002); American Dictionary of the English Language (1st ed. 1828). Now, pair this definition for the transitive verb "litigate" with the adverb "successfully," which the Second Edition defines either directly or indirectly as "[w]ith success" or "in a… manner" "resulting or terminating in success." Webster's New International Diction-

ary 2517 (2d ed. 1941). What follows when one inserts these definitions into the *Pauma* advertisement is that Mr. Rosette prosecuted a case on the pleadings, evidence, and by ultimate debate in court in a manner that resulted or terminated in a favorable decision. The fruits of that decision are then described in the latter half of the statement as the "$100 Million" in compact savings the judgment supposedly awarded and Mr. Rosette supposedly attained. Of course, both portions of the *Pauma* advertisement are literally false in light of the actual filings in the referenced case, which show that the Rosette Defendants were removed early on in the proceedings, and more than a full year before the claim on which the tribe ultimately prevailed was even added to the complaint.

### ii.    Bryan A. Garner

It is not just dictionaries through; the "preeminent legal writing scholar" mentioned above would also reach the same conclusion that the Rosette advertisement is objectively inaccurate from a grammatical perspective. How do we know that? Well, because Bryan A. Garner agreed to serve as an expert witness for Williams & Cochrane in this lawsuit. *See* Williams Decl., Ex. 1. As most people in this profession know, Bryan A. Garner is an *extremely* distinguished legal scholar, one who has served as the editor of Black's Law Dictionary for the past five unabridged editions, a recurrent drafter for the revisions to the federal rules, and the author of more than 25 books – most of which deal with grammatical or interpretive issues. When presented with an anonymized version of the *Pauma* advertisement and a concise, neutral statement of underlying facts, Professor Garner agreed to involve himself in this case and ultimately opine in line with the dictionary discussion above: that the *Pauma* advertisement is objectively false both as it relates to Mr. Rosette having "successfully litigated [the] case" and the amount he supposedly obtained for the client as a result of that effort. In reaching his opinion, Professor Garner explained that for the first nine months of the lawsuit

> Essentially, the procedures up to this point were preliminary skirmishes in the litigation. When Mr. Rosette was replaced as counsel, he left the litigation having just filed what would be an unsuccessful opposition to a motion. His client was in no better position, and arguably in a worse position, than

10                    Case No.: 17-CV-01436 GPC DEB

W&C'S MOT. FOR SUMM. J. AGAINST ROSETTE DEFS. (LANHAM ACT CLAIM)

when the original suit was filed.

Williams Decl., Ex. 1, ¶ 9. Professor Garner then went on to discuss the tempestuous nature of litigation that can create problems – often permanent problems – on a moment's notice:

> Any lawsuit involves complexities in responding to the opponent's maneuverings, especially when the financial stakes are high. Cases can be won or lost on procedural points as well as substantive ones. Discovery can be time-consuming and burdensome, and it can take unexpected turns. Deadlines come and go. Impressions that counsel make on the court, based on stances taken, can have an enduring effect on the decision-maker.

Williams Decl., Ex. 1, ¶ 12. With this in mind, Professor Garner then concluded that "it is impossible to say truthfully that he [Mr. Rosette] 'successfully litigated' the case when he was replaced as counsel within the first year of its pendency" and, amongst other things, "the theory of the case on which the client ultimately prevailed is one that Mr. Rosette's pleadings never contained… and… the legal complications of the case were so significant that the Ninth Circuit took nearly 34 pages to explain its intricate reasoning." Williams Decl., Ex. 1, ¶ 13.

### iii.    Federal Courts Generally

In addition to deconstructing the *Pauma* advertisement, it is also helpful to look at how federal courts treat similar language that comes before them. The primary way in which the meaning of "litigation" arises in federal court is in connection with collateral estoppel, where a court has to determine whether an issue has been "actually litigated." According to numerous federal court opinions, the phrase "actually litigated" when used in connection with a singular issue means that the issue was "contested by the parties and submitted for determination by the court." *See, e.g., Ghalehtak v. Fay Servicing, LLC,* 304 F. Supp. 3d 877, 888 (N.D. Cal. 2018) (citation omitted). On this point, the Restatement Second of Judgments agrees, as it explains precisely "[w]hen an issue is actually litigated":

> When an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated

Case No.: 17-CV-01436 GPC DEB

W&C'S MOT. FOR SUMM. J. AGAINST ROSETTE DEFS. (LANHAM ACT CLAIM)

within the meaning of this Section. An issue may be submitted and determined on a motion to dismiss for failure to state a claim, a motion for judgment on the pleadings, a motion for summary judgment[ ], a motion for directed verdict, or their equivalents, as well as on a judgment entered on a verdict. A determination may be based on a failure of pleading or of proof as well as on the sustaining of the burden of proof.

