EXHIBIT 2

FORMAN & ASSOCIATES

ATTORNEYS AT LAW

4340 REDWOOD HIGHWAY, SUITE E352

SAN RAFAEL, CALIFORNIA 94903

---

TELEPHONE: (415) 491-2310    FAX: (415) 491-2313

GEORGE FORMAN                                                    GEORGE@GFORMANLAW.COM
JAY B. SHAPIRO                                                         JAY@GFORMANLAW.COM
MARGARET CROW ROSENFELD                                  MARGARET@GFORMANLAW.COM

July 13, 2020

## REPORT OF GEORGE FORMAN

**I.      Professional Background and Experience, Publications, Prior Expert Testimony and Compensation.**

I am a member in good standing of the Bars of, and have practiced before, the Supreme Court of the State of California, the United States Supreme Court, the United States Court of Appeals for the Ninth, Seventh and District of Columbia Circuits, and the United States District Courts for the Northern, Eastern, Central and Southern Districts of California.  I also have been admitted *pro hac vice* to practice before the United States District Courts for Western District of Washington, the Western District of Michigan and the District of Columbia.

I received my Bachelor of Arts degree from the University of California at Berkeley in June, 1967, and my Juris Doctor degree from the University of California at Berkeley, formerly Boalt Hall, now Berkeley Law, in June, 1970.  I was admitted to practice in California in January, 1971, and have practiced continuously since then.

During the summer of 1969, I worked as a law clerk at the Escondido office of California Indian Legal Services ("CILS"), a program funded by the former federal Office of Economic Opportunity to provide legal services to indigent Indians, Indian tribes and Indian organizations unable to afford private legal counsel.  Upon receiving my Juris Doctor degree, I was awarded a Reginald Heber Smith Community Lawyer Fellowship ("Reggie") through the Office of Economic Opportunity's Legal Services program, and was assigned to CILS, where I served as a staff attorney in the program's Escondido office until I opened the CILS office in Ukiah, California, in 1973.

While at the Escondido office of CILS, I filed and served as lead counsel in *Rincon Band of Mission Indians v. County of San Diego*, in which an allottee of the Rincon Indian Reservation asserted the right to operate a card room on his Reservation trust allotment despite a San Diego County ordinance prohibiting all forms of gambling in the unincorporated territory of San Diego County.  The district court held that the County's ordinance was a "law of the State" within the meaning of 18 U.S.C. §1162 (along with 28 U.S.C. §1360, this statute commonly is known as

Report of George Forman
July 13, 2020
Page 2

"Public Law 83-280" or simply as "P.L. 280" and thus was applicable to Indians in Indian country; on appeal, the U.S. Court of Appeals for the Ninth Circuit vacated the district court's decision and ordered the case dismissed on the basis that there was not a sufficiently immediate threat of prosecution to constitute a live case or controversy.

During my remaining tenure at CILS, which ended in 1985, I served variously as director of that program's Indian land consolidation project, Executive Director, Litigation Director and director of the program's untermination and recognition project. Among the cases for which I was directly responsible at CILS that would later have significance in the area of Indian gaming was *Santa Rosa Band of Tachi Indians v. Kings County*, 532 F.2d 655 (9th Cir. 1975), which established that a County ordinance is not a "law of the State" within the meaning of P.L. 280, that a County zoning ordinance constitutes an "encumbrance" on trust property within the meaning of P.L. 280 and that tribal governments have jurisdiction over their Reservation lands comparable to that of city or county governments, and thus that Kings County could not enforce its zoning ordinance to prevent Indians of the Santa Rosa Rancheria from living in BIA-funded mobile homes on the Rancheria although the Rancheria was not zoned for mobile homes. The United States Supreme Court cited this decision with approval in *Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976).

I have not published articles in law reviews or professional journals. However, over the course of my legal career, I have litigated numerous cases dealing with State jurisdiction over Indians in Indian country, tribal sovereign immunity, Indian Reservation reserved natural resource rights, reversing the unlawful termination of the status of tribes and individual Indians, federal liability for breach of trust obligations and, as an outgrowth of jurisdictional and immunity issues, the right of tribal governments to operate gaming in Indian country notwithstanding state or local laws that otherwise would regulate or prevent such activity. The decisions in these cases, which have affected and improved the lives of tens of thousands of Indian people, are more meaningful to me than any articles I would have had to spend time writing. These cases have included *Duncan v. Andrus.*, 517 F.Supp. 1 (N.D. Calif. 1977); *People v. McCovey*, 36 Cal.3d 517 (1984); *Mattz v. Superior Court*, 46 Cal.3d 355 (1988); *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655 (9th Cir. 1976); *Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269 (9th Cir. 1991); *Boisclair v. Superior Court*, 51 Cal.3d 1140 (1990); *Pan American Co. v. Sycuan Band of Mission Indians*, 884 F.2d 416 (9th Cir. 1989); *Morongo Band of Mission Indians v. Rose*, 34 F.3d 901 (9th Cir. 1994); *Sycuan Band of Mission Indians v. Roache*, 54 F.3d 535 (9th Cir. 1994); *Table Mountain Rancheria v. Andrus*, (District Court, unpublished); *Table Bluff Rancheria v. United States* (District Court, unpublished); *Big Sandy Association v. United States* (District Court, unpublished); *Upper Lake Pomo Association v. United States* (District Court, unpublished); *Segundo v. Rancho Mirage City*, 873 F.2d 1277 (9th Cir. 1989); *Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244 (9th Cir. 1992); *Cabazon Band of Mission Indians v. Wilson*, 37 F.3d 430 (9th Cir. 1994); *Segundo v. City of Rancho Mirage, et al.*

