EXHIBIT 3

FORMAN & ASSOCIATES
ATTORNEYS AT LAW
4340 REDWOOD HIGHWAY, SUITE E352
SAN RAFAEL, CALIFORNIA 94903

TELEPHONE:  (415) 491-2310     FAX:  (415) 491-2313

GEORGE FORMAN
JAY B. SHAPIRO
MARGARET CROW ROSENFELD

GEORGE@GFORMANLAW.COM
JAY@GFORMANLAW.COM
MARGARET@GFORMANLAW.COM

July 27, 2020

## REBUTTAL REPORT OF GEORGE FORMAN

### INTRODUCTION

I have been retained by plaintiffs to review and comment on the Expert Report of Steven Hart dated July 13, 2020.  At the outset, I should say that I am familiar with and respect Mr. Hart's abilities and integrity, based, *inter alia*, on his input as the attorney for the Jamul Indian Village during that Tribe's participation from 2013-2015 in what became the Compact Tribes Steering Committee ("CTSC").[1]

Mr. Hart's July 13, 2020 Report seems to stray afield into issues other than those directly related to Indian law in general, and compact negotiation in particular (*e.g.*, ethics, validity of attorney contracts), and regarding Indian law matters, many of his opinions seem to lack factual bases on the time line and cost of compact negotiations.  In addition, based upon my personal experience and knowledge over the course of my career representing California Indian Tribes and organizations since being admitted to practice in California in January, 1971, and in particular my experiences in negotiating class III gaming compacts with the State of California and litigating with the State of California concerning such Compacts, I have concluded that several of the opinions expressed by Mr. Hart in his July 13, 2020 Report either are inaccurate, mischaracterize certain events, or lack factual substantiation, perhaps due, at least in part, to his limited experience with compacting specifically in California.

### I.  FACTUAL INACCURACIES

A.      Incorrect history of Class III Gaming Compacts in California.

Mr. Hart is not licensed to practice law in California, and until 2005 was employed by the Arizona Department of Gaming.  To the best of my knowledge, he was not involved in negotiating class III gaming compacts in California prior to 2005, and thus was not active in negotiating the first California class III gaming compacts, the Pala and other compacts negotiated

---

[1] Jamul eventually withdrew from the CTSC, after having participated between late 2013 and mid-2015 in preparations for and actual compact negotiations as part of the CTSC.

Report of George Forman
July 27, 2020
Page 2

with the Wilson Administration, or the 2004 Compact Amendments negotiated with the Schwarzenegger Administration. To the best of my knowledge, his first involvement in California compacting was in the *Rincon Band v. Schwarzenegger* litigation.

On page 6 of his report, Mr. Hart states that,

The first Tribal-State gaming compacts in California were entered into in 1999 between the State and approximately 60 Indian tribes ("1999 Compact").

This is factually incorrect, if only because the first class III gaming compacts between the State and California Tribes were entered into in 1990 (Cabazon) and 1991 (Sycuan, Viejas, and Barona, later joined by San Manuel).

Mr. Hart also failed to mention that in 1997-1998, the State of California entered into class III gaming compacts with the Pala Band of Mission Indians and several other Tribes. The Legislature's ratification of the Pala Band's Compact was the subject of a referendum as Proposition 29 on the March, 2000 ballot; it received a majority of the votes cast on the measure, but because Proposition 1A (the amendment to Art. IV, Sec. 19 of the California Constitution allowing the Governor to negotiate and the Legislature to ratify compacts authorizing Tribes to operate slot machines, banked and percentage card games and lottery games on their Indian lands) received more votes, that Compact never took effect, although the U.S. Department of Justice allowed Tribes that signed clones of the Pala Band's Compact to continue operating what it considered to be class III Gaming Devices without having those devices arrested in place and subjected to civil forfeiture actions.

B.      Mischaracterization of the result in *Pauma Band v. State of California*.

On page 3 of his Report, Mr. Hart states as follows:

W&C had recently represented the Pauma Band of Luiseno Mission Indians, another California Indian tribe, in litigation with the State over an amended compact similar to the Tribe's 2006 Amendment. As explained below, in its litigation against the State, the Pauma Band received an award of damages representing the "overpayments" it made to the State under its amended compact, and so the Tribe contacted W&C to discuss negotiations with the State.

