EXHIBIT 4

Expert Report of Anthony Miranda

Prepared for Williams & Cochrane LLP

In the Matter Entitled,

*Williams & Cochrane LLP v. Quechan, et al.*

Case. No. 17-01436 GPC

United States District Court for the Southern District of California

July 13, 2020

Ex 4
P0041

I, Anthony Miranda, am a non-legal expert on tribal gaming in California. I have been retained by Williams & Cochrane LLP to serve as an expert witness in this matter. I have been asked to opine on an advertising statement by attorney Robert Rosette, the truth or falsity of the statement, whether the statement would be significant in a tribal leader's hiring decision, and if false, whether the statement would be likely to mislead. I was also asked to opine on my perceptions of the State of California's historical conduct in Tribal-State gaming compact negotiations with tribes pursuant to the Indian Gaming Regulatory Act and apply those perceptions to certain events described in the Fourth Amended Complaint in this matter and in documents provided to me from Williams & Cochrane LLP.

I.  Experience and Qualifications Relevant to Tribal Gaming, Compact Negotiations, and Tribal Governance

I am an enrolled member of the federally-recognized Pechanga Band of Luiseno Mission Indians ("Pechanga" or "Tribe"). Pechanga is a politically influential tribe located in Temecula, California that now operates the largest casino resort on the west coast of the United States, as will be explained below. In my mid-20s in approximately 1989, I began my service to the Tribe's gaming efforts as a volunteer on the Pechanga Economic Development Committee ("EDC"). Over the next 2 and a half years or so, I negotiated with Grand Casinos, a casino operation company that was later acquired by Park Place Entertainment which was ultimately renamed as Caesars Entertainment, and numerous other gaming investors and developers in an effort to start a gaming operation for Pechanga. Continuing in that endeavor, I became Chairman of the Pechanga Development Corporation ("PDC") on or about 1992. The PDC was the corporate entity established by the Tribe to pursue gaming development. During my tenure on the EDC and PDC, I assisted in the following projects and activities to start Pechanga's gaming operation: negotiated a joint venture with Grand Casinos; negotiated a

management contract between the joint venture and Grand Casino; extricated the Tribe from aforesaid management contract with zero liability when the parties parted ways; negotiated a consulting agreement which, to my knowledge, was the first tribal gaming consulting agreement approved by the National Indian Gaming Commission ("NIGC"); and, on Mother's Day of 1995, obtained tribal approval to develop and open within 45 days the Tribe's first gaming operation consisting of 200 slot machines and table games.

On July 4, 1995, I delivered on my promise by opening the Tribe's first gaming facility as described above, which was accomplished in part through my own funds and my own guarantee for personal liability of over $1 million dollars. The casino was tremendously successful. Throughout the ensuing 11 years, I continued developing the Tribe's casino, serving on the PDC as its Chairman for three terms and serving as several of the other officers on the PDC for one term due to a rotating requirement for each of the four offices. I ultimately resigned from the PDC in 2006. During my tenure, the Pechanga Casino became the phenomenal success that it is today as the largest gaming facility on the west coast. By 2003, Pechanga Casino was operating over 4,000 electronic gaming positions including video lottery terminals and multi-player stations.

Along with the development and operation of Pechanga Casino, I also served as the Chair of the California Nations Indian Gaming Association ("CNIGA") from approximately 2003 to 2009. CNIGA is an association of 34 tribes in California, and the largest association of tribal governments dedicated to the protection of the inherent right to have gaming on tribal lands. I also served as Chair of CNIGA's Technical Standards Committee from approximately 1995 to 2000. As such, I assisted in the development of the Pala Device, a paper pull tab device designed to simulate the play of a Class III slot machine but operate as a Class II device under

the Indian Gaming Regulatory Act ("IGRA"). This device is still in operation in Washington State. I also created a road map for Class II Gaming under IGRA and then assisted in the development of the NIGC regulations for Class II gaming.

