UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAMS & COCHRANE, LLP,<br><br>               Plaintiff,<br><br>v.<br><br>ROBERT ROSETTE, et al.,<br><br>               Defendants. | Case No.:  17-CV-1436-RSH-DEB<br><br>**ORDER (1) PARTIALLY GRANTING AND PARTIALLY DENYING MOTIONS FOR SUMMARY JUDGMENT BY QUECHAN TRIBE AND BY WILLIAMS AND COCHRANE AGAINST QUECHAN TRIBE; (2) DENYING MOTION FOR SUMMARY JUDGMENT BY WILLIAMS & COCHRANE AGAINST ROSETTE DEFENDANTS; (3) GRANTING MOTION FOR SUMMARY JUDGMENT BY ROSETTE DEFENDANTS; AND (4) DENYING AS MOOT MOTIONS TO EXCLUDE AND STRIKE**<br><br>**[ECF Nos. 322, 328, 329, 330, 332, 336]** |

This Order addresses six motions: (1) a motion for summary judgment filed by Defendant Quechan Tribe of the Fort Yuma Indian Reservation (the "Quechan Tribe") (the "Quechan Motion"), ECF No. 329; (2) a summary judgment motion filed by Plaintiff

Williams & Cochrane, LLP ("W&C" or "Plaintiff") against the Quechan Tribe (the "W&C Motion against the Quechan Tribe"), ECF No. 330; (3) a motion for summary judgment filed by Defendants Robert Rosette ("Rosette"); Rosette & Associates, PC; and Rosette, LLP (collectively, the "Rosette Defendants") (the "Rosette Motion"), ECF No. 322; (4) a motion for summary judgment filed by W&C against the Rosette Defendants (the "W&C Motion against the Rosette Defendants"), ECF No. 328; (5) the Rosette Defendants' motion to exclude expert declarations that W&C filed in connection with its summary judgment briefing, ECF No. 332; and (6) W&C's motion to strike the Rosette Defendants' aforementioned motion to exclude, ECF No. 336. After outlining the facts and procedural history, the Court will address the Quechan Motion and W&C Motion against the Quechan Tribe [(1) through (2)], the Rosette Motion and W&C Motion against the Rosette Defendants, [(3) and (4)], and finally the motions to exclude and strike [(5) and (6)].

This case arises out of an attorney-client relationship between W&C as attorneys and the Quechan Tribe as client. The representation began in September 2016, and involved work on negotiating a new gaming compact with the State of California. In June 2017, the Quechan Tribe fired W&C and hired a new law firm, the Rosette Defendants, which completed the negotiations with the State at a lower cost to the Quechan Tribe.

W&C sued its former client, seeking unpaid attorney's fees, and the Quechan Tribe brought counterclaims against W&C. W&C also sued the replacement law firm, the Rosette Defendants, alleging that the Rosette Defendants had overstated Rosette's past accomplishments, as contained within a single sentence in Rosette's web biography.

As set forth below, as to W&C's claims against the Quechan Tribe, the Court denies summary judgment to both sides on W&C's claim for breach of contract, and grants summary judgment to the Quechan Tribe on W&C's claim for breach of implied covenant. As to the Quechan Tribe's counterclaims against W&C, the Court grants summary judgment to W&C on the Quechan Tribe's counterclaims for breach of fiduciary duty and breach of implied covenant, and denies summary judgment to W&C on the Quechan Tribe's counterclaims for negligence and breach of contract. As to W&C's claim against

the Rosette Defendants under the Lanham Act—the sole federal claim in this case—the Court grants summary judgment to the Rosette Defendants and denies summary judgment to W&C.

## I.    FACTS

The law firms that are parties to this lawsuit—Plaintiff W&C and the Rosette Defendants—have a history together. Several years ago, Cheryl Williams ("Williams") and Kevin Cochrane ("Cochrane") worked as associates for Rosette, LLP (formerly known as Rosette & Associates, PC). ECF Nos. 322-3 ¶ 15; 321-15 at 34:22-24; 321-16 at 25:6-14; 52-2 ¶ 4.[1] Rosette, the firm's founder, along with Williams and Cochrane, worked together to bring a lawsuit against the State of California on behalf of the Pauma Band of Luiseño Mission Indians (the "Pauma Band") based on overpayments the Pauma Band had made under its gaming compact (the "Pauma Litigation"). ECF No. 220, Fourth Amended Complaint ("4AC"), ¶ 119; ECF Nos. 322-3 ¶¶ 10, 13; 349-2 ¶ 20. In the midst of the Pauma Litigation, Williams and Cochrane left Rosette's firm to start their own firm, Plaintiff W&C. 4AC ¶ 28; ECF No. 321-16 at 101:21-102:1. The Pauma Band terminated Rosette's firm and hired W&C instead. 4AC ¶ 32; ECF Nos. 328-12 at 4. The Pauma Band was highly successful in that lawsuit.[2]

### A.    The Quechan Tribe Retains W&C

In 1999, the Quechan Tribe entered into its own gaming compact with the State of California. ECF No. 335. This compact was amended in June 2006 (the "2006

---

[1]    This Order cites pleadings and declarations by paragraph number, cites the Parties' briefs by the page numbers contained in the briefs, cites deposition transcripts by page and line number, and cites other exhibits with reference to the court-stamped (*i.e.*, ECF) page number at the top of each page.

[2]    In the Pauma Litigation, the district court ordered the State of California to refund approximately $36.2 million that the Pauma Band had overpaid in excess revenue sharing fees under an amended gaming compact. *Pauma Band of Luiseno Mission Indians of Pauma & Yuma Rsrv. v. California*, No. 3:09-cv-1955 (S.D. Cal. Dec. 2, 2013), at ECF

Amendment"). ECF No. 328-22. The 2006 Amendment required the Quechan Tribe to pay additional revenue sharing fees. ECF Nos. 325 at 3-4; 349-4 ¶ 3. On September 29, 2016, the Quechan Tribe hired W&C, along with its two founding partners, Williams and Cochrane, for legal advice on reducing those compact payments. ECF Nos. 328-20 ¶ 2; 328-21.

The Attorney-Client Fee Agreement between the Quechan Tribe and W&C (the "Fee Agreement") had three different fee provisions: a monthly flat fee, a contingency fee, and—as an alternative to the contingency fee—a "reasonable fee" for services provided. ECF No. 329-7 ¶¶ 4, 5, 11.

Paragraph 4 of the Fee Agreement required the Quechan Tribe to pay a flat fee of $50,000 per month, without regard to the work performed or results obtained:

> 4.     MONTHLY FLAT FEE
>
> Client agrees to pay a flat fee of $50,000 per month for Firm's services under this Agreement. This fee is fixed and does not depend on the amount of work performed or the results obtained. Client acknowledges that this fee is negotiated and is not set by law. The fee shall be paid by Client by the last day of each month . . . If either party terminates the representation before Firm has provided all legal services described in this Agreement, Client may be entitled to a refund or reduction of all or part of the flat fee for the current month based on a pro-rated daily fee (*i.e.*, $50,000 divided by the number of days in the month equals daily fee) . . .

*Id*. ¶ 4.

Paragraph 5 of the Fee Agreement provided for a contingency fee additional to the monthly flat fee. The fee was to be calculated at 15% of a base amount referred to as a "net recovery," which referred to amounts that the Quechan Tribe might receive, in the form of

---

No. 245. W&C and the Rosette Defendants dispute who personally developed the legal strategy for the *Pauma* action and whether the Rosette Defendants successfully litigated that case. *See* ECF Nos. 322-3 ¶ 13; 349-2 ¶ 20; 322-1 at 14-20; 328-1 at 8-11.

a credit, offset, or reduction in future compact payments "as a result of the excess payments" it had made under the 2006 Amendment:

> 5.    CONTINGENCY FEE
>
> Client agrees to pay Firm an additional contingency fee in the event Client receives a monetary award or other sum resulting from the representation . . . The contingency fee will be a percentage of the "net recovery," depending on the stage at which the settlement or judgment is reached. The term "net recovery" means the total of all amounts received by settlement, court award or judgment, including but not limited to any award of pre- or post-judgment interest or attorney's fees. In the event Client's matter is resolved via negotiation or settlement, the term "net recovery" shall include any credit, offset or other reduction in future compact payments to the State in a successor compact (whether new or amended) as a result of the excess payments made under [the 2006 Amendment] in lieu of or in addition to a monetary "net recovery." Whether resolved through negotiation, settlement, or legal action, the contingency percentages . . . shall be calculated by totaling the amounts Client receives — both monetary and/or as a credit, offset, or other reduction in future compact payments — for the excess payments it made under [the 2006 Amendment] . . . Firm's contingency fee will be calculated as follows if the representation matter is resolved through settlement or negotiations:
>
> (a) If the matter is resolved before the filing of a lawsuit or within 12 months thereof, then Firm's contingency fee will be fifteen percent (15%) of the net recovery.
>
> [ . . . ]
>
> (c) For purposes of subsection (a) alone, the matter is resolved at the point in time that the Client signs a successor compact (whether new or amended), which subsequently obtains the requisite State and federal approvals and takes effect under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq.

*Id*. ¶ 4.

Before the Quechan Tribe executed the Fee Agreement, Williams in an email of September 16, 2016 explained to the Tribal Council the scope of the contingency fee arrangement, distinguishing between reductions in future compact payments (i) offered by the State of California for past excess payments made under the 2006 Amendment, to

which the contingency fee would apply; and (ii) those offered "during the normal give and take of negotiating . . . to end the dispute without court directives," to which the contingency fee would not apply:

> To be clear, the contingency amount will only apply to the actual value Quechan receives for the excess payments the Tribe made to the State of California under [2006 Amendment] . . . [I]f Quechan decides [] to pursue settlement now or at any point in the future, the contingency rate would only apply to any revenue sharing rate reduction the Tribe receives as a credit or reimbursement of sorts for its past excess payments, and not any standard (albeit slight) reduction the State offers during the normal give and take of negotiating in an attempt to end the dispute without court directives.

ECF No. 327-3 at 3.

Paragraph 11 of the Fee Agreement authorized the Quechan Tribe to terminate W&C at will. It provided, however, that if the Quechan Tribe terminated W&C before W&C became entitled to a contingency fee under Paragraph 5, W&C would instead be entitled to a "reasonable fee" for legal services performed. Paragraph 11 also listed ten factors that would be used to determine the amount of such a "reasonable fee":

> 11. DISCHARGE AND WITHDRAWAL
>
> Client may discharge Firm at any time. Firm may withdraw with Client's consent or for good cause or if permitted under the Rules of Professional Conduct of the State Bar of California and/or applicable law . . . Notwithstanding the discharge, Client will remain obligated to pay Firm at the agreed rates for all services provided and to reimburse Firm for all costs advanced.
>
> In the event of Firm's discharge, or withdrawal with justifiable cause, prior to the issuance of a court order granting a monetary award in Client's favor or before Client otherwise becomes entitled to any other monetary amount constituting the "net recovery" as described in paragraph 5 of this Agreement, Client agrees that Firm will be entitled to be paid by Client a reasonable fee for the legal services provided in lieu of the contingency fee set forth in paragraph 5 of this Agreement. Such fee will be determined by considering the following factors:
>
> (1) The amount of the fee in proportion to the value of the services performed;

(2) The relative sophistication of the Firm and the Client;

(3) The novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly;

(4) The likelihood, if apparent to the Client, that the acceptance of the particular employment will preclude other employment by the Firm;

(5) The amount involved and the results obtained;

(6) The time limitations imposed by the Client or by the circumstances;

(7) The nature and length of the professional relationship with the Client;

(8) The experience, reputation, and ability of the Attorney;

(9) The time and labor required;

(10) The informed consent of the Client to the fee.