Restatement (Second) of Judgments § 27 cmt. d (1982). To get from "actually litigated" to the statement under review, all one needs to do is assign the ultimate outcome to the case so litigated – whether it be successfully or unsuccessfully. Thus, in the context of a whole case rather than just a singular issue, "successfully litigated" means that the entire case was submitted for determination and decided by a court in favor of the party or other person contending it resulted or terminated in a successful outcome.

### iv.   The *Brave Law Firm* Case

Additional support also comes from the myriad of federal courts that have dealt with cases in which professionals try to bolster their competitive standing by inflating their credentials or "claiming [another's] historical accomplishments as their own." *AECOM Energy & Constr., Inc.,* 348 F. Supp. 3d at 1056; *see Healthport Corp. v. Tanita Corp. of Am.,* 563 F. Supp. 2d 1169, 1179 (D. Or. 2008) (explaining that inaccurate statements about one's verifiable credentials are literally false). In recent years, this problem has even come to arise in other cases involving competing law firms in which one is alleged to be overreaching in its advertising to the detriment of the other. One such case is the *Brave Law Firm* lawsuit in the District of Kansas, in which the plaintiff reviewed the "verdicts and settlements" webpage for its competitor and concluded that it misrepresented the firm's role in attaining a $9 million settlement. *See Brave Law Firm, LLC v. Truck Accident Lawyers Grp., Inc.,* 2019 U.S. Dist. Lexis 79275, *19 (D. Kan. 2019). The evidence supporting this belief was actually quite flimsy: just a text message from an undisclosed individual who contended that the defendant "had the case with him and then some Texas lawyer stole the case settled it for the large amount and [the defendant] had an attorney lien claim on it" which was subsequently settled. *Brave Law Firm, LLC v.*

Case No.: 17-CV-01436 GPC DEB
W&C'S MOT. FOR SUMM. J. AGAINST ROSETTE DEFS. (LANHAM ACT CLAIM)

*Truck Accident Lawyers Grp., Inc.,* No. 17-01156 , Dkt. No. 38-12 (D. Kan. July 9, 2018). Nevertheless, this *somewhat* substantiated allegation in the complaint was enough for the case to go forward, as the district court explained it was literally false for an attorney to represent that he or she had achieved a settlement when in reality "it was the client's new counsel who obtained that amount." *Brave Law Firm, LLC,* 2019 U.S. Dist. Lexis 79275 at *19.

Things got strange at this point, however. Apparently feeling emboldened by this decision on the pleadings, the plaintiff attended a rather raucous case management conference during which he promised to dismiss his claim if the defendant could actually come forward with credible proof that it obtained the $9 million settlement. *See Brave Law Firm, LLC,* No. 17-01156, Dkt. No. 91 (D. Kan. Sept. 9, 2019). What happened next is the defendant filed a motion to enforce this unilateral promise to dismiss the case, attaching declarations from its co-counsel and opposing counsel in the twenty-year-old case that testified in unison the defendant was counsel of record in the matter from start to settlement *and* materially participated in every aspect of the case. *See Brave Law Firm, LLC,* No. 17-01156, Dkt. Nos. 91-5 & 91-6 (D. Kan. Sept. 9, 2019). This was enough for the district court, as it held the plaintiff to its promise and dismissed the case after finding the defendant represented the client at the time of the $9 million settlement *and* materially participated in obtaining the settlement. *Brave Law Firm, LLC v. Truck Accident Lawyers Grp., Inc.,* 2020 U.S. Dist. Lexis 24201, *12-*13 (D. Kan. 2020). The same principle should hold true in this case: if someone wants to take credit for successfully litigating a case, he or she needs to be present and materially involved at the end (not the beginning) when the remedies are obtained.

### v.    The *Bennett* Case

*Brave Law Firm* is not the lone case on false advertisements by attorneys, as there is also the *Bennett* case from the Eastern District of Virginia that dealt with the fallout of partners who dissolved a law firm and went separate ways. *See Bennett v. Zydron,* 2017 U.S. Dist. Lexis 15439 (E.D. Va. 2017), *aff'd by* 2017 U.S. Dist. Lexis 154692 (E.D. Va.