In 1985, I left CILS and became an associate at the law firm of Alexander & Karshmer, where I worked until forming Forman & Prochaska in 1996. While at Alexander & Karshmer, I was co-counsel in *Morongo Band of Mission Indians v. County of Riverside* in the district court,

Report of George Forman
July 13, 2020
Page 3

the Court of Appeals for the Ninth Circuit (where the case was consolidated with *Cabazon Band of Mission Indians v. County of Riverside)*, and eventually the U.S. Supreme Court as *California v. Cabazon and Morongo Bands of Mission Indians*, in which the Supreme Court held that P.L. 280 had not given California and other states jurisdiction to enforce their civil/regulatory laws against Indians in Indian country; that California's gambling laws in general are civil/regulatory, rather than criminal/prohibitory, and thus could not be enforced against Indians in Indian country; and that federal and tribal interests in tribal self-government and economic self-determination outweighed California's interest in preventing infiltration of tribal gaming by criminal elements, and thus that California was preempted by federal law and policy from enforcing its gambling laws to prevent tribal governments from operating or non-Indians from participating in high-stakes bingo and commercial card games operated by tribal governments. While litigating this case, I also participated in legislative efforts to codify the right of tribal governments to operate gaming for governmental purposes; these efforts culminated in Congress passing and President Reagan signing into law the Indian Gaming Regulatory Act of 1988 ("IGRA"), 25 U.S.C. §2701, *et seq.*

In 1990, I negotiated a Class III gaming compact between the Sycuan Band of Mission Indians (now known as the Sycuan Band of the Kumeyaay Nation) and the State of California that allows the Sycuan Band to operate a simulcast wagering facility (off-track betting, or "OTB") on its Reservation lands. The first OTB compact in California – indeed, the first IGRA compact of any sort in California – had been negotiated the previous year between the State and the Cabazon Band, represented by Glenn Feldman. Subsequently, the Viejas, Barona and San Manuel Bands also entered into OTB compacts with the State. Pursuant to provisions in their respective OTB Compacts, the Cabazon and Sycuan Bands filed actions for declaratory relief on the question of whether the State's license fee could be applied to wagers placed at tribal OTB facilities; the Barona and Viejas Bands later joined that litigation, and in *Cabazon Band, et al. v. Wilson*, the United States Court of Appeals for the Ninth Circuit held that the State's jurisdiction to collect that fee had been preempted by IGRA, and the State was required to refund those fees to the Tribes. Due to a provision unique to Sycuan's OTB Compact, only Sycuan recovered not only the fees that the State had collected, but also interest on the collected fees. The same four tribes later prevailed against the State's effort to terminate the tribes' respective OTB operations based upon the tribes' operation of electronic gaming equipment that the State considered to be a violation of the tribes' compacts. *Cabazon Band, et al., v. Wilson II*, 124 F.3d 1050 (9th Cir. 1997).

During the late 1980s and early 1990s, I was an adjunct professor at the University of California's Hastings College of the Law in San Francisco, where I taught that school's course in Federal Indian Law. I have been a presenter at two annual meetings of the California State Bar Association's Environmental Law section, speaking on environmental laws applicable to Indian country and tribal government gaming. I have been a presenter at several meetings of the California State District Attorneys' Association, speaking on the question of jurisdiction in Indian country under Public Law 83-280. I also have been a presenter at several national and regional conferences on Indian gaming and economic development in Indian country, speaking on the future of Indian gaming and relevant legal issues, including on-line gaming. I have prepared written materials for the classes I have taught and presentations I have given, and those

Report of George Forman
July 13, 2020
Page 4

materials have been disseminated among students or participants, including other lawyers and tribal leaders.