Mr. Hart is correct that Williams & Cochrane represented the Pauma Band of Luiseño Indians in litigation with the State over a Compact Amendment, but his characterization of the relief obtained by the Pauma Band is incorrect. Rather than an award of damages, the Pauma Band obtained a judgment rescinding the Pauma Band's 2004 Compact Amendment (not "amending" the Amendment as stated in Mr. Hart's July 13, 2020 Report), reinstating the Pauma Band's 1999 Compact, and ordering the State to reimburse the Pauma Band, as restitution rather than damages, approximately $36 million in payments the Pauma Band had made to the State under its 2004 Compact Amendment.

Report of George Forman
July 27, 2020
Page 3

       C.     Erroneous description of the Compact approval process.

On page 9 of his July 13, 2020 Report, Mr. Hart erroneously asserts that a Compact, once executed, ratified and approved by the Department of the Interior, is "filed in the Federal Register."  In fact, the Compact itself neither is filed nor published in the Federal Register; rather, a compact "shall take effect only when *notice of approval* by the Secretary of such compact has been published by the Secretary in the Federal Register." [Emph. added] 25 U.S.C. § 2719(d)(3)(B).

## II. MISLEADING CHARACTERIZATION OF CALIFORNIA COMPACT NEGOTIATIONS

I agree with Mr. Hart's assertion, on page 6 of his July 13, 2020 Report, that,

> Compact negotiation is therefore a crucial aspect of tribal gaming, because the Tribal-State gaming compact outlines the terms`—including regulatory and financial terms—for operation of gaming. Tribes may be bound by a particular gaming compact for decades, which highlights the critical importance of effective, fair, and thoughtful negotiation.

However, I emphatically *disagree* with Mr. Hart's assertions in the next paragraph of his Report that,

> In recent years, however, compact negotiation in California has become more streamlined and less impassioned. Litigation has generally resolved the most contentious issues, leaving a good deal of compact negotiation controlled by standard language and more limited tribe-specific issues.

As to the assertion in the first sentence that compact negotiation in California has become more streamlined and less impassioned, Mr. Hart knows full well from his involvement with the CTSC on behalf of the Jamul Indian Village that compact negotiation in California has not become more streamlined and less impassioned for any Tribe that is not willing to accede to the State's evolving demands.  Only if a Tribe is prepared to make concessions to the State by accepting intrusive and burdensome terms that are outside the parameters of what IGRA provides may be included in a Compact, and without receiving meaningful consideration from the State in return for those concessions, can compact negotiation in California be described as having become more streamlined and less impassioned.

IGRA, 25 U.S.C. § 2710(d)(3)(C) provides as follows:

> "Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to—
>     (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

Report of George Forman
July 27, 2020
Page 4

> (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
>
> (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
>
> (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
>
> (v) remedies for breach of contract;
>
> (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
>
> (vii) any other subjects that are directly related to the operation of gaming activities.

IGRA, 25 U.S.C. § 2710(d)(4) provides as follows:

> Except for any assessments that may be agreed to under paragraph (3)(C)(iii) of this subsection, nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity. No State may refuse to enter into the negotiations described in paragraph (3)(A) based upon the lack of authority in such State, or its political subdivisions, to impose such a tax, fee, charge, or other assessment.

Prior to its formal organization, the Tribes that would become the CTSC held internal meetings starting in 2013, and began initial consultations with the State in 2014. Mr. Hart participated in those negotiations on behalf of Jamul until approximately June 15, 2015, when Jamul, apparently under crushing financial pressure from having spent tens of millions of dollars in pre-development expenses and having faced fierce local opposition to its plans for a casino, withdrew from the CTSC and largely acquiesced in the State's demands after a process that had begun some 18 months earlier.

Over time, other Tribes with so-called 1999 Compacts also withdrew from the CTSC; some have accepted the State's demands, but others have not. As of the date of this report, some thirty Tribes with 1999 Compacts -- including Tribes that have not been part of the CTSC -- still have not agreed to the State's demands, even after several years of negotiations and the State's intransigence.

In January, 2019, several of the Tribes in the CTSC withdrew from the CTSC and filed suit against the State for failing to negotiate in good faith. Those Tribes' and the State's cross-motions for summary judgment were taken under submission on December 16, 2019, but the district court in Fresno has not yet issued its ruling. More recently, six other Tribes, including four of my firm's clients, withdrew from the CTSC rather than acceding to the State's demands, submitted last, best offers to the State, and if those offers are rejected, likely will file similar lawsuits in the near future.