During the same time period in which I served on the PDC and CNIGA, I participated in Tribal-State relations with respect to gaming and gaming compacts in several capacities. In chronological order, First, I acted as an observer (responsible for dissemination of information to other tribes) to the negotiations between the Pala Band of Mission Indians and Governor Pete Wilson on behalf of the State of California, which resulted in the signing of the much-reviled Pala Compact on April 25, 1998. Then, on behalf of the PDC, I worked on the passage of Proposition 5, also called the Tribal-State Gaming Compacts Initiative, which provided for the terms of a mandatory gaming compact between the State and Tribes. It appeared on the November 3, 1998 election ballot in California as an initiated state statute and was approved with 62.4% of voters in favor. I traveled around the State participating in public debates in support of Prop 5. Of course, Prop 5 was largely overturned by the California Supreme Court in a legal challenge the following year, and its decision to hear the underlying petition resulted in tribes initiating compact negotiations with Governor Gray Davis in 1999. I was present at the 1999 compact negotiation sessions on behalf of Pechanga and witnessed the events leading to the resulting form compact in September 1999. I also was involved in compact negotiations with Governor Schwarzenegger on behalf of Pechanga that concluded in August of 2006. During the Schwarzenegger administration, I also assisted in negotiating a peace agreement between tribes and cardrooms and horse racing tracks, and the State was involved in these discussions in connection with the Horse Racing Board. In addition, my involvement in leading CNIGA meant that I was tasked with being familiar with the general status

of most compact negotiations and negotiated compacts affecting the tribal gaming landscape in the State. From approximately 2000 to 2009, I also served on the CNIGA Tradeshow Committee and worked with the Tradeshow vendors leading up to the annual CNIGA Tradeshow. After I left office at CNIGA, I continued to attend and participate in CNIGA meetings and events.

From approximately 2006 to 2009, I worked as a casino development consultant with Penta Building Group, a nationally recognized general contractor with vast expertise in many market segments including tribal gaming. Part of my duties included developing and maintaining a matrix showing what tribes were doing on the gaming front, including tracking casinos, compacts and compact negotiations, land into trust applications, timelines for casino development, etc., so that Penta could identify and foresee any casino construction opportunities.

Although I retired from tribal gaming in an official capacity after I left Penta, I still regularly attend the major gaming conferences in the United States, such as those put on by CNIGA, the National Indian Gaming Association ("NIGA"), and the American Gaming Association's Global Gaming Expo ("G2E"), and have spoken as a panelist at such events several times. In light of my history in tribal gaming in California, I maintain a large network of contacts and keep abreast of developments that impact tribal gaming in the State including gaming compacts. As a result, I was generally familiar with the *Pauma v. California* litigation in which the State was required to pay the Pauma Band of Mission Indians approximately $36 million in restitution resulting from the State's misrepresentation regarding the size of the license pool of the 1999 compacts. I also met Cheryl Williams in approximately 2011 at the annual NIGA conference and kept in touch with her to follow the *Pauma* litigation to its ultimate successful result in 2016.

II. Materials Reviewed and Rate Charged for Expert Witness Work

I reviewed a printout from the Rosette law firm's website attached hereto as Exhibit 1. Although I was already familiar with the case, I reviewed the *Pauma v. California* case docket sheet attached hereto as Exhibit 2. I also reviewed the Ninth Circuit opinion from the *Pauma v. California* case, attached hereto as Exhibit 3. I reviewed portions of the Fourth Amended Complaint in this action as well as Exhibits 4, 6, 9, 12, 19, and 20 thereto. My rate for expert witness work is $350 per hour. I have not previously testified as an expert witness nor been disclosed as such in other litigation matters.

III. Opinions Formed in this Matter regarding *Pauma v. California*

The *Pauma v. California* case is and was very important to California tribes and tribal leaders. It was a game changer in that it was the first time that the State of California was held accountable for its bad faith conduct in compact negotiations with a tribe in an actual dollar amount, and an incredibly sizable amount at that. It was the first time that the State had to refund compact payments that it had overcharged a tribe for the right to operate slot machines. The case also provided much needed leverage in compact negotiations with the State. For the first time, the State now had a result to be feared if it took advantage of a Tribe in bad faith; rather than merely being sent back to the negotiation table as the preliminary remedy for a violation of the State's duty to act in good faith under IGRA provides.