ECF No. 329-7 ¶ 11.

Paragraph 12 of the Fee Agreement provided that the Quechan Tribe "may have access to Client's case file upon request at any reasonable time." *Id*. ¶ 12. The "case file includes Client papers and property as defined in Rule 3-700(D)(1) of the California Rules of Professional Conduct." *Id*.

On October 12, 2016, W&C, acting on behalf of the Quechan Tribe, formally requested that the State of California begin dispute resolution proceedings with the Quechan Tribe and negotiate the Tribe's gaming compact. ECF No. 328-23. On December 7, 2016, the Office of the Governor sent W&C a new draft compact that purported to reduce the Quechan Tribe's payment obligations by approximately $4 million annually. ECF Nos. 328-26 at 4; 328-27. By June 2017, W&C believed that negotiations were nearing a conclusion. ECF No. 328-41 at 2.

### B.   The Quechan Tribe's Dissatisfaction With W&C's Work and Fees

Months into the representation, the Tribal Council began having concerns about W&C's work and its cost. Shortly after being sworn in in March 2017, the new President of the Tribal Council, Keeny Escalanti, "developed concerns about the ongoing expenses W&C was charging the Tribe for what did not appear to be much work, and the length of

time it was taking W&C to complete its contract negotiations with the State of California." ECF No. 322-4 ¶ 4. Another member of the Tribal Council, Mark White, developed the same concerns. ECF No. 322-5 ¶ 4. Both described the Tribal Council as "unhappy" with W&C's work and "concerned" about W&C's fees in relation to that work. ECF Nos. 322-4 ¶ 5; 322-5 ¶ 5.

On April 5, 2017, Quechan Tribe Vice President Michael Jack expressed concern to Williams by email that the Tribe might have to pay $13 million dollars in contingency fees on top of W&C's monthly flat rate of $50,000. ECF Nos. 322-28 at 3; 328-20 ¶¶ 4-5; 322-31 at 2. To allay these concerns, on April 14, 2017, Williams emailed Jack, explaining that the contingency fee applied only to reductions provided by the state "on account of the heightened payments," and therefore "the maximum amount" of the contingency fee would be fifteen percent of the Tribe's overpayments during the lifetime of the 2006 Amendment. ECF No. 327-4 at 2. While Williams "d[id] not have the exact figures in front of [her]," she approximated a maximum contingency fee of $5.8 million, noting that "[t]here is simply no way the fee could reach $13 million." *Id.*

On April 13, 2017, more than four months after the State had sent its original draft compact, W&C sent the State its "first set of proposed redlines." ECF Nos. 328-26; 322-29 at 2; 322-30.

On April 27, 2017, White emailed an attorney named Wilson Pipestem to analyze "the extent of [the Quechan Tribe's] obligation in terms of the agreement between our Tribe and [W&C]." ECF No. 328-51 at 2. White shared with Mr. Pipestem his "findings . . . that the firm has not provided services adequate of the level [of] compensation, [and] that the Tribe as a whole was under duress at the time of signing this agreement." *Id.*

In an email of June 9, 2017, Williams again discussed with the Tribe the contingency fee, emphasizing that "the fifteen percent only applies to the savings under the new compact that result from the past payments under the 2006 Amendment." ECF No. 327-6 at 2. She approximated the contingency to be $5.88 million, but indicated she could

"provide an exact calculation of the precise amount once the flurry of negotiations are over and we are able to shift some of our attention to these issues." *Id*.

Also in June 2017, W&C recommended that the Quechan Tribe retain a lobbyist for $14,000 for the first month and $5,000 for each month thereafter, ECF Nos. 321-10 at 2-3, which Escalanti and White found "unexpected and troubling." ECF Nos. 29-2 ¶ 4; 29-3 ¶ 4.

### C.   The Quechan Tribe Terminates W&C And Hires The Rosette Defendants

In light of its concerns, the Quechan Tribe decided to fire W&C and hire the Rosette Defendants. Rosette's introduction to the Quechan Tribe did not come through W&C, or through Rosette's work with the Pauma Band, but rather through Rosette's work with a different tribe, the Tonto Apache Tribe of Arizona (the "Tonto Apache Tribe") in its gaming compact negotiations with the State of Arizona. ECF No. 52-2 ¶¶ 6-7. Between February and May 2017, the Tonto Apache Tribe sent letters to other tribes, including the Quechan Tribe, inviting them to discuss the Arizona compact negotiations and build a coalition. ECF Nos. 322-26; 322-37; 322-28; 322-39; 52-2 ¶¶ 10-15. After meeting with Quechan Tribal leaders, Tonto Apache President and Vice Chairman Calvin Johnson suggested that those leaders meet with Rosette in Scottsdale, Arizona on June 16, 2017 (the "June 16, 2017 Meeting"). ECF Nos. 52-2 ¶¶ 9-18; 322-4 ¶ 7; 322-5 ¶ 7.

During this time, Rosette's attorney biography on his firm's website (the "Rosette Bio") included the following sentence (the "Pauma Sentence"): "**Rosette also successfully litigated a case saving the Pauma Band of Luiseño Mission Indians over $100 million in Compact payments allegedly owed to the State of California against then Governor Schwarzenegger.**" ECF Nos. 322-50 at 6; 328-12 at 3.[3]

---

[3]   After the Court denied Rosette's motion to dismiss Plaintiff's Lanham Act claim, Rosette removed the Pauma Sentence from his attorney biography. ECF No. 322-3 ¶ 28.

The June 16, 2017 Meeting took place as scheduled. The attendees were Rosette, Escalanti, and White. ECF Nos. 52-2 ¶ 19; 322-4 ¶ 7; 322-5 ¶ 7. Neither Escalanti nor White had met or talked to Rosette prior to that meeting. ECF Nos. 52-2 ¶ 19; 322-4 ¶ 7; 322-5 ¶ 7. During the meeting, the participants discussed the Tonto Apache's Tribe's desire to enlist the Quechan Tribe's support, and Rosette was also asked about his experience with compact negotiations with California. ECF Nos. 322-4 ¶ 10; 322-4 ¶ 10. At no point prior to or at that meeting did White or Escalanti review or receive the Rosette Bio. ECF Nos. 322-4 ¶ 9; 322-5 ¶ 9. During the meeting, the attendees never discussed Rosette's previous experience litigating on behalf of the Pauma Band. ECF Nos. 322-3 ¶ 35; 322-4 ¶ 11.

Immediately after the meeting, Escalanti and White returned to the Quechan reservation and relayed the conversation to the Tribal Council. ECF Nos. 322-4 ¶¶ 12-13; 322-5 ¶¶ 12-13. Escalanti and White state that "[a]t that time, the entire Tribal Council decided to invite Mr. Rosette to present to the Tribal Council because the Tribal Council was interested in replacing W&C due to the expenses the Tribe had incurred and the length of time it was taking W&C to complete negotiations with the State of California." ECF Nos. 322-4 ¶ 13, 322-5 ¶ 13. For instance, as of June 2017, W&C had not discussed with the State the issue of $4 million in compact payments the Quechan Tribe had failed to make to the State. ECF No. 321-13 at 162:22-168:11; 284:5-285:11. During this internal discussion, there was no discussion of the Rosette Bio, the Pauma Sentence, or the Pauma Litigation. ECF Nos. 322-4 ¶ 13, 322-5 ¶ 13.

On June 19, 2017, Rosette and another Rosette attorney, Richard Verri, made a presentation at a Quechan Tribal Council meeting about the legal services offered by Rosette's firm (the "June 19, 2017 Meeting"). ECF Nos. 322-3 ¶ 36; 322-4 ¶ 14; 322-5 ¶ 14. At no point prior to or at the June 19, 2017 Meeting did Escalanti or White review the Rosette Bio, and they are not aware of any other Tribal Council members reviewing it either. ECF Nos. 322-4 ¶ 15; 322-5 ¶ 15. At no point during the June 19, 2017 Meeting did

the Tribal Council discuss the Rosette Bio, the Pauma Sentence, or the Pauma Litigation. ECF Nos. 322-3 ¶ 37; 322-4 ¶ 16; 322-5 ¶ 16.

On June 26, 2017, the six-member Quechan Tribal Council unanimously voted to retain the Rosette Defendants, ECF No. 29-2 at 9-10, and terminated W&C the morning after, ECF No. 321-12 at 2. Escalanti and White explain that decision as follows:

> Because the Tribe was impressed with Mr. Rosette's experience in negotiating compacts in California, and because Rosette, LLP was willing to work . . . for approximately 20% of the monthly fees Quechan was paying to W&C without any additional contingency fee, the Tribal Council thought it was a good idea to go forward with Rosette.

> The Tribe did not hire Mr. Rosette based on his litigation experience or based on his involvement in the Pauma Litigation, since no member of the Tribal Council mentioned or discussed litigation or the Pauma Litigation. At the time the Tribal Council hired Rosette, LLP, Quechan's goal was to complete the compact negotiations with the State of California quickly in order to obtain a gaming compact by the end of the 2017 legislative session and time was running out. As of June 2017, Quechan did not wish to litigate with the State of California over its compact.

> The Tribe did not hire Mr. Rosette or Rosette, LLP based on any statement made in Mr. Rosette's attorney biography, on the Rosette, LLP website, or in Rosette, LLP's marketing materials about the Pauma Litigation.

> Prior to the filing of this lawsuit, I had never read Mr. Rosette's attorney biography. Specifically, I do not believe I was aware of any statement in any Rosette, LLP material, including its website, to the effect that "Mr. Rosette also successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 million in Compact payments allegedly owed to the State of California against then Governor Schwarzenegger." And certainly, any such statement was never a factor in our decision to retain Rosette, LLP.

ECF Nos. 322-4 ¶¶ 17-20; 322-5 ¶¶ 17-20.

## D.   After W&C's Termination

After W&C's termination, the Quechan Tribe and the Rosette Defendants requested the client file from W&C. On June 27, 2017, Rosette's firm emailed W&C seeking the

11

most recent draft of the compact "[w]hile there is a formal file request forthcoming." ECF No. 330-46. On the same day, the Quechan Tribe sent a termination letter to W&C that included that formal file request, demanding that W&C "promptly return our entire case file." ECF No. 327-7 at 4. On June 30, 2017, the Quechan Tribe sent a cease-and-desist letter to W&C demanding "that [W&C] immediately furnish all work-product belonging to the Tribe, including, but not limited to, the most recent redlined changes to the draft State-Tribal Compact, including any comments incorporated therein." ECF No. 231-2 at 2-3.