2017). In the wake of the dissolution, the plaintiff discovered that his one-time co-worker was "taking credit for legal services [that were] assigned to [him at the prior firm] when he was not actually responsible for the results achieved." *Id.* at *20. As one example, the professional website run by the defendant "displayed a $105,450.00 jury verdict reached in an auto collision case in Chesapeake Circuit Court in 2012" which the plaintiff contended in his complaint was his case for which he "did all of the work and tried it successfully to a jury verdict." *Id.* at *21. When presented with these allegations, the district court sided with the plaintiff and concluded that the advertisement as alleged was "literally false." *Id.* at *21. The principle that comes out of this case is really just an extension of the *Brave Law Firm* case discussed above: even if an attorney was present when a settlement was obtained or a case was successfully litigated, he or she still needs to have actually done the work in order to take credit for it in commercial advertising.

### B.   Literal Falsity – Implied

Literal falsity occurs in multiple ways, not just when an explicit statement in the advertisement is found to be offensive but also when the same can be said about a message being conveyed by "necessary implication." *MMM Healthcare, Inc. v. MCS Health Mgmt. Options,* 818 F. Supp. 2d 439, 450 (D.P.R. 2011) (citing *Clorox Co. P.R. v. P&G,* 228 F.3d 24, 34-35 (1st Cir. 2000)). Here, there is a yin to the yang, as the claim that Mr. Rosette *did* successfully litigate the Pauma case is also an implied representation that Williams & Cochrane *did not*. The least Mr. Rosette should have done was to preface the first portion of offending language by saying that he *helped* to successfully litigate the *Pauma* case, which, while still not true, would have at least put the consuming public on notice that another firm had a role in the case and they should inquire further before blindly relying upon the representations of a potential fiduciary. *See Brave Law Firm,* 2019 U.S. Dist. Lexis 79725 at *19 (rebuking the defendant for not saying he *helped* to obtain a settlement for which he was alleged to have contributed to the point of having an enforceable attorney's lien).

///

**C.    Misleading**

A false advertising claim is still viable even if an advertisement falls outside the a-bove categories when it is literally true but misleading in context. Typically, this down-grade from literally false to true but misleading is a big deal because a plaintiff has to present evidence of consumer confusion in unintentional situations through the use of consumer surveys or the reactions of witnesses, whether expert or percipient. *See Cottrell, Ltd. v. Biotrol, Int'l, Inc.,* 191 F.3d 1248, 1252 (10th Cir. 1999). However, this is not the case with *attorney* advertisements, as courts have long held in analogous situa-tions that judges are perfectly capable of ruling on whether such advertisements are mis-leading by just looking at the advertisement. *See, e.g., FTC v. Colgate-Palmolive Co.,* 380 U.S. 374, 391-92 (1965) (finding such for the FTC's regulation of deceptive advertis-ing); *Brockey v. Moore,* 107 Cal. App. 4th 86, 100 (3d Dist. 2003) (same for false adver-tising actions under California's unfair competition law). Thus, even if the Court con-cludes the *Pauma* advertisement is technically true based upon Mr. Rosette's association with the case for the first nine months during which time the preliminary injunction was secured and subsequently lost, it is still misleading because his deposition testimony re-veals that he was not even responsible for doing any of the work leading up to the injunc-tion:

> Q. Now, in terms of the [compact] litigation, the drafting and filing of the complaint and the arguing, did you do all that yourself up to the time you were removed from the case?
> A. No, I – I have employees that work for me that conduct research, draft, make court appearances, so on and so forth.
> Q. All right. So outside of being sort of the lead strategist, did you make any appearances or become an attorney of record at all?
> A. I was an attorney of record. There was only one appearance that was actually showing up, the oral argument for the preliminary injunction. And I had a conflict that day.
> Q. Who argued that case from your firm?
> A. Cheryl Williams.

*See* Williams Decl., P1233-1234. Further, as will be discussed in greater detail in the de-

ception section below, multiple expert witnesses with decades of experience in California Indian law believe that tribal clients – like most any other client – would find the *Pauma* advertisement completely misleading if they knew the details of Mr. Rosette's actual role in the case. *See* Williams Decl., Exs. 2, 4.