During the mid-1990s, I negotiated and/or litigated implementation of class III gaming Compacts and management agreements in Washington (Lummi Tribe) and Michigan (Little Traverse Bay Bands of Odawa). I also have negotiated several gaming management agreements, as well as implementing tribal decisions to terminate such agreements prior to their scheduled expiration.

Beginning in 1992, I was a principal negotiator, along with several other attorneys, for a coalition of Tribes seeking class III gaming compacts from the State of California. Those negotiations broke down when, after agreeing to litigate the question of the scope of class III gaming for which IGRA obligated the State to negotiate,[1] Governor Wilson professed shock that Tribes were operating games that he contended were unlawful, and the State broke off those negotiations.

While *Rumsey v. Wilson* wound its way through the federal district and appellate courts, Tribes continued operating, while the U.S. Justice Department, responding to the State's complaints, began pressuring Tribes to cease their activities. By then, tribal government gaming had become well established in California, employing thousands of Californians and greatly improving the lives of many California Indians. The Clinton Administration did not want to see a repeat of the confrontation that had occurred when federal authorities attempted to remove uncompacted slot machines from an Arizona Tribe's casino, and the Wilson Administration also wanted to find a way to end the dispute.

The result was that the State agreed to negotiate with a Tribe that was not then engaged in gaming. The gaming Tribes, including my clients, nominated the Pala Band to act as their surrogate, and designated several tribal attorneys, including me, to participate in the negotiations in addition to Pala's attorney, with the understanding that the other Tribes would be kept informed about developments in the negotiations and would have input into the positions advanced by Pala.

When Pala's and the State's attorneys imposed a veil of secrecy on the negotiations, even as to the other attorneys' clients, I withdrew. The other attorneys soon followed, and in late 1997 those negotiations ultimately resulted in announcement of a "model" compact with the Pala Band that the U.S. Justice Department and the State tried hard to coerce other Tribes to accept.

The Wilson-Pala Compact was deemed so odious by all but a handful of California Tribes (also represented by Pala's attorney) that some 80 Tribes decided to go directly to California's voters for relief. I was deeply involved in that effort; indeed, Jerry Levine and I were the principal authors of what became Proposition 5 on the November, 1998 general election ballot, and during the course of the campaign, I frequently met with tribal leaders from

---

[1] That litigation, *Rumsey Rancheria, et al., v. Wilson*, consumed several years, during which the Tribes continued to operate what the State, and eventually the U.S. Justice Department, contended was uncompacted class III gaming.

Report of George Forman
July 13, 2020
Page 5

throughout the State. Proposition 5 received about 64% of the vote, but was stayed by the California Supreme Court, and in August, 1999, all but one section was struck down as inconsistent with the California Constitution's prohibition against casinos of the type currently operating in Nevada and New Jersey.

Elected in November, 1998 with broad tribal support, and concerned about the adverse impacts on Indian country that would result if the California Supreme Court ultimately overturned Proposition 5, in March, 1999, Gov. Gray Davis invited all California Tribes to participate in negotiating a model compact as a hedge against a potential adverse Supreme Court ruling on Proposition 5. I was chosen to be part of the tribal negotiating team for the 80-member United Tribes Compact Steering Committee. Between March and September, 1999, I participated in numerous large and small group meetings of tribal leaders to prepare for and actually conduct the negotiations, frequently interacting with tribal representatives from all over California.

In September, 1999, the UTCSC and two small groups of Tribes also trying to negotiate Compacts came together in a series of meetings that culminated in what became known as the "1999 Compact" that would take effect only if California's voters approved an amendment to the State Constitution that would authorize the Governor to negotiate and the Legislature to ratify compacts allowing Tribes to operate slot machines, banked and percentage card games and lottery games and devices on their Indian lands. The Legislature put Proposition 1A on the March, 2000 ballot, the voters approved it by a wide margin, and the Compacts took effect on or about May 16, 2000 upon publication in the Federal Register of a notice that they had been approved by the Department of the Interior.

The 1999 Compact put some serious constraints on the ability of Tribes with large potential markets to respond to market demand. Each Tribe was to be limited to no more than 2,000 Gaming Devices, and in order to add Gaming Devices to those already in operation on September 1, 1999 (or more than 350 if a Tribe had fewer than 350 Gaming Devices on that date), a Tribe would have to draw licenses from a statewide pool of licenses that the State dictated contained fewer licenses than the Compacts actually had created. In *Cachil Dehe Band of Wintun Indians v. California*, I obtained a ruling from the Ninth Circuit Court of Appeals that the State had both improperly limited the size of the statewide license pool and prevented Colusa from drawing as many licenses as it was entitled to receive.