Report of George Forman
July 27, 2020
Page 5

In my opinion, any Tribe that has entered into compact negotiations with the State of California since 2004, but is not willing to accede to the State's demands on issues that the Tribe contends are not proper subjects of negotiation under IGRA, should plan not only on a protracted, contentious and ultimately fruitless negotiation, but also on having to sue the State for failing to negotiate in good faith. The combination of negotiations and litigation likely would take, at a bare minimum, two to three years, requiring the expenditure of many hundreds of hours of attorney time, and cost the Tribe hundreds of thousands of dollars, as amply demonstrated by the five+ years that the CTSC Tribes have been negotiating with the State.[2]

The Tribes that stayed with the CTSC after Mr. Hart's client withdrew, rather than surrendering to the State's demands on issues unrelated to and unnecessary for the regulation or operation of Gaming Activities, did so for a basic and principled reason: the State has insisted on including in new Compacts at least fourteen provisions that the Tribes contend are not proper subjects of negotiation under IGRA, and for which the State has not offered any meaningful consideration. These provisions include the following:

(1)     inclusion of the Tribal Nation Grant Fund ("TNGF");[3]

(2)     defining "Gaming Facility," "Gaming Operation" and "Project" to include structures and activities not directly related to operation of class III Gaming Activities;

(3)     requiring negotiation and, if necessary, arbitration of mitigation agreement(s) with local governments;

(4)     mandating money damage remedies for workplace discrimination, harassment and/or retaliation, including for employees not involved in

---

[2] This estimate is for a fairly standard compact negotiation, which seems to be what Mr. Hart's July 13, 2020 Report describes, not a compact dispute in which a Tribe tries to aggressively alter the *status quo* in its compact relationship with the State by withholding revenue sharing payments. *See* Section III, *infra*.

[3] The TNGF is a fund administered by a State-supervised board to which RSTF-eligible Tribes may apply on a competitive basis for grants unrelated to Gaming Activities, awarded on the basis of subjective criteria with no accountability to Tribes whose money is used for the grants. The TNGF is to be funded by surpluses in the RSTF. The TNGF was imposed by the State, not proposed by the Tribes, and the State has not offered meaningful consideration in return for Tribes' agreement to include the TNGF in Compacts. Moreover, by requiring a contributing Tribe to spend money in excess of what is needed to fund the RSTF for the life of the Compact, the TNGF may constitute an impermissible tax. In these and other respects, the TNGF is fundamentally different from the RSTF. As the Ninth Circuit held in *In Re Indian Gaming Related Cases*, 331 F3d 1094, 1113 (9th Cir 2003), "Given that the State offered significant concessions to tribes during the course of negotiations in return for the RSTF provision, that the provision originated in proposals by the tribes and now has strong support among the tribes, and that Coyote Valley was not excluded from the negotiations that shaped the RSTF provision, we hold that the State did not act in bad faith by refusing to enter a compact with Coyote Valley that did not include this provision." The validity of the TNGF has not yet been litigated.

Report of George Forman
July 27, 2020
Page 6

class III Gaming Activities, notwithstanding that relevant federal workplace discrimination laws exclude Tribes from the definition of "employer";

(5)     imposing restrictions on cashing government checks;

(6)     requiring compliance with California minimum wage laws and regulations;

(7)     requiring creation of money damage remedies for injuries to persons and property sustained in ways and places unrelated to class III Gaming Activities;

(8)     requiring the Tribe to withhold State income taxes from the wages of all gaming operation employees except tribal members residing on-Reservation;

(9)     requiring tribal enactment and maintenance of a new, State-imposed proposed Tribal Labor Relations Ordinance about which the State has been unwilling to negotiate for the past three years, despite judicial affirmation of NLRB's assertion of jurisdiction under the National Labor Relations Act, thus eliminating the need for either the Tribe's existing TLRO or the State's proposed replacement that would subject the Tribe to a labor-management relations regime unlike that applicable to any other California employer subject to the NLRB's jurisdiction;

(10)     requiring compliance with state court non-support orders;

(11)     failing to offer meaningful consideration in the event that the Tribe were to lose its exclusive right to offer the class III Gaming Activities authorized by Article IV, § 19(f) of the California Constitution;

(12)     imposing taxes, fees or assessments that are not directly related to the regulation or operation of Class III Gaming Activities, and thus constitute taxes unauthorized by IGRA;

(13)     proposing payments into the Indian Gaming Revenue Sharing Trust Fund that constitute an impermissible tax, fee or assessment to the extent that the State proposes to use such payments for purposes that are not directly related to the regulation or operation of class III Gaming Activities; and

(14)     defining "Gaming Employees" as including persons having no involvement in or duties regarding the actual operation of Gaming Activities.