Mr. Rosette advertised on his website as follows:

> Mr. Rosette also successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 million in compact

payments allegedly owed to the State of California against then Governor Schwarzenegger.

This statement is false based on my general knowledge of the *Pauma* case which was further supported by my review of the materials cited in Section II. Even assuming Mr. Rosette performed substantial work on the case while Ms. Williams and Mr. Cochrane were still employed at Rosette LLP (and I doubt that), the Rosette firm was terminated from the case early on in June 2010 and the case was then litigated to its final conclusion in 2016 when the Supreme Court denied the State's petition for review.

However, I am far more informed as to compact issues and developments than the average tribal member or tribal leader in California. Most tribal leaders in California do not have advanced degrees or extensive education. They would be highly likely to accept at face value a statement on an attorney's website without attempting to independently verify the statement, in part because as non-legal lay people they would not know how to go about doing so. But more importantly, the general public has some awareness that attorneys are bound by a certain standard of professionalism and ethics and would not likely subject themselves to liability for publicly taking credit for another attorney's work. And given the importance of the *Pauma* case, the statement on Mr. Rosette's website would likely be an important factor in a hiring decision for a tribe such as Quechan that, like Pauma, had a Schwarzenegger-era compact requiring onerously high compact payments procured through the State's misrepresentations regarding the number of slot machine licenses available from the license pool of the 1999 compacts.

IV.   Opinions Formed in this Matter Regarding Compact Negotiations

Although the gubernatorial administrations have changed over the years since I was an observer of the Pala Compact negotiations, there remain many constants in compact negotiations with the State. For example, Sara Drake, an attorney at the

California Department of Justice, has been present since those Pala-Wilson negotiations and largely believed (by myself as well) to be the legal strategist behind the State's compact strategy from Governor Wilson to the present. There is a pattern and sameness to the State's compact negotiations. For starters, the State will usually present an initial draft to the tribe that will be largely based on a template from other recent compacts (although its initial 2016 draft to Quechan was unique at the time; for example, it lacked non-regulatory revenue sharing payments for slot machines). From there, the State will usually take a hardline stance on changing major terms unless the tribe can find some hook or leverage to force the State to reconsider. Once a draft compact is offered by the State, it would generally be considered bad faith under the IGRA standard for the State to retract the offer or substantially deviate from it without providing some concession in return. The State is savvy enough to understand this, especially since it has been negotiating compacts (largely through Sara Drake) for a quarter century now. Of course, the State (and Sara Drake) would certainly retract a term or concession if it saw an advantageous opening in which it could do so without being sued by the tribe for bad faith negotiation under IGRA. This would be the case where the State is dealing with an attorney who is very conciliatory towards the State and does not threaten litigation or otherwise take a hardline stance on behalf of the Tribe, and thus the State sees little threat of being sued by the Tribe in connection with the negotiations. Another perceived weakness or "opening" would be a change in counsel during the negotiations in which a hard-bargaining attorney was replaced by a more conciliatory attorney, which I believe is why Quechan's final 2017 compact requires repayment of prior overdue compact payments although none of the drafts exchanged between Williams & Cochrane LLP and the State contained any such term. Moreover, a change in counsel deep into the negotiations, such as after the parties are close to a deal or during the last months of the legislative

session in which the tribe hopes to have a compact executed, is extremely rare. Compact negotiations involve tens if not hundreds of millions of dollars, and most tribal leaders are keenly aware of this fact and would therefore avoid a late change in counsel, which would provide the State with an advantage in dealing with a new attorney who was not present at any of the prior negotiation sessions. Accordingly, changing counsel late in the game would only make sense if tribal leaders thought a deal with the State was essentially in final form or nearly complete and the new attorney somehow led them to believe that the benefits outweighed the risks.

I declare under penalty of perjury that the foregoing is true and correct to the best of my recollection and I would competently testify thereto if called to do so.

July 13, 2020

Anthony Miranda