On July 3, 2017, W&C sent the Quechan Tribe and Rosette's firm the most recent draft of the compact but no other documents from W&C's case file. ECF No. 330-71. This draft had been sent to the State on June 20, 2017, less than a week before the Quechan Tribe had terminated W&C. *Id.* According to Williams, W&C had not sent this draft to the Quechan Tribe before sending it to the State, because W&C had not known whether the State would agree to the proposed changes. ECF No. 329-34.

In late August 2017, the Quechan Tribe, represented by the Rosette Defendants, and the State of California executed a new gaming compact, which "reduce[d] the Tribe's revenue sharing obligations by approximately four million dollars [] per year, and simultaneously increase[ed] the Tribe's ability to generate revenues through its Gaming Operation by providing the right to operate additional Gaming Facilities and Gaming Devices." ECF No. 329-35 at 11. The Tribe also agreed to make a discounted payment of $2 million to resolve approximately $4 million in missed payments under the 2006 Amendment. ECF No. 329-35 § 4.8; *see also* 4AC ¶ 108. There were substantive differences between the executed compact and the draft compact that W&C had sent the State on June 20, 2017. *Compare* ECF No. 329-35 §§ 5.2, 5.3 (Aug. 31, 2017 Compact) *with* ECF No. 329-30 § 5.2 (June 20, 2017 Draft Compact from W&C); *see also* 4AC ¶¶ 107-08.

12

1    The new compact took effect on January 22, 2018, 4AC ¶ 107 (citing 83 Fed. Reg.

2    3015-16 (Jan. 22, 2018)), and is effective for 25 years after that date, ECF No. 329-35 §

3    14.2(a).

4         The Tribal Council was satisfied with the Rosette Defendants' work in negotiating

5    the gaming compact for the Quechan Tribe, and has engaged Rosette, LLP as the Quechan

6    Tribe's general counsel, a position that the firm maintains to this day. ECF Nos. 322-4 ¶

7    21; 322-5 ¶ 21.

8         In January 2018, WilmerHale, the Quechan Tribe's counsel in this litigation, wrote

9    to W&C stating that "it is not clear" whether W&C turned over the entire case file to the

10   Quechan Tribe. ECF No. 231-5 at 2. WilmerHale requested that W&C transmit "all time

11   sheets or time records," "client ledger cards, bookkeeping or computer records relating to

12   the services performed by [W&C]," "all statements or bills" that W&C sent to the Quechan

13   Tribe, and "all correspondence that [W&C] sent to [the Quechan Tribe] or third parties in

14   the course of the representation." *Id*. W&C responded by questioning whether WilmerHale

15   was in fact the Tribe's counsel because W&C "h[ad] yet to see anything confirming your

16   representation of the Quechan Tribe." ECF No. 231-6 at 2. W&C also questioned whether

17   Escalanti and White, whom WilmerHale represented, had authority to act on behalf of the

18   Tribe because of a recall vote in the Quechan Tribe General Council elections. *Id*.

19   WilmerHale dismissed W&C's concerns, ECF No. 231-7, and W&C did not further

20   respond to WilmerHale's request for the case file.

21   **II.    PROCEDURAL BACKGROUND**

22        **A.    W&C's Claims Against the Rosette Defendants and the Quechan Tribe**

23        W&C filed this lawsuit on its own behalf on July 17, 2017, less than a month after

24   W&C was terminated as counsel. ECF No. 1. The initial Complaint was accompanied by

25   a motion to file the Complaint in its entirety under seal, which the Court denied, ordering

26   that the Complaint be stricken to allow W&C to make appropriate redactions and re-file.

27   ECF No. 3.

28

On September 19, 2007, W&C re-filed its Complaint, containing nine claims, with redactions. ECF No. 5. After the filing of defense motions to dismiss and to strike, W&C filed its First Amended Complaint. ECF No. 39. Relevant to the pending motions, the First Amended Complaint included claims for breach of contract, breach of implied covenant, and two Lanham Act false advertising claims: the first based on the Pauma Sentence in the Rosette Bio, and the second based on a press release on the firm's website stating that Rosette was responsible for negotiating the contract between the Quechan Tribe and the State of California. *Id*. ¶¶ 272-84. Defendants filed new motions to dismiss and to strike, along with a motion to disqualify W&C. ECF Nos. 50-53.

On June 7, 2018, the Court granted in part and denied in part the motions to dismiss, denied the motion to disqualify, and denied the motion to strike as moot. ECF No. 89. In its Order, the Court partially dismissed W&C's breach of contract claim. After noting that the Quechan Tribe "concede[d] that W&C has sufficiently pled a breach claim with respect to Section 11," the Court found that the Quechan Tribe's "failure to pay W&C the contingency fee envisioned in Section 5 of the fee agreement was not a breach of contract." *Id*. at 14-15. In so holding, the Court "[could not] agree with W&C that at the time Quechan discharged W&C, Quechan was 'entitled' – under any understanding of that term – to any of the net recovery it obtained as a result of the compact it signed with California." *Id*. at 14. Instead, there was "no question that, at the time Quechan discharged W&C as its counsel, Quechan had no legal right to any of the benefits that California had offered during the negotiations with W&C." *Id*.

With respect to W&C's implied covenant of good faith and fair dealing claim, the Court rejected the Quechan Tribe's "only argument" that the implied covenant claim was duplicative of W&C's breach of contract claim. *Id*. at 17-18. The Court found that those claims "focus[ed] on different moments in the dealings between W&C and Quechan and . . . [sought] different remedies." *Id*. at 18.

As to W&C's Lanham Act claim that was based on the Pauma Sentence in the Rosette Bio, the Court granted the motion in part and denied it in part. The Rosette

Defendants had argued, first, that other allegations in the First Amended Complaint established that Rosette had indeed participated in the Pauma litigation, such that the Pauma Sentence was not false. The Court agreed only in part:

> The Court agrees with the Rosette Defendants that the statement that Rosette was involved with, or even "litigated," the Pauma case is not actionable. However, the statements that Rosette's litigation efforts were "successful" and that they resulted in $100 million in savings for Pauma is sufficiently misleading to plead a violation of the Lanham Act. The statement that Rosette's efforts were "successful" could be misleading: according to the FAC, at the time Rosette was discharged as Pauma's counsel, Rosette had unsuccessfully opposed a motion to stay the injunction pending appeal. The assertion that Rosette's efforts saved Pauma "$100 Million" also could be misleading: Pauma had not saved anywhere near that amount of money by the time it discharged Rosette as its counsel.

*Id*. at 23-24. Second, the Rosette Defendants argued that W&C had failed to properly allege that the Pauma Sentence had caused W&C's harm. The Court disagreed with the Rosette Defendants, and ruled that causation had been properly pleaded:

> The FAC plausibly alleges that Rosette's false statement about his role in the Pauma litigation led to Quechan's decision to discharge W&C as its counsel in the compact negotiations with California. The FAC states that Pauma's success in its compact litigation was the motivation behind Quechan hiring W&C. It is thus plausible that if Quechan officials were misled by Rosette's statement discussed above, they came to believe that it was Rosette, not Williams or Cochrane, who would give them the best chance at success at their negotiations with California.

*Id*. at 24-25.

As to W&C's separate Lanham Act claim that was based on the Rosette Defendants' statement about representing the Quechan Tribe in gaming compact negotiations, the Court granted the motion to dismiss, determining that "[b]ased on the facts alleged in the FAC, nothing about the statements … are false or misleading." *Id*. at 25.

On July 20, 2018, W&C filed a Second Amended Complaint. ECF No. 100. On November 11, 2018, the Court ruled on additional motions to dismiss and to strike by

Defendants. ECF No. 172. The Order declined to rule on the Quechan Tribe's argument that W&C's implied covenant of good faith and fair dealing claim should be dismissed "because the Fee Agreement was an at-will legal services contract." *Id*. at 31. The Court ruled that that argument was untimely because the Quechan Tribe failed to make it in its previous Rule 12(b)(6) motion, but the Court left open the possibility of the Quechan Tribe raising the argument again after the close of the pleadings. *Id*. at 31-32.

On December 6, 2018, W&C filed a Third Amended Complaint. ECF No. 174. The Court thereafter granted defense motions to dismiss additional claims not relevant to the disposition of the pending summary judgment motions, and to strike certain language as irrelevant. ECF No. 217 (Order dated Sept. 10, 2019).

W&C's operative complaint is its Fourth Amended Complaint ("4AC"), filed on September 25, 2019. ECF No. 220. The 4AC contains W&C's three remaining claims: (1) breach of contract, against the Quechan Tribe; (2) breach of the implied covenant of good faith and fair dealing, against the Quechan Tribe, and (3) false advertising in violation of the Lanham Act, against the Rosette Defendants. *Id.*

## B. The Quechan Tribe's Counterclaims Against W&C

The Quechan Tribe brought the following counterclaims against W&C on June 21, 2018: (1) breach of fiduciary duty; (2) breach of the implied covenant of good faith and fair dealing; (3) negligence; (4) breach of contract, (5) unfair competition under California Business and Professions Code § 17200 *et seq*.; and (6) recoupment and/or setoff. ECF No. 94.

On June 22, 2018, W&C filed a motion to strike the Quechan Tribe's counterclaims. ECF No. 95. On August 20, 2018, the Court denied the motion to strike. ECF No. 135 at 12.

On September 4, 2018, W&C filed a motion to dismiss the Quechan Tribe's counterclaims under Rules 12(b)(1) and (6). After rejecting W&C's jurisdictional arguments, the Court denied W&C's Rule 12(b)(6) motion because W&C had failed to raise its arguments in its first Rule 12 motion. ECF No. 173.

After W&C filed the 4AC, ECF No. 220, Quechan filed an answer with the same counterclaims on October 8, 2019, which is the operative pleading for the Quechan Tribe's counterclaims. ECF No. 231. On October 22, 2019, W&C filed a Motion for Judgment on the Pleadings. ECF No. 235 at 1.

On April 22, 2020, the Court partially granted and partially denied W&C's motion for judgment on the pleadings. ECF No. 285 at 13-16. The Court summarized the Quechan Tribe's counterclaim for breach of fiduciary duty as follows:

> W&C breached its fiduciary duty by acting against the Tribe's interest while representing the tribe in negotiations with the State – namely, by failing to effectively negotiate with the State, by dragging out negotiations to continue to collect the $50,000 monthly payments, and by making false representations to the Tribe about its performance of duties.

*Id.* at 6. The Court determined that the Quechan had sufficiently alleged such a breach. *Id.* at 7. However, the Court dismissed the Quechan Tribe's unfair competition and recoupment/setoff counterclaims. *Id.* at 11-16. The Quechan Tribe's first four counterclaims remain.

## III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden by: (1) presenting evidence that negates an essential element of the nonmoving party's case; or (2) demonstrating that the nonmoving party failed to make a showing sufficient to

17

establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the movant fails to discharge this initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970). If the moving party meets this initial burden, however, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." (citing *Anderson*, 477 U.S. at 242, 252)). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## IV. THE QUECHAN MOTION AND W&C'S MOTION AGAINST THE QUECHAN TRIBE [ECF Nos. 329, 330]

W&C and the Quechan Tribe move for summary judgment on W&C's claims for breach of contract and breach of implied covenant. Both parties also seek summary judgment on the Quechan Tribe's counterclaim for breach of fiduciary duty. Only W&C moves for summary judgment on the Quechan Tribe's remaining counterclaims for breach of the implied covenant of good faith and fair dealing, negligence, and breach of contract.