**III.   CAUSATION OR CONSUMER DECEPTION IS PRESUMED IN AT LEAST FOUR WAYS, ESTABLISHED AS A MATTER OF LAW, AND FURTHER PROVEN THROUGH EVIDENCE LIKE ADMISSIONS BY QUECHAN AND EXPERT TESTIMONY FROM WILLIAMS & COCHRANE**

**A.   Presumptions**

Again, the literal falsity of the advertisement and the intentionality of the conduct create presumption of consumer deception, but there are at least two additional presumptions that also shift the burden to disprove causation on to the Rosette Defendants. The first of these arises from the expenditure of substantial funds by a competitor to "deceive consumers and influence their purchasing decisions." *Southland Sod Farms*, 108 F.3d at 1146 (citation omitted). After all, "[h]e who has attempted to deceive should not complain when required to bear the burden of rebutting a presumption that he succeeded." *Id*. During the anti-SLAPP portion of this case, the Rosette Defendants submitted a declaration by Christian Cienfuegos, an executive assistant with the firm who for at least the past ten years has been responsible for overseeing the firm's marketing efforts, from managing the creation and distribution of the its marketing materials to maintaining records of such. Williams Decl., Ex. 14, ¶¶ 3-4 In carrying out these job responsibilities, Ms. Cienfuegos testified that in the ordinary course of business the Rosette Defendants "often commission[] the printing and distributions of marketing brochures." Williams Decl., Ex. 14, ¶ 4. Thus, all of the idiosyncratic statements about the Pauma suit disclosed thus far have an army of capital support, from a long-tenured executive assistant responsible for putting them into commerce, to outside marketing professionals who assist in this endeavor, to the costs of mass mailing, to all the trappings associated with the electronic version (from a web designer to a hosting platform). Whatever the actual cost, it is certain to be substantial.

But, the timing of the advertisements can be just as important as the amount of the expenditures in the presumption analysis. The chronology of events or the temporal correlation between the advertisement and the alleged harm can also give rise to a presumption of causation, which a defendant is free to rebut with evidence of alternate credible explanations. *See*, *e.g.*, *Larry Pitt & Assocs., v. Lundy Law LLP*, 294 F. Supp. 3d 329, 342 (E.D. Pa. 2018). One would be hard pressed to find a case in which the contractual interference was any closer in time to the culmination of the principal work. As the evidence shows, the parties engaged in a final negotiation session on June 14, 2017, after which Cheryl Williams immediately called the point persons for Quechan – the Vice President and the CEO for the Quechan Casino Resort – to relay what transpired and the projected timeline for winding up the negotiations over the next sixteen or so days. Williams Decl., Exs. 37, 38. Right after that, the Quechan Vice President circulated an e-mail to the rest of the Tribal Council to recount the conversation and apprise everyone that the compact would be ready for signature on or about the 1st of July. Williams Decl., Ex. 39. And yet, Mr. Rosette was in a face-to-face meeting with the President and a Councilmember of Quechan *the very next morning* in which he was touting his "experience with compact negotiations in California" and expressing his "interest[] in assisting in Quechan's California negotiations." Williams Decl., Exs. 12-13. Of course, the only California compact experience worthy of note in the Rosette marketing materials was the *Pauma* case, the very project that led Williams & Cochrane to get the Quechan work in the first place. And by taking credit for the *Pauma* suit, the Rosette Defendants did something that is largely unheard of when dealing with governmental clients: it went from A to Z in the courtship and thereby convinced a governmental entity to enter into a contractual relationship designed to totally breach another contract in less than the *sixteen* days that remained before the negotiations underlying the targeted contract were complete.

## B.  Established as a Matter of Law

The presumptions above just relate to false advertising in the normal marketplace, and do not take into account that such advertising *when done by an attorney* is presumed

Case No.: 17-CV-01436 GPC DEB

W&C'S MOT. FOR SUMM. J. AGAINST ROSETTE DEFS. (LANHAM ACT CLAIM)

as a matter of law to have deceived the audience. Attorney advertising is such a sensitive subject that entire ethical rules are devoted to it, which at the time of the events in this case prohibited California attorneys from advertising in such a way that communicates any untrue statement; presents or arranges the information in a manner that makes it false, deceptive, confusing, or otherwise misleading; or omits any facts necessary to make the statements *not* misleading to the public. Cal. Rule of Prof'l Conduct 1-400(D)(1)-(3) (1992). What these rules try to convey is that an attorney has to take ownership for the effects of its false advertising (especially when it comes to claimed successes), a point made clear by the district court in the *Bennett* case discussed above:

> Moreover, even if a showing of consumer deception was required in this instance, it is reasonable to infer that defendants' misrepresentations deceived or tended to deceive website visitors. … The Court agrees with plaintiffs' argument that 'the entire reason a lawyer would advertise positive case outcomes is to influence the purchasing decision – to convince prospective clients that the lawyer is competent, that he can get good results, and that he has expertise in cases similar to the prospective client's.'