Several of my clients' markets would support more than 2,000 Gaming Devices, so between 2004 and 2006, I represented several them in efforts to negotiate Compact amendments that would enable those Tribes to expand their gaming operations beyond what was allowed in their original 1999 Compacts. Two of my clients ultimately succeeded in obtaining Compact amendments that were ratified by the Legislature in 2007, and survived a referendum on the ratification of those Compacts in February, 2008.

For one of those clients, I negotiated a new Compact that took effect in February, 2018. It was not affirmatively approved by DOI, but was considered approved to the extent consistent with IGRA. In fact, virtually none of the Brown and Newsom Administration compacts have

Report of George Forman
July 13, 2020
Page 6

been affirmatively approved, due to DOI's concerns about inclusion of provisions that are not proper subjects of negotiation under IGRA.

Beginning in 2015, I served as a principal negotiator for the 1999 Compact Tribes Steering Committee ("CTSC"), a coalition of Tribes with 1999 Compacts seeking to negotiate new Compacts to replace the existing Compacts when those Compacts expire. Four of my CTSC clients, having become convinced that the State would not recede from its insistence on including in new Compacts provisions that are not proper subjects of negotiation under IGRA, recently withdrew from the CTSC, and are contemplating suing the State for failing to negotiate in good faith.

For several years in 2015-2017, I represented one of my tribal clients in organizing a broad coalition of California Tribes seeking enactment of California legislation that would authorize intrastate on-line poker in California, and negotiated contracts with various Internet gaming service providers. In the course of that project, I interacted with the leaders of Tribes throughout California, large and small, gaming and non-gaming.

My current gaming-related clients include the Morongo Band of Mission Indians; the Soboba Band of Luiseño Indians; the Cahuilla Band of Indians; the Cachil Dehe Band of Wintun Indians of the Colusa Indian Community; the Bear River Band of Rohnerville Rancheria; and the Karuk Tribe of California. My law firm also provides legal advice and representation on Indian Child Welfare Act matters to a number of Tribes in California and occasionally to Tribes from other states with citizens in California, represents a tribal health clinic in northeastern California, and provides advice to various of our clients' gaming regulatory agencies.

At various times during the course of my career, I have provided advice and/or representation to the following California Tribes: Augustine, Bear River, Blue Lake, La Posta, Santa Ysabel, Ewiiaapaayp, Sycuan, Pala, Pechanga, Morongo, Cahuilla, Santa Rosa Tachi (Kings County), Santa Rosa (Riverside County), Table Mountain, Table Bluff, Big Sandy (Auberrry), Cold Springs, Picayune, Robinson, Guidiville, Graton, Soboba, Quechan, Yurok (through the Yurok Transition Team, as well as defending individual Yurok citizens exercising their federally-reserved right to fish in the Klamath River free of State regulation), Smith River, Upper Lake, Cloverdale, Sherwood Valley, Susanville, Chemehuevi, Torres Martinez, Chicken Ranch, Ione and Karuk. I also have represented several Tribes outside California in connection with Compact negotiations, gaming management contracts, other economic development projects, land rights, and ICWA cases, including the Lummi Nation in Washington, the Cocopah Tribe in Arizona, and the Little Traverse Bay Bands of Odawa in Michigan.

I last testified as an expert by deposition in 2009. I have not testified as an expert at trial. I have testified at trial as a percipient witness.

I am being paid $585 per hour, billed in tenths of hours, plus reimbursement for actual out-of-pocket expenses, in connection with my services as an expert witness in this action.

Report of George Forman
July 13, 2020
Page 7

        In preparing my report, I have reviewed pleadings, various exhibits and district court orders in this action, as well as relevant court opinions and other documents I considered to be of use in formulating my report. I also have relied upon my own experience as a practicing attorney represented Indian tribes and tribal organizations since January, 1971,dealing with both Tribal leaders and their citizens, other actual and would-be tribal attorneys, and elected State and local officials and their staffs, including Gov. George Deukmejian, Gov. Pete Wilson, Gov. Gray Davis, Gov. Arnold Schwarzenegger, Gov. Jerry Brown, and now Gov. Gavin Newsom, as well as various members of the California Legislature and their staffs, and the members of several County boards of supervisors.  My experience includes dealing with attorney Rob Rosette, both when he was affiliated with the law firm formerly known as Monteau and Peebles (which later became Monteau, Fredericks and Peebles), and in his own firm.

        I have been asked to opine on my experience in dealing with a broad spectrum of Tribes and tribal leaders, including in negotiating class III gaming Compacts; why tribal leaders and tribal members may be susceptible to undue influence and misrepresentations by lawyers in the field of Indian law, and examples of such; and related subjects.