Report of George Forman
July 27, 2020
Page 7

      Contrary to Mr. Hart's assertion that, "Litigation has generally resolved the most contentious issues, leaving a good deal of compact negotiation controlled by standard language and more limited tribe-specific issues[,]" the fact is that only one of the fourteen provisions listed above – requiring enactment of a new Tribal Labor Relations Ordinance that subjects Tribes to a less favorable labor-management relations regime than applies to any other California employer subject to the jurisdiction of the National Labor Relations Board – has been the subject of appellate review, and then under fundamentally different legal circumstances than exist today.[4]

      Mr. Hart's opinion that California compact negotiations have become more streamlined and less impassioned ignores the following facts: 1) approximately thirty Tribes still have not agreed to replace their 1999 Compacts with new compacts, and either still are negotiating for new Compacts after five years, as in the case of the CTSC, or have sued – or are about to sue – the State for failing to negotiate in good faith; 2) the Rincon Band, which Mr. Hart has represented, is operating under Secretarial Procedures in lieu of a compact, and yet for many months – if not actually for more than a year – has been engaged in dispute resolution with the State about whether the State can justify its claimed regulatory costs; 3) since the Rincon Band obtained its Secretarial Procedures, two other California Tribes have obtained Secretarial Procedures through federal court judgments that the State had failed in good faith to enter into compacts;[5] and 4) the Rincon Band's Chairman, who also is the Chairman of the California Nations Indian Gaming Association, has for the past several years continued to urge Tribes to resist the State's over-reaching in compact negotiations.

      Based on the foregoing facts, as well as my experience representing Tribes that have participated in the CTSC for the past five years and more, my opinion is that California compact negotiations neither are streamlined nor less impassioned for any Tribe that is more committed to protecting its sovereignty and thus resisting the State's intrusion into its internal affairs beyond

---

    [4] When the State insisted that the 1999 Compact contain provisions acceptable to the State protecting the organizational and representational rights of certain categories of casino and related facility employees, the NLRB had not asserted jurisdiction over tribal casinos. The Ninth Circuit upheld the State's right to insist on this provision because, "The TLRO provides only modest organizing rights to tribal gaming employees and contains several provisions protective of tribal sovereignty. Further, the UTCSC, of which Coyote Valley was a member, met with union representatives and participated in the shaping of the TLRO. Finally, all compacting tribes in California have adopted it. Under these circumstances, and in light of the concessions granted by the State to the tribes, we hold that the State did not act in bad faith by requiring that Coyote Valley do the same." *In re Indian Gaming Related Cases*, 331 F3d 1094, 1116-17 (9th Cir 2003). The State's new proposed TLRO was not negotiated between the Tribes and organized labor, nor has it even been negotiated between Tribes and the State. The fact that tribal casino employees now are protected by the National Labor Relations Act, coupled with the absence of new State concessions on issues about which the State is not otherwise obligated to negotiate in good faith, calls the continued validity of the Ninth Circuit's previous decision into serious doubt.

    [5] The Big Lagoon Rancheria has been in negotiations and/or litigation with the State of California for more than ten years in an effort to obtain a class III gaming compact. In a July 27, 2020 search of the websites of the California Gambling Control Commission, the Bureau of Indian Affairs and the National Indian Gaming Commission, I could find neither a Compact that is in effect, nor class III Secretarial Procedures for Big Lagoon, notwithstanding that Big Lagoon won a lawsuit against the State in 2015.

Report of George Forman
July 27, 2020
Page 8

what IGRA authorizes to be included in a compact, than to acquiescing in the State's over-reaching for the sake of expedience.  Indeed, in my opinion the converse is true, because the State's adamant insistence on including in compacts provisions that not only are not proper subjects of negotiation under IGRA, but also are demeaning and disrespectful of the competence and integrity Tribes have demonstrated over the past twenty years, has stiffened tribal resistance to the point that numerous Tribes now are prepared to litigate with the State despite the State's history of vigorously opposing tribal lawsuits, often with scorched-earth tactics,[6] inevitably making such litigation costly and time-consuming.