### A.     W&C's Breach Of Contract Claim

To prevail on a breach of contract claim, a plaintiff must show: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiffs." *Orcilla v. Big Sur, Inc.*, 244 Cal. App. 4th 982, 1004 (Ct. App. 2016) (citing *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1388 (Ct. App. 1990)). When a plaintiff's "failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract." *Brown v. Grimes*, 192 Cal. App. 4th 265, 277 (Ct. App. 2011).

The Court previously ruled that W&C was not entitled to a contingency fee under Paragraph 5 of the Fee Agreement under a breach of contract theory. ECF No. 89 at 14. W&C claims that it is entitled to the alternative "reasonable fee" under Paragraph 11— which, in W&C's view, ought to be "at least half of the contingency fee" that would have been due under Paragraph 5 if W&C had never been fired. ECF 330-1 at 18. W&C also claims a smaller additional amount of $45,000 in unpaid prorated monthly fees under Paragraph 4. *Id.*

The Quechan Tribe claims that it does not owe W&C anything under Paragraph 11, because the Quechan Tribe's monthly payments under Paragraph 4 were already "more than ample compensation for the work [W&C] did." ECF No. 327 at 23. The Quechan Tribe faults W&C for not articulating or supporting a theory of how a "reasonable fee" should be calculated under the factors enumerated in Paragraph 11. *Id.* at 18-21. The Quechan Tribe also claims that W&C's contract claim is defeated by W&C's own breach of the Fee Agreement based on its refusal to return the client file, as well as by W&C's own breach of its fiduciary duties to the Quechan Tribe. ECF No. 346 at 17-19.

W&C's breach of contract claim is unsuitable for disposition at summary judgment, either for W&C or for the Quechan Tribe. Paragraph 11 of the Fee Agreement provides that "[i]n the event of Firm's discharge . . . before Client . . . becomes entitled to any other monetary amount constituting the 'net recovery' as described in paragraph 5 of this

Agreement, Client agrees that Firm will be entitled to … a reasonable fee for the legal services provided in lieu of the contingency fee set forth in paragraph 5 of this Agreement." ECF No. 329-7 ¶ 11. Paragraph 11 then provides that such fee "will be determined by considering" ten enumerated factors. *Id.* The Parties have not offered an analysis of these ten factors in their briefing. More importantly, the Parties have offered no legal authority that would allow the Court to substitute its own consideration of these factors and its resulting determination of a "reasonable fee" for a jury's determination. *See Children's Hosp. Cent. Cal. v. Blue Cross of Cal.*, 226 Cal. App. 4th 1260, 1275 (Ct. App. 2014) (noting that "trier of fact can determine the reasonable value of the particular services provided" in action by hospital for claim reimbursement); *Neblett v. Getty*, 20 Cal. App. 2d 65, 70 (Ct. App. 1937) ("What was the reasonable value of [attorneys'] services, if any, was a question of fact which should have been submitted to the jury . . . ."); *Watson Bowman Acme Corp. v. RGW Constr., Inc.*, 2 Cal. App. 5th 279, 295 (Ct. App. 2016) ("Under contracts where the plaintiff is entitled to no more than the reasonable value of the extra work done, that value typically is ascertained by the trier of fact after considering conflicting evidence."). There is a triable issue of material fact as to what "reasonable fee," if any, W&C has earned under Paragraph 11 beyond that which the Quechan Tribe has already paid.

There is also a triable issue of material fact as to whether W&C itself materially breached the Fee Agreement by failing to ever return the client file to the Quechan Tribe, thereby excusing any nonperformance by the Quechan Tribe. Paragraph 12 of the Fee Agreement states that the Tribe "may have access to the Client's case file upon request at any reasonable time," ECF No. 231 ¶¶ 83-90, and W&C did not comply. If W&C did breach the agreement, it would be for the jury to determine whether the Quechan Tribe's performance was excused. *Brown*, 192 Cal. App. 4th at 277 ("Normally the question of whether a breach of an obligation is a material breach, so as to excuse performance by the other party, is a question of fact."). The summary judgment motions of W&C and the Quechan Tribe as to W&C's claim for breach of contract are therefore both DENIED.

**B.     W&C's Claim For Breach Of Implied Covenant**

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 371 (1992). W&C claims that the Quechan Tribe breached this implied covenant "by meeting with Mr. Rosette to terminate [W&C] the very morning after learning the negotiations would conclude in two weeks' time." ECF No. 330-1 at 8. W&C further argues that, although the Quechan Tribe had the discretion to fire W&C at will, "Quechan wrongfully used this discretionary power to in turn deprive [W&C] of a fixed benefit under the [Fee Agreement]." ECF No. 349 at 13. The Quechan Tribe responds that the Fee Agreement not only contemplates that the Quechan Tribe could terminate W&C at will, but also addresses the compensation that would be due to W&C—the "reasonable fee" under Paragraph 11—in such a situation. ECF No. 327 at 8-10.

Here, Paragraph 11 of W&C's Fee Agreement specifically and expressly contemplates the situation that the Parties face here: That the client might fire the attorney before a contingency fee is earned. Paragraph 11 also specifically and expressly addresses the compensation that would be due in such circumstances, namely, a "reasonable fee" as further set forth in that paragraph. Indeed, it would be difficult to imagine a contractual provision that would be more closely tailored to the situation where a client fires its attorney before a judgment or settlement amount is recovered and a contingency fee becomes due. W&C's implied covenant claim, based on a theory that would forbid doing what the Fee Agreement expressly permits, fails as a matter of law. *See 21st Century Ins. Co. v. Super. Ct.*, 47 Cal. 4th 511, 526-27 (2009) ("We have [] held that one cannot invoke the implied covenant to prohibit conduct that a contract expressly allows."); *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349-50 (2000) (holding that an implied covenant "cannot be endowed with an existence independent of its contractual underpinnings. It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement."); *Carma Devs.*, 2 Cal. 4th at 374 ("As to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and

fair dealing can be implied which forbids such acts and conduct. And if the defendants were given the right to do what they did by the express provisions of the contract there can be no breach."); *Gerdlund v. Elec. Dispensers Int'l*, 190 Cal. App. 3d 263, 277 (Ct. App. 1987) (finding error when trial court applied implied covenant to override an express provision allowing employee to be terminated "at any time and for any reason").

This is not a situation where the Quechan Tribe's exercise of its termination rights under the Fee Agreement would somehow render illusory its performance due under the contract. Under W&C's Fee Agreement, even if the Quechan Tribe terminates W&C, the Tribe is responsible for its past monthly flat fee under Paragraph 4, as well as any "reasonable fee" under Paragraph 11. Indeed, the "reasonable fee" becomes due *only* in such circumstances of termination or withdrawal—such is the clear intent of the parties as reflected in the Fee Agreement.[4] *See Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 808 (Ct. App. 1995) ("[C]ourts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement."). Nor is this a situation in which

---

[4]    W&C argues that a client's *power* to terminate an attorney does not equal the *right* to terminate the attorney without liability. ECF No. 349 at 13. Whether this is true in the abstract, here W&C's Fee Agreement in Paragraph 11 expressly gave the Quechan Tribe both the power and the right to terminate W&C, and provided the conditions under which W&C would become entitled to a "reasonable fee."

W&C also argues that even if Paragraph 11 gave the Quechan Tribe the "right to terminate" W&C, the implied covenant constrains the exercise of that right. ECF No. 349 at 14. W&C relies on *Kelly v. Skytel Commc'ns, Inc.*, 32 F. App'x 283 (9th Cir. 2002), which is inapposite here. In that case, the Ninth Circuit determined that some provisions of an employee compensation agreement vested elements of discretion in the employer; but taking into account other provisions, the "agreement as a whole … does not allow the company unlimited discretion in awarding over-the-maximum commissions." *Id.* at 286. In contrast, under the Fee Agreement, the Quechan Tribe's discretion was not so limited.

W&C had already become entitled to a contingency fee, and termination was a mere pretext to avoid paying that amount already due and owing. [5] *See Guz*, 24 Cal. 4th at 218 n.18 (noting that "the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned"). An attorney asserting that negotiations with the State will conclude in two weeks is a far cry from having a signed compact with the State in hand.

W&C argues that, under the "law of the case" doctrine, this Court is barred from considering the Tribe's arguments related to W&C's implied covenant claim because they were already heard and decided by Judge Curiel earlier in the case. ECF No. 349 at 10-12. Under the "law of the case" doctrine, "a court is generally precluded from reconsidering

---

[5]   In this case, the Court has previously found as a matter of law that Quechan was not "entitled" to a contingency fee, and the event triggering the contingency fee had not occurred. ECF No. 89 at 14; *see* 4AC ¶ 107 (noting that new compact did not take effect until nearly seven months after W&C's termination). *See also Fracasse v. Brent*, 6 Cal. 3d 784, 792 (1972) ("[T]he cause of action to recover compensation for services rendered under a contingent fee contract does not accrue until the occurrence of the stated contingency."); *Jalai v. Root*, 109 Cal. App. 4th 1768, 1777 (Ct. App. 2003) ("No recovery, no fee, regardless of the work.").

For this reason, the other case law cited by W&C is distinguishable. *See McCollum v. XCare.net, Inc.*, 212 F. Supp. 2d 1142, 1151 (N.D. Cal. 2002) (finding triable issue of fact as to whether employee had in fact earned unpaid commissions); *Teague v. BioTelemetry, Inc.*, No. 16-cv-06527-TSH, 2018 U.S. Dist. LEXIS 183506 at *1, *37 (N.D. Cal. Oct. 25, 2018) (denying summary judgment on implied covenant claim by plaintiff who earned 3% commission on any revenues from new imaging contracts "whether or not he did anything to help bring them in"); *Wood v. Igate Techs., Inc.*, No. 3:15-CV-00799 JSW, 2015 WL 13345325, at *4 (N.D. Cal. Aug. 11, 2015) (denying motion to dismiss where "Plaintiff sufficiently allege[d] that Defendant breached [implied covenant] by terminating her employment to cheat her out of receiving her *earned* commissions that she was promised and *entitled* to receive") (emphasis added); *Fin. Tech. Partners L.P. v. FNX Ltd.*, No. C07-01298JSW, 2007 WL 1848045, at *2-3 (N.D. Cal. June 27, 2007) (denying motion to dismiss where contract provision was ambiguous as to whether it entitled plaintiff to minimum transaction fee regardless of when transaction occurred).

an issue that has already been decided by the same court, or a higher court in the identical case." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993). However, that doctrine applies "only when the issue in question was actually considered and decided by the first court." *United Steelworkers of Am. v. Ret. Income Plan for Hourly-Rated Emps. of ASARCO, Inc.*, 512 F.3d 555, 564 (9th Cir. 2008) (quoting *United States v. Cote*, 51 F.3d 178, 181 (9th Cir.1995)). Judge Curiel did not consider and decide the question presented here. As stated by the Court in denying the Quechan Tribe's motion to dismiss the implied covenant action, the Quechan Tribe's "only argument" was that the implied covenant claim in W&C's First Amended Complaint "is duplicative of W&C's breach of contract claim." ECF No. 89 at 18. The Court is not foreclosed from granting summary judgment for the reasons stated herein on W&C's implied covenant claim.