*Bennett,* 2017 U.S. Dist. Lexis 15439 at *21-*22. Thus, the false *Pauma* advertisement – whether literally false or just misleading – has given rise to an irrebuttable presumption of causation, if not materiality as well.

## C.   Additional Proof

Presumptions aside, there is still a wealth of evidence showing both that the *Pauma* advertisement *did* deceive Quechan and *would* deceive a substantial segment of the audience. For the former point, one needn't look past the responsive pleading by Quechan in this case, which begins the Counterclaims section by detailing the import of the *Pauma* case – explaining that Williams & Cochrane raised the case in its very first meeting with the Tribal Council shortly after the press reported upon it, allegedly promised an outcome "resembling a *Pauma* like recovery," and then allegedly did a "bait and switch" on this "*Pauma*-based sales pitch" at some point after that. Dkt. No. 231, p. 28. But, moving away from Quechan in particular, Williams & Cochrane has also submitted expert reports from two professionals who have been in the California Indian law field for decades and

believe the Rosette Defendants' advertisement would likely deceive the intended audience. *See* Williams Decl., Exs. 2, 4; *Skydive Az., Inc. v. Quattrocchi,* 673 F.3d 1105, 1111 (9th Cir. 2012) (explaining causation and materiality can be proven by expert testimony on what consumers might believe, and that consumer surveys are best suited for when a non-legal advertisement is just misleading in nature). One of these professionals is George Forman, an attorney who has been practicing in the field for fifty years and is one of the three responsible for *California v. Cabazon Band of Mission Indians,* 480 U.S. 202 (1987), the Supreme Court case that held states do not have general civil regulatory authority over Indian tribes and consequently led to the enactment of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq*., the following year. In his expert report, Mr. Forman details his considerable experience over ten-plus pages, indicates that he reviewed the *Pauma* advertisement on the Rosette website, and then explains that tribal leaders would be deceived by falsities like this because "few tribal leaders would have the wherewithal to look up the decision to verify the claimed result, the extent to which the lawyer actually had personal responsibility for that result, and the aftermath of that result." Williams Decl., Ex. 2, p. 11. Of course, this sort of trust is reflective of clients more generally, according to Mr. Forman, who – much in line with the *Bennett* court – believes that clients "tend to take lawyers' representations about their abilities and accomplishments at face value, lacking the means or knowledge with which to test the accuracy of representations made to them." Williams Decl., Ex. 2, p. 11.

## IV. MATERIALITY IS PRESUMED IN AT LEAST THREE WAYS, ESTABLISHED AS A MATTER OF LAW, AND FURTHER PROVEN BY THE ROSETTE DEFENDANTS SELLING SOMETHING THEY KNEW WAS IMPORTANT TO QUECHAN

Along with the two familiar presumptions of literal falsity and intentionality comes a third for the materiality element, and that is a defendant making a false advertisement in a small marketplace that could persuade a customer to forego one of a select few competitors for itself. *See Allen v. The Ghoulish Gallery,* 2007 U.S. Dist. Lexis 86224, *29 (S.D. Cal. 2007). Correctly identifying the market in this case requires one to perpetually

increase the magnification: not attorneys, but Indian law attorneys; not Indian law attorneys, but California Indian law attorneys; not California Indian law attorneys, but California Indian law attorneys that deal with compact and related gaming issues. And so it goes. But, this fact is well-known to the Court who has already described the firms as "operating in a niche market involving the representation of Indian tribes." Dkt. No. 285, p. 2. Thus, a misrepresentation about one or another's services in a field as specialized as this is bound to have an effect – and likely profound effect – on the purchasing decisions of the customers.