**II.     Why Tribal Leaders and Tribal Members, Particularly Those in California, May Be Susceptible to Undue Influence and Misrepresentations by Lawyers in the Field of Indian Law.**

        From the first contacts between California's Native peoples and Spanish and Mexican invaders, continuing through the genocidal era that followed the discovery of gold in the mid-1800s, the allotment era beginning in the 1890s, and the termination era that followed World War II, California's Native peoples have endured an almost endless effort to either physically eradicate their presence or force their assimilation into an unwelcoming larger society.

        California was the first state in which Indian reservations were created after the state was admitted to the Union, and although 18 treaties were executed between treaty commissioners and the purported representatives of Tribes in various regions of the State, at California's urging the treaties never were ratified; rather, they were kept hidden until 1905, by which time, many California tribes that had not been eradicated by the Mission system or by gold seekers had been dispossessed, effectively fragmenting California's surviving Native population.

        The effect of all of these policies and actions was to reduce most of California's Native peoples to abject poverty, without means or resources – including lawyers – with which to mount legal challenge the laws and policies responsible for their plight.  This began to change in the mid- to late-1960s, with the advent of the federal War on Poverty and the establishment of federally-funded legal services programs under the Office of Economic Opportunity ("OEO") (later to become the Legal Services Corporation).  Under the OEO, national and regional projects focused on law reform on a macro level, while local legal services offices, located in the low-income communities they were to serve, focused primarily on local legal issues as well as individual client service.

Report of George Forman
July 13, 2020
Page 8

While OEO-funded legal services programs were established on several large Reservations in other states fairly early in the War on Poverty, the first OEO-funded legal services project established to specifically address problems unique to California's Native people was not established until 1967, when California Indian Legal Services ("CILS") was spun off from the existing California Rural Legal Assistance program. From its office in Santa Rosa, CILS began to deal with the problems caused for California Rancherias by the disastrous federal termination policy under the California Rancheria Act of 1958, as amended in 1964.

Prior to the establishment of CILS, and with the occasional exception of lawyers working *pro bono,* court-appointed criminal defense, or representing allottees on the Agua Caliente Reservation, the first exposure most California Native people had to lawyers was indirect, through the pursuit of the claims of various groups of California Indians before the Indian Claims Commission ("ICC"). Rather than continually enacting a series of special jurisdictional acts for specific tribal claims, Congress had established the ICC to provide a forum in which Tribes or defined groups of Indian people could seek compensation from the United States for the pre-1946 loss of tribal rights or property, including from "less than fair and honorable dealing," and a small number of lawyers in California and Washington, D.C. represented various groupings of California Indians before the ICC.[2] Those claims were settled in 1964, but payment of approximately $650 to every California Indian who could trace his/her ancestry to a California Indian who was alive in California in 1852 was delayed until the early 1970s.[3]

CILS established offices in Eureka, Escondido, Bishop and Ukiah (in addition to the program's main office in Berkeley/Oakland), and each of those offices focused primarily on matters specific to each locality, but also occasionally addressed issues of statewide or even national concern. The lawyers in these offices lived in or near the Tribes and individuals they served, did not charge for their services, and worked to strengthen, and when possible, restore not only tribal status and governmental structures, but also the lands and jurisdiction that had been taken from them, and the individual Indian status lost in termination. Moreover, the CILS governing board consisted of prominent California Indians and the few Indian people then practicing law in California. These factors combined to create a strong bond of trust between the communities and individuals served by CILS, and the lawyers working for the program. The Quechan Tribe was served by the CILS office in Escondido.

Many former CILS lawyers remain active in Indian law today, and that bond of trust generally has carried over to them, and to an extent, to other lawyers now working in this area of the law. CILS also sponsored the creation of the Native American Rights Fund, a national law firm devoted exclusively to advancing the rights and status of Tribes and tribal organizations on

---

[2] Through an earlier special jurisdictional act, Congress designated California's Attorney General to represent "the Indians of California" to seek compensation for the lands encompassed in the 18 treaties that never were ratified.

[3] After the Pit River Tribe voted to reject that settlement, the Tribe's lawyer worked with the Department of the Interior to hold a second election, in which the settlement was approved. A challenge to the validity of the settlement, in which I participated, was rejected. *Andrade v. U.S.*

Report of George Forman
July 13, 2020
Page 9

the state and federal levels, which further enhanced the reputation of lawyers practicing Indian law as generally trustworthy.

Before the advent of tribal government gaming, CILS and former CILS lawyers were pretty much the only lawyers with whom California tribal leaders and individual Indians had regular contact. Tribes with successful gaming enterprises lost their financial eligibility for free service from CILS, and once the Revenue Sharing Trust Fund established under the 1999 Compacts was implemented, no recognized California Tribe was eligible for free service, but many California Tribes continue to use CILS on a fee-for-service basis.