## III.  UNDERESTIMATION OF TIME AND FEES FOR COMPACT NEGOTIATION

In his July 13, 2020 Report, Mr. Hart estimates, based on his limited experience negotiating compacts in California, that negotiating a compact should take only a few months, with an anticipated cost ranging between $100,000 and $150,000, but not exceeding $200,000. That estimate may be valid if the negotiating Tribe goes into the negotiations prepared to accept what the State has obtained in concessions from other Tribes, particularly on issues that arguably are not proper subjects of negotiation under IGRA, but in my experience, if a Tribe is unwilling to accept the State's terms, the Tribe must be prepared to engage in protracted negotiations over a span of years, followed by litigation that the State will resist by every available means.

In my experience, attorneys representing Tribes in California bill at widely varying rates, and in differing ways.  I am personally aware that one prominent California attorney who has represented several different California Tribes, whether with a successful casino or hoping to build a casino, whose fees included a percentage of the Tribe's gaming revenues.  I am personally aware that some attorneys charge what might appear to be a low hourly rate, but use a variety of means to substantially raise their effective rates by, *e.g.*, billing in increments of fifteen minutes, rather than six minutes, and charging separately for items such as support staff time, utility costs outside of normal business hours, marking up computerized legal research fees and copying costs, and other overhead items.

In his July 13, 2020 Report, Mr. Hart opines that the fee arrangement between Williams & Cochrane and the Quechan Tribe was both unusual and excessive.  I disagree with Mr. Hart for several reasons: 1) the Quechan Tribe was seeking to obtain relief of great value; 2) the negotiations likely would be protracted and contentious; 3) protracted and contentious litigation appeared likely if no agreement could be reached; 4) this was not an ordinary compact negotiation, but a compact dispute in which the Tribe had stopped making revenue sharing payments months before Williams & Cochrane had been retained, and both the stakes and the Tribe's potential liability were quite high; and 5) the potential impact on a small firm's cash flow and profitability of committing such a potentially large percentage of the firm's time and

---

[6] In *Cachil Dehe*, the State attempted to introduce into the record a letter that one of the State's attorneys declared under penalty of perjury had only recently been discovered. In fact, the letter had been produced to the State in other then-recent litigation, and actually had been in the State's possession for ten years preceding the State's attempt to introduce it.

Report of George Forman
July 27, 2020
Page 9

resources to pursuing the objectives of a single major client.[7]

For these reasons, I cannot agree with Mr. Hart's opinion that the fee agreement was excessive, particularly given that Mr. Hart apparently has reviewed relatively few documents generated or received by Williams & Cochrane in the course of representing Quechan, thus has no factual basis upon which to question whether the work actually performed by Williams & Cochrane justified what Quechan agreed to pay them. Moreover, under a true retainer agreement such as that between Williams & Cochrane and Quechan, Williams & Cochrane need not have accounted for how all of their time was spent.

Finally, Mr. Hart's July 13, 2020 Report goes on at considerable length about federal statutes, Department of the Interior regulations, and policies of the Bureau of Indian Affairs regarding review and approval of contracts between Tribes and attorneys. Having been repealed or superseded, those statutes, regulations and policies no longer are relevant. Had Congress intended that modern gaming-related contracts between attorneys and Tribes be subject to BIA review, approval, and/or substantive standards, Congress would have included those in IGRA, much as it did for gaming management contracts and agreements collateral to such contracts. It did not, entrusting modern Tribes to make their own informed decisions about their legal representation. Further, although Mr. Hart's July 13, 2020 Report also delves into issues related to his ethical concerns and employment contracts, I will refrain from commenting on those issues because my only experience with Mr. Hart is regarding matters pertaining generally to Indian law.

## IV.  SUPPLEMENT TO MY JULY 13, 2020 INITIAL REPORT

I reviewed the following documents from this case in connection with the preparation of my July 13, 2020 Initial Report and this Rebuttal Report:

1. Portions of the Fourth Amended Complaint, including Exhibits 6, 7, 12, 19 and 20;
2. Williams & Cochrane's Designation of Experts;
3. Williams & Cochrane's Designation of Rebuttal Experts;
4. Magistrate Judge Berg's Protective Order;
5. Expert Report of Steven Hart dated July 13, 2020;
6. Portions of the Quechan Tribe's Objections and Responses to Williams & Cochrane's First Set of Requests for Production.

Respectfully submitted,

George Forman

---

[7] I understand that despite the fee agreement, a period of at least several months elapsed during which Quechan made no payments at all to Williams & Cochrane. In my experience, such an interruption in revenues can be extremely damaging, because a small firm with limited personnel necessarily must limit the number of clients and matters it takes on.