Accordingly, W&C's motion for summary judgment on its implied covenant claim is DENIED, and the Quechan Tribe's motion for summary judgment on W&C's implied covenant claim is GRANTED.

## C.   The Quechan Tribe's Counterclaim For Breach Of Fiduciary Duty

"The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach." *Stanley v. Richmond*, 35 Cal. App. 4th 1070, 1086 (Ct. App. 1995); *see also O'Neal v. Stanislaus Cnty. Employees' Ret. Assn.*, 8 Cal. App. 5th 1184 (Ct. App. 2017).

The Quechan Tribe's counterclaim for breach of fiduciary duty, as set forth in its operative pleading, alleges that W&C "fail[ed] to perform under the Fee Agreement in exchange for the $50,000/month flat fee that it collected," "dragg[ed] out negotiations to extend its representation and collect additional monthly fixed fee payments from the Tribe," and "made knowingly false representations to the Tribe that were designed to make the Tribe believe that W&C was effectively and diligently performing its duties when in reality it was not." ECF No. 231 at 41. Based on this articulation of its counterclaim, the Court denied W&C's motion for judgment on the pleadings and ruled that the Quechan Tribe had sufficiently alleged a breach. ECF No. 285 at 7.

The Quechan Tribe's theory of breach of fiduciary duty, as articulated in its summary judgment briefing, is entirely different and abandons the theory as pleaded. It is now based on W&C's allegedly false assertion, made during and prior to this lawsuit, that it is entitled to an approximately $6 million contingency fee under the Fee Agreement. ECF No. 327 at 23-25. The Quechan Tribe writes:

> W&C's contention that it is owed $6 million is a sham that it started peddling to the Tribe during its representation, and continued asserting in this litigation. This campaign to first trick, and now force, the Tribe into paying over $6 million dollars—on top of the $400,000 dollars the Tribe already paid W&C—for the minimal work it did is a clear breach of the fiduciary duty W&C owed the Tribe.

*Id.* at 23; *see also id.* at 25 ("W&C's statements to the Tribe were simply false, and an effort to trick the Tribe into paying it more than $6 million dollars. This was nothing less than an outrageous breach of an attorney's fiduciary duty to its client."). Citing paragraphs in the 4AC, the Quechan Tribe alleges that "W&C sought, and still seeks, to charge the Tribe 15% of $39,732,774." *Id.* at 24.

To the extent the Quechan Tribe's new theory is premised on the position W&C has taken in this litigation—that is, alleging that W&C breached its fiduciary duty by filing a complaint against its former client—that theory is barred by the litigation privilege. The litigation privilege "applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action." *Silberg v. Anderson*, 50 Cal. 3d 205, 216 (1990). The litigation privilege applies to breach of fiduciary duty actions. *See Jacob B. v. Cnty. of Shasta*, 40 Cal. 4th 948, 960 (2007) ("We have repeatedly stated that the litigation privilege bars all tort causes of action except malicious prosecution."); *Mireskandari v. Gallagher*, 59 Cal. App. 5th 346, 367 (Ct. App. 2020) (affirming demurrer where litigation privilege barred breach of fiduciary duty cause of action). The Quechan Tribe's theory is partly based on W&C's allegations in the 4AC in which "W&C sought, and still seeks, to charge the Tribe 15% of $39,732,774." ECF No.

17-CV-1436-RSH-DEB

327 at 24 (citing only to specific paragraphs in the 4AC). Those allegations were made in judicial proceedings, by a litigant to achieve the objects of the litigation, and they have some logical relation to the action. They are therefore protected by the litigation privilege.

In its opposition brief to W&C's summary judgment motion, the Quechan Tribe cites, as evidence of W&C's "attempt[] to mislead the Tribe into believing that Section 5 required it to pay to W&C 15% of $39,732,774," the April 14, 2017 email that Williams wrote to Quechan Tribe Vice President Jack discussing how a hypothetical contingency fee would be calculated. ECF No. 346 at 22 (citing ECF No. 327-4).[6] Although the Quechan Tribe characterizes this email as an "attempt[] to mislead," the email itself accurately quotes the relevant language of Paragraph 5; the Quechan Tribe offers no evidence of any attempt to mislead beyond merely arguing that the email's interpretation and application of Paragraph 5 is incorrect. Although not cited in W&C's briefing, its separately submitted statement of undisputed facts also references a June 19, 2017 email from Williams that is similar to the April 14, 2017 email. *See* ECF No. 327-1 ¶ 46 (citing ECF No. 327-6). That June 2017 email likewise quotes Paragraph 5 and contains no indication that the Tribe was misled. The Quechan Tribe offers no evidence whatsoever that it suffered any damages as a proximate result of either email.

Without evidence of causation or damages arising from a breach of fiduciary duty, there is no triable issue of material fact as to the Quechan Tribe's counterclaim for breach of fiduciary duty.[7] W&C's motion for summary judgment as to this counterclaim is

---

[6]   This email is consistent with the position taken by W&C in this litigation; but the email itself was not written in the context of litigation and would not be covered by the litigation privilege.

[7]   W&C also argues that the Tribe's new theory of breach of fiduciary duty should be precluded because "the Firm did not have the opportunity to conduct discovery on it." ECF No. 354 at 9. A district court need not consider an unpleaded theory for the first time at summary judgment unless the party gave adequate notice of the claim prior to the close of discovery. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000); *Pickern*

GRANTED, and the Quechan Tribe's motion for summary judgment as to this counterclaim is DENIED.

### D.   The Quechan Tribe's Counterclaim for Breach of Implied Covenant

The Quechan Tribe's implied covenant counterclaim against W&C alleges that W&C breached that covenant by "failing to perform under the Agreement in exchange for the $50,000/month flat fee that it collected and by dragging out negotiations in an effort to collect monthly fixed fee payments from the Tribe." ECF No. 231 at 42. W&C moves for summary judgment on this counterclaim.

Paragraph 4 of the Fee Agreement provided that the $50,000 monthly fee "is fixed and does not depend on the amount of work performed or the results obtained." ECF No. 329-7 ¶ 4. Of course, under Paragraph 11 of the Fee Agreement, the Quechan Tribe had the right to terminate W&C at any time. *Id.* ¶ 1. Together, these provisions expressly provided that during such time as the Fee Agreement is in effect and has not been terminated, the Quechan Tribe owed the monthly fee to W&C regardless of the amount of work W&C performed.

For the same reason that the Quechan Tribe is entitled to summary judgment on W&C's implied covenant claim, *see supra* Section IV.B., so too is W&C entitled to summary judgment on the Tribe's implied covenant counterclaim. The implied covenant cannot supersede an express provision of the contract requiring the Quechan Tribe to pay the monthly flat fee which "does not depend on the amount of work performed or the results obtained." ECF No. 329-7 ¶ 4; *see Carma*, 2 Cal. 4th at 374 (finding no authority for proposition that implied covenant can prohibit party from doing what is expressly permitted by agreement). The Quechan Tribe provides no substantive response to W&C's

*v. Pier I Imports (U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006); *Patel v. City of Long Beach*, 564 F. App'x. 881, 882 (9th Cir. 2014) The Quechan Tribe has not shown that it provided adequate notice. Its failure to plead this theory is also an adequate basis for the Court's summary judgment rulings as to this counterclaim.

argument. *See* ECF No. 347 at 21-24. W&C's motion for summary judgment on this counterclaim is GRANTED.

### E.   The Quechan Tribe's Counterclaims for Negligence and Breach of Contract

"To prevail in an action for negligence, the plaintiff must demonstrate that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach proximately caused the plaintiff's injuries." *John B. v. Super. Ct.*, 38 Cal. 4th 1177, 1188 (2006). A breach of contract claim requires proof of "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiffs." *Orcilla*, 244 Cal. App. 4th at 1004.

The Quechan Tribe's negligence and breach of contract counterclaims are each based on W&C's failure to hand over the case file after W&C was terminated. ECF No. 231 ¶¶ 73-82. Although W&C is the moving party, its briefing fails to address the substance of these two counterclaims. Nor does it provide any facts rebutting the Tribe's theory that W&C failed to provide the case file as requested. W&C has failed to meet its burden of production. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000) ("A moving party without the ultimate burden of persuasion at trial . . . has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment . . . If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything . . . In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything.").[8]

---

[8]   Without engaging the theory of negligence that the Quechan Tribe pleaded, W&C argues that summary judgment is warranted because the Quechan Tribe has failed to provide expert evidence in support of its malpractice claim. ECF No. 330-1 at 22-24. Even under the case on which W&C relies, expert testimony is not required "when the type of conduct required by the particular circumstances is within the knowledge of laymen." *Vaxiion Therapeutics, Inc. v. Foley & Lardner LLP*, 593 F. Supp. 2d 1153, 1165 (S.D. Cal. 2008); *see also Kelley v. Trunk*, 66 Cal. App. 4th 519, 523 (Ct. App. 1998) (noting expert testimony is required "except in cases where the negligence is obvious to laymen"). There

1   Accordingly, W&C's motion for summary judgment as to the Quechan Tribe's

2   counterclaims for negligence and breach of contract is DENIED. The Tribe shall be

3   allowed to proceed to trial on those counterclaims based on the theory it has pleaded of

4   W&C's failure to return the case file.

5   **E.   W&C's Rule 56(d) Request**

6   W&C requests in its opposition brief that the Court defer its summary judgment

7   ruling and re-open discovery, pursuant to Federal Rule of Civil Procedure, 56(d). ECF No.

8   349 at 7-10. It seeks discovery of "the Tribe's documents surrounding the negotiations and

9   execution of the [Fee Agreement] during the fall of 2016 to show that the Tribe did not

10  have a different understanding of the contingency fee provision of this Agreement, and if

11  it did, it never communicated this to anyone affiliated with [W&C]." ECF No. 349-1 ¶ 7;

12  *see also* ECF No. 349 at 9-10. It also requests that "discovery of [the Tribal Presidential

13  and Vice Presidential] e-mail accounts be allowed, but the Court should order it to be done

14  through an independent IT firm since counsel for Quechan proved to be wholly incapable

15  of complying with its discovery obligations." ECF No. 349 at 10.

16  Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for

17  specified reasons, it cannot present facts essential to justify its opposition, the court may:

18  (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or

19  declarations or to take discovery; or (3) issue any other appropriate order." The Rule

20  "provides a device for litigants to avoid summary judgment when they have not had

21  sufficient time to develop affirmative evidence." *United States v. Kitsap Physicians Serv.*,

22

23  _____

24  is no basis for ruling as a matter of law that a negligence claim based on failure to return a
    case file—an obligation clearly set forth in the Fee Agreement—requires expert testimony

25  to survive a summary judgment motion. In any case, it is apparent from W&C's brief that

26  its argument is *not* directed to the theory of negligence that the Quechan Tribe pleaded, but
    instead is directed to the theory that W&C committed malpractice in its conduct of compact

27  negotiations. ECF No. 330-1 at 23. W&C's moving papers fail to address in any

28  meaningful way the theory of negligence pleaded.