In proving materiality, it is important to remember that "[t]he plaintiff does not need to demonstrate that the defendant's representations actually affected consumer behavior, but rather only that they were *likely* to have done so." *Merck Eprova AG*, 920 F. Supp. 2d at 423. And this likeliness analysis occurs in the abstract, as, just for causation, one does not even need to submit proof that the customers even saw the advertisement at issue in order to make its case. *See Youngevity Int'l*, 2019 U.S. Dist. Lexis 112926 at *26. But saw it Quechan did, as the Tribe admits right at the outset of its responsive pleading that the *Pauma* decision was critical to the hiring for the compact work (its importance was even stressed by the Tribe's other employees), and the anti-SLAPP declarations disclose that the Tribe's leadership and Mr. Rosette had an in-depth discussion about his supposed accomplishments in the world of California compacting, of which the *Pauma* case was the only thing worthy of note. *See, e.g.,* Williams Decl., Exs. 12-13, 16, 32.

It would be absurd to believe the *Pauma* advertisement was neither seen nor discussed; after all what could be more material to a tribe seeking to get out of an amended compact with onerous revenue sharing obligations than the credentials of an attorney who claimed to have litigated the *one* case in which a tribe was successfully able to do just that? Ample proof exists that clients *do* hire attorneys based upon their past successes in similar matters. It happened to Quechan's litigation counsel WilmerHale for one; on that front, the Attorney General of the Tohono O'odham Nation filed a declaration in a federal lawsuit explaining her tribe hired WilmerHale to defend its attempts to take lands into

trust for gaming purposes because "in *City of Roseville v. Norton,* 248 F.3d 1020 (D.C. Cir. 2003), WilmerHale's attorneys successfully defended against similar challenges to a determination by the Department of the Interior to take land into trust for an Indian tribe and the land's eligibility for gaming." Williams Decl., Ex. 63, ¶¶ 7-8. Put simply, legal successes are advertised for a reason, and that reason is no different for fraudsters who are trying to at least create the appearance of sameness in order to sponge off the good-will of another. *See Bennett,* 2017 U.S. Dist. Lexis 15439 at *21-*22 ("[T]he entire reason a lawyer would advertise positive case outcomes is to influence the purchasing decision – to convince prospective clients that the lawyer is competent, that he can get good results, *and that he has expertise in cases similar to the prospective client's*."). Once they have done this, then all they need to do is sell this contrived sameness at a lower cost, thus forcing a customer in the marketplace to ponder why it is paying X for something it can purchase for X-Y. *See Quidel Corp. v. Siemens Med. Solutions USA, Inc.,* 2017 U.S. Dist. Lexis 171757, *10 (S.D. Cal. 2017) ("If Defendants advertise that IMMULITE operates in the same manner as Thyretain… but works faster and is less expensive, it is reasonable to infer that this would influence customers' purchasing decisions.").

Coming full circle, it is obvious that all of this actually played out at Quechan. The anti-SLAPP declarations submitted by Quechan testify that a Tribal Councilmember "spoke with another [Indian] law firm [that specializes in litigation]… to explore the possibility of replacing [Williams & Cochrane]," [b]ut [ultimately the Tribe]… decided not to pursue a relationship." Dkt. No. 29-3, p. 3. Williams Decl., Ex. 13, ¶¶ 6-7. The reason for this is attributed to a seeming fallacy pertaining to admission status, but one patent and provable difference between this firm and the one run by Mr. Rosette is that one claimed to have "successfully litigated" the *Pauma* case and the other did not. Thus, just chalk Quechan up as part of the "74%" of potential clients who believe "that past results are an important attribute in choosing a lawyer," as it obviously bought what the Rosette Defendants were selling. *See Rubenstein v. Fla. Bar,* 72. F. Supp. 3d 1298, 1303 (S.D. Fla. 2014).

## V.   INTERSTATE COMMERCE IS SHOWN BY THE WEB-BASED SITUS

Proving the foregoing elements essentially winds up a false advertising claim and positions the Court to fashion relief. Showing the advertisement at issue entered interstate commerce may seem like it stands in the way of this but this "requirement of a Lanham Act false advertising claim is 'virtually automatic for website,' as for the Representations in this case" (*see Nutrition Distrib. LLC*, 2019 U.S. Dist. Lexis 25352 at *9 n.3), which the Defendants admit "[we]re generally accessible by users [anywhere in the world] who ha[d] access to the internet." Williams Decl., P0167.