The growth in tribal economic resources soon attracted the attention of private law firms from both within and without California. These firms previously had not been interested in servicing California Tribes. Monteau & Peebles, later to become Monteau, Fredericks & Peebles ("MFP"), was one of the non-California firms that came into the State to solicit tribal clients, touting themselves as an Indian-owned firm with tribal clients in many different states. Harold Monteau had been the Chairman of the National Indian Gaming Commission, and Tom Fredericks had been Associate Solicitor for Indian Affairs. Rob Rosette was associated with MFP before he founded his own firm.

When MFP came to California, many lawyers already representing California Tribes had relationships with State legislators and other elected officials. To be able to tout its ability to get things done with the State government, MFP needed to build such relationships of their own. One of the ways in which I believe MFP did so was to curry favor with State officials, particularly in the Governor's Office and the California Gambling Control Commission, by sharing with them information about internal tribal strategy deliberations.

Because many of the Tribes that had achieved early success with gaming already had legal counsel, MFP generally targeted Tribes with limited or no gaming, but also some Tribes that already had gaming and lawyers. In several instances of which I am personally aware, MFP's retention by Tribes was preceded by the Tribe's hiring of a specific non-lawyer as tribal administrator who would urge the ouster of the Tribe's existing legal counsel and replacement by MFP. This occurred sequentially at the Santa Rosa Tachi Tribe in Kings County, then at the Picayune Chukchansi Rancheria in Madera County, then at the Coyote Valley Rancheria in Mendocino County, and then at the Alturas Rancheria in Modoc County. Without using the same non-lawyer, MFP also solicited the Death Valley Timbi-Sha Shoshone Tribe and the Buena Vista Rancheria. At least at the Picayune Chukchansi, Buena Vista, and Redwood Valley Rancherias, MFP also brought in the same gaming management company, offering the tribal client what seemed to be a complete package, presumably without fully explaining the conflicts of interest inherent in such arrangements.

Another way that MFP, and later Rosette & Associates,[4] cultivated tribal clients has been to identify individuals or factions within a Tribe, and work with them to overthrow existing tribal officials, sometimes violently; the insurgents then would hire MFP or Rosette & Associates as

---

[4] A fairly small number of other attorneys, Indian and non-Indian, have employed similar tactics.

Report of George Forman
July 13, 2020
Page 10

the Tribe's new attorneys.  That is exactly what happened at Picayune Chukchansi, and I am informed that this also happened at Paskenta Rancherias.  At Timbisha Shoshone, the insurgents, backed by their preferred gaming developer, paid members to attend a meeting at which to vote to recall the incumbent Tribal Council Chairman.

The most common characteristics of the Tribes targeted by MFP and Rosette & Associates, at least in California, have been location in rural areas of the State, leadership's limited experience in business or other economic affairs, generally a small tribal land base, little or no experience with lawyers (except through CILS), and generally low levels of higher education among both leadership and general membership.

### A.    My Experience in Dealing with a Broad Spectrum of Tribes and Tribal Leaders in Negotiating Class III Gaming Compacts.

As noted above, my involvement in Compact negotiations in California began in 1989-1990, when I negotiated a simulcast wagering ("OTB") Compact on behalf of the Sycuan Band of the Kumeyaay Nation.  Shortly thereafter, I became involved in broader-scope Compact negotiations when a group of 17 Tribes, including several of my clients, began negotiating with the Wilson Administration.  These negotiations broke down when the parties could not agree on the scope of class III gaming for which the State is obligated to negotiate under IGRA, resulting in the *Rumsey v. Wilson* litigation that ensued over the course of the next several years.

In 1994, the U.S. Attorneys in California began pressuring Tribes that were offering electronic forms of what were contended to be aids to bingo, and thus class II, as well as certain card games that the Tribes contended were not house banked, and thus also class II, to stop their gaming activities until Compacts were in place.  Subsequently, the State agreed to resume the negotiations that had been interrupted, but only with a Tribe not then engaged in any form of gaming; the Tribes then involved in gaming nominated the Pala Band of Mission Indians to be at the negotiating table, but to ensure that Pala's lawyer would not cut a deal unacceptable to the rest of California Tribes, other tribal attorneys, including me, were designated to represent the negotiating Tribe, with the understanding that all interested Tribes would be kept apprised of, and have input into, the negotiations.  I eventually withdrew from the negotiations when the State and Pala's principal lawyer prohibited me from keeping my other tribal clients informed about the negotiations.

When Governor Wilson announced in late 1997 that he had agreed to a Compact with the Pala Band, most other California Tribes were horrified by the Compact's terms.  More than 80 California Tribes joined together as the United Tribes Compact Steering Committee to put on the November, 1998 general election ballot an initiative that would have offered a model Compact to every California Tribe with gaming-eligible land.  Jerry Levine and I were the principal authors of what became Proposition 5, which the UTCSC qualified for the ballot in record time.