314 F.3d 995, 1000 (9th Cir. 2002). "The party seeking a Rule 56(d) continuance bears the burden of proffering facts sufficient to satisfy the requirements of 56(d)." *Martinez v. Columbia Sportswear USA Corp.*, 553 F. App'x 760, 761 (9th Cir. 2014). To obtain relief, W&C "must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." *Tatum v. City & Cnty. of S.F.*, 441 F.3d 1090, 1100 (9th Cir. 2006). "In ruling on a 56(d) motion, a district court considers: whether the movant had sufficient opportunity to conduct discovery[,] whether the movant was diligent[,] whether the information sought is based on mere speculation[,] and whether allowing additional discovery would preclude summary judgment." *Martinez*, 553 F. App'x at 761 (internal citations omitted).

W&C had more than a sufficient opportunity to conduct discovery, but it was not diligent. The parties held their Rule 26(f) conference on January 25, 2019. ECF No. 195 at 1. Fact discovery closed on June 12, 2020. ECF Nos. 232, 294 at 2. W&C did not take a single deposition. It did not, for example, depose key Quechan Tribal Councilmembers regarding the basic facts underlying the claims and counterclaims in the case.

W&C also fails to show what specific facts further discovery would reveal, and its request is based on speculation. W&C already sought all documents concerning the Quechan Tribe's hiring of W&C and the Fee Agreement. ECF No. 297-3 at 12-13. After the Quechan Tribe produced documents, W&C served interrogatories on the Tribe, seeking information regarding the sufficiency of its document collection from the Quechan Tribal Councilmembers. ECF No. 303 at 2-5. The Court previously ruled on the Parties' discovery dispute regarding those interrogatories. *See* ECF No. 303. The Court declines to use the summary judgment process to reopen that dispute.

Finally, W&C fails to meet its burden to demonstrate that the facts it seeks are "essential to justify its opposition." Fed. R. Civ. P. 56(d). Documents concerning the Quechan Tribe's understanding of the contingency fee, even if such documents exist and were not previously produced, are not essential to W&C opposing the Quechan Tribe's motion for summary judgment as to any claims or counterclaims. The only claim for which

the Court is granting summary judgment to the Quechan Tribe is on W&C's claim for breach of implied covenant; as set forth above, the Court's analysis of this claim does not depend on the Quechan Tribe's understanding of the contingency fee. The Quechan Tribe's subjective understanding of the contingency fee would be relevant to the Quechan Tribe's newly formulated counterclaim against W&C for breach of fiduciary duty, but the Court is granting summary judgment to *W&C* on that counterclaim. W&C's request is therefore DENIED.

## V.   THE ROSETTE MOTION AND W&C'S MOTION AGAINST THE ROSETTE DEFENDANTS [ECF Nos. 322, 328]

At issue in the Rosette Motion and W&C's Motion against the Rosette Defendants is the sole federal claim in this case: W&C's claim against the Rosette Defendants for false advertising under the Lanham Act, 15 U.S.C. § 1125(a), the third claim for relief in the 4AC. ECF No. 220. In short, W&C alleges that the Rosette Bio contained a single sentence (the Pauma Sentence) falsely overstating Rosette's results in the Pauma lawsuit. W&C claims that the false Pauma Sentence contained in the Rosette Bio deceived the Quechan Tribe, causing that Tribe to fire W&C and hire the Rosette Defendants instead to handle the Quechan Tribe's ongoing gaming compact negotiations with the State of California. W&C claims that, as a result of being fired due to the false Pauma Sentence, W&C lost out on over $6.3 million in legal fees from the Quechan Tribe.

In theory, a single false sentence in an attorney's web page biography, about results the attorney achieved in a past lawsuit, could so impress a client that it decides to hire the new attorney and fire its existing counsel based on the falsehood. But on the evidence presented, there can be no genuine dispute that that is not what happened here. As discussed further below, the Quechan Tribe's Tribal Council unanimously voted on June 26, 2017 to hire the Rosette Defendants to replace W&C. There was no discussion at that meeting of the Rosette Bio in general, or the Pauma Sentence in particular; no discussion of Rosette's role in the earlier Pauma litigation; and indeed, no discussion of litigation at all. Instead, the Tribal Council was impressed with Rosette's experience in negotiating compacts, and

was unhappy with W&C's work and with W&C's fees – and Rosette was offering his services for a small fraction of the fees being charged by W&C. Far from being deceived, the Quechan Tribe was and remains a satisfied client of the Rosette Defendants.

Because W&C has no evidence that the Pauma Sentence influenced the Quechan Tribe's decision – and because the evidence establishes that it did *not* influence that decision – its Lanham Act claim fails for lack of proximate causation. The Court grants the Rosette Motion and denies the W&C Motion against the Rosette Defendants.

### A.    Discussion

To establish liability under Section 43(a) of the Lanham Act, a plaintiff must prove: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

More recently, the Supreme Court has held that in order to "invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014). The Supreme Court emphasized that the plaintiff in that case could not "obtain relief without *evidence* of injury proximately caused by [the defendant's] alleged misrepresentations." *Id.* Likewise, the Ninth Circuit held in a Lanham Act false advertising case that "[s]ummary judgment is … proper when the plaintiff 'fail[s] to present any evidence of injury resulting from the defendants' deception.'" *VBS Dist., Inc. v. Nutrivita Labs., Inc.*, 811 Fed. App'x 1005, 1007 (9th Cir. 2020) (quoting *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989)); *see also Kurin, Inc. v.*

*Magnolia Med. Techs., Inc.*, 473 F. Supp. 3d 1117, 1144 (S.D. Cal. 2020) ("To prevail on a false advertising claim under the Lanham Act, a plaintiff must prove proximate cause, *i.e.*, injury 'flowing directly from the deception wrought by the defendant's advertising.'") (quoting *Lexmark*, 572 U.S. at 133).

On the record before the Court, there is a complete absence of evidence that the Pauma Sentence contained in the Rosette Bio caused the Quechan Tribe's decision to replace W&C. Nor is there any evidence that any member of the Tribal Council was even aware of the Pauma Sentence or the Rosette Bio at the time of that decision.

Instead, the only evidence – including sworn statements from the Tribal President and the other Tribal Councilmember who met with Rosette and thereafter participated in the Tribal Council's decision – was that neither the Pauma Sentence, nor the Rosette Bio, nor Rosette's experience in the Pauma litigation, played any role whatsoever in the decision. Instead, the decision was made based on the fact that Rosette was offering to do the legal work at a fraction of the cost being charged by W&C, and that the Tribal Council was impressed with Rosette's experience in negotiating compacts (not his litigation experience, which wasn't discussed). This decision was made after months of concern and discontent over W&C's work and the fees it charged.

Viewing all inferences drawn from the facts in the light most favorable to W&C, there is no genuine issue of material fact with respect to causation. W&C's claimed harm – being fired by the Quechan Tribe – was not caused by the Rosette Defendants. Conversely, the profits that the Rosette Defendants made as a result of being hired by the Quechan Tribe were not causally related to the alleged false advertisement, and were not ill-gotten gains.[9] Because of the unequivocal and uncontradicted evidence on the issue of causation, the Court declines to address the other elements of W&C's Lanham Act claim.

---

[9]   In addition to seeking approximately $19 million in trebled compensatory damages, W&C seeks "the disgorgement of any of the direct or indirect profits that [the Rosette Defendants] may have obtained as a result of the [Pauma Sentence in the Rosette Bio]."

33

In its briefing, W&C offers arguments of two kinds. The first involves speculation, based on purported evidence that does not in fact pertain to whether the Pauma Sentence caused the decision the Quechan Tribe actually made. The second involves legal argument that under various doctrines, in certain circumstances a defendant is "presumed" to have caused injury to the plaintiff. These arguments are addressed in turn.

### 1. *W&C's Factual Arguments*

W&C makes numerous factual arguments citing purported evidence. These arguments all suffer from a common problem: They are not evidence that the Pauma Sentence in the Rosette Bio caused the Quechan Tribe to hire the Rosette Defendants and fire W&C. The dots do not connect.

First, W&C cites declarations by President Escalanti and Councilmember White stating that during the June 16, 2017 Meeting, when Rosette was asked about his experience with compact negotiations, Rosette "indicated he had a great deal of experience," and that they "discussed the subject in further detail." ECF Nos. 328-15 ¶ 11; 328-16 ¶ 11. W&C argues that this statement is inconsistent with the later declarations by Escalanti and White that they did not discuss the Pauma litigation during that meeting. ECF No. 348 at 8. But these statements are not inconsistent. The participants in the meeting could discuss Rosette's experience with negotiating compacts without also discussing his

---

ECF No. 220 at 64. W&C's request for disgorgement suffers from the same problem as his request for damages: the only evidence before the Court on the summary judgment motions indicates that the hiring of the Rosette Defendants, and their consequent profits, were caused by factors other than the Quechan Tribe being deceived by the Pauma Sentence. Whether conceptualized in terms of losses to W&C or profits to the Rosette Defendants, on the undisputed facts presented here there is no compensation that Plaintiff is due. *See TrafficSchool.com, Inc. v. Edriver, Inc.*, 653 F.3d 820, 830 (9th Cir. 2011) (holding that district court committed no error in holding that the defendants violated the Lanham Act but declining to make an award of profits, where the plaintiffs "didn't produce any proof of past injury or causation").

role in the Pauma litigation.[10] As Escalanti and White have explained in their declarations, they were interested in negotiating a compact, not litigation. ECF Nos. 322-4 ¶ 18, 322-5 ¶ 18. Additionally, a discussion about the Pauma litigation, even if it had occurred, would not amount to Rosette providing or reading the Pauma Sentence to Escalanti and White. The statements cited by W&C are not evidence in support of W&C's theory of causation.

Second, W&C submits a declaration from Farrell Hoosava ("Hoosava"), a Councilmember of the Tonto Apache Tribe. ECF No. 348-3; 348 at 17-18. Hoosava states that "[m]ultiple copies of [a Rosette] brochure . . . had been sitting around the [Tonto Apache] Tribal Office, in the location where the [Tonto Apache] Tribal Council members regularly meet, for quite some time after it was provided to the [Tonto Apache] Tribal Council by Mr. Rosette, presumably in late 2016 based on the meeting minutes of Mr. Rosette's initial arrival at the [Tonto Apache] Tribe." *Id*. at 3-4. That brochure contained the Pauma Sentence. *Id*. at 14. The Hoosava Declaration does not attach the meeting minutes he cites, and there is no evidence that the Tonto Apache leaders read the brochure or the Pauma Sentence. More fundamentally, this declaration is not evidence that the Quechan Tribe (as opposed to the Tonto Apache Tribe) read the Pauma Sentence or used it in making their decision to fire W&C.