## VI.   THE COURT SHOULD AWARD DAMAGES IN THE AMOUNT OF WILLIAMS & COCHRANE'S LOSSES AND THE ROSETTE DEFENDANTS' GAINS AT QUECHAN, IF NOT TREBLING ONE OR BOTH OF THE FOREGOING AMOUNTS FOR DETERRENCE PURPOSES

The remedial analysis for this claim is simple and straightforward, as an injury is presumed where, as here, the "defendant and plaintiff are direct competitors and defendant's misrepresentation has a tendency to mislead consumers." *Pipe Restoration Techs., LLC v. Coast Bldg. & Plumbing, Inc.,* 2018 U.S. Dist. Lexis 196094, *11 (C.D. Cal. 2018) (citing, *e.g.*, *TrafficSchool.com, Inc. v. Edriver, Inc.,* 653 F.3d 820, 826 (9th Cir. 2011)). This presumption in turn empowers the "district court in its discretion to fashion [the] relief [afforded by the statute], including monetary relief, based on the totality of the circumstances." *Southland Sod Farms.* 108 F.3d at 1146; *see* 15 U.S.C. § 1117(a) (providing for the recovery of any damages sustained by the plaintiff, the defendant's profits, and the cost of the action). In making this determination, the circumstances a court is supposed to consider include "the nature of the infringing actions, including the intent with which they were motivated and the actuality, if any, of their adverse effects upon the aggrieved party." *Lindy Pen Co.,* 982 F.2d at 1405. Thus, for example, a customer who switched its account from the plaintiff to the defendant is credible proof of the fact of damages, if not the base amount of such. *Id.* at 1411. And again, this is precisely the situation presented in this case, as the Rosette Defendants met with Quechan the morning after it was informed by Cheryl Williams of the agreement in principle reached

W&C'S MOT. FOR SUMM. J. AGAINST ROSETTE DEFS. (LANHAM ACT CLAIM)

at the June 14, 2020 negotiation session and the anticipated date it would need to be available to sign the final agreement. *See* Williams Decl., Exs. 12-13, 37-39.

Yet, lost profits is just the first and most direct of the three financial remedies available to Williams & Cochrane under the statute, with another being "an accounting of the defendant's profits under a theory of unjust enrichment" if it acted with an intent to reap the benefits of the plaintiff's products or services. *See, e.g., Healthport Corp.,* 563 F. Supp. 2d at 1182 (collecting cases). The purpose of this remedy is to serve as a first-line form of deterrence by ensuring that a defendant cannot profit from infringing activity. *Maier Brewing Co. v. Fleischmann Distilling Corp.,* 390 F.2d 117, 123 (9th Cir. 1968). What is truly remarkable here is that the tribal declarations submitted as part of the anti-SLAPP portion of this case reveal that the false advertising has been *extremely* lucrative for the Rosette Defendants. As to that, the two members of the Quechan Tribal Council who met with Mr. Rosette the morning after the final update on the status of the compact negotiations admitted that they were so "satisfied with Rosette's work [in winding up the compact] that Rosette LLP, took over the general counsel job" for the Tribe. *See, e.g.,* Williams Decl., Ex. 13, ¶ 20. This code speak about a job well done in reality has nothing to do with rubber stamping the final draft compact and everything to do with scaring Williams & Cochrane out of the picture by employing threats to ruin its reputation in Indian Country and the State of California. Williams Decl., Ex. 41. Thus, terrible human behavior has produced tremendous financial rewards, making the present case one in which disgorgement is absolutely warranted. With that said, deterrence is still best accomplished under the Lanham Act by enhancing damages using a multiplier of up to three, and Williams & Cochrane requests the Court to do that in this case. *See OmniGen Research, LLC v. Yongqiang Wang,* 2017 U.S. Dist. Lexis 189543, *47-*49 (D. Or. 2017) (collecting cases).

**VII. THE COURT SHOULD EXCLUDE THE EXPERT REPORT OF LYNDA SHELY, AN ALLEGED PROFESSIONAL ETHICS EXPERT WHO OPINES ON ADVERTISING AND MAKES NUMEROUS LEGAL CONCLUSIONS IN CONNECTION THEREWITH EVEN THOUGH THERE IS NO PROOF SHE HAS EVER SURVEYED OR EVEN INTERACTED**