My tribal clients have varied widely in terms of enrolled membership, trust land base, history of functioning as governments exercising sovereignty, levels of education among elected leaders and tribal citizens, and degree of cultural assimilation into surrounding non-Indian

Report of George Forman
July 13, 2020
Page 11

communities. My work on reversing the legal and other impacts of the failed federal policy of terminating the trust relationship between the United States and California Tribes involved restoring the federal status of communities and individuals that had lost their tribal status; when my work with those communities began, they often were not even organized as Tribes, and the individuals remaining on the original tribal land bases often faced dispossession due to unpaid property taxes or creditors' claims.

Since 2015, I have represented four Tribes with 1999 Compacts as part of the Compact Tribes Steering Committee ("CTSC"), negotiating with the State of California for new Compacts to replace the Compacts that are due to expire by June 30, 2022. The CTSC has been seeking replacement Compacts that are at least as favorable to the Tribes as their 1999 Compacts, but the State has insisted on including in new Compacts numerous provisions that the CTSC Tribes contend are not proper subjects of negotiation under IGRA. Meanwhile, other California Tribes have entered into new Compacts containing many of those same provisions, reinforcing the State's resistance to making concessions to the CTSC Tribes. Many of the Tribes that originally were part of the CTSC later dropped out of the group for their own reasons, and entered into new Compacts containing many of the provisions to which the CTSC Tribes have objected.

In my experience, one of the keys to a successful negotiation, particularly if the parties to the negotiation have very different ideas of what would be an acceptable result, is the establishment of a relationship of trust between legal counsel for the parties. This can take time, but over the course of the negotiation at least the lawyers will have a common understanding of the goals of their respective principals, will have a shared recollection of the history of the negotiations, and will be better able to inform their respective clients of the degree to which their respective clients' goals are likely to be attainable. In my experience, particularly when negotiations have reached an advanced stage, as appears to have occurred during Williams & Cochrane's representation of Quechan in its compact negotiations, changing the Tribe's legal counsel would not be advantageous to the Tribe, unless the Tribe was prepared to abandon whatever concessions had been obtained from the State. In my experience, such changes in legal counsel at such a late stage of negotiations would be highly unusual, and not recommended.

### III. The Likely Perceived Impact on Tribal Leaders of the Advertising Statement at Issue in Williams & Cochrane's Lanham Act Claim Against the Rosette Defendants.

In my experience, whether for cultural reasons, lack of business experience and/or education, and/or infrequent interaction with lawyers, and being people of great persona integrity themselves, tribal leaders tend to take lawyers' representations of their ability and accomplishments at face value. If, for example, a lawyer claims to have been responsible for a particular court decision, few tribal leaders would have the wherewithal to look up the decision to verify the claimed result, the extent to which the lawyer actually had personal responsibility for that result, and the aftermath of that result. This is not unique to Tribes, of course; despite numerous popular culture jokes about lawyers, in my experience most people with limited education, experience and resources tend to take lawyers' representations about their abilities and accomplishments at face value, lacking the means or knowledge with which to test the accuracy of representations made to them. For example, without knowing how to perform legal research,

Report of George Forman
July 13, 2020
Page 12

someone would have difficulty looking up a reported court decision, and even more difficulty
looking up an unreported decision.

Rosette & Associates' firm website, a screenshot of which was attached to the Complaint
in this action as Exhibit 6, and which I last examined on July 8, 2020 contains several examples
of such claims that, on the surface, are very impressive, but if researched further, become
considerably less so.  The description of Mr. Rosette's accomplishment includes the following:

> Mr. Rosette has been involved with Internet gaming issues
> pursuant to the IGRA since 1997. He has represented Indian tribes
> with the successful launch of internet gaming websites for Class II
> bingo and poker.
>
> Mr. Rosette's litigation experience includes Indian tribal cases
> involving public interest and civil rights. For example, Mr. Rosette
> successfully resolved a dispute between the Havasupai Tribe and
> the State of Arizona in a case whereby the Tribe alleged the illegal
> taking of its blood and genetic material. Mr. Rosette conducted the
> first arbitration regarding off-reservation mitigation pursuant to a
> gaming compact and received a victorious award against the
> County of San Diego on behalf of the La Posta Tribe of Mission
> Indians. Mr. Rosette has also successfully restored recognition of
> tribal governments against United States' attempts to dissolve
> them, including the California Valley Miwok Tribe, the Lower
> Lake Rancheria, Koi Nation, and the Wilton Rancheria.

Before it was removed from the firm's website, Mr. Rosette also claimed to have saved
the Pauma Band "over one hundred million dollars" by "successfully litigat[ing] a case"
concerning the validity of that Tribe's 2004 Compact Amendment.