Third, W&C submits the reports of two of its experts, George Forman and Anthony Miranda. ECF No. 348 at 14-15. Forman opines that "tribal leaders tend to take lawyers' representations of their ability and accomplishments at face value." ECF No. 328-5 at 12. Miranda opines that a change in counsel during compact negotiations would be a "perceived weakness," and given the financial stakes involved, "most tribal leaders . . . would [] avoid a late change in counsel," unless they thought a deal was nearly complete

---

[10]    Rosette had extensive compact experience that was unrelated to his work for Pauma. *See* ECF Nos. 322-50 at 4-5 (Rosette Bio referencing successful negotiations of "dozens of gaming compacts"); 322-3 ¶ 5 (attesting that Rosette represented "at least two dozen tribes in successfully negotiating various compacts").

or a "new attorney somehow led them to believe that the benefits outweighed the risks." ECF No. 328-7 at 9-10. Both of these opinions are speculative, and neither is evidence that the Pauma Sentence in the Rosette Bio caused the Quechan Tribe to fire W&C.

Fourth, W&C points to an August 24, 2016 email reflecting internal discussion among Quechan Tribe officers regarding the *Pauma* litigation, *id*.; ECF No. 328-19, and argues that "the only reason [the June 16, 2017 Meeting] took place was because the [CEO] for Quechan's gaming facility found the news reports discussing the conclusion of the *Pauma* suit . . ." ECF No. 348 at 13. But Escalanti, White, and Rosette – the only attendees at the June 16, 2017 Meeting – are nowhere on the email. Nor does the email anywhere mention Rosette or his firm's involvement with the Pauma litigation. Even if this email did so mention, it still would not establish that the *Rosette Bio* had any causal relationship whatsoever to W&C's termination.

Much of W&C's argument does not rest on facts at all, but instead on an articulation of suspicion. For example, W&C argues that it simply "flies in the face of logic" to suggest that the Quechan Tribe "just magically ended up in a face-to-face meeting with the only other law firm in the world that had any involvement in the *Pauma* suit the morning *after* learning that negotiations settling a revenue sharing dispute under an amended gaming company would be completed in two weeks' time," and that Rosette "said nothing whatsoever about the [] *Pauma* suit." ECF No. 348 at 13; *see also* ECF Nos. 238-39 to 328-41. This speculative argument is not evidence. *Estrella v. Brandt*, 682 F.2d 814, 819–20 (9th Cir. 1982) ("Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid summary judgment."). Additionally, the evidence does not reveal anything magical about the appearance of Rosette at the June 16, 2017 Meeting. It was the Tonto Apache Tribe, not Rosette, who had reached out to the Quechan Tribe to discuss gaming compact negotiations. ECF Nos. 322-26; 322-37; 322-28; 322-39; 52-2 ¶¶ 10-15. It is unsurprising that the Tonto Apache Tribe would suggest Rosette – the Tonto Apache Tribe's own counsel – to the Quechan Tribe. More to the point, W&C's articulation of its suspicion fails to connect the dots for purposes

of the pending summary judgment motions. Even if there was indeed a discussion at the June 16, 2017 Meeting about the Pauma litigation, which every participant in that meeting denies, what then? This would be a far cry from suggesting that the Pauma Sentence in the Rosette Bio – the alleged false advertisement for purposes of W&C's Lanham Act claim – actually caused the Quechan Tribe's decision. W&C makes numerous similar arguments which the Court declines to address sentence-by-sentence; each suffers from the same defect, that mere suspicion is not evidence of causation.

Finally, W&C alleges that the Rosette Defendants have engaged in unethical conduct, which is "relevant to the authenticity of the declarations filed in this matter," ECF No. 348 at 17, including: attempting to negotiate a settlement on behalf of the Pauma Band without authority from that Tribe, representing tribal clients that were involved in "armed standoff[s]," and using "bogus tribal law" to remove unfavorable Tonto Apache Councilmembers. *Id*. at 16-18. Whatever relevance these allegations have to the authenticity of Rosette's declaration (if any at all), they say nothing about the credibility of the declarations from other witnesses, including Escalanti and White, and they do nothing to mask W&C's complete failure to marshal facts establishing a causal connection between the Rosette Bio and W&C's termination.[11]

## 2.   *W&C's Legal Arguments*

As stated above, the Supreme Court has held that in order to "invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014). The Rosette Defendants' summary judgment brief leads its

---

[11]   The Court twice struck allegations relating to this conduct after W&C re-introduced them in revisions of the complaint, ECF Nos. 217 at 27; 285 at 19-20. It warned W&C that its "continued failure to abide by Court orders may warrant remedial measures in the future." ECF No. 285 at 19-20.

argument with the *Lexmark* case. ECF No. 321 at 10. Nowhere in W&C's extensive briefing does it cite or mention this case, or attempt to distinguish it. ECF Nos. 328, 348, 352.

In the absence of evidence of causation, W&C argues that, under various legal doctrines, causation can be "presumed" in certain circumstances. At the outset, it is worth noting what a presumption is. A presumption generally affects the burden of production, not the burden of persuasion, which remains at all times with W&C. Fed. R. Evid. 301 ("In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally."); *see also Hawaii Stevedores, Inc. v. Ogawa*, 608 F.3d 642, 650 (9th Cir. 2010) (noting that, despite statutory presumption in workers' compensation context, "burden of persuasion remains on the disability claimant throughout the administrative process"); *Sumner v. San Diego Urb. League, Inc.*, 681 F.2d 1140, 1142 (9th Cir. 1982) (noting in employment discrimination context that, despite presumption, "defendant does not take on a burden of persuasion"). A Lanham Act presumption is also rebuttable. *See Appliance Recycling Centers of Am., Inc. v. JACO Env't, Inc.*, 378 F. App'x 652, 655 (9th Cir. 2010) (noting that, under Lanham Act, "[d]eliberately false comparative claims give rise to a rebuttable presumption of actual deception"). "Under the so-called 'bursting bubble' approach to presumptions, a presumption disappears where rebuttal evidence is presented." *Nunley v. City of Los Angeles*, 52 F.3d 792, 796 (9th Cir. 1995).

Importantly, regardless of to whom a presumption assigns the burden of production, in this case, the evidence establishes that there is no genuine dispute of material fact on the issue of causation. W&C's legal arguments do not apply to change day into night – to transform the evidence that the Pauma Sentence did not cause the Pauma Tribe's decision into a legal fiction that it did.

W&C first contends that there are "two major presumptions affecting a false advertising claim": If a statement is literally false or is done with an intent to deceive, actual

deception and materiality are presumed. ECF No. 328-1 at 6. W&C claims that where either of these two triggers applies – literal falsity or intent to deceive – the burden shifts to the Defendants "to come forward and disprove causation or materiality," and "to show by a preponderance of the evidence that either the statement was not material or the cause of harm." *Id.* at 6-7.

The cases cited by W&C, however, do not support applying a presumption to the requirement of causation. *See AECOM Energy & Constr., Inc. v. Ripley*, 348 F. Supp. 3d 1038, 1056 (C.D. Cal. 2018), *rev'd sub nom. AECOM Energy & Constr., Inc. v. Morrison Knudsen Corp.*, 851 F. App'x 20 (9th Cir. 2021) (finding that literal falsity or intent to deceive create presumption of "actual deception and materiality" only); *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040 (9th Cir. 1986) (affirming application of presumption of deception or reliance in a case of "deliberately false comparative claims"); *Youngevity Int'l v. Smith*, 2019 WL 2918161, at *3 (S.D. Cal. July 5, 2019) (applying presumption of only deception and materiality based on literal falsity); *Nutrition Distrib. LLC v. PEP Rsch.*, LLC, 2019 WL 652391, at *5 (S.D. Cal. Feb. 15, 2019) (discussing presumption of deception and materiality based on literal falsity, and possibly injury where plaintiff and defendant are direct competitors and defendant's misrepresentation has a tendency to mislead consumers, but noting *Lexmark*'s separate requirement that plaintiff prove proximate causation); *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1411 (9th Cir. 1993), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016) (never analyzing proximate cause element or any presumptions); *San Diego County Credit Union v. Citizens Equity*, 360 F. Supp. 3d 1039, 1052 (S.D. Cal. 2019) (discussing presumption of only deception and materiality when a statement is literally false); *Upper Deck Co. v. Panini Am., Inc.*, 469 F. Supp. 3d 963, 976 (S.D. Cal. 2020) (noting presumption of deception only based on literal falsity or intent to deceive); *ITEX Corp. v. Glob. Links Corp.*, 90 F. Supp. 3d 1158, 1171 (D. Nev. 2015) (same); *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 69 F. Supp. 3d 175, 216 n.16 (D.D.C. 2014) ("[N]o such presumption [of materiality based on literal falsity] has

been applied in this Circuit, and the Court finds no reason to do so for the first time here");
*Fourtek Teknoloji Ve Guvenlik Sistemleri, A.S. v. GSI-Orient, Inc.*, No. 19-CV-3555, 2020
WL 2527754 (E.D.N.Y. Feb. 26, 2020) (never mentioning presumptions); *Pizza Hut, Inc.
v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000) (discussing presumption only
of deception when literal falsity is established); *In-N-Out Burgers v. Smashburger IP
Holder LLC*, No. SACV 17-1474, 2019 WL 1431904, at *7 (C.D. Cal. Feb. 6, 2019)
(noting presumption only of deception and reliance on the basis of literal or deliberate
falsity).

W&C cites a single District of Oregon decision for the proposition that a finding of
literal falsity creates a "[a] domino effect" that requires a presumption for all the remaining
elements in its Lanham Act claim. ECF No. 348 at 4; *Sys., Inc., v. Sierra Media, Inc.*, 903
F. Supp. 2d 1120, 1132 (D. Or. 2012). But that decision is limited to false comparative
advertisements. *See id.* ("With respect to false *comparative* advertising, a court's summary
judgment analysis largely turns on element one.") (emphasis added); *see also Southland
Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1146 (9th Cir. 1997) (recognizing a
presumption of deception and reliance where "Defendants['] comparative advertisement
claims were deliberately false"); *Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, No. 16-
CV-3059-BAS-AGS, 2020 WL 4747724, at *9 (S.D. Cal. Aug. 17, 2020), *aff'd.*, 2021 WL
4622504 (9th Cir. Oct. 7, 2021) ("The presumption is inapplicable when, as here, the
advertising does not directly compare defendant's and plaintiff's products.") (internal
quotation marks omitted). The Rosette Bio here nowhere mentions W&C and the Pauma
Sentence does not compare Rosette's and W&C's services. Nor does W&C provide any
legal support for treating the Pauma Sentence as comparative in nature.

Even if W&C's "two major presumptions" did apply to causation, there would be
another problem: According to W&C, the result of those presumptions is to shift the burden
to the Rosette Defendants. Whether the Rosette Defendants are required to shoulder the
burden of proof (as W&C contends) or merely the burden of production, they have met
both burdens. The only evidence before the Court on the summary judgment briefing is

1  that the Pauma Sentence was not the cause of the Quechan Tribe's decision to replace
2  W&C.

3      Later in its brief, W&C advances a third presumption, arguing that the expenditure
4  of substantial funds by a competitor to deceive customers and influence their purchasing
5  decisions also serves to "shift the burden to disprove causation on to the Rosette
6  Defendants." ECF No. 328-1 at 16. This third presumption has problems similar to the first
7  two. The one case W&C cites, *Southland Sod Farms*, 108 F. 3d at 1146, recognizes a
8  presumption only of deception and reliance, not causation. Even if the presumption applies
9  to shift the burden, the Rosette Defendants have met that burden on their summary
10  judgment motion.