**WITH INDIAN TRIBES**

Lastly, the Court should exclude the expert report of Lynda Shely, an alleged professional ethics expert who claims to be testifying on advertising issues but really spends most of her report making legal conclusions about the propriety of the attorneys' behaviors. Under Federal Rule of Evidence 702, expert testimony is only permissible if it is reliable, and the proponent of such has the burden of proving to the trial court – acting as a "gatekeeper" – that the proposed testimony is admissible. *See Kwan Software Eng'g, Inc. v. Foray Techs., LLC,* 2014 U.S. Dist. Lexis 17376, *10-*12 (N.D. Cal. 2014) (collecting cases). Here, Ms. Shely begins her report by explaining that she has "devoted most of [her] practice [over the past 26 years] to providing professional responsibility and risk management advice to lawyers," and in connection therewith she has served "as an expert witness on ethical issues." Dkt. No. 322-63, ¶ 1. Based on these qualifications, Ms. Shelly then shifts from lawyers to clients and ethics to advertising, citing a single Legal Trends Report detailing how consumers find a lawyer to conclude that "[c]onsumers of legal services do not rely on advertising claims when deciding to hire a lawyer," and tribes are even less likely to do so based on their more considerable "experience in retaining [these] professionals." Dkt No. 322-63, ¶¶ 70-71. Yet, the fact that Ms. Shelly *might* be an ethics expert does not make her in the least bit qualified to either do or dissect consumer surveys. *See, e.g., Valador, Inc. v. HTC Corp.,* 242 F. Supp. 3d 448, 458 (E.D. Va. 2017) (explaining "four decades of experience as a market research consultant" does not make the requisite showing that someone "is qualified to opine on consumer confusion or proper survey methods"). Moreover, there is no proof that the survey cited even examined the proper universe of consumers, which is not "consumers of legally services generally" but federally-recognized Indian tribes. *See Kwan Software Eng'g, Inc,.* 2014 U.S. Dist. Lexis 17376 at *11-*12. While she may want to sub in her professional opinion for that of the proper audience, Ms. Shely is not positioned to do so because nothing in her report even suggests that she has met a single disinterested Indian let alone worked with

Indian tribes. Not to mention, the advertising section of her report is woefully incomplete; Ms. Shely cites this single survey on the supposed unimportance of attorney advertising but does mention the one conducted in recent years by the Florida State Bar on the importance of this advertising that found 74% of survey participants believed past results are an important attribute in choosing a lawyer. *See Rubenstein v. Fla. Bar,* 72 F. Supp. 3d at 1303; Florida Supreme Court, *2011 Rules Cases – SC11-1327 In Re: Amendments to the Rules Regulating The Florida Bar – Subchapter 4-7, Lawyers Advertising, available at* https://www.floridasupremecourt.org/Case-Information/Archive-Rules-Cases/ 2011-Rules-Cases (last visited Sept. 7, 2020). There are surely other state bar surveys out there, but it should be the responsibility of the expert to distill those for the Court, *not* the adverse party.

Of course, the real purpose of Ms. Shely's expert report is *not* to relay expertise on false advertising within the Indian law field but simply to cite cases and make legal conclusions primarily on issues that have nothing to do with the Lanham Act claim – the statement is protected commercial speech, Mr. Rosette's complied with his ethical obligations, and Williams & Cochrane violated its own based upon a cursory review of just some of the materials filed in the case. None of these and the other legal conclusions are appropriate, and all of this should have just been argued by the Rosette Defendants themselves as part of their motion for summary judgment. *See Convertino v. U.S. DOJ,* 772 F. Supp. 2d 10, 13 (D.D.C. 2010) ("[T]he standard is not that experts may testify and offer legal conclusions as long as such testimony would only amount to harmless error; the standard is that expert witnesses may not testify and offer legal conclusions *at all*.").

## CONCLUSION

For the foregoing reasons, Williams & Cochrane respectfully requests the Court to enter judgment in favor of the Firm on its false advertising claim under the Lanham Act in the manner described herein.

///

///

W&C'S MOT. FOR SUMM. J. AGAINST ROSETTE DEFS. (LANHAM ACT CLAIM)

1    RESPECTFULLY SUBMITTED this 17th day of September, 2020

2

3                                    WILLIAMS & COCHRANE, LLP

4                                    By: */s/ Kevin M. Cochrane*
                                     Cheryl A. Williams
5                                    Kevin M. Cochrane
                                     caw@williamscochrane.com
6                                    kmc@williamscochrane.com
                                     WILLIAMS & COCHRANE, LLP
7                                    125 S. Highway 101
                                     Solana Beach, CA 92075
8                                    Telephone: (619) 793-4809

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28