As to Mr. Rosette's claim that he personally saved the Pauma Band over one hundred
million dollars, the Pauma Band was able to rescind its 2004 Compact Amendment as a result of
the decision in *Cachil Dehe Band of Wintun Indians of the Colusa Indian Community v.
Schwarzenegger* that the State had erroneously determined that there were fewer Gaming Device
licenses available than the 1999 Compacts actually created.  The Pauma case was litigated
primarily by Kevin Cochrane and Cheryl Williams.  I know that because, among other things,
Kevin Cochrane reached  out to me for copies of transcripts of the negotiations leading up to the
1999 Compact, and the reported decision of the 9th Circuit does not mention Mr. Rosette.

As to Mr. Rosette's claim that he successfully launched Internet bingo and poker
websites, the fact is that the website of a California client for which he attempted to launch such
sites almost immediately was shut down by federal and state authorities.

As to Mr. Rosette's claim that he successfully resolved a dispute between the State of
Arizona and the Havasupai Tribe, the attorney who actually won the case for the Tribe on appeal

Report of George Forman
July 13, 2020
Page 13

has informed me that Mr. Rosette argued the case in the trial court and lost, and did not brief or argue the case on appeal.

As to Mr. Rosette's claim that he succeeded in representing a tribal client in an arbitration with San Diego County, the claim is true as far as it goes. What the claim does not address is that his client had agreed to a much less favorable gaming compact than other California Tribes had obtained in 1999, and that the Tribe's own proposal that the arbitrator accepted turned out to be more costly than the Tribe could afford. The Tribe's gaming operation closed, and the Tribe later tried and failed to obtain protection from a judgment in favor of the County under the bankruptcy laws.

**IV.    Quechan's Latest Gaming Compact.**

Any Tribe with gaming-eligible lands that is willing to accept whatever Compact a State may offer likely can obtain such a Compact quickly, with little effort or expenditure of time and resources. Obtaining a Compact with terms that are consistent with IGRA and not unduly invasive of tribal sovereign prerogatives is much more difficult, even in a State such as California, which has waived its 11th Amendment sovereign immunity to suit under IGRA for failing to negotiate in good faith. The same is true when a Tribe attempts to assert an interpretation of a Compact that is contrary to what the State has determined the Compact means.

A comparison between the Compact that Quechan actually executed in 2017, for which Mr. Rosette claims credit, and the last draft of the Compact that Williams & Cochrane were negotiating before being replaced by Rosette & Associates, LLP, demonstrates that the vast majority of the provisions are the same or substantially similar. However, the 2017 Compact appears to contain at least two notable and material differences that are considerably less favorable to Quechan than the Williams & Cochrane draft.

The first of these differences is that Section 4.8 of the 2017 Compact requires Quechan to repay $2 Million of the $4 Million in arrearages that had accrued under its former Compact. The Williams & Cochrane draft would have completely replaced the former Compact, thus eliminating the need to make any such repayment, saving the Tribe $4 Million.

The second of these differences is that the 2017 Compact requires that if Quechan operates more than 1,200 Gaming Devices at any time in a given quarter, Quechan must pay 6% of its net win from all gaming devices in excess of 350 for that quarter into the Revenue Sharing Trust Fund, but that up to 80% of such payments can be offset by expenditures for a variety of other defined purposes, some of which clearly constitute taxes. The Tribe must submit its proposed expenditures to the State in advance, and the State has the right to disapprove particular expenditures and review expenditures after the fact.

The Williams & Cochrane draft establishes a sliding scale of RSTF payments based on the 1999 Compact fee schedule, but more graduated, and, most significantly, applicable only to Gaming Devices in excess of 1,200. Thus, even if the Tribe were to operate more than 1,200

Report of George Forman
July 13, 2020
Page 14

Gaming Devices, the Tribe would not have been mandated to spend 6% of the net win from gaming devices in excess of 350.

While the allowance for credits may seem favorable, in fact this forces Quechan to spend 6% of the net win from Gaming Devices in excess of 350 (assuming Quechan operates more than 1,200 devices in a quarter) for the full term of the Compact, whether in the form of payments to the RSTF, or for various other purposes, some of which are unrelated to gaming or the Tribe itself. This deprives the Tribe of discretion about how its revenues are to be spent, or not spent. In my opinion, this constitutes an impermissible tax under IGRA, for which Quechan did not receive meaningful consideration in the form of substantial concessions on matters about which the State was not otherwise obligated to negotiate in good faith. Relief from a financial burden that the State had no right to impose in the first place was not meaningful consideration. In my opinion, the Williams & Cochrane draft Compact would have been more advantageous to Quechan than the compact that ultimately was executed.

Respectfully submitted,

George Forman