11      W&C then asks the Court to apply a fourth presumption, citing an Eastern District
12  of Pennsylvania case, *Larry Pitt & Assocs. v. Lundy Law LLP*, 294 F. Supp. 3d 329, 342
13  (E.D. Pa. 2018), for the proposition that the Court may presume causation based on the
14  "chronology of events or the temporal correlation between the advertisement and the
15  alleged harm." ECF No. 328-1 at 17. That case does not support W&C's theory. Instead,
16  the case said in passing that "inferences of causation based solely on the chronology of
17  events, where the record contains . . . other equally credible theories of causation, are not
18  reasonable inferences." *Larry Pitt & Assocs.*, 294 F. Supp. 3d at 342. In fact, that court
19  granted summary judgment against the plaintiff because the plaintiff's "evidence d[id] not
20  support a reasonable inference of causation." *Id.*

21      W&C also contends that a fifth presumption applies in the context of false
22  advertising done by an attorney: To the extent an attorney is responsible for advertising
23  that is "literally false or just misleading," that "gives rise[] to an irrebuttable presumption
24  of causation, if not materiality as well." ECF No. 328-1 at 18. W&C relies on a case from
25  the Eastern District of Pennsylvania, *Bennett v. Zydron*, No. 2:17cv92, 2017 U.S. Dist.
26  Lexis 154539 (E.D. Cal. Aug. 17, 2017). That case does not support W&C's theory. The
27  court denied the defendant's Rule 12(b)(6) motion to dismiss, holding that the plaintiff had
28  properly alleged the elements of Lanham Act false advertising. *Id.* at *20-22. Quoting

*Lexmark*, the court concluded that although the plaintiffs had alleged an adequate basis to proceed, they "cannot obtain relief without evidence of injury proximately caused by [defendants'] alleged misrepresentations." *Id.* at *22.

### 3. *Injunctive Relief*

The Parties do not, in their summary judgment briefing, address the availability of injunctive relief on W&C's Lanham Act claim. Nonetheless, because W&C requests an injunction in the 4AC, the Court addresses that remedy here. The requirement that a plaintiff in a false advertising case prove proximate causation applies whether the plaintiff is seeking damages, injunctive relief, or both – as was the plaintiff in *Lexmark*. *Lexmark*, 572 U.S. at 123; *see also City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1042 (9th Cir. 2021) (requiring a showing of proximate cause in claims for injunctive relief under the Federal Housing Act, and stating that "*Lexmark* uniformly applied the proximate cause test without making any distinction between the damages and injunctive relief claims.").

For the reasons stated above, the problem with W&C's Lanham Act claim is not its inability to quantify its losses with sufficient certainty, but rather its inability to establish causation. W&C's claim focuses on one factual allegation: that the Pauma Sentence in the Rosette Bio caused the Quechan Tribe to fire W&C and hire the Rosette Defendants.[12] W&C's summary judgment briefing does not seek to expand this allegation to other business that W&C has allegedly lost in the past or will lose in the future. In seeking summary judgment, the remedy W&C has requested is that of damages: W&C's alleged

---

[12] It was based on this theory that the Court, at an earlier stage of the litigation, denied the Rosette Defendants' motion to dismiss. ECF No. 89 at 24-25 (Order dated June 7, 2018) ("The FAC states that Pauma's success in its compact litigation was the motivation behind Quechan hiring W&C. It is thus plausible that if Quechan officials were misled by Rosette's statement discussed above, they came to believe that it was Rosette, not Williams or Cochrane, who would give them the best chance at success at their negotiations with California.").

1   $6.3 million in lost profits, plus any profits made by the Rosette Defendants as determined

2   by an accounting, all multiplied by three. ECF No. 328-1 at 22-23.

3         *Lexmark* noted that "[e]ven when a plaintiff cannot quantify its losses with sufficient

4   certainty to recover damages, it may still be entitled to injunctive relief under § 1116(a)

5   (assuming it can prove a likelihood of future injury) …." 572 U.S. at 135. With respect to

6   seeking an injunction, in addition to failing *Lexmark*'s requirement of proving proximate

7   cause, W&C fails *Lexmark*'s requirement of proving likelihood of future injury. W&C's

8   summary judgment briefing does not articulate a factual basis for believing that it faces

9   future injury, and has not marshalled evidence sufficient to create a triable issue of material

10  fact. *See Southland Sod Farms*, 108 F.3d at 1139 (requiring a plaintiff to prove that it "has

11  been or *is likely* to be injured as a result of the false statement"); *Appliance Recycling

12  Centers of Am., Inc. v. JACO Env't, Inc.*, 378 F. App'x 652, 655 (9th Cir. 2010) ("Proof of

13  actual injury is necessary to obtain damages under the Lanham Act, but a competitor need

14  not prove injury when suing to enjoin conduct that violates the Act . . . A plaintiff who

15  shows that it is *likely to be injured* as a result of the false statement may be eligible

16  for injunctive relief.") (internal citations and quotation marks omitted); *Kurin*, 473 F. Supp.

17  3d at 1135 (denying summary judgment motion seeking injunctive relief where plaintiff

18  "has provided no evidence" of likelihood of future injury).

19        In addition, in order to obtain injunctive relief, W&C would need to satisfy all the

20  other required elements for a permanent injunction: "(1) that it has suffered an irreparable

21  injury; (2) that remedies available at law, such as monetary damages, are inadequate to

22  compensate for that injury; (3) that, considering the balance of hardships between the

23  plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

24  would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*,

25  547 U.S. 388, 391 (2006). W&C has not offered evidence satisfying these requirements

26  either. *See Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 310 F. Supp. 3d 1089, 1128

27  (S.D. Cal. 2018) (denying permanent injunction where counter-plaintiff "d[id] not cite to

28  any evidence to show it will suffer irreparable harm . . ."); *Kurin*, 473 F. Supp. 3d at 1135

(denying summary judgment motion seeking injunctive relief where plaintiff "has provided no evidence" to satisfy the required *eBay* elements for a permanent injunction); *Quidel*, 2020 WL 4747724, at \*11 (granting summary judgment in favor of defendant where plaintiff sought permanent injunctive relief and plaintiff's predicted "loss of sales [was] monetary loss," which failed to establish inadequacy of legal remedies). The Rosette Motion is therefore GRANTED, and the W&C Motion against the Rosette Defendants is DENIED.

### B.   W&C's Rule 56(d) Request

W&C again requests that in the event the Court is inclined to grant summary judgment to the Rosette Defendants, that it instead defer ruling on the motion and allow W&C to re-open discovery. ECF No. 348 at 6. Specifically, W&C wants to do two things. First, W&C wants an independent IT firm to conduct "file searches" of the Quechuan Tribe and the Rosette firm to see whether Rosette "raised his supposed role in the *Pauma* case directly with representatives for Quechan as a basis for taking over the compact negotiations work." ECF No. 348 at 9. W&C does not trust that Defendants made the required searches of their own records during discovery. *Id.* Second, W&C wants the Court to engage in an *in camera* review of all the documents listed on 110 pages of privilege logs "to determine if any of them mention either the Pauma tribe or the *Pauma* case." *Id.* at 9-10.

The Court again finds that W&C had a sufficient opportunity to conduct discovery, but that W&C was not diligent. The fact discovery window closed on June 12, 2020. ECF Nos. 232, 294 at 2. Given the W&C's Lanham Act theory – that the Pauma Sentence in the Rosette Bio deceived the Quechan Tribal Council into firing W&C – it would have been logical to depose one or more of the six members of the Tribal Council who made the decision to fire W&C. W&C did not do so. In fact, W&C did not take a single deposition of anyone.

The Court also finds that W&C's requested additional discovery (which W&C contemplates will actually be conducted by an independent IT firm and the Court itself) is

based on speculation. W&C already sought documents concerning the Pauma Band that reflect an intention to interfere with W&C's business, but those documents apparently did not exist. ECF 274 at 1-5 (Joint motion for determination of discovery dispute dated Mar. 18, 2020). The assigned U.S. Magistrate Judge found that the Rosette Defendants' compliance with this Court's order to produce those documents was satisfactory. ECF No. 284 ¶ 3 (Order dated Apr. 17, 2020). As to the privilege logs, the Magistrate Judge already heard and decided W&C's extensive objections to the Defendants' privilege logs. ECF No. 284 ¶¶ 1-2. Nor does W&C provide any basis to infer that the documents on the privilege logs would establish that Rosette "raised his supposed role in the *Pauma* case" with the Quechan Tribe. Williams admits that "[n]either log contained entries for the purported Rosette meetings on June 16 or 19 of 2017." ECF No. 348-2 ¶ 6.

Finally, the Court finds that W&C has not provided any reason to believe that the additional discovery sought would preclude summary judgment. Documents showing that Rosette "raised his supposed role in the *Pauma* case directly with representatives for Quechan," ECF No. 348 at 9, would not demonstrate that the Pauma Sentence caused W&C's termination. The Court denies W&C's request.

## VI.   MOTIONS TO EXCLUDE AND TO STRIKE [ECF Nos. 332, 336]

The Rosette Defendants filed a motion to exclude the expert reports or declarations of Bryan Garner, George Forman, and Anthony Miranda, that W&C had filed in connection with its summary judgment briefing. ECF No. 332. W&C filed a motion to strike that motion. ECF No. 336.

The Court's ruling granting summary judgment to the Rosette Defendants does not rely on the report of the Rosette Defendants' expert, and to the extent they are relevant has given full consideration to the reports of W&C's experts. The motions to exclude and to strike are therefore moot.[13]

––––––––––––––––––––

[13]   Likewise, W&C's brief in support of its summary judgment motion against the Quechan Tribe includes a request to exclude the expert report of Stephen Hart, ECF 330-1

## VII.  CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** that:

1.  The Quechan Motion, ECF No. 329, is **GRANTED** as to W&C's claim for breach of the implied covenant of good faith and fair dealing and is otherwise **DENIED**;

2.  The W&C Motion against the Quechan Tribe, ECF No. 330, is **GRANTED** as to the Quechan Tribe's counterclaims for breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty, and is otherwise **DENIED**;

3.  The Rosette Motion, ECF No. 322, is **GRANTED**;

4.  The W&C Motion against the Rosette Defendants, ECF No. 328, is **DENIED**;

5.  The Rosette Defendants' motion to exclude Garner, Forman, and Miranda, ECF No. 332, is **DENIED** as moot; and

6.  W&C's motion to strike the Rosette Defendants' motion to exclude, ECF No. 336, is **DENIED** as moot.

**IT IS SO ORDERED**.

Dated:  September 27, 2022

_Robert S Huie_
_____
Hon. Robert S. Huie
United States District Judge

---

at 24-25; and W&C's brief in support of its summary judgment motion against the Rosette Defendants includes a request to exclude the expert report of Lynda Shely. ECF No. 328-1 at 23-24. The Court does not rely in this Order on either of these reports, and W&C's requests are denied as moot.